IVY T. NGO (249860)
ngoi@fdazar.com
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone:     (303) 757-3300
Facsimile:      (720) 213-5131

David Bricker (158896)
dbricker@tenlaw.com
**THORNTON LAW FIRM LLP**
9430 West Olympic Boulevard, Suite 400
Beverly Hills, California
Telephone: (310) 282-8676

*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ADAMAS PHARMACEUTICALS, INC., GREGORY T. WENT, AND ALFRED G. MERRIWEATHER <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Ali Zaidi ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation a review and analysis of: (a) regulatory filings made by Adamas Pharmaceuticals, Inc. ("Adamas" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by Adamas; and (c) other publicly available information concerning Adamas.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the publicly-traded securities of Adamas between August 8, 2017 and September 30, 2019, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Adamas is a commercial stage pharmaceutical company that specializes in developing drug treatment therapies for chronic neurologic disorders.

3.      Adamas's primary product is GOCOVRI, an extended-release formulation of amantadine (formerly referred to as ADS-5102), which has been approved by the U.S. Food and Drug Administration for the treatment of levodopa-induced dyskinesia.

4.      Amantadine is available as an inexpensive generic drug in multiple instant-release formulations and is approved for the treatment of dyskinesia.

5.      After the market closed on March 4, 2019, during Adamas's Q4 2018 conference call with investors, Adamas walked back its previous prescription growth estimates for GOCOVRI, warned of a continued slow-down in GOCOVRI prescriptions, and refused to make further predictions about GOCOVRI's ability to achieve a sizeable market share.

6.      On this news, Adamas's stock fell $3.99 per share, or 32.84%, to close at $8.16 per share on March 5, 2019.

7.      On September 30, 2019, Bank of America/Merrill Lynch analyst Tazeen Ahmad lowered its rating for Adamas shares to "Underperform" noting "existing overhangs for ADMS: (1)

Gocovri coverage: a number of national formularies exclude Gocovri. We expect reimbursement hurdles in MSWI space especially with generic Ampyra launch."

8.     On this news, Adamas shares fell a further 42.83% from $7.05 per share on September 26 to $4.03 by October 3, 2019.

9.     Throughout the Class Period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects.

10.     Specifically, Defendants made materially false and misleading statements about: (1) managed care's acceptance of GOCOVRI; (2) the breadth of insurer coverage for GOCOVRI prescriptions; and (3) the impact of the Company's commercialization efforts.

11.     In addition, Defendants failed to disclose: (1) that health insurers were excluding GOCOVRI from their prescription formularies or requiring patients to use "step therapy" - i.e., making patients try immediate-release amantadine prior to covering GOCOVRI; (2) that the rapid increase in physicians prescribing GOCOVRI during the Class Period was not due to its efficacy; and (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about Adamas's business, operations, and prospects, were materially false and misleading at all relevant times.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud

3

or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company maintains offices in this Judicial District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.     Plaintiff Ali Zaidi, as set forth in the accompanying certification, incorporated by reference herein, purchased Adamas securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

18.     Defendant Adamas is incorporated in Delaware and maintains offices in Emeryville, California. Adamas's shares trade on the NASDAQ Stock Market ("NASDAQ") under the symbol "ADMS." The Company's Annual Report filed with the SEC on March 4, 2019 states that 27,448,990 shares of Adamas were issued and outstanding as of February 24, 2019.

19.     Defendant Gregory T. Went ("Went"), the Chief Executive Officer ("CEO") of Adamas and the chairman of its Board of Directors since its inception, stepped down during the Class Period on September 15, 2019.

20.     Defendant Alfred G. Merriweather ("Merriweather") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Adamas.

21.     Defendants Went and Merriweather are collectively referred to hereinafter as the "Individual Defendants." Adamas and the Individual Defendants are collectively referred to herein as "Defendants."

22.     Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about Adamas's business, operations, operational trends, controls, markets, and present and future business prospects via internal corporate documents,

4

conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof.

23.    It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, controls, growth, products and present and future business prospects as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

24.    As officers and controlling persons of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products, markets, management, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.    The Individual Defendants, because of their positions of control and authority as Officers and Directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance or had the ability or opportunity to prevent their

issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

26.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Adamas shares by disseminating materially false and misleading statements and/or concealing material adverse facts.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

27.     Defendants' false and misleading statements are set within a complicated interplay between pharmaceutical manufacturers and pharmaceutical payors – health insurers and other managed care entities. These payors seek to minimize their spending on pharmaceuticals in order to lower overall healthcare costs. The primary tool payors use to contain costs is formulary placement. A payor's formulary is the list of all pharmaceuticals that the payor will provide coverage for. The formulary will also provide patient co-pay amounts depending on the tier the pharmaceutical is placed on. For instance, a generic drug might have a $5 co-pay while a newer brand name drug might have a $50 co-pay.

28.     Payors use other cost containment strategies such as Prior Authorization and Step Therapy. In Prior Authorization, the payor will not cover the cost of the drug unless a patient's doctor first contacts the payor and describes the specific set of conditions that makes the drug therapeutically appropriate. Step Therapy is an even more restrictive version of Prior Authorization where a payor makes a patient try a cheaper therapeutic alternative prior to approving a more expensive drug.

29.     As relevant here, once GOCOVRI was approved by the FDA, payors immediately began excluding the drug from their formularies and requiring patients to undergo Step Therapy through immediate-release amantadine prior to authorizing payment for GOCOVRI. Company management, however, hid this highly relevant fact from the market and made misleading statements that Step Therapy was not occurring.

30.     The Class Period starts on August 8, 2017. On that day, Adamas published a press release announcing its financial results for the second quarter ended June 30, 2017. The Company stated in relevant part:

> "This is a very exciting time for Adamas, as we are potentially at the cusp of *transitioning from a company focused on product development to a commercial entity marketing its own medicines*," stated Gregory T. Went, Ph.D., Chairman and Chief Executive Officer of Adamas Pharmaceuticals, Inc. "We look forward to hearing from the FDA regarding the potential approval of ADS-5102 for the treatment of levodopa-induced dyskinesia in people with Parkinson's disease. If approved, *ADS-5102 will be the first and only approved medicine for this indication*." The New Drug Application for ADS-5102 has a PDUFA date of August 24, 2017.
>
> **Recent Achievements**
>
> - Presented expanded analysis from the ADS-5102 (amantadine extended release capsules) open-label study at the 21st International Congress of Parkinson's Disease and Movement Disorders (MDS) meeting showing tolerability and durability out to 88 weeks. The new subgroup analyses also showed that *patients previously treated with immediate-release amantadine, who switched directly to ADS-5102, experienced a statistically significant benefit from ADS-5102 comparable to patients not previously treated with ADS-5102*.
>
> - Published ADS-5102 Phase 3 EASE LID clinical trial data in JAMA Neurology online. The data demonstrated that *ADS-5102 significantly reduced both dyskinesia and OFF time at six months in Parkinson's disease patients with levodopa-induced dyskinesia*.

