**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (#270796)
CHRISTOPHER R. FALLON (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ADAMAS PHARMACEUTICALS, INC., GREGORY T. WENT, ALFRED G. MERRIWEATHER, RICHARD A. KING, RAJIV PATNI, AND VIJAY SHREEDHAR, <br> Defendants. | Case No. 4:19-cv-08051-JSW <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**CLASS ACTION**</u> <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ...................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................. 6

III. PARTIES .................................................................................................................... 6

IV.  BACKGROUND ...................................................................................................... 10

    A.   Background Of The Company, Its Primary Product, GOCOVRI, And Its
        Approved Indication, Treatment of Levodopa Induced Dyskinesia .................... 10

    B.   Adamas Former Employees .................................................................................. 13

V.   SUMMARY OF THE FRAUD ................................................................................ 14

    A.   Adamas Touts the Market Opportunity And Payer Support For GOCOVRI ....... 14

    B.   Defendants Were Aware Of And Ignored Substantial Obstacles Blocking
        Adamas's Penetration Of Its Target Market For GOCOVRI ............................... 18

        1.   Adamas Had Not Performed A Head-to-Head Study Comparing The
            Efficacy And Tolerability of GOCOVRI to Amantadine IR ................... 18

        2.   Physicians Generally Did Not Treat Patients With Moderate or Mild
            Dyskinesia ................................................................................................ 23

        3.   Market Access Was Limited By GOCOVRI's High Cost And Payers'
            Coverage Requirements ............................................................................ 26

        4.   Adamas Chose To Distribute GOCOVRI Through A Specialty
            Pharmacy .................................................................................................. 35

        5.   Adamas Did Not Provide Physicians With A Free Supply of
            GOCOVRI ............................................................................................... 36

        6.   OSMOLEX Approval Brings Competition And Added Confusion .......... 38

    C.   The Truth Begins To Emerge ................................................................................ 40

        1.   An Analyst Report Reveals Weak Demand For GOCOVRI And High
            Levels Of Drop-Outs Due to Cost And Prior Authorizations .................. 40

        2.   Adamas Maintains Its Market Share Projections While Revealing Flat
            Prescription Growth And Cutting The Targeted Physicians In Half ......... 41

         3.   Adamas Backs Off Previously Issued Guidance And Refuses To
            Provide Future Guidance .......................................................................... 43

        4.   Adamas Confirms Weak Demand Was A Result Of Fulfillment Issues
            And GOCOVRI's High Cost .................................................................... 48

    D.   Adamas Announces MSWI Was A Top Priority, But It Faces Similar
        Obstacles In Commercializing GOCOVRI In The Treatment Of MSWI ............. 50

VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........................... 53

A.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2017 Financial Results .............................. 53

B.    Defendants' False and Misleading Statements and Omissions At Adamas's September 18, 2017 Investor & Analyst Meeting .............................. 54

C.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 3Q' 2017 Financial Results .............................. 56

D.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's January 2018 Secondary Public Offering ........................ 57

E.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's Fiscal Year 2017 Financial Results .................. 58

F.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 1Q' 2018 Financial Results .............................. 61

G.    Defendants' False And Misleading Statements And Omissions At A May 8, 2018 Deutsche Bank Investor Conference .............................. 65

H.    Defendants' False And Misleading Statements And Omissions At A May 16, 2018 Bank Of America Conference .............................. 66

I.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2018 Financial Results .............................. 68

J.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 3Q' 2018 Financial Results .............................. 72

K.    Defendants' False And Misleading Statements And Omissions At A November 14, 2018 Credit Suisse Investor Conference .......................... 76

L.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's Fourth Quarter & Fiscal Year 2018 Financial Results ..... 77

M.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 1Q' 2019 Financial Results .............................. 81

N.    Defendants' False And Misleading Statements And Omissions At A May 15, 2019 Bank Of America Conference .............................. 83

O.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2019 Financial Results .............................. 84

VII.    LOSS CAUSATION ........................................................................ 85

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ........................................ 88

A.    The Significant Number Executive Departures Support An Inference of Scienter .............................................................................. 88

|   |   | B. | GOCOVRI's Successful Launch Was A Core Operation | 89 |
|---|---|---|---|---|
|   |   | 1. | Defendants Touted GOCOVRI's Differentiation & Value Proposition | 91 |
|   |   | 2. | Defendants Tracked GOCOVRI's Progress & Received Regular Feedback | 91 |
| IX. | CORPORATE SCIENTER ALLEGATIONS | | | 92 |
| X. | CLASS ACTION ALLEGATIONS | | | 93 |
| XI. | APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE) | | | 94 |
| XII. | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE | | | 96 |
| XIII. | CLAIMS | | | 97 |
| XIV. | PRAYER FOR RELIEF | | | 100 |
| XV. | JURY TRIAL DEMANDED | | | 101 |

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Centene: Clinical Policy regarding Amantadine ER (Gocovri, Osmolex ER) |
| B | Tricare: The Department of Defense Pharmacy and Therapeutics Committee minutes from November 15-16, 2017 |
| C | Idaho Medicaid Preferred Drug List Recommendations from November 20, 2017 |
| D | Blue Cross Blue Shield Federal Employees Program Prescription Requirements |
| E | Delaware Medicaid Preferred Drug List, 2018 |
| F | Prime Therapeutics/BlueCross BlueShield of Alabama Gocovri (amantadine) Prior Authorization with Quantity Limit Program Summary |
| G | Kaiser Permanente Criteria for Drug Coverage, Amantadine ER (GocovriTM) |
| H | Vermont Medicaid Preferred Drug List and Drugs Requiring Prior Authorization |

1        Lead Plaintiff Ralph Martinez ("Plaintiff"), by his undersigned attorneys, hereby brings this

2   Amended Class Action Complaint ("Complaint") against Adamas Pharmaceuticals, Inc. ("Adamas" or

3   the "Company"), Gregory T. Went ("Went"), Alfred G. Merriweather ("Merriweather"),  Richard

4   A. King ("King"), Rajiv Patni ("Patni"), and Vijay Shreedhar ("Shreedhar") (together,

5   "Defendants").  The allegations herein are based on Plaintiff's personal knowledge as to his own

6   acts and on information and belief as to all other matters, such information and belief having been

7   informed by the investigation conducted by and under the supervision of Lead Counsel, which

8   includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Adamas;

9   securities analysts' reports and advisories about the Company; press releases and other public

10  statements issued by the Company; media reports about the Company; interviews with former

11  Adamas employees; and other publicly available information concerning Adamas.  Lead Counsel's

12  investigation into the matters alleged herein is ongoing and many relevant facts are known only to,

13  or are exclusively within the custody or control of, the Defendants.  Plaintiff believes that substantial

14  additional evidentiary support will exist for the allegations set forth herein after a reasonable

15  opportunity for discovery.  On behalf of himself and the class he seeks to represent, Plaintiff alleges

16  as follows:

17  **I.        NATURE OF THE ACTION**

18        1.        This is a federal securities class action on behalf of persons or entities who or which

19  purchased or acquired Adamas securities between August 8, 2017 and September 30, 2019,

20  inclusive (the "Class Period") and who were damaged thereby, seeking to pursue remedies under

21  Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

22        2.        Adamas is a pharmaceutical company that specializes in developing treatments for

23  chronic neurological disorders.  It was formed by Went in 2000, who served as its CEO throughout

24  the Class Period.

25        3.        On August 24, 2017, the FDA approved GOCOVRI, an extended-release

26  formulation of amantadine, for the treatment of levodopa-induced-dyskinesia ("LID").  Levodopa

27  therapy replaces the lost dopamine in patients with Parkinson's disease, allowing patients improved

28  control over their bodily movements.  The primary side effect associated with levodopa treatment

is dyskinesia—involuntary and uncontrolled movements that occur when there is too much dopamine.

4.      Adamas's success depended on successfully commercializing GOCOVRI, as it was the Company's primary source of revenue during the Class Period.  Adamas priced GOCOVRI at $28,500 per year, or $2,375 per month.  The generic immediate release amantadine ("amantadine" or "amantadine IR"), however, was available for a couple thousand dollars per year.  Although amantadine IR was indicated for "the treatment of parkinsonism and drug-induced extrapyramidal reactions," physicians interpreted this broader indication to include LID and had been using amantadine to treat LID for decades.   Thus GOCOVRI's commercial success depended on Adamas's ability to differentiate it from the inexpensive generic amantadine IR, such that patients, physicians, and payers would appreciate its value proposition.

5.      Whereas the dosing for amantadine IR may be multiple times a day, GOCOVRI was administered once a day at night time.  By administering GOCOVRI at night, its concentration was at its highest during waking hours when dyskinesia was most bothersome, and would taper off at night, minimizing sleep issues that were experienced with amantadine.   Defendants touted GOCOVRI's efficacy and tolerability compared to existing treatments.  But there was no head-to-head study comparing GOCOVRI to amantadine IR, and existing studies of amantadine IR were not limited to treatment of LID, which made actually differentiating GOCOVRI difficult.

6.      Because of the high cost of GOCOVRI compared to the generic amantadine IR, amantadine IR's history of use to treat LID, and separately, the fact that amantadine IR was not effective or tolerable to many patients, Adamas needed to convince patients, physicians, and payers (*i.e.*, health insurers and other managed care entities) that GOCOVRI was more than just an expensive extended-release version of the drug.

7.      If payers did not differentiate GOCOVRI from amantadine IR and appreciate its value proposition, it was unlikely that they would provide reimbursement, or alternatively, would require expensive co-pays, and/or a showing of medical necessity, prior authorization, and/or step-therapy.  Such additional costs and/or requirements for reimbursement would logically suppress GOCOVRI's patient and physician interest and demand, particularly given the lack of data showing

its superior efficacy or tolerability.

8.      Approximately 1 million people in the United States have Parkinson's Disease, and at any given time, approximately 150,000 to 200,000 of these patients have LID.  During the Class Period, Defendants represented that this entire sub-population was GOCOVRI's available market, and projected that GOCOVRI would penetrate 25% to 30% of these patients, starting with 1% in year one of GOCOVRI's commercial availability.  The Company told investors that it would initially focus its promotional efforts on movement disorder specialists.  Patients treated by movement disorder specialists tended to be the most severely dyskinetic, and likely had a prior history with amantadine IR.  However, Defendants also told investors that the largest portion of GOCOVRI's market population would be patients whose LID had not been treated.

9.      Adamas's forecast did not account for the fact that not at all patients who have dyskinesia want or need treatment.  Less severe dyskinesia was not particularly bothersome to many patients, some did not even know they had it.  For others, the dyskinesia was effectively managed by adjusting their levodopa dose.  Furthermore, polypharmacy, the concurrent use of multiple medications, was a problem for many Parkinson's patients, particularly elderly patients who tend to take numerous medications.  Nevertheless, Defendants told investors GOCOVRI was appropriate for all patients, regardless of the severity or duration of their dyskinesia.

10.      Adamas made GOCOVRI available in October 2017, shortly after its FDA approval on August 24, 2017.  The Company's sales efforts however, largely kicked off in January 2018, when Adamas launched its sales force.  Adamas told investors that, based on market research and discussions with payers prior to its commercial launch, reimbursement would only be available through medical necessity or prior authorization at first, but it did not anticipate that payers would require step therapy.  However, shortly after the drug was made available, contrary to Defendants' claims otherwise, payers began requiring step therapy and reimbursement was a slow process.  The burdensome and uncertain process of attaining fulfillment further weakened demand from physicians and patients.  Physicians did not want to go through the hassle of the reimbursement process again after going through it with one patient, and therefore, did not prescribe GOCOVRI for their other patients.  Patients would go through the lengthy approval process and would often

1   ultimately obtain reimbursement, but co-pays would be so high that they would drop-off.

2       11.   As more payers completed their review of GOCOVRI and made their coverage

3   decisions, more and more payers were denying reimbursement or requiring step therapy.

4   Furthermore, GOCOVRI was not viewed as differentiated from amantadine IR with patients and

5   physicians merely viewing it as an extended release version of amantadine.  Many physicians and

6   patients also experienced the same issues with tolerability experienced with amantadine IR.

7       12.   In addition, Adamas made the decision to distribute GOCOVRI through a specialty

8   pharmacy.  This specialty pharmacy, which Adamas called Onboard, was to assist patients with

9   obtaining reimbursement and would provide a two week sample of GOCOVRI while patients

10   awaited payer reimbursement decisions.  The ease and efficiency of GOCOVRI Onboard was

11   critical to GOCOVRI's commercial success.   However, the decision to send GOCOVRI

12   prescriptions through this specialty pharmacy weakened demand from physicians because: (1)

13   physicians could not easily obtain free samples to see for themselves if GOCOVRI was more

14   effective and tolerable than amantadine IR; and (2) it added extra burden to physicians, requiring

15   them to familiarize themselves with another process rather than simply writing a prescription to be

16   filled by a retail pharmacy.  There was also similar confusion and added burden for patients.

17       13.   These issues curtailed demand for GOCOVRI and were partially revealed in an

18   October 5, 2018 Bank of America report, which indicated that demand from physicians had

19   weakened due to "hurdles" to get patients on GOCOVRI due prior authorization and step therapy

20   requirements.  On this news, Adamas's stock fell 8% on modestly higher volume in early trading

21   on October 5, 2018 and closed at $17.83 that day, damaging investors.

22       14.   On November 1, 2018, the Company revealed that it was cutting the number or

23   targeted physicians in half to more closely focus on the movement disorder specialists.  The

24   Company also announced that the pace of prescription growth had flattened and projected it would

25   only increase its market penetration to 2% in 2019, which was disappointed to investors.  However,

26   the Company maintained that GOCOVRI would penetrate 25% to 30% of the market and touted the

27   market opportunity for GOCOVRI as a treatment for MSWI, indicating that there was promise for

28   the Company.

15.     On this news, Adamas's stock fell $5.08 per share, or 29.94%, to close at $11.89 per share on November 2, 2018, damaging investors.

16.     On March 4, 2019, Adamas backed off its prior projection of reaching 2% market penetration in 2019 and refused to provide further guidance.  The Company claimed this was due to the slow rate of growth seen in the fourth quarter of 2018 and because it had expanded the free trial program from two weeks to four weeks to allow more physicians to try GOCOVRI.  The expansion of the free trial period indicated not only that the Company's failure to differentiate GOCOVRI had resulted in weak demand, but also, that the two-week trial period was not enough time for payers to make their reimbursement decision.

17.     On this news, Adamas's stock fell $3.99 per share, or 32.84%, to close at $8.16 per share on March 5, 2019, damaging investors.

18.     Just two months later, on May 9, 2019, Adamas told investors that GOCOVRI's commercialization and its development as a treatment for multiple sclerosis walking impairment ("MSWI") were the Company's top priorities.

19.     On August 8, 2019, the Company admitted that operational issues with GOCOVRI's fulfillment process related to obtaining prior authorization had weakened demand for GOCOVRI among patients and physicians, and that these operational issues were the primary driver of patient drop-offs.  In addition, the Company admitted that the high cost and patients' lack of awareness to their disease state were the primary causes for poor adoption of GOCOVRI.

20.     On September 30, 2019, Bank of America reported that a survey of doctors found that doctors were uncomfortable with GOCOVRI's safety profile and would continue to prescribe AMPYRA to treat MSWI.  Furthermore, the report revealed that payers would like require a step-through of AMPYRA since it would be available as a generic.

21.     Following this news, the Company' stock price fell $1.55, or approximately 23.26%, to close at $5.12 per share on September 30, 2019, and continued to fall the following day, declining another $0.74, or 14.37%, to close at $4.38 per share on October 1, 2019, both on heavy volume, damaging investors.

22.     As a result of Defendants' wrongful acts and omissions, and the significant decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.  Accordingly, Plaintiff seeks to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

26.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities markets.

## III.   PARTIES

27.    Lead Plaintiff Ralph Martinez, as set forth in his previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 29-2), purchased Adamas securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.    Defendant Adamas is incorporated in Delaware with its principal executive offices located at 1900 Powell Street, Suite 1000, Emeryville, California 94608.  Adamas's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "ADMS."    Adamas is a pharmaceutical company focused on developing and commercializing medicine for the treatment of chronic neurological diseases, including Parkinson's

1   disease, multiple sclerosis, epilepsy and Alzheimer's disease.  During the Class Period, its only

2   approved drug was GOCOVRI™ (amantadine), formerly referred to as ADS-5102, for the treatment

3   of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy.

4          29.     Throughout the Class Period, Adamas, through its officers and directors, published

5   periodic filings with the SEC, and made public statements that, as alleged herein, contained material

6   misrepresentations and omissions that artificially inflated the price of the Company's shares.

7          30.     Defendant Gregory T. Went ("Went"), served as the Chief Executive Officer

8   ("CEO") of Adamas and Chairman of its Board of Directors since the Company's inception in 2000

9   until he resigned, effective as of September 16, 2019, and transitioned to a strategic advisory role

10  with the Company.  He is currently a Managing Director of Halteres Associates.  Previously, Went

11  cofounded Tethys Bioscience, Inc. and served on its Board of Directors from April 2003 through

12  November 2013.  Went also served on the Board of Directors of Angelica Therapeutics, Inc. from

13  January 2006 through the present, and on the Board of Parallele Bioscience (Affymetrix) from

14  November 2001 through July 2005.  Went cofounded CuraGen Corporation in 1992, where he

15  served as an Executive Vice President and Director until December 1999.  Went received his Ph.D.

16  in Chemical Engineering from the University of California, Berkeley in 1990, and a B.S. in

17  Chemical Engineering from Carnegie Mellon University in 1985.  Went has authored at least 20

18  scientific papers and was listed as an inventor on more than 45 patents and patent applications.

19         31.     Throughout the Class Period, Went frequently spoke to investors and analysts on

20  conference calls and investor conferences.  Went possessed the power and authority to control the

21  contents of the Company's public filings with the SEC.  During the Class Period, Went signed or

22  authorized the signing of and certified the accuracy of Adamas's Annual Reports on Form 10-K for

23  the years 2017 and 2018, and its Quarterly Reports on Form 10-Q for each quarterly period ended

24  June 30, 2017 through June 30, 2019.[1]

25         32.     Defendant Alfred G. Merriweather ("Merriweather") was the Chief Financial Officer

26  ("CFO") of Adamas from June 2017 until his retirement on December 31, 2019.  For more than

27  _____

28  [1] References to Adamas's fiscal years and quarters are referenced herein as "FY" and "1Q," "2Q,"
    "3Q," or "4Q" respectively, and are followed by the corresponding year.

thirty years prior to joining Adamas, Merriweather served as CFO at numerous companies including RainDance Technologies, Inc., Verinata Health Inc., Celera Corporation, Calypso Medical Technologies, Monogram BioSciences, Inc., ACLARA Biosciences Inc., Syphonix Devices Inc., LipoMatrix Inc., and Laserscope. He received his Bachelor's degree in Economics from Cambridge University in 1975.

33.    Throughout the Class Period, Merriweather frequently spoke to investors and analysts on conference calls and investor conferences. During the Class Period, Merriweather signed or authorized the signing of and certified the accuracy of Adamas's Annual Reports on Form 10-K for the years 2017 and 2018, and its Quarterly Reports on Form 10-Q for each quarterly period ended June 30, 2017 through June 30, 2019.

34.    Defendant Richard A. King ("King") was Chief Operating Officer ("COO") of Adamas from April 27, 2017 until September 15, 2018, and was responsible for leading the Company's commercial organization and its established teams in marketing, market access, manufacturing, and distribution, as well as, overseeing the company's planning and information technology operations. Prior to joining Adamas, King held executive positions at numerous life sciences companies, including The Scripps Research Institute where he was COO. King also served as President and CEO of AcelRx Pharmaceuticals, Inc., President, COO, and General Manager of Tercica Inc., Executive Vice President of Commercial Operation for Kos Pharmaceuticals Inc., and was also employed at Smith Kline Beecham and Lederle Laboratories. King has served on the Boards of Acelrx Pharmaceuticals Inc., Clarus Therapeutics Inc., and Domain Assoc. LLC. He received a Masters in Business Administration from the Manchester Business School and a Bachelor's of Science in chemical engineering from the University of Surrey.

35.    During the Class Period until his departure in September 2018, King frequently spoke to investors and analysts on earnings calls and at investor conferences.

36.    Defendant Rajiv Patni, M.D. ("Patni") joined Adamas as Chief Medical Officer in June 2015 and continued to serve in that position throughout the Class Period. Patni served as Chief Development Officer at Ocera Therapeutics from September 2014 to May 2015, where he was responsible for the management and direction of all drug development activities. From 2007 to

August 2014, Patni served as SVP Chief Medical Officer at Actelion US Pharmaceuticals, where he was responsible for overseeing medical and regulatory activities in the United States.  Prior to that position, Patni held several senior management roles including as Executive Director/VP, Product Lifecycle Team Leader, Therapeutic Area Head, at Roche Pharmaceuticals, and Senior Medical Director, Development Team Leader, at Novartis and Pfizer Pharmaceuticals.  Patni earned a B.S. from the City University of New York Sophie Davis School of Biomedical Education and an M.D. from the Mount Sinai School of Medicine.

37.     Throughout the Class Period, Patni frequently spoke to investors and analysts on conference calls and investor conferences.

38.     Defendant Vijay Shreedhar ("Shreedhar") became Adamas's Chief Commercial Officer in May 2019.  Prior to joining Adamas, Shreedhar served in a variety of sales and marketing roles of increasing responsibility in multiple therapeutic areas at Amgen, a biotechnology company, from August 2005 to May 2019.  Most recently, he was Executive Director and Integrated Commercial Lead for the Multiple Myeloma franchise with responsibility for national sales, brand marketing and regional marketing teams.  Shreedhar holds a Ph.D. in Oncology and Immunology from the University of Texas, M.D. Anderson Cancer Center and an MBA in Healthcare Management from the Wharton School at the University of Pennsylvania.

39.     After Shreedhar joined the Company in May 2019, during the Class Period, Shreedhar frequently spoke to investors and analysts on conference calls and investor conferences.

40.     Defendants Went, Merriweather, King, Patni and Shreedhar are collectively referred to hereinafter as the "Individual Defendants."   Adamas and the Individual Defendants are collectively referred to as "Defendants".

41.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Adamas's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and

access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.   BACKGROUND

### A.   Background Of The Company, Its Primary Product, GOCOVRI, And Its Approved Indication, Treatment of Levodopa Induced Dyskinesia

42.   Adamas is a pharmaceutical company that was founded by Went in 2000 and specializes in developing drug treatment therapies for chronic neurological disorders. Adamas's approach to developing therapies was not to create novel new compounds, but rather to take existing treatments and add a timing feature to them.

43.   GOCOVRI, formerly referred to as ADS-5102, is an extended-release formulation of amantadine for the treatment of levodopa-induced dyskinesia ("LID"). Levodopa therapy replaces the lost dopamine in patients with Parkinson's disease (sometimes referred to as "PD"), allowing patients improved control over their bodily movements. The primary side effect associated with levodopa treatment is dyskinesia—involuntary and uncontrolled movements that occur when there is too much dopamine.

44.   Amantadine IR is an inexpensive generic drug available in multiple instant-release formulations that was "indicated in the treatment of parkinsonism and drug-induced extrapyramidal reactions." Drug-induced extrapyramidal reactions are "commonly referred to as drug-induced movement disorders," such as dyskinesia. Amantadine IR had been used to treat dyskinesia for decades, yet was thought to not be effective or tolerable for many patients, causing them to discontinue using the drug.

45.   Approximately 1 million people in the United States have Parkinson's disease and approximately 150,000 to 200,000 of those patients experience dyskinesia. Prior to GOCOVRI's approval, there were three treatments for dyskinesia.

46.     The primary treatment method was to adjust the dose and timing of levodopa to minimize dyskinesia and "OFF time."  OFF time refers to periods of rigidity and stiffness which occur when there is too little dopamine.

47.     The second treatment method was amantadine IR, which was often used in conjunction with dosing adjustments.  Went stated that "approximately 7% of [dyskinetic] patients are taking amantadine" on an earnings conference call on May 9, 2017 (the "May 2017 call").  Lastly, another ~5% of patients experiencing dyskinesia underwent deep brain stimulation, which was an expensive and invasive procedure.

48.     GOCOVRI was to be administered orally once daily at bedtime.  Its extended release formulation resulted in patients experiencing high concentrations of amantadine in the morning and maintained throughout waking hours, when dyskinesia and OFF time were most bothersome.  GOCOVRI meant that patients would not have to adjust their levodopa dose downward, thus decreasing OFF time.  In addition, GOCOVRI would "moderate the sleep-related adverse events" that were associated with amantadine IR because its formulation and administration resulted in it being at its lowest concentration at night.

49.     Adamas released its Phase 3 topline results for GOCOVRI on December 25, 2015 and submitted a New Drug Application ("NDA") for ADS-5102 in October 2016.  On January 6, 2017 Adamas announced that the FDA had accepted the NDA for review and set a Prescription Drug User Free Act (PDUFA) date of August 24, 2017.  On the May 2017 call, the Company announced the appointment of King as Chief Operating Officer ("COO"), who was charged to lead the commercialization of GOCOVRI.

50.     On August 24, 2017, the FDA approved GOCOVRI, making it the first drug treatment Adamas had developed and would market entirely on its own.  The drug was made available in October 2017, but the Company did not officially launch GOCOVRI until January 2018.

51.     Prior to GOCOVRI becoming commercially available, for the first three quarters of 2017, Adamas had earned just $3,000 for a drug that it contributed to, which was marketed and largely developed by another company.  As noted in the Company's 2017, 2018, and 2019 Form 10-K's, "***Our success depends heavily on successful commercialization of GOCOVRI…. To the***

1    *extent GOCOVRI is not commercially successful, our business, financial condition and results*

2    *of operations will be materially harmed."*   GOCOVRI was the primary source of revenue for the

3    Company throughout the Class Period, representing 99% of its revenue in 2017, 2018, and 2019, as

4    indicated in the Form 10-K for the year ending December 31, 2019 filed by Adamas on February

5    25, 2020.

6         52.    During the Class Period, Adamas was also seeking a follow-on indication for

7    GOCOVRI as a treatment for multiple sclerosis walking impairment ("MSWI").  The Company had

8    an end of Phase II meeting with the FDA in December 2016.  The Phase II results showed a 17%

9    placebo-adjusted improvement, which  was very similar to the primary endpoint for AMPYRA, the

10   brand name for dalfampridine, the only treatment available at the time.

11        53.    The Company announced at the September 18, 2017 Investor & Analyst Meeting

12   that it was moving into Phase III studies, and was aiming to start its first patient in 1Q' 2018.  An

13   analyst asked about GOCOVRI's market opportunity compared to AMPYRA and King stated the

14   Company's qualitative research indicated there was a "substantial unmet need" and "the profile is a

15   broad agent that will treat a broad MS gait population as opposed to a subset of the MS gait

16   population."

17        54.    Went discussed the possibility for a follow-on indication for MSWI patients on the

18   Company's November 2, 2017 earnings call and discussed how it would compete with a generic

19   AMPYRA that was expected to come to market in the near future:

20       [I]t is true that there is a product approved that works in a subpopulation.  In fact, the
         product – program design was based upon that subpopulation response.  Our
21       expectation from our Phase IIa data and our understanding of the mechanism of
         action of amantadine in this indication strongly suggests that *we'll have a broader*
22       *response across all MS patients*.  And so in a market where you'll have generic
         AMPYRA present, I think, the -- what will make ADS-5102/GOCOVRI exciting in
23       this population is its breadth of response, *its ability to improve a wide number of*
         *walking dimensions both from AMPYRA responders and nonresponders*.  So that's
24       kind of the business case.

25        55.    On the February 22, 2018 earnings call, Adamas stated that "[i]n consultation with

26   the FDA, the primary outcome measure is the proportion of patients that experience at least a 20%

27   increase in walking speed."  The Company also announced that it planned to initiate Phase III studies

28

1    in early 2019, and hoped to bring the treatment to market by 2022.

2        56.    At the May 16, 2018 Bank of America investor conference, Adamas announced that

3    Phase III enrollment began at the end of March 2018 and would be completed in the second half of

4    2019 with top line data reported shortly thereafter.

5        57.    At the November 14, 2018 Credit Suisse investor conference, Went noted "we're

6    recruiting patients who have responded to AMPYRA.  We are recruiting patients who have not

7    responded to AMPYRA. We're recruiting patients who have never tried AMPYRA. So I think it's

8    a pretty wide open market opportunity[.]"

9        **B.    Adamas Former Employees**

10       58.    Former Employee 1 ("FE1") was employed by Adamas as the Mid-Atlantic Regional

11   Business Director from September 2017 until approximately July 2019.  The Mid-Atlantic Region

12   covered North Carolina, Virginia, Washington D.C., Maryland, part of Delaware, Pennsylvania

13   (excluding Philadelphia), Ohio, and parts of Kentucky and West Virginia.  FE1 was hired to help

14   launch GOCOVRI.  FE1 and five other Regional Business Directors were responsible for recruiting

15   59 sales representatives, who started in November 2017 and were trained in Dallas, TX the first

16   week of December 2017.  Ten sales representatives reported to FE1.  FE1 and the other Regional

17   Business Directors reported to SVP of Sales, Dean Hart ("Hart"), who reported to King, and after

18   King's departure, reported directly to Went.

19       59.    FE2 was employed by Adamas as a Senior Medical Science Liaison ("MSL") from

20   April 2018 until December 2018 and was responsible for a territory that included Texas, Arkansas,

21   and Louisiana.  The MSLs reported to a Manager of Medical Affairs, who reported to Patni, who

22   FE2 believed reported to Went.  MSLs typically hold more advanced degrees, such as an M.D.,

23   Ph.D., Pharm.D. or nursing degree, and were supposed to have more knowledge of GOCOVRI data

24   and be able to discuss it in more depth.  MSLs were field-based and answered doctors' questions

25   and collected doctors' feedback about GOCOVRI.

26       60.    FE3 was an Adamas Neurology Account Specialist from November 2017 until

27   August 2018.  FE3 had worked in pharmaceutical sales for 20 years and specialized in neurology

28   drugs for 12 of those years.  FE3 was responsible for the sale of GOCOVRI in the Greensboro and

1   coastal region of North Carolina and reported to a Regional Manager, who reported to Hart, who

2   reported to King.

3         61.    FE4 was the VP of Marketing at Adamas from June 2017 through February 2019 and

4   reported to King, and then, after King's departure, reported directly to Went.  FE4 was responsible

5   for the commercial aspect of the GOCOVRI launch, including sales materials and print ads, and also

6   served as the Project Leader for the GOCOVRI brand.  FE4 said this was a cross-functional team

7   consisting of other department heads including Market Access, Sales, and Clinical who all reported

8   to King.  As part of FE4's responsibility as the Project Leader for the brand, all the manufacturing

9   and purchase orders associated with GOCOVRI came through FE4 and this team.

10         62.    FE5 was an Adamas Neurology Account Specialist from November 2017 through

11   January 2020, who initially reported to Regional Business Director Dan Wilson, and later reported

12   to Steve Welsh.  Wilson and Welsh both reported to Hart, who reported to King, and subsequently

13   reported to Went after King's departure.  FE5 was responsible for selling GOCOVRI in San Antonio

14   and south Texas and was appointed to a Sales Advisory Board for the first year of FE5's

15   employment, which consisted of seven or eight sales representatives, one from each region, as well

16   as Hart.  The purpose of this Board was to provide feedback about the sales process and any issues

17   encountered with selling GOCOVRI.

