**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (#270796)
LEANNE H. SOLISH (#280297)
CHRISTOPHER R. FALLON (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ADAMAS PHARMACEUTICALS, INC., GREGORY T. WENT, ALFRED G. MERRIWEATHER, RICHARD A. KING, RAJIV PATNI, AND VIJAY SHREEDHAR, <br> Defendants. | Case No. 4:19-cv-08051-JSW <br><br> **LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** <br><br> Date: November 6, 2020 <br> Time: 9:00 a.m. <br> Judge: The Hon. Jeffrey S. White <br> Dept.: Courtroom 5, 2nd Floor |

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ........................................................................................................vii

STATEMENT OF ISSUES TO BE DECIDED.................................................................................1

MEMORANDUM OF LAW IN OPPOSITION ...............................................................................1

I.  INTRODUCTION................................................................................................................1

II. STATEMENT OF FACTS....................................................................................................1

    A.  Background Of Adamas And GOCOVRI....................................................................1

    B.  GOCOVRI's Dismal Commercial Prospects Throughout The Class Period...........2

        1.  Payers Did Not Support GOCOVRI ..............................................................2

        2.  Prescribing Doctors Did Not Support GOCOVRI .......................................3

        3.  The Patient Market For GOCOVRI Was Small............................................4

        4.  Faced With Dismal Commercial Prospects For GOCOVRI's Indicated Use, Defendants Touted An Equally Troubled Alternative Use.........................................................................................................4

    C.  As the Truth About GOCOVRI's Dismal Commercial Prospects Emerged Over October 2018 – September 2019, Adamas' Stock Price Plummeted.............4

III. ARGUMENT .......................................................................................................................5

    A.  The Applicable Legal Standards Disfavor Defendants' Motion ...........................5

    B.  Plaintiff Adequately Pleads Materially Misleading Statements and Omissions ....................................................................................................................6

        1.  Many Alleged Misstatements Have Already Survived A Demurrer...........6

        2.  False And Misleading Statements Regarding Payer Support And Coverage.........................................................................................................7

        3.  False And Misleading Statements Regarding Prescriber Support ............11

        4.  False And Misleading Statements Regarding The GOCOVRI Market ............................................................................................................13

        5.  Defendants' Misleading Risk Statements ..................................................14

        6.  Defendants Cannot Avail Themselves of Safe Harbor Protection............15

        7.  Defendants' Misleading Statements Are Not Mere "Puffery"..................17

        8.  The AC Is Not A Puzzle...............................................................................18

C.      Plaintiff Alleges A Strong Inference of Defendants' Scienter .............................. 19

    1.    Defendants Knowingly Misled Investors About GOCOVRI's Commercial Prospects While Withholding Negative Information .......... 19

    2.    Defendants Had Extensive Knowledge of GOCOVRI Commercialization Because It Was Adamas' Core Operation ................. 22

    3.    The Six Former Employees Provide Reliable Information Contributing to a Strong Inference of Defendants' Scienter ..................... 24

    4.    The Abrupt Departures Of Adamas' Three Top Executives In The Wake Of Negative GOCOVRI Revelations Supports Scienter ................ 26

    5.    Motive Is Not Required To Plead Scienter ............................................... 26

    6.    Defendants' Purported Lack of Stock Sales Does Not Negate Scienter ...................................................................................... 28

D.      Plaintiff Adequately Pleads Loss Causation ......................................................... 28

E.      Plaintiff States a Claim for Section 20(a) Control Person Liability...................... 30

IV.    CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007) .................................................................................................... 6

*Berson v. Applied Signal Tech., Inc.,*
 527 F.3d 982 (9th Cir. 2008)..................................................................................... 15

*Bos. Ret. Sys. v. Uber Techs., Inc.,*
 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020).............................................................. 8

*Brody v. Transitional Hospitals Corp.,*
 280 F.3d 997 (9th Cir. 2002)....................................................................................... 6

*Bruce v. Suntech Power Holdings Co. Ltd.,*
 64 F. Supp. 3d 1365 (N.D. Cal. 2014) ........................................................................ 6

*Costabile v. Natus Med. Inc.,*
 293 F. Supp. 3d 994 (N.D. Cal. 2018) ...................................................................... 16

*Cutler v. Kirchner,*
 696 F. App'x 809 (9th Cir. 2017)........................................................................ 24, 25

*Fecht v. Price Co.,*
 70 F.3d 1078 (9th Cir. 1995)....................................................................................... 6

*Flynn v. Sientra, Inc.,*
 2016 WL 3360676 (C.D. Cal. June 9, 2016)............................................................. 18

*Glazer Capital Mgmt., LP v. Magistri,*
 549 F.3d 736 (9th Cir. 2008)..................................................................................... 19

*In re Allied Nevada Gold Corp. Sec. Litig.,*
 743 F. App'x 887 (9th Cir. 2018)........................................................................ 10, 12

*In re Apple Computer Sec. Litig.,*
 886 F.2d 1109 (9th Cir. 1989).................................................................................... 15

*In re Apple Inc. Sec. Litig.,*
 2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................. 13, 15, 18

*In re Atossa Genetics Inc. Sec. Litig.,*
 868 F.3d 784 (9th Cir. 2017)................................................................................. 6, 16

*In re Finisar Corp. Sec. Litig.,*
 2017 WL 1549485 (N.D. Cal. May 1, 2017) ............................................................ 25

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................................................ 28

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................................... 27

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) .................................................................................... 14

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................................ 17, 18

*In re Marvell Tech. Grp. Ltd. Sec. Litig.*,
2008 WL 4544439 (N.D. Cal. Sept. 29, 2008) .......................................................................... 9

*In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ................................................................................. 8

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ................................................................................................... 30

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ................................................................................... 10

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................................... passim

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) ............................................................................. 8

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..................................................................................................... 6

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .................................................................................................... 13

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ........................................................... 22, 26, 27, 28

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) .................................................................................. 19

*In re Zynga Inc. Sec. Litig.*,
2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ................................................................... passim

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) .................................................................................. 28

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .................................................................................................. 6, 26

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008)................................................................................... 11

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................... 17, 18

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
    2017 WL 4453561 (D. Or. Oct. 3, 2017) ................................................................. 9

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)................................................................................... 27

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)............................................................................... 9, 28

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019)........................................................................... 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................ 6, 10

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)................................................................................... 12

*Osher v. JNI Corp.*,
    183 Fed. Appx. 604 (9th Cir. 2006) ....................................................................... 30

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)..................................................................... 10

*Plymouth County Contributory v. Adamas Pharms., Inc.*,
    2019 WL 7900426 (Cal. Super. Dec. 17, 2019)................................................*passim*

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)................................................................................. 29

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014)................................................................. 19, 21, 23, 24

*Robb v. Fitbit*,
    216 F. Supp. 3d 1017 (N.D. Cal 2017) ................................................................ 7, 28

*Roofers Local No. 149 Pension Fund v. Dream Works Animation SKG, Inc.*,
    2017 WL 655789 (9th Cir. Feb. 17, 2017)............................................................. 30

*S. Ferry LP No. 2 v. Killinger*,
  399 F. Supp. 2d 1121 (W.D. Wash. 2005) ................................................................................. 18

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .................................................................................................. 23

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ............................................................................................ *passim*

*South Ferry #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ............................................................................. 25

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) .................................................................................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................... vi, 6, 19

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  2017 WL 3097184 (N.D. Cal. June 22, 2017) ....................................................................... 25

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .................................................................................................. 26

**STATUTES**

15 U.S.C. § 78u-4 ........................................................................................................................ 6

15 U.S.C. § 78u-5 ........................................................................................................... 9, 15, 16

**RULES**

Fed. R. Civ. P. 15 ...................................................................................................................... 30

## SUMMARY OF ARGUMENT

The Amended Complaint ("AC") sufficiently alleges Defendants' false and misleading statements, made with scienter, touting its commercial prospects for Adamas' only FDA-approved drug, GOCOVRI, based on professed known strong support from doctors and insurers.[1]

Contrary to the Defendants' motion to dismiss (the "Motion"), Plaintiff had adequately pled falsity, and in fact, certain of these alleged misstatements have already been sustained in another securities action. *See Plymouth County Contributory v. Adamas Pharms., Inc.*, 2019 WL 7900426, at *2, *3 (Cal. Super. Dec. 17, 2019). Defendants' statements are actionable as they failed to "disclos[e] adverse information that cuts against the positive information" they touted. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). The omission of these current and historical facts precludes protection from liability under the PSLRA safe harbor and renders any of Defendants' opinions actionable.

Defendants knew that many insurers and doctors did not support GOCOVRI. Defendants' scienter is bolstered by the core operations inference, corroborating statements from six former employees, the abrupt departure of three defendants, and Adamas' significant proceeds in its January 2018 offering. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)

As the truth of Defendants' assurances were revealed over time, Adamas' stock tanked. Plaintiff has satisfied his minimal burden to plead loss causation, *see In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015). Defendants point to supposed previous disclosures as revealing the truth to investors, but in reality, those announcements continued to mislead investors. In sum, the AC adequately alleges Defendants' violations of the securities laws; the Motion should be denied.