31.     This first statement regarding ADS-5102 (GOCOVRI) indications is materially false and misleading because immediate-release amantadine is also "indicated in the treatment of parkinsonism and drug-induced extrapyramidal reactions."[1] Drug-induced extrapyramidal reactions are "commonly referred to as drug-induced movement disorders"[2] such as dyskinesia.  In other words, immediate release amantadine is approved for the same indication as GOCOVRI, despite the Company's statements to the contrary.  The Defendants knew or should have known that clinicians would not change their prescribing habits without incredibly significant clinical benefits.  The Defendants knew or should have known that insurers would place GOCOVRI on a

---

[1] *See e.g.* https://dailymed.nlm.nih.gov/dailymed/getFile.cfm?setid=4157d9a7-a53f-4dde-b051-fe3e9a674913&type=pdf&name=4157d9a7-a53f-4dde-b051-fe3e9a674913 (Label for Amantadine IR capsules); https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/016023s041,018101s016lbl.pdf (Label for Amantadine IR Syrup).

[2] "Extrapyramidal Symptoms (EPS)" Ryan S. D'Souza; W M. Hooten, Mayo Clinic, https://www.ncbi.nlm.nih.gov/books/NBK534115/

disadvantaged formulary tier or exclude it entirely where an effective generic medication exists to treat the same condition.

32.    That same day, August 8, 2017, Adamas held a quarterly earnings conference call with investors. During that call CEO Gregory Went stated:

> This is a pivotal time here at Adamas, as *we are at the cusp of transitioning to a commercial entity that delivers its medicines to people in need*.

33.    As a result of Defendants' false and misleading statements, analysts, including at Cowen and Company, understood that Adamas's "Commercialization Plans Are Well Under Way" because "ADS-5102 Is Nicely Differentiated And Addresses An Unmet Need" and believed that the Company was "Nearing A Significant Inflection In Valuation."

34.    Also during the August 8, 2017 call, Chief Operating Officer ("COO") Richard King answered a question from analyst David Amsellem regarding the likelihood of insurers requiring a step-through of the related generic product prior to accessing GOCOVRI:

> [**Amsellem**:] And my question here is what are your thoughts on the extent to which payers are going to force patients to step through immediate-release amantadine in order to get access to 5102? Is that something that you're planning for?
>
> * * *
>
> [**King**:] We've obviously done a fair amount of assessment of ADS-5102 with physicians and with payers. The profile for the product, as I mentioned in the comments, resonates extremely well. And they don't see this profile as really having much to do with the amantadine IR profile that they – that's currently on the marketplace. *They recognize that amantadine IR is not approved for this indication. And that if ADS-5102 is approved for this indication and with the clinical dataset that is available to support it, that there's no anticipation of requiring a step-through of amantadine IR to get to 5102*.

35.    Upon the approval of GOCOVRI in August 2017, insurers would have begun evaluating whether to cover the drug.  One health management company, Centene Corp., issued early guidance.  Centene operates health plans that cover over 12 million individuals in 29 states. On October 10, 2017, Centene issued its coverage guidelines, requiring patients to take immediate-release amantadine for two weeks and either fail to resolve symptoms or experience clinically significant adverse effects prior to covering GOCOVRI. This is referred to as "step therapy" or a "step through."

36.     On November 2, 2017, Adamas published a press release announcing its financial results for the third quarter ended September 30, 2017, detailing GOCOVRI's FDA approval:

**Recent Achievements**

**GOCOVRI™**

- ***Received approval by the U.S. Food and Drug Administration (FDA) for GOCOVRI (amantadine) extended release capsules (previously ADS-5102) for treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, on August 24, 2017. GOCOVRI is the first and only medicine approved by the FDA for this indication.***

- Earned seven-years of orphan drug exclusivity from the FDA for GOCOVRI, which will continue through August 24, 2024.

- Provided access to GOCOVRI for physicians and patients through its distribution network and GOCOVRI Onboard, Adamas' patient services support program.

- Hired six regional sales leaders to manage its planned 59 neurology account specialist sales force.

- Published GOCOVRI (ADS-5102) Phase 3 EASE LID 2 open-label clinical trial data in the *Journal of Parkinson's Disease*. The data demonstrated tolerability and durability out to 88 weeks and a subgroup analysis showed that patients previously having undergone Deep Brain Stimulation also received benefit from ADS-5102.

- Published GOCOVRI (ADS-5102) Phase 3 EASE LID 3 clinical trial data in *Movement Disorders*. The data demonstrated that ADS-5102 significantly reduced both dyskinesia and OFF time at three months in Parkinson's disease patients with dyskinesia on levodopa-based therapy and confirmed the results from the EASE LID study, as published in *JAMA Neurology*, which showed the significant reduction in dyskinesia and OFF time for 6 months.

37.     That same day, November 2, 2017, Adamas held a quarterly earnings conference call with investors. During that call, Went followed up on his previous statements regarding the Company's commercialization, stating:

> ***With the upcoming commercial launch of GOCOVRI, we are fulfilling our corporate strategy of building a multi-product company that discovers, develops and commercialize[s] medicines to treat chronic neurologic disorders.***

38.     During that call COO Richard King also detailed doctors' extensive use of GOCOVRI, as well as insurers' support for GOCOVRI, stating in relevant part:

> **[King**:] Reacting to this product profile presented in market research, ***physicians reported they would use GOCOVRI and*** [sic] ***a little over half of their***

9

*dyskinesia patients. They specify that they would use it in place of all three of the satisfactory dyskinesia management strategies that they currently use, as well as in patients who are currently not being treated at all for the dyskinesia.*

\* \* \*

[**King**:] We have also begun outreach to payers and have scheduled clinical presentation with seven out of the top 10 payers in the country for later this year. The payers are particularly interest[ed] in GOCOVRI as a first indication medicine for dyskinesia patients who they recognize are in need. *We anticipate broad payer coverage for GOCOVRI. And will grow over the cost* [sic] *of 2018.*

39.   King made this statement despite Centene's prior coverage guidance.

40.   In January 2018, Prime Therapeutics ("Prime"), a large pharmaceutical benefits management company aligned with the BlueCross BlueShield networks, issued their coverage requirements for GOCOVRI.[3] Prime covers over 28 million individuals in the United States. Prime required doctors to secure prior authorization and required patients to try immediate-release amantadine before it would cover GOCOVRI.

41.   On February 22, 2018, Adamas held a quarterly earnings conference call with investors. During that call, COO Richard King again detailed insurer support for GOCOVRI, stating:

As you know, our discussions with payers regarding GOCOVRI are in full swing. *Clinical presentations have been well received, and these payers are moving forward in their process to determine guidelines for reimbursement. It is important to note that even in situations in which payers have not published reimbursement criteria, we are routinely seeing patients receive reimbursement for GOCOVRI.* We continue to engage payers to streamline the processing of claims for GOCOVRI.

42.   During that call COO Richard King also discussed the Company's limited use of free trial programs for GOCOVRI:

GOCOVRI Onboard is working well to process receipt prescriptions, with the majority of patients in both commercial and Medicare coverage gaining access to GOCOVRI. *We are not providing drug samples, and we do not have a free trial program through our specialty pharmacy. We do have a QuickStart Program, whereby qualified patients can receive a free 14-day supply if the benefits verification process is taking more than five days. To date, a majority of patients have not utilized this program*.