18         63.    FE6 was a Senior Director of Business Analytics at Adamas from October/November

19   2016 until November 2018.  FE6 initially worked on market research and data analytics for

20   GOCOVRI, then on various side projects for other compounds in development.  FE6 initially

21   reported directly to Went, and then to King when he was hired in 2017.  After King departed Adamas

22   in 2018, FE6 did not report to anyone, although there was a dotted line to Melissa Masterson

23   ("Masterson"), Adamas's SVP of Market Access throughout the Class Period.

24   **V.**    **SUMMARY OF THE FRAUD**

25       **A.**    **Adamas Touts the Market Opportunity And Payer Support For GOCOVRI**

26         64.    Adamas began building its commercial team in 2014 and formed a market access

27   team who were "working on the value proposition with the payers" shortly after it released topline

28   results in late 2015.  Went stated on the May 2017 call, "our research [] indicated that ***payers***

*appreciate the strong value proposition* of ADS-5102.  The payers recognize the ***substantial unmet need for this orphan population for whom there is no approved medication*.**  Went assured that "the data that we present for ADS-5102 has been ***very well-received***" by payers and stated that "this product will be viewed on the merits of this data.  ***It will be viewed as differentiated***…."  Went noted that "[l]ess than 25% of surveyed physicians are satisfied with current management modalities such as levodopa dose adjustments."

65.    On August 8, 2017, during an earnings conference call, King noted, "In terms of market access, we have begun to reach out to payers to introduce them to Adamas and to raise awareness to the anticipated approval of ADS-5102.  King stated that commercial communications "appear to resonate with prescribers, payers and people with Parkinson's disease."  King said the Company was "very pleased with the reception we're getting from payers, and the interest in treating the currently underserved Parkinson's disease population with dyskinesia."  King also noted that "the value of deferring the launch date until January 1 of 2018 is that we get effectively 4 months to go and interact with payers."  King said, "[Medicare] will likely add this, given there's no other product for this indication, sometime in 2018 and make it available through Medicare.  And it will become a covered item effectively under Part D."

66.    After GOCOVRI was approved in August 2017, King discussed market for GOCOVRI at the September 18, 2017 Investor & Analyst Meeting.  King explained that "about 200,000 of [Parkinson's] patients [in the U.S.] have dyskinesia; and out of them, 150,000 of them are treated for that dyskinesia."  King noted that Adamas had surveyed 130 physicians and stated that "when asked the question what share of your patient population with dyskinesia is going to get treated by GOCOVRI, the physician response is 54% of that population will get treated with GOCOVRI."  King described GOCOVRI as having "***preference brand share***" and indicated that Adamas believed GOCOVRI's market share would "ultimately [be] in the 25% to 30% range," and that it would obtain "a little under 1% penetration" in the first year.  King noted:

> So in terms of where GOCOVRI will pick up, it's 54% share. ***The majority of it actually interestingly comes from currently untreated dyskinesia patients***. There's a lot of patients who remain untreated in this population, just because of the challenge of managing these patients. Some of it comes from replacement and instead of fractionation of the levodopa dose, allowing levodopa to maintain a higher level of

presence in the patient and adding GOCOVRI to reduce down the risk of dyskinesia. And again, another chunk of that 54% comes from replacing other therapies, such as immediate-release amantadine or dopamine agonists as a mechanism of managing dyskinesia.

67.     King stated that its 59 sales representatives would be able to "target 94% of the physicians who deal with the majority of these patients with Parkinson's disease…."

68.     King also provided further details of the Company's "extensive research" of payers, which included "talk[ing] to 5 pharmacy benefit managers, 8 national-scale managed care organizations, 12 more regional managed care organization covering 125 million lives in the U.S." King said "*what payers were willing to support us at was the GOCOVRI list price at $28,500 per year or $2,375 per month[.]*"

69.     Masterson also discussed market access at the September 18, 2017 Investor & Analyst Meeting, stating, "*[t]hrough our market research and discussions that we've had to date with payers, we anticipate there will be broad coverage for GOCOVRI, given its novel indication and established clinical benefit for patients.*"  Masterson noted that "about 20 payers cover about 85% of the lives in the United States" and assured "[w]e've already started discussion.  We've already actually done a clinical presentation with one of the largest in the space."

70.     On Adamas's November 2, 2017 earnings call, King reported on the Company's progress with payers stating:

> We have also begun outreach to payers and have scheduled clinical presentations with 7 out of the top 10 payers in the country for later this year.  The payers are particularly interested in GOCOVRI as a first in indication medicine for dyskinesia patients, who they recognize are in need.  *We anticipate broad payer coverage for GOCOVRI that will grow over the course of 2018*.

71.     After being made available since October 2017, GOCOVRI officially launched in January 2018.

72.     On Adamas's February 22, 2018 earnings call, King reported that "even in situations in which payers have not published reimbursement criteria, *we are routinely seeing patients receive reimbursement for GOCOVRI.*"  Merriweather likewise reported that as of December 31, 2017, 100 prescribers had written prescriptions for GOCOVRI and as of February 16, 2018, the number of prescribers had increased to 300, "reflecting **strong initial adoption** among the 6,500 targeted

physicians and good growth in just 6 weeks of the deployment of our sales force."  King similarly noted, "*We've seen strong interest from physicians in GOCOVRI…*."

73.     On May 3, 2018, Adamas held an earnings call (the "May 2018 call") where Merriweather reported that the Company had 1,608 fulfilled prescriptions from 550 prescribers. King noted that this represented "almost 1 in 12 of the target population" of approximately 6,500 physicians, which he claimed, "*demonstrates the strength of the GOCOVRI value proposition* for patients as well as the effectiveness of our sales team to share the GOCOVRI story and the investments we have made in ensuring the physician population is aware of the GOCOVRI data set through promotion, peer presentations, media and medical publications."  King assured, "*We're hearing loudly and clearly from these patients about the successes they are seeing with GOCOVRI treatment.  Every day, we hear stories from our field team following meetings that they have had with physicians*."

74.     King reported on the May 2018 call that "less than 2% of prescriptions received to date [are] ultimately rejected as not covered."

75.     At the May 16, 2018 Bank of America investor conference, King stated:

What we're seeing is it doesn't matter whether there is published criteria for the majority of plans.  Reimbursement, whether you're Medicare or in the commercial environment, is occurring, and *it's occurring with speed and support from the payer.*  In almost all cases, we are having to answer those questions, and so *we've streamlined ways in which we can provide offices the chance to get the right responses to the questions to -- that are needed by the payer of [their groups].*  But that's what we're witnessing at this stage.  It's less about published criteria and more just about a process regardless of the published criteria.

76.     King continued to tout payer support on an August 8, 2018 earnings call, stating, "*We continue to see strong support from payers regarding GOCOVRI prescription reimbursement.*  The significant majority of submitted prescriptions to GOCOVRI [O]nboard are being *reimbursed in a short period of time*."  King also said that while Medicare had not issued formal guidance, Medicare patients were "getting reimbursement support from their plans, and *it's happening quickly*."

**B.** **Defendants Were Aware Of And Ignored Substantial Obstacles Blocking Adamas's Penetration Of Its Target Market For GOCOVRI**

**1.** **Adamas Had Not Performed A Head-to-Head Study Comparing The Efficacy And Tolerability of GOCOVRI to Amantadine IR**

77.     Defendants repeatedly touted GOCOVRI as the "first and only" FDA-approved medicine indicated for the treatment of LID, yet were well aware that amantadine IR had been used to treat this condition for decades.  Went acknowledged on the May 2017 call that "the primary treatment modality is managing the dyskinesia with levodopa dose adjustments, but we estimate from the work we've done approximately 7% of patients are taking amantadine.  The problem is when they do, it's not durable and they don't stay on it for very long."  Defendants thus understood that for GOCOVRI to be commercially successful they would have to prove it was not just an extended release version of amantadine IR, but that it was more effective and tolerable.

78.     Adamas priced GOCOVRI at $28,500 per year or $2,375 per month, whereas generic amantadine IR was available for a couple thousand dollars per year.  Given this drastic price difference, Adamas needed to show GOCOVRI was superior to amantadine IR.  Defendants acknowledged the importance of making this distinction and frequently discussed GOCOVRI's "value proposition."  However, patients whose dyskinesia was effectively managed by amantadine IR had no incentive to switch to GOCOVRI, which was significantly more expensive.

79.     Defendants also understood that patients, physicians, and payers would evaluate GOCOVRI based on the available clinical data, as illustrated on the May 2017 call when Went stated that GOCOVRI "offers a ***new level of efficacy***" and has "***a very robust clinical package***. …And so, from our standpoint this ***product will be viewed on the merits of this data***.  ***It will be viewed as differentiated*** with its reduction, 30% reduction in LID, and its corresponding reduction in off-time."  Likewise, on Adamas's August 8, 2017 earnings call, King assured that GOCOVRI pricing would be "consistent with the value proposition for patients.  And we believe we've got a ***strong value proposition, given the differentiated clinical nature of ADS-5102***."

80.     While Defendants peddled GOCOVRI's clinical data, Adamas had not performed a study directly comparing the efficacy and tolerability of GOCOVRI to amantadine IR, which made differentiating the two a difficult task.  The comparison was made more difficult by the fact that

1  there were no clinical studies of amantadine IR's efficacy or tolerability limited to LID.

2      81.    In August 2017, Dr. Aparna Shukla wrote an editorial published in the Journal of the

3  American Medical Association ("JAMA"), a leading publication for doctors, titled "Extended-

4  Release Amantadine – A Smart Pill for Treatment of Levodopa-Induced Dyskinesia but Does the

5  Evidence Justify the Cost?"[2]  Shukla wrote:

6      There are several important limitations of the study. ***There was no active comparison
       with immediate-release amantadine***. There was an early and unexpected termination
7      of the study. ***The study did not shed light on responders to amantadine therapy vs
       nonresponders***. There was also an underrepresentation in the sample of patients with
8      young-onset PD who in general tend to have more severe LID (the mean age at onset
9      for PD in the study was about 56 year).

10     82.    Shukla concluded that that "***until a true comparison with a generic Amantadine IR***

11 ***pill is performed, it remains unclear whether the potential benefits [of GOCOVRI] justify the***

12 ***costs***."  The article also stated that amantadine IR was a "robust" and "powerful" treatment for

13 dyskinesia, noting that it was "found to reduce the severity of peak-dose dyskinesia and to reduce

14 the overall duration of troublesome LID."  Shukla's article put Adamas on notice that its reliance

15 on the clinical data to drive demand would be an issue, and payers' coverage decisions were critical

16 to addressing physicians' cost concerns.

17     83.    Defendants acknowledged this challenge, when on September 18, 2017, the Lead

18 Investigator for the GOCOVRI clinical studies and Chief of the Parkinson's and Movement Disorder

19 Disease Division at the University of Kansas Medical Center, Rajesh Pahwa ("Pahwa"), discussed

20 the challenge of differentiating the two at Adamas's Investor & Analyst Meeting.  Pahwa noted that

21 there was a perception of amantadine IR that "after a few months, it loses its efficacy."  Pahwa

22 indicated that Adamas recognized that it would need to overcome this perception, stating, "because

23 that is out there, there was an open label extension up to 2 years to show that the efficacy was

24 maintained long term with GOCOVRI."

25     84.    Pahwa stated "one question I'm often asked is… what about amantadine [extended

26 release] or GOCOVRI? What is the difference?"  Reflecting the concerns expressed by Dr. Shukla,

27 ─────────────────────

28 [2]  *Available at*  https://jamanetwork.com/journals/jamaneurology/article-abstract/2630678  (last
    accessed May 13, 2020).

Pahwa discussed the lack of data directly comparing GOCOVRI to amantadine IR and the issues with the open label study comparing the two stating, "if you were a tech reporter, *you would blow this [open] study apart*. But the thing is, *that's the best data we have on talking about IR and GOCOVRI*. Yes, this is an open-label study. Yes, *this could be a biased group.*" Pahwa stated, "*if you have a patient on amantadine IR who's not doing well, you are going to try GOCOVRI* on that patient, no matter what, to see if they can do better." However, Pahwa explained that the side effects from GOCOVRI "you also see with amantadine IR."

85.     King nevertheless attempted to tout GOCOVRI's efficacy and tolerability at this same meeting, stating, "the amantadine IR persistency, which is somewhere around 40% at the end of first year. And in our open-label clinical study over a period of 2 years, we're probably in that 65% to 70% range persistency." However, Pahwa explained the difficulty in comparing the available data for amantadine to GOCOVRI's data, noting, "one thing I would talk about amantadine IR, of *the data that Richard presented, that did not specifically target patients with dyskinesias, correct? That was amantadine IR in general*." Pahwa noted, "if [amantadine IR] is efficacious, they're going to have a hard time discontinuing it."

86.     As Pahwa indicated, if Adamas was unable to substantially differentiate GOCOVRI from amantadine IR, its use would be confined to the most severely dyskinetic patients or patients who had dyskinesia for a long duration who had not found amantadine IR to be effective or tolerable, drastically limiting Adamas's ability to penetrate the market.

87.     Defendant Patni acknowledged this challenge on Adamas's November 2, 2017 earnings call, noting, "[s]ince the approval, we have received *numerous questions about GOCOVRI and about how it is differentiated from existing treatment strategies for dyskinesia, including the use of amantadine immediate release. Some have commented that GOCOVRI is simply a long-acting amantadine*." But Patni went on to explain how GOCOVRI was different, stating that "GOCOVRI was designed to achieve high sustained concentrations of amantadine from awakening and throughout the day, when dyskinesia symptoms frequently occur."

88.     An analyst followed up on Patni's remarks and asked if the Company's marketing materials would make it clear that "GOCOVRI is not an extended release amantadine," King

responded that "physician experience of amantadine IR is in general that it lack the designed efficacy," and noting GOCOVRI's efficacy data, stated he was "*comfortable and confident that, that's enough of a clinical comparison that we can substantiate in the minds of physicians*."

89.     On the Company's February 22, 2018 earnings call, King assured that the value proposition derived from GOCOVRI's efficacy and safety profile was resonating with physicians and payers:

> I'll only add that the use of GOCOVRI in Parkinson's dyskinesia is very clearly supported by a *very robust safety and efficacy data package*, which clearly demonstrates the impact on both dyskinesia and OFF [time] in that patient population. *And for about the last 4 or 5 months right now, we've been presenting to the payer community and the physician community, the value proposition that's derived from that dataset*. And that's in the environment in which amantadine IR is available. And that's been resulting in *very strong, resonant support for GOCOVRI at both the physician and the payer level.*

90.     An analyst at the May 16, 2018 Bank of America investor conference asked how Adamas was differentiating GOCOVRI from amantadine IR for physicians who don't like amantadine IR.  King answered, "One, the PK profile for GOCOVRI is very, very different to anything that's been seen before with IR amantadine…. That profile appears to resonate and provide an *efficacy profile, which, again, from our clinical studies, is very enticing to physicians.*"

91.     On August 2, 2018, Adamas held a quarterly earnings call where King noted that some physicians who were "taking a thoughtful approach" to GOCOVRI were doing so "*largely based on their unsatisfactory historic experience with immediate-release amantadine in dyskinesia patients."*  King noted that these physicians were "*surprised*" by the clinical data and wanted to see if "clinical benefits that we describe for GOCOVRI are as strong as our Phase III data illustrates."

92.     Several Adamas former employees indicated that Adamas had not been able to successfully differentiate GOCOVRI from amantadine.  FE2 noted that Adamas had not conducted a head-to-head comparison of generic IR amantadine to GOCOVRI and that FE2 found it difficult to differentiate the two drugs, describing it as similar to explaining the difference between an aspirin and a much more expensive coated aspirin.  FE2 noted that pharmaceutical companies typically want to avoid these types of comparison trials because they are costly and the companies never

know if the trial will produce significantly better results.  FE2 said GOCOVRI was touted as a ground-breaking discovery, but it was mostly a drug delivery modification of amantadine which had been around forever.  FE2 said the main difference was that patients were supposed to take GOCOVRI in the evening so that the drug would be a peak concentration during the day.

93.     FE2 said that GOCOVRI supposedly had slight improvements on some of the amantadine side effects, but was sold at a much higher price.  FE2 noted GOCOVRI was supposedly designed to avoid issues with sleep, but FE2 received reports that patients had issues with sleep when taking it.  FE2 explained that another side effect of GOCOVRI was hallucinations, which was also a side effect of Parkinson's, making it difficult to know if it was caused by the disease or the drug.  In this instance, FE2 said a patient might prefer not to take the drug.

94.     FE3 also recalled that some patients had sleep issues and hallucinations due to GOCOVRI, which also occurred with the generic amantadine.  FE3 explained that GOCOVRI's impact on sleep was an issue, since the main difference between GOCOVRI and amantadine was that GOCOVRI had to be taken at night to work properly.  FE3 said doctors noted the big difference in cost between GOCOVRI and generic amantadine, which had been available for approximately 40 years already and was typically reimbursed by payers.

95.     FE1 described GOCOVRI as "a joke from the get go" and similarly stated that the only distinguishing characteristic between GOCOVRI and generic amantadine was that it was administered in the evening.  FE1 believed King and Went assembled the "pie in the sky" forecasts for GOCOVRI, which were based on nothing except the fact that GOCOVRI was the only brand name drug with a LID indication.  FE1 explained that while Adamas could have pursued approval for a broader indication, it focused on LID because there were no other drugs approved for that specific indication; however, it was known that amantadine was used to treat LID.  FE2 also questioned if Went considered whether there was a great enough need for a new version of the drug.

96.     FE6 said prior to launch physicians were consulted to determine their interest in GOCOVRI and some said it sounded just like amantadine, while others liked the convenience of once-a-day dosing.  FE6 said that while GOCOVRI got off to a good start in terms of number of prescriptions written, it plateaued after a few months.  Adamas tried to figure why some doctors

only wrote one or two prescriptions.  FE6 said the market research indicated that doctors were

confused about the difference between GOCOVRI and amantadine IR.  FE6 said doctors realized

they could adjust dosage of amantadine and get the same result of GOCOVRI at the lower generic

price.  FE6 said Went decided to change the sales message approximately three to six months after

launch, which caused further confusion because there was not a consistent sales message.

### 2. Physicians Generally Did Not Treat Patients With Moderate or Mild Dyskinesia

97.    On the May 2017 call Defendants told investors that dyskinesia was a "troublesome"
disease that was severely disruptive to patients' lives, and treatment for it was "*a critical unmet
need.*"  Went stated that "market research confirms that physicians struggled to balance dyskinesia
and off [time] in the context of treating Parkinson's patients."  Went stated:

> Nearly two-thirds of surveyed neurologists or movement disorder specialists
> recognize efficacy as the biggest unmet need in treating dyskinesia in Parkinson's.
> Less than 25% of surveyed physicians are satisfied with current management
> modalities such as levodopa dose adjustments.  Additionally, our market research
> shows that ADS5102 would significantly reduce the proportion of Parkinson's
> patients with dyskinesia that go untreated.

98.    At the September 18, 2017 Investor & Analyst Meeting, Patni described the impact
of dyskinesia on patients as "particularly stressing for patients when they're working" and "can lead
to a sense of embarrassment, isolation, and depression."  Patni also said it was "quite a burden for
caregivers" and represented a "disproportionate amount of health care cost" associated with
Parkinson's disease.

99.    However not all patients receiving levodopa therapy, nor the physicians treating
them, were even aware that they are experiencing dyskinesia, but rather, confused it for the tremors
that are associated with Parkinson's.  In addition, patients with mild or moderate dyskinesia were
often not particularly bothered by it, finding it to be a minor side effect, and that the relief and high
experienced from the increased levels of dopamine from the levodopa treatment outweighed the
accompanying LID.

100.   King stated at the September 18, 2017 Investor & Analyst Meeting that patients were
"*not sure what [dyskinesia] is right now*" and discussed a "qualitative survey of patients which

indicated that patients felt dyskinesia "was just **part of my normal Parkinson's disease"** or merely "**unfortunate consequence**" of levodopa.  King also noted that the survey indicated "**only about 20% of patients were aware of this risk of dyskinesia from their physician**" and noted that "the physician is more focused on managing Parkinson's at the broadest level."  Nevertheless, Patni assured, "GOCOVRI can be used in a broad Parkinson's disease population with dyskinesia and is appropriate for all patients, irrespective of dyskinesia severity or dyskinesia duration."

101.    Defendants said the largest portion of its targeted market were untreated patients (*see* ¶66, *supra*).  For this strategy to be successful, patients and physicians would need to find the dyskinesia problematic enough to desire treatment.  It would also require overcoming amantadine's reputation for lack of efficacy and tolerability.  King noted at the September 18, 2017 Investor & Analyst Meeting that physicians said "again and again and again efficacy, efficacy, efficacy" when asked what the most unmet need was for patients with dyskinesia.

102.    Acquiring these untreated patients meant educating general neurologists, since most newly diagnosed or untreated patients would be treated by a general neurologist before progressing to a movement disorder specialist.  However, King noted on the August 8, 2017 earnings call, that the Company's education efforts was focused on movement disorder specialists.  Given the lack of data showing GOCOVRI was superior to amantadine, the general neurologists were not convinced, as Went indicated at the May 8, 2018 Deutsche Bank Conference, stating that there are "**neurologists who are just incredibly busy and you really need to come in with a really strong data story and convince them to give it a try.**"

103.    Adamas former employees confirmed that demand for GOCOVRI was limited primarily to severely dyskinetic patients.  FE1 noted that patients are not always that bothered by dyskinesia because there is a euphoria or good feeling from the levodopa.  FE1 believed Adamas did not meet its projections because they were based on a guess and not every patient with LID desired treatment.

104.    FE2 explained that Parkinson's patients do not typically mind the sudden movements and typically want more dopamine because it feels good, and patients prefer the sudden movements to no movement.  FE2 said dyskinesia is more bothersome to the caregivers or family members than

1   the patients.  FE2 noted that neurologists were not "super excited" by GOCOVRI.

2       105.    FE3 noticed that GOCOVRI was mostly used for "train wreck patients" or those who

3   tried everything else and nothing was working.  FE4 similarly stated that patients with severe

4   dyskinesia were more suited to GOCOVRI.  FE4 believed the real issue for GOCOVRI was demand.

5   FE4 noted the original forecasts were based upon a potential market of 150,000 to 200,000 total

6   patients with dyskinesia; however, only a small subset of this number had such severe movements

7   that the patient would be a candidate for this drug.  FE4 noted that patients who experienced

8   moderate dyskinesia were less willing to take GOCOVRI, as such the market was dramatically

9   smaller.

10      106.    FE5 said Adamas did not tell sales representatives that every patient with dyskinesia

11  might not need or want treatment.  FE5 believed that Adamas probably overestimated the market

12  size, by defining it as everyone with dyskinesia.  FE5 explained that not all patients experiencing

13  dyskinesia require treatment, and doctors typically only treat dyskinesia in the more severe cases.

14      107.    FE6 said the original forecasts did not take into account the level of dyskinesia, such

15  as, whether it was moderate or severe.  However, FE6 understood that only those patients taking

16  higher levels of levodopa typically seek treatment for dyskinesia.

17      108.    Polypharmacy was another issue impacting demand for GOCOVRI.  Polypharmacy

18  occurs when patients are concurrently prescribed multiple medications which may present too much

19  risk for too little benefit due to adverse drug reactions, drug interactions, prescribing cascade, and

20  higher costs,[3] and is common issue for Parkinson's patients.  Given these circumstances, many

21  patients and physicians found that the dyskinesia was effectively managed by adjusting the levodopa

22  dose, thus GOCOVRI was only appropriate for severely dyskinetic patients.

23      109.    FE2 explained that by the time a Parkinson's patient might take amantadine, they

24  could be on a number of other drugs with side effects.  FE2 said if the patient is older, they could

25  also be taking medications for other conditions such as hypertension, cholesterol or even anti-

---

27  [3] Rushabh J Dagli & Akanksha Sharma, *Polypharmacy: A Global Risk Factor for Elderly People*,

28  J. Int. Oral Health, vol. 6:6, i-ii (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/
    PMC4295469 (last accessed May 11, 2020).

depressants.  FE2 said doctors evaluate the potential benefit of amantadine or GOCOVRI with the potential side effects, as well as, the balance the value of taking another drug.  FE4 similarly explained that not every patient taking levodopa experienced such severe movements that necessitated an additional treatment to control those movements.

110.    FE5 noted that dyskinesia is not life-threatening to patients so doctors do not typically treat until it becomes problematic.  FE5 said that patients are not typically bothered by mild dyskinesia and do not want to take another pill in addition to other medications.  FE5 said dyskinesia is not a burden to patients until it gets really bad.

111.    While Defendants touted the strong initial support from physicians after GOCOVRI was launched, FE1 said that approximately eight out of ten of the top prescribers of GOCOVRI were either Investigators in the clinical trials or a doctor on the Adamas Speakers Bureau.  FE4 noted that the initial spike in prescriptions was from severely dyskinetic patients, including patients from the clinical trials who saw good results and others who were actively looking for a new treatment.  King admitted as such on the August 2, 2018 earnings call, stating that physicians who were "heavily involved in [Adamas's] clinical study" were "very well represented in our prescribing …" population.

### 3.    Market Access Was Limited By GOCOVRI's High Cost And Payers' Coverage Requirements

112.    For those who were interested in trying GOCOVRI, its high cost meant that payer coverage was necessary.  Payers for prescription drugs include governmental payers, such as the Medicare and Medicaid programs, managed care organizations, and private health insurers.  Payers seek to minimize their spending on pharmaceuticals in order to lower overall healthcare costs.  The primary tool payers use to contain costs is formulary placement.  A payer's formulary is the list of all pharmaceuticals that the payer will provide coverage for.  The formulary will also provide patient co-pay amounts depending on the tier the pharmaceutical is placed on.  For instance, a generic drug might have a $5 co-pay while a newer brand name drug might have a $50 co-pay.  While a payer may provide reimbursement, high co-pays may cause patients to not fill prescriptions or to drop treatment.

113.   Adamas acknowledged in each of its annual reports filed on Form 10-K's for the years ending December 31, 2016 through December 31, 2019 that, "Coverage, reimbursements, and placement decisions for a new product are based on many factors including the coverage, reimbursement, and placement of already marketed branded drugs for the *same or similar* indications, the *safety and efficacy* of the new product, *availability of generics for similar indications*, and the *clinical need* for the new product."  The Company was aware that generic amantadine IR was approved for a similar indication and placed on preferred or top tiers on most formularies, and thus would play an integral role in payers' coverage decisions.

114.   Payers also use other cost containment strategies, such as, medical necessity, prior authorization, and step-throughs, which are frequently coupled with each other.  Medical necessity refers to a decision by a payer that a drug is necessary to treat a diagnosed medical problem.  Most payers will not provide reimbursement for drugs that they deem to be not medically necessary.  In prior authorization, the payer will not cover the cost of the drug unless a patient's doctor first contacts the payer and describes the specific set of conditions that makes the drug therapeutically appropriate.  A step-through, also known as step-therapy or step-edits, involve a payer requirement that a patient try a cheaper therapeutic alternative prior to approving a more expensive drug.  Step-therapy may also involve a showing that the cheaper alternative was not effective or well tolerated.  Step-therapy may be required to prove medical necessity or to gain prior authorization, or may be an independent requirement.   Meeting these requirements involves patients and physicians providing payers with documentation for them to base their decision.

115.   Coverage for GOCOVRI depended on whether payer's would differentiate GOCOVRI from generic amantadine IR, such that they appreciated the value proposition of GOCOVRI to justify its cost.  Adamas did not perform a study comparing the efficacy and tolerability of GOCOVRI to amantadine IR (as detailed in ¶81, *supra*), thus it faced the same hurdle with payers that it faced with patients and physicians.  If Adamas was unable to successfully make this differentiation, payers would: (i) not reimburse the drastically higher priced GOCOVRI; (ii) place it on a disadvantaged formulary tier; (iii) require a showing of medical necessity and/or a prior authorization; and/or (iv) require that patients first step-through amantadine IR before providing

1   reimbursement.

2       116.    Payers' requirements to obtain reimbursement would impact demand for GOCOVRI

3   due to the time and burden of providing documentation and waiting for fulfillment.  Patients and

4   physicians would need to appreciate the benefits of GOCOVRI compared to amantadine IR to

5   undertake this task.

6       117.    On Adamas's May 2017 call, Went assured, "the data that we present for ADS-5102

7   has been very well-received" by payers.  Went indicated payers were unlikely to require a step-

8   through, stating, "we have not been at this point receiving significant pushback with regards to that

9   given the size of the population or with regard to IR amantadine likely because of its relatively light

10  use in this population."

11      118.    On the Company's August 8, 2017 earnings call, King again assured that payers

12  would not require a step-through of amantadine IR:

13          KING: …We've obviously done a fair amount of assessment of ADS5102 with
            physicians and with payers. The profile for the product, as I mentioned in the
14          comments, resonates extremely well. And *they don't see this profile as really having
            much to do with the amantadine IR profile*, that they - - that's currently on the
15          marketplace. *They recognize that amantadine IR is not approved for this
            indication*. And that if ADS-5102 is approved for this indication, and with the
16          clinical data set that is available to support it, that *there is no anticipation of
            requiring a step-through of amantadine IR to get to 5102*.
17

18      119.    To the contrary, FE4 stated that Adamas always anticipated that some payers would

19  require a step-through of amantadine.  FE4 noted that Adamas conducted payer research to

20  determine how to price of GOCOVRI and the fact that GOCOVRI was a reformulation of a generic

21  drug drove down the payer support for pricing.  FE2 similarly noted that managed care companies

22  sometimes require step therapy, especially when there is a big price difference between two drugs

23  without a big enough difference in efficacy.  Indeed, Adamas acknowledged in its annual reports

24  that payers' decisions are based in part on the availability of generics available to treat similar

25  indications (as detailed in ¶113, *supra*).

26      120.    Masterson explained the reimbursement paradigm GOCOVRI faced when it entered

27  the market at the September 18, 2017 Investor & Analyst Meeting:

28          Some  of  the  largest  commercial  payers  now  like  UnitedHealthcare,  like

                                        28

CVS/caremark, like Express Scripts also do not cover a product until they have an opportunity to review it. Most of the commercial plans will be reviewing the product within 6 months of launch. Similar to Medicare, commercial[] [is] the same type of dynamic. While they're going through the review, you can get coverage through a provisional process, typically known as *medical necessity, where paperwork is filled out, it goes to the payer*. When medical necessity is approved, a patient is approved for a 12 month period of time to be able to get medication.

And then, also in the commercial space, *we anticipate there will be some plans that will automatically cover us at a Tier 3 or that nonpreferred tier until they review the product*. *Some of those plans until they formally review the product may have prior authorizations in place to assure appropriate use. Appropriate use prior authorizations are typically as it relates to the diagnoses and also ensuring quantities aligned with the package insert*.

121.   Adamas understood that proving medical necessity or securing a prior authorization would in some cases require a step-through of amantadine.

122.   At the September 18, 2017 Investor & Analyst Meeting, King stated, "We also presented to payers the fact that amantadine IR, which they know has been available in Parkinson's disease for some time, doesn't necessarily do a great job in providing support for these patients… "[H]aving presented those background elements to payers, what we concluded and *what the payers were willing to support us at was the GOCOVRI list price at $28,500 per year or $2,375 per month*…"

123.   On January 22, 2018, Adamas filed a Form 8-K which noted that, "*although no payer has done so to date,* a payer may determine to require patients to use immediate release amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI."