---

[1] Defendants are Adamas Pharmaceuticals, Inc. ("Adamas" or the "Company"), founder, former CEO and Chairman Gregory T. Went ("Went"), former CFO Alfred G. Merriweather ("Merriweather"), former COO Richard A. King ("King"), Chief Medical Officer ("CMO") Rajiv Patni ("Patni"), and Chief Commercial Officer Vijay Shreedhar ("Shreedhar").

Unless otherwise indicated, all internal alterations, citations and quotations are omitted, citations to the Motion are "Mot. __," citations to the exhibits and appendix submitted in support of the Motion are "Mot. Ex. __" and "App'x," citations to the AC are "¶__," and citations to the exhibit attached to the declaration in support of this opposition are "Opp. Ex." Terms not otherwise defined have the same meanings as in the AC.

**STATEMENT OF ISSUES TO BE DECIDED**

1.    Has Lead Plaintiff Ralph Martinez ("Plaintiff") adequately pled that Defendants made false and/or misleading statements or omissions within the meaning of § 10(b) of the Exchange Act and Securities Exchange Commission ("SEC") Rule 10b-5?

2.    Has Plaintiff adequately pled facts sufficient to support a strong inference of Defendants' scienter within the meaning of § 10(b) of the Exchange Act and Rule 10b-5?

3.    Has Plaintiff adequately pled loss causation?

4.    Has Plaintiff adequately pled a claim under § 20(a) of the Exchange Act?

**MEMORANDUM OF LAW IN OPPOSITION**

**I.    INTRODUCTION**

Plaintiff alleges that he and a class of investors were repeatedly misled about the commercial prospects of GOCOVRI, Adamas' only FDA-approved drug.  Defendants assured investors that there was broad payer and prescriber support for GOCOVRI, and that they appreciated the differences between GOCOVRI and another, significantly cheaper, generic alternative.  But payers and prescribers did not view GOCOVRI as sufficiently differentiated to justify an almost $25,000/year price difference.  Payers soon placed GOCOVRI on inferior formulary tiers, required patients to first try the generic, and implemented other restrictive coverage and reimbursement policies.  Doctors found GOCOVRI too expensive and difficult to prescribe.  Over time, these truths were revealed to investors, who lost millions as a result.  The AC adequately alleges Defendants' violations of the securities laws, and this case should proceed to discovery.

**II.    STATEMENT OF FACTS**

**A.    Background Of Adamas And GOCOVRI**

Adamas is a pharmaceutical company focused on developing medicines for treatment of chronic neurological diseases including Parkinson's disease.  ¶28.  Went founded Adamas in 2000.  ¶2.  During the Class Period (August 8, 2017 – September 30, 2019), Adamas' only approved drug was GOCOVRI, and sales of this drug accounted for 99% of Adamas' revenue.  ¶¶28, 51.  Thus, Adamas' success or failure depended on GOCOVRI.  ¶4.

On August 24, 2017 the FDA approved GOCOVRI for its first (and so far only) approved

use: treatment of levodopa-induced-dyskinesia ("LID"). Levodopa is a Parkinson's therapy intended to improve patient control over bodily movements. Dyskinesia (involuntary or uncontrolled movements) can be a side effect of levodopa. GOCOVRI's approved use was to mitigate this side effect of levodopa therapy in Parkinson's patients. ¶3.

Following FDA approval, GOCOVRI's main competition was the generic, immediate release version of a drug called amantadine ("amantadine IR"), which has been used to treat LID for decades. ¶4. GOCOVRI is an extended-release formulation of amantadine. ¶¶3, 43. Despite these similarities, Adamas priced GOCOVRI at $28,500 per year, as compared to pricing of a couple thousand dollars per year for generic amantadine IR. ¶4.

Adamas' success or failure depended on GOCOVRI, and GOCOVRI's success or failure depended on effectively competing with the far more affordable, well-established, and highly similar drug amantadine IR. ¶6. Therefore, Adamas had to convince doctors, patients, and payers that GOCOVRI was more than just an expensive, extended-release version of amantadine IR. *Id*. Adamas first made GOCOVRI available in October 2017, and began marketing it in January 2018. ¶10. But, from their very outset, Adamas' efforts to commercialize GOCOVRI floundered.

**B.     GOCOVRI's Dismal Commercial Prospects Throughout The Class Period**

**1.     Payers Did Not Support GOCOVRI**

Health insurance companies, Medicare, Medicaid, managed care entities, and other similar institutional 'payers' pay for a large portion of all U.S. prescription drug sales, and set policies to determine which drugs will be reimbursed, in what amounts, and under what conditions. As such, obtaining payer support is essential to any new prescription drug's commercial success. Payers seek to minimize their drug expenditures while still meeting patients' health needs, and so create policies to discourage use of more expensive drugs when cheaper equivalent drugs are available. *See* ¶112. Through their ability to create hurdles to drug reimbursement, payers can dissuade doctors from prescribing the drug, and can dissuade patients (who may find themselves responsible for all or a large part of the drug's full price) from taking the drug. *See* ¶7.

Almost immediately following its FDA approval, GOCOVRI encountered strong resistance from payers, which continued throughout the Class Period. *See* ¶11. Payers did not view

GOCOVRI as sufficiently differentiated from amantadine IR to justify its ten-fold price increase. *See id*. From October 2017 on, multiple large payers representing tens of millions of patients created policies preferring generic amantadine IR to GOCOVRI. ¶¶127-28, 158. These policies included requirements that patients try amantadine IR at a particular dosage or length of time without improvement, prior to seeking reimbursement for GOCOVRI ("step therapy"). ¶127. Former Adamas employees ("FEs") described payers' ongoing resistance to GOCOVRI, as evidenced by and effectuated through various coverage and reimbursement policies. ¶¶119, 138-42.

Despite stiff resistance from payers, Defendants regularly touted strong payer support for GOCOVRI throughout the Class Period. *E.g.*, ¶64.

### 2. Prescribing Doctors Did Not Support GOCOVRI

Successful commercialization also requires doctor support—*i.e.*, those that can prescribe the drug. Adamas likewise encountered doctor resistance from the get-go due to Adamas' decisions regarding the testing, pricing, and distribution of GOCOVRI.

Adamas' decision not to perform a head-to-head study comparing GOCOVRI and amantadine IR undermined doctor support. *See* ¶80. An editorial in the Journal of the American Medical Association ("JAMA") (a leading, and highly influential, publication for doctors) concluded that without such a direct comparison, "it remains unclear whether the potential benefits [of GOCOVRI] justify the costs." ¶82. According to the FEs, doctors viewed GOCOVRI and amantadine IR as similar drugs and noted their vast price difference. ¶¶94, 96.

Adamas' decision to distribute GOCOVRI exclusively via its own specialty pharmacy, Onboard, as opposed to traditional retail pharmacies, further undermined doctor support. ¶12. According to the FEs, doctors were confused by Onboard's procedures, and had difficulty filling prescriptions through Onboard. ¶¶148-151. Similarly, the FEs reported doctors' frustration with the lengthy and difficult payer coverage and reimbursement process, caused in substantial part by Adamas' high pricing of GOCOVRI and failure to differentiate it from amantadine IR. ¶¶139, 142.

Adamas further alienated prescribing doctors by refusing to provide a standard free sample program, which in general allows doctors to evaluate a drug's effectiveness prior to writing a prescription. ¶155. Although Adamas provided a limited amount of free GOCOVRI to particular

patients under certain circumstances, this required doctors to write prescriptions and go through the cumbersome Onboard fulfillment process. ¶¶152-54.

Despite Adamas' decisions that actively undermined doctor support, Defendants continued to claim strong doctor support for GOCOVRI throughout the Class Period.

### 3. The Patient Market For GOCOVRI Was Small

GOCOVRI is a niche drug with a small market. Approximately 1 million people in the United States have Parkinson's disease, and at any given time approximately 150,000 to 200,000 of these patients have LID. ¶8. However, many LID patients do not want or need treatment, and others took generic amantadine IR to treat their symptoms. ¶¶9, 47. According to several FEs, factors such as these seriously limited the patient market for GOCOVRI. ¶¶103-110.

Despite these significant limitations to GOCOVRI's market and the above impediments to payer and prescriber support, Defendants represented that the available market was all LID patients, and projected that GOCOVRI would achieve market penetration of up to 30% among all LID patients. ¶8.