To close. Although it's very early, we are pleased with the access we are seeing in patients and the progress of our launch. We look forward to reporting our first quarter of sales in May.

---

[3] Gocovri™ (amantadine) Prior Authorization with Quantity Limit Program Summary, BlueCross BlueShield of Alabama,
https://providers.bcbsal.org/portal/documents/10226/299839/Gocovri+%28amantadine%29+Prior+Authorization+with+Quantity+Limit+Program+Summary/138d633f-c6e0-373e-9b90-465f1ff3c3b4?version=1.0

**CLASS ACTION COMPLAINT**

43.     Also, during that call, Merriweather detailed the QuickStart program and its relationship to the aforementioned insurer support for GOCOVRI:

> **[Lugo:]** For the majority of patients who do not need a QuickStart product, is that because the reimbursement is going relatively smooth for them? And can you give us some kind of defining feature of these patients?"

> **[Merriweather**:] ***It is, because it's going relatively smoothly, and we're getting to a point where we get reimbursement before we need to move towards a QuickStart.*** I'm not sure I can give you any more characteristic than that other than, there's no - I can't say, they're all commercial. They're all Medicare. We're seeing across all different characteristics of the payer environment, and there's no particular patient environment that I can point you even at this stage.

44.     Also during that call, Went answered a question from analyst Ken Cacciatore, and in doing so further assured investors of insurer support for GOCOVRI, and specifically downplayed the impact of prior authorization:

> **[Cacciatore**:] So can you give us a sense, again, on some of these plans, whether there's been prior authorizations or not, and how we're dealing with that? And maybe, again, drilling down on some of the discussions on where the coverage actually stands in terms of covered lives, if you can give us any sense. . . .

> **[Went**:] Let me deal first with the managed care side of things, Ken. The - I think people do traditionally think very much of coverage or not coverage. And that's a black-and-white situation. What I think is really important to realize is that black-and-white situation, we're not experiencing that black-and-white situation. We do have formal coverage. I'm going to define formal coverage for you here as a situation in which plans have made a decision, a public decision as to how they will handle GOCOVRI and manage approval of GOCOVRI prescriptions, when presented. That's – we'll call that coverage for the sake of argument. And there are good number of plans that have actually made that decision and presented those conclusions publicly and then at handling the GOCOVRI prescriptions according to that pathway**.**

> ***But we are seeing, across all of the payers that we've addressed and dealt with, responsiveness, regardless of whether they have published set of criteria or not to manage GOCOVRI. And yes, in some cases, that results in the prior authorization request, which then leads to, ultimately, prescription fulfillment. But we're seeing prescription fulfillment across most every plan. There's very few that are not fulfilling. We have a handful of filed decisions where people are not fulfilling prescriptions. But in general, people are all fulfilling, whether they have a published plan or not.***

45.     In March 2018, Kaiser Permanente ("Kaiser"), a large west coast health insurer, issued their coverage requirements for GOCOVRI.[4]  Kaiser covers over 12 million patients.  Kaiser, too, required step therapy through amantadine immediate release prior to covering GOCOVRI.

---

[4] "CRITERIA FOR DRUG COVERAGE Amantadine ER (Gocovri TM)" Kaiser Permanente, https://healthy.kaiserpermanente.org/static/health/pdfs/formulary/nw/Gocovri.pdf

11

46.     On May 3, 2018, Adamas held a quarterly earnings conference call with investors. During that call COO Richard King again dismissed the impact of prior authorization on insurer support for GOCOVRI, explaining that only "some" plans call for prior authorization:

> *Today we've seen support from payers regarding GOCOVRI prescription reimbursement, a process which is handled by our GOCOVRI onboard program. The significant majority of prescriptions submitted are being reimbursed with less than 2% of prescriptions received to-date ultimately rejected as not covered.*
>
> While specific criteria for coverage may not yet be available and/or may differ slightly from plan to plan in the majority of cases and across all peer segments, coverage is supported if the patient has a diagnosis of Parkinson's disease dyskinesia is consistent with labeling. *Some plans also ask the physician to confirm that the patient has a medical history with amantadine IR.*

47.     During that call COO Richard King answered a question from analyst David Amsellem, and in doing so further downplayed the impact of prior authorization:

> **[Amsellem**:] Can I ask you similar [sic] related question it may be a bit of a backward looking question but are you surprised regarding the extent to which you are seeing patient having to be step [sic] through immediate release amantadine. And I guess maybe another way of asking this is, as you look to broaden the patient audience and presumably get access to patients who are naïve to amantadine. Does that inform in any way your willingness to contract more aggressively?
>
> **[King**:] So, let me just try and pickup on the first point you mentioned stepping through IR you mentioned*, I'm not aware of any plan that has a hard step for us through IR amantadine. I am aware of plans that have – I'm interested as to whether IR amantadine has been tried before in patients and has been shown to be ineffective or not well-tolerated, we've seen that. But I'm unaware of any plan which is a formal step through IR amantadine.*

48.     On August 2, 2018, Adamas held a quarterly earnings conference call with investors. During that call COO Richard King answered a question from analyst Josh Schimmer regarding physician trial periods for GOCOVRI and its relevance for supposedly showing positive feedback from GOCOVRI patients:

> **[Schimmer**:] Since the last update, it looks like the number of prescribers of GOCOVRI have grown by about 75%. The scrips per prescribers have grown by about 20%. So how do you think about those drivers going forward, the ability to sustain kind of 30 new prescribers per week? And I think some of your commentary suggested that maybe the growth in prescriptions per prescriber may be slowing just based on the delay in getting physicians to hear back from patients. So how effective do you think your efforts will be in at least sustaining this pace of growth of prescriptions per prescriber?

* * *

1

2   **[King**:] Certainly. So Josh, the number of prescribers, getting to 1,000 prescribers within 6 months, I feel, is a significant success. And you're right, that you could do the -- the math is about 30 or so per week. Inevitably, that's going to slow down. It has to at some stage. But certainly, I don't imagine that's going to stop. It will just slow down gradually over the course of time. In terms of the prescriptions per prescriber, it has increased. ***But the important thing, as I mentioned on the call, we still see a number of physicians who are in a trial mode for GOCOVRI. We do think that, that largely reflects, that when we present the GOCOVRI data to them, they're surprised by the dramatic affects that GOCOVRI has on dyskinesia and OFF and ON functional time, particularly in comparison to immediate release amantadine. And because of this, they decide that they want to prove to themselves, in their own hands, that the clinical benefits that we describe for GOCOVRI are as strong as our Phase III data illustrates. And for that reason, they trial the product. And the good news is that the feedback from patients is strong and generally complementary of the effects that we see in Phase III. And then as physicians move through that trial period, they become regular and continuous prescribers of GOCOVRI at that stage. It's our challenge to get them through that trial period as quickly as possible***. And that's our focus for the second half of the year.