124.   The investment bank advisory firm Evercore issued a report on February 4, 2018 discussing coverage of GOCOVRI, noting that GOCOVRI was excluded from Express Scripts 2018 formulary, impacting "11% of total commercial lives" in the United States.  It also noted that GOCOVRI was being processed under medical necessity, yet "[l]imited efficacy of amantadine makes establishing medical necessity fairly straightforward."  The report also noted that four of ten payers were providing reimbursement "with established prior auth[ortization] forms…"

125.   On the February 22, 2018 earnings call, King downplayed the impact payers'

reimbursement criteria was having on fulfillment and demand, noting that prescriptions were being fulfilled regardless of whether payers were formally covering GOCOVRI:

> KING: …*[W]e are seeing, across all of the payers that we've addressed and dealt with, responsiveness, regardless of whether they have published set of criteria or not to manage GOCOVRI. And yes, in some cases, that results in a prior authorization request, which then leads to, ultimately, prescription fulfillment. But we're seeing prescription fulfillment across most every plan.* There's very few that are not fulfilling. We have a handful of final decisions where people are not fulfilling prescriptions. But in general, people are fulfilling, whether they have a published plan or not.

126.    King indicate that formulary adoption was "***not the critical defining distinction for access to GOCOVRI.***"  King further claimed that fulfillment was "***going relatively smoothly.***"

127.    The language in the January 22, 2018 Form 8-K indicating that payers were not requiring step-therapy (¶123, *supra*) was repeated in the Company's FY' 2017  annual report filed with the SEC on Form 10-K on February 22, 2018, as well as, its 1Q' 2018 quarterly report filed with the SEC on Form 10-Q on May 3, 2018.  However, contrary to Defendants statements, several payers were already requiring an amantadine step-through, as indicated in the chart[4] below.

| Payer | Decision Date | Step-Through Requirements |
|---|---|---|
| Centene | 10/10/17 | Failure of a 2-week trial of **immediate-release amantadine** unless contraindicated or clinically significant adverse effects are experienced<br><br>On 4/12/18 added the following requirement:<br><br>Medical justification supports inability to continue use of immediate-release amantadine (e.g., contraindications to excipients) |
| Tricare | 11/16/2017 | The Department of Defense Pharmacy and Therapeutics Committee minutes from November 15-16, 2017, indicate that GOCOVRI required both medical necessity (MN) and prior authorization (PA), which involved:<br><br>Medical Necessity (MN) criteria:<br>The patient has experienced significant adverse effects to the formulary alternative **amantadine IR** that are not expected to occur with Gocovri.<br><br>Manual PA Criteria—Gocovri is approved if:<br>• The patient is ≥18 years old AND<br>• Has a diagnosis of Parkinson's Disease AND<br>• Has had therapeutic failure of a trial of **amantadine 200 mg immediate release** tablets administered twice daily |

---

[4] This list is intended to be illustrative, not exhaustive, as many formularies that were in place at the time are no longer publicly available or have since been revised without indicating when revisions were made.  The payers' decisions, or the relevant excerpts of the formulary, are attached hereto as Exhibits A-H.

| Idaho Medicaid | 11/17/2017 | The formulary lists GOCOVRI as a non-preferred drug. Non-preferred drugs require failure of 1, 2 or 3 preferred agents for prior authorization approval. Among the list of preferred drugs was **amantadine capsules, syrup.** |
|---|---|---|
| Blue Cross Blue Shield Federal Employees Program | 12/8/2017 | There was a requirement to show GOCOVRI was medically necessary which required among items that: <br><br> Prescribing physician has attempted to adjust levodopa therapy to decrease dyskinesia <br> AND <br> Inadequate treatment response or intolerance to **short acting amantadine** |
| Delaware Medicaid | 1/24/18 | Gocovri is listed as a Non-preferred agent for which prior authorization is required. The criterion says: Two preferred products required before a non-preferred product will be approved. <br> Among the preferred agents are **amantadine capsules, solution**. |
| Prime Therapeutics/ Blue Cross Blue Shield of Alabama | Jan 2018 | GOCOVRI required prior authorization. <br> The approval criteria included a requirement that: <br><br> The patient's medication history indicates the use of **immediate release amantadine** <br> OR <br> The patient has a documented intolerance, FDA labeled contraindication, or hypersensitivity to **immediate release amantadine** |
| Kaiser Permanente | March 2018 | Non-formulary amantadine ER (GocovriTM) will be covered on the prescription drug benefit when the following criteria are met: <br><br> * Pt has dyskinetic movements that have responded to adequate trial (≥4 week) of **amantadine IR** <br> -AND- <br> * Pt has failed **amantadine IR** due to frequency of dosing |
| Vermont Medicaid | 4/27/18 | [P]atient has a documented side effect, allergy, or treatment failure with **immediate release amantadine**. Note: treatment failure is defined by a decrease in effectiveness despite attempts to increase dosage to 300mg/day or by temporarily discontinuing amantadine for several weeks and restarting therapy. |

128.     Many of these payers were among the largest in the United States. Centene insures over 14.7 million people among all of its affiliates. Tricare, a health insurer for the Department of Defense, covers approximately 9.4 million people. Blue Cross Blue Shield Federal Employee Program provides benefits to approximately 5.3 million people. Prime Therapeutics is aligned with BlueCross Blue Shield networks and covers over 28 million individuals in the U.S. Kaiser, a large west coast health insurer covers approximately 12 million people.

129.     Defendants would have been aware of these decisions because they were regularly meeting with the top payers who covered 85% of the U.S. population (¶¶69-70). In addition, these decisions were in most cases publicly available on the payers' websites. Moreover, Defendants had access to information about payers' reimbursement criteria through Onboard, which was responsible for providing payers with any documents required for fulfillment, including those for step-therapy

(*see* Sec. V.B.4, *infra*).  Furthermore, this information would have been known to GOCOVRI sales representatives who reported feedback to the Sales Advisory Board, which was then conveyed to Defendants (*see* ¶363, *infra*).  Given the significance of GOCOVRI to the Company's operations (*see* Sec. VIII.B, *infra*), Defendants knew step-therapy was required by some payers at the time.

130.    Cowen published a report on February 22, 2018 stating,  "*if reimbursement is a bit more mixed than management is indicating – and Osmotica's Osmolex ER [] launches at a significant discount (which we believe is likely) – then the managed care/formulary situation could become a bit more complicated.*"  The report concluded, "with seemingly *only one way to gain access (i.e. managed care/pricing)* – this does need to be monitored and we are sensitive to it."

131.    On April 19, 2018, Piper Jaffray issued a report detailing insights it gathered into the payer landscape from senior management meetings with investors:

> ADMS did make it clear that they are not seeing any "hard" step-edits. In other words, payers are not requiring a patient to prospectively try a course with immediate-release (IR) amantadine before allowing access to Gocovri. *The main step edit in place is one where the physician has to attest that the patient has been on a previous course of IR amantadine*. To be clear, *a sizable portion of PD patients (particularly more advanced PD patients managed by movement disorder specialists, a core physician target audience) have at some point been previously treated with IR amantadine* (ADMS believes that 30%-50% of all treated PD patients have been on IR amantadine at some point), meaning that this kind of *"soft" step edit does not in any way dramatically limit the underlying patient opportunity* (i.e., though IR amantadine is not a standard-of-care treatment, it has seen sizable usage in PD patients moving through more advanced stages of the disease).

132.    While Adamas may have believed 30%-50% of all *treated* Parkinson's disease patients had a prior history with amantadine IR, this payer requirement presented a barrier to penetrating the untreated patients.  As indicated in the report, this prior history was more common with the "more advanced PD patients", and therefore, limited demand to severely dyskinetic patients.

133.    King reported on Adamas's May 8, 2018 earnings call:

> While specific criteria for coverage may not yet be available and/or may differ slightly from plan to plan, in the majority of cases and across all payer segments, coverage is supported if the patient has a diagnosis of Parkinson's disease dyskinesia that's consistent with labeling.

***Some plans also ask the physician to confirm that the patient has a medical history with amantadine IR.*** We believe our GOCOVRI onboard program is effectively working to enhance physicians, patients and caregiver access to good healthy treatment when needed. And we continue to improve and make this program even more effective.

134.   An analyst on the call asked about payers requiring an amantadine step-through and King responded:

DAVID A. AMSELLEM: ***…[A]re you surprised regarding the extent to which you are seeing patients having to be stepped through immediate release amantadine?*** And I guess maybe another way of asking this is as you look to broaden the patient audience and presumably get access to patients who are naive to amantadine, does that inform in any way your willingness to contract more aggressively?

KING: So let me just try and pick up on the first point. You mentioned stepping through IR amantadine. ***I'm not aware of any plan that has a hard step for us through IR amantadine.*** I am aware of plans that have -- are interested as to whether IR amantadine's been tried before in patients and has been shown to either be ineffective or not well tolerated. ***We've seen that, but I'm unaware of any plan which has a formal step-through through IR amantadine.***

135.   FE5 explained that soft edits are when a payer requires the patient to have tried another medication, typically one that is less expensive and usually generic.  FE5 said hard edits are when a payer wants the patient to not only try the generic, but also, for a certain amount of time and sometimes up to a specific dose.  Contrary to Defendants claims, payers were requiring these so-called "hard" edits at the time (as detailed in ¶127, *supra*).  Regardless of Defendants' distinction, payers were requiring a "formal" step-through which was limiting access to patients with a prior history of being treated with amantadine IR, and therefore, limiting the market opportunity for GOCOVRI.

136.   On August 2, 2018, Adamas held a quarterly earnings call, King stated, "We continue to see strong support from payers regarding GOCOVRI prescription reimbursement.  The significant majority of submitted prescriptions to GOCOVRI onboard are being reimbursed in a short period of time."

137.   Piper Jaffray issued a report on August 2, 2018 responding to the news, describing access as "favorable" indicating the market was unaware that the payer requirements were impacting demand:

*Regarding access, the payer landscape on the whole continues to be favorable, with most payers requiring what is essentially a "soft" step-edit where a physician need only attest* that the patient has LID and has previously been on dopaminergic therapy (we take that to mean that it could be immediate-release (IR) amantadine or perhaps another dopamine agonist such as ropinirole).

138.    Adamas former employees revealed that the reimbursement paradigm was not exactly as Defendants described.  FE5 noticed market access issues right away.  FE5 submitted approximately 100 prescriptions in 1Q' 2018 and 20 to 30 were denied.  FE5 said some payers initially provided reimbursement, but began denying approval and requiring prior authorization and/or step-therapy after reviewing the drug.  FE5 was unable to continue to secure as many prescriptions when payers began denying reimbursement and denying appeals.

139.    FE5 said doctors were frustrated with the long process and the low likelihood of approval so they did not want to waste their time, which restricted access for patients.  FE5 said reimbursement was denied most of the time.  FE5 said the initial prior authorization took between 3-4 weeks, and an appeal would take another 1-2 weeks.  FE3 said *half of prescriptions were held up because managed care was not willing to reimburse unless the patient had previously used generic amantadine.*

140.    FE5 stated that GOCOVRI's high price negatively impacted its commercial success and noted that many prescriptions were not filled because of the high co-pays.  FE5 said Went instructed sales representatives to focus on commercial payers as opposed to Medicare because the commercial payer approval rate was higher than Medicare's.  FE5 said there was no way to really do this and no strategy was provided.  FE5 believed Went gave this instruction at a sales meeting in or around June 2018, but was not certain of the date.

141.    FE1 indicated that step-edits were becoming more common after the initial surge in enrollments, because the managed care companies figured out GOCOVRI was not that different from the generic amantadine.  FE1 said there was a lot of paperwork for approval which discouraged doctors from writing prescriptions.  FE1 said fulfillment began taking longer and longer after the first several months after the launch due to request for prior authorization and step-edits, and could take 30 days from writing the prescription.

142.    FE4 similarly noted that doctors were frustrated by prior authorizations, and those

34

AMENDED CLASS ACTION COMPLAINT
Case No. 4:19-cv-08051-JSW

who went through the process of filling out a prior authorization and waiting for approval, who were then declined, were less interested in going through the process again for other patients.  This resulted in the Company not just losing one patient, but also the physician, who might have numerous patients and potential users of GOCOVRI.  FE6 believed that if a doctor had the experience of writing one or two prescriptions that were not approved, then those doctors were unlikely to continue writing prescriptions.

### 4.    Adamas Chose To Distribute GOCOVRI Through A Specialty Pharmacy

143.    Adamas chose to distribute GOCOVRI through a specialty pharmacy, which they dubbed GOCOVRI Onboard ("Onboard").  This meant patients and physicians could not fill prescriptions at retail pharmacies.  Onboard was also responsible for obtaining any documentation from patients and physicians that was required by payers for prior authorization, medical necessity, and step-therapy.

144.    Masterson described Onboard at the September 18, 2017 Investor & Analyst Meeting, stating, "GOCOVRI Onboard will do the benefit verification.  They will provide any [prior authorization] or reimbursement support that's required to get patient on to medication."

145.    On the November 2, 2017 earnings call, King provided further detail about Onboard, stating, "the interaction is *singular and uniform* for both patients and physicians as well as for payers, by the way, and in terms of the management of reimbursement support for patients."  King noted, "we've designed it to be a single point of interaction, rather than potentially multiple points of interaction for the patient."  King also described the "treatment form" which was used "in lieu of a prescription to establish the ability for GOCOVRI Onboard to support patient reimbursement."  King said "*we've taken a lot of input there from physicians to make sure that, that is a simple-to-use- form*."   King claimed, "*we've designed this patient interaction, this patient assistance program well to meet the needs of both physicians and patients*."

146.    On Adamas's May 8, 2018 earnings call, King reported, "We believe our GOCOVRI onboard program is effectively working to enhance physicians, patients and caregiver access to good healthy treatment when needed."

147.   Adamas was heavily relying on the specialty pharmacy operating smoothly and efficiently for GOCOVRI's commercial success.  Adamas former employees revealed that the decision to use the specialty pharmacy hurt the Company's commercialization efforts.

148.   FE4 noted that there was negative feedback on the use of specialty pharmacy, GOCOVRI Onboard, and the treatment form as part of the prescription fulfillment process.  FE4 said the use of a specialty pharmacy caused confusion, explaining that some doctors wrote typical prescriptions and patients then tried to fill them at a typical pharmacy, which could result in Adamas losing the prescription.

149.   FE6 also discussed missed or lost prescriptions that were accidentally sent to regular pharmacies instead of the specialty pharmacy.  FE6 said in the first six months there were a fair number of these prescriptions, but Adamas refused to even investigate how many prescriptions were potentially lost due to this confusion or how to correct the issue.  FE1 said that three months after physicians submitted treatment forms to Onboard, sales representatives followed up to inquire how patients were responding to GOCOVRI and learned many prescriptions were never filled.

150.   FE5 said Adamas decided to offer GOCOVRI through a specialty pharmacy in order to control distribution, but it resulted in additional steps for patients to access it.  FE5 noted that Adamas revised the Onboard treatment form two times.  FE5 explained that the first treatment form only had one dosage listed, the recommended starting dose, and if doctors wanted a different dosage, such as the lower renal dose, then they had to write it in.  FE5 did not like the initial treatment form for this reason.  FE5 said the form was later revised with different dosage options, including the lower renal dose.  FE5 preferred this treatment form, but the Company later changed it back to one dosage thinking it would simplify things.

151.   FE3 also said using the specialty pharmacy made it more difficult to obtain GOCOVRI.  FE3 had to help guide the doctors' offices in filling out the Onboard treatment form.  FE1 similarly believed having only one specialty pharmacy limited distribution and indicated that other pharmacies were interested in offering GOCOVRI.

### 5.   Adamas Did Not Provide Physicians With A Free Supply of GOCOVRI

152.   King announced at the September 18, 2017 Investor & Analyst Meeting that "we

won't sample this program into the physician's office….[B]ecause we're going to provide access from QuickStart to all patients, that will be the support mechanism that we'll use to help patients as they work their way through the reimbursement challenges that will be integral for any part of this being introduced. So we'll replace sampling with that…"  Masterson  explained, "It will be triggered on day 5 to help patients get onto medication as quickly as possible as GOCOVRI Onboard works through any type of prior authorizations or any barriers that may be in place."

153.    On the February 22, 2018 earnings call, King explained that QuickStart allowed "qualified patients [to] receive a free *14-day supply* if the benefits verification process is taking more than 5 days. *To date, a majority of patients have not utilized this program.*"

154.    This decision increased the Company's reliance on GOCOVRI's clinical data, since physicians could not evaluate GOCOVRI's efficacy or tolerability without writing prescriptions.  In addition, deciding to not provide samples placed increased reliance on Onboard operating efficiently.

155.    FE3 said QuickStart was heavily promoted to get patients taking GOCOVRI at no cost for a limited period of time, but doctors would have preferred free samples to see if it actually worked before writing a prescription.

156.    At the May 16, 2018 Bank Of America conference, King indicated that reimbursement was taking longer for some patients and if they were still waiting for reimbursement at the end of the two weeks, "*we'll provide another 2 weeks' worth of GOCOVRI under the Quick Start program.*  If at the end of that, there's still no decision, we have to say, 'Okay, we can't provide any more.'"  However, King noted "Quick Start is a very small minority of our patient population. So it gives you some sense as to *how rapidly the payers are coming to conclusion.*"

157.    FE1 confirmed that the QuickStart program became more of an emphasis because fulfillment was taking a long time and the payers were not reimbursing.  FE1 said that QuickStart existed from the time GOCOVRI was launched; however, FE1 believed for the first year QuickStart provided 14-days of GOCOVRI at no cost.  FE1 said QuickStart was later increased to 28 days due to the longer time it was taking to obtain approval from payers.

### 6.     OSMOLEX Approval Brings Competition And Added Confusion

158.    On February 20, 2018, the FDA approved OSMOLEX ER ("OSMOLEX"), another extended release version of amantadine, was approved for the same indication as amantadine IR. OSMOLEX was seen as a potential competitor to GOCOVRI.  For example, William Blair issued a report the same day as OSMOLEX's approval, titled "Osmolex ER FDA Approval Places Indirect Competitive Pressure on the Gocovri Franchise."  The report noted that Adamas shares were "down about 20%" and stated, "*Gocovri ER was left off Express Scripts' preferred formulary list while generic amantadine IR remained —this highlights ongoing pricing and reimbursement pressures.*"

159.    On Adamas's February 22, 2018 earnings call, Went admitted the approval of OSMOLEX "was a surprise to us," but attempted to differentiate it from GOCOVRI: "*[i]mportantly, it is not approved for the use of dyskinesia in Parkinson's disease, as this is a separate and distinct orphan movement disorder*."  But Went understood the market would view both products as an extended release amantadine and that the distinction was meaningless, stating, "We recognized that there could be confusion, and we will be vigilant to address it with the payers, physicians and patients."

160.    An analyst asked, "does the availability of the OSMOLEX ER product change your path forward?"  Went replied, "I don't think so… [T]he label that OSMOLEX has, is very much based upon that of immediate release amantadine.  And I think *all of our attempts to look at indications for GOCOVRI are in light of the [] availability of immediate-release amantadine as potential treatment*… And so *I really don't see it affecting it at this instance*."  Went's statement reflects that Adamas's commercial strategy rested on payers differentiating GOCOVRI based on it being the only drug approved for its indication – LID.  FE1 confirmed that Adamas's "pie in the sky forecasts" for GOCOVRI were based on nothing except being the only brand name drug with a LID indication.

161.    King stated on the February 22, 2018 call that, "*if you believe that OSMOLEX ER is basically an equivalency to IR amantadine, then I don't think that value proposition to either the payer or to the physician community changes in that light*."

162.     At the May 16, 2018 Bank of America conference, King indicated that he believed that OSMOLEX would have issues justifying its pricing to payers because it was merely an extended release amantadine and lacked sufficient clinical data:

> There's no indication you have for dyskinesia in Parkinson's disease, and no data that's available to demonstrate effecting in Parkinson's disease. I think, *at the payer level, we've obviously, every time we talked about GOCOVRI, we've had to confront the question about IR amantadine*. How -- why can't we get that with IR amantadine? *We can't answer that*, but we can certainly answer the question of how does GOCOVRI affect dyskinesias very clear in our data set. And to date, *payers have concluded that, that is a very different profile with GOCOVRI and IR amantadine and that, therefore, they will reimburse the product and support usage of it across the board, actually from a payer standpoint*. I think with *Osmotica's product, the challenge is going to be if what you are is potentially a more convenient IR amantadine, how do you justify that price point that you're charging for it* against the value of the convenience between dosing once a day for the OSMOLEX product or 2 or 3 times a day for the IR product. I think that'll be an interesting challenge for them to face.
>
> \* \* \* \*
>
> *[P]ayers have already made this assessment of how does GOCOVRI compare to IR amantadine. And concluded GOCOVRI is a better way to go with these patients without any additional clinical data....* And therefore, if you concluded to go with GOCOVRI for your Parkinson's dyskinesia patients compared to IR amantadine, can't quite (inaudible) the basis there would be to conclude to go with OSMOLEX as an alternative to GOCOVRI extension.

163.     Contrary to King's assertion, payers had not concluded GOCOVRI was a better way to go than amantadine IR, as indicated by the fact that some denied reimbursement, while others reimbursed it at much less favorable rates, and/or required a showing of medical necessity, prior authorization, or a step-through of amantadine (as detailed in Sec. V.B.3, *supra*).  Indeed, the very paradigm King claimed OSMOLEX would face with respect to justifying its price point was precisely the payers' reaction to GOCOVRI.  Furthermore, as indicated in Cowen's February 22, 2018 report (¶130), OSMOLEX was expected to be launched at a significant discount, thereby further weakening the value proposition of GOCOVRI.

164.     FE1 said the OSMOLEX competition was somewhat anticipated because Adamas was approached by the company that developed OSMOLEX about buying OSMOLEX, to prevent it from being released.  Nevertheless, the FDA approval was still somewhat of a surprise because

1    there was almost no data for the drug and the company had not done a Phase III clinical trials, just

2    a bio-equivalency study.

3        165.   FE5 said OSMOLEX was an added problem for GOCOVRI.  FE5 said OSMOLEX

4    was better priced and offered free samples.  FE5 said the sales leadership indicated there was no

5    impact from the OSMOLEX competition, but FE5 said there really was no way of knowing since it

6    was a new product and there was not much data yet.

7        **C.    The Truth Begins To Emerge**

8        **1.    An Analyst Report Reveals Weak Demand For GOCOVRI And High
             Levels Of Drop-Outs Due to Cost And Prior Authorizations**

9

10       166.   On October 5, 2018, just weeks after King departed the Company for "personal

11   reasons" (*see* Sec. VIII.A, *infra*), an analyst at Bank of America downgraded Adamas, revealing

12   that a survey of doctors showed a higher-than-expected dropout rate for GOCOVRI due to the ***high***

13   ***cost*** and ***difficulty in securing prior authorizations*** from payers.  Not only were GOCOVRI

14   dropouts occurring, but doctors may have been looking at other options and ***the drug's value***

15   ***proposition was not fully appreciated*** so the level of doctors' excitement was still in the middle

16   range and it was taking longer than expected to become a "go-to-drug."  Furthermore, it noted

17   looming competition from the pending IPO of Osmotica Pharmaceuticals, which planned to launch

18   OSMOLEX in direct competition with GOCOVRI.

19       167.   The Bank of America survey cast doubt on GOCOVRI's ability to achieve a sizable

20   market share, providing:

21       We conducted doctor checks with active prescribers who treat a total ~l.5k pts with
         Parkinson's disease (PD), of which ~700 are on generic amantadine IR and ~140 are

22       on Gocovri. While this is a subset of total applicable physicians, their views are
         consistent with previous checks we have conducted this year. While respondents

23       recognize the benefits of Gocovri over generic in reducing "off" time, better
         tolerability and lower pill burden (QD vs 3x a day), they ***note the hurdles to get***

24       ***patients on Gocovri due to cost*** (WAC [Wholesale Acquisition Cost]: $28.5k vs 2k
         for IR). ***The majority cited the need for prior authorization requests, with half***

25       ***noting requirement for prior treatment of generic.*** Doctors expect a moderate
         increase in Gocovri use in the next six months . . . . ***Gocovri is restricted on several***

26       ***formularies in 2019 (Express Scripts, CVS, United, Optum) but we note***
         ***management in the past has stated to us that this is not in their view a deterrent to***

27       ***uptake***.

28

40
AMENDED CLASS ACTION COMPLAINT
Case No. 4:19-cv-08051-JSW

168.   On this news, Adamas's stock fell $1.52 per share, or approximately 7.86%, to close at $17.83 on October 5, 2018.

**2.   Adamas Maintains Its Market Share Projections While Revealing Flat Prescription Growth And Cutting The Targeted Physicians In Half**

169.   On November 1, 2018, after the market close, Adamas held a quarterly earnings conference call (the "November 2018 call") with investors.  During that call, Went assured that "***market access and distribution are solid***."   Went indicated that the market opportunity for GOCOVRI had not changed, stating, "We continue to believe that GOCOVRI is an extremely important drug and that we can reach 25% to 30% peak penetration in the Parkinson's disease dyskinesia population."

170.   Went stated that the Company had "increased our understanding of market dynamics and we are making adjustments and applying the learnings which we believe will lead to the prolonged success of GOCOVRI."   While the Company had previously said it would focus on movement disorder centers, Went stated "we need to continue to expand the use of GOCOVRI in these centers… [*W*]*e are refining our execution and focusing our sales effort on these prescribers*."   Although Adamas did not lower its market share projections, Went noted the Company was substantially narrowing the physicians it was targeting, "focusing down on a little less than half of that 6,500 right now."

171.   Contrary to the Company's previous statements that physicians were viewing GOCOVRI as differentiated, Went's statement confirms that demand was weak among neurologists, and primarily limited to the movement disorder specialists who treated the most severely dyskinetic patients (as detailed Sec. V.B.2, *supra*).  In fact, Patni admitted on the call that movement disorder specialists were primarily using GOCOVRI to treat "***more severely dyskinetic or have had dyskinesia for a long period of time.***"

172.   Whereas Adamas had previously touted access to GOCOVRI and stated prescriptions were being filled "very, very quickly," Went noted that in addition to focusing on movement disorder centers, the Company would "***continue to improve and educate on the seamless access experience provided by GOCOVRI Onboard to support adoption and shorten times to fill.***"

As detailed by Adamas employees (Sec. V.B.4, *supra*), Onboard was impacting demand for GOCOVRI and payer reimbursement requirements had extended the time it took to fulfill prescriptions.

173.    Despite previously touting positive feedback from patients and physicians (*see* ¶72-73, *supra*), Went now also stated that the Company was "refining our communications regarding appropriate dosing," noting that "[d]osing can directly impact prescriber and patient experience with the medicine."  Went stated that "patients with moderate to severe renal impairment, which can occur more often in the elderly, should start GOCOVRI at the 68.5-milligram dose to balance the efficacy with the tolerability, per GOCOVRI's label."  As Went indicated, this was not new information, and was clearly indicated on GOCOVRI's label from the time the drug had been approved.

174.    As noted by FE5, the treatment form did not include the renal dose option, which was later added.  FE2 noted that physicians had to test patients for renal impairment, adding to the time to fulfill and cost, suppressing demand.  FE1 indicated that while the lower dosage mitigated the side effects, it was also less effective, which negatively impacted demand.  Furthermore, this adverse effect was also experienced with amantadine IR,[5] reinforcing the notion that GOCOVRI was nothing more than an extended release version of amantadine at a much higher cost.

175.    Went also stated that the Company would be "simplifying and strengthening our messaging for GOCOVRI as a treatment for dyskinesia as well as its benefits in OFF, highlighting the role GOCOVRI plays in widening the therapeutic window for dopamine treatments; and effectively educating physicians on appropriate use and appropriate patients for GOCOVRI."  Adamas had been using this message to differentiate GOCOVRI from amantadine IR from the beginning, thus indicating that it had not been successful which negatively impacted demand (as detailed in ¶79, *supra*).

176.    Merriweather told investors the Company was "intensely focused on increasing demand" and stated that the Company believed that "approximately 2% market penetration on

---

[5] https://www.drugs.com/pro/amantadine.html

average for [2019] is an appropriate framework." Merriweather also revealed that new patient starts was "*in that very same range quarter to quarter*," reflecting that there had been no growth, which was very concerning at this stage of a drug launch.

177.   On all this news, Adamas's stock fell $5.08 per share, or 29.94%, to close at $11.89 per share on November 2, 2018.

178.   Cowen issued a report on November 1, 2018 discussing the results, stating:

> *[M]anagement indicates that the payer landscape and progress has been on-plan, as has been the effectiveness of the "Gocovri Onboard" program….* However, we provide two caveats, and unfortunately they are not insignificant. First, although management is providing total paid prescription figures, it is not disclosing the new prescriptions, which makes patient refill/retention impossible to calculate…. But second, and much more concerning, is that management indicated that "*Due to patient starts generally at a consistent level over the last 2 quarters, we are intensely focused on increasing demand*." We can come up with no good reason why patient starts were flat Q/Q and that trend is troubling if it persists. *Management indicates that there is going to be a greater focus on the larger, major movement disorder centers, which we applaud but would have thought was obvious*.

179.   Nevertheless, some analysts remained optimistic, as reflected in Piper Jaffray's report issued the same day, which stated GOCOVRI "is well-positioned for commercial success."

180.   Went continued to tout the Company's prospects at the November 14, 2018 Credit Suisse investor conference, stating, "Our *market access and distribution with our special -- single specialty pharmacy is going very well*. And as we look forward at bringing this product to the market and educating the market on it and increasing the depth of its utilization, we anticipate that a 2019 performance is going to be a doubling of what we've seen in 2018." On December 12, 2018, Evercore issued a report after hosting meetings with management which noted, "ADMS continues to believe that sales/scripts will double next year."

### 3.   Adamas Backs Off Previously Issued Guidance And Refuses To Provide Future Guidance

181.   On March 4, 2019 after the market close, the Company held an earnings call (the "March 2019 call") to discuss fourth quarter and full year results for 2018 wherein Defendants revealed that they were backing off its 2% market share projection and would not be providing 2019 guidance. As partially revealed on the November 2, 2018 call, Went confirmed that demand was

1    primarily limited to movement disorder specialists who used amantadine IR.

2         182.   Went stated, "We have equipped our neurology account specialists with tools to

3    distinguish between those movement disorder specialists that use amantadine as a part of their

4    treatment toolbox and those who don't."  Went noted, "*we've seen strong adoption of GOCOVRI*

5    *by the first group*", but explained that the second group "*does not typically use amantadine*

6    *immediate release* because in their experience, it is associated with limited efficacy and/or poor

7    tolerability."  Went indicated that "[f]or this latter group, we believe, based upon market research

8    and confirmed through field feedback, that we need to more strongly emphasize the connection

9    between dyskinesia and OFF time[.]"  Went's statements indicated to the market that the Company's

10   failure to differentiate the efficacy and tolerability of GOCOVRI from amantadine IR, combined

11   with GOCOVRI's cost and payers' prior authorization and step-through requirements, greatly

12   limited the demand for the drug  to the most severely dyskinetic patients who had issues with the

13   efficacy or tolerability of amantadine IR (as detailed in Sec. V.B.1-V.B.3, *supra*.)

14        183.   In an effort to spur demand, Went also announced on the call that the Company had

15   "*evolved our Quick Start program into a broader free trial program to allow more prescribers and*

16   *patients to readily experience first-hand the benefits of GOCOVRI*."  Went stated that it would

17   now be a "28-day program."  The decision indicated not only that fulfillment time was taking longer

18   due to payer requirements, but also, that physicians were not convinced by the clinical data that

19   GOCOVRI was any different than amantadine IR (as detailed in Sec. V.B.1, V.B.3, *supra*).

20        184.   Went stated, "*As we look back on the latter part of 2018, we specifically note a*

21   *slowing in the rate of total prescription growth quarter-to-quarter, which we see continuing into*

22   *the first part of 2019*."   Merriweather added,   "Because we're still very early in the

23   commercialization of GOCOVRI, *we are not providing prescription or revenue guidance in 2019*."