### 4. Faced With Dismal Commercial Prospects For GOCOVRI's Indicated Use, Defendants Touted An Equally Troubled Alternative Use

During the Class Period, Adamas sought a follow-on FDA approval of GOCOVRI for use in treating multiple sclerosis walking impairment ("MSWI"). However, GOCOVRI's test results for MSWI treatment were similar to those for AMPYRA, an existing treatment for MSWI already approved by the FDA. ¶52. Furthermore, AMPYRA would soon be available in a low-cost generic version. ¶209. In short, the same factors that thwarted GOCOVRI's commercial use as a LID treatment loomed over its potential use as a MSWI treatment – the availability of a competing, long-established, low-cost generic drug, with similar efficacy to GOCOVRI. ¶218.

In spite of these considerable obstacles, as the markets began to understand GOCOVRI's sharply limited commercial prospects as a LID treatment, Defendants began to tout as a top business priority their development of GOCOVRI as a MSWI treatment. *See* ¶210.

### C. As the Truth About GOCOVRI's Dismal Commercial Prospects Emerged Over October 2018 – September 2019, Adamas' Stock Price Plummeted

During the Class Period, Adamas' publicly traded stock price was artificially inflated by

Defendants' false statements. However, the truth was revealed over four dates, following each of which Adamas' stock saw abnormally high trading volume and large price declines. ¶332.

On October 5, 2018 Bank of America reported that some payers required prior use of amantadine IR before reimbursing GOCOVRI, and reported results from a doctor survey showing a higher-than-expected dropout rate for GOCOVRI due to the high cost and difficulty in securing prior authorizations from payers. ¶333. These announcements contradicted Defendants' previous statements about doctor and payer support for GOCOVRI. On this news, Adamas' stock fell $1.52 per share, or approximately 7.86%. ¶334.

On Defendants' November 1, 2018 investor earnings call they announced that they expected GOCOVRI to reach only 2% market penetration for LID treatment by the end of 2019, and that sales efforts would target only half of the doctors previously identified. ¶335. These announcements contradicted Defendants' previous statements about the market for GOCOVRI, further disclosed that prescriber and patient support was not as robust as previously communicated, and caused Adamas' stock price to decline by $5.08 per share, or 29.94%. ¶337.

On Defendants' March 4, 2019 investor earnings call they acknowledged slowing prescription growth rates, and retracted their recently issued 2019 market penetration guidance, and refused to issue any additional guidance. ¶339. These announcements contradicted Defendants' guidance issued only four months earlier, as well as their previous statements about the market for GOCOVRI. On this news, Adamas' stock fell $3.99 per share, or 32.84%. ¶341.

Finally, on September 30, 2019 Bank of America reported the results of its doctor checks, revealing that the doctors were more comfortable with AMPYRA's safety profile as a MSWI treatment than that of GOCOVRI. ¶346. This contradicted Defendants' previous statements regarding GOCOVRI's commercial potential as a MSWI treatment. This caused Adamas' stock price to fall $1.55, or approximately 23.26%. ¶347.

## III. ARGUMENT

### A. The Applicable Legal Standards Disfavor Defendants' Motion

To state a claim under § 10(b) of the Exchange Act, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4)

reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must … accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "construe them in the light most favorable to the non-moving party," *Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1369-70 (N.D. Cal. 2014). While plaintiffs must meet a heightened pleading standard under Rule 9(b) and the PSLRA, a court should deny a motion to dismiss when the complaint plausibly articulates the circumstances constituting fraud. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**B.    Plaintiff Adequately Pleads Materially Misleading Statements and Omissions**

Pursuant to the PSLRA, a sound complaint for securities fraud is one that "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)(B)). A plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was false or misleading. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995).

Even "a statement that is literally true can be misleading and thus actionable under the securities laws" if it "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1008 (9th Cir. 2002). Moreover, once defendants choose to tout "positive information to the market," they are "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (a defendant must "desist from misleading investors by saying one thing and holding back another").

**1.    Many Alleged Misstatements Have Already Survived A Demurrer**

Late last year, the Alameda County Superior Court sustained securities claims for materially

false and misleading statements and omissions in Adamas' January 24, 2018 secondary public offering (the "SPO") documents. *Plymouth County Contributory v. Adamas Pharms., Inc.*, 2019 WL 7900426, at *2, *3 (Cal. Super. Dec. 17, 2019). Many of these same statements are also alleged to be false and misleading here, including: "although no payer has done so to date" (¶¶235, 241, 252); "we currently anticipate broad coverage" (¶228; ¶¶237, 248 (similar)); and "early reception of GOCOVRI by physicians is consistent with our market research indicating that GOCOVRI would be well-received by physicians, patients and payers" (¶239; ¶¶243, 246, 250, 265 (similar)).

The Superior Court also sustained risk disclosures that plaintiffs alleged had already occurred, including: "coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available" (¶¶235, 241, 252; *see also* Mot. at 12); and "failure to successfully obtain coverage and reimbursement of GOCOVRI … would harm Adamas' business" (¶¶235, 241, 252, 276, 287, 302, 312). *Plymouth*, 2019 WL 7900426, at *2, *3.

The Superior Court rejected the Adamas defendants' arguments that the statements were forward-looking and thus required actual knowledge, and that the statements were "mere puffery." *Id.* at *3. Defendants again make these arguments,[2] and again, they should be rejected.[3]

### 2. False And Misleading Statements Regarding Payer Support And Coverage

Payers' support and coverage of GOCOVRI was crucial to its success. ¶¶82, 112-116, 358-359. As such, Adamas promptly began both market research and a comprehensive payer outreach campaign. *E.g.*, ¶¶64-65, 68-70, 118. Defendants touted these efforts and continuously assured the market with their statements concerning payer support and coverage.[4]

On three separate occasions, Defendants asserted that "although ***no payer has done so to***

---

[2] *See* Mot. at 11-13 (forward-looking); 13-15 (knowledge); 16, 18 n.20, 19-20 (puffery).

[3] Although plaintiffs alleged claims under § 11 of the Securities Act of 1933, the law with respect to falsity is identical to that of § 10(b) of the Exchange Act. *See, e.g.*, *Robb v. Fitbit*, 216 F. Supp. 3d 1017, 1034 (N.D. Cal 2017).

[4] ¶¶220-22, 225-26, 228, 237, 239, 243, 248, 250, 258-62, 271-72, 274, 280-84, 289, 292-93, 296, 314.

*date*, a payer may determine to require patients to use immediate release Amantadine IR for dyskinesia ... prior to receiving reimbursement for GoCOVRI." ¶¶235, 241, 252.[5] But by that time multiple payers covering millions of Americans had already required some sort of step therapy. ¶¶127-128. This is enough to establish falsity. *Plymouth*, 2019 WL 7900426, at *3 (allegations that multiple insurers added step requirement sufficient to plead falsity).

Defendants likewise repeatedly indicated to the market that payers would be and were supporting GOCOVRI's use despite its high price and the availability of the generic amantadine IR. For example, on the first day of the Class Period, King stated that payers "don't see this profile [GOCOVRI] as really having much to do with the amantadine IR profile…. They recognize that amantadine IR is not approved for this indication" and that Medicare will likely add GOCOVRI to its formulary "given there's no other product for this indication[.]" ¶¶220, 221. However, amantadine IR had been used to treat LID for decades (¶¶77, 92, 94-95) and was already covered as a preferred drug on most formularies for this and similar indications (¶¶94, 127, 158).

Defendants also assured the market that the lack of a head-to-head study comparing the efficacy of GOCOVRI to amantadine IR (¶¶81-85, 92) would and did not deter broad payer support.[6] *E.g.*, ¶226 ("having presented those background elements to payers, what we concluded and what the payers were willing to support us at was the GOCOVRI list price at $28,500 per year"); ¶228 ("We anticipate broad payer coverage for GOCOVRI"); ¶248 ("Clinical presentations [to payers] have been well received").[7]

---

[5] *See also, e.g.*, ¶260 (On 5/3/18, King "unaware of any plan which has a formal step through IR amantadine"); ¶261 (patients use of amantadine IR not a limitation to GOCOVRI access).

[6] Defendants attempt to invoke the truth-on-the-market defense, pointing to the August 2017 JAMA editorial. Mot. at 15 & n. 15. This defense "it is not available at the motion to dismiss stage" (*see Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020)), and even so, Defendants have not met their burden of proof to invoke it (*see* n.19, *infra*). Moreover, Defendants repeatedly responded to the JAMA editorial and assured the market that GOCOVRI was sufficiently differentiated (¶¶82-88). *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011) (rejecting truth on the market defense where pharmaceutical company gave "repeated reassurances" about drug "in spite of apparently negative data" known to the public); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (similar). !

[7] *See also* ¶250 (GOCOVRI's data package has "been resulting very strong, resonant support … at both the physician and payer level" against the backdrop of amantadine IR availability); ¶274

In making these statements, Defendants did not disclose critical contrary facts: (1) that the data presented to payers did not sufficiently differentiate GOCOVRI from the generic amantadine IR, such that payers were "supporting" GOCOVRI; and (2) as a result, payers would, and did, exclude or place GOCOVRI on disadvantaged formulary tiers, require prior authorization or medical necessity showings, and/or require other forms of step therapy.  ¶¶119, 127-28, 138-42, 166-67, 199-206, 359.  By not disclosing these material, negative facts, Defendants violated the well-established legal principle that "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors[.]" *Arena Pharm.*, 840 F.3d 698, 706 (9th Cir. 2016); *see id.* at 708 (touting likely FDA approval of drug by referring to positive study was misleading without disclosing FDA's concerns about that study).