11   49.   During that call, COO Richard King also answered a question from analyst Myles

12   Minter, explaining the 3-month cycle for GOCOVRI:

13   **[Minter**:] Myles Minter on for Tim Lugo. My question is just about more granularity, about the time lag that you see with patients that aren't following up as quickly as you'd like. How long does it take from going away from the doc with a scrip to potentially seeing them coming back*?*

15   **[King**:] So I'll take that one. ***It's variable. But we know that the standard cycle of a patient seeing a physician is a 3-month cycle. So we would also like to see that accelerated and get feedback to the physician faster than that 3-month cycle.***

18   50.   On that same call, in response to a question from analyst Ken Cacciatore, Went

19   detailed the declining use of the QuickStart program, stating:

20   And with regard to -- just back to Greg. With patients not paying, Ken, we're not -- as Alf commented in his part of the call, ***the Quick Start, which was used in the beginning, is being used less and less, as patients become familiar and begin to put multiple patients onboard, and gain more confidence in GOCOVRI Onboard. And the percentage who are being supported by our patient assistance program is also very small.***

24   51.   During that call, Merriweather answered a question from analyst Josh Schimmer,

25   again detailing insurer support for GOCOVRI:

26   **[Schimme**r:] Great. And then last question, maybe you could just discuss the status of reimbursement, characterize the ease of access to GOCOVRI, percent of plans with prior auths and as well what you're seeing from IR or sustained IR amantadine versions in terms of their positioning on formularies as well.

28

**[Merriweather:]** So very little on sustained IR. I like that characterization actually. ***In terms of our position on formularies, we continue to see current plans that have issued now formal guidance on how to process reimbursement for GOCOVRI. That continues to happen. There are still a number of plans that have not published those formal criteria yet. But in the overwhelming majority of cases, we're seeing the vast majority of plans give us good support for reimbursement for GOCOVRI approval for reimbursement. And they're processing the prescription very, very quickly***, which is clinging [sic] to us.

52.     On November 1, 2018, Adamas held a quarterly earnings conference call with investors. During that call Went touted:

We continue to believe that GOCOVRI is an extremely important drug and ***that we can reach 25% to 30% peak penetration in the Parkinson's disease dyskinesia population***.

53.     Went answered a question from analyst Serge Belanger, dismissing the impact of the potential competitor drug OSMOLEX:

**[Belanger**:] No, no worries. So I just have a question. Do you expect any increase in the formulary coverage starting next year? And do you expect the launch of OSMOLEX to affect your future coverage in 2019 and going forward? Thanks.

**[Went**:] Thanks for the question. We don't really expect any change in the formulary coverage. As you know, we're not a formally covered, but ***we are reimbursed and the majority of prescriptions are we [sic] getting reimbursed in a really good period of time***. We have heard a bit about OSMOLEX coming to the market. That product has a very different value proposition being once daily in the morning equivalent version of amantadine IR. I think it will be – and it has a separate indication, it is supported only by pharmacokinetic data and not by any efficacy data since as you recall the original label for Symmetrel does not contain a significant data package to promote to. ***And so I think it will be largely independent from us in terms of how it ends up being reimbursed and what its challenges will be and whether or not it gets folded into something that physicians are encouraged to try as some plans have done with amantadine IR, I think remains to be seen. But again, we are – we've been facing that market reality since, well before we launched the product and are pleased with how that is playing out right now in terms of any kind of a prior attestation of use of amantadine IR.***

54.     On that same call, Merriweather answered a question from analyst Ken Cacciatore, updating on the Company's use of the QuickStart program:

**[Merriweather**:] Yes, Ken. We're not wanted to get into sort of the specifics of NRx levels and so on. But what we're trying to convey was that internal term, we use generally consistent. So, really, we're saying that we're in that very same range quarter-to-quarter. That was the tone that we were trying to get a general sense that you're trying to convey. ***With regard to the question was sort of free drug, I think that was the gist of your question. And we continue to see a minority of prescriptions, patients coming through the Quick Start program. So, it's there as part of our armor if you like, but not necessarily, a significant element. It's not trivial, but it's certainly not significant.***

55.     During that same call Went answered a question from analyst Josh Schimmer, detailing the impact of physicians in trial phase on the Company's growth, and discussing GOCOVRI tolerability:

> **[Schimmer**:] One more question if I may, it looks like in the third quarter, you've now switched to growth driven, much more extensively by scripts per prescriber as opposed to the incremental number of prescribers, which seems to be slowing a little bit. Maybe as you look at the trends throughout the quarter, you can give us a sense of what you expect going forward as the primary driver. And whether this – either of these growth trajectories are at some kind of a steady state?

> **[Went**:] Josh, it's Greg, let me take that on. What we're seeing in my remarks on the call, it really kind of reflects the sort of specialty, subspecialty nature of this market. *We're getting very, very strong adoption in the movement disorders we've become adopted in with a greater 5% penetrance in that percentage, which means a relatively high volume prescription there. And then if you look back all the way down to the general neurologist, it's still in a smaller population and in more of a trialing phase.*

> *So with the efforts we're going to take during the quarter and in next quarter, it really is about aligning sales execution and incentives into those movement disorder centers, the simplification of the messaging and then the educating on the breadth of patients present there and your other message, which was how to properly dose them, we think is what's going to drive the business forward. And what that's going to lead to is, we believe greater penetrance in these very large centers and where we have neurologists, who have eligible patients. It's a smaller practice and we look forward to seeing that occur as well. But clearly for the next several quarters, the focus is on the larger centers and deepening the prescribing behavior per physician.*

56.     The statements referenced above in ¶¶27-55 were materially false and misleading when made because specifically, Defendants made materially false and misleading statements about and omitted material information concerning: (1) the tolerability and persistence rates of GOCOVRI as correlated with the number of prescriptions; (2) the breadth of insurer coverage for GOCOVRI prescriptions; and (3) the impact of the Company's commercialization efforts.

57.     In addition, Defendants failed to disclose and omitted: (1) the importance of GOCOVRI's price on market penetration; (2) that the rapid increase in physicians prescribing GOCOVRI during the Class Period was not due to its efficacy; and (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about Adamas's business, operations, and prospects, were materially false and misleading at all relevant times.

**THE TRUTH IS REVEALED**

58.    The truth was partially revealed on October 5, 2018, November 1, 2018, and March 4, 2019, and fully disclosed on September 30, 2019.

59.    On October 5, 2018, an analyst at Bank of America/Merrill Lynch downgraded Adamas, revealing that his survey of doctors showed a higher-than-expected dropout rate for GOCOVRI due to the high cost and difficulty in securing prior authorizations from payers. Not only were GOCOVRI dropouts occurring, but doctors may have been looking at other options and the drug's value proposition was not fully appreciated so the level of doctors' excitement was still in the middle range and it was taking longer than expected to become a "go-to-drug." Furthermore, there was looming competition from the pending IPO of Osmotica Pharmaceuticals, which planned to launch an extended release formulation of amantadine, branded as OSMOLEX, in direct competition with GOCOVRI.