24        185.   An analyst asked, "should I take your comments to mean that *you're backing off of*

25   *your prior guidance that prescriptions or share would double?*" Merriweather replied:

26        *As we look back from the end of last year, as I mentioned on the call, we did see a*
         *slower rate of increase in the TRx. And given that trend in the end of the fourth*
27       *quarter and going into the first quarter, are not going to provide any specific TRx*
         *guidance this year or revenue guidance*. So we'll continue to drive that growth
28       through spreading the GOCOVRI message, broadening the GOCOVRI message

around and it's typical early -- it's still in launch, ***we're really not in a position right now to guide for quarter-over-quarter for this year***.

186.    One analyst, Ken Cacciatore, stated he was "***really confused by the commentary.*** At this point, I would think enough clinicians had touched the product that we wouldn't have a slowing[.]"  However, Adamas had not revealed that payers were regularly denying reimbursement or requiring patients and physicians to "jump through hoops" to obtain reimbursement (as detailed in Sec. V.B.3, *supra*).

187.    Went indicated that the expansion of QuickStart was a factor in the decision to pull back guidance because "what percentage of folks received 28-day is unknowable at this point[.]" Went also corroborated FE3 (*see* ¶155, *supra*), stating that the free trial expansion was a result of "listen[ing] to the field" and saw "that there were those ***physician's offices who were so accustomed to samples and other forms*** -- programs that would proceed their reimbursement experience."

188.    Went stated that the Company had "not noticed any differences in the beginning of the year with payer coverage."  However, FE5 indicated this was not the case, noting that step therapy had become more prevalent.

189.    In response to this news, Piper Jaffray issued a report on March 4, 2019 titled, "Is Gocovri Being Mismanaged? Sure Looks That Way."  The report indicated the analyst had lowered its price target and stated, "With Adamas refining its marketing message on GOCOVRI, in addition to starting a sampling program over one year following the launch, ***it is fair to wonder if management has misread both its physician audience and the payer landscape***."

190.    Irina Koffler of Mizuho also downgraded Adamas to underperform and stated that she believed the launch to be going, "***even worse than we thought***."

191.    On March 5, 2019, Cowen issued a report and downgraded Adamas to perform from outperform, and cut the target price to $15 from $30.  The report stated that management's own caution, "now raises many questions that we simply can't answer" and "***We rarely see a company back away from guidance so quickly***."

192.    Bank of America published a report on March 5, 2019 stating, "the expansion of free drug to 28 day (prev. 14-day) in our view is a signal of ***weak demand consistent with our prior***

*doctor checks* which led to our initial round of estimate revisions last fall." The report noted that "coverage remains scarce with several national formularies excluding Gocovri in 2019." It added that "*failure of the MS indication to advance would lead to meaningful downside to our current estimates.*"

193. On this news, Adamas's stock fell $3.99 per share, or 32.84%, to close at $8.16 per share on March 5, 2019.

194. A "Seeking Alpha" article posted on March 11, 2019 stated:

[T]he selling in afterhours coincided with the analyst Q&A session during the company conference call. *Analysts appeared to be confused with the company's new changes in their commercial plan for GOCOVRI and the company's lack of revenue guidance for 2019*. It seemed as if every analyst was asking for some clarification on these issues, but the Adamas management answered with vague responses. The management's opposition to offering specifics appeared to frustrate the analysts[.]

The numbers did provide me confidence that GOCOVRI is making headway, but the vibe from the management had me wondering if they are preparing for a lackluster 2019. *It was only a couple of months ago that the company's goal was to double its market penetration with GOCOVRI. Now… no targets, benchmarks, or specifics.*

195. On Adamas's May 9, 2019 earning call, the Company claimed to be making progress with its efforts to drive GOCOVRI's growth, but no longer reported the number of prescribers. As indicated in the charts below, the number of additional prescriptions and rate of growth continued to decline.



AMENDED CLASS ACTION COMPLAINT
Case No. 4:19-cv-08051-JSW

46

1
2
3
4
5
6
7
8
9
10
11
12



196.    Echoing the finding of several former employees (*see* ¶¶148-151, *supra*), an analyst asked about the Company's use of a specialty pharmacy to distribute GOCOVRI, noting that there was "almost a ***vilification*** of specialty pharma distribution systems[.]"  Went answered:

> …I think our approach to picking a -- having a specialty distribution model in place was really to provide patients, their care partners and physicians with an ***experience which was seamless,*** was positive and provide a regular point of contact back with the patients in order to really make sure that they had a positive experience on GOCOVRI. And ***I don't think anything has changed*** in our observations in the last year about the ability to do that through a specialty distribution model versus a retail model. ***So we continue to be positive about the experience we believe our patients can have as a result[.]***

197.    On May 10, 2019, Mizuho analyst Irina Koffler issued a report stating, "We reiterate our Underperform rating and $5 PT after ***disappointing sequential trends for Gocovri***, a topline miss, and delay of a pipeline program."

198.    On May 27, 2019, a "Seeking Alpha" article indicated that the author felt "***hoodwinked***" by the Company's optimistic outlook:

> What's My Verdict? Adamas was Overrated… I have to confess, I feel as if I continued to buy into the hype after GOCOVRI approval. ***I felt as if the company had a product that was destined to be prescribed to a large number of PD patients that were starved for a drug like GOCOVRI***. Throw in street analysts projecting $75 per share and ***I feel a bit hoodwinked as ADMS investor. The company has not been***

*able to grab a large piece of their market and hasn't done a great job admitting their initial outlook was too optimistic for a patient population that has so many challenges.* So, I would say ADMS was overrated for the past year and change.

### 4. Adamas Confirms Weak Demand Was A Result Of Fulfillment Issues And GOCOVRI's High Cost

199.    Finally, on Adamas's August 8, 2019 earnings call, the Company confirmed that its inability to generate demand for GOCOVRI was not only due to its failure to differentiate it from amantadine IR, but also, the burden of meeting payer requirements for reimbursement.  Confirming statements from former employees (*see* ¶¶138-142, *supra*), Adamas indicated that the documentation requirements to obtain prior authorizations were a burden patients and doctors, and were not as simple as a physician attesting to a patients prior history and checking a box on the treatment form as understood by an analyst on the August 2018 call (*see* ¶137, *supra*, ¶280, *infra*). These fulfillment issues were suppressing demand, along with operational issues with the specialty pharmacy, Onboard (as detailed in Sec. V.B.4, *supra*).   Contrary to prior representations that QuickStart was not being used by many patients because prescriptions were being fulfilled quickly (*see* ¶¶75-76, *supra*), the Company now stated that patients were dropping off due to operational issues with fulfillment.  Finally, the Company admitted that GOCOVRI's cost was a major factor inhibiting demand for the drug, contradicting prior claims that payers, physicians, and patients recognized the value proposition and that payers were providing strong support for reimbursement (*see* ¶¶74-76, 89-91, *supra*).

200.    The Company's new Chief Commercial Officer, Vijay Shreedhar described an extensive analysis he undertook after joining the Company and stated there were "3 key areas where I will focus intensively."  Shreedhar elaborated:

*First, we need to do a better job in educating healthcare practitioners to recognize the disruptive impact of dyskinesia, its relationship to OFF and its impact on the effective treatment of Parkinson's disease*. While prevalent in patients treated with levodopa, dyskinesia is still relatively poorly understood or appreciated by both prescribers and patients. It is often confused with tremors and the impact that it may have on many aspects of a patient's daily life is not effectively highlighted. Educating healthcare practitioners on these aspects and on how to systematically identify appropriate patients for consideration of GOCOVRI therapy offers an opportunity for enhancing patient care. *Second, based on my recent observations, there is an opportunity to improve our operational effectiveness in the fulfillment process*.

From the moment when a physician sends in a treatment form to when a patient gets the drug. I have noted some level of ***frustration among prescribers*** and we are working actively to address this and to improve the customer centricity of our overall fulfillment process to ensure that we create 1 that is ***simple, reliable and transparent***.

***Third, we need to better educate a wider audience about our 28-day free trial program, which we hope will expand trial of the drug among non-adopters***.

201.   Went discussed the expanded QuickStart program and stated that Adamas hoped to "***increase conversion by improving operational efficiencies with the process***."  Shreedhar further indicated that the operational issues impacting fulfillment were causing the vast majority of drop-offs in the free trial program, rather than adverse events ("AEs"):

So we have done an analysis of patients who received drug through the free trial program in order to understand where the gaps were in them converting to maintenance scripts. The ***vast majority*** of patients actually drop-off because of operational considerations. There are prior authorizations that are still in process. ***There are steps that a physician's office needs to complete. There are steps that a patient themselves need to complete***. That's where we believe we can have the most impact, which is why one of the focus areas that I articulated in terms of fulfillment focuses on the operational effectiveness to make it ***simpler and more transparent and reliable***. And actually, the ***AEs are not one of the big reasons why they drop-off*** as far as we have seen in our initial analysis.

202.   Shreedhar described the fulfillment issues as "***a white space that exists between a physician sending in a treatment form and then finally getting confirmation that their patient is on drug***."

203.   Shreedhar told an analyst that the primary reasons for the poor adoption of GOCOVRI "boiled down to 2 areas."  Shreedhar said the first reason was "***confusion around dyskinesia***, how does it manifest? ***Is it bothersome***?"  Shreedhar stated, "***The other reason that they talk about most often is cost and the perceptions of cost***."

204.   Shreedhar noted on the August 2019 call that there was "***no significant change*** in access in the first part of 2019."  However, Shreedhar indicated that prior authorizations were stymieing demand from physicians, stating that Adamas was "evaluat[ing] contracting as a means ***to drive access to simplify the prior auth[orization] process to reduce physician burden in terms of process.***"  The Company also announced that Merriweather would be retiring on December 31, 2019.

205.    These revelations corroborate the claims made by former employees that meeting payer requirements for reimbursement was suppressing demand, along with the Onboard (as detailed in ¶¶138-142, 148-151, *supra*).

206.    Cowen issued a report on August 8, 2019 reacting to this news, which stated, "[E]ven with this free start program, it has not meaningfully altered the new start trends."  The report also noted:

> In addition, ***management disclosed "fulfillment issues"*** have been a significant component of the relatively low (40-50%) conversion of Gocovri free sampled patients to paying patients. They indicated that this low rate stems from what appears to be ***poor operations that are not allowing proper navigation of the managed care process and prior authorizations***. ***This is causing frustration at the clinician and patient level. At this point in launch – and with this small number of patients and how critical the product is to the company, (and the amount of cash available to make the system work) – we are very surprised that this has still not been properly resolved.***

207.    While these revelations provided further insight into the causes of GOCOVRI's weak demand and the Company's failure to successfully launch, the market had already accounted for the lackluster demand when Adamas backed off its projections in March 2019.  Adamas shares slightly increased, by 0.7%, on the news, from $6.01 per share on August 7, 2019 to $6.05 by August 9, 2019.

208.    Then on September 13, 2019, Adamas announced that Went had resigned as Chairman and CEO on September 11, 2019, but would continue to serve as a strategic advisor to the Company.  The Company also announced that Neil McFarlane, an outsider, was named the new CEO of Adamas on September 11, 2019, indicating that Adamas had likely been recruiting for the position for awhile.

### D.    Adamas Announces MSWI Was A Top Priority, But It Faces Similar Obstacles In Commercializing GOCOVRI In The Treatment Of MSWI

209.    While GOCOVRI was Adamas's primary source of revenue and share value during the Class Period, the Company began to switch its focus to the market opportunity for GOCOVRI as a treatment for patients with walking impairment due to multiple sclerosis ("MSWI").  If GOCOVRI were approved for this indication, the market opportunity was dependent on it having superior efficacy and tolerability compared to AMPYRA, which would soon be available as a

1  generic.

2       210.    On a May 9, 2019 quarterly earnings call, Went stated that the Company had "2

3  immediate priorities: GOCOVRI's launch in Parkinson's and the MS [multiple sclerosis] program."

4  Patni discussed the MSWI market opportunity:

> There is currently only 1 FDA-approved drug, AMPYRA, or dalfampridine, to
> improve walking in patients with MS.  In their pivotal trials, approximately 70% of
> AMPYRA-treated patients did not experience a consistent increase of any magnitude
> in walking speed during double-blind treatment.  Hence, there remains a significant
> unmet need to treat walking impairment in MS, with an opportunity to address as
> many as 180,000 MS patients in need.

9       211.    At the May 15, 2019 Bank of America conference, Went again noted "there are about

10  70% of patients that do not respond to AMPYRA….  And that is at least our initial target population,

11  although I think the entire population would be a part of the market."  Went noted:

> [T]he data appears to be coming in the fourth quarter from the latest update from the
> team, which is about 6 months faster than we thought it was going to come.  And that
> has given us a *great deal of confidence* that some of the work we did on the market
> and *the magnitude of the unmet need of walking in this population was more
> significant than we modeled* in terms of our recruitment rate coming in.

15      212.    The Bank of America analyst asked, "when you do your doctor checks of the market

16  opportunity in MS walk, what do they say are the greatest limiting factors of AMPYRA?"  King

17  responded, "A third of people respond and two-thirds people are just nonresponders….  And so

18  there is -- *I think there is room in there because it's such a critical effect*, and it affects their entire

19  day."  King also indicated that the Company had learned from its failures in launching GOCOVRI,

20  stating, "*we would go back to lessons learned, really begin to invest in market development,* so

21  that by the time that product got into their hands, we really had set the stage for it from a mechanism

22  of disease understanding standpoint."

23      213.    On the Company's August 8, 2019 earnings call, Defendants began to hedge on the

24  size of the market opportunity for GOCOVRI in MSWI.  Went noted that MSWI was "an already

25  established market."  Went stated, "*our initial commercial focus will be on those who've tried and

26  discontinued dalfampridine*[.]"  However, Patni assured on the call that "Our thesis remains that

27  the treatment effect will be consistent irrespective of prior dalfampridine use."  Nevertheless, Patni

28  stated, "We believe *the initial unmet medical need is in patients who discontinue dalfampridine*

1   in the past due to limited efficacy and/or intolerability."

2       214.    Shreedhar answered an analyst's question about the payer landscape in MSWI and

3   whether the Company was "expecting a step-through toward dalfampridine in order to gain access

4   to the product," stating "we expect a different and more active dynamic for how that drug launches

5   in that market."

6       215.    In response, Piper Jaffray issued a report on August 8, 2019, which stated that "it has

7   been a bumpy road for GOCOVRI[,]" but commented that "Gocovri is growing" and there was an

8   "*expansion opportunity in MS-related ambulation*[,]" and concluded, "*the potential for significant*

9   *recovery in ADMS shares is considerable*."

10      216.    On September 27, 2019, the Evaluate Group reported on a preliminary study

11  involving GOCOVRI for MS and stated:

12          Gocovri could find it tough to gain market share. Adamas's initial focus will be
            patients who have discontinued [competitor drug] Ampyra; around half of the
13          patients in Inroads are Ampyra failures. But in order to sell really well, Gocovri will
            need to show markedly better efficacy than Ampyra. In one of its pivotal trials, the
14          Acorda drug improved walking speed by 14% versus 8% with placebo at nine weeks.

15          **The omens are not good**: phase II data with Gocovri show a similar 17%
16          improvement in walking speed at four weeks, although the usual caveats about
            crosstrial comparisons apply.
17

18      217.    On September 30, 2019, Bank of America issued a report lowering its rating for

19  Adamas shares to "Underperform":

20          We lower our rating for ADMS shares to Underperform with new PO of $5 (from
            $9). *We make our changes based on our recent doctor checks ahead of ph*
21          *3 INROADS data in MSWI* (see page 3). Key points: (1) While efficacy data of '5102
            in ph 2 is in line with current SoC (Ampyra), *doctors are more confident about the*
22          *safety profile of Ampyra* (despite incidence of seizures as a concern) compared to
            '5102. Doctors continue to expect Ampyra as an earlier line tx especially with
23          *cheaper generic Ampyra available*; (2) although doctors already use amantadine
            primarily for fatigue, its use in MSWI is of novel idea for doctors and will need time
24          to gain comfort;…

25          We note existing overhangs for ADMS: (1) Gocovri coverage: a number of national
26          formularies exclude Gocovri. *We expect reimbursement hurdles in MSWI space*
            *especially with generic Ampyra launch*; (2) ongoing litigations against Sandoz and
27          Osmotica; (3) Osmolex launch: (priced approx. 3x lower than Gocovri) poses
            competitive risk; and (4) New mgmt team: ADMS will have a *new CEO, CFO and*
28          *CCO*, to take over the launch in LID and oversee the pipeline….

218.   It was becoming apparent that GOCOVRI as a treatment for MSWI faced similar market dynamics as Adamas had experienced in the Parkinson's market: the drug failed to offer substantial improvement over a cheaper generic competitor that was familiar to patients, physicians, and payers, which would limit demand and many payers would require a step-through of AMPYRA.

219.   On this news, Adamas shares fell a further 42.83% from $7.05 per share on September to $4.03 by October 3, 2019.

## VI.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2017 Financial Results

220.   On August 8, 2017, Adamas held a quarterly earnings conference call wherein King answered an analyst question regarding the likelihood of a step-through requirement before a payer would reimburse GOCOVRI (previously referred to as ADS-5102):

> DAVID A. AMSELLEM: … And my question here is what are your thoughts on the extent to which payers are going to force patients to step through immediate-release amantadine in order to get access to 5102? Is that something that you're planning for?...

> KING: …We've obviously done a fair amount of assessment of ADS-5102 with physicians and with payers. The profile for the product, as I mentioned in the comments, resonates extremely well. And **they don't see this profile as really having much to do with the amantadine IR profile**, that they - - that's currently on the marketplace. They recognize that amantadine IR is not approved for this indication. And that if ADS-5102 is approved for this indication, and with the clinical data set that is available to support it, that **there is no anticipation of requiring a step-through of amantadine IR to get to 5102**.

221.   King also answered an analyst's question about penetrating commercial payers and Medicare, stating:

> We are too late to be added to the 2018 Medicare Part D formulary. However, we are acutely aware of the fact that we can approach Medicare as early as approval of the product, and they will start the review process and **they will likely add this, given there's no other product for this indication, sometime in 2018 and make it available through Medicare.** And it will become a covered item effectively under Part D.

222.   King also answered a question about the pricing of GOCOVRI and stated:

> So price, obviously, is something we've talked about historically. **It's obviously going to be consistent with the value proposition for patients. And we believe we've**

***got a strong value proposition, given the differentiated clinical nature of ADS-5102.*** We are testing price bands in market research currently to finalize the price. We've talked about somewhere between the AZILECT and NUPLAZID price range, about $10,000 to $30,000 a year as being an appropriate price point for 5102. We're evaluating in that arena. And we'll refine our thinking based upon that -- the feedback from that market research and with a view to obviously, investing into the strength of the clinical data.

223. The statements in ¶¶220-222 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, because:

   a. amantadine IR was covered as a preferred or Tier 1 drug on most formularies for similar indications (*see e.g.,* ¶¶127,158, *supra)*;

   b. Adamas had not performed a head-to-head study comparing the efficacy and tolerability of GOCOVRI to amantadine IR;

   c. The foregoing facts created a foreseeable risk that:

      i. patients, physicians and payers would not see GOCOVRI as differentiated from the generic amantadine and/or would not appreciate the value proposition of GOCOVRI;

      ii. payers would exclude GOCOVRI from their formularies, place it on a disadvantaged formulary tier, and/or provide reimbursement only with a prior authorization or showing of medical necessity, which would in many cases involve a step-through of amantadine IR; and

   d. As a result, Defendants' public statements were materially false and misleading at all times.

**B.    Defendants' False and Misleading Statements and Omissions At Adamas's September 18, 2017 Investor & Analyst Meeting**

224. On September 18, 2017, Adamas held an Investor & Analyst Meeting to discuss the recent approval of GOCOVRI and its commercialization plans. King discussed the Company's expectations for the market share GOCOVRI would achieve:

As a result of the profile of GOCOVRI that we've generated, when asked the question what share of your patient population with dyskinesia is going to get treated by GOCOVRI, the physician response is 54% of that population will get treated with GOCOVRI. Now this is what we would call, from a commercial standpoint, a

preference brand share. They're not being presented with the array of other therapies that can potentially manage dyskinesia. So my way of thinking is always to take a preference brand share and halve that number, that's kind of standard thinking from an industry standpoint, which puts us, from an overall penetration rate, ultimately in the **25% to 30% range for GOCOVRI** to treat this dyskinesia population[.]

225.    King detailed the extensive research Adamas had done with respect to payers and that determined what they were willing to pay for GOCOVRI, including the presentation that Defendants made to payers representing 125 million covered persons in the United States, including that: "dyskinesia in Parkinson's disease, which, again, as we know, it's a condition that causes frustration and limitations on quality of life of patients. And we can demonstrate clinically and statistically significant improvements in dyskinesia as a result of utility of GOCOVRI."

226.    King concluded that "So with all that said, having presented those background elements to payers, what we concluded and what the payers were willing to support us at was the GOCOVRI list price at $28,500 per year or $2,375 per month[.]"

227.    The statements in ¶¶224-226 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, because:

a.    amantadine IR was covered as a preferred or Tier 1 drug on most formularies for similar indications;

b.    Adamas had not performed a head-to-head study comparing the efficacy and tolerability of GOCOVRI to amantadine IR;

c.    The foregoing facts created a foreseeable risk that:

i.    patients, physicians and payers would not see GOCOVRI as differentiated from the generic amantadine and/or would not appreciate the value proposition of GOCOVRI;

ii.    most physicians would not change their prescribing habits, thus limiting demand for GOCOVRI primarily to movement disorder specialists who treated patients already using amantadine IR, the most severely dyskinetic patients, and dyskinetic patients for whom amantadine IR was no longer effective or tolerable; and

iii.    payers would exclude GOCOVRI from their formularies, place it on a disadvantaged formulary tier, and/or provide reimbursement only with a prior authorization or

1  showing of medical necessity, which would in many cases involve a step-through of amantadine IR;

2  and

3        d.    As a result, Defendants' public statements were materially false and

4  misleading at all times.

5    **C.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 3Q' 2017 Financial Results**

6

7    228.   On November 2, 2017, Adamas held a quarterly earnings conference call with

8  investors.  During that call, King detailed payers' support for GOCOVRI, stating in relevant part:

9        We have also begun outreach to payers and have scheduled clinical presentations with 7 out of the top 10 payers in the country for later this year. The payers are

10       particularly interested in GOCOVRI as a first in indication medicine for dyskinesia patients, who they recognize are in need. ***We anticipate broad payer coverage for***

11       ***GOCOVRI that will grow over the course of 2018***.

12   229.   Also during this call, Patni stated that "based on our Phase III data, GOCOVRI can

13  be used in a broad Parkinson's disease population with dyskinesia and ***is appropriate for all***

14  ***patients, irrespective of dyskinesia severity or dyskinesia duration***."

15   230.   Also on this call, King responded to a question that asked if the Company's

16  marketing materials differentiated GOCOVRI as more than an extended-release amantadine:

17       SERGE D. BELANGER: …And, I guess, Rajiv hinted that there was still a misunderstanding in the market that GOCOVRI is not an extended-release

18       amantadine. Do you feel this could be adequately addressed in your marketing materials or other publications?

19

20       RICHARD A. KING: [T]he physician experience of amantadine IR is in general that it lacks the designed efficacy to manage patients' dyskinesias, but it's inconvenient

21       to use because it's not effective in the morning hours, but it cannot be dosed after a certain time in the day due to significant sleep-related issues and it doesn't have

22       durability in usage. Against that, ***there's plenty of data with our product in our label***

23       ***to support the fact that it's very effective, that it's manageable.*** It gives patients early-morning coverage of dyskinesia. Because it's dosed at night, the sleep-related

24       side effects are minimized and it certainly has durability based on long-term data. ***So I feel comfortable and confident that, that's enough of a clinical comparison that***

25       ***we can substantiate in the minds of physicians***.

26   231.   King also answered a question from another analyst during the call about the demand

27  for GOCOVRI:

28

CAROLINE H. PALOMEQUE: So, I guess, this question is for Richard as well. So when you discussed the potential adoption of GOCOVRI, which you mentioned was about 50% with physicians, is this a reflection of the patient population that would need the drug? Or were there any particular concerns or thoughts that physicians had?

KING: So, in general, *it is a reflection of the population that needs the drug. This dyskinesia population is a challenging population to manage*, as I said previously. The terrible choice that physicians have to make between having their patients be off by underdosing levodopa or having them be dyskinetic by overdosing levodopa is a terrible dilemma both for the physician as well for the patient. And they really don't have a tool that they can use that adequately addresses that. *GOCOVRI is the first time they've actually got a purposeful, meaningful tool to do it[.]*

232.    The statements in ¶¶228-231 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶227.

233.    Also during the November 2017 earnings call, King described Onboard and the GOCOVRI treatment form:

We've also designed the treatment form, which the physician uses in lieu of a prescription to establish the ability for GOCOVRI Onboard to support patient reimbursement, seeking for on behalf of patients, as a single page form. It's easy to fill in, and we've taken a lot of input there from physicians to make sure that, that is a simple-to-use form. *So I think we've designed this patient interaction, this patient assistance program well to meet the needs of both physicians and patients*.

234.    The statement was materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading because the use of a specialty pharmacy for distribution creates additional burdens that are not typically necessary for distribution at a retail pharmacy, such as additional paperwork and new procedures; this foregoing fact created the foreseeable risk that patients and physicians would largely prefer traditional retail pharmacies; and, as such, Adamas's use of a specialty pharmacy for distribution of GOCOVRI would suppress demand.

**D.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's January 2018 Secondary Public Offering**

235.    On January 22, 2018, Adamas filed a Form 8-K with the SEC which stated:

*Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.*

...Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available. For example, *although no payer has done so to date*, a payer may determine to require patients to use immediate release amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI.

236.    The statement above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because payers were already requiring patients to use amantadine IR prior to receiving reimbursement for GOCOVRI, including Centene, Tricare, Idaho Medicaid, and Blue Cross Blue Shield Federal Employees Program.

237.    On January 22, 2018, Adamas filed with the SEC a Prospectus Supplement on Form 424B5 to the Prospectus dated November 21, 2016, which stated:

We have made clinical presentations to the ten top payers who account for 70% of carbidopa/levodopa prescriptions. To date, four of the top ten payers have made affirmative coverage determinations for their commercial lives, and *we currently anticipate broad coverage[.]*

238.    The emphasized statement above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶223 and 236.

**E.      Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's Fiscal Year 2017 Financial Results**

239.    On February 22, 2018 the Company filed its Form 10-K for the year ending December 31, 2017 (the "2017 10-K"), which stated:

As of December 31, 2017, after being available for a little over two months for physician and patient use without sales-based promotional efforts by us, 100 distinct prescribers had prescribed GOCOVRI for Parkinson's disease patients with dyskinesia. This early reception of GOCOVRI by physicians is consistent with our market research indicating that GOCOVRI would be well-received by physicians, patients and payers.

240.    This statement was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading because:

a.      Early prescribers of GOCOVRI were physicians:

i.      whose patients participated in GOCOVRI clinical studies;

58
AMENDED CLASS ACTION COMPLAINT
Case No. 4:19-cv-08051-JSW

ii.      who were on the Speakers Bureau, and physicians whose patients were severely dyskinetic and were desperate for a new treatment;

b.      The foregoing fact created a foreseeable risk that these early prescribers were not indicative of GOCOVRI's acceptance by the broader targeted population of physicians and patients.

241.   The 2017 10-K also stated:

*Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.*

…Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available. For example, *although no payer has done so to date,* a payer may determine to require patients to use other formulations of amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI. (emphasis added).

242.   The statement above was materially false and misleading when made and/or omitted to state material facts necessary to make the statement not misleading because payers were already requiring patients to use amantadine IR prior to receiving reimbursement for GOCOVRI, including Centene, Tricare, Idaho Medicaid, and Blue Cross Blue Shield Federal Employees Program, Delaware Medicaid, and Prime Therapeutics/ Blue Cross Blue Shield of Alabama.

243.   On February 22, 2018 Adamas issued a press release, which was also filed with the SEC as Exhibit 99.1 to a Form 8-K, discussing its earnings for 4Q' 2017 and FY' 2017 and quoting Went:

"Parkinson's disease is a particularly *burdensome and costly* disease, not only for patients, but also for their care partners and the healthcare system, which is why it was so important to bring to market a medicine that delivers substantial benefit in dyskinesia as well as a secondary benefit in OFF time. We are encouraged by the initial weeks of GOCOVRI's full commercial launch and are pleased with the reaction we are receiving from physicians, patients, care partners and payers as we continue to educate them on the unique benefits of GOCOVRI."

244.   This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶227, 240.

245.   Also on February 22, 2018, Adamas held an earnings conference call to discuss its fourth quarter and annual earnings for 2017 with investors.  Merriweather reported, "In January, we reported that through December 31, 2017, 100 prescribers had written prescriptions for GOCOVRI. As of February 16, this number has increased to over 300, reflecting strong initial adoption among the 6,500 targeted physicians and good growth in just 6 weeks of the deployment of our sales force."

246.   King further stated on the February 2018 call that the Company had "seen strong interest from physicians in GOCOVRI" and noted "strong growth in prescribers".

247.   The statements in ¶¶245-246 were materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶240.

248.   On the February 2018 call, King detailed insurer support for GOCOVRI, stating:

> [O]ur discussions with payers regarding GOCOVRI are in full swing. ***Clinical presentations have been well received***, and these payers are moving forward in their process to determine guidelines for reimbursement. It is important to note that even in situations in which payers have not published reimbursement criteria, we are routinely seeing patients receive reimbursement for GOCOVRI. We continue to engage payers to streamline the processing of claims for GOCOVRI.

249.   This statement was materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶227.

250.   Later on the February 2018 call, Went responded to an analyst's question about the "OSMOLEX threat," stating "So at the moment, I don't see a significant adjustment other than being prepared for the confusion that another amantadine immediate-release like product could pose to the market."  King added:

> I'll only add that the use of GOCOVRI in Parkinson's dyskinesia is very clearly supported by a ***very robust safety and efficacy data package***, which clearly demonstrates the impact on both dyskinesia and OFF in that patient population. And for about the last 4 or 5 months right now, we've been presenting to the payer community and the physician community, the value proposition that's derived from that dataset. And that's in the environment in which amantadine IR is available. ***And that's been resulting in very strong, resonant support for GOCOVRI at both the physician and the payer level.*** So if you believe that OSMOLEX ER is basically an equivalency to IR amantadine, then ***I don't think that value proposition to either the payer or to the physician community changes in that light***.

251.   This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶227.

The statement was also false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (i) Defendants were unable to differentiate GOCOVRI from amantadine IR such that patients, physicians and payers appreciated its value proposition; (ii) OSMOLEX and GOCOVRI would both be viewed as an extended release version of amantadine IR; and (iii) OSMOLEX was expected to be offered at a much lower cost than GOCOVRI and would impact GOCOVRI's ability to penetrate the market.