Defendants claim that their payer statements are forward-looking (*see* Mot. at 13) to invoke the requirement that Plaintiff must allege facts demonstrating that payer determinations were known or knowable to Adamas.  Mot. at 13-14.[8]  But the statement "no payer to date has done so *to date*," for example, is irrefutably a statement of current and historical fact, and the payers' coverage decisions demonstrably prove these statements false.  *See In re Marvell Tech. Grp. Ltd. Sec. Litig.*, 2008 WL 4544439, at *4 (N.D. Cal. Sept. 29, 2008) (representation that board committee met was false where no meetings took place); *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *4 (N.D. Cal. Mar. 25, 2015) (representation of "solid growth" in bookings was false where bookings were declining).  Defendants' statements reporting payer support for GOCOVRI was represented to investors as based on feedback from Defendants' market research and payer outreach and actual payer coverage decisions, and thus any forward-looking portion of these statements were invariably intertwined with and premised on misleading statements of present conditions.  *E.g.*, *NECA-IBEW*

(payers have already assessed that GOCOVRI is better than amantadine IR without any additional clinical data); ¶280 (assurance that Osmotica was not an impediment based on clinical data).

[8] The PSLRA safe harbor requirement of "actual knowledge" by its terms only applies to forward-looking statements.  15 U.S.C. § 78u–5(c)(1)(B).  Therefore, for present, historical, or mixed statements the general scienter standard of deliberate recklessness applies.  *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

*Pension Tr. Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *10-11 (D. Or. Oct. 3, 2017) (statements reflecting "management's most up-to-date and accurate forecasts" were about present conditions); *Plymouth*, 2019 WL 7900426, at *3. *See also* Sec. III.B.6, *infra* (PSLRA safe harbor).

Even so, payer support and coverage determinations were known or knowable to the Defendants. S*ee also* Sec. III.C, *infra* (scienter). Defendants portrayed their payer statements as the result of "extensive" payer research and outreach, thus representing that they had the knowledge to make these statements—if Defendants did not, their assertions otherwise are misleading. *See, e.g.*, *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter alleged as to bank executive in charge of allegedly fraudulent trading venue where he "held himself [out] to the public as intimately knowledgeable about [venue]'s functions and purported transparency").[9]

Nor are these payer statements inactionable opinions. Mot. at 15. Under *Omnicare*, the omission of "facts going to the basis for the issuer's opinion" can render an opinion statement misleading. 575 U.S. at 194; *see also In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887 (9th Cir. 2018). Here, the crucial contrary facts listed above were required to make Defendants' statements (or opinions) regarding payer support and coverage not misleading. *See Omnicare*, 575 U.S. at 191 ("[T]he expression of an opinion may carry with it an implied assertion ... that the speaker knows no facts which would preclude such an opinion").

Defendants further take issue with statements concerning payers' reimbursements,[10] stating that FE allegations cannot demonstrate falsity (Mot. at 15-16).[11] However, the AC alleges not just

---

[9] The authorities Defendants rely on to dispute their knowledge of payer determinations are inapposite. In *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, the court found the "critical inquiry" to relate to the requirement of SEC Regulation S-K Item 303 that an issuer disclose material *known* trends and uncertainties. 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008). Item 303 is not at issue here. In *In re Pixar Sec. Litig.*, the plaintiffs' relevant allegations relied entirely on statements of confidential witnesses from companies *other than* the defendant, who said nothing about the *defendant's* knowledge. 450 F. Supp. 2d 1096, 1103 (N.D. Cal. 2006). In contrast here, Defendants held themselves out as knowledgeable about payer policies, and according to FE4 (Adamas' VP of Marketing), Adamas always anticipated that some payers would require a step-through of amantadine (¶¶61, 119).

[10] ¶¶258, 259, 262, 272, 274, 280, 281, 283, 284, 292, 293.

[11] These FEs reported slow and disappointing reimbursement levels. Defendants take issue with the statements from these two sales representatives, but ignore that these sales representatives covered

that the level or speed of payer reimbursement was false (*e.g.*, ¶254), but that those statements, "through their context and manner of presentation" misled investors. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). For example, the statement "[re]imbursement … is occurring, and its occurring with **speed and support from the payer**" (¶271) is misleading because it created the impression that payers were supporting GOCOVRI, when in fact it did not disclose that Adamas' failure to distinguish GOCOVRI from amantadine IR continued to be an impediment to broad payer support such that payer coverage requirements[12] and operational issues with Adamas' Onboard program[13] stifled demand (*i.e.*, these were roadblocks causing doctors' unwillingness to write GOCOVRI prescriptions and patients' unwillingness to otherwise fill them). ¶¶254, 275.

### 3.    False And Misleading Statements Regarding Prescriber Support

Defendants also aggressively touted broad prescriber and patient support for GOCOVRI. ¶¶239, 243, 245, 246, 270, 278, 279, 291. These included assurances that doctors appreciated the differences between GOCOVRI and the amantadine IR (and later Osmolex, a different extended-release version of amantadine), particularly based on Adamas' provided clinical data (¶¶220, 222, 230, 250, 265, 267, 268, 273), that an impressive percentage of doctors would and were prescribing GOCOVRI (¶¶224, 255-57), and that Onboard, Adamas' specialty pharmacy, was well-designed and successful (¶¶233, 282, 296).

In doing so, Defendants did not disclose critical, contrary facts: that prescribing doctors did not view GOCOVRI as more effective than a generic, and that GOCOVRI was otherwise too expensive, difficult, and time consuming to prescribe (¶¶227, 254). *See also* Sec. III.C.1, *infra.*

---

two very different U.S. regions, and reported similar coverage and reimbursement problems from, most likely, different payers. Furthermore, FE5 participated in the Sales Advisory Board, whose purpose was to provide feedback from the different sales regions concerning issues in selling GOCOVRI. Went received feedback from this board, and provided further sales instructions in response. ¶¶62, 363.

[12] ¶¶127-28, 138-42, 166-67.

[13] ¶¶148-49, 200-04 (confusion surrounding use of specialty pharmacy; Adamas refused to investigate lost prescriptions).

Later in the Class Period, Defendants assured investors that their marketing tweaks would address slower prescription growth (¶¶291, 306-08, 314, 315, 319), but continued to omit from their assurances the underlying causes of GOCOVRI's weak prescriptions. ¶¶254, 309.

Despite their Class Period statements suggesting otherwise, Defendants now claim these statements are immaterial and that no reasonable investor would consider "physician views or experiences with GOCOVRI" as important to their investment decision (Mot. at 16). Not only is this argument illogical—without prescriber support, there would be *no* sales of GOCOVRI, Adamas' only commercial *prescription* drug—but the fact that Adamas' stock precipitously dropped following the revelations that prescriber and payer support was not so robust[14] supports a finding of materiality. *E.g.*, *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock"). *See also* Sec. III.B.7, *infra* (responding to puffery arguments).

Defendants again claim that a number of these misleading prescriber statements are inactionable opinions (Mot. at 17), ignoring these crucial contrary facts, the omission of which made these opinion statements misleading in its context. *Allied*, 743 F. App'x at 887. Furthermore, some of these opinions were objectively untrue. For example, in discussing with analysts the differences between GOCOVRI and amantadine IR, King's statement that he felt "'comfortable and confident' that there was 'enough of a clinical comparison' to amantadine IR" (Mot. at 17 (citing ¶230)) was both objectively untrue—there was *no* clinical comparison of these two drugs—and furthermore, King did not disclose that Adamas' already completed, doctor survey found that many doctors failed to see the difference between GOCOVRI and generic amantadine (¶¶66, 96).

Lastly, Defendants challenge Plaintiffs' allegations concerning reported prescription totals. ¶¶239, 245, 256. But Adamas attributed that those results were "without sales-based promotional efforts" (¶239) and thus was obligated to disclose that the "100 distinct prescribers" were the result of sales efforts like the Adamas' Speakers' Bureau, a promotional program that pays doctors to

---

[14] *E.g.*,¶¶333-41; ¶342 ("it is fair to wonder if management has misread both its physician audience and payer landscape").

speak about GOCOVRI (¶111). *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) ("where a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors"). Adamas also indicated that these early results were consistent with its research that GOCOVRI "would be well-received by physicians" (¶239), and thus had a duty to disclose that its prescriber research and payer coverage determinations indicated otherwise. *Arena Pharm.*, 840 F.3d at 705-06; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.").