60.    The Bank of America/Merrill Lynch survey cast doubt on GOCOVRI's ability to achieve a sizable market share, providing:

> We conducted doctor checks with active prescribers who treat a total ~l.5k pts with Parkinson's disease (PD), of which ~700 are on generic amantadine IR and ~140 are on Gocovri. While this is a subset of total applicable physicians, their views are consistent with previous checks we have conducted this year. While respondents recognize the benefits of Gocovri over generic in reducing "off" time, better tolerability and lower pill burden (QD vs 3x a day), they note the hurdles to get patients on Gocovri due to cost (WAC [Wholesale Acquisition Cost]: $28.5k vs 2k for IR). **The majority cited the need for prior authorization requests, with half noting requirement for prior treatment of generic.** Doctors expect a moderate increase in Gocovri use in the next six months . . . . Gocovri is restricted on several formularies in 2019 (Express Scripts, CVS, United, Optum) but we note management in the past has stated to us that this is not in their view a deterrent to uptake.

61.    On this news, Adamas's stock fell 8% on modestly higher volume in early trading on October 5, 2018 and closed at $17.83 that day.

62.    After the markets closed on November 1, 2018, Adamas released its Q3 2018 earnings results, disclosing that the rate of new prescribers was not as robust as expected. Specifically, Adamas informed investors that the Company expected just 2% market penetration by the end of 2019, up from the then-expected 1% penetration by the end of 2018. In addition, Defendants failed

to confirm that the FDA's approval of OSMOLEX would not impact GOCOVRI's sales in the long run.

63.    On this news, Adamas's stock fell $5.08 per share, or 29.94%, to close at $11.89 per share on November 2, 2018.

64.    On March 4, 2019, in Adamas's Q4 2018 conference call with investors, Adamas walked back its previous growth estimates for GOCOVRI, warned of a continued slow-down in prescriptions, and refused to make further predictions about GOCOVRI's ability to achieve a sizeable market share. In greater part, Defendants Went and Merriweather disclosed:

> **[Went:]** We believe that advancing prescriber education and positive experience of GOCOVRI through these and our other commercial efforts will drive the use of GOCOVRI going forward. We are excited about the potential of these approaches which are live in the field today. Of course, we are still relatively early in our launch, actively learning, and we expect it to take a few quarters for these improved execution efforts to take effect.
>
> During this time, our results may continue to fluctuate quarter-to-quarter. *As we look back on the latter part of 2018, we specifically note a slowing in the rate of total prescription growth quarter-to-quarter, which we see continuing into the first part of 2019.* While seasonal phenomenon maybe playing some role in this, *we are focused on the improved execution previously mentioned in order to expand GOCOVRI use and adoption in 2019 and beyond.*
>
> * * *
>
> **[Merriweather:]** Let me know [sic] turn to our outlook for 2019. We expect continued total prescription and revenue growth for the year based upon the benefits of GOCOVRI and the commercial initiatives to drive demand that Greg noted. *Because we're still very early in the commercialization of GOCOVRI, we're not providing prescription or revenue guidance in 2019.*

65.    During this conference call Went disclosed, in relevant part:

> *[W]e have evolved our Quick Start program into a broader free trial program to allow more prescribers and patients to readily experience firsthand the benefits of GOCOVRI.* This option will also potentially encourage trial of GOCOVRI in a broader array of patient [sic] with dyskinesia consistent with the population in which GOCOVRI was studied.

66.    During this conference call, Went answered a question by analyst David Amsellem from Piper Jaffray regarding GOCOVRI prescriptions:

> **[Amsellem:]** Thanks. So, just a clarification question on 2019 and the outlook for GOCOVRI, so should I take your comments to mean that you are backing off your prior guidance that prescriptions or share would double? And I guess the second part of the question is, I guess, in the absence of guidance, are there any kind of guideposts that you could point us to regarding the trajectory of the product, particularly

considering that you had provided certain clear markers regarding expectations last year? How should we think about that? Thanks.

[**Went**:] David, thanks for your question. Listen, as we started with the third quarter call and reiterated today, our goal right now is to drive growth in TRx through the strategies I just described. We then implemented a number of these in the last few weeks at our National Sales Meeting, as we came off the call and really spend the fourth quarter developing the materials and the newer tools that we have rolled out to the field. So they are now all live in the field.

*As we look back from the end of last year, as I mentioned on the call, we did see a slower rate of increase in the TRx, and given that trend in the end of the fourth quarter and going into the first quarter, are not going provide [sic] any specific TRx guidance this year, or revenue guidance.* So, we will continue to drive that growth through spreading the GOCOVRI message, broadening the GOCOVRI message around, and it's typical early -- still in launch, we are really not in a position right now to guide quarter-over-quarter for this year.

67.    Also during this conference call, Went answered a follow-up question by analyst Tim Lugo from William Blair regarding the growth of GOCOVRI sales:

[**Lugo**:] …. And sequentially should we be expecting growth throughout the year in GOCOVRI in terms of just net product sales?

[**Went**:] Tim, what we think the current trajectory, which is, it's just very difficult to model as you know, four quarters into a launch. We are pleased with where it is overall. *The strategies we are implying right now are specifically intended to drive TRx and adoption into the areas where we are seeing lesser performance.* We are very enthused by what we are seeing in some really core areas as adoption has occurred both broadly and deeply, but we still need to make progress, and we believe the tactics we are laying out are going to allow us to grow. And we will be monitoring it and reporting it to you very carefully as the next couple of quarters proceed.

68.    Also during this conference call, Went answered a question by analyst Tazeen Ahman from Bank of America:

[**Ahmad**:] Okay. And then wanted to get your thoughts also on how you're thinking about the overall ramp. So if you're not giving guidance on specific numbers on script gross, where do you think you can guide us to where the growth could be? Is the growth going to come from doctors that have already been prescribing it or are you looking more to growth from new prescribers?

[**Went**:] Great question that kind of ties into Ken's. Where we're seeing adoption that we're pleased with in those areas, what we're seeing is both a breadth of adoption in an area, as well as a dept of adoption, and physicians are continuing to prescribe GOCOVRI and we see them deepening that as is common in the launch of a new product. *Where we need to be successful with the efforts that we're laying out that we've just introduced to the field in the last couple of weeks is in areas where the adoption is not as deep, where the number of experiences the physicians have had are not as significant as I'd like to be.* And we believe from what we've seen that the market is every bit as big as we thought it was, based upon how the top areas are performing, but *in those areas where we're not seeing that performance, we really need to get, you know, if you will, the fire started, get that deepening beginning, so that physicians and then neighboring physicians can see the impact that GOCOVRI*

*can have both on their reduction in dyskinesia, but their ability to manage these patients more effectively through the improvements and reduction and OFF time as well*.

69.    Also during this conference call, Defendant Went disclosed, in relevant part:

[**Went**:] We see as a proof point, *our learning from 2018 that we needed to better educate prescribers about the appropriate use of GOCOVRI and the availability of the 68.5 milligram starting dose for patients with moderate to severe renal impairment. Many PD patients are elderly and less [thus?] more likely to have renal impairment. Such patients not properly dosed on GOCOVRI could have, and in some cases, have had negative experiences on the medicine with the occurrence of adverse events*. Accordingly, we armed our field team with specific messages around appropriate dosing, and added the 68.5 milligram dose as a reduced dosing option on our treatment front. We are already seeing a positive impact of this approved education.