**F.      Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 1Q' 2018 Financial Results**

252.     On May 3, 2018 Adamas filed a Form 10-Q for the period ending March 30, 2018, which stated:

***GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business.***

GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, healthcare payers, and others in the healthcare community. The degree of market acceptance of GOCOVRI will depend on a number of factors, including:

- its efficacy, duration of response, and potential advantages compared to alternative treatments;

- the prevalence and severity of any side effects;

- the acceptability of the price of GOCOVRI relative to other treatments;

- the willingness of physicians to change their current treatment practices;

- its convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the effectiveness of our marketing, promotion, selling, and distribution support; and

- the availability of third-party insurance coverage or reimbursement.

The failure of GOCOVRI to achieve market acceptance would negatively impact our business.

* * * *

***If we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed.***

… Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer.

\* \* \* \*

***Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.***

… Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available. For example, ***although no payer has done so to date***, a payer may determine to require patients to use other formulations of amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI.

Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any newly approved medicine for a particular indication, ***there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI***. Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. Coverage and reimbursement decisions for GOCOVRI by third-party payers are generally subject to change and may not be permanent.

253.    The statement above was materially false and misleading when made and/or omitted to state material facts necessary to make the statement not misleading because payers were already requiring patients to use amantadine IR prior to receiving reimbursement for GOCOVRI, including Centene, Tricare, Idaho Medicaid, and Blue Cross Blue Shield Federal Employees Program, Delaware Medicaid, and Prime Therapeutics/ Blue Cross Blue Shield of Alabama, Kaiser Permanente, and Vermont Medicaid.

254.    The statement in ¶252 was also materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because the foreseeable risks in ¶227 had come to pass. The statements were additionally false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (i) the process of securing prior authorization, medical necessity, and/or demonstrating patients had stepped-through amantadine had significantly slowed fulfillment time and suppressed demand from physicians and patients, derailing GOCOVRI's chance for a successful launch; (ii) operational issues with Onboard were hindering demand from patients and physicians; and (iii) GOCOVRI's cost and low level of reimbursement was hindering demand.

255.    On May 3, 2018, Adamas held a quarterly earnings conference call in which Went told investors and analysts that "we are hearing more and more from patients, as well as from their physicians, about positive patient experiences on the medicine."

256.    Also during the call, King stated:

[W]e have generated prescriptions from almost 1 in 12 of the target population by the end of the first quarter 2018. Now that's extremely encouraging, and again, demonstrates the strength of the GOCOVRI value proposition for patients as well as the effectiveness of our sales team to share the GOCOVRI story and the investments we have made in ensuring the physician population is aware of the GOCOVRI data set through promotion, peer presentations, media and medical publications.

257.    King further stated:

[W]e are already seeing some individual physicians that have moved a large proportion of their Parkinson's dyskinesia population to GOCOVRI. And while not all physicians are doing this yet, we are encouraged by the positive feedback from new patients on GOCOVRI. **We're hearing loudly and clearly from these patients about the successes they are seeing with GOCOVRI treatment. Every day, we hear stories from our field team following meetings that they have had with physicians**.

258.    During the call, King also assured that payers were supporting GOCOVRI and physicians and patients had access to the drug:

Today, we've seen support from payers regarding GOCOVRI prescription reimbursement, a process which is handled by our GOCOVRI onboard program. The significant majority of prescriptions submitted are being reimbursed, with less than 2% of prescriptions received to date ultimately rejected as not covered.

259.    Later during that same call, King told an analyst "To date, we have found that we

can get that access for patients reasonably straightforwardly. Certainly, we're seeing the overwhelming majority of prescriptions filled, as I noted earlier on."

260.     King also answered an analyst's question during the call about the extent to which patients were having to step-through amantadine IR:

> DAVID A. AMSELLEM: …[A]re *you surprised regarding the extent to which you are seeing patients having to be stepped through immediate release amantadine*?...

> RICHARD A. KING: So let me just try and pick up on the first point. You mentioned stepping through IR amantadine. *I'm not aware of any plan that has a hard step for us through IR amantadine. I am aware of plans that have -- are interested as to whether IR amantadine's been tried before in patients and has been shown to either be ineffective or not well tolerated. We've seen that, but I'm unaware of any plan which has a formal step through IR amantadine*.

261.     King went on to note that the population of LID patients who had been on amantadine IR was "around the 50% mark… And *we're not seeing that as a limitation to get access* to GOCOVRI and the ultimate outcome."

262.     King also discussed QuickStart, stating, "Generally, *we're seeing reimbursement for prescriptions happen quickly*, which means that there's no need for the majority of patients for access to our QuickStart Program."

263.     The statements in ¶¶255-262 were materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶254.

264.     The statement in ¶260 was additionally materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because a "hard" step edit required a patient to use the stepped through drug for a certain amount of time or dosage and Defendants knew or were severely reckless in not knowing that payers were requiring "hard" step-edits prior to patients receiving reimbursement for GOCOVRI.

265.     Also during the May 2018 earnings call, an analyst asked about OSMOLEX's "recently released pricing, which put it maybe at around [$5,400] a year. What do you think about that price point?..." King replied by noting that OSMOLEX had "no new clinical data… no data we're aware of in dyskinesia[,]" and contrasting it to GOCOVRI:

> The data, lots of it, is available to support using in Parkinson's dyskinesia. And we're now getting *really strong positive feedback from both physicians and patients*

*relative to their experience.* I think that the challenge for us would actually be, whatever the price point is, that the comparison will be to amantadine IR in the first instance, and *whether that price point is worth paying for the convenience of a once daily version of amantadine IR.*

266.    This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

**G.    Defendants' False And Misleading Statements And Omissions At A May 8, 2018 Deutsche Bank Investor Conference**

267.    At a May 8, 2018 Deutsche Bank investor conference, Went answered an analyst question about coverage and demand from physicians for GOCOVRI:

UNIDENTIFIED ANALYST: … Could you comment a little about managed care and insurance coverage? And maybe also talk about, anecdotally, what are you hearing from docs that have put patients on it? I mean, what do they want to see before they would go from putting 1 or 2 to putting a broader number?

WENT: Great questions. So with regards to managed care and coverage, as you know, we begin that journey without any coverage at all and the prescriptions are filled through medical necessity. And over the last couple of quarters since we've had it in channel, and now in the market, we've begun to see some of those medical necessity only turned into coverage decisions with prior authorizations. So prescriptions are being filled via 1 of those 2 process, either a covered prior authorization or medical necessity. And generally speaking, the prior auth requires that the patient be on label to GOCOVRI as the major requirement of getting access to GOCOVRI.

In terms of how physicians have been reacting…there are kind of 2 types of trials, the n equals 1 to 2 that take some time for the patients to come back into the office and report how they're doing. But there are also *some movement disorder centers that we've heard back from, obviously, with more familiarity with the underlying mechanism of the disease and mechanism of drugs and a reason to believe who've been exposing quite a few patients to GOCOVRI, we're getting into that.*

So the dynamic is different between -- in every launch between the innovator and the -- honestly, a *group of neurologists who are just incredibly busy and you really need to come in with a really strong data story and convince them to give it a try*….

268.    Likely referring to OSMOLEX, an analyst asked about "any competitive threat from any recent approval" to which Went responded by discussing GOCOVRI's "substantial data package[,]" stating:

…I do think we've set a high bar.  We've published on what that bar is for a *clinically*

*important difference*. We had 70% of our patients hit that bar, and that's just not a standard that has been met by any product including amantadine IR, which is a product which is labeled for parkinsonism, it has an additional label for extrapyramidal symptoms in Parkinson's and really does not have a label or substantial evidence base that it can treat dyskinesia and OFF. And *I think that will really serve us well as we go forward here, having the only drug label and backed up by that evidence base*.

269.    The statements in ¶¶267-268 were materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

**H.    Defendants' False And Misleading Statements And Omissions At A May 16, 2018 Bank Of America Conference**

270.    At the May 16, 2018 Bank of America conference, King discussed feedback from patients and physicians about how GOCOVRI was differentiated from amantadine IR:

*[T]he feedback we get from physicians and patients is overwhelmingly positive*. We've made reference on our last quarterly call, somewhat unusual, I think, to actual commentary that we get back daily from our field team and directly from physicians about the impact that GOCOVRI has on people's lives. *And the thing about dyskinesia is it's so visible, it's so manifest with patients.* You see Michael J. Fox. That visibility in the way in which dyskinesia manifests is very, very tangible. So if you could change that, it's very, very tangible straightaway. You're not waiting to go back to a physician's office to see a marker of disease change. It's there. It's in your face. *So I think that feedback is positive, and it's animated. And that, I think, reinforces that physician trial, which gets them to go to a second patient and a third patient*. And as we kind of look at our adoption, what we see is sort of the time period between the first and the second prescription tends to be variable, can be short, can be long. But each subsequent prescription tends to get shorter and shorter between the second or the third, and third and the fourth. That time period shortens. *So I think that feedback just reinforces to physicians about the differentiation*.

271.    King also touted payer support for GOCOVRI and the speed of reimbursement:

Reimbursement, whether you're Medicare or in the commercial environment, is occurring, and it's occurring with *speed and support from the payer.* In almost all cases, we are having to answer those questions, and *so we've streamlined ways in which we can provide offices the chance to get the right responses to the questions to -- that are needed by the payer of [their groups.]*

272.    King also stated, "that proportion of patients that's getting *Quick Start is a very small minority of our patient population*. So it gives you some sense as to *how rapidly the payers are coming to conclusion.*"

273.   The Bank of America analyst also asked about how Adamas was differentiating GOCOVRI from amantadine IR:

> TAZEEN AHMAD: So another topic that's come up in a lot of discussions with physicians is, doctors historically don't tend to like amantadine very much. And so what part of the education process here involves trying to explain to doctors that your version of amantadine may not be the same version that they experienced in the past? And how do you get them past that hump of wanting to try it?

> KING: Another great question. And it's absolutely right. IR amantadine historically has been sort of -- it's not been the happy go-to drug for many physicians. It's difficult to find a risk-benefit profile that's acceptable to physicians with amantadine IR. It's -- at lower doses, it doesn't produce the desired effects, but it's an effort. ***It's not actually effective for the majority of patients***. As you move up through the doses, you run into side effects, which tend to stop the majority of patients getting benefit from the drug. So there's just this very difficult to manage risk-benefit profile. We're at pains with GOCOVRI to point out a couple of things really. One, the ***PK profile for GOCOVRI is very, very different to anything that's been seen before with IR amantadine*** …. *[T]hat profile appears to resonate and provide an efficacy profile, which, again, from our clinical studies, is very enticing to physicians.…*

274.   The analyst also asked about competition from OSMOLEX, to which King responded:

> …So there's certainly some risk of confusion, I think. GOCOVRI is an extended-release amantadine, and OSMOLEX is an extended-release amantadine. I think there, the similarities end, to be honest.

* * * *

> I think, at the payer level, we've obviously, every time we talked about GOCOVRI, we've had to confront the question about IR amantadine. How -- why can't we get that with IR amantadine? We can't answer that, but we can certainly answer the question of how does GOCOVRI affect dyskinesias very clear in our data set. And to date, ***payers have concluded that, that is a very different profile with GOCOVRI and IR amantadine and that, therefore, they will reimburse the product and support usage of it across the board***, actually from a payer standpoint. I think with Osmotica's product, the challenge is going to be ***if what you are is potentially a more convenient IR amantadine, how do you justify that price point*** that you're charging for it against the value of the convenience between dosing once a day for the OSMOLEX product or 2 or 3 times a day for the IR product. I think ***that'll be an interesting challenge for them to face***.

* * * *

> ***[T]he payers have already made this assessment of how does GOCOVRI compare to IR amantadine. And concluded GOCOVRI is a better way to go with these patients without any additional clinical data.*** I think the question, when you apply

that same question to Osmotica, which is about 10x the price of IR amantadine, I'm going to -- some payers may decide to go there. But I think a difficult struggle to conclude that IR amantadine and Osmotica's product are different in anything other than dosage form or the dosage you take per day. And therefore, *if you concluded to go with GOCOVRI for your Parkinson's dyskinesia patients compared to IR amantadine, can't quite (inaudible) the basis there would be to conclude to go with OSMOLEX as an alternative to GOCOVRI extension*.

275.    The statements in ¶¶270-274 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

**I.      Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2018 Financial Results**

276.    On August 2, 2018, Adamas filed a Form 10-Q for the period ending June 30,2018, which stated:

*GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business.*

GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, healthcare payers, and others in the healthcare community. The degree of market acceptance of GOCOVRI will depend on a number of factors, including:

- its efficacy, duration of response, and potential advantages compared to alternative treatments;

- the prevalence and severity of any side effects;

- the acceptability of the price of GOCOVRI relative to other treatments;

- the willingness of physicians to change their current treatment practices;

- its convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the effectiveness of our marketing, promotion, selling, and distribution support; and

- the availability of third-party insurance coverage or reimbursement.

The failure of GOCOVRI to achieve market acceptance would negatively impact our business.

\* \* \* \*

*If we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed.*

…Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer….

\* \* \* \*

*Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.*

…Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. *Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost*. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any newly approved medicine for a particular indication, *there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI*. Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. Coverage and reimbursement decisions for GOCOVRI by third-party payers are generally subject to change and may not be permanent. (emphasis added).

277.    These statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶254.

278.    On Adamas's August 2, 2018 quarterly earnings conference call, King stated, "I am ***thrilled with the comments we continue to hear back from our field team and directly from physicians and patients***…. These stories are ***not isolated events,*** and we are hearing it from patients and physicians from around the country. This positive reinforcement to the prescriber of the effects of a product is key to seeing continued and expanded usage by physicians over time."

279.    Later on this call, King answered a question from an analyst regarding physician trial

1   periods for GOCOVRI and its relevance for showing positive feedback from GOCOVRI patients:

2       JOSHUA SCHIMMER: Since the last update, it looks like the number of prescribers
        of GOCOVRI have grown by about 75%. The scrips per prescribers have grown by
3       about 20%. So how do you think about those drivers going forward, the ability to
        sustain kind of 30 new prescribers per week? And I think some of your commentary
4       suggested that maybe the growth in prescriptions per prescriber may be slowing just
        based on the delay in getting physicians to hear back from patients. So how effective
5       do you think your efforts will be in at least sustaining this pace of growth of
6       prescriptions per prescriber?

7                                          * * * *

8       KING: Certainly. So Josh, the number of prescribers, getting to 1,000 prescribers
        within 6 months, I feel, is a significant success. And you're right, that you could do
9       the -- the math is about 30 or so per week. Inevitably, that's going to slow down. It
        has to at some stage. But certainly, I don't imagine that's going to stop. It will just
10      slow down gradually over the course of time. In terms of the prescriptions per
        prescriber, it has increased. But the important thing, as I mentioned on the call, we
11      still see a number of physicians who are in a trial mode for GOCOVRI. We do think
        that, that largely reflects that when we present the GOCOVRI data to them, they're
12      surprised by the dramatic effects that GOCOVRI has on dyskinesia and OFF and ON
        functional time, particularly in comparison to immediate release amantadine. And
13      because of this, they decide that they want to prove to themselves, in their own hands,
        that the clinical benefits that we describe for GOCOVRI are as strong as our Phase
14      III data illustrates. And for that reason, they trial the product. And the good news is
        that the **feedback from patients is strong and generally complementary of the
15      effects that we see in Phase III. And then as physicians move through that trial
        period, they become regular and continuous prescribers of GOCOVRI at that
16      stage**. It's our challenge to get them through that trial period as quickly as possible.
17      And that's our focus for the second half of the year.

18

19      280.    King also addressed an analyst's questions about an amantadine step-through and

20  competition from OSMOLEX during the August 2018 call:

21      DAVID A. AMSELLEM: Just a couple. So first, just expanding on the topic of payer
        access. **I think you've talked about in the past what I would call, I guess, a soft step
22      [edit], where patients just have to check the box in terms of having been exposed
        to immediate release amantadine**. So are you still seeing that as being the case? And
23      that's number one. And then secondly, I mean, I guess, at the risk of being a Debbie
        Downer here, I'll ask about OSMOLEX. Do you get the sense in any of your dialogue
24      with payers that, that product is going to emerge on the payer radar? And has there
        been any sort of evolution in how payers are thinking about it or how you're thinking
25      about in terms of your efforts to drive and maintain access?
26

27      KING: So thank you, David. Yes, in the general sense, the plans that are both -- have
        formal guidance and the way on which plans without formal guidance are managing
28      GOCOVRI is that there is generally a prior authorization requirement required for

patient to be confirmed having dyskinesia to be on dopaminergic therapy and, in some cases, for the physician to confirm that the patient has had some prior exposure to and failed to tolerate or find effective immediate release amantadine. And we're finding that, *that is supportable in the overwhelming majority of patients that are presented to payers for reimbursement*. On the subject of Osmotica's product, I'm sure, at the end of the day, there'll be a few plans that will offer OSMOLEX ER to their patients. I'm absolutely sure of it. But I also believe, *based on contact with the payers, that the majority of them will look at the breadths and depths of the data that we have provided from our Phase III trials. They'll look at the unique pharmacokinetic profile of GOCOVRI. They'll look at the unique indication for GOCOVRI that's been granted by the FDA based on that evidence. And they'll listen to the feedback from their patients that have already been treated with GOCOVRI because they hear it, too, as well as the physician population. And they'll contrast that with the evidence for Osmotica's product, which is basically some form of bioequivalent product to IR amantadine without much clinical evidence or any clinical evidence for effect in this population, and without evidence for feedback from patients, and conclude that it's an expensive IR as opposed to an alternative to GOCOVRI*. So I'm sure some will move forward, but I think a majority, will see it for what it is.

281.    King stated on the August 2018 earnings call, "We continue to see *strong support from payers* regarding GOCOVRI prescription reimbursement.   The significant majority of submitted prescriptions to GOCOVRI on board are being *reimbursed in a short period of time*. Our recovery onboard program continues to support *quick access through our Quick Start* program, although we are seeing the need for this program slow down as we progress further from the launch."

282.    On that same call, in response to a question from analyst Ken Cacciatore, Went detailed the declining use of the QuickStart program, stating:

With patients not paying, Ken, we're not -- as Alf commented in his part of the call, *the Quick Start, which was used in the beginning, is being used less and less*, as patients become familiar and begin to put multiple patients onboard, and gain more confidence in GOCOVRI Onboard. And the percentage who are being supported by our patient assistance program is also very small.

283.    During the August 2018 call, King told an analyst that Adamas was seeing very little of amantadine IR on formularies and noted that GOCOVRI was reimbursed in the "*overwhelming majority of cases…very, very quickly[.]*":

JOSHUA SCHIMMER: [M]aybe you could just discuss the status of reimbursement, characterize the ease of access to GOCOVRI, percent of plans with prior [authorizations] and as well what you're seeing from IR or sustained IR amantadine versions in terms of their positioning on formularies as well.

RICHARD A. KING: So *very little on sustained IR*. I like that characterization actually. In terms of our position on formularies, we continue to see current plans that have issued now formal guidance on how to process reimbursement for GOCOVRI. That continues to happen. There are still a number of plans that have not published those formal criteria yet. *But in the overwhelming majority of cases, we're seeing the vast majority of plans give us good support for reimbursement for GOCOVRI approval for reimbursement. And they're processing the prescription very, very quickly*, which is pleasing to us.

284.    King also answered an analyst's question about reimbursement for Medicare patients, and assuring that "*[t]hey're getting reimbursement support from their plans, and it's happening quickly*."

285.    King addressed an analyst's question on whether price was a detractor for physicians on the August 2018 call:

TAZEEN AHMAD: And also just on price, is that part of the discussion with physicians? I know that you haven't been -- for those who have prescribed the drug, it's not been an issue to get it to patients. But is that viewed as a detractor for physicians initially?

RICHARD A. KING: *I wouldn't say that*. *And I think detractors for physicians initially is just the data set from Phase III[.]*

286.    The statements in ¶¶278-285 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

**J.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 3Q' 2018 Financial Results**

287.    On November 1, 2018, Adamas filed a Form 10-Q for the quarter ending September 30, 2018, which stated:

*GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business.*

GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, healthcare payers, and others in the healthcare community. The degree of market acceptance of GOCOVRI will depend on a number of factors, including:

- its efficacy, duration of response, and potential advantages compared to alternative treatments;

- the prevalence and severity of any side effects;

- the acceptability of the price of GOCOVRI relative to other treatments;

- the willingness of physicians to change their current treatment practices;

- its convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the effectiveness of our marketing, promotion, selling, and distribution support; and

- the availability of third-party insurance coverage or reimbursement.

The failure of GOCOVRI to achieve market acceptance would negatively impact our business.

*If we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed.*

…Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer. …

\* \* \* \*

*Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.*

… Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. *Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost.* If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any newly approved medicine for a particular indication, *there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI.* Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. Coverage and reimbursement decisions for GOCOVRI by third-party payers are generally subject to change and may not be permanent. (emphasis

added)

288.   These statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶254.

289.   On November 1, 2018, Adamas held a quarterly earnings conference call with investors.  During that call, Went stated, "*our market access and distribution are solid*. While this is a great start, we have only just begun to realize the growth potential of GOCOVRI and we believe *we are on our way to reaching our goal of 25% to 30% penetration."*

290.   Merriweather stated, "*Looking to 2019, we similarly believe that approximately 2% market penetration on average for the year is an appropriate framework*."

291.   Went discussed the Company's focus on patients in movement disorder centers on the November 2018 call, stating:

> First, we have long understood that GOCOVRI adoption in major movement disorder centers, which treat a large portion of Parkinson's patients, is critical to our business. At this point, we believe that approximately 10% of the major centers have adopted GOCOVRI for greater than 5% of their eligible patients. *Adoption is occurring in a combination of amantadine experienced and [naive] patients*. We need to continue to expand the use of GOCOVRI in these centers where it has been initially adopted and penetrate additional key treatment centers. To address this, we are refining our execution and focusing our sales efforts on these prescribers. In addition, we continue to improve and educate on the *seamless access experience provided by GOCOVRI Onboard* to support adoption and shorten times to fill.

292.   Went answered a question from an analyst on the November 2018 call regarding prior authorizations:

> DAVID A. AMSELLEM: Just a couple of quick ones. So first on the payer landscape. *Any changes that you've observed regarding step edits and anything regarding increasingly onerous prior [authorizations] that we should be aware of?*...
>
> GREGORY T. WENT: …With regards to the payer landscape, we have not seen a change. We continue to be covered through prior authorizations. Makes a prior authorization a medical necessity. *The prescriptions are being filled in a vast majority and they're being filled quickly*. So while we continue to work to improve it, we haven't seen a change. And although that may not predict future performance, we don't expect anything on the near horizon right now. And I think it kind of *reflects the value that we're bringing to patients with GOCOVRI*.

293.   Also on this call Went answered a question from analyst Serge Belanger regarding

1   formulary coverage and the impact of potential competitor drug OSMOLEX:

2       SERGE D. BELANGER, SENIOR ANALYST, NEEDHAM & COMPANY, LLC,
        RESEARCH DIVISION: Do you expect any increase in formulary coverage starting
3       next year? And do you expect the  launch of OSMOLEX to affect your future
        coverage in 2019 and going forward?
4

5       GREGORY T. WENT: Thanks for the question. We don't really expect any change
        in the formulary coverage. As you know, we're not formally covered, but we are
6       reimbursed. And *the majority of prescriptions are getting reimbursed in a really
        good period of time*. We have heard a bit about OSMOLEX coming to the market.
7       That product has a *very different value proposition*, being a once daily in the
        morning, equivalent version of amantadine IR. I think it will be -- it has a separate
8       indication. It is supported only by pharmacokinetic data and not by any efficacy data,
        since as you recall, the original label for SYMMETREL does not contain a
9       significant data package to promote to. And so I think it will be largely independent
        from us, in terms of how it ends up being reimbursed and what its challenges will be,
10      and whether or not it gets folded into something that physicians are encouraged to
        try, as some plans have done with amantadine IR, I think remains to be seen. *But
11      again, we are -- we've been facing that market reality since, well before we
        launched the product, and are pleased with how that is playing out right now, in
12      terms of any kind of a prior attestation of use of amantadine IR*.
13

14      294.   During the call, an analyst asked if the Company still expected to reach 2% market

15   penetration in 2019 and what the Company saw as it primary drivers of growth in reaching that

16   number to which Merriweather responded:

17      JOSHUA ELLIOTT SCHIMMER:… you had reiterated 1% market penetration in
        2018, 2% in 2019. Is this the cadence going forward? Or do you see any reason for
18      the acceleration of penetration beyond or even within 2019?

19                                          * * * *

20      MERRIWEATHER: Yes, Josh. So the -- you may remember last year, the 1%
        framework was what we couched as a reasonable framework for folks to think of
21      first year penetration. And that was in reference to the dyskinetic population, which
        is 150,000 to 200,000, as you know. We internally tend to think of the low end of
22      that range just for the planning, but certainly that entire range is the reference and
        scope of the market. *The 2% number that we suggested for next year, we naturally
23      would hope to beat that*. We would hope to beat any number that gets out there. So
        again, we just think that's a prudent way to be thinking about next year. And I think
24      as Greg described in the call, we've been doing -- understanding certain key learnings
        on our first 9 months and implementing some actions, which we believe will help us
25      get to that benchmark or perhaps beyond.
26

27      295.   The statements in ¶¶289-294 were materially false and/or misleading when made

28   and/or omitted to state material facts necessary to make the statement not misleading for the reasons

                                            75
                            AMENDED CLASS ACTION COMPLAINT
                                Case No. 4:19-cv-08051-JSW

1   stated in ¶¶251, 254.

2   **K.    Defendants' False And Misleading Statements And Omissions At A November 14, 2018 Credit Suisse Investor Conference**

3

4   296.    At a November 14, 2018 Credit Suisse investor conference, Went stated:

5   ***Our market access and distribution with our special -- single specialty pharmacy is going very well***. And as we look forward at bringing this product to the market and educating the market on it and increasing the depth of its utilization, ***we anticipate***

6   ***that a 2019 performance is going to be a doubling of what we've seen in 2018.***

7   297.    The statement was materially false and/or misleading and/or omitted to state material

8   facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

9   298.    Went also described the market opportunity in MSWI for ADS-5102 at the

10   November 2017 Credit Suisse investor conference:

11   So what we see as a market opportunity here within multiple sources is within that about 500,000 diagnosed MS patients, there are about 220,000 or so who are experiencing fairly significant walking impairment. A relatively small percentage of those respond to AMPYRA, which has been a tremendous success in the market and you've got about 45,000 people taking the AMPYRA, but that leaves those plus an additional 170,000 people who are without any treatment benefit and we're very interested in providing one.

12

13

14

15

16   * * * *

17   So I don't have to translate that into potential share of that market, but of those 225,000 patients, nearly all the huge fraction have tried and failed AMPYRA, because it does have a demonstrated subpopulation, the majority who are placebo responsive and that's what led to its approval. So we are recruiting, we're recruiting patients who have responded to AMPYRA. We are recruiting patients who have not responded to AMPYRA. We're recruiting patients who have never tried AMPYRA. So I think it's a pretty ***wide open market opportunity*** and again, in a point in life where people are really debilitated by these walking, and may be the associated fatigue deficits that affect these patients. So we're psyched about it.

18

19

20

21

22

23   299.    This statement was materially false and/or misleading when made and/or omitted to

24   state material facts necessary to make the statement not misleading because:

25   a.    based on clinical trials Defendants knew GOCOVRI did not provide

26   substantial improvement over AMPYRA;

27   b.    AMPYRA would soon be available as a generic;

28   c.    The foregoing facts created a foreseeable risk, magnified by Defendants'

experience with GOCOVRI to treat LID, that:

         i.     physicians would not change their prescribing habits;

        ii.    payers would require a step-through of AMPYRA; and

       iii.   as a result, there would be limited market opportunity for GOCOVRI to treat MSWI; and

     d.   As a result, Defendants' public statements were materially false and misleading at all times.

**L.    Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's Fourth Quarter & Fiscal Year 2018 Financial Results**

300.    On January 6, 2019, Adamas issued a press release which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on January 7, 2019, which listed as a key priority with respect to GOCOVRI "Target an approximate doubling of total prescriptions for 2019 over 2018[.]"

301.    The statements was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

302.    On March 4, 2019, Adamas filed with the SEC a Form 10-K for the year ending December 31, 2018, which stated:

> ***GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community we are targeting, which would negatively impact our business.***
>
> GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, third-party payers, and others in the healthcare community. The degree of market acceptance of GOCOVRI will depend on a number of factors, including:
>
> •    its efficacy, duration of response, and potential advantages compared to alternative treatments;
>
> •    the prevalence and severity of any side effects;
>
> •    the acceptability of the price of GOCOVRI relative to other treatments;
>
> •    the willingness of physicians to change their current treatment practices;

- its convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the effectiveness of our marketing, promotion, selling, and distribution support; and

- the availability of third-party payer coverage and adequate reimbursement.

The failure of GOCOVRI to achieve market acceptance would negatively impact our business.

***If we are unable to retain experienced commercial personnel, our business will be substantially harmed.***

… Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer.

* * * *

***Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.***

… Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. ***Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost***. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any approved medicine for a particular indication, ***there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI or changes in coverage and reimbursement decisions over time***. Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. (emphasis added)

303.    The statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

304.   The 2018 10-K also stated:

Walking impairment affects about 225,000 of the approximately 400,000 patients diagnosed and treated for multiple sclerosis in the United States. MS Walking remains an area of high unmet need, with approximately 180,000 patients either untreated or not adequately served by the one approved product on the market for the indication.

Our market research suggests that a high proportion of multiple sclerosis patients develop walking impairment, significantly impacting both quality of life and independence. Additionally, physician satisfaction with current treatment options is low, and payers find current treatment to be inappropriate for newly diagnosed patients and effective only in a minority of patients.

305.   The statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

306.   On March 4, 2019, Adamas held an earnings call to discuss its fourth quarter and full year financial results for 2018. Went announced, "we have evolved our Quick Start program into a broader free trial program to allow more prescribers and patients to readily experience first-hand the benefits of GOCOVRI. This option will also potentially encourage trial of GOCOVRI in a broader array of patients with dyskinesia, consistent with the population in which GOCOVRI was studied."

307.   Went responded to an analyst's question about the expansion of QuickStart:

MARC HAROLD GOODMAN: …[I]s the more aggressive free drug trial program really the major change with respect to how you're more -- how you're viewing 2019, and how you don't want to provide guidance on how things have changed a little bit with respect to prescriptions and paid prescriptions, I'm assuming. Because we're going to have prescriptions they're not just going to be paid prescriptions, right?

WENT: …***We're taking this move because we believe based upon what we've seen, that we need to -- in order to expand physician experience with this drug, provide them this.*** We think it will perform better than the Quick Start program that we had in place for the first 12 months of commercialization. And so that definitely factors into what Q1 from a revenue and from a total of prescription -- paid prescription is going to play out because of how many, what percentage of folks received 28-day is unknowable at this point, having...

308.   Another analyst asked if the expansion of QuickStart was in response to competition from OSMOLEX and Went answered:

RAGHURAM SELVARAJU: Okay. With respect to the free drug program, I know several other people had asked about this. But maybe you could give us some more color on whether we should be thinking about it in terms of you using it as a potential response to OSMOLEX or not?...

WENT: ...With regards to the free drug trial program, we launched with a Quick Start program, which allowed us to kick in free drug if the adjudication process on the claim had not progressed to completion by day 5. We could kick them over into Quick Start. And this was, I would say, a bit of a minority approach, but *it worked actually extraordinarily well in the areas that we had uptake for the first 12 months of the launch. But we did observe, and we did listen to the field, that there were those physician's offices who were so accustomed to samples and other forms -- programs that would proceed their reimbursement experience, that we felt it prudent to put this in place and made that decision really without consideration and before considering anything with regards to the introduction of OSMOLEX*....