### 4.    False And Misleading Statements Regarding The GOCOVRI Market

During the Class Period Defendants continuously represented that the available market for GOCOVRI was all LID patients, and projected that GOCOVRI would achieve 25%-30% market penetration. *E.g.*, ¶229 ("GOCOVRI can be used in a broad Parkinson's disease population with dyskinesia and *is appropriate for all patients*"); *see also* ¶¶224-25, 231, 243, 256-57, 267, 270. Later, even as Defendants addressed certain marketing problems and lowered their yearly market penetration guidance, Defendants did not refine the overall available market or GOCOVRI's eventual penetration of 25-30% that market. ¶¶289-91, 294, 296, 300.

Plaintiff's claims concerning the GOCOVRI market center around the misrepresentation that the appropriate market consisted of *all* LID patients, and thus, take issue with the present portions of these mixed statements. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1136, 1143, 1144 (9th Cir. 2017) (statements that the market for defendant company's products was "greenfield for the most part" and refuting that the market was largely penetrated were false and misleading "mixed" statements that were not subject to the PSLRA state harbor); *see also* Sec. III.B.6(a), *infra*.

The actual market for GOCOVRI was far more limited, consisting of the most severe LID patients. Five of the six FEs expressed that the majority of the LID patients, *i.e.*, those with mild or moderate dyskinesia, either did not want or need to be treated for LID, that doctors typically only sought treatment for the most severe LID cases, and that even then, concerns about polypharmacy restricted LID treatment. ¶¶102-110. These contrary facts are bolstered by the undisclosed facts

discussed in Sections III.B.2 & III.B.3, *supra*, and undermine Defendants' statements that GOCOVRI was appropriate for all LID patients, let alone that 30% of this population would use GOCOVRI.

Each of the FE accounts – from wide-ranging positions and regions – corroborate each other (¶¶58-63). *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 992 (S.D. Ohio 2008) (crediting corroborating witness statements). Their accounts are not mere "speculation": FE6, the Senior Director of Business Analytics, who worked on market research and data analytics for GOCOVRI and reported directly to Went and then King (¶63), confirmed that the original forecasts did not take into account the level of dyskinesia. ¶107. *See also* Sec. III.C.3, *infra* (reliability of the FEs).

Defendants later pivoted their focus to discussing a GOCOVRI follow-on indication to treat MSWI, and again mislead investors about the "wide open market opportunity" (¶298) based on Adamas' market research concluding that physician and payer satisfaction with current MSWI treatments was low (¶304). But GOCOVRI's test results for MSWI treatment showed similar results to its competition (¶52), which would soon be available as a generic (¶209), making Defendants' statements to the contrary materially misleading. *E.g.*, ¶299; ¶215 (opportunity to expand GOCOVRI use in MSWI created considerable "potential for significant recovery in ADMS shares").

### 5. Defendants' Misleading Risk Statements

Many of Defendants' purportedly cautionary risk disclosures were themselves materially misleading because they were presented in hypothetical, future terms despite significant adverse events that were already then transpiring. *See, e.g.*, ¶¶235, 241, 252 ("***although no payer has done so to date***, a payer <u>may</u> determine to require patients to use immediate release amantadine for dyskinesia ... prior to receiving reimbursement for GOCOVRI"); ¶¶252, 276, 287, 302 ("GOCOVRI <u>may</u> fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success") (underline emphasis added).

Although Defendants apparently argue that such disclosures are categorically incapable of being false, they cite no authority to support this novel and expansive claim of immunity. *See generally* App'x (listing "Risk Factor" as one of the reasons statements are not actionable). Disproving this contention, the Superior Court held affirmatively that falsity was adequately alleged

for at least one of the risk disclosures at issue, and sustained without discussing the remaining alleged misleading risk disclosures. *Plymouth*, 2019 WL 7900426 at *3 (discussing "no payer has ... determine[d]" disclosure).

Indeed, where risk disclosures "speak[] entirely of as-yet-unrealized risks and contingencies" they may be materially misleading if "[n]othing alerts the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). As discussed above, by the time Defendants issued these risk disclosures multiple large payers required prior use of generic amantadine IR, and that GOCOVRI was encountering strong resistance from physicians, patients and payers. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)("[t]here is a difference between knowing that any product-in-development ***may*** run into a few snags, and knowing that a particular product ***has already*** developed problems so significant as to require months of delay") (emphasis added).

### 6.    Defendants Cannot Avail Themselves of Safe Harbor Protection

The PSLRA "safe harbor" protects statements that are forward-looking, accompanied by meaningful cautionary disclosures, and not made with actual knowledge that the statements were false or misleading. 15 U.S.C. § 78u-5(c). The safe harbor does not apply here.

### (a)    The Safe Harbor Does Not Apply To Misstatements Of Present Or Historical Fact

"[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142. Rather, "statements involving future predictions are actionable when they make representations about the past or present that can demonstrably be proven false." *Apple*, 2020 WL 2857397, at *12.

Here, as the Superior Court already determined, Defendants' risk factor claiming that no payer required prior use of generic amantadine IR, "is not forward looking but purports to be a statement of current fact," and so does not qualify for safe harbor protection. *Plymouth*, 2019 WL

7900426, at *3.  Similarly, when viewed in context, each of the purportedly "forward-looking" statements Defendants now cite was based on and inextricably intertwined with misleading statements of then-existing fact.  *See* Mot. at 12; ¶220 ("We've obviously done a fair amount of assessment of ADS-5102 with physicians and with payers…. And they don't see this profile as really having much to do with the amantadine IR profile"); ¶228 ("We have also begun outreach to payers …. The payers are particularly interested in GOCOVRI as a first in indication medicine for dyskinesia patients"); Mot. Ex. 37 at 5 ("we are intensely focused on increasing demand…. Total paid prescriptions were strong in the quarter, reflecting good persistence and compliance levels for patients on drug."); ¶296 ("Our market access and distribution with our … single specialty pharmacy is going very well").  Such statements are not entitled to safe harbor protection because they are not forward-looking, but are "related directly to ... present facts." *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) ("the challenged statements included implicit representations that the stated 'expectation' was consistent with the" present facts).

### (b)    The Safe Harbor Does Not Apply To Misleading Guidance

#### (i)    The Absence of *Meaningful* Cautionary Language

Even for those portions of Defendants' false statements that may be considered forward-looking, Defendants are not entitled to safe harbor protection because they were not "accompanied by ***meaningful*** cautionary statements."    15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added). Defendants must make a "stringent showing," in order to prevail on this defense at the pleading stage: "[t]here must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading." *See Atossa Genetics*, 868 F.3d at 798.

Indeed, whereas here forward-looking statements are mixed with misleading statements of present fact, "it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Quality Sys.*, 865 F.3d at 1146-47 (insufficient cautionary language to shield false revenue projections accompanied by non-forward looking statements about sales pipeline).  Defendants here made no such outright admissions.

Furthermore, as discussed in Sec. III.B.5, *supra*, Defendants' risk disclosures that "only discussed the possibility of future problems" are insufficient to negate misrepresentations of present or historical fact. *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019); *see, e.g.*, Mot. at 12 ("GOCOVRI *may* fail to achieve the degree of market acceptance by physicians") (emphasis added); *id.* ("a payer *may* determine to require patients to use other formulations of amantadine") (emphasis added).

### (ii)     The AC Alleges Defendants' Actual Knowledge

As shown in Section III.C, *infra*, the AC creates a strong inference that Defendants had actual knowledge of the falsity of their statements, including those the Defendants now claim to be forward-looking. Further, as discussed above, these statements were intertwined with and premised on misleading statements of present fact. Because Defendants had actual knowledge that their statements of present fact were misleading, "[i]t necessarily follows that they also had actual knowledge that their forward-looking statements were false or misleading." *Quality Sys.*, 865 F.3d at 1149.

### 7.     Defendants' Misleading Statements Are Not Mere "Puffery"

Puffery is a statement "so exaggerated or vague that no reasonable investor would rely upon it when considering the total mix of information." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014). Defendants rehash the "puffery" arguments already rejected by the Superior Court. *Plymouth*, 2019 WL 7900426 at *3. However, Defendants now concede that many of the challenged statements are not puffery. *See generally* App'x (numerous false statements not argued to be puffery). This is because it would simply not be credible for Defendants to claim 'puffery' for objectively false and material statements such as "no payer has [required use of generic amantadine IR prior to GOCOVRI] to date." ¶235.

Where Defendants have not abandoned their puffing defense, the argument relies entirely on improperly de-contextualized snippets of challenged statements, however "the court must analyze the context in which the statements were made." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *Quality Sys.*, 865 F.3d at 1143 ("even general statements of optimism, *when taken in context*, may form a basis for a securities fraud claim when those statements address

specific aspects of a company's operation that the speaker knows to be performing poorly") (emphasis added).  The context of Defendants' false statements directly undercuts their argument. *See, e.g.*, ¶237 ("we currently anticipate broad coverage" in context of quantitative payer support statements); ¶270 ("overwhelmingly positive" doctor support in context of timeline for repeat prescriptions).[15]  These statements are not puffery because they "affirmatively created an impression of a state of affairs that differ[ed] in a material way from the one that actually existed." *Quality Sys.*, 865 F.3d at 1144.