70.    Analysts' reaction to these disclosures reflected their surprise. David Amsellem of Piper Jaffray lowered his price target for Adamas and stated:

With Adamas refining its marketing message on GOCOVRI, in addition to starting a sampling program over one year following the launch, it is fair to wonder if management has misread both its physician audience and the payer landscape.

71.    Irina Koffler of Mizuho downgraded Adamas to underperform and stated that she believed the launch to be going, "'even worse than we thought.'"

72.    In reaction to the disclosures contained in the earnings report and conference call, Cowen analyst Ken Cacciatore downgraded Adamas to perform from outperform, and cut the target price to $15 from $30 on March 5, 2019, stating in a post-earnings research note for investors that:

"Disclosure that Gocovri Rx trajectory is flattening and that growth for the next several quarters is expected to be erratic is concerning this early in the launch. Reflecting management's removal of their previous qualitative guidance – and therefore lowering the growth trajectory – our corresponding DCF declines to where a downgrade is warranted."

Cacciatore further stated that, management's own caution, "'now raises many questions that we simply can't answer'" and "We rarely see a company back away from guidance so quickly."

73.    Needham analyst Serge Belanger downgraded Adamas to hold on March 5, 2019, stating: "'[W]e are heading to the sidelines, downgrading ADMS to a Hold, until we have better visibility that issues can be addressed and Gocovri's launch ramp can re-accelerate.'"

74.    Similarly, Bank of America/Merrill Lynch analyst Tazeen Ahmad wrote:

[**T**]he expansion of free drug to 28 day (prev. 14-day) in our view is a signal of weak demand consistent with our prior doctor checks which led to our initial round of estimate revisions last fall. Recall, doctors we surveyed reported higher-

**than-expected dropouts with only early signs of appreciation of its time release biology**. We continue to view Gocovri sales cautiously as: (i) competitor Osmotica recently initiated full commercial launch of Osmolex (also extended release amantadine) which is priced approx. 3x lower than Gocovri ($2.6K vs ~$1K/mo); (ii) **coverage remains scarce with several national formularies excluding Gocovri in 2019**; and (iii) ongoing litigations against Sandoz and Osmotica. In our model, we update 4Q financials including cash and share count.

We lower our peak penetration to 15% (prev. 18.5%) and adjust ramp rate in LID. We also adjust sales ramp for the follow-on indication in MS given struggling sales in lead indication and concerns on whether mgmt will be able to execute commercially. We now model Gocovri peak sales of $208mn (prev. $258mn) in LID (contributing $1/sh in our PO) in 2025. ADMS is expected to report topline results from ongoing ph 3 ADS-4101 study in multiple sclerosis walking impairment (MSWI) in 2H19. We reiterate our Neutral rating on ADMS shares with lower PO $10 (prev. $17), but note failure of the MS indication to advance would lead to meaningful downside to our current estimates.

75.    On this news, Adamas's stock fell $3.99 per share, or 32.84%, to close at $8.16 per share on March 5, 2019.

76.    A "Seeking Alpha" article posted on March 11, 2019 stated:

[T]he selling in afterhours coincided with the analyst Q&A session during the company conference call. **Analysts appeared to be confused with the company's new changes in their commercial plan for GOCOVRI and the company's lack of revenue guidance for 2019. It seemed as if every analyst was asking for some clarification on these issues, but the Adamas management answered with vague responses. The management's opposition to offering specifics appeared to frustrate the analysts…** I started to imagine the analyst downgrades in retaliation to the management's stonewalling.

The numbers did provide me confidence that GOCOVRI is making headway, but the vibe from the management had me wondering if they are preparing for a lackluster 2019. **It was only a couple of months ago that the company's goal was to double its market penetration with GOCOVRI. Now… no targets, benchmarks, or specifics.**

77.    On March 10th Mizuho analyst Irena Koffler issued a report maintaining the underperform rating and stating: "'We reiterate our Underperform rating and $5 PT after **disappointing sequential trends for Gocovri**, a topline miss, and delay of a pipeline program.'"

78.    On May 27, 2019, a "Seeking Alpha" article reflecting on Adamas's stock performance was posted stating:

What's My Verdict? Adamas was Overrated… I have to confess, I feel as if I continued to buy into the hype after GOCOVRI approval. I felt as if the company had a product that was destined to be prescribed to a large number of PD patients that were starved for a drug like GOCOVRI. **Throw in street analysts projecting $75 per share and I feel a bit hoodwinked as ADMS investor. The company has not been able to**

**grab a large piece of their market and hasn't done a great job admitting their initial outlook was too optimistic for a patient population that has so many challenges.** So, I would say ADMS was overrated for the past year and change.

79.     During the next quarters, Adamas focused on securing a follow-on indication for GOCOVRI for multiple sclerosis with walking impairment ("MSWI").

80.     During a May 9, 2019 earnings call, CEO Went stated the company had "2 immediate priorities: GOCOVRI's launch in Parkinson's and the MS program."

81.     On September 27, 2019, the Evaluate Group reported on a preliminary study involving GOCOVRI for MS and stated:

> Gocovri could find it tough to gain market share. Adamas's initial focus will be patients who have discontinued [competitor drug] Ampyra; around half of the patients in Inroads are Ampyra failures. But in order to sell really well, Gocovri will need to show markedly better efficacy than Ampyra. In one of its pivotal trials, the Acorda drug improved walking speed by 14% versus 8% with placebo at nine weeks.
>
> **The omens are not good**: phase II data with Gocovri show a similar 17% improvement in walking speed at four weeks, although the usual caveats about cross-trial comparisons apply.

82.     Finally, on September 30, 2019, Bank of America/Merrill Lynch analyst Tazeen Ahmad lowered its rating for Adamas shares to "Underperform" noting:

> We lower our rating for ADMS shares to Underperform with new PO of $5 (from $9). We make our changes based on our recent doctor checks ahead of ph 3 INROADS data in MSWI (see page 3). Key points: (1) While efficacy data of '5102 in ph 2 is in line with current SoC (Ampyra), doctors are more confident about the safety profile of Ampyra (despite incidence of seizures as a concern) compared to '5102. Doctors continue to expect Ampyra as an earlier line tx especially with cheaper generic Ampyra available; (2) although doctors already use amantadine primarily for fatigue, its use in MSWI is of novel idea for doctors and will need time to gain comfort;…
>
> We note existing overhangs for ADMS: (1) **Gocovri coverage: a number of national formularies exclude Gocovri. We expect reimbursement hurdles in MSWI space especially with generic Ampyra launch**; (2) ongoing litigations against Sandoz and Osmotica; (3) Osmolex launch: (priced approx. 3x lower than Gocovri) poses competitive risk; and (4) New mgmt team: ADMS will have a new CEO, CFO and CCO, to take over the launch in LID and oversee the pipeline. While we agree change in this situation can be good, we also note new CEO Neil McFarlane and CCO Vijay Shreedhar have prev. success, though they will also be on learning curves for the time being. A successful new indication or acceleration of LID sales would lead to upside in our ests.

83.     On this news, Adamas shares fell a further 42.83% from $7.05 per share on September 26 to $4.03 by October 3, 2019.