309.    The statements referenced above in ¶¶306-308 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, because:

      a.    physicians were accustomed to and preferred receiving free samples rather than going through GOCOVRI Onboard, which has the effect of weakening demand;

      b.    operational issues with GOCOVRI Onboard related to obtaining prior authorization coupled with medical necessity were negatively impacting demand from physicians and patients and causing drop-offs; and

      c.    Quick Start was extended from 14 to 28 days because the 14 day period was inadequate to provide access due to the extended time it took to obtain fulfillment.

310.    Also on the March 4, 2019 earnings call, Patni discussed the potential for ADS-5102 to treat MSWI, stating, "I will begin by reviewing our 570-patient Phase III trial in multiple sclerosis, which is enrolling very well, suggestive, we believe, of a *strong interest on the part of both the MS physician and MS patient communities*." Patni went on to state:

In conclusion, our thesis on the potential role of ADS-5102 in walking impairment in patients with MS, pending Phase III data, remains unchanged: number one, a relatively *large treatment effect in a broad population* using complementary measures of walking; number two, approximately 30% to 35% of patients experiencing at least a 20% improvement in walking speed; number three, a treatment option in dalfampridine failure.

311.    These statements were materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

**M.     Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 1Q' 2019 Financial Results**

312.     On May 9, 2019, Adamas filed a Form 10-Q for the quarter ending March 31, 2019, which stated:

> ***If we are unable to recruit and retain experienced commercial personnel, our business will be substantially harmed.***
>
> …Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer.
>
> \* \* \* \*
>
> ***Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.***
>
> … Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. ***Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost***. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.
>
> As with any approved medicine for a particular indication, ***there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI or changes in coverage and reimbursement decisions over time***…. (emphasis added)

313.     The above statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶251, 254.

314.     On May 9, 2019, Adamas held a quarterly earnings call.  Went answered an analyst's question about converting patients on QuickStart to paying customers:

> JOSHUA ELLIOTT SCHIMMER: Got it. And then what are the obstacles and what's the timing that you may estimate for converting patients on free GOCOVRI to paying customers?
>
> GREGORY T. WENT: The timing -- the free drug program, as currently configured, lasts for 28 days. So we look forward to converting them, obviously, as quickly as

1    possible within that period or immediately after that.

2    JOSHUA ELLIOTT SCHIMMER: Is there a reason to think that some may not be
     able to convert and fall off therapy?

3

4    GREGORY T. WENT: It does occur with these types of programs, so there is that
     possibility, but we're obviously working very hard to get the patients onto
5    GOCOVRI and keep them on GOCOVRI. And by and large, that's been our
     experience with our -- the program that we had in place last year and with last year,
6    that people really like to be on GOCOVRI and go through a lot in order to stay on it.

7    315.    An analyst on the May 2019 call asked about the specialty pharmacy distribution

8    system:

9    TIMOTHY FRANCIS LUGO: Okay. And I guess a broader question. There is a lot
     of almost **discussion around pricing** and how it works through the channel, and
10   almost a **vilification** of specialty pharma distribution systems. What's your opinion
     right now on your current distribution system? And has any of the scrutiny around
11   this model changed how you are able to market the therapy?

12

13   WENT: …I think our approach to picking a -- having a specialty distribution model
     in place was really to provide patients, their care partners and physicians with an
14   experience which was seamless, was positive and provide a regular point of contact
     back with the patients in order to really make sure that they had a positive experience
15   on GOCOVRI. ***And I don't think anything has changed in our observations in the
     last year about the ability to do that through a specialty distribution model versus***
16   ***a retail model. So we continue to be positive about the experience we believe our***
     ***patients can have as a result.*** And that's really been our focus as a company from -
17   - that's what drives us.

18   316.    The statements in ¶¶314-315 were materially false and/or misleading when made

19   and/or omitted to state material facts necessary to make the statement not misleading for the reasons

20   stated in ¶309.

21   317.    Also on this call, Patni discussed the market opportunity for ADS-5102 in treating

22   MSWI, stating,

23   There is currently only 1 FDA-approved drug, AMPYRA, or dalfampridine, to
     improve walking in patients with MS. In their pivotal trials, approximately 70% of
24   AMPYRA-treated patients did not experience a consistent increase of any magnitude
     in walking speed during double-blind treatment. Hence, ***there remains a significant***
25   ***unmet need to treat walking impairment in MS, with an opportunity to address as***
     ***many as 180,000 MS patients in need***.
26

27   318.    This statement was materially false and/or misleading when made or omitted to

28   state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

82
AMENDED CLASS ACTION COMPLAINT
Case No. 4:19-cv-08051-JSW

**N.     Defendants' False And Misleading Statements And Omissions At A May 15, 2019 Bank Of America Conference**

319.    At the May 15, 2019 Bank of America conference, Went discussed GOCOVRI and stated:

> *We've modified our free trial program, so we can increase the number of physicians who can experience GOCOVRI*…. And then finally, *we continue to improve and work to improve our support services and how our patients and physicians get their patients on GOCOVRI improving the time to fill and just improving that overall experience* along with the follow-up experience that GOCOVRI Onboard has with the patients.

320.    The statement was materially false and/or misleading and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶309.

321.    Went also discussed the market opportunity for ADS-5102 in treating MSWI at the 2019 Bank of America conference, stating, "On the flip side, there are about 70% of patients that do not respond to AMPYRA, have a placebo like response. And that is at least our initial target population, although I think the entire population would be a part of the market."

322.    Went answered the analyst's question about what doctor checks tell them about the market opportunity in MSWI:

> TAZEEN AHMAD: So when you do your doctor checks of the market opportunity in MS walk, what do they say are the greatest limiting factors of AMPYRA?

> WENT: A third of people respond and two-thirds people are just nonresponders. And the treatment effect occurs very quickly, and in the people who respond they respond very well. Now that doesn't mean they are satisfied with the -- I mean, you know the MS market very well. Movement -- if a patient -- you and I can do a 25 Foot Walk test in 4.5 seconds. Our included population is 8 to 45. And if you go from 12 seconds down to 10 seconds, which is a big clinical effect, Tazeen, you are still impaired.

> And so there is -- I think *there is room in there because it's such a critical effect*, and it affects their entire day….

323.    Went touted the market opportunity for GOCOVRI in treating MSWI stating, "[] I think investors should take a very careful look at the MS data, the basis of the Phase III study that we have coming in, the broader MS market and what effects those drugs have on those patients because I think this could be a really special contribution to those patients."

324.    The statements in ¶¶321-323 were materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

### O.   Defendants' False And Misleading Statements And Omissions In And Relating To Adamas's 2Q' 2019 Financial Results

325.   On August 8, 2019, Adamas issued a press release that was attached as Exhibit 99.1 to a Form 8-K filed the same day, which stated:

> Dr. Went continued, "additionally, we passed an important milestone with the completion of enrollment of approximately 590 patients in our INROADS Phase 3 study of ADS-5102 (GOCOVRI) in MS patients with walking impairment. The rapid enrollment in this trial reinforces our view that there is a *significant need for additional therapies* for the estimated 270,000 MS patients currently suffering from walking impairment, especially the 100,000 who have discontinued dalfampridine."

326.   This statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

327.   On the Company's August 8, 2019 earnings call, Patni discussed the market opportunity for ADS-5102 in treating MSWI on the August 2019 call, stating, "We believe the initial unmet medical need is in patients who discontinue dalfampridine in the past due to limited efficacy and/or intolerability.  Our current estimate of the size of this population today is about 100,000 patients."

328.   Shreedhar answered an analyst's question about the Company's expectations regarding the payer landscape for ADS-5102 for treatment of MSWI:

> DAVID A. AMSELLEM: …First on commercial consideration for GOCOVRI in MS, are you expecting -- it's really for Vijay, *are you expecting a step-through toward dalfampridine in order to gain access to the product* and I realize that you don't have the data. But talk about the -- how restrictive do you think the payer landscape will be, vis-a-vis the dalfampridine?
>
> * * * *
>
> VIJAY SHREEDHAR: Yes, so 2-part question, I'd see. So the first question in terms of MS itself, it all depends on the clinical profile of the drug and what the clinical studies show us and what that readout is. We all eagerly anticipate towards the end of this year. What I will comment on in the MS market is -- was commented on in the prepared remarks is, a lot of *learnings for us from where we are in the PD market and what we can apply to in the MS market*. Now it is a well-established market for MS walking. It is a market which has seen specialty neurology drugs for a long period of time. The patient demographics are younger, more motivated to seek

help and to proactively talk to their physicians about new treatment options. ***So we expect a different and more active dynamic for how that drug launches in that market***.

329.   The statements in ¶¶327-328 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶299.

## VII.   LOSS CAUSATION

330.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

331.   During the Class Period, Plaintiff and the Class purchased Adamas's securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

332.   Artificial inflation in ADMS's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on October 5, 2018, November 1, 2018, March 4, 2019, and September 30, 2019.   As a direct result of these partial disclosures, the price of Adamas's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiff and other members of the Class.

333.   On October 5, 2018, Bank of America issued a report announcing that it had downgraded Adamas.   As discussed *supra* at ¶¶166-168, the report revealed that a survey of doctors showed a ***higher-than-expected dropout rate for GOCOVRI due to the high cost and difficulty in securing prior authorizations from payers***.   It also noted that some payers were requiring prior treatment with generic amantadine IR.   Not only were GOCOVRI dropouts occurring, but the drug's ***value proposition was not fully appreciated*** and was competition from OSMOLEX was looming. The Bank of America survey cast doubt on GOCOVRI's ability to achieve sizable market share.

334.   On this news, Adamas's stock fell $1.52 per share, or approximately 7.86%, to close at $17.83 on October 5, 2018, damaging investors.

335.    On November 1, 2018, after the market closed, held an earnings conference call with investors.  On this earnings call, Merriweather announced that the Company expected just 2% market penetration by the end of 2019, up from the then-expected 1% penetration by the end of 2018 (as detailed at ¶176, *supra*).  Went further explained that Adamas was narrowing its commercial efforts to focus on movement disorder center prescribers, and later explained that by doing so, sales efforts would focus on a "little less than half" of Adamas's previously number of targeted physicians.  These announcements partially revealed that the rate of new prescribers was not as robust as the Company previously expected.

336.    Also during the earnings call, Went explained that the Company had received feedback that elderly patients with renal impairment were experiencing tolerability issues.  Because these same issues were experienced with amantadine IR, this announcement revealed that GOCOVRI did not have superior tolerability for these patients(as detailed at ¶173, *supra*).

337.    Following this news, Adamas's stock fell $5.08 per share, or 29.94%, to close at $11.89 per share on November 2, 2018, on heavy volume, damaging investors.

338.    On November 1, 2018, the analyst firm Cowen explained that it remains cautious despite  "[m]anagement indicat[ing] that the payer landscape and progress has been on-plan," because of two "not insignificant" caveats: first that management is "not disclosing the new prescriptions[;]" and "[s]econd, and much more concerning, is that management indicated 'Due to patient starts ***generally at a consistent level*** over the last 2 quarters, we are intensely focused on increasing demand.'  We can come up with no good reason why patient starts were flat Q/Q and that trend is troubling if it persists. Management indicates that there is going to be a greater focus on the larger, major movement disorder centers, which we applaud ***but would have thought was obvious***." (Emphasis in original).

339.    On March 4, 2019, after the market close, Defendants held an earnings conference call with investors and analysts to discuss Adamas's financial results for the fourth quarter and year ended December 31, 2018.  During the opening comments, Went stated that the latter part of 2018 saw a slowing rate of total prescription growth quarter-to-quarter, and warned that this slowdown in prescription growth rate would continue "into the first part of 2019."  In his opening comments,

Merriweather announced that "[b]ecause we're still very early in the commercialization of GOCOVRI, we are not providing prescription or revenue guidance in 2019." Went reiterated that Adamas would not be providing prescription or revenue guidance in response to an analyst question.

340. Went further explained that the Company was expanding Quick Start into a "broader free trial program," extending it from 14 to 28 days "to encourage trial of GOCOVRI in a broader array of patients" (as detailed at ¶183, *supra*). The announcement disclosed that, contrary to prior statements, the 14 day period was inadequate and demand for GOCOVRI was limited to the most severely dyskinetic patients.

341. Following this news, Adamas's stock fell $3.99 per share, or 32.84%, to close at $8.16 per share on March 5, 2019, on heavy volume, damaging investors.

342. On March 4, 2019, Piper Jaffray lowered its price target for Adamas, concluding that "[w]ith Adamas refining its marketing message on GOCOVRI, in addition to starting a sampling program over one year following the launch, *it is fair to wonder if management has misread both its physician audience and the payer landscape*." Under the heading "**Our confidence in management's ability to execute on Gocovri has been shaken**[,] Piper Jaffray further found it "troubling" "that ADMS is only now initiating a sampling program when it could have done so right out of the gate." (Bold emphasis in original).

343. On March 5, 2019, Cowen published a report entitled "Downgrade – Something Is Wrong And We Can't Figure It Out." Cowen concluded: "Reflecting management's removal of their previous qualitative guidance – and therefore lowering the growth trajectory – … a downgrade is warranted. Cowen further noted that "*We rarely see a company back away from guidance so quickly*[,]" which "should obviously be [a] heightened concern."

344. Needham & Company similarly downgraded Adamas to hold and halved its price target to $15, on March 5, 2019, concluding: "Given the uncertainty and disruption of the ongoing Gocovri launch, we are heading to the sidelines … until we have better visibility that issues can be addressed[.]" The analyst firm Mizuho also downgraded Adamas to "underperform," slashing its price target to $5, explaining that it did not expect the company to "back away from prior 2019 outlook and believe[s] the launch is likely going even worse than thought."

345.     Bank of America's March 5, 2019 report said that the expansion of the free trial was "**a signal of weak demand** consistent with our prior doctor checks which led to our initial round of estimate revisions last fall."  It noted that "**failure of the MS indication to advance would lead to meaningful downside to our current estimates**."

346.     Finally on September 30, 2019, Bank of America again lowered its rating for Adamas, and published a report noting that doctor checks regarding the use of GOCOVRI for MSWI revealed they were "more confident about the safety profile of Ampyra" and expected to continue using it, "especially with cheaper generic Ampyra available."  The report also warned investors, "We **expect reimbursement hurdles in MSWI space especially with generic Ampyra launch**" (as detailed at ¶217, *supra*).

347.     Following this news, the Company' stock price fell $1.55, or approximately 23.26%, to close at $5.12 per share on September 30, 2019, and continued to fall the following day, declining another $0.74, or 14.37%, to close at $4.38 per share on October 1, 2019, both on heavy volume, damaging investors.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    The Significant Number Executive Departures Support An Inference of Scienter

348.     On September 14, 2018, shortly after the Company announced on the August 2, 2018 earnings call that physicians were "**taking a thoughtful approach**" to GOCOVRI "**largely based on their unsatisfactory historic experience with immediate-release amantadine in dyskinesia patients,**" Adamas filed an 8-K announcing that King had resigned for personal reasons.  King was hired to spearhead the launch of GOCOVRI and regularly reported on Company earnings calls and investor conferences on the progress of the GOCOVRI's commercialization.  FE1 believed King was fired in the summer of 2018 because many of the prescriptions that the Company had reported were ultimately denied reimbursement (as detailed in ¶149, *supra*).  Weeks later, on October 5, 2018 Bank of America would issue its report revealing that a survey of doctors showed weak demand and a higher-than-expected dropout rate for GOCOVRI due to the high cost and difficulty securing prior authorization.

349.     The following month, on the November 1, 2018 earnings call, Adamas revealed that the rate of new prescribers was worse than expected and that they were only targeted half of the initially projected 6,500 physicians and only anticipated 2% market penetration by the end of 2019. William Blair issued a report on November 2, 2018, stating that GOCOVRI sales were "better than expected after patient retention concerns were raised in the second quarter *followed by commercial management departure in the third quarter*."

350.     On August 8, 2019, when Adamas revealed that operational issues were impacting fulfillment and demand and that despite the expansion of the QuickStart program, the Company had not experienced substantial growth in new patients,  Adamas also announced that Merriweather was be leaving the Company and his last day would be December 31, 2019.

351.     Shortly after, on September 13, 2019, Adamas filed a Form 8-K which announced that Went had resigned as Chairman and CEO on September 11, 2019, but would continue to serve as a strategic advisor to the Company.  The Company also announced that Neil McFarlane, who was not previously employed by the Company, was named the new CEO of Adamas on September 11, 2019, indicating that Adamas had likely been recruiting for the position for some time.  Weeks later analysts would reveal that the MSWI market opportunity was substantially smaller than the Company had represented.

352.     This string of executive departures supports the conclusion that Adamas was aware that it had not successfully differentiated GOCOVRI from amantadine IR, such that patients, physicians, and payers did not appreciate the value proposition, which derailed GOCOVRI's commercial launch.

**B.     GOCOVRI's Successful Launch Was A Core Operation**

353.     The fraud alleged herein relating to concealing the true state of affairs with respect to the market opportunity for GOCOVRI, the success of GOCOVRI's commercial launch, and the market opportunity for ADS-5102 as a treatment for MSWI, all involved Adamas's core operation, and knowledge of the fraud may therefore be imputed to Defendants Went, Merriweather, King, Patni, and Shreedhar.

354.     Went was the founder of Adamas and conceived of the idea for GOCOVRI.  Went oversaw its development and FDA approval.   Following the FDA approval of GOCOVRI, Merriweather noted at the September 18, 2017 Investor & Analyst Meeting that it was "clearly a *very important inflection point for Adamas* as we transition from a company that's been focused on product development to a company that has a commercial opportunity and a pipeline of exciting new opportunities."   GOCOVRI's commercial success was not only significant to Adamas's commercial success, but also, to validating the Company's development strategy of taking existing treatments and add a timing feature to them.  On the February 22, 2018 earnings call, Went described GOCOVRI as "the most important proof point to date of our time-dependent biology approach."

355.     As indicated in the Form 10-K for the year ending December 31, 2019 filed by Adamas on February 25, 2020, GOCOVRI was the primary source of revenue for the Company throughout the Class Period, representing 99% of its revenue in 2017, 2018, and 2019.   The Company acknowledged in each of its annual reports filed on Form 10-K's for the years ending December 31, 2016 through December 31, 2019 that, "*Our success depends heavily on successful commercialization of GOCOVRI…. To the extent GOCOVRI is not commercially successful, our business, financial condition and results of operations will be materially harmed.*"

356.     The significance of GOCOVRI's commercial success is further reflected by Went's deep involvement in the commercial organization after King's departure.  FE4, as well as, FE5's superior, reported directly to Went after King's departure, despite the Company publicly stating that Masterson and Hart would lead commercial efforts after King's departure.  With King gone, Went led the commercial organization until Shreedhar joined the Company as Chief Commercial Officer on or around May 30, 2019.

357.     The 2019 10-K similarly stated, "In 2019, we placed [the ADS-4101] development program on hold in order to focus our resources on our priorities of GOCOVRI commercialization, and our MSW[I] development program."  On the May 9, 2019 earnings call, Went stated that the commercialization of GOCOVRI and the development of ADS-5102 for MSWI were the Company's "2 key priorities."

### 1. Defendants Touted GOCOVRI's Differentiation & Value Proposition

358.   The Defendants understood that differentiating GOCOVRI from amantadine IR, such that, patients, physicians, and payers appreciated the value proposition, was critical to commercial success.  On the May 2017 call Went stated, "our research also indicated that *payers appreciate the strong value proposition of ADS-5102*.  The payers recognize the *substantial unmet need for this orphan population for whom there is no approved medication*."  Went assured that GOCOVRI "*will be viewed as differentiated*."  On the August 8, 2017 earnings call, King assured that GOCOVRI pricing would be "consistent with the value proposition for patients. And we believe we've got a *strong value proposition, given the differentiated clinical nature of ADS-5102*."  On the November 2, 2017 call, Patni discussed how the Company was addressing "numerous questions about GOCOVRI and about *how it is differentiated from existing treatment* strategies for dyskinesia, including the use of amantadine immediate release."

359.   On the February 2018 call, King assured that the OSMOLEX approval did not change the "*value proposition*" of GOCOVRI, noting "*very strong, resonant support for GOCOVRI at both the physician and the payer level*."  King said that the number of prescribers "demonstrates the strength of the GOCOVRI *value proposition for patients*" on the May 2018 call. At the May 16, 2018 Bank of America Conference, King noted, "*at the payer level, [] everytime we talked about GOCOVRI, we've had to confront the question about IR amantadine.*"

### 2. Defendants Tracked GOCOVRI's Progress & Received Regular Feedback

360.   The Defendants were heavily involved with the commercial launch of GOCOVRI and received regular progress reports.  FE4 said the Company received data from the specialty pharmacy that allowed them to track the fulfillment time.  Masterson, who reported to Went, was primarily responsible for this and was familiar with the data.  FE4 also noted that Adamas had an internal market research group that reported directly to Went.

361.   On the May 2018 call, King stated, "*Every day*, we hear stories from our field team following meetings that they have had with physicians."  At the May 2018 Bank of America Conference, King similarly referenced "commentary that we get back *daily from our field team and*

1  ***directly from physicians*** about the impact that GOCOVRI has on people's lives."  On the August

2  2018 call, King said, "I am thrilled with the comments we continue to hear back from our field team

3  and directly from physicians and patients."  Patni noted that he "was out visiting a movement

4  disorder center recently" on the November 1, 2018 earning call.  Patni similarly stated on the May

5  9, 2019 earnings call that he had "visited [] many of these [experienced neurologists'] practices…"

6  At the May 2019 Bank of America Conference, Went indicated that dosing challenges were

7  something that the Company "heard [] enough times" to address.  Shreedhar similarly detailed on

8  the August 8, 2019 earnings call that he had "visited top movement disorder centers and neurologists

9  to observe practice considerations… visited our specialty pharmacy partner …spoken individually

10  and collectively to our entire sales and broader commercial teams."

11      362.   FE2 confirmed that Patni and Went received reports of physicians' feedback, noting

12  that Patni occasionally attended weekly meetings of MSLs and information from those meetings

13  was shared with Patni when he did not attend.  FE2 also believed Went would have been aware due

14  to his close working relationship with Patni.  FE2 noted Adamas was a small company and Went

15  developed the idea for GOCOVRI, was involved in the clinical trials, and everything have to do

16  with GOCOVRI.

17      363.   FE5 noted that a Sales Advisory Board, led by Hart and consisting of sales

18  representatives from each region, provided feedback to executives including Went, regarding sales

19  and market access issues.  FE5 also indicated that Went was aware of the approval rate for

20  GOCOVRI and instructed sales representatives to focus on patients covered by commercial payers

21  as opposed to Medicare because the commercial payer approval rate was higher than Medicare's.

22  **IX.    CORPORATE SCIENTER ALLEGATIONS**

23      364.   The Company is liable for the acts of the Individual Defendants and its other

24  employees and agents under the doctrine of *respondeat superior* and common law principles of

25  agency because all of the wrongful acts complained of herein were carried out within the scope of

26  their employment and/or agency.

27

28

365.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

## X.     CLASS ACTION ALLEGATIONS

366.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Adamas shares between August 8, 2017 and September 30, 2019, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

367.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Adamas's shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Adamas shares were traded publicly during the Class Period on the NASDAQ.  As of July 31, 2019, Adamas had 27,771,115 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Adamas or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

368.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

369.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

370.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

1          a.      whether the federal securities laws were violated by Defendants' acts as

2    alleged herein;

3          b.      whether statements made by Defendants to the investing public during the

4    Class Period omitted and/or misrepresented material facts about the business, operations, and

5    prospects of Adamas;

6          c.      whether Defendants knew or deliberately disregarded that their statements

7    were false and misleading;

8          d.      whether the price of Adamas securities were artificially inflated because of

9    Defendants' conduct complained of herein; and

10          e.      to what extent the members of the Class have sustained damages and the

11   proper measure of damages.

12          371.    A class action is superior to all other available methods for the fair and efficient

13   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

14   damages suffered by individual Class members may be relatively small, the expense and burden of

15   individual litigation makes it impossible for members of the Class to individually redress the wrongs

16   complained of herein.  Moreover, there will be no difficulty in the management of this action as a

17   class action.

18   **XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE)**

19
20          372.    The market for Adamas's shares was open, well-developed, and efficient at all

21   relevant times.  As a result of the materially false and/or misleading statements and/or failures to

22   disclose, Adamas's securities traded at artificially inflated prices during the Class Period.   On

23   January 23, 2018, the Company's shares closed at a Class Period high of $42.65 per share.  Plaintiff

24   and other members of the Class purchased or otherwise acquired the Company's shares relying upon

25   the integrity of the market price of Adamas's shares and market information relating to Adamas,

26   and have been damaged thereby.

27          373.    During the Class Period, the artificial inflation of Adamas's stock was caused by the

28   material misrepresentations and/or omissions particularized in this Complaint, which in turn caused

the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Adamas's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Adamas and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

374.  At all relevant times, the market for Adamas's shares was an efficient market for the following reasons, among others:

    a.  Adamas stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b.  As a regulated issuer, Adamas filed periodic public reports with the SEC and/or the NASDAQ;

    c.  Adamas regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.  Adamas was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and entered the public marketplace; and/or

    e.  The average daily trading volume for Adamas securities during the Class Period was approximately 724,324 shares, with more than 27.7 million shares outstanding as of July 31, 2019, and a market capitalization reaching almost $1.1 billion during the Class Period.

375.  As a result of the foregoing, the market for Adamas's shares promptly digested current information regarding Adamas from all publicly available sources and reflected such

information in Adamas's stock price.  Under these circumstances, all purchasers of Adamas's shares during the Class Period suffered similar injury through their purchase of Adamas's securities at artificially inflated prices and a presumption of reliance applies.

376.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

377.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

378.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

379.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Adamas

1   who knew that the statement was false when made.

2   **XIII.   CLAIMS**

3                                    **FIRST CLAIM**
                           **Violations of Section 10(b) of the Exchange Act and**
4                              **Rule 10b-5 Promulgated Thereunder**
                                   <u>**Against All Defendants**</u>
5

6          380.   Plaintiff repeats and re-alleges each allegation contained above as if fully set forth

7   herein.

8          381.   This claim is asserted against all Defendants and is based on Section 10(b) of the

9   Exchange Act.

10          382.   During the Class Period, the Defendants carried out a plan, scheme and course of

11   conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

12   public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

13   other members of the Class to purchase Adamas's shares at artificially inflated prices.  In furtherance

14   of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

15          383.   The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

16   untrue statements of material fact and/or omitted to state material facts necessary to make the

17   statements not misleading; and (iii) engaged in acts, practices, and a course of business which

18   operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain

19   artificially high market prices for Adamas's shares in violation of Section 10(b) of the Exchange

20   Act and Rule 10b-5.  All the Defendants were either primary participants in the wrongful and illegal

21   conduct charged herein or were controlling persons as alleged below.

22          384.   The Defendants, individually and in concert, directly and indirectly, by the use,

23   means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in

24   a continuous course of conduct to conceal adverse material information about Adamas's financial

25   well-being and prospects, as specified herein.

26          385.   The Defendants employed devices, schemes and artifices to defraud, while in

27   possession of material adverse non-public information and engaged in acts, practices, and a course

28   of conduct as alleged herein in an effort to assure investors of Adamas's value and performance and

continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Adamas and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

386.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

387.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Adamas's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those

statements were false or misleading.

388.    Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Adamas's shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiff and the other members of the Class acquired Adamas's shares during the Class Period at artificially high prices, and were damaged thereby.

389.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Adamas shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

390.    Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

391.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Adamas securities during the Class Period.

## SECOND CLAIM
### Violations of Section 20(a) of the Exchange Act
### <u>Against Adamas and the Individual Defendants</u>

392.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

393.    This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

394.    The Individual Defendants acted as controlling persons of Adamas within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

395.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

396.    As set forth above, Adamas and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Adamas's primary Exchange Act Section 10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Such other and further relief as the Court may deem just and proper.

## XV.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2020                      **GLANCY PRONGAY & MURRAY LLP**

By:  <u>*s/ Robert V. Prongay*</u>
Robert V. Prongay
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

# EXHIBIT A



## Clinical Policy: Amantadine ER (Gocovri, Osmolex ER)
Reference Number: CP.PMN.89
Effective Date: 10.10.17
Last Review Date: 02.20
Line of Business: Commercial, Medicaid                                    Revision Log

**See Important Reminder at the end of this policy for important regulatory and legal information.**

**Description**
Amantadine extended-release (Gocovri™, Osmolex ER™) is a weak uncompetitive antagonist of the N-methyl-D-aspartate (NMDA) receptor.

**FDA Approved Indication(s)**
Gocovri is indicated for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications.

Osmolex ER is indicated for the treatment of Parkinson's disease and for the treatment of drug-induced extrapyramidal reactions in adult patients.

**Policy/Criteria**
*Provider must submit documentation (such as office chart notes, lab results or other clinical information) supporting that member has met all approval criteria.*

It is the policy of health plans affiliated with Centene Corporation® that Gocovri and Osmolex ER are **medically necessary** when the following criteria are met:

**I.  Initial Approval Criteria**
   **A.  Dyskinesia in Patients with Parkinson's Disease** (must meet all)**:**
   1.  Diagnosis of dyskinesia in patients with Parkinson's disease;
   2.  Member is receiving levodopa-based therapy;
   3.  Meets one of the following (a or b):
        a.  Failure of a 2-week trial of immediate-release amantadine unless contraindicated or clinically significant adverse effects are experienced;
        b.  Medical justification supports inability to continue use of immediate-release amantadine (e.g., contraindications to excipients);
   4.  Dose does not exceed 274 mg per day for Gocovri or 322 mg per day for Osmolex ER.
   **Approval duration:**
   **Medicaid –** 12 months
   **Commercial –** Length of Benefit

   **B.  Drug Induced Extrapyramidal Reactions** (must meet all)**:**
   1.  Diagnosis of a drug induced extrapyramidal reaction;
   2.  Request is for Osmolex ER;
   3.  Meets one of the following (a or b):

a.  Failure of a 2-week trial of immediate-release amantadine unless contraindicated or clinically significant adverse effects are experienced;
b.  Medical justification supports inability to continue use of immediate-release amantadine (e.g., contraindications to excipients);

4.  Dose does not exceed 274 mg per day.

**Approval duration:**
**Medicaid –** 12 months
**Commercial –** Length of Benefit

### C.  Other diagnoses/indications

1.  Refer to the off-label use policy for the relevant line of business if diagnosis is NOT specifically listed under section III (Diagnoses/Indications for which coverage is NOT authorized): CP.CPA.09 for commercial and CP.PMN.53 for Medicaid.

## II.  Continued Therapy

### A.  All Indications in Section I (must meet all):

1.  Currently receiving medication via Centene benefit or member has previously met initial approval criteria;
2.  Member is responding positively to therapy (e.g., reductions in OFF time, improvement in dyskinesia symptoms);
3.  If request is for a dose increase, new dose does not exceed 274 mg per day for Gocovri or 322 mg per day for Osmolex ER.

**Approval duration:**
**Medicaid –** 12 months
**Commercial –** Length of Benefit

### B.  Other diagnoses/indications (must meet 1 or 2):

1.  Currently receiving medication via Centene benefit and documentation supports positive response to therapy.
    **Approval duration: Duration of request or 12 months (whichever is less)**; or
2.  Refer to the off-label use policy for the relevant line of business if diagnosis is NOT specifically listed under section III (Diagnoses/Indications for which coverage is NOT authorized): CP.CPA.09 for commercial and CP.PMN.53 for Medicaid.