Moreover, puffery is a materiality argument entailing "fact-intensive assessments that are more properly left to the jury," which requires courts to exercise "great caution" at the pleading stage.  *Mulligan*, 36 F. Supp. 3d at 966.  For this reason, "the exception for puffery is narrowly drawn." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005).

### 8.    The AC Is Not A Puzzle

Defendants wrongly contend that the AC uses puzzle pleading.  Mot. at 10-11.  But "Plaintiff here has precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading." *Intuitive*, 65 F. Supp. 3d at 831 (rejecting a similar "puzzle pleading" argument).  Defendants' Motion and 39-page appendix demonstrates the ease of identifying the statements at issue, and the alleged reasons as to why they were misleading.[16]  Mot. at 13-20 (disputing falsity allegations).[17]

---

[15] Defendants lump "value proposition" statements into this category (Mot. at 19-20), but in context, these statements discuss the purported payer, prescriber, and patient recognition and appreciation of the strong, clinical efficacy differences between amantadine IR and GOCOVRI.

[16] Plaintiff's use of bold and italic text to emphasize particular false or misleading portions of longer quotations is a commonly used practice in pleadings to facilitate the Court's analysis and to give defendants notice, by drawing attention to particular challenged portions of longer statements.  *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016) (use of emphasis helpful to allege falsity "in a logical and organized fashion"); *Apple*, 2020 WL 2857397, at *8 (similar).  Plaintiff here has emphasized portions of statements alleged to be misleading and immediately thereafter specified the reasons why.  *Compare, e.g.*, ¶235 *with* ¶236.

[17] Defendants also suggest that Plaintiff relies on a "group pleading" theory that does not identify which Defendant made which false statement.  Mot. at 11 n.10.  Not so.  Plaintiff has named the maker of each false statement at issue.  *E.g.*, ¶235 (Adamas); ¶250 (Went); ¶290 (Merriweather); ¶220 (King); ¶229 (Patni); ¶328 (Shreedhar).  Plaintiff's particularized allegations as to each false statement are further bolstered by the common sense allegation that the Individual Defendants, as

## C.   Plaintiff Alleges A Strong Inference of Defendants' Scienter

Scienter requires that "the defendant[] made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). "The inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id*. at 324.

Here, Plaintiff advances numerous reliable and mutually reinforcing scienter allegations, that when considered holistically raise an inference of scienter that is both cogent and compelling.

### 1.   Defendants Knowingly Misled Investors About GOCOVRI's Commercial Prospects While Withholding Negative Information

Defendants' statements about GOCOVRI's strong commercial prospects were knowingly false when made and intentionally withheld adverse information, or at the very least were deliberately reckless. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569.

**Lack of Payer Support.**  Despite their statements to the contrary, Defendants knew that many payers did not support GOCOVRI, and required prior unsuccessful use of generic amantadine IR.  Adamas began building a commercial team in 2014, and its market access team began reaching out to payers in late 2015.  ¶64.  By August 2017 Adamas had begun discussions with payers about GOCOVRI and monitored payer reactions to GOCOVRI data and marketing.  *See* ¶¶64-65, ¶118.

Adamas' highest ranking officers, controlled Adamas' statements in publicly issued corporate documents such as SEC filings and press releases. *See* ¶41.  The Ninth Circuit has left open "the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008).  In any event, mere invocation of 'group pleading' will not defeat a cause of action where, as here, "Plaintiffs do not exclusively rely on this doctrine." *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017).

By September 2017 Adamas was conducting "extensive research" of payers including GOCOVRI pricing discussions with payers covering 125 million people in the U.S. *See* ¶68; *see also* ¶69 (discussions begun with 20 payers covering 85% of U.S. lives). Adamas scheduled clinical presentations on GOCOVRI for the fourth quarter of 2017 with at least 7 of the top 10 U.S. payers. ¶70. This extensive payer interaction provided Defendants with real time information about payers' reimbursement policies.

Defendants received additional reimbursement information through their operation of the Onboard specialty pharmacy. ¶¶143, 360. Defendants received yet more reimbursement information through reports from their sales representatives. ¶138 (20-30% of prescriptions submitted for reimbursement by FE5 in the first quarter of 2018 were denied, in part due to step therapy); ¶139 (half of prescriptions submitted for reimbursement by FE3 to managed care organizations were held up due to requirements for previous generic amantadine use); ¶363 (Sales Advisory Board provided feedback regarding sales and market access to executives, including Went).

Therefore, when in late 2017 and early 2018 several large payers began requiring use of generic amantadine IR prior to GOCOVRI reimbursement, this was known to Defendants in real time. ¶¶127-29. And if it wasn't, they were deliberately reckless in not knowing. Moreover, according to FE4 (Adamas' VP of Marketing, who reported directly to King at the time), Adamas always anticipated that some payers would require a step-through of amantadine. ¶¶61, 119.

**Lack of Doctor Support.** Defendants also knew that prescribing doctors did not support GOCOVRI. By September 2017 Adamas had conducted a survey of 130 doctors relating to GOCOVRI (¶66), identified the doctors who treat a majority of Parkinson's patients, and had hired 59 sales representatives to interact with these doctors (¶67). This sales field team had meetings with doctors every day and reported back to Adamas executives, including Went. ¶¶73, 361-63. Through these and other similar doctor interactions, Defendants knew doctors' real view of GOCOVRI – that it was no more effective than generic amantadine IR, too expensive, and difficult to prescribe.

By September 2017 Defendants knew that what mattered most to doctors treating dyskinesia was "efficacy, efficacy, efficacy." ¶101. However, according to FE6, prior to GOCOVRI's launch

Adamas consulted physicians to determine their interest in the drug, and some said it sounded just like generic amantadine IR. ¶96. Adamas' market research indicated that doctors were confused about the difference between GOCOVRI and amantadine IR, and doctors realized they could get the same results with either drug. *Id.* Moreover, Adamas knew that its decision not to perform a head-to-head study comparing GOCOVRI and amantadine IR contributed to doctors' efficacy concerns, as evidenced by an August 2017 editorial in JAMA which concluded that, "until a true comparison with a generic Amantadine IR is performed, it remains unclear whether the potential benefits [of GOCOVRI] justify the costs." ¶82.[18]

Defendants knew that doctors were reluctant to prescribe GOCOVRI because Adamas had priced it at $28,500 per year, more than ten times the cost of generic amantadine IR. *See* ¶4. The JAMA editorial explicitly raised the issue of whether Adamas could "justify" GOCOVRI's high cost. ¶82. According to FE3, doctors noticed the vast price difference, and according to FE6, this could result in doctors choosing to treat patients with an adjusted dosage of generic amantadine IR instead of GOCOVRI. *See* ¶¶ 94, 96.

Furthermore, Defendants knew that doctors were frustrated and discouraged by the onerous reimbursement and coverage process for GOCOVRI (¶¶139, 141-42), by Adamas' choice to only distribute GOCOVRI through its Onboard specialty pharmacy (¶¶148-51), and by Adamas' refusal to provide free samples of GOCOVRI (¶155). Defendants knew that all of these factors contributed to doctors' reluctance to prescribe GOCOVRI.

**GOCOVRI's Tiny Market.** Defendants knew that the true market for GOCOVRI was so small that it could not possibly support their sales forecasts, including that GOCOVRI would achieve up to 30% market penetration as a LID treatment. Defendants knew that doctors typically only sought treatment for the most severe cases of dyskinesia, occurring in Parkinson's patients on the highest doses of levodopa. ¶¶106-07. Defendants also knew that patients with mild or moderate dyskinesia often did not find the condition bothersome, and often did not seek treatment for it. ¶¶103-05, 109-10. Therefore, Defendants knew that the true market for GOCOVRI was limited to

---

[18] Defendants knew of the importance of this critical editorial, and directly respond to the article's concerns in public comments made shortly after its publication. *See* ¶¶82-88.

the most severe cases of dyskinesia.

Nonetheless, according to FE6 (Director of Business Analytics, reporting directly to King), Defendants' original GOCOVRI sales forecasts did not take into account the severity of dyskinesia symptoms. ¶¶63, 107.  According to FE4 and FE5, these forecasts considered all dyskinesia patients as the target market, no matter how mild their symptoms. ¶¶105-06.  According to FE1 (one of five Regional Business Directors, responsible for overseeing 10 of Adamas' 59 GOCOVRI sales representatives), King and Went had no basis for their "pie in the sky" forecasts except the fact that GOCOVRI was the only brand name drug with a LID indication.  ¶¶58, 95.  But, as Defendants knew, generic amantadine IR had been used to treat LID for decades.  ¶77.