84.     The market for Adamas shares was open, well-developed and efficient at all relevant times. As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, Adamas shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Adamas shares relying upon the integrity of the market price of Adamas shares and market information relating to Adamas, and have been damaged thereby.

85.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Adamas shares, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

86.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Adamas's business and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Adamas, its business and financial prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

87.     The statutory safe harbor provided by the Private Securities Litigation Reform Act of 1995 ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the

statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

88. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection – at least with respect to the part of the statement that refers to the present.

89. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

90. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants made materially false and/or misleading statements about: (1) the tolerability and persistence rates of GOCOVRI as correlated with the number of prescriptions; (2) the breadth of insurer coverage for GOCOVRI prescriptions; and (3) the impact of the Company's commercialization efforts. In addition, Defendants failed to disclose: (1) the importance of GOCOVRI's price on market penetration; (2) that the rapid increase in physicians prescribing GOCOVRI during the Class Period was not due to its efficacy; and (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about Adamas's business, operations, and prospects, were materially false and misleading at all relevant times.

91.     Defendants are also liable for false or misleading statements that may be construed as forward-looking because at the time each of those purportedly forward-looking statements were made, the particular speaker knew that the particular statement was false, or by reason of what the speaker failed to note, was materially false or misleading, or that each such statement was authorized or approved by an Adamas executive officer who actually knew that each statement was false or misleading when made.

**ADDITIONAL SCIENTER ALLEGATIONS**

92.     As alleged herein, the Individual Defendants acted with scienter in that each knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Adamas, their control over, and receipt of modification of Adamas's allegedly materially misleading misstatements and their associations with the Company which made them privy to confidential proprietary information concerning Adamas, participated in the fraudulent scheme alleged herein.

93.     The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive level positions with Adamas, the Individual Defendants controlled the contents of Adamas's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants were responsible

24

for the accuracy of Adamas's corporate statements and are, therefore, responsible and liable for the representations contained therein.

94.    In addition, Defendants' scienter is enhanced by the Sarbanes-Oxley mandated certifications of the Individual Defendants, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Adamas was made known to them and that the Company's disclosure-related controls were operating effectively.

95.    The scienter of the Individual Defendants who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of Adamas, can be imputed to Adamas.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

96.    At all relevant times, the market for Adamas's shares was an efficient market for the following reasons, among others:

(a)    Adamas's shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    Adamas had more than 27 million shares outstanding as of February 24, 2019. During the Class Period, millions of shares of Adamas were traded on a daily basis, demonstrating a very active and broad market for Adamas shares and permitting a very strong presumption of an efficient market;

(c)    Adamas filed periodic public reports with the SEC as a regulated issuer;

(d)    Adamas regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Adamas was followed by many securities analysts who wrote reports that were distributed during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)   unexpected material news about Adamas was rapidly reflected in and incorporated into the Company's share price during the Class Period.

97.    As a result of the foregoing, the market for Adamas shares promptly digested current information regarding Adamas from publicly available sources and reflected such information in Adamas's share price. Under these circumstances, all purchasers of Adamas shares during the Class Period suffered similar injury through their purchase of Adamas shares at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

98.    During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Adamas's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

99.    By artificially inflating and manipulating Adamas's share price, the Individual Defendants deceived Plaintiff and the Class and caused them losses when the truth was partially revealed on October 5, 2018, November 1, 2018, and March 4, 2019, and fully disclosed on September 30, 2019.

100.   As a result of their purchases of Adamas securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws when Adamas's share price dropped over 8% in early trading on October 5, 2018, over 29% to close at $11.89 on November 2, 2018, over 32% to close at $8.16 on March 5, 2019, and over 42% to close at $4.03 on October 3, 2019.

## CLASS ACTION ALLEGATIONS

101.   This is a class action on behalf of the following:

All purchasers of Adamas's publicly traded securities during the period from August 8, 2017 and September 30, 2019, inclusive, and who were damaged thereby. The following are excluded from the Class: (a) Defendants; (b) members of Defendants' immediate families; (c) any person who was an officer or director of Adamas during the Class Period; (d) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (e) Adamas's employee retirement and benefit plan(s), if any; and (f) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

CLASS ACTION COMPLAINT

102.   The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, according to its March 4, 2019 annual report filed with the SEC, the Company had 27,448,990 shares of Adamas outstanding and actively traded on the NASDAQ with the ticker symbol "ADMS." While the exact number of Class members is unknown to Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Adamas or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

103.   Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

104.   Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class and securities litigation.

105.   Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

- Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

- Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

- Whether, and to what extent, the market price of Adamas shares was artificially inflated during the Class Period because of the material misstatements alleged herein;

- Whether Defendants acted with the requisite level of scienter;

- Whether Defendants Went and Merriweather were controlling persons of Adamas;

- Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), or both; and

- Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

106.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
### Violation of Section 10(b) of the Exchange Act
### And Rule 10b-5 Against All Defendants

107.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

108.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

109.   As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and other members of the Class; (ii) artificially inflate and maintain the prices of Adamas common stock; and (iii) cause Plaintiff and other members of the Class to purchase Adamas shares at artificially inflated prices.

110.   The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff and other members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

111.   As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased Adamas shares during the Class Period.

112.   In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Adamas shares, Plaintiff and other members of the Class purchased Adamas shares at artificially inflated prices during the Class Period. But for the fraud, Plaintiff and other members of the Class would not have purchased Adamas shares at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Adamas common stock declined precipitously and Plaintiff and other members of the Class were damaged and harmed as a direct and proximate result of their purchases of Adamas shares at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

113.   By virtue of the foregoing, Defendants are liable to Plaintiff and other members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against Individual Defendants Went and Merriweather

114.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

115.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

116.   The Individual Defendants had control over Adamas and made the material false and misleading statements and omissions on behalf of Adamas within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and share ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends, were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior

29

to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

117.   In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

118.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Lead Counsel;

B.    Declaring and determining that Defendants violated Section 10(b) and Rule 10b-5 thereunder of the Exchange Act by reason of the acts and omissions alleged herein;

C.    Declaring and determining that Defendants Went and Merriweather violated Section 20(a) of the Exchange Act by reason of the acts and omissions alleged herein;

D.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

F.    Granting all other and further relief as the Court deems just and proper.

1

## JURY DEMAND

2

    Plaintiff demands a trial by jury.

3

4

5

DATED: December 10, 2019

6

                                               */s/ Ivy T. Ngo*

IVY T. NGO (249860)

7

**FRANKLIN D. AZAR & ASSOCIATES, P.C.**

14426 East Evans Avenue

8

Aurora, CO 80014

Telephone:    (303) 757-3300

9

Facsimile:     (720) 213-5131

Email:         ngoi@fdazar.com

10

11

DAVID BRICKER (158896)

**THORNTON LAW FIRM LLP**

12

9430 West Olympic Boulevard, Suite 400

Beverly Hills, California

13

Telephone:    (310) 282-8676

Email:         dbricker@tenlaw.com

14

15

BRIAN SCHALL (290685)

**THE SCHALL LAW FIRM**

16

1880 Century Park East, Suite 404

Los Angeles, CA 90067

17

Telephone:    (310) 301-3335

Facsimile:     (310) 388-0192

18

Email:         brian@schallfirm.com

*Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

## SWORN CERTIFICATION OF PLAINTIFF

I, Syed Ali M. Zaidi, hereby certify as follows:

1.      I have reviewed the complaint filed against Adamas Pharmaceuticals, Inc. ("Adamas") alleging violations of the federal securities laws, and authorized its filing;

2.      I did not purchase the securities of Adamas at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      I am willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      My transactions in Adamas during the Class Period are reflected in Exhibit A, attached hereto;

5.      During the three years prior to the date of this Certification, I have not sought to serve or served as a lead plaintiff and representative party for a class under the federal securities laws;

6.      Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____11/29/2019_____.