## III. Diagnoses/Indications for which coverage is NOT authorized:

### A.  Non-FDA approved indications, which are not addressed in this policy, unless there is sufficient documentation of efficacy and safety according to the off label use policy – CP.CPA.09 for commercial and CP.PMN.53 for Medicaid or evidence of coverage documents.

## IV. Appendices/General Information

*Appendix A: Abbreviation/Acronym Key*
FDA: Food and Drug Administration



**CLINICAL POLICY**
Amantadine ER

*Appendix B: Therapeutic Alternatives*
*This table provides a listing of preferred alternative therapy recommended in the approval criteria. The drugs listed here may not be a formulary agent for all relevant lines of business and may require prior authorization.*

| Drug | Dosing Regimen | Dose Limit/ Maximum Dose |
|------|----------------|--------------------------|
| amantadine immediate-release | Titrated up to 100 mg PO QID | 400 mg/day |

*Therapeutic alternatives are listed as Brand name® (generic) when the drug is available by brand name only and generic (Brand name®) when the drug is available by both brand and generic.*

*Appendix C: Contraindications/Boxed Warnings*
- Contraindication(s): end-stage renal disease
- Boxed Warning(s): none reported

## V.  Dosage and Administration

| Drug Name | Indication | Dosing Regimen | Maximum Dose |
|-----------|-----------|----------------|--------------|
| Amantadine ER (Gocovri) | Dyskinesia in Parkinson's disease | 137 mg PO QHS for 1 week. After 1 week, increase to 274 mg (two 137 mg capsules) PO QHS | 274 mg/day |
| Amantadine ER (Osmolex ER) | Dyskinesia in Parkinson's disease; drug induced extrapyramidal reaction | 129 mg PO QAM, increase dose in weekly intervals | 322 mg/day |

## VI. Product Availability

| Drug Name | Availability |
|-----------|-------------|
| Amantadine ER (Gocovri) | Extended-release capsules: 68.5 mg and 137 mg |
| Amantadine ER (Osmolex ER) | Extended-release tablets: 129 mg, 193 mg, 258 mg |

## VII. References

1. Gocovri Prescribing Information. Emeryville, CA: Adamas Pharma, LLC; August 2017. Available at: https://www.gocovri.com/pdf/Gocovri_Prescribing_Information.pdf. Accessed October 30, 2019.
2. Osmolex ER Prescribing Information. Bridgewater, NJ: Vertical Pharmaceuticals, LLC; July 2018. Available at: www.osmolex.com. Accessed October 30, 2019.
3. Oertel W, Eggert Karla, Pahwa R, et al. Randomized, placebo-controlled trial of ADS-5102 (amantadine) extended-release capsules for levodopa-induced dyskinesia in Parkinson's disease (EASE LID 3). Mov Disord. 2017 August 21. Available at: 10.1002/mds.27131.
4. Pahwa R, Tanner CM, Hauser RA, et al. ADS-5102 (amantadine) extended-release capsules for levodopa-induced dyskinesia in Parkinson disease (EASE LID Study). JAMA Neurol. 2017;74(8):941-949. Doi:10.100/jamaneurol.2017.0943.



**CLINICAL POLICY**
Amantadine ER

| Reviews, Revisions, and Approvals | Date | P&T Approval Date |
|---|---|---|
| Policy created | 10.10.17 | 01.18 |
| Per SDC, added requirement for medical justification that supports inability to use immediate-release amantadine | 04.12.18 | |
| Added Osmolex ER per SDC based on approved clinical guidance; added criteria set for drug induced extrapyramidal reaction. | 09.18.18 | |
| 1Q 2019 annual review; no significant changes; immediate-release amantadine two-week trial and medical justification requirements are edited to reflect either/or; references reviewed and updated. | 11.13.18 | 02.19 |
| 1Q 2020 annual review: no significant changes; references reviewed and updated. | 10.30.19 | 02.20 |

**Important Reminder**

This clinical policy has been developed by appropriately experienced and licensed health care professionals based on a review and consideration of currently available generally accepted standards of medical practice; peer-reviewed medical literature; government agency/program approval status; evidence-based guidelines and positions of leading national health professional organizations; views of physicians practicing in relevant clinical areas affected by this clinical policy; and other available clinical information. The Health Plan makes no representations and accepts no liability with respect to the content of any external information used or relied upon in developing this clinical policy. This clinical policy is consistent with standards of medical practice current at the time that this clinical policy was approved. "Health Plan" means a health plan that has adopted this clinical policy and that is operated or administered, in whole or in part, by Centene Management Company, LLC, or any of such health plan's affiliates, as applicable.

The purpose of this clinical policy is to provide a guide to medical necessity, which is a component of the guidelines used to assist in making coverage decisions and administering benefits. It does not constitute a contract or guarantee regarding payment or results. Coverage decisions and the administration of benefits are subject to all terms, conditions, exclusions and limitations of the coverage documents (e.g., evidence of coverage, certificate of coverage, policy, contract of insurance, etc.), as well as to state and federal requirements and applicable Health Plan-level administrative policies and procedures.

This clinical policy is effective as of the date determined by the Health Plan. The date of posting may not be the effective date of this clinical policy. This clinical policy may be subject to applicable legal and regulatory requirements relating to provider notification. If there is a discrepancy between the effective date of this clinical policy and any applicable legal or regulatory requirement, the requirements of law and regulation shall govern. The Health Plan retains the right to change, amend or withdraw this clinical policy, and additional clinical policies may be developed and adopted as needed, at any time.



**CLINICAL POLICY**
Amantadine ER

This clinical policy does not constitute medical advice, medical treatment or medical care.  It is not intended to dictate to providers how to practice medicine. Providers are expected to exercise professional medical judgment in providing the most appropriate care, and are solely responsible for the medical advice and treatment of members.  This clinical policy is not intended to recommend treatment for members. Members should consult with their treating physician in connection with diagnosis and treatment decisions.

Providers referred to in this clinical policy are independent contractors who exercise independent judgment and over whom the Health Plan has no control or right of control.  Providers are not agents or employees of the Health Plan.

This clinical policy is the property of the Health Plan. Unauthorized copying, use, and distribution of this clinical policy or any information contained herein are strictly prohibited. Providers, members and their representatives are bound to the terms and conditions expressed herein through the terms of their contracts.  Where no such contract exists, providers, members and their representatives agree to be bound by such terms and conditions by providing services to members and/or submitting claims for payment for such services.

**Note:**
**For Medicaid members**, when state Medicaid coverage provisions conflict with the coverage provisions in this clinical policy, state Medicaid coverage provisions take precedence. Please refer to the state Medicaid manual for any coverage provisions pertaining to this clinical policy.

©2017 Centene Corporation. All rights reserved.  All materials are exclusively owned by Centene Corporation and are protected by United States copyright law and international copyright law.  No part of this publication may be reproduced, copied, modified, distributed, displayed, stored in a retrieval system, transmitted in any form or by any means, or otherwise published without the prior written permission of Centene Corporation. You may not alter or remove any trademark, copyright or other notice contained herein. Centene® and Centene Corporation® are registered trademarks exclusively owned by Centene Corporation.

# EXHIBIT B

# DEPARTMENT OF DEFENSE
## PHARMACY AND THERAPEUTICS COMMITTEE

## MINUTES AND RECOMMENDATIONS
### November 2017

## I. CONVENING

The Department of Defense (DoD) Pharmacy and Therapeutics (P&T) Committee convened at 0800 hours on November 15 and 16, 2017, at the Defense Health Agency (DHA) Formulary Management Branch, San Antonio, Texas.

## II. ATTENDANCE

The attendance roster is listed in Appendix A.

### A. Review Minutes of Last Meetings

1. **Approval of August 2017 Minutes**—Mr. Guy Kiyokawa, Deputy Director, DHA, approved the minutes from the August 2017 DoD P&T Committee meeting on October 20, 2017, and signed the first and second addenda to the minutes on September 27 and October 19, 2017, respectively.

2. **Clarification to the August 2017 Minutes Implementation Dates:**  The implementation dates for updated prior authorization criteria, quantity limits, line extensions, and the formulary status and prior authorizations for the newly-approved drugs per 32 CFR 199.21(g)(5) was changed to November 1, 2017.

## III. REQUIREMENTS

All clinical and cost evaluations for new drugs, including newly-approved drugs reviewed according to 32 Code of Federal Regulations (CFR) 199.21(g)(5), and full drug class reviews included, but were not limited to, the requirements stated in 32 CFR 199.21(e)(1) and (g)(5). All Uniform Formulary (UF) and Basic Core Formulary (BCF) recommendations considered the conclusions from the relative clinical effectiveness and relative cost-effectiveness determinations, and other relevant factors.  Medical necessity (MN) criteria were based on the clinical and cost evaluations, and the conditions for establishing MN for a nonformulary (NF) medication.

Nonformulary medications are generally restricted to the mail order program according to amended section 199.21, revised paragraphs (h)(3)(i) and (ii), effective August 26, 2015.

## IV. UF DRUG CLASS REVIEWS

### A. Weight Loss Agents

*Background*—Prior to the National Defense Authorization Act (NDAA) 2017, weight loss agents were excluded from the TRICARE pharmacy benefit.  An Interim Final Rule published on September 29, 2017, (DOD-2017-HA-RIN 0720) "authorizes coverage under TRICARE

6. ***COMMITTEE ACTION: EMMPI REQUIREMENTS***—The P&T Committee recommended (17 for, 0 opposed, 0 abstained, 0 absent) to not add the legend prenatal vitamins to the EMMPI program, and that the NF prenatal vitamins should be exempted from the NF mail order requirement due to feasibility issues related to the sheer number of products involved.

7. ***COMMITTEE ACTION:  UF IMPLEMENTATION PERIOD***—The P&T Committee recommended (17 for, 0 opposed, 0 abstained, 0 absent) 1) an effective date of the first Wednesday after a 90-day implementation period in all points of service and, 2) DHA send letters to beneficiaries who are affected by the UF decision.  Based on the P&T Committee's recommendation, the effective date is May 2, 2018.

V. ==NEWLY-APPROVED DRUGS PER 32 CFR 199.21(g)(5)==

*Relative Clinical Effectiveness and Relative Cost-Effectiveness Conclusions*—The P&T Committee agreed (Day 1: 17 for, 0 opposed, 0 abstained, 0 absent; Day 2: 16 for, 0 opposed, 0 abstained, 1 absent) with the relative clinical and cost-effectiveness analyses presented for the newly-approved drugs reviewed according to 32 CFR 199.21(g)(5).  See Appendix F for the complete list of newly-approved drugs reviewed at the November 2017 P&T Committee meeting, a brief summary of their clinical attributes, and their formulary recommendations, and see Appendix G for their restriction to or exemption from the Mail Order Pharmacy.

A. ***COMMITTEE ACTION:  UF RECOMMENDATION***—The P&T Committee recommended (Day 1: 17 for, 0 opposed, 0 abstained, 0 absent; Day 2: 16 for, 0 opposed, 0 abstained, 1 absent) the following:

- **UF**:
  - abemaciclib (Verzenio) – Oral Oncology Agents for Breast Cancer
  - belimumab (Benlysta) – Immunosuppressive Agents – Systemic Lupus Erythematosus
  - plasma-derived human C1 esterase inhibitor SQ injection (Haegarda)– Hereditary Angioedema (HAE)
  - enasidenib (Idhifa) – Oral Oncology Agents for Acute Myelogenous Leukemia
  - fluticasone furoate/umeclidinium/vilanterol (Trelegy Ellipta) – Pulmonary II Combination Agents – Chronic Obstructive Pulmonary Disease (COPD)
  - glecaprevir/pibrentasvir (Mavyret) – Hepatitis C Virus Direct Acting Antivirals (HCV DAAs)
  - L-glutamine (Endari) – Dietary Supplements
  - naldemedine (Symproic) – Gastrointestinal-2 Agents – Opioid Induced Constipation (OIC) Drugs
  - neratinib (Nerlynx) –  Oral Oncology Agents for Breast Cancer
  - nitisinone (Nityr) – Metabolic Replacement Agents
  - perampanel (Fycompa oral solution) – Anticonvulsants/Anti-Mania Agents

- ▪ sofosbuvir/velpatasvir/voxilaprevir (Vosevi) – HCV DAAs

- **NF:**
  - ▪ amantadine ER (Gocovri) – Parkinson's Disease Drugs
  - ▪ betrixaban (Bevyxxa) – Oral Anticoagulants
  - ▪ delafloxacin (Baxdela) – Antibiotics – Quinolones
  - ▪ fluticasone propionate (ArmonAir RespiClick) – Pulmonary I Agents – Inhaled Corticosteroids
  - ▪ guselkumab (Tremfya) injection – Targeted Immunomodulatory Biologics (TIBs)
  - ▪ insulin aspart (Fiasp) – Insulins – Short-Acting Agents
  - ▪ lesinurad/allopurinol (Duzallo) – Antigout Agents – Chronic
  - ▪ methylphenidate ER orally dissolving tablet (Cotempla XR ODT) – Attention Deficit Hyperactivity Disorder (ADHD) Drugs
  - ▪ simvastatin oral suspension (FloLipid) – Antilipidemic-1s

B. ***COMMITTEE ACTION: MN CRITERIA***—The P&T Committee recommended (Day 1: 17 for, 0 opposed, 0 abstained, 0 absent; Day 2: 16 for, 0 opposed, 0 abstained, 1 absent) MN criteria for Gocovri, Bevyxxa, Baxdela, ArmonAir RespiClick, Tremfya, Fiasp, Duzallo, Cotempla XR ODT, and Flolipid. See Appendix B for the full criteria.

C. ***COMMITTEE ACTION: PA CRITERIA***—The P&T Committee recommended (Day 1: 17 for, 0 opposed, 0 abstained, 0 absent; Day 2: 16 for, 0 opposed, 0 abstained, 1 absent) the following:

- Applying the same manual PA criteria for Tremfya in new users, as is currently in place for the other non step-preferred TIBs. Patients must first try adalimumab (Humira). Additionally, for Tremfya, a trial of both secukinumab (Cosentyx) and ustekinumab (Stelara) is required if the patient cannot be treated with Humira.

- Applying the same manual PA criteria to new users of Vosevi and Mavyret as is currently in place for the other non step-preferred DAAs for chronic hepatitis C infection. Harvoni is the preferred agent.

- Revising the manual PA criteria for Haegarda in new users to not allow concomitant use with another C1 esterase inhibitor product.

- Applying manual PA criteria to new users of Verzenio, Gocovri, Idhifa, Endari, Nerlynx, and Fycompa.

- Applying PA criteria to new and current users of Benlysta, ArmonAir RespiClick, Fiasp, Duzallo, Cotempla XR ODT, and FloLipid.

**Appendix B—Table of Medical Necessity (MN) Criteria**

| Drug / Drug Class | Medical Necessity Criteria |
|---|---|
| • liraglutide 3 mg injection (Saxenda)<br><br>**Weight Loss Agents** | • Use of formulary agents and nonformulary agents (Qsymia, Contrave, Xenical, Belviq/Belviq XR) are contraindicated<br>• Use of formulary agents and nonformulary agents (Qsymia, Contrave, Xenical, Belviq/Belviq XR) have resulted in therapeutic failure<br><br>**Formulary Alternatives:** phentermine, diethylpropion, benzphetamine, phendimetrazine |
| • lorcaserin (Belviq, Belviq XR)<br>• naltrexone SR/bupropion SR (Contrave)<br><br>**Weight Loss Agents** | • Use of formulary agents is contraindicated<br>• Use of formulary agent resulted in therapeutic failure<br><br>**Formulary Alternatives:** phentermine, diethylpropion, benzphetamine, phendimetrazine |
| • orlistat (Xenical)<br><br>**Weight Loss Agents** | • Use of formulary agents and nonformulary agents (Qsymia, Contrave, Belviq/ Belviq XR) is contraindicated<br>• Use of formulary agents and nonformulary agents (Qsymia, Contrave, Belviq/ Belviq XR) have resulted in therapeutic failure<br>• No alternative formulary agent:  The patient is between 12 and 18 years of age<br><br>**Formulary Alternatives:** phentermine, diethylpropion, benzphetamine, phendimetrazine |
| • phentermine 8 mg tabs (Lomaira)<br><br>**Weight Loss Agents** | • Patient has experienced or is likely to experience significant adverse effects from formulary agents<br><br>**Formulary Alternatives:**  phentermine, diethylpropion, benzphetamine, phendimetrazine |
| • phentermine/topiramate ER (Qsymia)<br><br>**Weight Loss Agents** | • Use of phentermine has resulted in therapeutic failure<br><br>**Formulary Alternatives:**  phentermine, diethylpropion, benzphetamine, phendimetrazine |
| • amantadine ER tablets (Gocovri)<br><br>**Parkinson's Disease Drugs** | The patient has experienced significant adverse effects to the formulary alternative amantadine IR that are not expected to occur with Gocovri.<br><br>**Formulary Alternative:  amantadine immediate relea**se |
| • betrixaban (Bevyxxa)<br><br>**Oral Anticoagulants** | • No formulary alternative:  The patient requires extended duration venous thromboembolism prophylaxis and cannot take SQ enoxaparin or SQ heparin due to adverse effects or therapeutic failure<br><br>**Formulary Alternatives:**  enoxaparin (Lovenox), SQ heparin |
| • delafloxacin (Baxdela)<br><br>**Antibiotics:  Quinolones** | • Use of formulary agents is contraindicated<br>• Formulary agents result or are likely to result in therapeutic failure<br><br>**Formulary Alternatives:**  ciprofloxacin and clindamycin, trimethoprim-sulfamethoxazole, linezolid, or any culture-sensitive agent(s) |

| Drug / Drug Class | Prior Authorization Criteria |
|---|---|
| • abemaciclib (Verzenio)<br><br>**Oral Oncologic Agents** | Manual PA criteria apply to all new users of Verzenio.<br><br>Manual PA criteria—Verzenio is approved if:<br><br>• The patient has a diagnosis of HR+, HER2 negative advanced or metastatic breast cancer<br><br>• Breast cancer has progressed during or after endocrine therapy<br><br>• The patient is using Verzenio and meets ALL of the following:<br><br>   ○ Patient is postmenopausal and will use Verzenio in combination with fulvestrant  OR<br>   ○ The patient is premenopausal or perimenopausal and is receiving ovarian suppression with GnRH agonist AND Verzenio will be used in combination with fulvestrant OR<br>   ○ Verzenio will be used as monotherapy and the patient has had prior chemotherapy for treatment of metastatic breast cancer<br><br>Off-label uses are not approved<br>Prior Authorization does not expire |
| • amantadine ER tabs (Gocovri)<br><br>**Parkinson's Disease Drugs** | Manual PA criteria apply to all new users of Gocovri<br><br>Manual PA Criteria—Gocovri is approved if:<br><br>• The patient is ≥18 years old AND<br><br>• Has a diagnosis of Parkinson's Disease AND<br><br>• Has had therapeutic failure of a trial of amantadine 200 mg immediate release tablets administered twice daily<br><br>Off label uses are not approved<br>Prior Authorization does not expire |
| • belimumab (Benlysta)<br><br>**Targeted Immunomodulatory Biologics (TIBs)** | Manual PA Criteria apply to all new and current users of belimumab (Benlysta), including patients currently receiving the IV formulation of Benlysta.<br><br>Manual PA criteria:  Coverage is approved for Benlysta if all of the following are met:<br><br>• Benlysta is prescribed by or in consultation with a specialty provider for systemic lupus erythematosus (SLE): rheumatologist, cardiologist, neurologist, nephrologist, immunologist, or dermatologist<br><br>• The patient is ≥18 years old<br><br>• The patient has a documented diagnosis of active, autoantibody positive (i.e., positive for antinuclear antibodies [ANA] and/or anti-double-stranded DNA antibody [anti-dsDNA]) SLE<br><br>• The patient is concurrently taking standard therapy for SLE (e.g., hydroxychloroquine, systemic corticosteroid and/or immunosuppressives either alone or in combination)<br><br>• The patient does not have severe active lupus nephritis or severe active central nervous system lupus<br><br>• The patient is not taking concomitant biologics (e.g., rituximab) and/or intravenous cyclophosphamide<br><br>Off-label uses are not approved<br><br>Prior Authorization expires in one year.<br><br>Renewal PA Criteria:  Benlysta will be approved on a yearly basis if all of the following are met:<br><br>• Treatment with Benlysta has shown documented clinical benefit (i.e. improvement in number/frequency of flares, improvement in Safety of |

Appendix F—Formulary Recommendations for Newly-Approved Drugs Per 32 CFR 199.21(g)(5)

| Generic (Trade) | UF Class | Comparators | Indications | Place in Therapy | Recommended UF Status |
|---|---|---|---|---|---|
| abemaciclib (Verzenio) | Oncologic Agents: Breast Cancer CDK4/6 | • palbociclib (Ibrance) • ribociclib (Kisqali) | With fulvestrant HR+, HER2-, advanced or metastatic breast cancer with disease progression following endocrine tx  Monotherapy HR+, HER2- advanced metastatic breast cancer with disease progression following endocrine tx and prior chemo in metastatic setting | • 3rd CDK4/6 inhibitor available for HR+, HER2- advanced breast cancer • Demonstrated progression-free survival (PFS) benefit as single therapy in advanced therapy and in combination with fulvestrant for patients with life-threatening incurable disease • No overall survival benefit shown to date • Failed to show benefit in overall survival for KRAS mutated NSCLC • More selective for CDK4 than CDK6 • Side effects of neutropenia less severe than comparators, while more severe than comparators in diarrhea • Antidiarrheals coadministered at first sign of adverse event • Reduced neutropenia allows for continuous dosing | • UF • Do not add to EMMPI list |
| amantadine ER (Gocovri) | Parkinson's Disease Drugs | • amantadine immediate release | Dyskinesia with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications | • Amantadine may be considered to reduce dyskinesia (Level C) • May be appropriate for reducing nocturnal side-effects in patients who experience benefit from the immediate release but have insomnia or agitation | • NF • Exempt from NF mail order requirement due to feasibility (unavailable at mail order) |
| belimumab (Benlysta) SC | Immuno-suppressive Agents | • Standard therapy only (e.g., NSAIDS, corticosteroids, antimalarials, immuno-suppressives) | B-lymphocyte stimulator-specific inhibitor for adults with active, autoantibody-+ systemic lupus erythematosus (SLE) receiving standard therapy | • 1st biologic approved to treat SLE in conjunction with standard therapy • New SC formulation allows for patient self-administration at home; previous approved formulation given as monthly IV infusion in the clinic/hospital • Dosed 200 mg SC injection (not weight-based) in the abdomen or thigh, given once weekly • Studies for IV and SC formulations demonstrated similar efficacy and safety profiles, and superiority over placebo • Advantage over infusion for convenience, but lower response rate in African American women than placebo | • UF • Do not add to EMMPI list |
| betrixaban (Bevyxxa) | Oral Anti-coagulants | • apixaban • rivaroxaban • enoxaparin | Venous thromboembolism (VTE) prophylaxis in acutely hospitalized adults at risk for thromboembolic complications from moderate or severely restricted mobility and other risk factors for VTE | • 5th available direct acting oral anticoagulant (DOAC) • Only oral agent approved for VTE prophylaxis in acutely hospitalized patients • CHEST guidelines do not recommend extended duration VTE prophylaxis beyond hospitalization or period of immobility • Significantly increases bleeding risk without significantly decreasing VTE risk • No compelling advantage over existing UF agents | • NF • Exempt from NF mail order requirement (acute use) |

Appendix F—Table of Formulary Recommendations for Newly-Approved Drugs per 32 CFR 199.21(g)(5)
Minutes and Recommendations of the DoD P&T Committee Meeting November 15-16, 2017

Page 46 of 55

# EXHIBIT C

**Idaho Medicaid Preferred Drug List Recommendations**
November 20, 2017

Idaho Medicaid makes the following recommendations for the Idaho Medicaid Preferred Drug List.  These recommendations are based on the clinical recommendations of the Pharmacy and Therapeutics Committee from the October 20 and November 17 meetings and take into consideration public and prescriber input, utilization patterns and cost data.

| Therapeutic Class | Preferred Drugs | Non-Preferred Drugs |
|---|---|---|
| **ALZHEIMER'S DRUGS**[CL] | donepezil [CL] –except 23 mg tablets<br>donepezil ODT [CL]<br>EXELON (rivastigmine) transdermal[CL]<br>memantine tablets [CL]<br>rivastigmine capsules[CL] | donepezil 23 mg tablets [CL]<br>galantamine tablets, solution[CL]<br>galantamine ER[CL]<br>memantine soln [CL]<br>NAMENDA (memantine) XR [CL]<br>NAMENDA (memantine) soln [CL]<br>NAMZARIC  (donepezil and memantine ER) [CL]<br>rivastigmine transdermal [CL] |
| **ANTI-ALLERGENS** | | GRASTEK (Timothy grass pollen allergen extract) [CL]<br>ORALAIR (grass pollen extract-Cocksfoot, Sweet Vernal Grass, Rye Grass, Meadow Grass, Timothy) [CL]<br>RAGWITEK (Short Ragweed pollen allergen extract) [CL] |
| **ANTICONVULSANTS** | Adjuvants, Epilepsy<br>APTIOM (eslicarbazepine) [CL]<br>divalproex sprinkle [CL]<br>GABITRIL (tiagabine) [CL]<br>levetiracetam solution, tablets [CL]<br>oxcarbazepine suspension [CL]<br>oxcarbazepine tablets [CL]<br>topiramate sprinkles [CL]<br>VIMPAT (lacosamide) tablets, soln [CL]<br>zonisamide [CL] | BANZEL (rufinamide) tablets, suspension [CL]<br>BRIVIACT (brivaracetam) tablets, soln [CL]<br>felbamate tablets, suspension [CL]<br>FYCOMPA (perampanel) tablets, suspension[CL]<br>lamotrigine XR [CL]<br>levetiracetam ER [CL]<br>OXTELLAR XR (oxcarbazepine) [CL]<br>SABRIL (vigabatrin) tablets, soln [CL]<br>SPRITAM (levetiracetam) suspension [CL]<br>tiagabine [CL] |

| ANTIHYPERURICEMICS | | |
|---|---|---|
| | allopurinol<br>probenecid | colchicine [CL] capsules, tablets<br>MITIGARE (colchicine) capsules [CL]<br>==probenecid/colchicine== [CL]<br>ULORIC (febuxostat) [CL]<br>ZURAMPIC (lesinurad) |
| ANTIPARKINSON'S DRUGS | amantadine capsules, syrup<br>benztropine<br>bromocriptine<br>carbidopa/levodopa IR tablets<br>carbidopa/levodopa ER<br>carbidopa/levodopa/entacapone<br>pramipexole IR<br>ropinirole IR<br>selegiline capsules, tablets<br>trihexyphenidyl tablets, solution | amantadine tablet<br>AZILECT (rasagiline)<br>carbidopa<br>carbidopa/levodopa ODT<br>entacapone<br>GOCOVRI (amantadine)<br>MIRAPEX ER (pramipexole)<br>NEUPRO (rotigotine) transdermal<br>pramipexole ER<br>==rasagiline==<br>ropinirole ER<br>RYTARY (carbidopa/levodopa ER)<br>tolcapone<br>==XADAGO (safinamide)==<br>ZELAPAR (selegiline) disintegrating<br>tablets |
| ANTIPSYCHOTICS | aripiprazole tablets<br>chlorpromazine<br>clozapine tablets<br>FAZACLO (clozapine ODT)<br>fluphenazine tablets, solution<br>haloperidol<br>==LATUDA (lurasidone)==<br>loxapine<br>olanzapine tablets<br>olanzapine ODT<br>ORAP (pimozide)<br>perphenazine<br>perphenazine/amitriptyline<br>quetiapine tablets<br>quetiapine ER<br>risperidone solution, tablets, ODT<br>thiothixene<br>trifluoperazine<br>ziprasidone capsules | aripiprazole disintegrating tablet<br>aripiprazole solution<br>clozapine ODT<br>FANAPT (iloperidone) tablets<br>molindone<br>NUPLAZID (pimavanserin)<br>olanzapine/fluoxetine (must use<br>individual agents)<br>paliperidone ER<br>pimozide<br>REXULTI (brexpiprazole)<br>SAPHRIS (asenapine)<br>thioridazine<br>VERSACLOZ (clozapine)<br>VRAYLAR (cariprazine) |

| STIMULANTS AND RELATED DRUGS[CL] | ADDERALL XR (amphetamine salt combination) [CL] | ADZENYS XR ODT (amphetamine) [CL] |
|---|---|---|
| | amphetamine salt combination IR [CL] | amphetamine salt combination ER [CL] |
| | ==APTENSIO XR (methylphenidate) [CL]== | armodafinil [CL] |
| | ==atomoxetine== | ==CONTEMPLA XR-ODT (methylphenidate)== |
| | clonidine IR | clonidine ER [CL] |
| | FOCALIN (dexmethylphenidate) [CL] | DAYTRANA (methylphenidate) [CL] |
| | FOCALIN XR (dexmethylphenidate) [CL] | dexmethylphenidate [CL] |
| | guanfacine ER | dexmethylphenidate XR [CL] |
| | guanfacine IR | dextroamphatamine IR, ER [CL] |
| | methylphenidate IR tablets[CL] | dextroamphetamine solution [CL] |
| | methylphenidate ER | DYANAVEL XR (amphetamine) [CL] |
| | methylphenidate ER (generic for Concerta) [CL] | EVEKEO  (amphetamine) [CL] |
| | methylphenidate ER (generic for Ritalin SR) [CL] | KAPVAY (clonidine ER) [CL] |
| | ==QUILLICHEW ER (methylphenidate) [CL]== | methylphenidate CD |
| | QUILLIVANT XR  (methylphenidate) solution [CL] | methylphenidate chewable tablets |
| | VYVANSE (lisdexamfetamine) [CL] | methylphenidate ER [CL] |
| | | (generic Ritalin LA) |
| | | methylphenidate solution [CL] |
| | | modafanil [CL] |
| | | ==MYDAYIS (amphetamine salt combination ER)== |
| | | NUVIGIL (armodafanil) [CL] |
| | | PROCENTRA (dextroamphetamine solution) [CL] |
| | | ZENZEDI (dextroamphetamine) [CL] |
| TOBACCO CESSATION | bupropion SR 150 mg | NICOTROL  inhalation (nicotine) |
| | CHANTIX (varenicline) [CL] | NICOTROL NS nasal (nicotine) |
| | nicotine gum OTC (nicotine polacrilex) | |
| | nicotine lozenge OTC buccal (nicotine polacrilex) | |
| | nicotine patch OTC (nicotine) | |

==Note:  Changes are indicated by highlighted area.  Non-preferred drugs require failure of 1, 2 or 3 preferred agents for prior authorization approval.  Those drugs with a [CL] also have clinical prior authorization criteria for use associated with them.==

# EXHIBIT D

**Page 1**

This is the html version of the file https://media.fepblue.org/-/media/77D82F5269A44313A070ECAF8ACDFD80.pdf.
Google automatically generates html versions of documents as we crawl the web.