**Bleak MSWI Commercial Prospects.**  Defendants knew that GOCOVRI's commercial prospects were just as bleak for MSWI treatment as they were for LID treatment.  Defendants conducted research into the possible use of GOCOVRI to treat MSWI, including clinical trials and discussions with doctors. ¶¶52, 212.  Defendants knew that GOCOVRI's test results for MSWI treatment were similar to those for AMPYRA, an existing treatment for MSWI already approved by the FDA.  ¶52.  Furthermore, Defendants knew that AMPYRA would soon be available in a low-cost generic version.  ¶209.  By the time Defendants began to tout GOCOVRI as a possible MSWI treatment, they already knew that GOCOVRI was a commercial failure as a LID treatment due to these very same factors – the availability of a low-cost generic with very similar efficacy.

*       *       *

As discussed above, at the time of Defendants' false statements about GOCOVRI's strong commercial prospects, Defendants knew the above significant adverse information, that their failure to communicate, at the very least, "does suggest deliberate recklessness."  *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *7 (N.D. Cal. June 1, 2020); *see also Arena Pharm.*, 840 F.3d at 708 (similar).

>          **2.     Defendants Had Extensive Knowledge of GOCOVRI Commercialization Because It Was Adamas' Core Operation**

Under established Ninth Circuit law, the core operations inference provides that "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter

requirement," as it relates to a business's "core operations." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); *see also Reese*, 747 F.3d at 569 ("It may ... be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies").

It is indisputable that commercialization of GOCOVRI was Adamas' core operation during the Class Period. *See* ¶¶353-63. GOCOVRI was Adamas' only FDA approved drug. ¶28. GOCOVRI accounted for 99% of Adamas' revenues. ¶51. GOCOVRI was the overwhelming focus of every Adamas SEC filing, investor presentation, and earnings call. *See, e.g.*, Mot. Exs. 4, 7, 26. Went stated that GOCOVRI's commercialization as a LID treatment and development as a MSWI treatment were Adamas' "2 key priorities." ¶357. As Adamas' SEC filings repeatedly admitted, "[o]ur success depends heavily on successful commercialization of GOCOVRI." ¶51. Therefore a strong inference arises that Defendants knew of material information affecting GOCOVRI's commercialization. Given GOCOVRI's paramount importance to Adamas, it would be utterly implausible to infer that Defendants were naively unaware of such information.

The core operations inference is further supported by the deep involvement of the Individual Defendants in GOCOVRI's commercialization. Went conceived of the idea for GOCOVRI, and oversaw its development and FDA approval. ¶354. At various times during the Class Period, Adamas' GOCOVRI commercialization efforts were directly led by Went, King (who was hired to spearhead the launch of GOCOVRI), and Shreedhar. ¶¶348, 356. As CMO, Patni oversaw Adamas' outreach to doctors regarding GOCOVRI. ¶¶36, 59, 361-62. As CFO, Merriweather was deeply involved in Adamas' financial projections relating to GOCOVRI. ¶¶32-33, 176.

Defendants had access to numerous specific sources of information regarding GOCOVRI commercialization, including fulfillment data from the Onboard specialty pharmacy, an internal market research group reporting directly to Went, regular reports from sales representatives regarding doctor interactions, the Individual Defendants' own visits to prescribing doctors, regular meetings of Medical Science Liaisons reporting to Defendant Patni, and regular meetings of a Sales Advisory Board reporting to Defendant Went. *See* ¶¶360-63.

Furthermore, each of the Individual Defendants repeatedly discussed GOCOVRI's

commercialization with investors, thereby holding themselves out as knowledgeable regarding key issues including GOCOVRI's patient market, payer reimbursement requirements, doctor support for the drug, and prospects for alternative use as an MSWI treatment. *See, e.g.*, ¶117 (Went discussing payer reimbursement requirements); ¶290 (Merriweather discussing market penetration); ¶66 (King discussing doctor support); ¶87 (Patni discussing attempts to differentiate GOCOVRI from generic amantadine); ¶328 (Shreedhar discussing MSWI market opportunity). As the Ninth Circuit held in *Reese*, "the inference that [defendant] did not have access to the ... data is directly contradicted by the fact that she specifically addressed it in her statement…. This case is distinguishable from situations where information may have been obscured from high-level executives." 747 F.3d at 572.

### 3. The Six Former Employees Provide Reliable Information Contributing to a Strong Inference of Defendants' Scienter

"Scienter may be pled based on allegations attributed to confidential witnesses, so long as two conditions are met: First, the confidential witnesses ... must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported ... must themselves be indicative of scienter." *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (memorandum).

The AC's allegations relating to the six FE witnesses contribute to a strong inference of scienter. Each FE is described with sufficient particularity. The AC provides titles, job responsibilities, employment dates, and reporting lines. Each FE's job involved GOCOVRI, so each employee's statements about GOCOVRI are made from their personal knowledge. ¶¶58-63.

The FE statements are strongly indicative of Defendants' scienter. For example, FE1, a Regional Business Director overseeing 10 GOCOVRI sales representatives, stated that Defendants' sales forecasts were based on unwarranted top-down assumptions, not any concrete information from his sales team in the field. *See* ¶¶58, 95. FE2, a Senior Medical Science Liaison who indirectly reported to Patni, stated that Patni and Went received regular reports of doctor feedback. ¶¶59, 362. FE3, a Neurology Account Specialist (*i.e.* sales representative) stated that doctors noticed the vast price difference between GOCOVRI and amantadine, and that GOCOVRI was mostly used in patients with the most severe dyskinesia for whom no other treatments worked. ¶¶60, 94, 105. FE4,

the VP of Marketing who first reported directly to King and later to Went, stated that Adamas conducted research to determine how payer's would react to GOCOVRI's price and competition from amantadine, and that Adamas always anticipated that some payers would require a step-through of amantadine.   ¶¶61, 119.   FE5, also a Neurology Account Specialist, stated that GOCOVRI prescriptions he submitted to payers were often denied, and that doctors were frustrated with the long fulfillment process and frequent denials.  ¶¶62, 138-39.  FE6, a Senior Director of Business Analytics who first reported directly to Went and later to King, stated that prior to GOCOVRI's launch Adamas consulted physicians to determine their interest in the drug, and some said it sounded just like generic amantadine IR.  ¶¶63, 96.

The Ninth Circuit and courts in this District have repeatedly held similar allegations, or considerably less detailed allegations from far fewer confidential witnesses, to reliably contribute to a strong inference of scienter.  *E.g.*, *Cutler*, 696 F. App'x at 815 (allegation of a single confidential witness that defendant executives had access to information in quarterly meetings supported scienter); *Zynga*, 2015 WL 1382217, at *7 (scienter alleged where confidential witnesses reported management's access to sales data); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (two confidential witnesses alleging that defendant company's customers disclosed their inventory levels during annual contract negotiations supported scienter).

Defendants' argument that some of the FEs did not directly interact with the Individual Defendants is groundless because that is not necessary to support a strong inference of scienter where the witness's information is otherwise reliable.  *See Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *2 (N.D. Cal. June 22, 2017) (scienter alleged "primarily because of" a single witness who participated in meetings regarding sales forecasts, even though defendants were only indirectly tied to such information via "hearsay"); *South Ferry #2 v. Killinger*, 687 F. Supp. 2d 1248, 1257-62 (W.D. Wash. 2009) (scienter of senior executives alleged based on their positions within the company and their public statements, even though "[n]one of the confidential witness statements implicates an individual [d]efendant directly").

**4.      The Abrupt Departures Of Adamas' Three Top Executives In The Wake Of Negative GOCOVRI Revelations Supports Scienter**

"[R]esignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), as amended (Feb. 10, 2009).  For resignations to contribute to an inference of scienter, a plaintiff need only "allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Id*.

In the wake of multiple negative revelations regarding Defendants' fraud, over the course of only one year, Adamas announced the resignation its three highest ranking executives – COO Defendant King, CEO Defendant Went, and CFO Defendant Merriweather.  ¶¶348-352.  King, who had been hired to spearhead the GOCOVRI launch, suspiciously resigned for unspecified "personal reasons" on September 14, 2018.  ¶348.  FE1, who indirectly reported to King, believes King was fired.  *Id.*  On August 8, 2019 Adamas announced Merriweather was leaving later that year, and also revealed lackluster patient growth and that operational issues were negatively impacting GOCOVRI prescription fulfillment.  ¶350.  After founding Adamas and leading it as CEO for 19 years, Went abruptly resigned one month later and was replaced by a newly hired outsider.  ¶¶30, 351.

Not only are these resignations suspicious on their face, they were announced over almost exactly the same time period (September 2018 to September 2019) as the corrective disclosures alleged in the AC (October 2018 to September 2019).  *See WageWorks*, 2020 WL 2896547, at *6 ("the close temporal proximity to the initial revelations weigh[s] against an innocent inference that defendants resigned for 'unrelated personal or business reasons.'").

**5.      Motive Is Not Required To Plead Scienter**

The crux of Defendants' scienter argument is their claim that it would be absurd for them to intentionally mislead investors because the fraud would inevitably be detected.  Mot. at 20, 23-24.  This argument fails for several reasons.

First, it is black letter law that in a securities fraud action plaintiffs are not required to establish defendants' motives at the pleading stage.  *See Matrixx*, 563 U.S. at 48 ("The absence of a motive allegation, though relevant, is not dispositive.")

Second, Defendants' argument depends on mischaracterizing the AC. Nowhere does the AC allege that Defendants knew their fraud would eventually be exposed. That contention was created out of thin air in the Motion. As discussed above, it is entirely likely that Defendants hoped and believed their fraud would go undetected, and that they could find some way to persuade payers, patients and doctors to change their views of GOCOVRI before the truth became known to investors.

Third, Defendants' argument depends on comparison to an inapt authority, *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). In *Nguyen*, the plaintiffs alleged that the defendant medical device manufacturer knew of "unsolvable" defects in its aneurysm sealing product that created an urgent danger to human life and rendered the device "unapprovable" by the FDA. *See id.* at 415. Plaintiffs nonetheless alleged the defendants made optimistic statements to investors about FDA approval prospects, despite knowing that the product could never obtain FDA approval. Unsurprisingly, the court rejected these implausible and contradictory allegations. In contrast, here, Defendants made almost all of their false statements after the FDA had already approved GOCOVRI. Defendants' false statements did not relate to an inescapable, all-or-nothing outcome as in *Nguyen*. Rather, at stake was the amount of GOCOVRI sales, and it is completely plausible that Defendants hoped to find a way to increase those sales before investors learned the truth about their prior falsehoods. *See WageWorks*, 2020 WL 2896547, at *8 n.8 (rejecting argument that it was implausible they would risk their reputation by falsifying revenue); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013) (crediting inference that defendant "consciously chose to withhold information ... from the public in the hopes that the dispute would be quickly resolved and that investors would be none the wiser").

Fourth, Defendants' argument proves too much. Taken to its logical conclusion, it is an argument that no defendant would ever commit securities fraud, due to the obvious and inevitable risk of getting caught. This argument is readily refuted by common sense and by history (consider, for example, the widely reported cases of Enron, or more recently, Wirecard). It is simply a matter of fact that companies and individuals do, at times, intentionally mislead investors, notwithstanding laws to the contrary. Discovery may help to ascertain why that happened in this particular case.

**6.      Defendants' Purported Lack of Stock Sales Does Not Negate Scienter**

Defendants argue that the absence of insider stock sales negates scienter. However, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *America West*, 320 F.3d at 944. Defendants' contention that one Defendant purchased stock is similarly unavailing, because "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012). As explained above, such a belief is entirely plausible.

Further undercutting Defendants' argument, at least one Defendant—Adamas—did sell an unusually large amount of stock during the Class Period. In the January 2018 SPO, Adamas sold 3.45 million shares at $41.50 per share, for net proceeds of $134.1 million. *See* Opp. Ex. (2017 Form 10-K at 70); *see also WageWorks*, 2020 WL 2896547, at *8 n.8 (plaintiffs persuasively alleged defendants falsified revenue in part to support its stock offering); *Fitbit*, 216 F. Supp. 3d at 1030-31 (incentive to inflate company's prospects prior to offering relevant to holistic scienter inquiry). Adamas' SPO price of $41.50 per share is very near Adamas' all-time high stock price, and is vastly in excess of the $5.12 per share where it ended the Class Period. *See* ¶347; Mot. Ex. 31.

**D.      Plaintiff Adequately Pleads Loss Causation**

"Loss causation is simply a causal connection between the material misrepresentation and the loss." *WageWorks*, 2020 WL 2896547, at *5. There are an "infinite variety" of ways to plead loss causation, including through a series of partial corrective disclosures or through materialization of concealed risks. *Id.* at *8. Plaintiffs need only meet a "low bar" to plead proximate cause for purposes of loss causation. *Id.* Plaintiff's minimal burden is satisfied by "alleging that (1) the plaintiff paid an artificially inflated price for the company's stock and (2) the stock price fell after the truth became known." *Zynga*, 2015 WL 1382217, at *7. Because of loss causation's fact-intensive nature, "it is normally inappropriate to rule on loss causation at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Plaintiff has more than met his pleading burden for each of the four alleged loss causation dates, specifying the new information revealed on each date and the immediately following

substantial stock price declines. *See* ¶¶330-47. Defendants' arguments to the contrary are without merit. First, Defendants claim that Adamas' risk disclosures revealed the truth prior to any alleged corrective disclosure or materialization of risk. However, as discussed *supra*, Adamas' risk disclosures did not reveal the truth to investors because these were incomplete, couched in hypothetical terms, and omitted material negative information then known to Defendants.

Second, Defendants wrongly point to three additional disclosures as revealing the truth to investors. Adamas' September 18, 2017 statement, made less than one month after GOCOVRI's FDA approval, that "we anticipate there will be some plans that will automatically cover us at a Tier 3 or that nonpreferred tier until they review the product," was made in the context of reassuring investors that GOCOVRI could be reimbursed by payers even before they had completed their review of the drug, and did nothing to warn investors of the substantial and permanent hurdles to reimbursement that GOCOVRI would face. *See* ¶120. King's May 16, 2018 acknowledgement that certain payers required a soft step edit cannot dispel the falsity of Defendants' repeated assertions that no payers had instituted hard step edits. *See* Mot. Ex. 10 at 5; ¶135.[19] Moreover, King immediately hedged this statement by misleadingly boasting that "[r]eimbursement, whether you're Medicare or in the commercial environment, is occurring, and it's occurring with speed and support from the payer." Mot. Ex. 10 at 5; ¶271. Finally, King's May 16, 2018 statements regarding the Quick Start program indicated that Adamas would provide 28 days of free GOCOVRI (as opposed to its standard 14 days) only under exceptional circumstances; this did nothing to warn investors that the 14-day Quick Start program was inadequate to overcome the substantial impediments to fulfilling GOCOVRI prescriptions. *See* Mot. Ex. 10 at 6; ¶¶156-57. Furthermore, King immediately downplayed Quick Start's significance ("that proportion of patients that's getting Quick Start is a very small minority of our patient population") and misleadingly implied strong payer support for GOCOVRI ("So it gives you some sense as to how rapidly the payers are coming to conclusion").

---

[19] *See also Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (*"before the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations"*).

Mot. Ex. 10 at 6; ¶272.

Third, Defendants fail in their attempt to shoehorn Plaintiff's allegations into the mold of cases where plaintiffs pleaded a loss that arose from non-fraudulent factors.[20] Unlike in those cases, Plaintiff has pled with particularity that declines in Adamas' stock price were caused directly by corrective disclosures and materialization of concealed risks. *See* ¶¶330-47. For example, Defendants repeatedly concealed the risk of the limited market for GOCOVRI by falsely touting GOCOVRI's commercial prospects, and as late as November 1, 2018, Defendants projected a doubling of market penetration by the end of 2019. However, on March 4, 2019 Defendants announced slowing prescription growth rates, stated they would not provide guidance for 2019, and refused to reaffirm their market share guidance issued only four months earlier; this materialization of the risk promptly resulted in a 32% stock price crash and a torrent of negative analyst commentary. ¶¶339-45; ¶343 ("We rarely see a company back away from guidance so quickly" which "should obviously be a heightened concern"); *see Zynga*, 2015 WL 1382217, at *8 (loss causation sufficiently alleged where company drastically reduced guidance only three months after making falsely positive statements about product demand).

### E.    Plaintiff States a Claim for Section 20(a) Control Person Liability

Defendants' sole argument against Section 20(a) control person liability is that Plaintiff failed to plead an underlying primary violation. Mot. at 25 n.26. Because Plaintiff adequately pleads a violation of Section 10(b), his Section 20(a) claim should be sustained.

## IV.    CONCLUSION

The motion to dismiss should be denied in its entirety. Alternatively, if the Court grants any portion of the motion, Plaintiff requests leave to amend pursuant to Fed. R. Civ. P. 15. *Osher v. JNI Corp.*, 183 Fed. Appx. 604, 605 (9th Cir. 2006) ("Leave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet").

---

[20] *Roofers Local No. 149 Pension Fund v. Dream Works Animation SKG, Inc.*, 2017 WL 655789, at *1 (9th Cir. Feb. 17, 2017) (loss due to investor disappointment); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (loss due to earnings miss).

Dated: August 28, 2020

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/Leanne H. Solish*
Robert V. Prongay
Leanne H. Solish
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.  On August 28, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 28, 2020, at Los Angeles, California.


_s/ Leanne H. Solish_
Leanne H. Solish