DocuSigned by:

*Ali Zaidi*

931D0C494D8840E...

Syed Ali M. Zaidi

**<u>Exhibit A</u>**

**Transactions in Adamas Pharmaceuticals, Inc. Common Stock (CUSIP: 00548A106)**

| Transaction | Trade Date | | Price | Shares | | Total |
|---|---|---|---|---|---|---|
| Purchase | 8/17/2017 | $ | 14.46 | 750 | $ | 10,844.93 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.59 | 100 | $ | 1,459.00 |
| Purchase | 8/17/2017 | $ | 14.59 | 800 | $ | 11,672.00 |
| Purchase | 8/17/2017 | $ | 14.59 | 200 | $ | 2,918.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.60 | 100 | $ | 1,460.00 |
| Purchase | 8/17/2017 | $ | 14.59 | 100 | $ | 1,459.00 |
| Purchase | 8/17/2017 | $ | 14.59 | 100 | $ | 1,459.00 |
| Purchase | 8/22/2017 | $ | 14.92 | 400 | $ | 5,968.00 |
| Sale | 10/26/2017 | $ | 18.71 | 100 | $ | 1,871.00 |
| Sale | 10/26/2017 | $ | 18.71 | 50 | $ | 935.50 |
| Sale | 10/26/2017 | $ | 18.71 | 2,650 | $ | 49,581.50 |
| Sale | 10/27/2017 | $ | 18.42 | 750 | $ | 13,815.08 |
| Purchase | 11/1/2017 | $ | 26.66 | 1,250 | $ | 33,324.93 |
| Purchase | 11/2/2017 | $ | 26.80 | 2,350 | $ | 62,980.00 |
| Purchase | 12/1/2017 | $ | 36.38 | 400 | $ | 14,551.00 |
| Sale | 12/1/2017 | $ | 33.71 | 100 | $ | 3,371.00 |
| Sale | 12/1/2017 | $ | 33.67 | 100 | $ | 3,367.00 |
| Sale | 12/1/2017 | $ | 33.67 | 260 | $ | 8,754.20 |
| Sale | 12/1/2017 | $ | 33.67 | 229 | $ | 7,710.43 |
| Sale | 12/1/2017 | $ | 33.67 | 1,661 | $ | 55,925.87 |
| Purchase | 12/4/2017 | $ | 36.87 | 100 | $ | 3,687.00 |
| Purchase | 12/13/2017 | $ | 33.69 | 200 | $ | 6,738.00 |
| Purchase | 12/13/2017 | $ | 33.69 | 800 | $ | 26,952.00 |
| Purchase | 12/14/2017 | $ | 33.40 | 100 | $ | 3,340.00 |
| Purchase | 12/14/2017 | $ | 33.40 | 100 | $ | 3,340.00 |
| Purchase | 12/14/2017 | $ | 33.40 | 100 | $ | 3,340.00 |
| Purchase | 12/14/2017 | $ | 33.40 | 500 | $ | 16,700.00 |
| Purchase | 12/14/2017 | $ | 33.40 | 100 | $ | 3,340.00 |
| Purchase | 12/14/2017 | $ | 33.43 | 250 | $ | 8,357.50 |
| Purchase | 12/14/2017 | $ | 33.40 | 200 | $ | 6,680.00 |
| Purchase | 9/21/2018 | $ | 19.70 | 900 | $ | 17,730.00 |
| Sale | 11/5/2018 | $ | 10.99 | 5,000 | $ | 54,929.14 |
| Purchase | 11/7/2018 | $ | 12.44 | 4,600 | $ | 57,239.82 |
| Purchase | 11/7/2018 | $ | 12.95 | 4,000 | $ | 51,790.72 |
| Purchase | 11/7/2018 | $ | 12.68 | 240 | $ | 3,043.20 |
| Sale | 11/7/2018 | $ | 12.45 | 4,600 | $ | 57,270.00 |
| Sale | 11/8/2018 | $ | 12.93 | 4,240 | $ | 54,823.20 |
| Purchase | 11/27/2018 | $ | 10.84 | 750 | $ | 8,129.92 |

DocuSign Envelope ID: DFCD8FC6-7B16-4B1E-A1F0-EDB813D655C3

**Transactions in Adamas Pharmaceuticals, Inc. Common Stock (CUSIP: 00548A106)**

| Transaction | Trade Date | Price | Shares | Total |
|---|---|---|---|---|
| Sale | 11/27/2018 | $ 10.64 | 750 | $ 7,980.08 |
| Purchase | 11/28/2018 | $ 10.19 | 750 | $ 7,639.50 |
| Sale | 11/28/2018 | $ 9.75 | 750 | $ 7,312.58 |
| Purchase | 11/30/2018 | $ 9.94 | 1,000 | $ 9,940.00 |
| Purchase | 11/30/2018 | $ 9.92 | 1,000 | $ 9,920.00 |
| Purchase | 11/30/2018 | $ 9.93 | 1,000 | $ 9,930.00 |
| Purchase | 11/30/2018 | $ 10.03 | 404 | $ 4,052.12 |
| Purchase | 12/3/2018 | $ 10.43 | 2,000 | $ 20,860.00 |
| Sale | 12/4/2018 | $ 10.59 | 5,000 | $ 52,965.00 |
| Purchase | 12/6/2018 | $ 9.44 | 605 | $ 5,711.20 |
| Purchase | 12/6/2018 | $ 9.44 | 604 | $ 5,701.76 |
| Sale | 12/6/2018 | $ 9.69 | 404 | $ 3,914.76 |
| Purchase | 12/7/2018 | $ 10.12 | 2,600 | $ 26,324.00 |
| Sale | 12/7/2018 | $ 9.85 | 3,809 | $ 37,522.65 |
| Purchase | 12/12/2018 | $ 9.69 | 100 | $ 969.00 |
| Purchase | 12/13/2018 | $ 9.65 | 1,000 | $ 9,650.00 |
| Purchase | 12/19/2018 | $ 8.29 | 2,000 | $ 16,580.00 |
| Sale | 12/20/2018 | $ 7.53 | 3,100 | $ 23,347.00 |
| Purchase | 4/3/2019 | $ 6.85 | 7,250 | $ 49,662.50 |
| Sale | 4/18/2019 | $ 6.25 | 7,250 | $ 45,323.54 |
| Purchase | 5/21/2019 | $ 5.44 | 8,000 | $ 43,520.00 |
| Purchase | 9/20/2019 | $ 6.87 | 900 | $ 6,183.00 |