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

---

Federal Employee Program®
1310 G Street, N.W.
Washington, D.C. 20005
202.942.1000
Fax 202.942.1125

# 5.75.21

| | | | |
|---|---|---|---|
| **Section:** | Prescription Drugs | **Effective Date:** | January 1, 2018 |
| **Subsection:** | Neuromuscular Agents | **Original Policy Date:** | September 29, 2017 |
| **Subject:** | Gocovri | **Page:** | 1 of 4 |

*Last Review Date:*                    December 8, 2017

# Gocovri

## Description

## Gocovri (amantadine)

**Background**

Gocovri is indicated for the treatment of dyskinesia in patients with Parkinson's disease
receiving levodopa-based therapy with or without concomitant dopaminergic medications. Motor
problems and dyskinesia are significant complications of levodopa therapy used to treat patients
with Parkinson's disease (PD) and increases in frequency the longer patients are treated with

levodopa for Parkinson's disease. Currently, treatment of dyskinesia related to Parkinson's disease includes adjusting levodopa doses and dosing schedule, adding additional medications to treat Parkinson's disease (thereby allowing for a decrease in the dose needed of levodopa) , and lastly adding a medication to specifically treat dyskinesia (amantadine) (1-2).

**Regulatory Status**

FDA approved indication:

Gocovri is indicated for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications.

Adverse reactions reported include: falling asleep during activities of daily living and somnolence, suicidality and depression, hallucinations/psychotic behavior, dizziness and orthostatic hypotension, and impulse control/compulsive behaviors. Additionally, the use of this medication is contraindicated in patient with end-stage renal disease (below 15 mL/min/1.73 $m_2$) as this medication is primarily excreted renally (1).

Safety and effectiveness in pediatric patients have not been established (1).

---

**Page 2**

# 5.75.21

| | | | |
|---|---|---|---|
| **Section:** | Prescription Drugs | **Effective Date:** | January 1, 2018 |
| **Subsection:** Neuromuscular Agents | | **Original Policy Date:** | September 29, 2017 |
| **Subject:** | Gocovri | **Page:** | 2 of 4 |

**Related policies**

## Policy

*This policy statement applies to clinical review performed for pre-service (Prior Approval, Precertification, Advanced Benefit Determination, etc.) and/or post-service claims.*

Gocovri may be considered **medically necessary** for patients 18 years of age or older with Parkinson's disease (PD), receiving levodopa therapy and experiencing dyskinesia when the conditions below are met.

Gocovri may be considered **investigational** in patients less than 18 years of age and for all other indications.

## Prior-Approval Requirements

**Age**                    18 years of age or older

**Diagnosis**

    Patient must have the following:

        Parkinson's disease (PD)
            a. Patient is experiencing dyskinesia

        **AND ALL** of the following:
            1. Currently receiving levodopa-based therapy
            2. Documented baseline evaluation of dyskinesia
            3. Prescribing physician has attempted to adjust levodopa therapy to decrease
               dyskinesia
            4. Inadequate treatment response, intolerance, or contraindication to **ONE** of
               the following adjunctive pharmacotherapy options:
                  a. Dopamine agonists
                  b. COMT inhibitors
                  c. MAO B inhibitors
             5. Inadequate treatment response or intolerance to short acting amantadine
            6. **NO** end-stage renal disease (ESRD)

**Page 3**

# 5.75.21

| | | | |
|---|---|---|---|
| **Section:** | Prescription Drugs | **Effective Date:** | January 1, 2018 |
| **Subsection:** Neuromuscular Agents | | **Original Policy Date:** | September 29, 2017 |
| **Subject:** | Gocovri | **Page:** | 3 of 4 |

## Prior – Approval *Renewal* Requirements

**Age**                    18 years of age or older

**Diagnosis**

Gocovri

Patient must have the following:

Parkinson's disease (PD)

a. Patient is experiencing dyskinesia

**AND ALL** of the following:
1. Currently receiving levodopa-based therapy
2. Documented improvement in dyskinesia from baseline
3. **NO** end-stage renal disease (ESRD)

## Policy Guidelines

### Pre - PA Allowance

None

### Prior - Approval Limits

| Quantity | 68.5 mg | 180 capsules per 90 days **OR** |
|----------|---------|---------------------------------|
|          | 137 mg  | 180 capsules per 90 days        |

**Maximum daily limit of any combination: 274 mg**

| Duration | 12 months |
|----------|-----------|

### Prior – Approval *Renewal* Limits

Same as above

## Rationale

**Summary**

Gocovri is indicated for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy with or without concomitant dopaminergic medications. Motor problems and dyskinesia are significant complications of levodopa therapy used to treat patients

**Page 4**

# 5.75.21

| **Section:** | Prescription Drugs | **Effective Date:** | January 1, 2018 |
|--------------|--------------------|--------------------|-----------------|
| **Subsection:** Neuromuscular Agents | | **Original Policy Date:** | September 29, 2017 |
| **Subject:** | Gocovri | **Page:** | 4 of 4 |

with Parkinson's disease (PD), and increases in frequency the longer patients are treated with levodopa for Parkinson's disease. Adverse reactions reported include: falling asleep during activities of daily living and somnolence, suicidality and depression, hallucinations/psychotic behavior, dizziness and orthostatic hypotension, and impulse control/compulsive behaviors (1-2).

Prior authorization is required to ensure the safe, clinically appropriate and cost effective use of Gocovri while maintaining optimal therapeutic outcomes.

**References**
1. Gocovri [package insert]. Emeryville, CA: Adamas Pharma, LLC.; August 2017.
2. Daniel Tarsy. Motor fluctuations and dyskinesia in Parkison disease. UpToDate. March 23, 2017.

## Policy History

| Date | Action |
|---|---|
| February 2017 | Addition to PA |
| December 2017 | Annual review |

## Keywords

This policy was approved by the FEP® Pharmacy and Medical Policy Committee on December 8, 2017 and is effective on January 1, 2018.

.

# EXHIBIT E

# 2018
# Delaware Preferred Drug List (PDL)

# Contents

ADHD AGENTS ............................................................................................................................1
   STIMULANTS AND RELATED AGENTS - SHORT ACTING.............................................1
   STIMULANTS AND RELATED AGENTS - LONG ACTING ..............................................1
ANALGESICS ..............................................................................................................................2
   ANALGESICS, NARCOTIC LONG ACTING .....................................................................2
   ANALGESICS, NARCOTIC SHORT ACTING ...................................................................2
   ANTIHYPERURICEMICS, ORAL........................................................................................3
   ANTIMIGRAINE AGENTS, TRIPTANS..............................................................................4
   CYTOKINE AND CAM ANTAGONISTS .............................................................................5
   NSAIDs, ORAL/TOPICAL ...................................................................................................6
   OPIATE DEPENDENCE TREATMENTS ...........................................................................6
ANTIDOTES.................................................................................................................................7
   OPIATE OVERDOSE TREATMENTS ................................................................................7
ANTI-INFECTIVE AGENTS .........................................................................................................8
   ANTIBIOTICS, INHALED ....................................................................................................8
   ANTIBIOTICS, TOPICAL ....................................................................................................8
   ANTIBIOTICS, VAGINAL ....................................................................................................9
   ANTIFUNGALS, ORAL ........................................................................................................9
   ANTIVIRALS, ANTIRETROVIRALS....................................................................................9
   ANTIVIRALS, HEPATITIS C AGENTS .............................................................................11
   ANTIVIRALS, ORAL ..........................................................................................................11
   CEPHALOSPORINS ..........................................................................................................11
   FLUOROQUINOLONES .....................................................................................................12
   LINCOSAMIDES/OXAZOLIDINONES/STREPTOGRAMINS ...........................................12
   MACROLIDES.....................................................................................................................12
   PENICILLINS ......................................................................................................................13
   TETRACYCLINES ..............................................................................................................13
   URINARY ANTI-INFECTIVES ...........................................................................................13
ANTINEOPLASTICS ..................................................................................................................13
ANTINEOPLASTICS ..................................................................................................................14
   ONCOLOGY AGENTS.......................................................................................................14
CARDIOVASCULAR AGENTS ...................................................................................................15
   ANGIOTENSIN MODULATORS ........................................................................................15
   ANGIOTENSIN MODULATOR/CALCIUM CHANNEL BLOCKER COMBINATIONS .........15

## ANTIPARKINSON'S AGENTS, ORAL/TRANSDERMAL

| PREFERRED AGENTS | | NON-PREFERRED AGENTS | | CRITERION |
|---|---|---|---|---|
| Preferred status implementation: 1/1/18 | | Prior authorization is required | | |
| amantadine capsules, solution | ropinirole IR | amantadine tablets | selegiline capsules | Two preferred products required before a non-preferred product will be approved |
| benztropine | selegiline tablets | entacapone | tolcapone | |
| carbidopa/levodopa IR, ER | trihexyphenidyl | bromocriptine | Duopa | |
| pramipexole IR | | carbidopa | Gocovri[NR] | |
| | | carbidopa/levodopa ODT | Neupro | |
| | | carbidopa/levodopa/ entacapone | Rytary | |
| | | pramipexole ER | Xadago[NR] | |
| | | ropinirole XL | Zelapar | |

## SKELETAL MUSCLE RELAXANTS

| PREFERRED AGENTS | | NON-PREFERRED AGENTS | | CRITERION |
|---|---|---|---|---|
| Preferred status implementation: 1/1/18 | | Prior authorization is required | | |
| baclofen | | carisoprodol ● | metaxalone | Two preferred products required before a non-preferred product will be approved |
| chlorzoxazone | | carisoprodol compound | orphenadrine | |
| cyclobenzaprine 5, 10 mg | | carisoprodol compound w/codeine ● | tizanidine capsules | Total quantity limit of 120 units of muscle relaxants per 30 rolling days. |
| methocarbamol | | cyclobenzaprine 7.5 mg | Amrix | |
| tizanidine tablets | | cyclobenzaprine ER | Lorzone | ●—Clinical PA required |
| | | dantrolene | | http://medicaidpublications.dhss.delaware.gov/dotnetnuke/search?Command=Core_Download&EntryId=177 |

# EXHIBIT F



# Gocovri™ (amantadine)
# <mark>Prior Authorization</mark> with
# Quantity Limit Program Summary

This prior authorization applies to Commercial, NetResults A series, SourceRx and Health Insurance Marketplace formularies.

**OBJECTIVE**
The intent of the <mark>Gocovri Prior Authorization (PA) Criteria</mark> is to appropriately select patients for therapy according to product labeling and/or clinical guidelines and/or clinical studies and according to dosing recommended in product labeling.

**TARGET AGENT**
**Gocovri ™ (amantadine)**

**QUANTITY LIMIT**

| Brand (generic) | GPI | Multisource Code | Quantity Limit |
|---|---|---|---|
| Gocovri (amantadine) extended release | | | |
| 68.3 mg capsules | 73200010107020 | M, N, O, or Y | 1 capsule |
| 137 mg capsules | 73200010107040 | M, N, O, or Y | 2 capsules |

**PRIOR AUTHORIZATION CRITERIA FOR APPROVAL**
**Gocovri (amantadine)** will be approved when ALL of the following are met:
1. The patient has a diagnosis of Parkinson's disease
   **AND**
2. The requested agent will be used for the treatment of dyskinesia
   **AND**
3. The prescriber is a specialist (e.g. neurologist) or the prescriber has consulted with a specialist
   **AND**
4. The patient is currently receiving levodopa therapy
   **AND**
5. ONE of the following:
   A. <mark>The patient's medication history indicates the use of immediate release amantadine</mark> **OR**
   B. <mark>The patient has a documented intolerance, FDA labeled contraindication, or hypersensitivity to immediate release amantadine</mark>
   **AND**
6. The patient does NOT have any FDA labeled contraindication(s) to the requested agent
   **AND**
7. ONE of the following
   A. The requested quantity (dose) is NOT greater than the program quantity limit
      **OR**
   B. ALL of the following:
      i. The requested quantity (dose) is greater than the program quantity limit
         **AND**
      ii. The requested quantity (dose) is less than or equal to the FDA labeled dose
         **AND**
      iii. The requested quantity (dose) cannot be achieved with a lower quantity of a higher strength that does not exceed the limit

© Copyright Prime Therapeutics LLC. <mark>01/2018</mark> All Rights Reserved

**OR**

C.  ALL of the following:

    i.  The requested quantity (dose) is greater than the program quantity limit
       **AND**

    ii.  The requested quantity (dose) is greater than the FDA labeled dose
       **AND**

    iii.  The prescriber has submitted documentation in support of therapy with a higher dose for the intended diagnosis (must be reviewed by the Clinical Review pharmacist)

**Length of Approval:**  12 months

*This pharmacy policy is not an authorization, certification, explanation of benefits or a contract. Eligibility and benefits are determined on a case-by-case basis according to the terms of the member's plan in effect as of the date services are rendered. All pharmacy policies are based on (i) information in FDA approved package inserts (and black box warning, alerts, or other information disseminated by the FDA as applicable); (ii) research of current medical and pharmacy literature; and/or (iii) review of common medical practices in the treatment and diagnosis of disease as of the date hereof. Physicians and other providers are solely responsible for all aspects of medical care and treatment, including the type, quality, and levels of care and treatment.*

*The purpose of Blue Cross and Blue Shield of Alabama's pharmacy policies are to provide a guide to coverage. Pharmacy policies are not intended to dictate to physicians how to practice medicine. Physicians should exercise their medical judgment in providing the care they feel is most appropriate for their patients.*

*Neither this policy, nor the successful adjudication of a pharmacy claim, is guarantee of payment.*

© Copyright Prime Therapeutics LLC. 01/2018 All Rights Reserved

**FDA APPROVED INDICATION AND DOSAGE[1]**

| Agent | Indications | Dose |
|-------|-------------|------|
| **Gocovri™** (amantadine) | Treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications | Initial dose: 137 mg orally daily at bedtime, after one week increase to recommended daily dose<br><br>Maintenance dose: 274 mg orally daily at bedtime |

**CLINICAL RATIONALE**

Parkinson's disease (PD) is a chronic, progressive movement disorder that affects at least one–half million patients across the United States.[2] PD belongs to a group of conditions called motor system disorders, which are the results of loss of dopamine-producing brain cells. The four primary symptoms of PD are tremor, or trembling in hands, arms, legs, jaw, and face; rigidity, or stiffness of the limbs and trunk; bradykinesia, or slowness of movement; and postural instability, or impaired balance and coordination. PD usually affects those over the age of 60. Early symptoms of PD are subtle and occur gradually and may progress more quickly in some people than others. Other symptoms may include depression and other emotional changes; difficulty swallowing, chewing, and speaking; urinary problems or constipation; skin problems; and sleep disruptions. Diagnosis is based on medical history and neurological examinations.[3]

There is no cure for PD and management of PD requires consideration of patient's symptoms, age, stage of disease, degree of functional disability, and level of physical activity and production. Treatment options can be divided into pharmacologic, non-pharmacologic, and surgical therapy. Pharmacologic treatment of PD can be further divided into neuroprotective and symptomatic therapy. Treatment of advanced PD, particularly the complications associated with long-term levodopa therapy, and management of the comorbid problems including daytime sleepiness, hallucinations, and psychosis.  Agents available for the treatment of PD motor symptoms include levodopa, dopamine agonists, monoamine oxidase (MAO) B inhibitors, anticholinergic agents, amantadine, and catechol-O-methyl transferase (COMT) inhibitors.[4]

Levodopa or a dopamine agonist can be used as initial therapy for patients who require symptomatic therapy for PD. Levodopa is the most effective drug for the symptomatic treatment of PD and is the first choice if symptoms, particularly related to bradykinesia, become intrusive or troublesome. Dopamine agonists may be employed as either monotherapy in early PD or in combination with other antiparkinsonian drugs for the treatment of more advanced disease. They are ineffective in patients who do not show response to levodopa. Dopamine agonists may be associated with fewer motor fluctuations than levodopa and there is a higher incidence of levodopa related dyskinesia in young-onset PD. Given this, dopamine agonists are reasonable initial therapy for younger patients (age <65 years) and with levodopa in older patients (age >65 years).[4]

Although initially effective, dopaminergic therapies are eventually complicated by motor fluctuations and dyskinesia.  Motor fluctuations include off time, where periods of when the medication wears off and the PD symptoms appear. Dyskinesia is defined as drug-induced involuntary movements including chorea and dystonia. The motor complications can impair the quality of life and cause significant disability.  Risk factors for motor complications

© Copyright Prime Therapeutics LLC. 01/2018 All Rights Reserved

include younger age at onset of PD, disease severity, higher levodopa dosage, and longer disease duration. Motor complications are usually addressed with levodopa adjustments and the addition of adjunctive medications. Motor fluctuations and dyskinesia can be resistant to medical therapy.[5]

Anticholinergic drugs are most useful as monotherapy in patients under 70 years of age with disturbing tremor who do not have significant bradykinesia or gait disturbance. They also may be useful in patients with more advanced disease who have persistent tremor despite treatment with levodopa or dopamine agonists. Their use in older or demented individuals and those without tremor is strongly discouraged.[4]

Amantadine may be considered for patients with PD with motor fluctuations in reducing dyskinesia.[5] Amantadine is a relatively weak antiparkinsonian drug with low toxicity that is most useful in treating younger patients with early or mild PD and perhaps later when dyskinesia becomes problematic. However, toxic side effects are more likely in older patients.[3] Amantadine in divided doses of 200 to 400 mg a day may reduce the intensity of levodopa-related dyskinesia and motor fluctuations in patients with PD. Although the published randomized trials on amantadine in advanced PD are limited by serious methodological flaws and small numbers of patients, experience has shown that individual patients with advanced PD who have motor fluctuations and dyskinesia can benefit dramatically, at least for a while, from the addition of amantadine to a regimen of levodopa. Furthermore, a randomized controlled trial of 56 patients with PD and levodopa-related dyskinesia found that withdrawal compared with continuation of amantadine led to significant worsening of dyskinesia.[4]

**Safety**[1]
The most common adverse reactions reported in >10% of GOCOVRI-treated patients and more frequently than on placebo were: hallucination, dizziness, dry mouth, peripheral edema, constipation, falls, and orthostatic hypotension.

The overall rate of discontinuation because of adverse reactions for GOCOVRI-treated patients was 20%, compared to 8% for placebo-treated patients. Adverse reactions that led to treatment discontinuation in at least 2% of patients were hallucination (8% GOCOVRI vs. 0% placebo), dry mouth (3% GOCOVRI vs. 0% placebo), peripheral edema (3% GOCOVRI vs. 0% placebo), blurred vision (GOCOVRI 3% vs. 0% placebo), postural dizziness and syncope (GOCOVRI 2% vs. 0% placebo), abnormal dreams (GOCOVRI 2% vs. 1% placebo), dysphagia (GOCOVRI 2% vs. 0% placebo), and gait disturbance (GOCOVRI 2% vs. 0% placebo).

Gocovri is contraindicated in patients with end-stage renal disease (i.e., creatinine clearance below 15 mL/min/1.73 m²). There are several warning and precautions within FDA approved label including suicidality and depression, hallucinations/psychotic behavior, dizziness, orthostatic hypotension, withdrawal-emergent hyperpyrexia, compulsive behavior, and somnolence.

**REFERENCES**
1.  Gocovir prescribing information. Adamas Pharma, Inc. August 2017.
2.  National Institute of Neurological Disorders and Stroke. Focus on Parkinson's Disease Research. www.ninds.nih.gov.
3.  American Academy of Neurology. Parkinson's Disease. American Academy of Neurology Foundation. 2017. Accessed at: http://patients.aan.com/disorders/?event=view&disorder_id=1029. Accessed on February 21, 2017.

© Copyright Prime Therapeutics LLC. 01/2018 All Rights Reserved

4.  Tarsy, Daniel, MD, Hurtig, Howard, MD, Dashe, John, MD, PhD. Pharmacologic Treatment of Parkinson's Disease. UpToDate. Topic 4896, Version 32.0. Last updated August 2017.
5.  Pahwa, R, MD, et al. Practice Parameters: Treatment of Parkinson Disease With Motor Fluctuations and Dyskinesia (An Evidenced Based Review). *Neurology*. April 11, 2006: 66 (7); 983-995.

*This pharmacy policy is not an authorization, certification, explanation of benefits or a contract. Eligibility and benefits are determined on a case-by-case basis according to the terms of the member's plan in effect as of the date services are rendered. All pharmacy policies are based on (i) information in FDA approved package inserts (and black box warning, alerts, or other information disseminated by the FDA as applicable); (ii) research of current medical and pharmacy literature; and/or (iii) review of common medical practices in the treatment and diagnosis of disease as of the date hereof. Physicians and other providers are solely responsible for all aspects of medical care and treatment, including the type, quality, and levels of care and treatment.*

*The purpose of Blue Cross and Blue Shield of Alabama's pharmacy policies are to provide a guide to coverage. Pharmacy policies are not intended to dictate to physicians how to practice medicine. Physicians should exercise their medical judgment in providing the care they feel is most appropriate for their patients.*

*Neither this policy, nor the successful adjudication of a pharmacy claim, is guarantee of payment.*

© Copyright Prime Therapeutics LLC. 01/2018 All Rights Reserved

# EXHIBIT G

# Criteria Based Consultation Prescribing Program

# CRITERIA FOR DRUG COVERAGE

# Amantadine ER (Gocovri™)

Non-formulary **amantadine ER (Gocovri™)** will be covered on the prescription drug benefit when the following criteria are met:

* Prescribed by a neurologist with expertise in diagnosis/treating Parkinson's Disease

- AND –

* Diagnosis of Parkinson's Disease on problem list

-AND-

* Pt currently prescribed carbidopa/levodopa 3 times per day or more

-AND-

* Pt has dyskinetic movements that have responded to adequate trial ($\geq$4 week) of amantadine IR

-AND-

* Pt has failed amantadine IR due to frequency of dosing

- OR -

* Dose Change Only: Patient previously met criteria and is already taking the drug

<u>New Member:</u> pt to be transitioned to amantadine IR if above criteria not met

Approved 3/18; cps/awc

KAISER PERMANENTE®

# EXHIBIT H



**EFFECTIVE**
**Version**
**Updated: 04/27/18**

# Department of Vermont Health Access
# Pharmacy Benefit Management Program

### Vermont Preferred Drug List and Drugs Requiring Prior Authorization
### (includes clinical criteria)

The Commissioner for Office of Vermont Health Access shall establish a pharmacy best practices and cost control program designed to reduce the cost of providing prescription drugs, while maintaining high quality in prescription drug therapies.  The program shall include:

"A preferred list of covered prescription drugs that identifies preferred choices within therapeutic classes for particular diseases and conditions, including generic alternatives"

        From Act 127 passed in 2002

The following pages contain:

• The therapeutic classes of drugs subject to the Preferred Drug List, the drugs within those categories and the criteria required for Prior Authorization (P.A.) of non-preferred drugs in those categories.

• The therapeutic classes of drugs which have clinical criteria for Prior Authorization may or may not be subject to a preferred agent.

•  Within bothof these categories there may be drugs or even drug classes that are subject to Quantity Limit Parameters.

Therapeutic class criteria are listed alphabetically.  Within each category the Preferred Drugs are noted in the left-hand columns.  Representative non-preferred agents have been included and are listed in the right-hand column.  Any drug not listed as preferred in any of the included categories requires Prior Authorization.

| GHS/Change Healthcare<br>**PRESCRIBER Call Center:**<br>PA Requests<br>Tel: 1-844-679-5363; Fax:  1-844-679-5366<br>Note: Fax requests are responded to within 24 hrs. | GHS/Change Healthcare<br>**PHARMACY Call Center:**<br>PA Requests<br>Tel: 1-844-679-5362<br>Available for assistance with claims processing | **GHS/Change Healthcare Sr. Account Manager:**<br>Michael Ouellette, RPh<br>Tel: 802-922-9614<br>Fax:<br>E-Mail: mouellette@changehealthcare.com |
|---|---|---|
| | **DVHA Pharmacy Unit Staff:**<br>Stacey Baker<br>Tel: 802-241-0140<br>Fax: 802-879-5651<br>E-Mail:  stacey.baker@vermont.gov | **DVHA Pharmacy Administration:**<br>*Director of Pharmacy Services*<br>Nancy Hogue, Pharm. D.<br>Tel: 802-241-0143<br>Fax: 802-879-5651<br>E-mail:  nancy.hogue@vermont.gov |

This is not an all-inclusive list of available covered drugs and includes only managed categories. Unless otherwise stated, the listing of a particular brand or generic name includes all dosage forms of that drug. NR indicates a new drug that has not yet been reviewed by the P&T Committee.

Drugs highlighted in yellow denote a change in PDL status.

To search the PDL, press CTRL + F

| PREFERRED AGENTS<br>(No PA required unless otherwise noted) | NON-PREFERRED AGENTS<br>(PA required) | PA CRITERIA |
|---|---|---|
| | | o Concomitant serum intact parathyroid hormone (PTH) concentrations below the lower limit of the normal laboratory reference range on 2 test dates at least 21 days apart within the past 12 months **AND**<br>▪ No history of the following:<br>    o mutation in CaSR gene **OR**<br>    o pseudohypoparathyroidism **OR**<br>    o a condition with an increased risk of osteosarcoma **AND**<br>▪ Hypocalcemia is not corrected by calcium supplements and preferred active forms of vitamin D alone **AND**<br>▪ Patients must be taking vitamin D metabolite/analog therapy with calcitriol ≥0.25 µg per day OR equivalent  **AND**<br>▪ Must be taking supplemental oral calcium treatment ≥ 1000 mg per day over and above normal dietary calcium intake **AND**<br>▪ Serum calcium must be ≥ 7.5 mg/dl prior to starting Natpara **AND**<br>▪ Serum thyroid function tests and serum magnesium levels must be within normal limits **AND**<br>▪ Documentation of creatinine clearance > 30 mL/min on two separate measurements **OR** creatinine clearance > 60 mL/min AND serum creatinine < 1.5 mg/dL |

## PARKINSON'S MEDICATIONS

| | | |
|---|---|---|
| **DOPAMINE PRECURSOR**<br><br>CARBIDOPA/LEVODOPA† (compare to Sinemet®)<br>CARBIDOPA/LEVODOPA† ER (compare to Sinemet® CR)<br>CARBIDOPA/LEVODOPA† ODT<br><br>**DOPAMINE AGONISTS (ORAL)**<br><br> BROMOCRIPTINE† (compare to Parlodel®)<br><br>PRAMIPEXOLE † (compare to Mirapex®)<br><br>ROPINIROLE† (compare to Requip®) | Rytary® (carbidopa/levodopa ER caps)<br>Sinemet®* (carbidopa/levodopa)<br>Sinemet CR®*(carbidopa/levodopa ER)<br><br><br>Mirapex®* (pramipexole)<br>Mirapex ER® (pramipexole ER)<br>*QL = 1 tab/day*<br>Pramipexole ER (compare to Mirapex ER®)<br>Requip®* (ropinirole)<br>Requip XL® (ropinirole XL)<br>*QL = 1 tab/day (all strengths except 12 mg), QL = 2 tabs/day  (12 mg)*<br>ropinirole XL† (compare to Requip XL® )<br>*QL = 1 tab/day (all strengths except 12 mg), QL = 2 tabs/day  (12 mg)*<br>Tasmar® (tolcapone)<br>Tolcapone (compare to Tasmar®) | **Sinemet, Sinemet CR, Mirapex, Parlodel, Requip:** The patient has had a documented intolerance to the generic product.<br>**Rytary:** The patient has a diagnosis of Parkinson's disease, post-encephalitic parkinsonism, or parkinsonism following intoxication from carbon monoxide or manganese AND the prescriber is a neurologist AND the patient is having breakthrough symptoms despite a combination of concurrent IR and ER formulations of carbidopa/levodopa<br>**Azilect, rasagiline:**  The diagnosis or indication is Parkinson's disease. AND The patient has had a documented side effect, allergy, or treatment failure with selegiline. AND  The dose requested does not exceed 1 mg/day<br>**carbidopa/levodopa/entacapone**:  The patient has had a documented intolerance to brand Stalevo.<br>**Gocovri**: diagnosis or indication is for the treatment of dyskinesia in a patient with Parkinson's Disease AND the patient is currently receiving levodopa-based therapy (with or without concomitant dopaminergic medications) AND the patient has a documented side effect, allergy, or treatment failure with immediate release amantadine. **Note:** treatment failure is defined by a decrease in effectiveness despite attempts to increase dosage to 300mg/day or by temporarily discontinuing amantadine for several weeks and restarting therapy. |

| PREFERRED AGENTS (No PA required unless otherwise noted) | NON-PREFERRED AGENTS (PA required) | PA CRITERIA |
|---|---|---|
| **DOPAMINE AGONISTS (TRANSDERMAL)**<br><br>Neupro® (rotigotine) transdermal patch<br>*(Quantity Limit = 1 patch/day)*<br>*(2mg, 4 mg, 6 mg and 8 mg patches)*<br><br>**COMT INHIBITORS**<br>COMTAN® (entacapone)<br>ENTACAPONE† (compare to Comtan®)<br><br>**MAO-B INHIBITORS**<br>SELEGILINE†<br><br>**OTHER**<br>AMANTADINE syrup<br>AMANTADINE† capsules, tablets<br>(PA required for ≤ 10 day supply)<br>STALEVO® (carbidopa/levodopa/entacapone) | Azilect® (rasagiline) (QL = 1 mg/day)<br>Rasagiline (compare to Azilect®) (QL = 1mg/day)<br>Xadago® (safinamide) (QL=1 tab/day)<br>Zelapar® (selegiline ODT) *(QL = 2.5 mg/day)*<br><br><br>carbidopa/levodopa/entacapone† (compare to Stalevo®)<br>Gocovri™ (amantadine extended release) QL = 2 tabs/day | **Mirapex ER, pramipexole ER, Requip XL, ropinirole XL:** The diagnosis or indication is Parkinson's disease. Requests will not be approved for Restless Leg Syndrome (RLS) AND The patient has had an inadequate response (i.e. wearing off effect or "off" time) with the immediate release product. OR The patient has not been able to be adherent to a three times daily dosing schedule of the immediate release product resulting in a significant clinical impact. AND If the requested product has an AB rated generic, the patient has a documented intolerance to the generic product.<br>**Tasmar, Tolcapone:** The diagnosis or indication is Parkinson's disease. AND The patient has had a documented side effect, allergy, or treatment failure with Comtan or entacapone. For approval of generic talcapone, the patient must have documented intolerance to brand Tasmar.<br>**Xadago:** The diagnosis or indication is Parkinson's disease AND The patient is on current therapy with levodopa/carbidopa AND The patient has had a documented side effect, allergy, or treatment failure with selegiline. Note: Xadago will no be approved for monotherapy.<br>**Zelapar:** The diagnosis or indication is Parkinson's disease. AND The patient is on current therapy with levodopa/carbidopa. AND Medical necessity for disintegrating tablet administration is provided (i.e. inability to swallow tablets or drug interaction with oral selegiline). AND the dose requested does not exceed 2.5mg/day<br><br>**Limitations:** To prevent the use of amantadine in influenza treatment/prophylaxis, days supply < 10 days will require PA. |
| **PHOSPHODIESTERASE-4 (PDE-4) INHIBITORS** | | |
| | Daliresp® tablet (roflumilast)<br>*Quantity limit = 1 tablet/day*<br><br>Otezla® tablet (apremilast)<br>*(Starter pack – Quantity limit = 27 tablets/14 days)*<br>*( 30 mg tablets – Quantity limit = 2 tablets/day)*<br>**\* Maximum days' supply per fill = 30** | **Daliresp:** The indication for the requested medication is treatment to reduce the risk of COPD exacerbations in patients with severe COPD associated with chronic bronchitis and a history of exacerbations. AND The patient has had a documented side effect, allergy, treatment failure, or a contraindication to at least one inhaled long-acting anticholinergic AND at least one inhaled long-acting beta-agonist AND at least one inhaled corticosteroid.<br>**Otezla:** The patient has a diagnosis of psoriatic arthritis AND The patient is 18 years of age or older AND The patient has had inadequate response to, intolerance to, or contraindication to methotrexate. |

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.  On May 15, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 15, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay