# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2017**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 001-36399**

# ADAMAS PHARMACEUTICALS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **2834** | **42-1560076** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1900 Powell Street, Suite 750**
**Emeryville, CA 94608**
**(510) 450-3500**
(Address, including zip code, and telephone number, including area code, of Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, par value $0.001 per share | The Nasdaq Global Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates was $301,001,186 computed by reference to the last sales price of $17.49 as reported by the Nasdaq Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2017. Shares of common stock held by each officer and director, and each entity affiliated with a director, have been excluded in that such persons may be deemed to be affiliates. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

As of February 15, 2018, the number of outstanding shares of the registrant's common stock, par value $0.001 per share, was 26,807,221.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates information by reference to the definitive proxy statement for the registrant's 2018 Annual Meeting of Stockholders, to be filed within 120 days of the registrant's fiscal year ended December 31, 2017.

**ADAMAS PHARMACEUTICALS, INC.**
**ANNUAL REPORT ON FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 22 |
| Item 1B. | Unresolved Staff Comments | 56 |
| Item 2. | Properties | 56 |
| Item 3. | Legal Proceedings | 56 |
| Item 4. | Mine Safety Disclosures | 56 |
| | | |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 57 |
| Item 6. | Selected Financial Data | 59 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 61 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 73 |
| Item 8. | Financial Statements and Supplementary Data | 74 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 107 |
| Item 9A. | Controls and Procedures | 107 |
| Item 9B. | Other Information | 108 |
| | | |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 109 |
| Item 11. | Executive Compensation | 109 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 109 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 109 |
| Item 14. | Principal Accountant Fees and Services | 109 |
| | | |
| **Part IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 110 |
| Item 16. | Form 10-K Summary | 113 |
| | | |
| Signatures | | 114 |
| Exhibit Index | | 110 |

"Adamas Pharmaceuticals," our logo and other trade names, trademarks and service marks of Adamas appearing in this report are the property of Adamas. Other trade names, trademarks and service marks appearing in this report are the property of their respective holders.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This report, including the sections titled "Business," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. In some cases you can identify these statements by forward-looking words, such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "could," "would," "project," "plan," "potential," "seek," "expect," "goal" or the negative or plural of these words or similar expressions. These forward-looking statements include, but are not limited to, statements concerning the following:

- our expectation as to the therapeutic profile of our products and product candidates, including the safety and efficacy thereof;

- our expectations as to whether we will be able to obtain and maintain regulatory approval of our product candidates;

- our expectations as to whether we will be able to successfully commercialize GOCOVRI$^{TM}$ and any of our other products that are approved;

- the rate and degree of market acceptance of our products in the future;

- our estimates of our expenses, ongoing losses, future revenue, capital requirements and our needs for or ability to obtain additional financing;

- the anticipated scope, rate of progress and cost of our preclinical studies and clinical trials and other research and development activities;

- the potential cost of establishing clinical and commercial supplies of our product candidates and any products that we may develop;

- the anticipated cost and timing of regulatory submissions and approvals;

- our expectation as to the legal proceedings and related stays and terms of settlements;

- our expectations as to the sufficiency of our capital resources to enable us to complete our ongoing clinical studies;

- our expectations as to our ability to obtain and maintain intellectual property protection for our products and product candidates;

- our expectations as to our ability to negotiate manufacturing arrangements and scale up manufacturing of our product candidates to commercial scale;

- the anticipated performance by our collaboration partners over which we do not have control;

- the anticipated receipt and timing of any royalties from our collaborators;

- our expectations as to our ability to successfully establish and successfully maintain appropriate collaborations and derive significant revenue from those collaborations;

- the anticipated performance of third parties to conduct our clinical studies;

- the anticipated ability of third-party contract manufacturers to manufacture and supply our product candidates for us;

- our expectations as to our ability to identify, develop, acquire and in-license new products and product candidates;

- our expectations as to our ability to initiate new or continue clinical development programs;

1

- our expectations as to our ability to initiate sites and enroll patients in our clinical studies at the pace that we project;

- our expectations as to our ability to retain and recruit key personnel;

- our expectations regarding the time during which we will be an emerging growth company under the Jumpstart Our Business Startups Act;

- our anticipated financial performance; and

- our anticipated developments and projections relating to our competitors or our industry.

These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in "Risk factors". Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this report may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future results, levels of activity, performance, or events and circumstances reflected in the forward-looking statements will be achieved or occur. Moreover, except as required by law, neither we nor any other person assumes responsibility for the accuracy and completeness of the forward-looking statements. We undertake no obligation to update publicly any forward-looking statements for any reason after the date of this report to conform these statements to actual results or to changes in our expectations.

You should read this report and the documents that we reference in this report and have filed with the Securities and Exchange Commission as exhibits to this report with the understanding that our actual future results, levels of activity, performance, and events and circumstances may be materially different from what we expect.

2

## ITEM 1. BUSINESS

### Overview

At Adamas Pharmaceuticals, Inc., we seek to redefine the treatment experience for patients suffering from chronic neurological diseases. Our vision is grand, our goal bold: to create and commercialize a new generation of medicines intended to lessen the burden of disease on patients, caregivers and society. With a new commercial medicine and robust pipeline of investigational programs focused on meaningfully differentiated treatment options for patients, we believe we are well on our way. Our therapeutic targets include a broad range of neurologic diseases, including Parkinson's disease, multiple sclerosis, epilepsy and Alzheimer's disease.

Our treatment innovations stem from a deep scientific understanding of time-dependent biology–the deliberate mapping of disease patterns and drug activity–along with a goal to meaningfully increase the efficacy of known molecules without compromising tolerability. This approach is designed to ensure that our medicines fit within, rather than define, people's daily lives. Our goal is to develop medicines that are timed for the benefit of patients.

Our understanding of time-dependent biological processes informs our every innovation, targeting advancement in treatment of chronic neurologic disorders. Our expanding portfolio includes:

*Approved Product:*

- GOCOVRI$^{TM}$ (amantadine) extended release capsules, formerly referred to as ADS-5102, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. GOCOVRI was approved for marketing by the U.S. Food and Drug Administration, or FDA, on August 24, 2017, with seven years of orphan exclusivity and additional patent protections, and we fully launched GOCOVRI with a deployed sales force in January 2018.

*Potential Additional Indications for GOCOVRI (amantadine) Extended Release Capsules (ADS-5102):*

- ADS-5102 in development for the treatment of walking impairment in patients with multiple sclerosis. We expect the start of our Phase 3 pivotal study in this supplemental indication to occur early in the second quarter of 2018.

- ADS-5102 in research and potential development for additional indications, including the treatment of wearing OFF and delaying motor complications in Parkinson's disease, tardive dyskinesia, Huntington's chorea, Tourette syndrome, and non-motor disorders, including depression, and anti-psychotic induced weight gain. We expect to select additional indications for ADS-5102 by first quarter 2019.

*Product Candidates:*

- ADS-4101 (lacosamide) modified release capsules in development for the treatment of partial onset seizures in patients with epilepsy. We have requested a meeting with the FDA in the first half of 2018, with the start of a Phase 3 pivotal study planned for 2019, depending on FDA feedback.

- Additional product candidates in research based on potential new discoveries in Parkinson's disease, multiple sclerosis, epilepsy, as well as new research programs in psychiatry.

*Partnered Products:*

- Namzaric® (memantine hydrochloride extended release and donepezil hydrochloride) capsules for the treatment of moderate to severe dementia of an Alzheimer's type, marketed in the United States by Allergan plc under an exclusive license agreement between us and Forest Laboratories Holdings Limited ("Forest"), an indirect wholly-owned subsidiary of Allergan plc.

- Namenda XR® (memantine hydrochloride) extended release capsules for the treatment of moderate to severe dementia of an Alzheimer's type, marketed in the United States by Allergan plc under the Forest license agreement.

Products in our wholly-owned portfolio, potential additional indications for these products, and our product candidates, are protected by an array of intellectual property, including robust and diversified patent claims, and regulatory exclusivities. For example, GOCOVRI is protected by seven-year orphan drug exclusivity, three-year new product exclusivity, and issued patents and pending patent applications out to at least 2035.

We have developed our current portfolio of therapies in a capital efficient manner. As of December 31, 2017, we had raised a total of $201.3 million from equity financings, including $61.8 million in net proceeds raised in January 2016 from the sale of 2,875,000 shares of common stock. We also received $160.0 million in upfront and milestone payments and $4.1 million in development funding from our partnership with Allergan plc. As of December 31, 2017, we had an accumulated deficit of $211.7 million and $176.4 million in cash, cash equivalents, and investments. In May 2017, we entered into a Royalty-Backed Loan, or HCRP Loan, with HealthCare Royalty Partners ("HCRP"). As of December 31, 2017, long-term debt related to our HCRP Loan was $102.6 million. In January 2018, we raised an additional $134.1 million in net proceeds from the sale of 3,450,000 shares of common stock.

### Our Market Opportunity

We estimate that approximately 36 million people in the United States suffer from chronic central nervous system, or CNS, disorders such as Parkinson's disease, multiple sclerosis, epilepsy, psychosis, depression, and Alzheimer's disease. CNS diseases are frequently treated with multiple medications having different mechanisms of action with the goal of maximizing symptomatic benefits for patients. Existing CNS drugs often require frequent dosing and may have tolerability issues that limit the amount of the drug that can be taken each day. We believe that many CNS disorders could be better addressed in individual patients, as well as society as a whole, if drug concentrations (or the pharmacokinetic profiles) were shaped as a function of time and disease activity, to improve treatment efficacy while maintaining tolerability.

### Our Strategy

Our business strategy is to discover, develop, and commercialize clinically differentiated medicines for patients suffering from chronic neurologic disorders, based upon our understanding of time-dependent biology.

### Our Portfolio

The following table summarizes our portfolio:



Additional product candidates in research based on potential new discoveries in Parkinson's disease, multiple sclerosis, epilepsy, and psychiatry.
NAMENDA XR® and NAMZARIC® are trademarks of Merz Pharma GmbH & Co. KGaA.

4

*GOCOVRI (formerly referred to as ADS-5102) for the Treatment of Dyskinesia in Patients with Parkinson's Disease*

GOCOVRI$^{TM}$ (amantadine) extended-release capsules is the first and only medicine approved by the FDA for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. GOCOVRI, a high-dose, 274-mg amantadine taken once-daily at bedtime that delivers high levels of amantadine in the morning and throughout the day when dyskinesia occurs, was approved by the FDA on August 24, 2017, and was granted seven years of orphan exclusivity upon its approval. GOCOVRI is now available for patients in need, and we are actively educating physicians about the GOCOVRI proven efficacy and safety profile, and promoting to physicians. We made GOCOVRI available for physician and patient use in the fourth quarter of 2017, and commenced the full commercial launch of GOCOVRI in January 2018. In addition to orphan exclusivity that protects GOCOVRI into 2024, issued patents and filed patent applications potentially provide GOCOVRI additional protections through at least 2035.

Parkinson's disease is a chronic, neurodegenerative disorder affecting close to one million people in the United States. Levodopa, which replaces lost dopamine, is considered the "gold standard" and the most effective therapy for Parkinson's disease. Over time, people with Parkinson's disease require increasingly higher or more frequent doses of levodopa to avoid recurrent periods of OFF time–characterized by slowness of movement, rigidity, impaired walking, tremors, and postural instability–when the underlying symptoms of Parkinson's disease return. At this stage of the Parkinson's disease journey, it is characterized by an over-activated glutamate system, which leads to the symptoms of dyskinesia and OFF time. Accordingly, as Parkinson's disease progresses, approximately 90 percent of people on levodopa therapy will experience dyskinesia, which is characterized by involuntary movements that are non-rhythmic, purposeless and unpredictable, impacting peoples' daily lives. Of the 400,000 Parkinson's disease patients in the United States with motor complications, approximately 150,000 to 200,000 suffer with dyskinesia.

In a robust clinical program consisting of three randomized, placebo-controlled studies and a two-year, ongoing, open label safety study, GOCOVRI demonstrated a durable reduction in dyskinesia and secondarily in OFF time in people with Parkinson's disease. Specifically, the pooled data analysis from the two positive, Phase 3 pivotal trials of GOCOVRI demonstrates:

- A 41% reduction in dyskinesia as measured on the Unified Dyskinesia Rating Scale total score, compared to 14% for placebo at week 12;

- A reduction in OFF time of approximately one hour per day (placebo adjusted); and

- An increase of approximately 4.0 hours in functional time daily (or ON time without troublesome dyskinesia).

The most common adverse reactions with GOCOVRI were hallucinations, dizziness, dry mouth, peripheral edema, constipation, falls and orthostatic hypotension. Warnings and precautions with GOCOVRI include falling asleep during activities of daily living, suicidality and depression, orthostatic hypertension/dizziness, and hallucinations/psychotic behavior.

In addition, the ongoing open label safety study of GOCOVRI has demonstrated the long-term durability and safety of GOCOVRI out to 88 weeks, and a significant improvement in patients in the study who were switched from amantadine immediate release treatment to GOCOVRI. We expect the final results of the two-year open label safety study to be reported mid-year in 2018.

As of December 31, 2017, after being available for a little over two months for physician and patient use without sales-based promotional efforts by us, 100 distinct prescribers had prescribed GOCOVRI for Parkinson's disease patients with dyskinesia. This early reception of GOCOVRI by physicians is consistent with our market research indicating that GOCOVRI would be well-received by physicians, patients and payers. In that research, almost 60% of physicians agree that "efficacy in reducing dyskinesia" was the most important unmet need for dyskinesia treatment. On January 8, 2018, we deployed our field sales team of 59 experienced neurology account specialists specifically to drive awareness and promote GOCOVRI to approximately 6,500 physicians who treat Parkinson's disease patients. Our sales team will be educating physicians about appropriate use of GOCOVRI using marketing materials developed with

5

feedback from experts in the Parkinson's disease community, as well as the published, peer reviewed scientific articles reporting the data from our two pivotal Phase 3 studies of GOCOVRI.

Additionally, while GOCOVRI faces similar launch challenges as any newly approved medicine with a new indication, we are pleased with the payer response to GOCOVRI's availability since October 2017 at a list price of $28,500 per year. To further facilitate patient access, in October 2017, we launched GOCOVRI Onboard, a patient services program. GOCOVRI Onboard provides reimbursement assistance as well as a Quick Start program that offers eligible patients a supply of GOCOVRI within days of receiving a prescription, while insurance coverage is being adjudicated; a co-pay assistance program for commercially insured patients, to ensure that they pay no more than $20 per prescription; a patient assistance program for under insured or non-insured patients; and the provision of information for government insured patients about available programs to assist with their out of pocket costs.

*Potential Additional Indications for GOCOVRI (amantadine) extended release capsules (formerly ADS-5102):*

*ADS-5102 in Development for the Treatment of Walking Impairment in Patients with Multiple Sclerosis*

ADS-5102, a high-dose amantadine investigational agent taken once-daily at bedtime, was designed to provide a slow initial rate-of-rise in drug concentrations and a delayed time to the maximum concentration. Symptomology of multiple sclerosis walking impairment, or MS Walking, has been associated with dysregulation of the NMDA receptor/glutamate signaling, as has been reported in Parkinson's disease. Symptoms, therefore, may be improved by modulating over-activated NMDA receptor/glutamate signaling. These symptoms are present during waking hours, not while the individual is asleep. As a result, an effective treatment should provide relief beginning in the morning, and be sustained throughout the day, while not disrupting sleep.

Walking impairment affects a majority of the approximately 400,000 multiple sclerosis patients in the United States. MS Walking remains an area of high unmet need, even though there is one approved product on the market for the indication. Our market research suggests that a high proportion of multiple sclerosis patients develop walking impairment, significantly impacting both quality of life and independence. Additionally, physician satisfaction with current treatment options is low, and payers find current treatment to be inappropriate for newly diagnosed patients and effective only in a minority of patients.

We plan to initiate a Phase 3 study of ADS-5102 for patients with MS Walking early in the second quarter of 2018, based on the feedback we received from our End-of-Phase 2 meeting with the FDA. Our Phase 2, 4-week proof-of-concept study showed a significant benefit in walking speed versus placebo on both mean value and the proportion of participants with a clinically significant 17% improvement. The results for timed-up-and-go (TUG) and 2-minute walking test (2MWT) also suggested benefit on other aspects of mobility and walking.

Our Phase 3 program is planned to consist of two Phase 3 studies, a pivotal efficacy and safety study, and an open label safety study. We are also completing non-clinical studies to support the approval in this multiple sclerosis population. If the first pivotal Phase 3 study is successful, we intend to meet with the FDA to confirm the filing requirements for this supplemental NDA.

*GOCOVRI (ADS-5102) in Research and Potential Development for Additional Indications*

We are continuing to review the results of preclinical studies, clinical trials, and case reports published in peer reviewed medical journals to evaluate additional potential indications for ADS-5102, including the treatment of wearing OFF and delaying motor complications in Parkinson's disease, tardive dyskinesia, Huntington's chorea, Tourette syndrome, and non-motor disorders, including depression, and anti-psychotic induced weight gain. We expect to select additional indications for ADS-5102 by the first quarter of 2019.

*Product Candidates:*

*ADS-4101 in Development for the Treatment of Partial Onset Seizures in Patients with Epilepsy*

ADS-4101 is an investigational high-dose, modified release lacosamide capsule, taken once-daily at bedtime. Lacosamide is an anti-epilepsy active ingredient previously approved by the FDA and currently marketed by UCB SA/NV as VIMPAT® (lacosamide). Based upon the patents and regulatory exclusivities listed in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations*, also known as the Orange Book, it is estimated that VIMPAT will lose patent exclusivity in 2022. ADS-4101 was designed to temper the initial rate-of-rise in lacosamide concentrations,

6

potentially improving the adverse event profile and dose limitations due to dizziness following administration of VIMPAT.

Epilepsy affects an estimated three million Americans, of which approximately 2/3 have partial onset seizures. Of those people with partial onset seizures, about 30% of patients have poor seizure control with current anti-epilepsy drugs. There are limited data on the temporal distribution of seizures over the 24-hour day; however, published studies suggest that seizures occur in a diurnal pattern, characterized by a peak between 11 a.m. and 5 p.m. and lowest between 11 p.m. and 5 a.m. Thus, by matching the timing pattern of seizures to the concentration of the anti-epileptic drug, with a higher drug concentration during the day and lower drug concentration during the night, ADS-4101 may enable improved seizure control for adults with epilepsy in the United States.

We have completed two Phase 1 studies of ADS-4101 in healthy volunteers. The Phase 1a study showed that a single 400 mg dose of ADS-4101 was better tolerated compared to the equivalent dose of VIMPAT immediate release tablets. The data also demonstrated that ADS-4101 exhibited the desired pharmacokinetic properties, namely a reduced rate of initial rise and delayed time to maximum drug concentration appropriate for bedtime dosing. The recently completed and reported results of a multi-dose Phase 1b study demonstrated that a 600 mg dose of ADS-4101, taken once-nightly, provided a 1.5 to 2.5-fold increase in average lacosamide concentrations throughout the day compared to the maximum approved daily dose of 400 mg, taken as 200 mg twice-daily (BID), of VIMPAT immediate release tablets in healthy volunteers, with comparable tolerability.

We expect to meet with the FDA in a meeting regarding our planned Phase 3, pivotal program for ADS-4101 in the first half of 2018. Our proposed clinical development program includes two Phase 3 studies: a robust pivotal study comparing 400 mg and 600 mg of ADS-4101 to placebo, as well as the active comparator, VIMPAT, and an open-label extension study. Subject to the feedback from the FDA, we anticipate that the Phase 3 study would enroll starting in 2019 and complete enrollment in 2020. The timing of the ADS-4101 clinical development program and its potential approval in the United States is planned to allow us to optimize ADS-4101's intellectual property protections and market opportunity.

*New Product Discovery–Advancing the Product Pipeline*

We continue to apply our "time-dependent biology" approach to identify CNS diseases for which we can drive significant improvements in efficacy without compromising tolerability. Research programs underway include:

- Additional programs in epilepsy, based upon our seizure profile discoveries;

- New programs in psychiatry;

- Additional Parkinson's products, alone and potentially in combination with ADS-5102; and

- Additional Multiple sclerosis products, alone and potentially in combination with ADS-5102.

We anticipate conducting four to five discovery projects per year, with the goal to nominate one additional clinical development program per year.

*Partnered Products:*

*Namzaric® and Namenda XR® for the Treatment of Moderate to Severe Dementia of an Alzheimer's Type*

Namzaric (memantine hydrochloride extended release and donepezil hydrochloride) capsules and Namenda XR (memantine hydrochloride) extended release capsules are two commercially available medicines, which are currently marketed by Forest, an indirect wholly-owned subsidiary of Allergan plc, in the United States for the treatment of moderate to severe Alzheimer's disease. Although we are eligible to receive royalties on net sales of Namenda XR beginning in June 2018, we do not expect to receive such royalties because of the potential entry of generic versions of Namenda XR. We are eligible to receive royalties on net sales of Namzaric beginning in May of 2020.

**Upcoming Milestones**

We expect the following milestones to occur over the next two years:

*GOCOVRI™*

- Providing updates on our commercial progress with GOCOVRI quarterly;

7

Case 4:19-cv-08051-JSW    Document 73-1    Filed 08/28/20    Page 11 of 153

- Presenting data at key annual scientific meetings, including the American Academy of Neurology (AAN), Movement Disorder Society (MDS), as well as publishing additional preclinical, Phase 1 and Phase 3 results for GOCOVRI; and

- Reporting final EASE LID 2 Phase 3 open-label safety and efficacy data.

*ADS-5102 (GOCOVRI)*

- Starting first Phase 3 study in MS Walking in early second quarter 2018;

- Starting an open-label safety and efficacy study by fourth quarter 2018;

- Completing enrollments in a first Phase 3 study in MS Walking by the second half of 2019; and

- Advancing additional indications for ADS-5102 by first quarter 2019.

*ADS-4101*

- Conducting a meeting with the FDA in the first half of 2018; and

- Enrolling in Phase 3 study patients with partial onset seizures with epilepsy in 2019-2020 (pending FDA feedback).

*New Product Development*

- Advancing two research programs into clinical development by the second half of 2020.

**License agreement with Allergan**

In November 2012, we granted Allergan an exclusive license, with right to sublicense, certain of our intellectual property rights relating to human therapeutics containing memantine in the United States. In connection with these rights, Allergan markets and sells Namzaric and Namenda XR for the treatment of moderate to severe dementia related to Alzheimer's disease. Pursuant to the agreement, Allergan made an upfront payment of $65.0 million. We earned and received additional cash payments totaling $95.0 million upon achievement by Allergan of certain development and regulatory milestones. Under the agreement, external costs incurred related to the prosecution and litigation of intellectual property rights are reimbursable.

We are entitled to receive royalties on net sales in the United States by Allergan, its affiliates, or any of its sublicensees of controlled-release versions of memantine products covered by the terms of the license agreement. Beginning in May 2020, we will be entitled to receive royalties in the low to mid-teens from Allergan for sales of Namzaric in the United States. Beginning in June 2018, we will be entitled to receive royalties in the low to mid-single digits for sales of Namenda XR in the United States. Allergan's obligation to pay royalties with respect to fixed-dose memantine-donepezil products, including Namzaric, continues until the later of (i) 15 years after the commercial launch of the first fixed-dose memantine-donepezil product by Allergan in the United States or (ii) the expiration of the Orange Book listed patents for which Allergan obtained rights from us covering such product. However, Allergan's obligation to pay royalties for any product covered by the license is eliminated in any quarter where there is significant competition from generics. For further information, see *Litigation and Other Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report. As stated above, we do not expect to receive royalties on sales of Namenda XR because of the potential entry of generic versions of Namenda XR.

**Intellectual property**

In developing therapies, we search for large treatment effects in the existing landscape of medicines. From that inquiry, we discover temporal patterns of disease activity and drug response, identify and invent new product candidates designed to achieve potentially greater efficacy with manageable safety and tolerability profiles.

Our success does and will significantly depend upon our ability to obtain and maintain patent and other intellectual property and proprietary protection for our product candidates, including usage, pharmacokinetic, composition-of-matter, and formulation patents, as well as patent and other intellectual property and proprietary protection for our novel discoveries and other important technology inventions and know-how. In addition to patents, we

rely upon unpatented trade secrets, know-how, and continuing technological innovation to develop and maintain our competitive position.

We actively protect our proprietary information, in part, by using confidentiality agreements with our commercial partners, collaborators, employees, and consultants and invention assignment agreements with our employees and selected consultants. Despite these measures, any of our intellectual property and proprietary rights could be challenged, invalidated, circumvented, infringed, or misappropriated, or such intellectual property and proprietary rights may not be sufficient to permit us to take advantage of current market trends or otherwise to provide competitive advantages. For more information, please see "Risk factors—Risks related to intellectual property."

As of February 1, 2018, we owned 28 issued U.S. patents, 15 U.S. patent applications, and additional patents and patent applications in other jurisdictions. The patent portfolios for Namenda XR, Namzaric, GOCOVRI, ADS-4101, and ADS-8704 as of February 1, 2018 are summarized below:

### GOCOVRI

GOCOVRI for its FDA-approved indication and other indications Adamas is actively studying is currently covered by a total of 13 issued U.S. patents and 7 additional patent applications containing method and composition claims relating to their pharmacokinetic profile and dosing of amantadine. These patents and applications, if issued, expire at least as late as 2035. These patents and patent applications are wholly owned by us and are not subject to any license agreements. We also own additional foreign patent applications covering GOCOVRI.

### ADS-4101

ADS-4101 is currently covered by U.S. and PCT patent applications containing method and composition claims relating to their pharmacokinetic profile and dosing of antiepileptic agents. Patents issuing from these applications, if issued, will expire in 2036. These patent applications are wholly owned by us and are not subject to any license agreements.

### Namenda XR, Namzaric

Namenda XR and Namzaric are covered by a total of 13 of our issued U.S. patents containing method and compositions claims relating to their pharmacokinetic profile and method claims relating to dosing of memantine. These patents expire as late as 2029 and are exclusively licensed to Allergan. We also own additional foreign patents and patent applications covering Namenda XR and Namzaric.

### ADS-8704 (memantine HCl/donepezil HCl, outside of the United States only)

We have retained the rights and continue to evaluate potential development and commercialization pathways for ADS-8704, a fixed-dose combination of our proprietary controlled-release version of memantine and donepezil for the treatment of moderate to severe dementia related to Alzheimer's disease in various non-U.S. markets.

### Research and Development

We continue to maintain our commitment to research and development, and a significant portion of our operating expenses is related to research and development. See "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for costs and expenses related to research and development, and other financial information for each of the fiscal years 2017, 2016 and 2015, which information is incorporated by reference here.

### Commercial activities, including sales and marketing

We made GOCOVRI available for physician and patient use in the fourth quarter of 2017, and commenced the full commercial launch of GOCOVRI in January 2018. In connection with this launch, we deployed a sales force of 59 Neurology Account Specialists plus 6 regional business directors. A significant portion of our operating expenses in 2018 will be related to our commercialization activities. Specifically, we estimate that we will focus our marketing and sales efforts on approximately 6,500 physician targets. See "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K for revenues and our net loss for each of the fiscal years 2017, 2016 and 2015, and total assets as of the end of each of those three years, which information is incorporated by reference here. For 2017, sales of GOCOVRI accounted for over 99% of our revenues, while in 2016 and 2015 all of our revenues were from

9

reimbursements for research and development expenses under our license agreement with Allergan and from government contracts.

All of our revenues for the years ended December 31, 2017, 2016, and 2015, were generated in the United States. As of December 31, 2017, 2016, and 2015, all long-lived assets were in the United States. See "Risk Factors" for risks attendant to foreign operations.

## Competition

Our industry is highly competitive and subject to rapid and significant technological change. While we believe that our development experience and scientific knowledge provide us with competitive advantages, we may face competition from large pharmaceutical and biotechnology companies, smaller pharmaceutical and biotechnology companies, specialty pharmaceutical companies, generic drug companies, academic institutions, government agencies and research institutions, and others.

Many of our competitors may have significantly greater financial, technical, and human resources than we have. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Our commercial opportunity could be reduced or eliminated if our competitors develop or market products or other novel technologies that are more effective, safer, or less costly than any that will be commercialized by us, or obtain regulatory approval for their products more rapidly than we may obtain approval for ours. Our success will be based in part on our ability to identify, develop, and manage a portfolio of drugs that are safer, more efficacious, and/or more cost-effective than alternative therapies.

### GOCOVRI™

The commercialization of new pharmaceutical products is highly competitive, and we face substantial competition with respect to GOCOVRI. For example, although GOCOVRI is the first and only FDA-approved medicine for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, we may face competition from various drugs approved for the treatment of Parkinson's disease, such as Azilect (Teva Pharmaceuticals Industries, Ltd.), Requip XL (GlaxoSmithKline plc), Mirapex ER (Boehringer Ingelheim Pharmaceuticals Inc.), Neupro Patch (UCB SA/NV), Sinemet (Merck & Co., Inc.), Parcopa (Schwartz Pharma, Mylan and others), Rytary (Impax), Duopa (AbbVie), Xadago (Newron Pharmaceuticals S.p.A.), Osmolex ER (Osmotica Pharmaceuticals LLC) and immediate release amantadine. Other products in late stage development for Parkinson's disease includes product candidates from Acorda, Mitsubishi Tanabe, Bial-Portela CSA, Genervon Biopharmaceuticals, and Pharma Two B. GOCOVRI may also face competition from drugs currently in development for dyskinesia in Parkinson's disease or for Parkinson's disease from a number of pharmaceutical companies, such as Novartis, Avanir Pharmaceuticals, Neurolixis, Amarantus BioScience, Addex Pharma, and Neurim Pharmaceuticals Ltd. In addition, GOCOVRI will face competition from the medical strategies historically used by physicians to manage dyskinesia, such as levodopa dose fractionation.

Many of our competitors, including a number of large pharmaceutical companies that compete directly with us, have significantly greater financial resources and expertise commercializing approved products than we do. Also, many of our competitors are large pharmaceutical companies that will have a greater ability to reduce prices for their competing drugs in an effort to gain market share and undermine the value proposition that we might otherwise be able to offer to payers.

Also, GOCOVRI may potentially face competition from other extended release versions of amantadine approved by the FDA that may be in development, even if not approved for the treatment of dyskinesia in patients with Parkinson's disease or approved without new clinical efficacy and safety data. For example, on February 16, 2018, the FDA approved Osmolex ER (amantadine) extended release tablets, manufactured by Osmotica Pharmaceuticals, LLC, for the treatment of Parkinson's disease and drug-induced extrapyramidal reactions.

### Namzaric/Namenda XR

In the market for Alzheimer's disease treatments, Namenda XR and Namzaric compete or will compete with branded and generic products such as galatamine, rivastigmine, and donepezil. In addition, Allergan currently markets Namenda, the immediate-release version of memantine, which physicians and patients may favor instead of Namenda

10

XR, the controlled-release version. In addition, generic versions of Namenda became available in 2015. Several generic manufacturers have or are currently seeking regulatory approval or have received regulatory approval to market generic versions of Namenda XR and Namzaric. We and our partner Allergan continue enforcement of our patent rights with respect to these products. We are also aware that other biopharmaceutical companies are developing treatments for Alzheimer's disease that may compete with Namenda XR and Namzaric. See *Litigation and Other Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report for more information.

**Manufacturing**

We currently have no manufacturing facilities and limited personnel with manufacturing experience. We rely on third-party manufacturers to produce bulk drug substance and finished drug products required for commercialization of GOCOVRI and to supply our clinical trials of ADS 5102 and our other product candidates. We plan to continue to rely upon contract manufacturers to manufacture commercial quantities of GOCOVRI, and for other product candidates, if and when we receive approval for marketing by the applicable regulatory authorities. With respect to GOCOVRI and our product candidates, we are seeking to qualify additional manufacturers of both bulk drug substance and finished drug products. For example, with respect to GOCOVRI, the FDA recently approved a supplemental new drug application by which we qualified a second manufacturing site with our current third-party manufacturer of GOCOVRI.

GOCOVRI and our product candidates are based upon controlled release coated pellet technology and can be difficult to manufacture. These products consist of an inert core, a drug layer, an optional seal coating, and controlled release coatings. Our products are made in a fluidized bed coating machine in sequential steps. Once the extended or modified release coating is applied, the coated pellets are tested to ensure that the desired dissolution rate is achieved. These coatings are relatively thin, and susceptible to changes in raw materials, temperature, humidity, and other manufacturing process parameters.

Allergan is responsible for all manufacturing related to Namzaric and Namenda XR.

Our third-party manufacturers, their facilities, and all lots of drug substance and drug products used commercially or in our clinical trials are required to be in compliance with current Good Manufacturing Practices, or cGMP. The cGMP regulations include requirements relating to organization of personnel, buildings and facilities, equipment, control of components and drug product containers and closures, production and process controls, packaging and labeling controls, holding and distribution, laboratory controls, records and reports, and returned or salvaged products. The manufacturing facilities for our products must meet cGMP requirements and FDA satisfaction before any product is approved and we can manufacture commercial products. Our third-party manufacturers are also subject to periodic inspections of facilities by the FDA and other authorities, including procedures and operations used in the testing and manufacture of our products to assess our compliance with applicable regulations. Failure to comply with statutory and regulatory requirements subjects a manufacturer to possible legal or regulatory action, including warning letters, the seizure or recall of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, and civil and criminal penalties. These actions could have a material impact on the availability of our products.

**Government regulation**

The FDA and comparable regulatory agencies in state and local jurisdictions and in foreign countries impose substantial requirements upon the clinical development, manufacture and marketing of pharmaceutical products. These agencies and other federal, state, and local entities regulate research and development activities and the testing, manufacture, quality control, safety, effectiveness, labeling, storage, recordkeeping, tracking, approval, import, export, advertising, and promotion of our products.

The process required by the FDA before product candidates may be marketed in the United States generally involves the following:

•    nonclinical laboratory and animal tests, including some that must be conducted in accordance with Good Laboratory Practices;

•    submission of an IND, which must become effective before clinical trials may begin;

11

- adequate and well-controlled human clinical trials to establish the safety and efficacy of the proposed drug candidate for its intended use;

- pre-approval inspection of manufacturing facilities and selected clinical investigators for their compliance with cGMP and Good Clinical Practices; and

- FDA approval of an NDA to permit commercial marketing for particular indications for use.

The testing and approval process requires substantial time, effort, and financial resources. Prior to commencing the first clinical trial with a product candidate, we must submit an IND to the FDA. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises safety concerns or questions about the conduct of the clinical trial by imposing a clinical hold. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. Submission of an IND may not result in FDA authorization to commence a clinical trial. A separate submission to the existing IND must be made for each successive clinical trial conducted during product development. Further, an independent institutional review board for each medical center proposing to conduct the clinical trial must review and approve the plan for any clinical trial and its informed consent form before the clinical trial commences at that center. Regulatory authorities or an institutional review board or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk. Some studies also include a data safety monitoring board, which receives special access to unblinded data during the clinical trial and may halt the clinical trial if it determines that there is an unacceptable safety risk for subjects or other grounds, such as no demonstration of efficacy.

In general, for purposes of NDA approval, human clinical trials are typically conducted in three sequential phases that may overlap.

- Phase 1—Studies are initially conducted to test the product candidate for safety, dosage tolerance, absorption, metabolism, distribution, and excretion in healthy volunteers or patients.

- Phase 2—Studies are conducted with groups of patients with a specified disease or condition to provide enough data to evaluate the preliminary efficacy, optimal dosages and dosing schedule, and expanded evidence of safety. Multiple Phase 2 clinical trials may be conducted to obtain information prior to beginning larger and more expensive Phase 3 clinical trials.

- Phase 3—These clinical trials are undertaken in larger patient populations to further evaluate dosage, to provide statistically significant evidence of clinical efficacy, and to further test for safety in an expanded patient population at multiple clinical trial sites. These clinical trials are intended to establish the overall risk/benefit ratio of the product and provide an adequate basis for product labeling. These trials may be done globally to support global registrations.

Our product development strategy often relies on using Phase 2/3 studies as a central element of our clinical development plans. Typically, these studies involve the testing of two or more doses of a product candidate, as is characteristic of a Phase 2 study, and also include a sufficient number of patients so that statistically significant evidence of efficacy can be obtained, as is characteristic of a Phase 3 study. In addition, we conduct the studies in a manner that we believe is consistent with the requirements for a Phase 3 study. We believe this approach has the potential to significantly shorten the time frame required for clinical development. The FDA generally requires that sponsors successfully complete two Phase 3 studies to obtain approval for a new drug, though in certain circumstances a single Phase 3 study is sufficient. We design and conduct our Phase 2/3 studies in a manner that is intended to allow the study to qualify as a Phase 3 study for the purposes of approval. The FDA has broad discretion in determining whether or not a completed Phase 2/3 study will be considered the equivalent of a Phase 3 study for the purposes of approval, and there can be no assurance that the FDA will agree with our assessment that the design, conduct, and results of a Phase 2/3 study are such that the study should be treated as a Phase 3 study.

The FDA may require, or companies may pursue, additional clinical trials after a product is approved. These so-called Phase 4 studies may be made a condition to be satisfied after approval. The results of Phase 4 studies can confirm the effectiveness of a product candidate and can provide important safety information.

12

Concurrent with clinical trials, companies usually complete additional animal studies and must also develop additional information about the chemistry and physical characteristics of the product candidate, as well as finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate and, among other things, must develop methods for testing the identity, strength, quality and purity of the final product. Additionally, appropriate packaging must be selected and tested, and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its shelf life.

*NDA submission, review and approval by the FDA*

The Federal Food, Drug, and Cosmetic Act ("FDCA") provides two pathways for the approval of new drugs through an NDA. An NDA under Section 505(b)(1) of the FDCA is a comprehensive application to support approval of a product candidate that includes, among other things, data and information to demonstrate that the proposed drug is safe and effective for its proposed uses, that production methods are adequate to ensure its identity, strength, quality, and purity of the drug, and that proposed labeling is appropriate and contains all necessary information. A 505(b)(1) NDA contains results of the full set of preclinical and clinical studies conducted by or on behalf of the applicant to characterize and evaluate the product candidate.

Section 505(b)(2) of the FDCA provides an alternate regulatory pathway to obtain FDA approval for new or improved formulations or new uses of previously approved drug products. Specifically, Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference. The applicant may rely to some extent upon the FDA's findings of safety and effectiveness for an approved product that acts as the reference listed drug ("RLD"), and submit its own product-specific data-which may include data from preclinical or clinical studies conducted by or on behalf of the applicant-to address differences between the product candidate and the RLD. GOCOVRI and our current and anticipated product candidates based upon ADS-5102 are or will be based on already approved active pharmaceutical ingredients ("API"), rather than new chemical entities, and a formulation that has been evaluated in Phase 1 studies. Accordingly, we expect to be able to rely on information from previously conducted studies involving our ADS-5102 formulation in our clinical development plans and our NDA submissions. For product candidates that involve novel fixed-dose combinations of existing drugs or for studies of an existing product or product candidate in a new indication, we expect that we will generally be able to initiate Phase 2/3 studies without conducting any new non-clinical or Phase 1 studies. In those instances where our product candidate includes previously unapproved API, we will need to conduct certain non-clinical and Phase 1 studies to investigate the safety and pharmacokinetic profile of the product candidate prior to conducting Phase 2/3 studies.

The submission of an NDA under either Section 505(b)(1) or Section 505(b)(2) generally requires payment of a substantial user fee to the FDA. The FDA reviews applications to determine, among other things, whether a product is safe and effective for its intended use and whether the manufacturing controls are adequate to assure and preserve the product's identity, strength, quality, and purity. For some NDAs, the FDA may convene an advisory committee to seek insights and recommendations on issues relevant to approval of the application. Although the FDA is not bound by the recommendation of an advisory committee, the agency usually follows such recommendations. Although the FDA did not do so upon the approval of GOCOVRI, the FDA may determine that a Risk Evaluation and Mitigation Strategy ("REMS"), is necessary to ensure that the benefits of a new product outweigh its risks, and the product can therefore be approved. A REMS may include various elements, ranging from a medication guide or patient package insert to limitations on who may prescribe or dispense the drug, depending on what the FDA considers necessary for the safe use of the drug. Under the Pediatric Research Equity Act, certain applications for approval must include an assessment, generally based on clinical study data, of the safety and effectiveness of the subject drug or biological product in relevant pediatric populations. Before approving an NDA, the FDA will inspect the facility or facilities where the product is manufactured. The FDA will not approve an application unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications.

Once the NDA submission has been accepted for filing, which occurs, if at all, within 60 days after submission of the NDA, the FDA's goal for a non-priority review of an NDA is ten months from submission for Section 505(b)(2) applications, although the review process can be and often is significantly extended by FDA requests for additional

13

information, studies, or clarification. Upon completion of its review, the FDA will respond to the applicant by approving the application or issuing a Complete Response letter. A Complete Response letter outlines deficiencies in the NDA and may request additional information, including additional preclinical or clinical data. Even if an applicant submits this additional information, the FDA may determine that the NDA still does not meet the standards for approval. Data from clinical trials are not always conclusive and the FDA may interpret data differently than the sponsor. The timing of approval, if any, of any NDA we submit will depend on when the FDA determines that the NDA satisfies all requirements for approval. Also, even if the FDA approves an NDA, such approval may entail limitations on the uses or conditions for which such product may be marketed, or the FDA may require Phase 4 post-marketing studies to monitor the safety or efficacy of the product, and may further limit the marketing of the product based on the results of these post-marketing studies. The FDA may withdraw approval of an NDA if the sponsor does not comply with extensive post-marketing regulatory requirements (as described below) or if problems occur after the product reaches the marketplace.

### The Hatch-Waxman Act

The Drug Price Competition and Patent Term Restoration Act of 1984, or the Hatch-Waxman Act, established two abbreviated approval pathways for pharmaceutical products that are in some way follow-on versions of already approved products: the 505(b)(2) NDA pathway, described above, and the abbreviated new drug application ("ANDA") pathway. To facilitate these abbreviated approval pathways, NDA applicants are required to list the FDA information concerning certain patents with claims that cover the applicant's product. Upon approval of an NDA and upon the issuance of any new patent claims that meet the requirements for submission to the FDA, the NDA holder is required to update the information and submit any new information concerning applicable patents, which will then be published in the FDA publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, also known as the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA (1) that no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) that such patent has expired; (3) the date on which such patent expires; or (4) that such patent is invalid or will not be infringed upon by the manufacture, use, or sale of the drug product for which the application is submitted. This last certification is known as a Paragraph IV certification. If the ANDA or 505(b)(2) applicant provides a Paragraph IV certification to the FDA, the competitor must also send notice of the Paragraph IV certification to the holder of the NDA for the RLD and the patent owner once the application has been accepted for filing by the FDA. The NDA holder or patent owner may then initiate a patent infringement lawsuit in response to the notice of the Paragraph IV certification. If the NDA holder or patent owner files a patent infringement lawsuit within 45 days of the receipt of a Paragraph IV certification, the FDA may not approve the 505(b)(2) application or ANDA until the earlier of 30 months from the date the NDA or patent holder receives notice of the certification, expiration of the patent, settlement of the lawsuit, or a decision in the infringement case that is favorable to the applicant. If a listed patent claims a method of using the approved drug, the ANDA or 505(b)(2) NDA applicant may, instead of submitting a certification to the patent, submit a "Section viii" statement certifying that the labeling for the proposed product does not contain, or carves out, any language regarding the patented method-of-use. We and Forest have received notices of ANDAs submitted to the FDA requesting permission to manufacture and market generic versions of Namenda XR and Namzaric, and we and Forest have agreed to settlements with certain ANDA filers on Namenda XR and Namzaric and we are currently in litigation with one filer in each case. For further information, see *Litigation and Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report.

The Hatch-Waxman Act also provides periods of regulatory exclusivity for products that would serve as RLDs for an ANDA or 505(b)(2) application. If a product is a new chemical entity, or NCE-generally meaning that the active moiety has never before been approved in any drug-there is a period of five years from the product's approval during which the FDA may not accept for filing any ANDA or 505(b)(2) application for a drug with the same active moiety. An ANDA or 505(b)(2) application may be submitted after four years, however, if the sponsor makes a Paragraph IV certification challenging a listed patent. Because of relevant statutory and regulatory provisions, as well as the time it takes for the FDA to review and approve an application, five-year NCE exclusivity usually effectively means an ANDA or 505(b)(2) application is not approved for a period well beyond five years after approval of the RLD.

A product, like GOCOVRI, that is not an NCE may qualify for a three-year period of exclusivity if the NDA contains clinical data that were necessary for approval. In that instance, the exclusivity period does not preclude filing or review of the ANDA or 505(b)(2) application; rather, the FDA may not grant final approval to the ANDA or 505(b)

(2) application until three years after approval of the RLD. Additionally, the exclusivity applies only to the conditions of approval that required submission of the clinical data. For example, if an NDA is submitted for a product that seeks approval for a new indication, and clinical data were required to demonstrate the safety or effectiveness of the product for that use, the FDA could not approve an ANDA or 505(b)(2) application for another product with that active moiety for that use. Upon receiving FDA approval, GOCOVRI received this three-year exclusivity for the submission of new clinical data that was necessary for approval.

The Hatch-Waxman Act also established provisions for patent term restoration, under which some of the term of a patent is extended, in order to compensate for time spent developing the product and for the FDA review and approval process. Generally, if an NDA represents the first time an active ingredient has been approved, the applicant can seek extension of one patent that claims the product. The additional patent term cannot exceed five years, and cannot extend the patent more than 14 years after the date of product approval. We currently do not anticipate applying for patent term extension for our product candidates.

### Orphan Drug designation and exclusivity

The Orphan Drug Act provides incentives for the development of drugs intended to treat rare diseases or conditions, which generally are diseases or conditions affecting less than 200,000 individuals in the United States. If a sponsor demonstrates that a drug or biologic is intended to treat a rare disease or condition and meets other qualifying criteria, the FDA grants orphan drug designation to the product for that use. The benefits of orphan drug designation include research and development tax credits and exemption from user fees. In general, a drug that is approved for the orphan drug designated indication is granted seven years of orphan drug exclusivity, and during that period, the FDA generally may not approve any other application for the same product for the same indication, although there are exceptions, most notably when the later product is shown to be clinically superior to the product with exclusivity.

### Post-approval requirements

Any drug products we manufacture, market, or distribute pursuant to FDA approvals are subject to continuing regulation by the FDA. For example, drug manufacturers and their subcontractors must register their establishments with the FDA and certain state agencies, and are subject to periodic unannounced inspections by regulatory authorities, including by the FDA for compliance with cGMP, which imposes significant manufacturing-related requirements. We cannot be certain that we or our present or future suppliers will be able to comply with the cGMP regulations and other regulatory requirements imposed by the FDA or other regulatory authorities. If we or our present or future suppliers are not able to comply with FDA requirements, for example, the FDA may take enforcement action, including, but not limited to, halting our clinical trials, requiring us to recall a product from distribution, or seeking to withdraw approval of an NDA or other necessary licenses.

The FDA closely regulates the marketing and promotion of drugs. A company's promotional claims about the safety and efficacy of its drug products must be consistent with FDA-approved labeling, truthful, and non-misleading. Failure to comply with these requirements can result in adverse publicity, warning or untitled letters, corrective advertising, and potential civil and criminal penalties. Physicians may legally prescribe approved drugs for uses that are not described in the product's labeling and that differ from those tested by us and approved by the FDA. Such "off-label" use is common in some areas of medicine and reflects physicians' professional judgment that such use is an appropriate treatment option for patients under certain circumstances. The FDA does not regulate physicians' practice of medicine, but the FDA does restrict manufacturers' communications about their drug products, including communications about unapproved uses of approved products.

In addition to these post-marketing requirements, companies that manufacture or distribute drug products or that hold approved NDAs must comply with numerous other post-marketing regulatory requirements, including submitting annual reports, reporting information about adverse drug experiences, and maintaining certain records.

The extensive laws and regulations that apply to the research, development, manufacture, quality control, safety, effectiveness, approval, labeling, storage, record keeping, reporting, distribution, import, export, advertising, and promotion of drug products and product candidates in the United States are subject to change, and it is difficult to foresee whether, how, and when such changes may affect our business.

*Other healthcare regulations*

Our business activities, including but not limited to, research, sales, promotion, distribution, medical education, and other activities following product approval will be subject to regulation by numerous regulatory and law enforcement authorities in the United States in addition to the FDA, including potentially the Department of Justice, the Department of Health and Human Services and its various divisions, including the Centers for Medicare and Medicaid Services, and state and local governments. Our business activities must comply with numerous healthcare laws, including but not limited to, the federal Anti-Kickback Statute, the False Claims Act, the Veterans Health Care Act, and similar state laws.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to induce or in return for purchasing, leasing, ordering, or arranging for the purchase, lease, or order of any item or service reimbursable under Medicare, Medicaid, or other federal healthcare programs. The term remuneration has been interpreted broadly to include anything of value. Liability under the Anti-Kickback Statute may be established without a person or entity having actual knowledge of the statute or specific intent to violate it. In addition, the government may assert that a claim including items or services resulting from a violation of the Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act. There are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution. We seek to comply with these exceptions and safe harbors whenever possible, but the exceptions and safe harbors are drawn narrowly and our business practices may be subject to scrutiny if they do not qualify for an exception or safe harbor or if there is no exception or safe harbor available. Failure to meet all of the requirements of a particular applicable statutory exception or regulatory safe harbor does not make the conduct per se illegal under the Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances.

The federal civil False Claims Act prohibits, among other things, any person or entity from knowingly presenting, or causing to be presented, a false claim for payment to, or approval by, the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The False Claims Act also permits a private individual acting as a "whistleblower" to bring actions on behalf of the federal government alleging violations of the statute and to share in any monetary recovery. Many pharmaceutical and other healthcare companies have been investigated or subject to lawsuits by whistleblowers and have reached substantial financial settlements with the federal government under the False Claims Act for a variety of alleged improper marketing activities. Pharmaceutical and other healthcare companies also are subject to other federal false claim laws, including federal criminal healthcare fraud and false statement statutes that extend to non-government health benefit programs.

We and our business activities are subject to the civil monetary penalties statute, which imposes penalties against any person or entity who, among other things, is determined to have presented or caused to be presented a claim to a federal health program that the person knows or should know is for an item or service that was not provided as claimed or is false or fraudulent.

Additionally, the federal Open Payments program requires manufacturers of drugs, devices, biological, and medical supplies for which payment is available under Medicare, Medicaid, or the Children's Health Insurance Program to report annually to the federal government information related to payments and other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists, and chiropractors) and teaching hospitals, as well as certain ownership and investment interests held by physicians and their immediate family members.

The majority of states also have statutes or regulations similar to the federal Anti-Kickback Statute and federal False Claims Act, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payer. These include state laws that require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and to report gifts and payments to individual physicians in the states; restrict when pharmaceutical companies may provide meals to prescribers or engage in other marketing related activities; and/or require pharmaceutical companies to implement compliance programs or marketing codes of conduct. Outside the U.S., we may be subject to similar regulations in those countries where we market and sell products.

16

In addition, we may be subject to data privacy and security regulations by both the federal government and the states in which we conduct our business. The legislative and regulatory landscape for privacy and data protection continues to evolve, and there has been an increasing focus on privacy and data protection issues which may affect our business. Numerous federal and state laws and regulations, including state security breach notification laws, state health information privacy laws and federal and state consumer protection laws, govern the collection, use, disclosure, and protection of personal information. Failure to comply with such laws and regulations could result in government enforcement actions and create liability for us (including the imposition of significant penalties), private litigation and/or adverse publicity that negatively affects our business. In addition, healthcare providers who prescribe our products and research institutions we collaborate with are subject to privacy and security requirements under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"). HIPAA and its implementing regulations impose certain requirements relating to the privacy, security and transmission of individually identifiable health information. Among other things, HITECH makes HIPAA's privacy and security standards directly applicable to business associates-independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates and possibly other persons, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions. In addition, state laws govern the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and may not have the same effect, thus complicating compliance efforts.

In order to be eligible to have our products paid for with federal funds under the Medicaid and Medicare Part B programs and purchased by certain federal agencies and grantees, we will have to comply with the Veterans Health Care Act of 1992 ("VHCA"). The VHCA requires manufacturers to offer their covered drugs (biologics and single source and innovator multiple source drugs) for sale to certain federal agencies, including but not limited to, the Department of Veterans Affairs ("VA"), on a Federal Supply Schedule contract, at a price no higher than the statutory Federal Ceiling Price ("FCP"). The FCP is based on the non-federal average manufacturer price, or Non-FAMP, which we will have to calculate and report to the VA on a quarterly and annual basis. In addition, the Federal Supply Schedule contract requires compliance with applicable federal procurement laws.

Depending on the circumstances, failure to comply with these laws can result in penalties, including criminal, civil, and/or administrative criminal penalties, damages, fines, disgorgement, exclusion of products from reimbursement under government programs, "qui tam" actions brought by individual whistleblowers in the name of the government, individual imprisonment, additional reporting requirements and oversight if we become subject to a corporate integrity agreement or similar agreement to resolve allegations of non-compliance with these laws, refusal to allow us to enter into supply contracts, including government contracts, reputational harm, diminished profits, and future earnings, and the curtailment or restructuring of our operations, any of which could adversely affect our business.

The United States and some foreign jurisdictions are considering or have enacted a number of legislative and regulatory proposals designed to change the healthcare system in ways that could affect our ability to sell our products profitably. Among policy makers and payers in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

For example, in March 2010, the Patient Protection and Affordable Care Act ("PPACA") was passed, which has substantially changed how health care is financed by both governmental and private insurers, and has significantly impacted the U.S. pharmaceutical industry. The PPACA, among other things, revised the methodology by which rebates owed by manufacturers to the state and federal government for covered outpatient drugs under the Medicaid Drug Rebate Program ("MDRP") are calculated, increased the minimum Medicaid rebates owed by most manufacturers under the MDRP, extended the MDRP to utilization of prescriptions of individuals enrolled in Medicaid managed care organizations, subjected manufacturers to new annual fees and taxes for certain branded prescription drugs, provided incentives to programs that increase the federal government's comparative effectiveness research, and provided for a Medicare Part D coverage gap discount program, in which manufacturers must agree to offer 50% point-of-sale

17

discounts off negotiated prices of applicable branded drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D.

Some of the provisions of the PPACA have yet to be fully implemented, and there have been legal and political challenges to certain aspects of the PPACA. Since January 2017, President Trump has signed two executive orders and other directives designed to delay, circumvent, or loosen certain requirements mandated by the PPACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the PPACA. While Congress has not passed repeal legislation, two bills affecting the implementation of certain taxes under the PPACA have been signed into law. The Tax Cuts and Jobs Act of 2017 includes a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the PPACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, on January 23, 2018, President Trump signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain PPACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices.

There has been heightened governmental scrutiny recently over pharmaceutical pricing practices in light of the rising cost of prescription drugs and biologics. Such scrutiny has resulted in several recent Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for products. At the federal level, Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have become increasingly active in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, have been designed to encourage importation from other countries and bulk purchasing.

We expect that the PPACA, as currently enacted or as it may be amended in the future, and other healthcare reform measures that may be adopted in the future, could have a material adverse effect on our industry generally and on our ability to maintain or increase sales of any of our product candidates that we successfully commercialize. There have also been proposals to impose federal rebates on Medicare Part D drugs, requiring federally-mandated rebates on all drugs dispensed to Medicare Part D enrollees or on only those drugs dispensed to certain groups of lower income beneficiaries. If any of these proposals are adopted, they could result in us owing additional rebates, which could have a negative impact on revenues from sales of any of our product candidates that we successfully commercialize.

*Pharmaceutical pricing and reimbursement*

Our ability to commercialize our product candidates successfully, and to attract commercialization partners for our products, will depend in significant part on the availability of adequate financial coverage and reimbursement from third-party payers, including, in the U.S., governmental payers such as the Medicare and Medicaid programs, managed care organizations, and private health insurers. We intend to participate in and then will have certain price reporting and other obligations to the Medicaid Drug Rebate program and other governmental pricing programs. These obligations are discussed in greater detail under the heading "If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs that we may join if we successfully commercialize any of our product candidates, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects" in Part 1, Item 1A. Risk Factors, of this Annual Report on Form 10-K. Political, economic, and regulatory influences are subjecting the healthcare industry in the U.S. to fundamental changes. There have been, and we expect there will continue to be, legislative and regulatory proposals to change the healthcare system in ways that could impact our ability to sell any of our product candidates that we successfully commercialize profitably. We expect to experience pricing pressure in the U.S. in connection with the sale of our products due to managed healthcare, the increasing influence of health maintenance organizations, additional legislative proposals to curb healthcare costs, and negative publicity regarding pricing and price increases generally, which could limit the prices that we charge for any of our product candidates that we successfully commercialize, limit our commercial opportunity, and/or negatively impact revenues from sales of our products. We anticipate that the U.S. Congress, state legislatures, and the private sector will

18

continue to consider and may adopt healthcare policies intended to curb rising healthcare costs, particularly given the current atmosphere of mounting criticism of prescription costs in the U.S. These cost containment measures include controls on government-funded reimbursement for drugs; new or increased requirements to pay prescription drug rebates to government health care programs; pharmaceutical cost transparency bills that aim to require drug companies to justify their prices; controls on healthcare providers; challenges to the pricing of drugs or limits or prohibitions on reimbursement for specific products through other means; requirements to try less expensive products or generics before a more expensive branded product; changes in drug importation laws; expansion of use of managed care systems in which healthcare providers contract to provide comprehensive healthcare for a fixed cost per person; and public funding for cost effectiveness research, which may be used by government and private third-party payers to make coverage and payment decisions. For example, much attention has been paid to legislation proposing federal rebates on Medicare Part D and Medicare Advantage utilization for drugs issued to certain groups of lower income beneficiaries and the desire to change the provisions that treat these dual-eligible patients differently from traditional Medicare patients. Any such changes could have a negative impact on revenues from sales of any of our product candidates that we successfully commercialize.

Coverage, reimbursement, and formulary placement decisions are being negotiated on a plan by plan basis for GOCOVRI for the treatment of dyskinesia in Parkinson's disease. Coverage, reimbursements, and placement decisions for a new product are based on many factors including the coverage, reimbursement, and placement of already marketed branded drugs for the same or similar indications, the safety and efficacy of the new product, availability of generics for similar indications, and the clinical need for the new product. Within the Medicare program, as self-administered drugs, GOCOVRI would be reimbursed under the expanded prescription drug benefit, known as Medicare Part D. This program is a voluntary Medicare benefit administered by private plans that operate under contracts with the federal government. These Part D plans negotiate discounts with drug manufacturers, which are passed on to each of the plan's enrollees. Historically, Part D beneficiaries have been exposed to significant out-of-pocket costs after they surpass an annual coverage limit and until they reach a catastrophic coverage threshold. However, changes made by recent legislation will reduce this patient coverage gap, known as the "donut hole", by transitioning patient responsibility in that coverage range from 100% in 2010 to only 25% in 2019. To help achieve this reduction, since 2011, pharmaceutical manufacturers are required to pay quarterly discounts of 50% off the negotiated price of branded drugs issued to Medicare Part D patients in the donut hole, and such quarterly discounts will increase to 75% in 2019.

If a drug product is reimbursed by Medicare or Medicaid, pricing and rebate programs must comply with the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, as applicable, as well as with the Medicaid rebate requirements of the Omnibus Budget Reconciliation Act of 1990, or the OBRA, and the Veterans Health Care Act of 1992, or the VHCA, each as amended. Among other things, the OBRA requires drug manufacturers to pay rebates on prescription drugs to state Medicaid programs and empowers states to negotiate rebates on pharmaceutical prices, which may result in prices for our future products that will likely be lower than the prices we might otherwise obtain. If products are made available to authorized users of the Federal Supply Schedule of the General Services Administration, additional laws and requirements apply.

Third-party payers decide which drugs they will pay for and establish reimbursement and co-pay levels. Third-party payers are increasingly challenging the prices charged for medical products and services and examining their cost effectiveness, in addition to their safety and efficacy. Even with studies, any of our product candidates that we successfully commercialize may be considered less safe, less effective, or less cost-effective than other products, and third-party payers may not provide coverage and reimbursement for any of our product candidates that we commercialize, in whole or in part. The process for determining whether a payer will provide coverage for a product may be separate from the process for setting the price or reimbursement rate that the payer will pay for the product once coverage is approved. Third-party payers may limit coverage to specific products on an approved list, or formulary, which might not include all of the approved products for a particular indication. For example, third-party payers have started to require discounts and/or exclusivity arrangements with some drug manufacturers in exchange for including a specific product on their formularies. Any such requirements could have a negative impact on revenues from sales of our products.

Payers also are increasingly considering new metrics as the basis for reimbursement rates, such as average sales price, average manufacturer price, and actual acquisition cost. The existing data for reimbursement based on these metrics is relatively limited, although certain states have begun to survey acquisition cost data for the purpose of setting

19

Medicaid reimbursement rates. Both Medicare and Medicaid are administered by the Centers for Medicare and Medicaid Services ("CMS"). CMS surveys and publishes retail community pharmacy acquisition cost information in the form of National Average Drug Acquisition Cost files to provide state Medicaid agencies with a basis of comparison for their own reimbursement and pricing methodologies and rates. It is difficult to project the impact of these evolving reimbursement mechanics on the willingness of payers to cover our products.

### The Foreign Corrupt Practices Act

The Foreign Corrupt Practices Act ("FCPA") prohibits any U.S. individual or business from paying, offering, or authorizing payment or offering of anything of value, directly or indirectly, to any foreign official, political party, or candidate for the purpose of influencing any act or decision of the foreign entity in order to assist the individual or business in obtaining or retaining business. The FCPA also obligates companies whose securities are listed in the United States to comply with accounting provisions requiring the company to maintain books and records that accurately and fairly reflect all transactions of the corporation, including international subsidiaries, and to devise and maintain an adequate system of internal accounting controls for international operations.

### Foreign regulation

In addition to regulations in the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial sales and distribution of our products to the extent we choose to develop or sell any products outside of the United States. Under an agreement with Forest, we hold the rights to manufacture and market an extended-release memantine and a fixed-dose combination of memantine and donepezil in ex-U.S. markets. However, we have not yet taken any steps to market these products. The approval process varies from country to country and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing the conduct of clinical trials, product licensing, pricing, and reimbursement vary greatly from country to country.

Under the European Union regulatory system, we may submit applications for marketing authorizations either under a centralized, decentralized, or mutual recognition marketing authorization procedure. The centralized procedure provides for the grant of a single marketing authorization for a medicinal product by the European Commission on the basis of a positive opinion by the EMA. A centralized marketing authorization is valid for all European Union member states and three of the four EFTA States (Iceland, Liechtenstein and Norway). The decentralized procedure and the mutual recognition procedure apply between European Union member states. The decentralized marketing authorization procedure involves the submission of an application for marketing authorization to the competent authority of all European Union member states in which the product is to be marketed. One national competent authority, selected by the applicant, assesses the application for marketing authorization. The competent authorities of the other European Union member states are subsequently required to grant marketing authorization for their territory on the basis of this assessment, except where grounds of potential serious risk to public health require this authorization to be refused. The mutual recognition procedure provides for mutual recognition of marketing authorizations delivered by the national competent authorities of European Union member states by the competent authorities of other European Union member states. The holder of a national marketing authorization may submit an application to the competent authority of a European Union member state requesting that this authority recognize the marketing authorization delivered by the competent authority of another European Union member state for the same medicinal product.

Medicinal products that are (a) used to treat or prevent life-threatening or chronically debilitating conditions that affect no more than five in 10,000 people in the European Union; or (b) used to treat or prevent life-threatening or chronically debilitating conditions and that, for economic reasons, would be unlikely to be developed without incentives; and (c) where no satisfactory method of diagnosis, prevention or treatment of the condition concerned exists, or, if such a method exists, the medicinal product would be of significant benefit to those affected by the condition, may be granted an orphan designation in the European Union. The application for orphan designation must be submitted to the EMA and approved before an application is made for marketing authorization for the product. Once authorized, orphan medicinal products are entitled to ten years of market exclusivity. During this ten-year period, with a limited number of exceptions, neither the competent authorities of the European Union member states, the EMA, or the European Commission are permitted to accept applications or grant marketing authorization for other similar medicinal products with the same therapeutic indication. However, marketing authorization may be granted to a similar medicinal product with the same orphan indication during the ten-year period with the consent of the marketing authorization holder for the original orphan medicinal product or if the manufacturer of the original orphan medicinal product is unable to supply sufficient

20

quantities. Marketing authorization may also be granted to a similar medicinal product with the same orphan indication if this latter product is safer, more effective or otherwise clinically superior to the original orphan medicinal product. The period of market exclusivity may, in addition, be reduced to six years if it can be demonstrated on the basis of available evidence that the original orphan medicinal product is sufficiently profitable not to justify maintenance of market exclusivity.

We are subject to the U.K. Bribery Act and other third country anti-corruption laws and regulations pertaining to our financial relationships with foreign government officials. The U.K. Bribery Act, which applies to any company incorporated or doing business in the UK, prohibits giving, offering, or promising bribes in the public and private sectors, bribing a foreign public official or private person, and failing to have adequate procedures to prevent bribery amongst employees and other agents. Penalties under the Bribery Act include potentially unlimited fines for companies and criminal sanctions for corporate officers under certain circumstances. Liability in relation to breaches of the Bribery Act is strict. This means that it is not necessary to demonstrate elements of a corrupt state of mind. However, a defense of having in place adequate procedures designed to prevent bribery is available.

**Employees**

As of December 31, 2017, we had 147 full-time equivalent employees. Of these employees, 25 were engaged in research and development. Our employees are not represented by labor unions or covered by collective bargaining agreements. We consider our relationship with our employees to be good.

**Corporate and other Information**

We were incorporated in Delaware in November 2000 under the name NeuroMolecular, Inc. In December 2004, we changed our name to NeuroMolecular Pharmaceuticals, Inc., and in July 2007 we changed our name to Adamas Pharmaceuticals, Inc.

Our principal executive offices are located at 1900 Powell Street, Suite 750, Emeryville, California 94608, and our telephone number is (510) 450-3500. Our website address is *www.adamaspharma.com*. References to our website address do not constitute incorporation by reference of the information contained on the website, and the information contained on the website is not part of this document.

We make available, free of charge on our corporate website, copies of our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, Proxy Statements, and all amendments to these reports, as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission pursuant to Section 13(a) or 15(d) of the Securities Exchange Act. We also show detail about stock trading by corporate insiders by providing access to SEC Forms 3, 4 and 5. The public may also read and copy any materials filed by us with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. This information may also be obtained from the SEC's on-line database, which is located at *www.sec.gov*. Our common stock is traded on the Nasdaq Stock Market under the symbol "ADMS".

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012. As such, we are eligible for exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies, including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 and reduced disclosure obligations regarding executive compensation. We will remain an emerging growth company until the earlier of (1) December 31, 2019, (2) the last day of the fiscal year (a) in which we have total annual gross revenue of at least $1.0 billion or (b) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (3) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

21

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition, results of operations, and future growth prospects. Our business could be harmed by any of these risks. The risks and uncertainties described below are not the only ones we face. The trading price of our common stock could decline due to any of these risks, and you may lose all or part of your investment. In assessing these risks, you should also refer to the other information contained in this Annual Report on Form 10-K, including our condensed consolidated financial statements and related notes.*

**Risks related to the commercialization of GOCOVRI™ (amantadine) extended release capsules (formerly ADS-5102)**

***Our success depends heavily on successful commercialization of GOCOVRI, which received approval in August 2017 from the U.S. Food and Drug Administration, or FDA, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. To the extent GOCOVRI is not commercially successful, our business, financial condition and results of operations will be materially harmed.***

We have invested and continue to invest a significant portion of our efforts and financial resources in the development, approval and now commercialization of GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. The success of GOCOVRI will depend on numerous factors, including:

- our success in commercializing GOCOVRI, including the marketing, sales, and distribution of the product;

- successfully establishing and maintaining commercial manufacturing with third parties;

- acceptance of GOCOVRI by physicians, patients and the healthcare community;

- the acceptance of pricing and placement of GOCOVRI on payers' formularies and the associated tiers;

- effectively competing with other approved or used medicines and future compounds in development;

- continued demonstration of an acceptable safety profile of GOCOVRI following approval; and

- obtaining, maintaining, enforcing, and defending intellectual property rights and claims.

If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully commercialize GOCOVRI, which would materially harm our business.

***GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business.***

GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, healthcare payers, and others in the healthcare community. The degree of market acceptance of GOCOVRI will depend on a number of factors, including:

- its efficacy, duration of response, and potential advantages compared to alternative treatments;

- the prevalence and severity of any side effects;

- the acceptability of the price of GOCOVRI relative to other treatments;

- the willingness of physicians to change their current treatment practices;

- its convenience and ease of administration compared to alternative treatments;

22

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the effectiveness of our marketing, promotion, selling, and distribution support; and

- the availability of third-party insurance coverage or reimbursement.

The failure of GOCOVRI to achieve market acceptance would negatively impact our business.

*If we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed.*

We currently have limited experience in marketing, selling and distributing pharmaceutical products. With respect to GOCOVRI in particular, it is a newly marketed drug and is the first and only drug approved by the FDA for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. Therefore, none of the members of our recently hired commercial team, including our sales force, has ever promoted GOCOVRI prior to its launch, and we have only recently established our distribution and reimbursement capabilities, all of which will be necessary to successfully commercialize GOCOVRI. As a result, we will be required to expend significant time and resources to market, sell, and distribute GOCOVRI to neurologists and movement disorder specialists in a credible, persuasive, and compliant manner consistent with applicable laws. There is no guarantee that the strategies, tactics and marketing messages, or the distribution and reimbursement capabilities, that we have developed will be successful. Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer. Also, if we are unable to effectively market and sell GOCOVRI for any reason, including ineffective training of our sales force or equipping them with ineffective materials, including medical and sales literature to help them inform and educate potential customers about the benefits and risks of GOCOVRI and its proper administration, our efforts to successfully commercialize could be put in jeopardy.

*Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.*

Our ability to commercialize GOCOVRI successfully in the United States will depend in part on the extent to which coverage and reimbursement for GOCOVRI becomes available from third-party payers, including government health administration authorities, such as those that administer the Medicare and Medicaid programs, and private health insurers. Patients who are prescribed medicine for the treatment of their conditions generally rely on third-party payers to reimburse all or part of the costs associated with their prescription drugs. Coverage and reimbursement discussions are currently ongoing with payers. Coverage and adequate reimbursement from both governmental healthcare programs, such as Medicare and Medicaid, and commercial payers are critical to GOCOVRI's commercial success. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available. For example, although no payer has done so to date, a payer may determine to require patients to use other formulations of amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI.

Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any newly approved medicine for a particular indication, there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI. Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. Coverage and reimbursement decisions for GOCOVRI by third-party payers are generally subject to change and may not be permanent.

23

Net prices for products may be reduced by mandatory discounts or rebates required by government healthcare programs, such as the federal 340B Drug Pricing Program, or by private third-party payers and could also be adversely affected by any future relaxation of laws that currently restrict imports of products from countries where they may be sold at lower prices than in the United States. In the United States, private third-party payers often rely upon Medicare coverage and reimbursement policies and payment limitations in setting their own coverage and reimbursement policies.

Our inability to promptly obtain coverage and adequate reimbursement rates from both government-funded and private third-party payers for GOCOVRI could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize products, and our overall financial condition.

***We face substantial competition in the commercialization of GOCOVRI.***

The commercialization of new pharmaceutical products is highly competitive, and we face substantial competition with respect to GOCOVRI. For example, although GOCOVRI is the first and only FDA-approved medicine for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, we may face competition from various drugs approved for the treatment of Parkinson's disease, such as Azilect (Teva Pharmaceuticals Industries, Ltd.), Requip XL (GlaxoSmithKline plc), Mirapex ER (Boehringer Ingelheim Pharmaceuticals Inc.), Neupro Patch (UCB SA/NV), Sinemet (Merck & Co., Inc.), Parcopa (Schwartz Pharma, Mylan and others), Rytary (Impax), Duopa (AbbVie), Xadago (Newron Pharmaceuticals S.p.A.), Osmolex ER (Osmotica Pharmaceuticals LLC) and immediate release amantadine. Other products in late stage development for Parkinson's disease includes product candidates from Acorda, Mitsubishi Tanabe, Bial-Portela CSA, Genervon Biopharmaceuticals, and Pharma Two B. GOCOVRI may also face competition from drugs currently in development for dyskinesia in Parkinson's disease or for Parkinson's disease from a number of pharmaceutical companies, such as Novartis, Avanir Pharmaceuticals, Neurolixis, Amarantus BioScience, Addex Pharma, and Neurim Pharmaceuticals Ltd. In addition, GOCOVRI will face competition from the medical strategies historically used by physicians to manage dyskinesia, such as levodopa dose fractionation.

Many of our competitors, including a number of large pharmaceutical companies that compete directly with us, have significantly greater financial resources and expertise commercializing approved products than we do. Also, many of our competitors are large pharmaceutical companies that will have a greater ability to reduce prices for their competing drugs in an effort to gain market share and undermine the value proposition that we might otherwise be able to offer to payers.

Also, GOCOVRI may potentially face competition from other extended release versions of amantadine approved by the FDA or that may be in development, even if not approved for the treatment of dyskinesia in patients with Parkinson's disease or approved without new clinical efficacy and safety data. For example, on February 16, 2018, the FDA approved Osmolex ER (amantadine) extended release tablets, manufactured by Osmotica Pharmaceuticals, LLC, for the treatment of Parkinson's disease and drug-induced extrapyramidal reactions in adult patients.

***If we are unable to maintain orphan exclusivity for GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, our business may be substantially harmed.***

Under the Orphan Drug Act, the FDA may designate a drug product as an orphan drug if it is a drug or biologic intended to treat a rare disease or condition. Generally, if a drug product with an orphan drug designation receives the first marketing approval for the indication for which it has such designation, the drug product is entitled to a period of marketing exclusivity, which may preclude the FDA from approving another marketing application for the same drug product for the same therapeutic indication. The applicable period of exclusivity is up to seven years in the United States. GOCOVRI received orphan designation for the treatment of levodopa-induced dyskinesia in 2015. When it was approved for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, GOCOVRI earned seven years of orphan drug exclusivity. The FDA has recognized GOCOVRI's orphan drug exclusivity by letter to us on its Orphan Drug Designation and Approvals database listing and the *Approved Drug Products with Therapeutic Equivalence Evaluations*, also known as the Orange Book.

Although we have obtained marketing approval for GOCOVRI for the treatment of dyskinesia, the FDA could still subsequently approve the same drug with the same active moiety for the same condition if the FDA concludes that

24

the later drug is safer or more effective or makes a major contribution to patient care, or if we are unable to assure that sufficient quantities of medicine are available to meet patient needs. If we are unable to maintain orphan drug exclusivity for GOCOVRI for the treatment of dyskinesia, our business would be substantially harmed.

***If manufacturers obtain approval for generic versions of GOCOVRI, or of products with which we compete, our business may suffer.***

Under the U.S. Food, Drug and Cosmetic Act, or FDCA, the FDA can approve an Abbreviated New Drug Application, or ANDA, for a generic version of a branded drug without the ANDA applicant undertaking the clinical testing necessary to obtain approval to market a new drug. Generally, in place of such clinical studies, an ANDA applicant usually needs only to submit data demonstrating that its product has the same active ingredient(s), strength, dosage form, route of administration and that it is bioequivalent to the branded product.

The FDCA requires that an applicant for approval of a generic form of a branded drug certify either that its generic product does not infringe any of the patents listed by the owner of the branded drug in the Orange Book or that those patents are not enforceable. This process is known as a paragraph IV challenge. Upon notice of a paragraph IV challenge, a patent owner has 45 days to bring a patent infringement suit in federal district court against the company seeking ANDA approval of a product covered by one of the owner's patents. If this type of suit is commenced, the FDCA provides a 30-month stay on the FDA's approval of the competitor's application. If the litigation is resolved in favor of the ANDA applicant or the challenged patent expires during the 30-month stay period, the stay is lifted and the FDA may thereafter approve the application based on the standards for approval of ANDAs. Once an ANDA is approved by the FDA, the generic manufacturer may market and sell the generic form of the branded drug in competition with the branded medicine.

The ANDA process can result in generic competition if the patents at issue are not upheld or if the generic competitor is found not to infringe the owner's patents. If this were to occur with respect to GOCOVRI or products with which it competes, our business would be materially harmed. Furthermore, even if ultimately successful, ANDA litigation can take several years and is generally time-consuming and costly. Such litigation has been commenced by Forest Laboratories Holdings Limited, or Forest, an indirect wholly-owned subsidiary of Allergan plc, referred to collectively with Forest as Allergan, and us to enforce certain patents related to Namenda XR® and Namzaric®. See *Litigation and Other Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report for more information. Based on adverse trial and appellate court rulings to date with respect to Namenda XR, we do not expect to receive royalties on net sales of Namenda XR due to the potential entry of generic versions of Namenda XR. The pending ANDA litigation with respect to Namzaric is at a very early stage.

***There is an ongoing open label safety study with GOCOVRI in Parkinson's disease patients with dyskinesia. New safety findings regarding GOCOVRI from this study could harm our business.***

There is an ongoing safety study with GOCOVRI. If any new safety concerns emerge from this ongoing clinical study, we may:

- have the product removed from the market;

- be subject to additional post-marketing testing requirements; or

- be subject to restrictions on how the product is distributed, marketed, or used.

Any of these unforeseen events could impair our ability to commercialize GOCOVRI and harm our business and results of operations.

***Unforeseen safety issues could emerge with GOCOVRI that could require us to change the prescribing information to add warnings, limit use of the product, and/or result in litigation. Any of these events could have a negative impact on our business.***

Discovery of unforeseen safety problems or increased focus on a known problem could impact our ability to commercialize GOCOVRI and could result in restrictions on its permissible uses, including withdrawal of the medicine from the market.

25

If we or others identify additional undesirable side effects caused by GOCOVRI after approval:

- regulatory authorities may require the addition of labeling statements, specific warnings, contraindications, or field alerts to physicians and pharmacies;

- regulatory authorities may withdraw their approval of the product and require us to take our approved drugs off the market;

- we may be required to change the way the product is administered, conduct additional clinical trials, change the labeling of the product, or implement a Risk Evaluation and Mitigation Strategy, or REMS;

- we may have limitations on how we promote our drugs;

- third-party payers may limit coverage or reimbursement for GOCOVRI;

- sales of GOCOVRI may decrease significantly;

- we may be subject to litigation or product liability claims; and

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of GOCOVRI and could substantially increase our commercialization costs and expenses, which in turn could delay or prevent us from generating significant revenue from its sale.

Further, GOCOVRI may also be affected by the safety and tolerability of its parent drug or drugs with similar mechanisms of action. Although amantadine, which is a component of GOCOVRI, has been used in patients for many years, newly observed toxicities or worsening of known toxicities in preclinical studies or in subjects in clinical studies receiving amantadine, or reconsideration of known toxicities of compounds in the setting of new indications, could result in increased regulatory scrutiny of our products and product candidates.

In addition, problems with approved products marketed by third parties that utilize the same therapeutic target or that belong to the same therapeutic class as amantadine could adversely affect the commercialization of GOCOVRI.

If a safety issue emerges post-approval, we may become subject to costly product liability litigation by our customers, their patients or payers. Product liability claims could divert management's attention from our core business, be expensive to defend, and result in sizable damage awards against us that may not be covered by insurance. If we cannot successfully defend ourselves against claims that GOCOVRI caused injuries, we will incur substantial liabilities. Regardless of merit or eventual outcome, liability claims may result in:

- decreased demand for any product candidates or products that we may develop;

- the inability to commercialize any products that we may develop;

- injury to our reputation and significant negative media attention;

- withdrawal of patients from clinical studies or cancellation of studies;

- significant costs to defend the related litigation;

- substantial monetary awards to patients; and

- loss of revenue.

We currently hold $10.0 million in product liability insurance coverage, which may not be adequate to cover all liabilities that we may incur. Insurance coverage is increasingly expensive. We may not be able to obtain insurance coverage at a reasonable cost or in amounts adequate to satisfy any liability or associated costs that may arise in the future. These events could harm our business and results of operations and cause our stock price to decline.

26

*The marketing and promotion of GOCOVRI will be limited to the approved indication for use and the information and clinical data included in or consistent with the approved prescribing information. If we want to expand the marketing and promotion of GOCOVRI beyond the approved indication or with information not consistent with the approved prescribing information, we will need to obtain additional regulatory approvals, which may not be granted.*

With the August 2017 approval of GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, we are permitted to market or promote it only for the treatment of dyskinesia and not for other uses. We are developing GOCOVRI for at least one additional indication, treatment of walking impairment in patients with multiple sclerosis, and potentially others. In order to market and promote GOCOVRI for these additional indications, we will need to conduct additional clinical trials that will likely be time-consuming and expensive to obtain regulatory approval for such uses. Additionally, our current marketing and promotional efforts will be limited to the use of information included in or deemed to be consistent with the approved prescribing information for GOCOVRI for the treatment of dyskinesia, including the clinical data and results reflected in the prescribing information. To use information not consistent with the approved prescribing information will require additional regulatory approvals.

*If we are found to have improperly promoted unapproved uses of GOCOVRI, or if physicians misuse it, we may be subject to restrictions on the sale or marketing of GOCOVRI and significant fines, penalties, sanctions and product liability claims, and our image and reputation within the industry and marketplace could be harmed.*

The FDA and other regulatory agencies, including regulatory authorities outside the United States, strictly regulate the marketing and promotional claims that are made about drug products, such as GOCOVRI. In particular, promotion for a product must be consistent with its labeling approved by the FDA or by regulatory agencies in other countries. For example, in the case of GOCOVRI, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, we cannot prevent physicians from prescribing GOCOVRI for indications or uses that are inconsistent with the approved label. If, however, we are found to have promoted such unapproved uses prior to the FDA's approval for an additional indication, we may, among other consequences, receive untitled or warning letters and become subject to significant liability, which would materially harm our business. Both the U.S. federal government and foreign regulatory authorities have levied significant civil and criminal fines against companies and individuals for alleged improper promotion and have entered into settlement agreements with pharmaceutical companies to limit inappropriate promotional activities. If we become the target of such an investigation or prosecution based on our marketing and promotional practices, we could face similar sanctions, which would materially harm our business. In addition, management's attention could be diverted from our business operations, significant legal expenses could be incurred, and our reputation could be damaged.

Physicians' prescribing of our products for unapproved uses may also subject us to product liability claims, to the extent such uses lead to adverse events, side effects, or injury. Product liability claims could divert management's attention from our core business, be expensive to defend, and result in sizable damage awards against us that may not be covered by insurance. Furthermore, the use of our products for indications other than those approved by the FDA or regulatory authorities outside the United States may not effectively treat such conditions, which could harm our reputation in the marketplace among physicians and patients. Any of these events could harm our business and results of operations and cause our stock price to decline.

*If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate Program or other governmental pricing programs in the United States, we could be subject to additional reimbursement requirements, fines, sanctions and exposure under other laws which could have a material adverse effect on our business, results of operations and financial condition.*

We will participate in the Medicaid Drug Rebate Program, as administered by the Centers for Medicare and Medicaid Services, or CMS, and other federal and state government pricing programs in the United States, and we may participate in additional government pricing programs in the future. These programs generally require us to pay rebates or otherwise provide discounts to government payers in connection with drugs that are dispensed to beneficiaries/recipients of these programs. In some cases, such as with the Medicaid Drug Rebate Program, the rebates are based on pricing that we report on a monthly and quarterly basis to the government agencies that administer the programs. Pricing requirements and rebate/discount calculations are complex, vary among products and programs, and are often subject to interpretation by governmental or regulatory agencies and the courts. The requirements of these programs, including, by

27

way of example, their respective terms and scope, change frequently. Responding to current and future changes may increase our costs, and the complexity of compliance will be time consuming. Invoicing for rebates is provided in arrears, and there is frequently a time lag of up to several months between the sales to which rebate notices relate and our receipt of those notices, which further complicates our ability to accurately estimate and accrue for rebates related to the Medicaid program as implemented by individual states. Thus, there can be no assurance that we will be able to identify all factors that may cause our discount and rebate payment obligations to vary from period to period, and our actual results may differ significantly from our estimated allowances for discounts and rebates. Changes in estimates and assumptions may have a material adverse effect on our business, results of operations and financial condition.

In addition, the Office of Inspector General of the Department of Health and Human Services and other Congressional enforcement and administrative bodies have recently increased their focus on pricing requirements for products, including, but not limited to the methodologies used by manufacturers to calculate average manufacturer price, or AMP, and best price, or BP, for compliance with reporting requirements under the Medicaid Drug Rebate Program. We are liable for errors associated with our submission of pricing data and for any overcharging of government payers. For example, failure to submit monthly/quarterly AMP and BP data on a timely basis could result in a civil monetary penalty of $18,107 per day for each day the submission is late beyond the due date. Failure to make necessary disclosures and/or to identify overpayments could result in allegations against us under the Federal False Claims Act and other laws and regulations. Any required refunds to the U.S. government or responding to a government investigation or enforcement action would be expensive and time consuming and could have a material adverse effect on our business, results of operations and financial condition. In addition, in the event that CMS were to terminate our rebate agreement, no federal payments would be available under Medicaid or Medicare for our covered outpatient drugs.

***GOCOVRI is complex to manufacture, and manufacturing disruptions may occur that could cause us to experience disruptions in the supply of GOCOVRI.***

GOCOVRI is an extended release version of amantadine. The manufacture of extended release versions of drugs is more complex than the manufacture of the immediate release versions of drugs. Notwithstanding the fact that we have validated our process, manufacturing disruptions may occur. Such problems may prevent the production of lots that meet the specifications required for sale of the product and may be difficult and expensive to resolve. If any such issues were to arise with respect to GOCOVRI or our future product candidates, our business, financial results, or stock price could be adversely affected.

**Risks related to our product candidates in clinical development**

***Our success depends on the timely clinical development, approval and successful commercialization of our product candidates. If we are unable to do any of these with our product candidates or if we experience significant delays in doing so, our business will be materially harmed.***

We have invested a significant portion of our efforts and financial resources into the development and potential commercialization of our product candidates, including ADS-5102 for the treatment of walking impairment in patients with multiple sclerosis, and potentially other indications, as well as ADS-4101 for the treatment of partial onset seizures in epilepsy. Our ability to generate product revenue will depend heavily on the successful development, regulatory approval, and commercialization of our other product candidates. The success of our product candidates will depend on numerous factors, including:

- successfully completing the development program for our product candidates in a timely manner;

- receiving marketing approval for our product candidates from the FDA in a timely manner;

- successfully establishing and maintaining commercial manufacturing with third parties;

- commercializing our product candidates, if approved, including marketing, sales, and distribution of the product independently or in partnership with another company;

- acceptance by the medical community and patients of the approved product;

28

- the pricing and placement of our product candidates on payers' formulary tiers and the reimbursement rates established for the approved products;

- effectively competing with other approved or used medicines and future compounds in development;

- continued demonstration of an acceptable safety profile of the approved products following approval; and

- obtaining, maintaining, enforcing, and defending intellectual property rights and claims.

If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business.

***We will face risks in the development of ADS-5102 (GOCOVRI) for additional indications, ADS-4101 and other product candidates.***

There are risks associated with pursuing clinical trials in other indications for ADS-5102 (GOCOVRI), ADS-4101 and other product candidates, as we may experience numerous unforeseen events during, or as a result of clinical studies that could harm our ability to commercialize such products and candidates or to receive regulatory approval, including that:

- clinical studies may produce negative or inconclusive results or raise significant safety concerns, and we may decide, or regulators may require us, to conduct additional clinical studies or abandon product development programs;

- even if clinical studies demonstrate statistically significant efficacy and acceptable safety, the FDA or similar authorities outside the United States may not consider the results of our studies to be sufficient for approval;

- our clinical sites and clinical investigators may fail to comply with, or inconsistently apply, the trial protocols, regulatory requirements including Good Clinical Practices, contractual obligations, and the rating assessments;

- our third-party vendors, including our Contract Research Organizations, or CROs, and contract manufacturing organizations, or CMOs, may fail to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;

- we might have to suspend or terminate clinical studies for various reasons, including a finding that our product candidates have unanticipated serious side effects or other unexpected characteristics or that the patients are being exposed to unacceptable health risks;

- regulators or institutional review boards may require that we or our investigators suspend or terminate clinical research for various reasons, including noncompliance with regulatory requirements;

- the supply or quality of ADS-5102, ADS-4101, or other materials necessary to conduct clinical studies may be insufficient or inadequate; and

- our new product discovery or research program may not be successful or warrant clinical development.

With respect to the development of additional indications for GOCOVRI, although the safety profile of amantadine, the active pharmaceutical ingredient in GOCOVRI, is already characterized in the approved label for amantadine (i.e., Symmetrel®) and in the GOCOVRI clinical trial data in the dyskinesia population, there can be no assurance that our clinical development program for ADS-5102 (GOCOVRI) for multiple sclerosis walking impairment or future studies in other indications will not reveal additional safety or tolerability issues that could lead to changes in the GOCOVRI prescribing information. In such an event, our ability to commercialize GOCOVRI for dyskinesia and/or expand our business could be compromised.

29

If we are forced to delay or abandon development of our product candidates, our business, results of operations, and financial condition will be materially and adversely harmed.

***We may expend our limited resources to pursue a particular product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

Because we have limited financial and managerial resources, we have chosen to focus on research programs and product candidates for specific indications. As a result, we may forego or delay pursuit of opportunities with other product candidates or other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our investment in current and future research and development programs and product candidates for specific indications may not yield any commercially viable products.

If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing, or other royalty arrangements in cases in which it would have been advantageous for us to retain sole development and commercialization rights.

***Failure to gain approval of or successfully commercialize our product candidates in the United States could substantially harm our business.***

Our product candidates will face the same or similar challenges in obtaining FDA approval and in commercialization as GOCOVRI, as outlined above, including but not limited to market acceptance by physicians and patients and coverage and reimbursement by third party payers.

***Failure to obtain regulatory approvals in foreign jurisdictions would prevent us from marketing our products internationally.***

We may decide to seek marketing authorizations to commercialize GOCOVRI, ADS-4101, and other future product candidates outside of the United States. To market our future products in the European Union, or EU, and many other foreign jurisdictions, we must obtain separate regulatory approvals. Specifically, in the EU, medicinal products can only be commercialized after obtaining a Marketing Authorization, or MA.

Before granting an MA, the European Medicines Agency, or EMA, or the competent authorities of the member states of the EU make an assessment of the risk-benefit balance of the product on the basis of a Common Technical Document including, among other information, scientific criteria concerning its quality, safety, and efficacy.

Similar to the United States, both MA holders and manufacturers of medicinal products are subject to comprehensive regulatory oversight by the EMA and the competent authorities of the individual EU member states both before and after grant of the manufacturing and Marketing Authorizations. This includes control of compliance with current good manufacturing practices, or cGMP, rules, which govern quality control of the manufacturing process and require documentation policies and procedures. We and our third-party manufacturers are required to ensure that all of our processes, methods, and equipment are compliant with cGMP. Failure by us or by any of our third-party partners, including suppliers, manufacturers, and distributors, to comply with EU laws and the related national laws of individual EU member states governing the conduct of clinical trials, manufacturing approval, marketing authorization of medicinal products, both before and after grant of marketing authorization, and marketing of such products following grant of authorization may result in administrative, civil, or criminal penalties. These penalties could include delays in or refusal to authorize the conduct of clinical trials or to grant Marketing Authorization, product withdrawals and recalls, product seizures, suspension, or variation of the marketing authorization, total or partial suspension of production, distribution, manufacturing, or clinical trials, operating restrictions, injunctions, suspension of licenses, fines, and criminal penalties.

We have had limited interactions with foreign regulatory authorities. The approval procedures vary among countries and can involve additional clinical testing, and the time required to obtain approval may differ from and be longer than that required to obtain FDA approval. Clinical studies conducted in one country may not be accepted by regulatory authorities in other countries. Approval by the FDA does not ensure approval by regulatory authorities in other countries, and approval by one or more foreign regulatory authorities does not ensure approval by regulatory authorities in other foreign countries or by the FDA. However, a failure or delay in obtaining regulatory approval in one country

may have a negative effect on the regulatory process in others. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval as well as additional, different risks.

There is no assurance that we will be able to obtain marketing authorizations in foreign countries on a timely basis, if at all. We may not be able to file for foreign regulatory approvals, and even if we file we may not receive necessary approvals to commercialize our products in any market. If we are unable to obtain non-U.S. regulatory approval to market our product candidates in other countries, we may not be able to achieve the financial results we project and our stock price could decline.

**Risks related to our reliance on third parties**

***We rely on third-party contract manufacturing organizations to manufacture, serialize and supply GOCOVRI and our product candidates. If one of our suppliers or manufacturers fails to perform adequately or fulfill our needs, we may be required to incur significant costs and devote significant efforts to find new suppliers or manufacturers and qualify them. We may also face delays in the development, commercialization, and supply of GOCOVRI or our product candidates.***

We currently have limited experience in, and we do not own facilities for, clinical and commercial manufacturing of GOCOVRI or our product candidates, and we rely upon third-party contract manufacturing organizations to manufacture, serialize and supply drug product for our clinical studies and to meet potential commercial demand. The manufacture of pharmaceutical products in compliance with the FDA's cGMP requires significant expertise and capital investment, including the development of advanced manufacturing techniques and process controls. Manufacturers of pharmaceutical products often encounter difficulties in production, including difficulties with production costs and yields, quality control, including stability of the product candidate and quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced cGMP requirements, other federal and state regulatory requirements, and foreign regulations. If our manufacturers were to encounter any of these difficulties or otherwise fail to comply with their obligations to us or under applicable regulations, our commercial supply of GOCOVRI or product candidates in our clinical trials could be jeopardized. Any delay or interruption in the supply of clinical study materials or commercial product could cause delays in our clinical programs, harm our ability to gain approval from regulatory authorities, and potentially disrupt patient access to our approved products. These events would substantially harm our business, reputation and stock price.

All third-party manufacturers of our products, product candidates and ingredients thereof must comply with cGMP requirements enforced by the FDA through its facilities inspection program. These requirements include, among other things, quality control, quality assurance, and the maintenance of records and documentation. Manufacturers of our products and product candidates may be unable to comply with these cGMP requirements and with other FDA, state and foreign regulatory requirements. The FDA or similar foreign regulatory agencies may also implement new standards at any time, or change their interpretation and enforcement of existing standards for manufacture, packaging, or testing of products. We have little control over our manufacturers' compliance with these regulations and standards. A failure to comply with these requirements may result in fines and civil penalties, suspension of production, suspension or delay in product approval, product seizure or recall, or withdrawal of product approval. If the safety of any product supplied is compromised due to our manufacturers' failure to adhere to applicable laws or for other reasons, we may not be able to obtain regulatory approval for or successfully commercialize our products or product candidates and we may be held liable for any injuries sustained as a result. Any of these factors could cause a delay of clinical studies, regulatory submissions, approvals, commercialization or supply of our products or product candidates, entail higher costs, impair our reputation, and potentially disrupt patient access or our approved products.

***We rely on a single source third-party contract manufacturing organization for the manufacture and supply of our drug substances for GOCOVRI and our other product candidates.***

We currently rely on single source suppliers for our drug substances for GOCOVRI and our other product candidates. We continue to seek additional long-term supply agreements with suppliers and supplier qualifications. A failure of our single source manufacturer or drug substance supplier or our failure to qualify at least one other manufacturer organization on a timely basis and validate the manufacturing process employed at that manufacturer or supplier could delay or harm commercialization of GOCOVRI or our product candidates. Although we believe

31

alternative sources of supply exist, the number of third-party suppliers with the necessary manufacturing and regulatory expertise and facilities is limited, and it could be expensive and take a significant amount of time to arrange and negotiate acceptable long-term contracts and obtain regulatory approvals and qualifications, which would adversely affect our business. New suppliers of any product candidate would be required to be qualified under applicable regulatory requirements, including demonstration of bioequivalence of the product made at the new supplier, and would need to have sufficient rights under applicable intellectual property laws to the method of manufacturing the product candidate. Obtaining the necessary FDA approvals or other qualifications under applicable regulatory requirements and ensuring non-infringement of third-party intellectual property rights could result in a significant interruption of supply and could require the new manufacturer to bear significant additional costs, which may be passed on to us. Qualifying and negotiating long-term contracts with manufacturers and providers of packaging services is a lengthy process. If at any time, one or more of our qualified contract manufacturing organizations were not able to manufacture our drug substance or drug product or provide the requisite services, our business and financial condition would be materially adversely affected.

***In our existing or any future potential collaborations or partnerships, we will likely not be able to control all aspects of the development and commercialization of our products or product candidates. This lack of control could subject us to additional risks that could harm our business.***

Collaborations or license agreements involving our current or future products are subject to numerous risks, which may include that:

- partners have significant discretion in determining the efforts and resources that they will apply to collaborations;

- partners may not pursue development and commercialization of our product candidates or may elect not to continue or renew development or commercialization programs based on clinical study results, changes in their strategic focus due to the acquisition of competitive products, availability of funding, or other external factors, such as a business combination that diverts resources or creates competing priorities;

- partners may delay clinical studies, provide insufficient funding for a clinical study program, stop a clinical study, abandon a product candidate, repeat or conduct new clinical studies, or require a new formulation of a product candidate for clinical testing;

- partners could independently develop, or develop with third parties, products that compete directly or indirectly with our products or product candidates;

- a partner with marketing, manufacturing, and distribution rights to one or more products may not commit sufficient resources to or otherwise not perform satisfactorily in carrying out these activities;

- we could grant exclusive rights to our partners that would prevent us from collaborating with others;

- Allergan and future partners may not properly maintain or defend our intellectual property rights or may use our intellectual property or proprietary information in a way that gives rise to actual or threatened litigation that could jeopardize or invalidate our intellectual property or proprietary information or expose us to potential liability;

- Allergan and future partners may not aggressively or adequately pursue litigation against ANDA filers or may settle such litigation on unfavorable terms, and as Allergan substantially controls the current ANDA litigation and terms of settlement and has different economic interests than ours, Allergan may grant licenses to generic manufacturers that permit them to make and sell generic versions of Namenda XR and Namzaric, which would negatively impact any royalties we may receive under our license with Allergan;

- disputes may arise between us and a partner that causes the delay or termination of the research, development, or commercialization of our current or future products or that results in costly litigation or arbitration that diverts management attention and resources;

32

- agreements may be terminated, sometimes at-will, without penalty, and, if terminated, may result in a need for additional capital to pursue further development or commercialization of the applicable current or future products;

- partners may own or co-own intellectual property covering our products that results from our collaborating with them, and in such cases, we would not have the exclusive right to commercialize such intellectual property; and

- a partner's sales and marketing activities or other operations may not be in compliance with applicable laws resulting in civil or criminal proceedings.

***We rely on third parties to conduct our clinical trials, and those third parties may not perform satisfactorily, including failing to meet deadlines for the completion of these trials.***

We do not independently conduct clinical studies of our product candidates. Instead, we rely on third parties, such as CROs, clinical data management organizations, medical institutions, and clinical investigators to perform this function. Our reliance on these third parties for clinical development activities reduces our control over these activities, but does not relieve us of our responsibilities. For example, the FDA requires us to comply with standards, commonly referred to as Good Clinical Practice, for conducting, recording, and reporting the results of clinical studies to assure that data and reported results are credible and accurate and that the rights, integrity, and confidentiality of patients in clinical studies are protected, even though we are not in control of these processes. These third parties may also have relationships with other entities, some of which may be our competitors. If these third parties do not successfully carry out their contractual duties, meet expected deadlines, or conduct our clinical studies in accordance with regulatory requirements or our stated protocols, we will not be able to obtain, or may be delayed in obtaining, regulatory approvals for our product candidates and will not be able to, or may be delayed in our efforts to, successfully commercialize our product candidates.

We also rely on other third parties to store and distribute supplies for our clinical studies. Any performance failure on the part of our existing or future distributors could delay clinical development or regulatory approval of our product candidates or commercialization of our products, producing additional losses and depriving us of potential product revenue.

**Risks related to government regulation**

***The regulatory approval process is expensive, time consuming, and uncertain and may prevent us or our collaboration partners from obtaining approvals for the commercialization of some or all of our product candidates.***

The research, development, manufacturing, quality control, labeling, approval, safety, effectiveness, storage, record keeping, reporting, selling, import, export, advertising, promotion, marketing, and distribution of drug products are subject to extensive regulation by the FDA and other regulatory authorities in the United States, and by regulatory authorities in other countries, with different regulations from country to country. Neither we nor our collaboration partners are permitted to market our product candidates in the United States or other countries until we receive FDA approval of an NDA. In August 2017, GOCOVRI was FDA-approved for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. The FDA will need to approve supplemental NDAs for GOCOVRI before we can market the drug for other indications, such as multiple sclerosis walking impairment.

To receive approval to commercialize any of our product candidates in the United States, we and our collaboration partners must demonstrate with substantial evidence from adequate and well-controlled clinical studies, and to the satisfaction of the FDA, that such product candidates are safe and effective for their intended uses. Results from preclinical studies and clinical studies can be interpreted in different ways. Even if we and our collaboration partners believe the preclinical or clinical data for our product candidates are promising, such data may not be sufficient to support approval by the FDA. Administering any of our product candidates to humans may produce undesirable side effects, which could interrupt, delay, or cause suspension of clinical studies of our product candidates and result in the denial of approval of our product candidates for any or all targeted indications.

33

FDA approval of an NDA is not guaranteed, and the approval process is expensive and may take several years. The FDA also has substantial discretion in the approval process. Despite the time and expense we invest, failure can occur at any stage, and we could encounter problems that require us to repeat clinical studies, perform additional preclinical studies and clinical studies, or abandon development and commercialization of a product candidate altogether. The number of preclinical studies and clinical studies that will be required for FDA approval varies depending on, among other factors, the product candidate, the disease or condition that the product candidate is designed to address, and the regulations applicable to any particular product candidate. The FDA can delay, limit, or deny approval of a product candidate for many reasons, including, but not limited to:

- disagreement with the design or implementation of our clinical trials;

- failure of clinical trials to show the level of statistical significance or clinical meaningfulness needed for approval;

- failure to demonstrate that a product candidate is safe or effective;

- insufficient data from preclinical and clinical studies to support an application;

- a finding by an institutional review board, or IRB, Data Safety Monitoring Board, or DSMB, Data Monitoring Committee, or DMC, or the FDA that the clinical trial exposes subjects or patients to an unacceptable health risk;

- disapproval of our or our third-party manufacturer's processes or facilities; or

- changes to FDA's approval policies or regulations.

If any of our product candidates fails to demonstrate safety and efficacy in clinical studies or does not gain regulatory approval, our business and results of operations will be materially and adversely harmed.

***If the FDA concludes that our product candidates do not satisfy the requirements for approval under the Section 505(b)(2) regulatory approval pathway, or if the requirements for approval under Section 505(b)(2) are not as we expect, the approval pathway for our products will likely take significantly longer, cost significantly more, and entail significantly greater complications and risks than anticipated, and in any case may not be successful. Similar obstacles may arise in other countries.***

Similar to the approval pathway for GOCOVRI, we are developing our current and future product candidates, with the expectation that they will be eligible for approval through the Section 505(b)(2) regulatory pathway. Section 505(b)(2) of the FDCA allows an NDA to rely in part on the FDA's prior conclusions regarding the safety and effectiveness of an approved drug product, or reference listed drug, or RLD. Use of the Section 505(b)(2) regulatory pathway could reduce the time required for the development programs of our product candidates by, for example, potentially decreasing the amount of preclinical and/or clinical data specific to a product candidate that we would need to generate in order to obtain FDA approval. If the FDA does not allow us to pursue the Section 505(b)(2) regulatory pathway as anticipated, we may need to conduct additional clinical trials, provide additional data and information, and meet additional standards for product approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates, and the complications and risks associated with regulatory approval would likely substantially increase. Moreover, our inability to pursue the Section 505(b)(2) regulatory pathway may result in competitive products reaching the market more quickly than our product candidates, which would adversely impact our competitive position and prospects. Even if we are able to utilize the Section 505(b)(2) regulatory pathway, there is no guarantee that utilizing this pathway will ultimately lead to faster product development or earlier approval for any product candidate that we may attempt to develop and commercialize.

An NDA submitted through the Section 505(b)(2) regulatory pathway for a drug product with an active moiety that has been previously approved in another product (e.g., amantadine) may be entitled to three years of regulatory exclusivity if the NDA contains data from clinical investigations (other than bioavailability or bioequivalence studies) conducted by or for the sponsor and deemed essential to FDA's approval of the NDA. This regulatory exclusivity precludes, among other things, approval of another 505(b)(2) NDA for a product with the same conditions of approval. Although obtaining such exclusivity for our product candidates could provide a competitive benefit for us, the

34

availability of such exclusivity to competitors, if their products were to be approved before our product candidates, presents a risk. If a competing product were approved in our target indication and granted three years of exclusivity, and if the FDA were to find that our product candidate does not differ with respect to the relevant conditions of approval of the approved competing product, then approval of the 505(b)(2) NDA for our product candidate in the target indication may be delayed for as long as the competitor has exclusivity.

With a Section 505(b)(2) NDA, we also must certify to the FDA concerning any patents listed for the RLD in the Orange Book. A certification that our product candidate does not infringe the RLD's Orange Book-listed patents, or that such patents are invalid (known as a paragraph iv certification) would require providing notice of that certification to the patent holder and the sponsor of the RLD NDA, and we could then be challenged in court by the patent owner or the holder of the approved NDA for the RLD. If such a lawsuit were to be filed within a specified timeframe, it would lead to a 30-month period during which FDA would be precluded from approving our NDA.

***With the approval of GOCOVRI, we will continue to be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense and subject us to penalties if we fail to comply with applicable regulatory requirements.***

With the approval of GOCOVRI, the manufacturing, marketing, and further development of the approved product are subject to continual review by the FDA and/or analogous non-U.S. regulatory authorities. Any regulatory approval that we or our collaboration partners receive for our product candidates will be subject to limitations on the indicated uses for which the product may be marketed, and may be subject to requirements for potentially costly post-marketing follow-up studies to monitor the safety and efficacy of the product. In addition, if the FDA and/or analogous non-U.S. regulatory authorities approve any of our product candidates, we will be subject to extensive and ongoing regulatory requirements with regard to the labeling, packaging, adverse event reporting, storage, distribution, advertising, promotion, tracking, recordkeeping, and periodic reporting for our products. Further, we and our contract manufacturers of our drug products are required to comply with cGMP regulations, which include requirements related to quality control and quality assurance and maintenance of records and documentation. Regulatory authorities must approve manufacturing facilities before they can be used to manufacture our drug products, and these facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with cGMP regulations. Certain changes to the manufacturing processes for our product candidates, if approved, would also be subject to pre-approval by regulatory authorities. In addition, if we or a third party discover previously unknown problems with a product, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory authority may impose restrictions on that product, its manufacturer, or us, including but not limited to requiring withdrawal of the product from the market or suspension of manufacturing. If we, our product candidates or the manufacturing facilities for our product candidates fail to comply with regulatory requirements of the FDA and/or applicable non-U.S. regulatory authorities, we could be subject to administrative or other sanctions, including:

- warning letters or untitled letters;

- civil or criminal penalties and fines;

- injunctions;

- suspension, variation, or withdrawal of regulatory approval;

- suspension of ongoing clinical studies;

- voluntary or mandatory product recalls;

- requirements for dissemination of corrective information or modifications to promotional materials;

- refusal to approve pending applications for marketing approval of new drugs or supplements to approved applications filed by us;

- refusal to permit import or export of our products;

35

- restrictions on operations, including costly new manufacturing requirements; or

- seizure or detention of our products.

Regulatory requirements and policies may change, and we may need to comply with additional laws and regulations that are enacted. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or in other countries. If we are not able to maintain regulatory compliance, we may not be permitted to market, or continue to market, our future products and our business may suffer.

***Changes in healthcare law and implementing regulations, including government restrictions on pricing and reimbursement, as well as healthcare policy and other healthcare payer cost-containment initiatives and current societal pressures regarding pharmaceutical product pricing, may negatively impact our ability to generate revenues from or could limit or prevent our product candidates' commercial success.***

In the United States, there have been and we expect there will continue to be a number of legislative and regulatory changes to the healthcare system that could affect our future revenue and profitability and the future revenue and profitability of our potential customers. Federal and state lawmakers regularly propose and, at times, enact legislation that would result in significant changes to the healthcare system, some of which are intended to contain or reduce the costs of medical products and services. For example, in March 2010, the Patient Protection and Affordable Care Act ("PPACA") was passed, which has substantially changed how healthcare is financed by both governmental and private insurers, and has significantly impacted the U.S. pharmaceutical industry. Details of changes under the PPACA are discussed in the business heading "Other healthcare regulations" in Part I, Item 1, of this Annual Report on Form 10-K.

Some of the provisions of the PPACA have yet to be fully implemented, and there have been legal and political challenges to certain aspects of the PPACA. Since January 2017, President Trump has signed two executive orders and other directives designed to delay, circumvent, or loosen certain requirements mandated by the PPACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the PPACA. While Congress has not passed repeal legislation, two bills affecting the implementation of certain taxes under the PPACA have been signed into law. The Tax Cuts and Jobs Act of 2017 includes a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the PPACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, on January 23, 2018, President Trump signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain PPACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices.

Other legislative changes have been proposed and adopted since the PPACA was enacted. These changes include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year pursuant to the Budget Control Act of 2011, which began in 2013 and will remain in effect through 2025 unless additional Congressional action is taken. The American Taxpayer Relief Act of 2012, among other things, further reduced Medicare payments to several providers, including hospitals and cancer treatment centers, increased the statute of limitations period for the government to recover overpayments to providers from three to five years. Additional changes that may affect our business include the expansion of new programs such as Medicare payment for performance initiatives for physicians under the Medicare Access and CHIP Reauthorization Act of 2015, or MACRA, which will be fully implemented in 2019. At this time it is unclear how the introduction of the Medicare quality payment program will impact overall physician reimbursement.

In addition, there have also been proposals to impose federal rebates on Medicare Part D drugs, requiring federally-mandated rebates on all drugs dispensed to Medicare Part D enrollees or on only those drugs dispensed to certain groups of lower income beneficiaries. If any of these proposals are adopted, they could result in our owing additional rebates, which could have a negative impact on revenues from sales of our products.

Also, there has been heightened governmental scrutiny recently over pharmaceutical pricing practices in light of the rising cost of prescription drugs and biologics. Such scrutiny has resulted in several recent Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to

36

product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for products. At the federal level, Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have become increasingly active in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, have been designed to encourage importation from other countries and bulk purchasing.

We expect that the PPACA, as currently enacted or as it may be amended in the future, and other healthcare reform measures that may be adopted in the future, could have a material adverse effect on our industry generally and on our ability to maintain or increase sales of our existing products.

The continuing efforts of the government, insurance companies, managed care organizations, other payers of healthcare services, and patient and political groups to contain or reduce costs of healthcare may, among other things, adversely affect:

- our ability to set a price we believe is fair for our products;

- the reputation of our company;

- our ability to generate revenue and achieve or maintain profitability; and

- the availability of capital.

Our ability to commercialize our products successfully, and to attract commercialization partners for our products, will depend in significant part on the availability of adequate financial coverage and reimbursement from third-party payers, including, in the United States, governmental payers such as the Medicare and Medicaid programs, managed care organizations and private health insurers. Details of these considerations are discussed in the business heading "Other healthcare regulations" in Part I, Item 1, of this Annual Report on Form 10-K.

***If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs that we may join if we successfully commercialize any of our product candidates, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

We intend to participate in and then will have certain price reporting obligations to the Medicaid Drug Rebate program and other governmental pricing programs.

Under the Medicaid Drug Rebate program, a manufacturer is required to pay a rebate to each state Medicaid program for its covered outpatient drugs that are dispensed to Medicaid beneficiaries and paid for by a state Medicaid program as a condition of having federal funds being made available to the states for our drugs under Medicaid and Medicare Part B. Those rebates are based on pricing data reported by the manufacturer on a monthly and quarterly basis to CMS, the federal agency that administers the Medicaid Drug Rebate program. These data include the average manufacturer price and, in the case of innovator products, the best price for each drug which, in general, represents the lowest price available from the manufacturer to any entity in the United States in any pricing structure, calculated to include all sales and associated rebates, discounts and other price concessions.

The PPACA made significant changes to the Medicaid Drug Rebate program, as discussed under the heading "Other healthcare regulations" in Part I, Item 1, of this Annual Report on Form 10-K. On February 1, 2016, CMS issued final regulations to implement the changes to the Medicaid Drug Rebate program under the PPACA. These regulations became effective on April 1, 2016. The issuance of regulations and coverage expansion by various governmental agencies relating to the Medicaid Drug Rebate program may increase our costs and the complexity of compliance and could have a material adverse effect on our results of operations if we participate in the Medicaid Drug Rebate Program if and when we successfully commercialize any of our product candidates.

Federal law requires that any company that participates in the Medicaid Drug Rebate program also participate in the Public Health Service's 340B drug pricing program in order for federal funds to be available for the manufacturer's

37

drugs under Medicaid and Medicare Part B. The 340B program requires participating manufacturers to agree to charge no more than the 340B "ceiling price" for the manufacturer's covered outpatient drugs to a variety of community health clinics and other entities that receive health services grants from the Public Health Service, as well as hospitals that serve a disproportionate share of low-income patients. The PPACA expanded the list of covered entities to include certain free-standing cancer hospitals, critical access hospitals, rural referral centers and sole community hospitals, but exempts "orphan drugs" from the ceiling price requirements for these covered entities. The 340B ceiling price is calculated using a statutory formula based on the average manufacturer price and rebate amount for the covered outpatient drug as calculated under the Medicaid Drug Rebate program. Changes to the definition of average manufacturer price and the Medicaid rebate amount under the Healthcare Reform Act and CMS's final regulations implementing those changes also could affect the 340B ceiling price calculations for any of our product candidates that we successfully commercialize and could negatively impact our results of operations.

The PPACA obligates the Secretary of the HHS to update the agreement that manufacturers must sign to participate in the 340B program to obligate a manufacturer to offer the 340B price to covered entities if the manufacturer makes the drug available to any other purchaser at any price and to report to the government the ceiling prices for its drugs. The Health Resources and Services Administration, or HRSA, recently initiated the process of updating the agreement with participating manufacturers. The PPACA also obligates the Secretary of the HHS to create regulations and processes to improve the integrity of the 340B program. In 2015, HRSA issued proposed omnibus guidance that addresses many aspects of the 340B program, and in August 2016, HRSA issued a proposed regulation regarding an administrative dispute resolution process for the 340B program. It is unclear when or whether the guidance or regulation will be released in final form under the Trump Administration. On January 5, 2017, HRSA issued a final regulation regarding the calculation of 340B ceiling price and the imposition of civil monetary penalties on manufacturers that knowingly and intentionally overcharge covered entities. The March 6, 2017 effective date of this regulation is subject to a temporary delay directed by the Trump Administration, and the regulation could be subject to further delay or other modification by the Trump Administration. Implementation of this final rule and the issuance of any other final regulations and guidance could affect our obligations under the 340B program in ways we cannot anticipate, if and when we successfully commercialize any of our product candidates and if we participate in the 340B program. In addition, legislation may be introduced that, if passed, would further expand the 340B program to additional covered entities or would require participating manufacturers to agree to provide 340B discounted pricing on drugs used in an inpatient setting.

Pricing and rebate calculations vary across products and programs, are complex, and are often subject to interpretation by the reporting manufacturer, governmental or regulatory agencies and the courts. In the case of Medicaid pricing data, if we join the Medicaid Drug Rebate Program and become aware that our reporting for a prior quarter was incorrect, or has changed as a result of recalculation of the pricing data, we will be obligated to resubmit the corrected data for up to three years after those data originally were due. Such restatements and recalculations would increase our costs for complying with the laws and regulations governing the Medicaid Drug Rebate program and could result in an overage or underage in our rebate liability for past quarters. Price recalculations also may affect the ceiling price at which we would be required to offer any of our product candidates that we successfully commercialize under the 340B drug discount program.

We will be liable for errors associated with any submission of pricing data. In addition to retroactive rebates and the potential for 340B program refunds, if we are found to have knowingly submitted any false price information to the government, we may be liable for civil monetary penalties in the amount of $178,156 per item of false information. Our failure to submit the required price data on a timely basis could result in a civil monetary penalty of $17,816 per day for each day the information is late beyond the due date. Such failure also could be grounds for CMS to terminate our Medicaid drug rebate agreement, pursuant to which we will participate in the Medicaid program if we join the program if and when we successfully commercialize any of our product candidates. In the event that CMS terminates our rebate agreement, federal payments may not be available under Medicaid or Medicare Part B for any of our product candidates that we successfully commercialize.

CMS and the OIG have pursued manufacturers that were alleged to have failed to report these data to the government in a timely manner. Governmental agencies may also make changes in program interpretations, requirements or conditions of participation, some of which may have implications for amounts previously estimated or paid. We

38

cannot assure you that our submissions, if we participate in the federal programs if and when we successfully commercialize any of our product candidates, will not be found by CMS to be incomplete or incorrect.

In order to be eligible to have any of our product candidates that we successfully commercialize paid for with federal funds under the Medicaid and Medicare Part B programs and purchased by the Department of Veterans Affairs, or VA, Department of Defense, Public Health Service, and Coast Guard, referred to collectively as the Big Four agencies, and certain federal grantees, we are required to participate in the VA Federal Supply Schedule, or FSS, pricing program, established under Section 603 of the Veterans Health Care Act of 1992. Under this program, we are obligated to make any of our product candidates that we successfully commercialize that meet the statutory definition of "covered drug" (biologics and single and innovator multiple source drugs) available for procurement on an FSS contract and charge a price to the Big Four agencies that is no higher than the Federal Ceiling Price, or FCP, which is a price calculated pursuant to a statutory formula. The FCP is derived from a calculated price point called the "non-federal average manufacturer price," or Non-FAMP, which we will be required to calculate and report to the VA on a quarterly and annual basis. Pursuant to applicable law, knowing provision of false information in connection with a Non-FAMP filing can subject a manufacturer to penalties of $178,156 for each item of false information. The FSS contract also contains extensive disclosure and certification requirements.

Under Section 703 of the National Defense Authorization Act for FY 2008, we will be required to pay quarterly rebates on utilization of innovator products that are dispensed through the Tricare network pharmacies to Tricare beneficiaries. The rebates are calculated as the difference between the annual Non-FAMP and FCP. If we overcharge the government in connection with the FSS contract or Tricare Retail Pharmacy Rebate Program, whether due to a misstated FCP or otherwise, we are required to refund the difference to the government. Failure to make necessary disclosures and/or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and any response to government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations, and growth prospects if we successfully commercialize any of our product candidates.

***If we fail to comply with healthcare regulations, we could face substantial penalties and our business, operations, and financial condition could be adversely affected.***

Healthcare providers, physicians, distributors, and third-party payers play a primary role in the distribution, recommendation, and prescription of any pharmaceutical product for which we obtain marketing approval. Our arrangements with third-party payers and customers expose us to broadly applicable federal and state fraud and abuse and other laws and regulations that may constrain the business or financial arrangements through which we market, sell and distribute GOCOVRI and other products for which we may obtain marketing approval. The laws and regulations that may affect our ability to operate include:

- the federal healthcare program Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully offering, paying, soliciting, or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce or reward either the referral of an individual for, or the purchase, order, lease, arrangement or recommendation of, any good, facility, item, or service for which payment may be made, in whole or in part, under federal healthcare programs, such as the Medicare and Medicaid programs. Liability under the Anti-Kickback Statute may be established without a person or entity having actual knowledge of the statute or specific intent to violate it. In addition, the government may assert that a claim including items or services resulting from a violation of the Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- the federal civil and criminal false claims laws, and civil monetary penalties laws, including the federal civil False Claims Act, which prohibits individuals or entities from, among other things, knowingly presenting, or causing to be presented, false or fraudulent claims for payment of government funds, or knowingly using false records or statements, to obtain payment from the federal government. In recent years, several pharmaceutical and other health care companies have faced enforcement actions under the False Claims Act for, among other things, allegedly submitting false or misleading pricing information to government healthcare programs, providing free product to customers with the expectation that the customers would bill federal programs, product and patient assistance programs, including reimbursement services, and marketing products for off-label or unapproved uses;

39

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which prohibits, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, regardless of the payer (e.g., public or private) and knowingly and willfully falsifying, concealing, or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, healthcare benefits, items, or services relating to healthcare matters.

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, and their implementing regulations, which impose obligations on HIPAA covered entities and their business associates, including mandatory contractual terms and required implementation of administrative, physical and technical safeguards to maintain the privacy and security of individually identifiable health information;

- the federal Physician Payments Sunshine Act, being implemented as the Open Payments Program, which requires manufacturers of drugs, devices, biologicals, and medical supplies for which payment is available under Medicare, Medicaid, or the Children's Health Insurance Program (with certain exceptions) to report annually to the federal government information related to payments and other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists, and chiropractors) and teaching hospitals, as well as certain ownership and investment interests held by physicians and their immediate family members; and

- analogous state laws and regulations, such as anti-kickback, and false claims laws, which may be broader in scope and apply to items or services reimbursed by any third-party payer, including commercial insurers. Several states also require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products in those states and to report gifts and payments to individual health care providers in those states. Some of these states also prohibit certain marketing-relating activities, including the provision of gifts, meals, or other items to certain health care providers. In addition, several states require pharmaceutical companies to implement compliance programs or marketing codes.

If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including civil, criminal and/or administrative penalties, damages, fines, disgorgement, possible exclusion from participation in Medicare, Medicaid, and other federal healthcare programs, individual imprisonment, additional reporting requirements and oversight if we become subject to a corporate integrity agreement or similar agreement to resolve allegations of non-compliance with these laws, reputational harm, diminished profits and future earnings, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our financial results. Any action against us for violation of these or other laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Moreover, achieving and sustaining compliance with applicable federal and state privacy, security, and fraud laws may prove costly.

In addition, in some foreign countries, the proposed pricing for a drug must be approved before it may be lawfully marketed. Moreover, the requirements governing drug pricing and reimbursement vary widely from country to country. For example, in the European Union the sole legal instrument at the European Union level governing the pricing and reimbursement of medicinal products is Council Directive 89/105/EEC (the Price Transparency Directive). The aim of the Price Transparency Directive is to ensure that pricing and reimbursement mechanisms established in European Union member states are transparent and objective, do not hinder the free movement and trade of medicinal products in the European Union, and do not hinder, prevent or distort competition on the market. The Price Transparency Directive does not, however, provide any guidance concerning the specific criteria on the basis of which pricing and reimbursement decisions are to be made in individual European Union member states. The national authorities of the individual European Union member states are free to restrict the range of medicinal products for which their national health insurance systems provide reimbursement and to control the prices and/or reimbursement of medicinal products for human use. Some individual European Union member states adopt policies according to which a specific price or level of reimbursement is approved for the medicinal product. Other European Union member states adopt a system of reference pricing, basing the price or reimbursement level in their territory either, on the pricing and reimbursement

40

levels in other countries, or on the pricing and reimbursement levels of medicinal products intended for the same therapeutic indication. Furthermore, some European Union member states impose direct or indirect controls on the profitability of the company placing the medicinal product on the market.

Health Technology Assessment, or HTA, of medicinal products is becoming an increasingly common part of the pricing and reimbursement procedures in some European Union member states. These countries include the United Kingdom, France, Germany, and Sweden. The HTA process in the European Union member states is governed by the national laws of these countries. HTA is the procedure according to which the assessment of the public health impact, therapeutic impact and the economic and societal impact of the use of a given medicinal product in the national healthcare systems of the individual country is conducted. HTA generally focuses on the clinical efficacy and effectiveness, safety, cost, and cost-effectiveness of individual medicinal products as well as their potential implications for the national healthcare system. Those elements of medicinal products are compared with other treatment options available on the market.

The outcome of HTA may influence the pricing and reimbursement status for specific medicinal products within individual European Union member states. The extent to which pricing and reimbursement decisions are influenced by the HTA of a specific medicinal product vary between the European Union member states.

In 2011, Directive 2011/24/EU was adopted at European Union level. This Directive concerns the application of patients' rights in cross-border healthcare. The Directive is intended to establish rules for facilitating access to safe and high-quality cross-border healthcare in the European Union. Pursuant to Directive 2011/24/EU, a voluntary network of national authorities or bodies responsible for HTA in the individual EU member states was established. The purpose of the network is to facilitate and support the exchange of scientific information concerning HTAs. This could lead to harmonization between European Union member states of the criteria taken into account in the conduct of HTA in pricing and reimbursement decisions and negatively impact price in at least some European Union member states.

***If we fail to comply with data protection laws and regulations, we could be subject to government enforcement actions (which could include civil or criminal penalties), private litigation and/or adverse publicity, which could negatively affect our operating results and business.***

We are subject to data protection laws and regulations (i.e., laws and regulations that address privacy and data security). In the United States, numerous federal and state laws and regulations, including state data breach notification laws, state health information privacy laws, and federal and state consumer protection laws (e.g., Section 5 of the Federal Trade Commission Act), govern the collection, use, disclosure, and protection of health-related and other personal information. Failure to comply with data protection laws and regulations could result in government enforcement actions and create liability for us, including civil and/or criminal penalties, private litigation and/or adverse publicity that could negatively affect our operating results and business. In addition, we may obtain health information from third parties (e.g., healthcare providers who prescribe our products) that are subject to privacy and security requirements under HIPAA, as amended by HITECH. Although we are not directly subject to HIPAA—other than potentially with respect to providing certain employee benefits—we could be subject to criminal penalties if we knowingly obtain or disclose individually identifiable health information maintained by a HIPAA-covered entity in a manner that is not authorized or permitted by HIPAA. HIPAA generally requires that healthcare providers and other covered entities obtain written authorizations from patients prior to disclosing protected health information of the patient (unless an exception to the authorization requirement applies). If authorization is required and the patient fails to execute an authorization or the authorization fails to contain all required provisions, then we may not be allowed access to and use of the patient's information and our research efforts could be delayed. Furthermore, use of protected health information that is provided to us pursuant to a valid patient authorization is subject to the limits set forth in the authorization (e.g., for use in research and in submissions to regulatory authorities for product approvals). In addition, HIPAA does not replace federal, state, international or other laws that may grant individuals even greater privacy protections.

EU member states and other jurisdictions where we operate have adopted data protection laws and regulations, which impose significant compliance obligations. For example, the EU Data Protection Directive imposes strict obligations and restrictions on the ability to collect, analyze and transfer personal data, including health data from clinical trials and adverse event reporting. Switzerland has adopted similar restrictions. Data protection authorities from the different EU member states may interpret the applicable laws differently, and guidance on implementation and compliance practices are often updated or otherwise revised, which adds to the complexity of processing personal data in

41

the EU. Although there are legal mechanisms to allow for the transfer of personal data from the EU to the U.S., the decision of the European Court of Justice in the *Schrems* case (Case C-362/14 Maximillian Schrems v. Data Protection Commissioner) invalidated the Safe Harbor framework and increased uncertainty around compliance with European Union restrictions on cross-border data transfers. As a result of the decision, it was no longer possible to rely on safe harbor certification as a legal basis for the transfer of personal data from the EU to entities in the U.S. On February 29, 2016, however, the European Commission announced an agreement with the United States Department of Commerce ("DOC") to replace the invalidated Safe Harbor framework with a new EU-U.S. "Privacy Shield." On July 12, 2016, the European Commission adopted a decision on the adequacy of the protection provided by the Privacy Shield. The Privacy Shield is intended to address the requirements set out by the European Court of Justice in its ruling by imposing more stringent obligations on companies, providing stronger monitoring and enforcement by the DOC and Federal Trade Commission, and making commitments on the part of public authorities regarding access to information. U.S. companies have been able to certify to the U.S. DOC their compliance with the privacy principles of the Privacy Shield since August 1, 2016. On September 16, 2016, the Irish privacy advocacy group Digital Rights Ireland brought an action for annulment of the European Commission decision on the adequacy of the Privacy Shield before the European Court of Justice (Case T-670/16). Case T-670/16 is still pending. If, however, the European Court of Justice invalidates the Privacy Shield, it will no longer be possible to rely on the Privacy Shield certification to support transfer of personal data from the European Union to entities in the US. Adherence to the Privacy Shield is not, however, mandatory. U.S.-based companies are permitted to rely either on their adherence to the EU-US Privacy Shield or on the other authorized means and procedures to transfer personal data provided by the EU Data Protection Directive.

In December 2015, a proposal for an EU General Data Protection Regulation, intended to replace the current EU Data Protection Directive, introducing new data protection requirements in the EU, as well as substantial fines for breaches of the data protection rules, was agreed between the European Parliament, the Council of the European Union, and the European Commission. The EU General Data Protection Regulation entered into force on May 24, 2016 and will apply from May 25, 2018. The EU Data Protection Regulation will increase our responsibility and liability in relation to personal data that we process and we will also face substantial fines for breaches of the data protection rules. We may be required to put in place additional mechanisms ensuring compliance with the new EU data protection rules. Furthermore, there is a growth towards the public disclosure of clinical trial data in the European Union which adds to the complexity of processing health data from clinical trials.

If we or our vendors fail to comply with applicable data privacy laws, or if the legal mechanisms we or our vendors rely upon to allow for the transfer of personal data from the EU or Switzerland to the U.S. (or other countries not considered by the European Commission to provide an adequate level of data protection) are not considered adequate, we could be subject to government enforcement actions and significant penalties against us, and our business could be adversely impacted if our ability to transfer personal data outside of the European Union or Switzerland is restricted.

**Risks related to intellectual property**

***Our ability to successfully commercialize GOCOVRI and our product candidates may be materially adversely affected if we are unable to obtain and maintain effective intellectual property rights for our products and product candidates.***

Our success depends in large part on our ability to obtain and maintain patent and other intellectual property protection in the United States and in other countries with respect to GOCOVRI and our product candidates. We have sought to protect GOCOVRI and our product candidates by filing patent applications in the United States and abroad related to our novel technologies and products that are important to our business. This process is expensive and time-consuming, and we may not be able to file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. In addition, we may not pursue or obtain patent protection in all relevant markets. It is also possible that we will fail to identify patentable aspects of our research and development output before it is too late to obtain patent protection. Our pending and future patent applications may not result in patents being issued which protect our technology or products, in whole or in part. In addition, our existing patents and any future patents we obtain may not be sufficiently broad to prevent others from using our technologies or from developing competing products and technologies.

42

The patent position of pharmaceutical and biotechnology companies generally is highly uncertain and involves complex legal and factual questions for which many legal principles remain unresolved. In recent years, patent rights have been the subject of significant litigation. As a result, the issuance, scope, validity, enforceability, and commercial value of our patent rights are highly uncertain. Our pending and future patent applications may not result in patents being issued in the United States or in other jurisdictions which protect our technology or products or which effectively prevent others from commercializing competitive technologies and products. Changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our patents or narrow the scope of our patent protection. In addition, the laws of foreign countries may not protect our rights to the same extent as the laws of the United States. Publications of discoveries in the scientific literature often lag behind the actual discoveries, and patent applications in the United States and other jurisdictions are typically not published until 18 months after filing, or in some cases not at all. Therefore, we cannot be certain that we were the first to make the inventions claimed in our patents or pending patent applications, or that we were the first to file for patent protection of such inventions. In addition, the United States Patent and Trademark Office, or USPTO, might require that the term of a patent issuing from a pending patent application be disclaimed and limited to the term of another patent that is commonly owned or names a common inventor. As a result, the issuance, scope, validity, enforceability, and commercial value of our patent rights is highly uncertain.

Recent or future patent reform legislation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. In March 2013, under the Leahy-Smith America Invents Act, or America Invents Act, the United States moved from a "first to invent" to a "first-to-file" system. Under a "first-to-file" system, assuming the other requirements for patentability are met, the first inventor to file a patent application generally will be entitled to a patent on the invention regardless of whether another inventor had made the invention earlier. The America Invents Act includes a number of other significant changes to U.S. patent law, including provisions that affect the way patent applications are prosecuted, redefine prior art and establish a new post-grant review system. The effects of these changes are currently unclear and/or uncertain, as the USPTO only recently developed new regulations and procedures in connection with the America Invents Act and many of the substantive changes to patent law, including the "first-to-file" provisions, only became effective in March 2013. In addition, the courts have only recently started to address these provisions such that the law is still developing, and the applicability of the act and new regulations on specific patents discussed herein have not been determined and would need to be reviewed. However, the America Invents Act and its continued implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents, all of which could have a material adverse effect on our business and financial condition.

From time to time, we may become involved in opposition, interference, derivation, *inter partes* review, or other proceedings challenging our patent rights or the patent rights of others, and the outcome of any proceedings are highly uncertain. An adverse determination in any such proceeding could reduce the scope of, or invalidate, our patent rights, allow third parties to commercialize our technology or products and compete directly with us or Allergan, without payment to us.

Even if our patent applications issue as patents, they may not issue in a form that will provide us with any meaningful protection, prevent competitors from competing with us, or otherwise provide us with any competitive advantage. Our competitors may be able to circumvent our owned or licensed patents by developing similar or alternative technologies or products in a non-infringing manner. The issuance of a patent is not conclusive as to its scope, validity, or enforceability, and our owned and licensed patents may be challenged in the courts or patent offices in the United States and abroad. Such challenges may result in the patent claims of our owned or licensed patents being narrowed, invalidated, or held unenforceable, which could limit our ability to stop or prevent us from stopping others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. Given the amount of time required for the development, testing, and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours or otherwise provide us with a competitive advantage.

For our partnered assets, like Namzaric, we may not have the right to control the prosecution of patent application, or to maintain or enforce the patent, covering our products or product candidates that we license to third parties or that we may license from third parties. Therefore, we cannot be certain that these patents and applications will

43

be prosecuted and enforced in a manner consistent with the best interests of our business. In addition, if third parties who license patents to us or from us fail to maintain such patents, or lose rights to those patents, the rights we have licensed may be reduced or eliminated.

***We may not be able to protect our intellectual property rights throughout the world.***

Filing, prosecuting, and defending patents on all of our product candidates throughout the world would be prohibitively expensive. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products and, further, may export otherwise infringing products to territories where we have patent protection but where enforcement is not as strong as in the United States. These products may compete with our product candidates in jurisdictions where we do not have any issued patents, and our patent claims or other intellectual property rights may not be effective or sufficient to prevent them from so competing. Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biopharmaceuticals, which could make it difficult for us to stop the infringement of our patents or marketing of competing products against third parties in violation of our proprietary rights generally. The initiation of proceedings by third parties to enforce our patent rights in foreign jurisdictions could result in substantial cost and divert our efforts and attention from other aspects of our business.

***Obtaining and maintaining our patent protection depends upon compliance with various procedural, document submission, fee payment, and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.***

The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment, and other provisions during the patent prosecution process and following the issuance of a patent. Our failure to comply with such requirements could result in abandonment or lapse of a patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. In such an event, competitors might be able to enter the market earlier than would otherwise have been the case if our patent were in force.

***We may become involved in lawsuits or other proceedings to protect or enforce our patents or other intellectual property, which could be expensive, time-consuming, and if unsuccessful could materially harm our business.***

Competitors may infringe or otherwise violate our patents, trademarks, copyrights or other intellectual property for GOCOVRI, our partnered products, and our product candidates. To counter infringement or unauthorized use, we or our licensees may be required to file infringement claims, which can be expensive and time-consuming. For example, we, Forest, Forest Laboratories, Inc., Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH filed patent infringement lawsuits under Forest's patents and patents owned by us and licensed to Forest, against several manufacturers of generic pharmaceuticals that have filed ANDAs with the FDA seeking approval to manufacture and sell generic versions of Namzaric and Namenda XR.

We anticipate that the prosecution of the lawsuits related to our partnered products and any lawsuits related to GOCOVRI will require a significant amount of time and attention of our chief executive officer and other senior executives. In addition, in a patent infringement proceeding, a court may decide that a patent of ours is invalid or unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the product in question. An adverse result in any litigations or proceeding could put one or more of our patents at risk of being invalidated or interpreted narrowly. Such a result could limit our ability to prevent others from using or commercializing similar or identical products, limit our ability to prevent others from launching generic versions of our products and could limit the duration of patent protection for our products, all of which could have a material adverse effect on our business. Also, a successful challenge to our patents could reduce or eliminate our right to receive royalties from Forest. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation.

44

***Third parties may initiate legal proceedings alleging that we or our partners are infringing their intellectual property rights, the outcome of which would be uncertain and could have a material adverse effect on the success of our business.***

Our commercial success depends upon our ability and the ability of our partners to develop, manufacture, market, and sell our product candidates and to use our proprietary technologies without infringing, misappropriating, or otherwise violating the proprietary rights or intellectual property of third parties. We or our partners may become party to, or be threatened with, future adversarial proceedings or litigation regarding intellectual property rights with respect to our products and technology, including interference, derivation, re-examination, *inter partes* review, post-grant review, opposition, or similar proceedings before the USPTO and its foreign counterparts. The costs of these proceedings could be substantial, and the proceedings may result in a loss of such intellectual property rights. Some of our competitors may be able to sustain the costs of complex patent disputes and litigation more effectively than we can, because they have substantially greater resources. In addition, any uncertainties resulting from the initiation and continuation of any disputes or litigation could adversely affect our ability to raise the funds necessary to continue our operations. Third parties may assert infringement claims against us or our partners based on existing patents or patents that may be granted in the future. Under our license agreement with Allergan we are obliged to indemnify Allergan under certain circumstances and our royalty entitlements may also be reduced. Our indemnification obligation to Allergan, while subject to customary limitations, has no monetary cap, and our right to receive royalties from Allergan may be eliminated in any calendar quarter in which certain third party generic competition exists. If we or our partners are found to infringe a third-party's intellectual property rights, we could be required to obtain a license from such third-party to continue developing and marketing our products and technology. However, we may not be able to obtain any required license on commercially reasonable terms or at all. Even if we were able to obtain a license, it could be non-exclusive, thereby giving our competitors access to the same technologies licensed to us. We could be forced, including by court order, to cease commercializing the infringing technology or product. In addition, we could be found liable for monetary damages. A finding of infringement could prevent us from commercializing our product candidates or force us to cease some of our business operations, which could materially harm our business. Claims that we have misappropriated the confidential information or trade secrets of third parties could have a similar negative impact on our business.

***We may be unable to protect the confidentiality of our trade secrets, thus harming our business and competitive position.***

In addition to our patented technology and products, we rely upon trade secrets, including unpatented know-how, technology, and other proprietary information, to develop and maintain our competitive position, which we seek to protect, in part, by confidentiality agreements with our employees, our partners, and consultants. We also have agreements with our employees and selected consultants that obligate them to assign their inventions to us. However, while it is our policy to require our employees and contractors who may be involved in the conception or development of intellectual property to execute such agreements, we may be unsuccessful in executing such an agreement with each party who in fact conceives or develops intellectual property that we regard as our own. In addition, it is possible that technology relevant to our business will be independently developed by a person that is not a party to such an agreement.

While to our knowledge the confidentiality of our trade secrets has not been compromised, if the employees, consultants or partners that are parties to these agreements breach or violate the terms of these agreements, we may not have adequate remedies for any such breach or violation, and we could lose our trade secrets through such breaches or violations. Further, our trade secrets could be disclosed, misappropriated, or otherwise become known or be independently discovered by our competitors. In addition, intellectual property laws in foreign countries may not protect our intellectual property to the same extent as the laws of the United States. If our trade secrets are disclosed or misappropriated, it would harm our ability to protect our rights and adversely affect our business.

**Risks related to Namzaric®**

***Under our license agreement with Allergan, if Allergan fails to successfully commercialize Namzaric for any reason or if the license agreement with Allergan is terminated, the potential royalties we are eligible to receive under our license agreement with Allergan may not occur or be minimal, and would have a negative impact on our revenue potential and harm our business.***

In November 2012, we entered into a license agreement with Allergan pursuant to which we granted Allergan a right to develop and commercialize Namenda XR and Namzaric in the United States. Under that agreement, we expect to receive future royalties from Allergan on the net sales of Namzaric, starting in 2020. If for any reason Allergan fails to successfully commercialize Namzaric, on which we are eligible to receive double digits percentage royalties, we may not receive such future royalties or receive minimal amounts, and our business will be harmed. We are also eligible to receive royalties on net sales of Namenda XR beginning in June 2018, but we do not expect to receive such royalties, due to the potential entry of generic versions Namenda XR.

Under the license agreement, we are reliant on Allergan to commercialize Namzaric and in that capacity Allergan has the discretion to:

- determine the efforts and resources that they apply towards commercialization;

- market, manufacture, and distribute the licensed products or to otherwise not perform satisfactorily in carrying out these activities; and

- to terminate the agreement without penalty and, such termination, may result in a need for additional capital to pursue further development or commercialization of the applicable current or future products.

***Under the license agreement, Allergan substantially controls the intellectual property rights subject to the agreement and the current ANDA litigation and potential settlement thereof, and has economic interests different from ours. Accordingly, Allergan may manage the litigation and settlements on terms which may have a material and negative impact on our business.***

We and Allergan are currently involved in ANDA litigation to enforce our intellectual property rights against generic manufacturers, who are seeking to bring generic versions of Namenda XR and Namzaric to the market. See *Litigation and Other Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report. Under the terms of that license agreement, Allergan has the right to enforce such intellectual property rights and control such litigation. Specifically, Allergan has the discretion to:

- maintain or defend our intellectual property rights or may use our intellectual property or proprietary information in a way that gives rise to actual or threatened litigation that could jeopardize or invalidate our intellectual property or proprietary information or expose us to potential liability; and

- not adequately pursue litigation against ANDA filers or settle such litigation on unfavorable terms, and as Allergan substantially controls the current ANDA litigation and terms of settlement and has different economic interests than ours, Allergan may grant licenses to generic manufacturers that permit them to make and sell generic versions of Namenda XR and Namzaric, which would negatively impact the royalties we receive under our license with Allergan.

We have a right to participate in, but not control, such litigations. If Allergan decides not to enforce the intellectual property rights licensed under the agreement or the litigation is resolved in favor of the generic manufacturers or if the FDA approves the ANDA filed by the generic manufacturers, such manufacturers may be able to market and sell the generic form of the branded drug in competition with Namenda XR and Namzaric. This could harm our business. Based on adverse trial and appellate court rulings to date with respect to Namenda XR, we do not expect to receive royalties on net sales of Namenda XR due to the potential entry of generic versions Namenda XR. The pending ANDA litigation with respect to Namzaric is at a very early stage.

46

**Risks related to our financial condition and need for additional capital**

***If we do not have adequate funds to cover all of our development and commercial activities, we may have to raise additional capital or curtail or cease operations.***

We have just begun to commercialize GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, in January 2018, and it will require substantial funds to be successful. In addition, funds are required for the continued operation of our business, as we seek to advance additional product candidates through the research and clinical development to regulatory approval and commercialization. In May 2017, we entered into a Sales Agreement with Cowen and Company, LLC under which we may offer and sell our common stock having aggregate sales proceeds of up to $50 million from time to time through Cowen and Company, LLC as our sales agent. As of December 31, 2017, we have not made any sales under this facility. As of December 31, 2017, we had approximately $176.4 million in cash, cash equivalents, and investments. In January 2018, we raised an additional $134.1 million in net proceeds from the sale of 3,450,000 shares of common stock. We believe that our available cash, cash equivalents, and investments will be sufficient to fund our anticipated level of operations for at least the next 12 months, but there can be no assurance that this will be the case.

We have financed our operations primarily through proceeds from our license agreement with Allergan, public and private equity offerings, our Royalty-Backed Loan with HealthCare Royalty Partners III, L.P., or HCRP, and, to a lesser extent, government grants, venture debt, and benefits from tax credits made available under a federal stimulus program supporting drug development. We have devoted substantially all of our efforts to research and development, including clinical studies, of our product candidates, including GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease. We anticipate that our cash requirements will increase substantially as we:

- enhance operational, financial, and information management systems and hire more personnel, including personnel to support development of our product candidates and, our commercial operations;

- commercialize GOCOVRI, including establishing distribution, marketing, and sales capabilities;

- manufacture GOCOVRI for commercial use;

- investigate ADS-5102 (GOCOVRI) in preclinical and clinical trials for the treatment of walking impairment in patients with MS, and potentially other indications;

- conduct preclinical and clinical trials of ADS-4101 for the treatment of epilepsy (partial onset seizures);

- seek regulatory approvals for our product candidates that successfully complete clinical studies;

- continue the research, development, and manufacture of our current product candidates; and

- seek to discover or in-license additional product candidates.

If we do not have adequate funds to support these activities, our business opportunities could be hindered.

***If we need additional funds to operate our business and if we cannot raise additional capital when needed, or if additional capital is not available to us on favorable terms, our stockholders may be adversely affected or our business may be harmed.***

If we need additional funds to support our business and additional funding is not available under our royalty-backed loan with HCRP, or from new funding sources on favorable terms or at all, we may need to delay or reduce the scope of our research and clinical development programs or commercialization efforts. We do not have any committed external source of funds or other support for our development efforts other than under our royalty-backed loan with HCRP, or from new funding sources or under our license agreement with Allergan, which may be terminated by Allergan upon delivery of notice. We expect to finance future cash needs through a combination of public or private equity offerings, debt financings, royalty financings, collaborations, strategic alliances, licensing arrangements, asset sales, and other marketing and distribution arrangements. Additional financing may not be available to us when we need it or it may not be available on favorable terms. If we raise additional capital through debt financings, royalty financings, collaborations, strategic alliances, or licensing arrangements with third parties, we may have to relinquish certain

valuable rights to our product candidates, technologies, future revenue streams, or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through equity offerings, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our stockholders' rights. If we raise additional capital through debt financing, in addition to the repayment of principal and interest on negotiated terms, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends. If we are unable to obtain adequate financing when needed, we may have to delay, reduce the scope of, or suspend one or more of our clinical studies or research and development programs or our commercialization efforts.

***We have outstanding debt backed by two of our principal assets, GOCOVRI and royalties we may receive on Namzaric, and failure by us or our royalty subsidiary to fulfill our obligations under the applicable loan agreements may cause the repayment obligations to accelerate.***

In May 2017, we, through a newly formed wholly-owned subsidiary, entered into a royalty-backed note arrangement with HCRP, pursuant to which we initially borrowed $35 million and then borrowed an additional $65 million upon FDA approval and FDA's recognition in the Orange Book of the seven-year orphan drug exclusivity that GOCOVRI earned upon approval in August 2017, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications.

Interest and principal on the loan will be payable from the proceeds of royalty on U.S. net sales of GOCOVRI and up to $15 million of our annual royalties from Allergan on U.S. net sales of Namzaric starting in May 2020. The HCRP notes mature in December 2026, if not earlier repaid.

We secured the loan with rights to GOCOVRI (ADS-5102) and rights to certain payment amounts on Namzaric and the loan documents further provide for assignment into our subsidiary holding these rights to any future intellectual property, licenses, assets and agreements with respect to the manufacture, development, supply, distribution, sale and commercialization of GOCOVRI. The loan documents contain customary events of default permitting HCRP to accelerate and require mandatory prepayment of outstanding principal and interest, including: failure to timely pay principal and interest when due and payable; failure to perform specified covenants with respect to maintenance of the collateral and prohibitions on liens with respect to the collateral; limitations on payments of dividends, additional loans, acquisition or merger transactions not in accordance with the arrangement. Upon the occurrence, an event of default under the loan documents, we could be required to prepay the entire loan and, if we are not able to do so, we may lose control over certain rights and payments to GOCOVRI and royalty payments with respect to Namzaric, either of which would seriously harm our business.

***Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations.***

Our quarterly and annual operating results may fluctuate significantly in the future, which makes it difficult for us to predict our future operating results. Any future revenue will depend on the successful commercialization and sales of GOCOVRI and our product candidates, the payment of royalties to us from Allergan under terms of our licensing agreement regarding Namenda XR and Namzaric, or the establishment of potential future collaboration and license agreements, if any, and the achievement of any upfront or milestone payments provided thereunder. Furthermore, our operating results may fluctuate due to a variety of other factors, many of which are outside of our control and may be difficult to predict, including:

- the level of demand for our products, which may vary significantly as they are launched and compete for position in the marketplace;

- pricing and reimbursement policies with respect to GOCOVRI and product candidates, if approved, and the competitive response from existing and potential future therapeutic approaches that compete with our product candidates;

- the cost of manufacturing our product candidates, which may vary due to a number of factors, including the terms of our agreements with contract manufacturing organizations, or CMOs;

- the timing, cost, level of investment, and success or failure of research and development activities relating to our preclinical and clinical-stage product candidates, which may change from time to time;

- expenditures that we may incur to acquire and develop additional product candidates and technologies;

- the timing and success or failure of clinical studies for competing product candidates, or any other change in the competitive landscape of our industry, including consolidation among our competitors or partners;

- the timing and magnitude of upfront and milestone payments under any potential future collaboration and licensing agreements;

- future accounting pronouncements or changes in our accounting policies; and

- changing or volatile U.S., European, and global economic environments.

The cumulative effects of these factors could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful. Investors should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated operating results and/or earnings guidance that we may provide.

**Risks related to the operation of our business**

*Our future success depends on our ability to retain our chief executive officer and other key executives and to attract, retain, and motivate qualified personnel.*

We are highly dependent on our chief executive officer and the other members of our executive and scientific teams. Our executives may terminate their employment with us at any time. The loss of the services of any of these people could impede the achievement of our research, development, and commercialization objectives.

Recruiting and retaining qualified scientific, clinical, manufacturing, and commercial personnel will also be critical to our success. We may not be able to attract and retain these personnel on acceptable terms given the competition among numerous pharmaceutical and biotechnology companies for similar personnel. We also experience competition for the hiring of scientific and clinical personnel from universities and research institutions. In addition, we rely on consultants and advisors, including scientific and clinical advisors, to assist us in formulating our research and development and commercialization strategies. Our consultants and advisors may be employed by employers other than us and may have commitments under consulting or advisory contracts with other entities that may limit their availability to us.

*We expect to expand our development and sales and marketing capabilities, and, as a result, we may encounter difficulties in managing our growth, which could disrupt our operations.*

As of December 31, 2017, we had 147 full-time equivalent employees. Over the next several years, we expect to experience significant growth in the number of our employees and the scope of our operations, particularly in sales and marketing. To manage our anticipated future growth, we must continue to implement and improve our managerial, operational, informational, and financial systems, expand our facilities, and continue to recruit and train additional qualified personnel. Due to our limited financial resources and the limited experience of our management team in managing a company with such anticipated growth, we may not be able to effectively manage the expansion of our operations or recruit and train additional qualified personnel. The physical expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability to manage growth could delay the execution of our business plans or disrupt our operations.

*The recently passed comprehensive tax reform bill could adversely affect our business and financial condition.*

On December 22, 2017, President Trump signed into law new legislation that significantly revises the Internal Revenue Code of 1986, as amended. The newly enacted federal income tax law, among other things, contains significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35% to a flat rate of 21%, limitation of the tax deduction for interest expense to 30% of adjusted earnings (except for certain small businesses), limitation of the deduction for net operating losses to 80% of current year taxable income and elimination of net operating loss carrybacks, one time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, elimination of U.S. tax on foreign earnings (subject to certain important exceptions), immediate deductions for certain new investments instead of deductions for depreciation expense over time, and modifying or repealing many business deductions and credits (including reducing the business tax credit for certain clinical testing expenses incurred in the testing of certain drugs for rare diseases or conditions generally referred to as "orphan drugs"). Notwithstanding the reduction in the corporate income tax rate, the overall impact of the new federal tax law is uncertain, and our business and financial condition could be adversely affected. In addition, it is uncertain if and to what extent various states will conform to the newly enacted federal tax law. The impact of this tax reform on holders of our common stock is also uncertain and could be adverse. Investors should consult with their legal and tax advisors with respect to this legislation and the potential tax consequences of investing in or holding our common stock.

### *Our effective tax rate may fluctuate, and we may incur obligations in tax jurisdictions in excess of accrued amounts.*

We are subject to taxation in numerous U.S. states and territories. As a result, our effective tax rate is derived from a combination of applicable tax rates in the various places that we operate. In preparing our financial statements, we estimate the amount of tax that will become payable in each of such places. Nevertheless, our effective tax rate may be different than experienced in the past due to numerous factors, including passage of the newly enacted federal income tax law, changes in the mix of our profitability from state to state, the results of examinations and audits of our tax filings, our inability to secure or sustain acceptable agreements with tax authorities, changes in accounting for income taxes and changes in tax laws. Any of these factors could cause us to experience an effective tax rate significantly different from previous periods or our current expectations and may result in tax obligations in excess of amounts accrued in our financial statements.

### *Our ability to use net operating losses to offset future taxable income may be subject to limitations.*

As of December 31, 2017, we had federal and state net operating loss carryforwards of $163.3 million and $131.3 million, respectively. The federal net operating loss carryforwards will begin to expire, if not utilized, beginning in 2025, and the state net operating loss carryforwards began to expire in 2016. These net operating loss carryforwards could expire unused and be unavailable to offset future income tax liabilities. Under the newly enacted federal income tax law, federal net operating losses incurred in 2018 and in future years may be carried forward indefinitely, but the deductibility of such federal net operating losses is limited. It is uncertain if and to what extent various states will conform to the newly enacted federal tax law. In addition, under Section 382 of the Internal Revenue Code of 1986, as amended, and corresponding provisions of state law, if a corporation undergoes an "ownership change," which is generally defined as a greater than 50% change, by value, in its equity ownership over a three-year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes to offset its post-change income or taxes may be limited. It is possible that we have experienced an ownership change limitation. We may experience ownership changes in the future as a result of subsequent shifts in our stock ownership, some of which may be outside of our control. If an ownership change occurs and our ability to use our net operating loss carryforwards is materially limited, it would harm our future operating results by effectively increasing our future tax obligations.

### *We are an "emerging growth company," and we cannot be certain whether the reduced reporting requirements applicable to emerging growth companies will make our common stock less attractive to investors.*

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act, or the JOBS Act, which was enacted in April 2012. For as long as we continue to be an emerging growth company, we may take advantage of exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding

executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier. We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of our initial public offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may suffer or be more volatile.

***Business disruptions could seriously harm our future revenue and financial condition and increase our costs and expenses.***

Our operations could be subject to earthquakes, power shortages, telecommunications failures, floods, hurricanes, fires, extreme weather conditions, medical epidemics, and other natural or manmade disasters or business interruptions. The occurrence of any of these business disruptions could seriously harm our operations and financial condition and increase our costs and expenses. Our corporate headquarters is located in California and certain clinical sites for our product candidates, operations of our existing and future partners, and suppliers are or will be located near major earthquake faults and fire zones. The ultimate impact on us, our significant partners, suppliers, and our general infrastructure of being located near major earthquake faults and fire zones and being consolidated in certain geographical areas is unknown, but our operations and financial condition could suffer in the event of a major earthquake, fire, or other natural or manmade disaster.

***Any future operations or business arrangements with entities outside the United States present risks that could materially adversely affect our business.***

If we obtain approval to commercialize any approved products or utilize CMOs outside of the United States, a variety of risks associated with international operations could materially adversely affect our business. If any product candidates that we may develop are approved for commercialization outside the United States, we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers, and regulatory requirements;

- economic weakness, including inflation or political instability in particular foreign economies and markets;

- difficulties in assuring compliance with foreign corrupt practices laws;

- compliance with tax, employment, immigration, and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters, including earthquakes, hurricanes or typhoons, floods, and fires.

51

***Our internal computer systems, or those of our CROs, CMOs, CSO, or other contractors or consultants, may fail or suffer security breaches, which could result in a material disruption of our business.***

Despite the implementation of security measures, our internal computer systems and those of our CROs, CMOs, specialty pharmacy, distributors, and other contractors and consultants are vulnerable to damage from computer viruses, unauthorized access, natural disasters, terrorism, war, and telecommunication and electrical failures. While we are not aware of any such system failure, accident, or security breach to date, if such an event were to occur and cause interruptions in our operations, it could result in a material disruption of our drug development programs or commercialization efforts. For example, the loss of clinical study data from completed or ongoing clinical studies for any of our product candidates could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. While we back-up our internal computer systems periodically and store such data off-site or in the cloud, we can offer no assurance that such off-site storage of data will allow us to continue our business without interruptions to our operations, which could result in a material disruption of our drug development programs or commercialization efforts. To the extent that any disruption or security breach were to result in a loss of or damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and the further development of our product candidates could be delayed.

***Risks generally associated with a company-wide implementation of information systems, including an enterprise resource planning (ERP) system, may adversely affect our business and results of operations or the effectiveness of our internal controls over financial reporting.***

In support of our anticipated growth and future commercial-stage operations, we have selected and implemented a number of company-wide information systems, and may select and implement additional systems in the future, including adding new functionality to our enterprise resource planning, or ERP, and other similar systems. Many of these systems are complex and their successful and timely implementation is not assured, requires significant capital expenditures, and can be disruptive to our business operations. We recently implemented a new ERP system in addition to a new human resource information system, or HRIS. These projects required and may continue to require investment of capital and human resources and the attention of many employees who would otherwise be focused on other aspects of our business. Any deficiencies in the design and implementation of the new ERP and HRIS system could result in potentially much higher costs than we had incurred and could adversely affect our ability to develop and launch solutions, provide services, fulfill contractual obligations, file reports with the SEC in a timely manner, operate our business, or otherwise affect our controls environment. Any of these consequences could have an adverse effect on our results of operations and financial condition.

**Risks related to ownership of our common stock**

***Our stock price may be volatile, and purchasers of our common stock could incur substantial losses.***

Our stock price has fluctuated in the past and may be volatile in the future. The stock market in general and the market for securities of pharmaceutical and biotechnology companies in particular have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. As a result of this volatility, investors may experience losses on their investments in our stock.

In addition, the clinical development stage of our operations may make it difficult for investors to evaluate the success of our business to date and to assess our future viability. The market price for our common stock may be influenced by many factors, including:

- our success in commercializing GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease;

- the availability of reimbursement by payers at acceptable levels, or at all, for GOCOVRI;

- the success of competitive products or technologies;

- results of clinical studies of our product candidates or those of our competitors;

52

- introductions and announcements of new products and product candidates by us, our commercialization partners, or our competitors, and the timing of these introductions or announcements;

- actions taken by regulatory agencies with respect to our or our competitors' products, product candidates, clinical studies, manufacturing process, or sales and marketing terms;

- variations in our financial results or those of companies that are perceived to be comparable to us;

- our revenue performance, both in absolute terms and relative to analyst and shareholder expectations;

- the success of our efforts to acquire or in-license additional products or product candidates;

- developments concerning our collaborations, including but not limited to those with our sources of manufacturing and our commercialization partners;

- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures, or capital commitments;

- developments or disputes concerning patents or other proprietary rights, including patents, litigation matters, and our ability to obtain patent protection for our current or future products;

- our ability or inability to raise additional capital and the terms on which we raise it;

- the recruitment or departure of key personnel;

- changes in the structure of healthcare reimbursement systems;

- regulatory or legal developments in the United States and other countries, especially changes in laws or regulations applicable to our current or future products;

- market conditions in the pharmaceutical and biotechnology sectors;

- actual or anticipated changes in revenue forecasts, earnings estimates or changes in stock market analyst recommendations regarding our common stock, other comparable companies or our industry generally;

- trading volume of our common stock;

- sales of our common stock by us or our stockholders;

- general economic, industry, and market conditions; and

- the other risks described in this "Risk Factors" section.

These broad market and industry factors may seriously harm the market price of our common stock, regardless of our operating performance. Additionally, following periods of volatility in the market, securities class-action litigation has often been instituted against companies. Such litigation, if instituted against us, could result in substantial costs and diversion of management's attention and resources, which could materially and adversely affect our business, financial condition, results of operations, and growth prospects.

***Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.***

Sales of a substantial number of shares of our common stock in the public market, or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that sales may have on the prevailing market price of our common stock.

53

*Concentration of ownership of our common stock among our existing executive officers, directors, and principal stockholders may prevent new investors from influencing significant corporate decisions.*

Our executive officers, directors and current beneficial owners of 5% or more of our common stock, in the aggregate, beneficially own a significant percentage of our outstanding common stock. These persons, acting together, will be able to significantly influence all matters requiring stockholder approval, including the election and removal of directors and any merger or other significant corporate transactions. The interests of this group of stockholders may not coincide with the interests of other stockholders.

*We will continue to incur increased costs and demands upon management as a result of complying with the laws and regulations affecting public companies, and we could fail to successfully improve our systems, procedures, and controls, which could affect our operating results.*

As a public company, we will continue to incur legal, accounting and other expenses associated with reporting requirements and corporate governance requirements, including requirements under the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as well as new rules implemented by the SEC and the Nasdaq Stock Market LLC. We expect that we will need to continue to improve existing, and implement new operational, financial, and information management systems, procedures, and controls to manage our business effectively. Any delay in the implementation of, or disruption in the transition to, new or enhanced systems, procedures, or controls may cause our operations to suffer and we may be unable to conclude that our internal control over financial reporting is effective.

*An active trading market for our common stock may not be maintained.*

Our stock is currently traded on Nasdaq, but we can provide no assurance that we will be able to maintain an active trading market on Nasdaq or any other exchange in the future or that the daily trading volume will be adequate to allow orderly purchases or sales of our common stock without significantly impacting the price per share. If an active market for our common stock is not maintained, it may be difficult for our stockholders to sell shares without depressing the market price for the shares or at all.

*If securities or industry analysts do not publish research, or publish inaccurate or unfavorable research, about us or our business, our stock price and trading volume could decline.*

The trading market for our common stock depends, in part, on the research and reports that securities or industry analysts publish about us or our business. Securities and industry analysts may cease to publish research on our company at any time in their discretion. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, demand for our stock could decrease, which might cause our stock price and trading volume to decline. In addition, if one or more of the analysts who cover us downgrade our stock or publish inaccurate or unfavorable research about our business, our stock price would likely decline. If our operating results fail to meet the forecast of analysts, our stock price will likely decline.

*Provisions in our corporate charter documents and under Delaware law could make an acquisition of us more difficult and may prevent attempts by our stockholders to replace or remove our current management.*

Provisions in our corporate charter and our bylaws may discourage, delay, or prevent a merger, acquisition, or other change in control of us that stockholders may consider favorable, including transactions in which stockholders might otherwise receive a premium for their shares. These provisions could also limit the price that investors might be willing to pay in the future for shares of our common stock, thereby depressing the market price of our common stock. In addition, these provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors. Because our board of directors is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace current members of our management team. Among others, these provisions include that:

- our board of directors is divided into three classes with staggered three-year terms, which may delay or prevent a change of our management or a change in control;

- our board of directors has the right to change the size of our board of directors and to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- our stockholders may not act by written consent or call special stockholders' meetings; as a result, a holder, or holders, controlling a majority of our capital stock would not be able to take certain actions other than at annual stockholders' meetings or special stockholders' meetings called by the board of directors or the chairman of the board and chief executive officer;

- our certificate of incorporation prohibits cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- stockholders must provide advance notice and additional disclosures in order to nominate individuals for election to the board of directors or to propose matters that can be acted upon at a stockholders' meeting, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company; and

- our board of directors may issue, without stockholder approval, shares of undesignated preferred stock, and the ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law, which prohibits a person who owns in excess of 15% of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired in excess of 15% of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner.

***Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be our stockholders' sole source of gain.***

We have never declared or paid cash dividends on our common stock. We currently intend to retain all of our future earnings, if any, to finance the growth and development of our business. In addition, the terms of existing or any future debt agreements may preclude us from paying dividends. As a result, capital appreciation, if any, of our common stock will be our stockholders' sole source of gain for the foreseeable future.

55

**ITEM 1B.  UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.  PROPERTIES**

We lease approximately 18,500 square feet of office space in Emeryville, California. On January 16, 2018, we amended our lease agreement to relocate within the current building and increase our leased space to approximately 37,626 square feet. The relocation is expected to occur no later than the second quarter of 2018. The amended lease agreement expires April 30, 2025. We believe that the expanded facility will be sufficient for our needs for the foreseeable future.

**ITEM 3.  LEGAL PROCEEDINGS**

For information regarding legal proceedings, refer to *Litigation and Other Legal Proceedings* in "Note 8 - Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report, which information is incorporated by reference here.

**ITEM 4.  MINE SAFETY DISCLOSURES**

The disclosure required by this item is not applicable.

**ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**PRICE RANGE OF COMMON STOCK**

Our common stock has been listed on the Nasdaq Global Market under the symbol "ADMS" since April 10, 2014. Prior to that date, there was no public trading market for our common stock. The following table sets forth for the periods indicated the high and low sales prices per share of our common stock as reported on the Nasdaq Global Market:

|  | Low | | High | |
|---|---|---|---|---|
| **Fiscal Year ended December 31, 2016** | | | | |
| First Quarter | $ | 12.02 | $ | 28.23 |
| Second Quarter | $ | 13.94 | $ | 19.15 |
| Third Quarter | $ | 12.81 | $ | 19.50 |
| Fourth Quarter | $ | 12.10 | $ | 17.74 |
| | | | | |
| **Fiscal Year ended December 31, 2017** | | | | |
| First Quarter | $ | 14.23 | $ | 19.50 |
| Second Quarter | $ | 14.59 | $ | 18.00 |
| Third Quarter | $ | 13.50 | $ | 23.84 |
| Fourth Quarter | $ | 17.68 | $ | 38.22 |

On February 15, 2018, the last reported sale price of our common stock as reported on the Nasdaq Global Market was $34.43 per share.

As of February 15, 2018, there were 26,807,221 shares of our common stock issued and outstanding with 26 holders of record of our common stock. The actual number of stockholders is greater than this number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include stockholders whose shares may be held in trust by other entities.

57

**STOCK PRICE PERFORMANCE GRAPH**

The following stock performance graph compares our total stock return with the total return for (i) the Nasdaq Composite Index and the (ii) the Nasdaq Biotechnology Index for the period from April 10, 2014 (the date our common stock commenced trading on the Nasdaq Global Market) through December 31, 2017. The figures represented below assume an investment of $100 in our common stock at the closing price of $14.01 on April 10, 2014 and in the Nasdaq Composite Index and the Nasdaq Biotechnology Index on April 10, 2014 and the reinvestment of dividends into shares of common stock. The comparisons in the table are required by the Securities and Exchange Commission, or SEC, and are not intended to forecast or be indicative of possible future performance of our common stock. This graph shall not be deemed "soliciting material" or be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any of our filings under the Securities Act of 1933, as amended, or the Securities Act, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.



**DIVIDEND POLICY**

We have never declared or paid, and do not anticipate declaring, or paying in the foreseeable future, any cash dividends on our capital stock. Future determination as to the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then existing conditions, including our operating results, financial conditions, contractual restrictions, capital requirements, business prospects and other factors our board of directors may deem relevant.

58

**ITEM 6.  SELECTED FINANCIAL DATA**

You should read the following selected financial data together with the section of this report entitled "Management's discussion and analysis of financial condition and results of operations" and our financial statements and the related notes included in this report. The statement of operations data for the years ended December 31, 2017, 2016, and 2015, and the balance sheet data as of December 31, 2017 and 2016, are derived from our audited financial statements included elsewhere in this report. Statement of operations data for the year ended December 31, 2014 and 2013, and balance sheet data as of December 31, 2015, 2014, and 2013, are derived from our audited financial statements not included herein. Our historical results are not necessarily indicative of the results to be expected in the future.

| | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2015 | | 2014 | | 2013 |
| | (in thousands, except per share data) | | | | | | | | |
| **Consolidated Statement of Operations data:** | | | | | | | | | |
| Revenues: | | | | | | | | | |
| Product sales, net | $ | 568 | $ | — | $ | — | $ | — | $ | — |
| License and grant revenue | | 3 | | 572 | | 1,916 | | 55,846 | | 71,095 |
| Total net revenues | | 571 | | 572 | | 1,916 | | 55,846 | | 71,095 |
| Costs and operating expenses: | | | | | | | | | |
| Cost of product sales | | 17 | | — | | — | | — | | — |
| Research and development | | 27,168 | | 31,230 | | 35,895 | | 21,860 | | 7,410 |
| Selling, general and administrative, net | | 61,312 | | 30,326 | | 23,458 | | 15,472 | | 6,667 |
| Total costs and operating expenses | | 88,497 | | 61,556 | | 59,353 | | 37,332 | | 14,077 |
| Income (loss) from operations | | (87,926) | | (60,984) | | (57,437) | | 18,514 | | 57,018 |
| Interest and other income (expense), net | | 1,351 | | 811 | | 363 | | (917) | | (4,906) |
| Interest expense | | (4,645) | | — | | — | | — | | — |
| Income (loss) before income taxes | | (91,220) | | (60,173) | | (57,074) | | 17,597 | | 52,112 |
| Provision (benefit) for income taxes | | (1,730) | | (115) | | (5,272) | | 7,374 | | 1,191 |
| Net income (loss) | $ | (89,490) | $ | (60,058) | $ | (51,802) | $ | 10,223 | $ | 50,921 |
| Net income (loss) attributable to common stockholders: | | | | | | | | | |
| Basic | $ | (89,490) | $ | (60,058) | $ | (51,802) | $ | 8,968 | $ | 33,068 |
| Diluted | $ | (89,490) | $ | (60,058) | $ | (51,802) | $ | 9,069 | $ | 35,353 |
| Net income (loss) per share attributable to common stockholders: | | | | | | | | | |
| Basic | $ | (3.97) | $ | (2.77) | $ | (2.86) | $ | 0.60 | $ | 3.48 |
| Diluted | $ | (3.97) | $ | (2.77) | $ | (2.86) | $ | 0.53 | $ | 2.99 |
| Weighted average number of shares used in computing net income (loss) attributable to common stockholders: | | | | | | | | | |
| Basic | | 22,558 | | 21,711 | | 18,111 | | 14,837 | | 9,506 |
| Diluted | | 22,558 | | 21,711 | | 18,111 | | 17,107 | | 11,806 |

Revenue in the years ended December 31, 2014 and 2013 includes recognition of revenue relating to upfront and milestone payments called for within our license agreement with Forest Laboratories Holdings Limited ("Forest"), an indirect wholly-owned subsidiary of Allergan plc (collectively, "Allergan"), effective November 13, 2012, of $55.0 million and $69.6 million, respectively. See the section of this report entitled "Management's discussion and analysis of financial condition and results of operations—Financial operations overview—Revenue" for a more detailed description of our revenue recognition with respect to these agreements.

59

| | As of December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 | | 2014 | 2013 |
| | | | | | (in thousands) | | | | |
| **Balance Sheet Data:** | | | | | | | | | |
| Cash, cash equivalents, and available-for-sale securities | $ | 176,433 | $ | 135,944 | $ | 119,960 | $ | 158,722 | $ 85,612 |
| Working capital | | 162,568 | | 107,244 | | 101,380 | | 110,982 | 81,790 |
| Total assets | | 186,176 | | 142,473 | | 128,743 | | 161,189 | 86,216 |
| Long-term debt | | 102,647 | | — | | — | | — | — |
| Warrant liability | | — | | — | | — | | — | 6,232 |
| Total liabilities | | 120,050 | | 10,290 | | 12,556 | | 14,115 | 10,462 |
| Convertible preferred stock | | — | | — | | — | | — | 19,149 |
| Total stockholders' equity | | 66,126 | | 132,183 | | 116,187 | | 147,074 | 56,605 |

60

**ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the section of this report entitled "Selected financial data" and our financial statements and related notes included elsewhere in this report. This discussion and other parts of this report contain forward-looking statements that involve risk and uncertainties, such as statements of our plans, objectives, expectations and intentions. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in the section of this report entitled "Risk factors."*

**Overview**

At Adamas Pharmaceuticals, Inc., we seek to redefine the treatment experience for patients suffering from chronic neurological diseases. Our vision is grand, our goal bold: to create and commercialize a new generation of medicines intended to lessen the burden of disease on patients, caregivers and society. With a new commercial medicine and robust pipeline of investigational programs focused on meaningfully differentiated treatment options for patients, we believe we are well on our way. Our therapeutic targets include a broad range of neurologic diseases, including Parkinson's disease, multiple sclerosis, epilepsy and Alzheimer's disease.

Our treatment innovations stem from a deep scientific understanding of time-dependent biology–the deliberate mapping of disease patterns and drug activity–along with a goal to meaningfully increase the efficacy of known molecules without compromising tolerability. This approach is designed to ensure that our medicines fit within, rather than define, people's daily lives. Our goal is to develop medicines that are timed for the benefit of patients.

Our understanding of time-dependent biological processes informs our every innovation, targeting advancement in treatment of chronic neurologic disorders. Our expanding portfolio includes:

*Approved Product:*

- GOCOVRI™ (amantadine) extended release capsules, formerly referred to as ADS-5102, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. GOCOVRI was approved for marketing by the U.S. Food and Drug Administration, or FDA, on August 24, 2017, with seven years of orphan exclusivity and additional patent protections, and we fully launched GOCOVRI with a deployed sales force in January 2018.

*Potential Additional Indications for GOCOVRI (amantadine) Extended Release Capsules (ADS-5102):*

- ADS-5102 in development for the treatment of walking impairment in patients with multiple sclerosis. We expect the start of our Phase 3 pivotal study in this supplemental indication to occur early in the second quarter of 2018.

- ADS-5102 in research and potential development for additional indications, including the treatment of wearing OFF and delaying motor complications in Parkinson's disease, tardive dyskinesia, Huntington's chorea, Tourette syndrome, and non-motor disorders, including depression, and anti-psychotic induced weight gain. We expect to select additional indications for ADS-5102 by first quarter 2019.

*Product Candidates:*

- ADS-4101 (lacosamide) modified release capsules in development for the treatment of partial onset seizures in patients with epilepsy. We have requested a meeting with the FDA in the first half of 2018, with the start of a Phase 3 pivotal study planned for 2019, depending on FDA feedback.

- Additional product candidates in research based on potential new discoveries in Parkinson's disease, multiple sclerosis, epilepsy, as well as new research programs in psychiatry.

61

*Partnered Products:*

- Namzaric® (memantine hydrochloride extended release and donepezil hydrochloride) capsules for the treatment of moderate to severe dementia of an Alzheimer's type, marketed in the United States by Allergan plc under an exclusive license agreement between us and Forest Laboratories Holdings Limited ("Forest"), an indirect wholly-owned subsidiary of Allergan plc.

- Namenda XR® (memantine hydrochloride) extended release capsules for the treatment of moderate to severe dementia of an Alzheimer's type, marketed in the United States by Allergan plc under the Forest license agreement.

Products in our wholly-owned portfolio, potential additional indications for these products, and our product candidates, are protected by an array of intellectual property, including robust and diversified patent claims, and regulatory exclusivities. For example, GOCOVRI is protected by seven-year orphan drug exclusivity, three-year new product exclusivity, and issued patents and pending patent applications out to at least 2035.

**Financial operations overview**

*Summary*

Net product sales consist of sales of GOCOVRI, which the FDA approved on August 24, 2017, and made available for physician and patient use in the fourth quarter of 2017; however, the full commercial launch of GOCOVRI did not occur until deployment of our sales team in January 2018. Prior to the generation of product sales from GOCOVRI, our revenue had been generated primarily from license, milestone, and reimbursement for research and development expenses and full-time equivalents assigned under our license agreement with Allergan. There are no further milestone payments to be earned under our license agreement with Allergan. As of December 31, 2017, we had an accumulated deficit of $211.7 million. We expect to incur significant losses as we support the commercialization of GOCOVRI and advance our product candidates into later stages of development and commercialization.

We are commercializing GOCOVRI through our deployed sales force targeting neurologists and movement disorder specialists in the United States, and may possibly commercialize GOCOVRI through partnership agreements with pharmaceutical companies outside the United States. Consequently, we expect selling, general and administrative expenses to increase as a result of the launch of the full product commercialization of GOCOVRI in January 2018. In addition, we expect to continue to incur significant research and development expenses as we continue to advance our product candidates through pre-clinical and clinical development. Because of the numerous risks and uncertainties associated with drug development and commercialization, we are unable to predict the timing or amount of expenses incurred or when, or if, we will be able to achieve or maintain profitability.

Under our agreement with Allergan, beginning in May 2020, we are entitled to receive tiered royalties in the low to mid-teens as a percent of net sales of Namzaric in the United States. We are also entitled to receive tiered royalties in the low to mid-single digits, as a percent of net sales, from Allergan for net sales of Namenda XR in the United States beginning in June 2018; however, we do not expect to receive royalties on net sales of Namenda XR because of the potential entry of generic versions of Namenda XR. Pursuant to the agreement, we received a non-refundable upfront license fee of $65.0 million in 2012, which we recognized on a straight-line basis from November 2012 to February 2013. We also earned and received additional cash payments totaling $95.0 million upon achievement by Allergan of certain development and regulatory milestones, which we recognized in 2013 and 2014.

Prior to 2015, we raised an aggregate of approximately $130.8 million in sales of equity securities. In June 2015, we entered into a Controlled Equity Offering Sales Agreement, pursuant to which we issued 509,741 shares of common stock and raised net proceeds of $9.7 million, prior to the termination of the agreement in November 2016. In January 2016, we raised $61.8 million from the sale of 2,875,000 shares of common stock in a follow-on public offering. In May 2017, we entered into a sales agreement with Cowen and Company, LLC, pursuant to which we may, from time to time, issue and sell shares of common stock having an aggregate offering value of up the $50.0 million. As of February 15, 2018, no shares had been sold under the sales agreement. Also in May 2017, we entered into a royalty-backed loan agreement ("Royalty-Backed Loan") with HealthCare Royalty Partners ("HCRP"), whereby we initially

62

borrowed $35.0 million, followed by an additional $65.0 million received in the fourth quarter of 2017 upon FDA's recognition in the Orange Book of the seven-year orphan drug exclusivity for GOCOVRI.

As of December 31, 2017, we had cash, cash equivalents, and available-for-sale securities of $176.4 million. In January 2018, we raised an additional $134.1 million in net proceeds from the sale of 3,450,000 shares of common stock.

*Revenue*

Net product sales consist of sales of GOCOVRI, which was approved by the FDA on August 24, 2017. Prior to the generation of product sales from GOCOVRI, our revenue had been generated primarily from non-refundable upfront license payments, milestone payments, reimbursements for research and development expenses and full-time equivalents assigned under our license agreement with Allergan, and to a lesser degree reimbursement for research and development expenses from NIH grants and government contracts.

The following table summarizes the sources of our revenue for the years ended December 31, 2017, 2016, and 2015 (in thousands):

| | December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Product sales, net | $ 568 | $ — | $ — |
| Allergan reimbursement of development costs | 3 | 317 | 1,434 |
| NIH grants and government contracts | — | 255 | 482 |
| **Total revenue** | $ 571 | $ 572 | $ 1,916 |

Pursuant to our license agreement with Allergan, we recognized revenue from Allergan of $3,000, $0.3 million, and $1.4 million in reimbursements for research and development expenses for the years ended December 31, 2017, 2016, and 2015, respectively. We do not expect to recognize any further milestone payments under our license agreement with Allergan, and we expect reimbursements for full-time equivalents assigned to the license agreement to be inconsequential in future periods. Beginning in May 2020, we will be entitled to receive royalties in the low to mid-teens, as a percent of sales, from Allergan for net sales of Namzaric in the United States. We are also entitled to receive tiered royalties in the low to mid-single digits, as a percent of sales, from Allergan for net sales of Namenda XR in the United States beginning in June 2018; however, we do not expect to receive such royalties because of the potential entry of generic versions of Namenda XR. We were also awarded a continuation of an NIH grant for $1.0 million in August 2014 that terminated in July 2016, which we administered, but conducted through subcontractors.

*Cost of product sales*

Cost of product sales consist primarily of direct and indirect costs related to the manufacturing of GOCOVRI products sold, including third-party manufacturing costs, packaging services, freight, and allocation of overhead costs, in addition to inventory adjustment charges. We began capitalizing inventory manufactured at the FDA approved location upon FDA approval of GOCOVRI in August 2017. We recorded inventory acquired prior to the regulatory approval as research and development expense.

*Research and development expenses*

Research and development expenses represent costs incurred to conduct research, such as the discovery and development of our wholly-owned product candidates. We recognize all research and development costs as they are incurred.

Research and development expenses consist of:

- fees paid to clinical investigators, clinical trial sites, consultants, and vendors, including contract research organizations, or CROs, in conjunction with implementing, conducting, and monitoring our clinical trials and acquiring and evaluating clinical trial data, including all related fees, such as for investigator grants, patient screening fees, laboratory work, and statistical compilation and analysis;

63

- expenses related to production of clinical supplies, including fees paid to contract manufacturing organizations, or CMOs;

- expenses related to establishment and validation of manufacturing capabilities for commercial supply;

- expenses related to the buildup of commercial supply to support commercial launch, prior to FDA approval;

- expenses related to compliance with regulatory requirements;

- other consulting fees paid to third parties; and

- employee-related expenses, which include salaries, benefits, and stock-based compensation.

The following table summarizes our research and development expenses incurred during the years ended December 31, 2017, 2016, and 2015 (in thousands):

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | **2016** | | **2015** | |
| ADS-5102(1) | $ | 20,174 | $ | 25,223 | $ | 32,231 |
| ADS-4101 | | 5,202 | | 1,659 | | — |
| Other research and development expenses | | 1,792 | | 4,348 | | 3,664 |
| **Total research and development expenses** | $ | 27,168 | $ | 31,230 | $ | 35,895 |

(1)  Includes program costs we incurred for GOCOVRI (formerly referred to as ADS-5102) for the treatment of dyskinesia in patients with Parkinson's disease, and ADS-5102 (GOCOVRI) for additional potential CNS indications, including for the treatment of walking impairment in patients with multiple sclerosis.

The program-specific expenses summarized in the table above include costs directly attributable to our product candidates. Other research and development expenses include costs for early stage programs and costs not allocated to a specific program. We allocate research and development salaries, benefits, stock-based compensation, and indirect costs to our product candidates on a program-specific basis, and we include these costs in the program-specific expenses. We begin to track and report program-specific expenses for early stage programs once they have been nominated and selected for further development and clinical-stage work has commenced.

Our investment in research and development activities, including the clinical development of our product candidates, has historically represented a significant portion of our total operating expenses. We anticipate incurring significant research and development expenses as we continue to support: clinical trials for ADS-5102 (GOCOVRI) in indications beyond dyskinesia in patients with Parkinson's disease, including but not limited to: walking impairment in patients with multiple sclerosis, or MS Walking, and other Parkinson's disease indications earlier in the Parkinson's disease treatment journey; ADS-4101 for the treatment of partial onset seizures in patients with epilepsy; and potentially additional clinical-stage programs in more indications or for future product candidates. The process of conducting the necessary clinical research to obtain FDA approval is costly and time consuming. We consider the active management and development of our clinical pipeline to be crucial to our long-term success. The actual probability of success for each product candidate and clinical program may be affected by a variety of factors, including but not limited to, the quality of the product candidate, early clinical data, investment in the program, competition, manufacturing capability, and commercial viability. Furthermore, in the past we have entered into licensing arrangements with other pharmaceutical companies to develop and commercialize our product candidates, and we may enter into additional licensing arrangements or collaborations in the future. In situations in which third parties have control over the clinical development of a product candidate, the estimated completion dates are largely under the control of such third parties and not under our control. We cannot forecast with any degree of certainty which of our product candidates, if any, will be subject to future licensing or collaboration arrangements or how such arrangements would affect our development plans or capital requirements. As a result of the uncertainties discussed above, we are unable to determine the duration and completion costs of our research and development projects or when and to what extent we will generate revenue from the commercialization and sale of any of our product candidates.

64

*Selling, general and administrative expenses, net*

Selling, general and administrative expenses, net, consist primarily of personnel and related benefit costs, facilities, professional services, insurance, and public company related expenses, as well as increasingly the costs associated with establishing commercial capabilities in support of the commercialization of GOCOVRI, reduced to a small degree by reimbursement from Allergan for external costs related to supporting prosecution and litigation of intellectual property rights under our license agreement. We anticipate our selling, general and administrative expenses will increase significantly as we continue to support the commercialization of GOCOVRI.

*Interest and other income (expense), net*

Interest and other income (expense), net, consists primarily of changes in fair value of the embedded derivative liability related to our Royalty-Backed Loan with HCRP, in addition to interest received on our investments.

*Interest expense*

Interest expense consists of accrued interest pursuant to our Royalty-Backed Loan and amortization of debt issuance costs. Interest expense over the life of the Royalty-Backed Loan includes an annual interest rate of 11% on the outstanding principal, a royalty rate of 6.25% on net sales of GOCOVRI after the principal amount is paid, and amortization of the debt discount.

## Critical accounting policies and significant judgments and estimates

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with United States generally accepted accounting principles, or U.S. GAAP. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported revenue generated and expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. We have discussed the development, selection, and disclosure of these estimates with the Audit Committee of our Board of Directors. Actual results may differ from these estimates under different assumptions or conditions.

While our significant accounting policies are described in more detail in Note 2 of our financial statements included in this Annual Report on Form 10-K, we believe the following accounting policies to be critical to the judgments and estimates used in the preparation of our financial statements.

### Revenue Recognition

We recognize revenue when all four of the following criteria have been met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the fee is fixed or determinable, and (iv) collectability is reasonably assured. We recognize revenue under license arrangements based on the performance requirements of the contract. We make determinations of whether persuasive evidence of an arrangement exists and whether delivery has occurred or services have been rendered based on management's judgments regarding the fixed nature of the fees charged for deliverables and the collectability of those fees. Should changes in conditions cause management to determine that these criteria are not met for any new or modified transactions, revenue recognized could be adversely affected.

#### *Product sales, net*

Our product sales, net, consist of U.S. sales of GOCOVRI, which we recognize once all four revenue recognition criteria described above have been met. GOCOVRI was approved by the FDA on August 24, 2017, and we commenced shipments of GOCOVRI to a specialty pharmacy (SP) during October 2017. The SP dispenses product to a patient based on the fulfillment of a prescription. Our agreement with the SP provides for transfer of title to the product at the time the product is delivered to the SP. In addition, except for limited circumstances, the SP has no right of product return to us. We have determined we can reasonably estimate our allowances for rebates and returns at the time title and

65

risk of loss transfers to the SP. Therefore, we record revenue when the product is delivered to the SP, which is an approach frequently referred to as the "sell-in" revenue recognition model.

We recognize revenue from product sales net of the following allowances at the time of revenue recognition:

*Distribution fees*: Distribution fees include fees paid to the SP for data and prompt payment discounts. We record distribution fees as an offset to revenue based on contractual terms.

*Rebates*: Rebates include mandated discounts under the Medicaid Drug Rebate Program, Medicare Part D Prescription Drug Benefit Program, and TRICARE Retail Pharmacy Refunds Program (TRICARE). Rebates are amounts owed after the final dispensing of the product to a benefit plan participant and are based upon contractual agreements or statutory requirements with benefit providers. We estimate the allowance for rebates based on statutory discount rates and expected utilization at the time of sale. We estimate for expected utilization of rebates based on data received from the SP. We adjust the allowance for rebates quarterly to reflect actual experience.

*Product Returns*: Consistent with industry practice, we offer limited product return rights. We generally allow for the return of product that is damaged or defective, and within a few months prior to and up to a few months after the product expiration date. We do not allow product returns for product that has been dispensed to a patient. We consider several factors in the estimation of potential product returns, including, expiration dates of the product shipped, the limited product return rights, third-party data in monitoring channel inventory levels, shelf life of the product, prescription trends, and other relevant factors.

*Medicare Part D coverage gap*: Medicare Part D coverage gap is a federal program to subsidize the costs of prescription drugs for Medicare beneficiaries in the United States, which mandates manufacturers to fund a portion of the Medicare Part D insurance coverage gap for prescription drugs sold to eligible patients. Funding of the coverage gap is generally invoiced and paid in arrears. Medicare Part D coverage gap is accrued at the time of sale based on an estimate of the amount expected to be incurred for the current quarter's activity, plus an accrual balance for known prior quarters and is adjusted quarterly based on actual experience.

*Co-payment assistance*: We provide co-payment assistance to patients who have commercial insurance and meet certain eligibility requirements. We accrue co-payment assistance based on actual program participation and estimates of program redemption using data provided by third-party administrators.

Each of the above adjustments are recorded at the time of revenue recognition, resulting in a reduction in product sales, net, and an increase in accrued expenses or a reduction in accounts receivable, net. The above adjustments require significant estimates, judgment and information obtained from external sources. If management's estimates differ from actuals, we will record adjustments that would affect product sales, net in the period of adjustment.

### License agreement revenue

We generate revenue from collaboration and license agreements for the development and commercialization of products. Collaboration and license agreements may include non-refundable upfront license fees, partial or complete reimbursement of research and development costs, contingent consideration payments based on the achievement of defined objectives, and royalties on sales of commercialized products. Our performance obligations under the collaboration and license agreements may include the license or transfer of intellectual property rights, obligations to provide research and development services and related materials, and obligations to participate on certain development and/or commercialization committees with the partners.

For revenue agreements with multiple-element arrangements, we allocate revenue to each non-contingent element based on the relative-selling-price of each element in an arrangement. When applying the relative-selling-price method, we determine the selling price for each deliverable using the following estimation hierarchy: (i) vendor-specific objective evidence of fair value of the deliverable, if it exists, (ii) third-party evidence of selling price, if vendor-specific objective evidence is not available or (iii) the vendor's best estimate of selling price, if neither vendor-specific nor third-party evidence is available. We recognize revenue allocated when the four basic revenue recognition criteria, mentioned above, are met for each element.

66

We recognize payments that are contingent upon achievement of a substantive milestone in their entirety in the period in which the milestone is achieved. Milestones are defined as events that can only be achieved based on our performance and there is substantive uncertainty about whether the event will be achieved at the inception of the arrangement. We do not consider events that are contingent only on the passage of time or only on counterparty performance to be milestones subject to this guidance. Further, the amounts received must relate solely to prior performance, be reasonable relative to all of the deliverables and payment terms within the agreement and commensurate with our performance to achieve the milestone after commencement of the agreement.

We recognize amounts related to research and development funding and full-time equivalents assigned to the license agreement with Allergan as the related services or activities are performed, in accordance with the contract terms.

**Stock-Based Compensation**

We account for stock-based compensation of stock options granted to employees and directors and for employee stock purchase plan shares by estimating the fair value of stock-based awards using the Black-Scholes option-pricing model. We account for stock-based compensation of restricted stock units granted to employees based on the closing price of our common stock on the date of grant. We recognize and amortize the fair value of stock-based awards, net of estimated forfeitures, over the applicable vesting period. We account for all stock options awarded to non-employees at the fair value of the consideration received or the fair value of the equity instrument issued, as calculated using the Black-Scholes model. We subject stock options granted to non-employees to periodic revaluation at each reporting date as the underlying equity instruments vest.

To estimate the value of share-based awards, we use the Black-Scholes model, which requires the use of certain subjective assumptions. The most significant subjective assumptions are management's estimates of the expected volatility and the expected term of the award. In addition, judgment is also required in estimating the amount of share-based awards that we expect to be forfeited. If actual results differ significantly from any of these estimates, stock-based compensation expense and our results of operations could be materially impacted.

**Clinical Trial Accruals**

Our clinical trial accruals are based on estimates of patient enrollment and related costs at clinical investigator sites, as well as estimates for the services received and efforts expended pursuant to contracts with multiple research institutions and clinical research organizations ("CROs") that conduct and manage clinical trials on our behalf.

We estimate clinical trial expenses based on the services performed pursuant to contracts with research institutions and CROs that conduct and manage clinical trials on our behalf. In accruing service fees, we obtain the reported level of patient enrollment at each site and estimate the time period over which services will be performed and activity expended in each period. If the actual timing of the performance of services or the level of effort varies from the estimate, we will adjust the accrual accordingly. We record payments made to third parties under these arrangements in advance of the receipt of the related services as prepaid expenses until the services are rendered.

**Long-Term Debt**

Long-term debt consists of our loan agreement with HealthCare Royalty Partners ("HCRP"). We accounted for the loan agreement as a debt financing arrangement. We accrue interest expense using the effective interest rate method over the estimated period the debt will be repaid. Debt issuance costs have been recorded as a debt discount in our consolidated balance sheets and are being amortized and recorded as interest expense throughout the life of the loan using the effective interest rate method. We must make certain assumptions and estimates, including future royalties and net product sales, in determining the expected repayment term and amortization period of the debt discount as well as the classification between current and long-term portions. We periodically assess these assumptions and estimates, and adjust the liabilities accordingly.

**Embedded Derivatives Related to Debt Instruments**

Embedded derivatives that are required to be bifurcated from their host contract are evaluated and valued separately from the debt instrument. Under our loan agreement with HCRP, upon the occurrence of a default or a change in control, we may be required to make mandatory prepayments of the borrowings. The prepayment premium is considered an embedded derivative, as the holder of the loans may exercise the option to require prepayment by us.

Further, in the event of a regulatory change that results in a material adverse effect on HCRP's rate of return, we shall pay directly to HCRP an amount that compensates HCRP for such reduction. We present the embedded derivative as a component of other non-current liabilities. We will remeasure the embedded derivatives each reporting period and report changes in the estimated fair value as gains or losses in interest and other income, net, in the condensed consolidated statement of operations.

**Results of operations**

*Comparison of the years ended December 31, 2017 and 2016*

The following table summarizes our results of operations for the years ended December 31, 2017 and 2016 (in thousands, except percentages):

| | December 31, | | Increase/ | % Increase/ |
|---|---|---|---|---|
| | **2017** | **2016** | **(Decrease)** | **(Decrease)** |
| Product sales, net | $ 568 | $ — | $ 568 | NM |
| License and grant revenue | 3 | 572 | (569) | (99)% |
| Cost of product sales | 17 | — | 17 | NM |
| Research and development expenses | 27,168 | 31,230 | (4,062) | (13)% |
| Selling, general and administrative expenses, net | 61,312 | 30,326 | 30,986 | 102 % |
| Interest and other income, net | 1,351 | 811 | 540 | 67 % |
| Interest expense | 4,645 | — | 4,645 | NM |

NM - Not meaningful.

*Product sales, net*

Product sales, net, of $0.6 million for the year ended December 31, 2017, consists of sales of GOCOVRI, which was approved by the FDA on August 24, 2017. We commenced shipments of GOCOVRI during October 2017; however, we did not fully launch GOCOVRI with a deployed sales force until January 2018.

*License and grant revenue*

License and grant revenue decreased by $0.6 million, or 99%, to $3,000 for the year ended December 31, 2017 from $0.6 million for the year ended December 31, 2016. Revenue for both periods presented was primarily related to reimbursement of certain expenses as provided for in our license agreement with Allergan, as well as from government contracts in 2016.

*Cost of product sales*

Cost of product sales of $17,000 for the year ended December 31, 2017, is related to certain fill finish costs incurred after FDA approval related to the cost of GOCOVRI products sold. Prior to receiving regulatory approval for GOCOVRI from the FDA in August 2017, we recorded all inventory costs incurred in the manufacture of GOCOVRI to be sold upon commercialization as research and development expense. We expect to use inventory expensed to research and development over approximately the next two years, and accordingly we expect our cost of product sales of GOCOVRI to increase as a percentage of net sales in future periods as we produce and then sell inventory that reflects the full cost of manufacturing the product.

*Research and development expenses*

Research and development expenses decreased by $4.1 million, or 13%, to $27.2 million for the year ended December 31, 2017, from $31.2 million for the year ended December 31, 2016. The decrease in research and development expenses was mainly attributable to costs associated with the clinical development of GOCOVRI (formerly ADS-5102), which decreased by $5.0 million, or 20%, to $20.2 million from $25.2 million for the years ended December 31, 2017 and 2016, respectively, due to the conclusion of two Phase 3 clinical trials assessing GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease, in addition to costs associated with the ongoing open-label safety study. The decrease was offset in part by increased activity related to clinical work associated with

68

ADS-4101 for the treatment of partial onset seizures in patients with epilepsy. Included in research and development expenses was stock-based compensation expense, which was $3.6 million compared to $2.9 million for the years ended December 31, 2017 and 2016, respectively.

*Selling, general and administrative expenses, net*

Selling, general and administrative expenses, net, increased by $31.0 million, or 102%, to $61.3 million for the year ended December 31, 2017, from $30.3 million for the year ended December 31, 2016. The increase in selling, general and administrative expenses, net, was primarily due to increased costs associated with the commercialization of GOCOVRI, which we made available for physician and patient use in the fourth quarter of 2017, although we commenced the full commercial launch in January 2018. The overall increase consists of a $10.2 million increase for personnel related costs, including $2.1 million for stock-based compensation expense, due to additional headcount, and a $20.8 million increase for expenses including GOCOVRI launch preparation costs, market research, and other professional services.

*Interest and other income, net*

Interest and other income, net, increased by $0.5 million, or 67%, to $1.4 million for the year ended December 31, 2017, from $0.8 million for the year ended December 31, 2016. The increase in interest and other income, net, in the year ended 2017 was primarily due to a change in fair value of the embedded derivative liability related to our Royalty-Backed Loan with HCRP. Also included in interest and other income, net, is interest income earned on investments.

*Interest expense*

The increase in interest expense of $4.6 million for the year ended December 31, 2017, compared to zero in the year ended December 31, 2016, was due to the interest expense incurred on the $100 million Royalty-Backed Loan entered into in May 2017 and borrowed in two tranches: $35 million in May 2017 and $65 million in December 2017.

*Comparison of the years ended December 31, 2016 and 2015*

The following table summarizes our results of operations for the years ended December 31, 2016 and 2015 (in thousands, except percentages):

| | December 31, | | | Increase/ | % Increase/ |
|---|---|---|---|---|---|
| | **2016** | | **2015** | **(Decrease)** | **(Decrease)** |
| License and grant revenue | $ | 572 | $ 1,916 | $ (1,344) | (70)% |
| Research and development expenses | | 31,230 | 35,895 | (4,665) | (13)% |
| Selling, general and administrative expenses, net | | 30,326 | 23,458 | 6,868 | 29 % |
| Interest and other income, net | | 811 | 363 | 448 | (123)% |

*License and grant revenue*

License and grant revenue decreased by $1.3 million, or 70%, to $0.6 million for the year ended December 31, 2016, from $1.9 million for the year ended December 31, 2015. Revenue for both periods in 2016 and 2015 was primarily related to reimbursement of certain expenses as provided for in our license agreement with Allergan, as well as from government contracts.

*Research and development expenses*

Research and development expenses decreased by $4.7 million, or 13%, to $31.2 million for the year ended December 31, 2016 from $35.9 million for the year ended December 31, 2015. The decrease in research and development expenses was mainly attributable to costs associated with the clinical development of GOCOVRI (formerly ADS-5102), which decreased by $7.0 million, or 22%, to $25.2 million from $32.2 million for the years ended December 31, 2016 and 2015, respectively, due to the conclusion of two Phase 3 clinical trials assessing GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease. The decrease was offset in part by increased efforts to support the preparation of the new drug application for GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease, in addition to increased expenses related to preclinical and clinical work associated with ADS-4101 for the treatment of partial onset seizures in patients with epilepsy in 2016 over the prior year period. Research and

69

development expenses associated with other indications of ADS-5102 were flat year over year when comparing 2016 to 2015. Included in research and development expenses was stock-based compensation expense, which was $2.9 million compared to $3.2 million for the years ended December 31, 2016 and 2015, respectively.

We began capitalizing inventory manufactured at the FDA approved location upon FDA approval of GOCOVRI in August 2017. Inventory acquired prior to the regulatory approval was recorded as research and development expense. We expect to use inventory expensed to research and development over approximately the next two years, and accordingly we would expect our cost of GOCOVRI product sales to increase as a percentage of net sales of GOCOVRI in future periods.

*Selling, general and administrative expenses, net*

Selling, general and administrative expenses, net, increased by $6.9 million, or 29%, to $30.3 million for the year ended December 31, 2016 from $23.5 million for the year ended December 31, 2015. The increase in selling, general and administrative expenses was primarily due to increased costs associated with establishing commercial capabilities in anticipation of the commercial launch of GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease, including an increase in headcount-related expenses. Selling, general and administrative expenses also included stock-based compensation expense of $7.7 million compared to $6.8 million for the years ended December 31, 2016 and 2015, respectively.

*Interest and other income, net*

Interest and other income, net, increased by $0.4 million or 123%, to $0.8 million for the year ended December 31, 2016 from $0.4 million for the year ended December 31, 2015. Net interest income is primarily due to interest income earned on investments.

**Liquidity, capital resources and plan of operation**

During the last three fiscal years, we have funded our operations primarily through sales of our common stock, our Royalty-Backed Loan with HCRP, and to a lesser extent through our license agreement with Allergan. In June 2015, we entered into a Controlled Equity Offering Sales Agreement, pursuant to which we issued 509,741 shares of common stock and raised net proceeds of $9.7 million, prior to the termination of the agreement in November 2016. In January 2016, we completed a follow-on public offering of 2,875,000 shares of common stock, which includes the exercise in full by the underwriters of their option to purchase 375,000 shares of common stock, at an offering price of $23.00 per share. Proceeds from the follow-on public offering were approximately $61.8 million, net of underwriting discounts and offering-related transaction costs. In May 2017, we entered into a sales agreement with Cowen and Company, LLC, pursuant to which we may, from time to time, issue and sell shares of common stock having an aggregate offering value of up the $50.0 million. As of December 31, 2017, no shares had been sold under the sales agreement. Also in May 2017, we entered into a Royalty-Backed Loan with HCRP, whereby we initially borrowed $35.0 million, followed by an additional $65.0 million received in the fourth quarter 2017 upon FDA approval and FDA's recognition in the Orange Book of the seven-year orphan drug exclusivity that GOCOVRI earned upon approval on August 24, 2017, for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications.

In January 2018, we completed a follow-on public offering of 3,450,000 shares of our common stock, which includes the exercise in full by the underwriters of their option to purchase 450,000 shares of common stock, at an offering price of $41.50 per share. Proceeds from the follow-on public offering were approximately $134.1 million, net of underwriting discounts, commissions, and offering-related transaction costs.

We made GOCOVRI available for physician and patient use in the fourth quarter of 2017, with a full commercial launch via the deployment of our sales team in January 2018. Prior to the generation of revenue from GOCOVRI, we had not generated any commercial revenue from the sale of our products. We expect to incur substantial and increasing losses for the foreseeable future. Our principal sources of liquidity were our cash, cash equivalents, and investments, which totaled $176.4 million and $135.9 million at December 31, 2017 and 2016, respectively.

We believe our existing cash, cash equivalents, and investments will be sufficient to fund our projected operating requirements, including operations related to the continued development of our product candidates and commercialization of GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease, for at least 12 months from the issuance of this annual report on Form 10-K. However, it is possible that we will not achieve the progress that we expect, because revenues from GOCOVRI may be less than anticipated and the actual costs and timing of drug development, particularly clinical studies, and regulatory approvals are difficult to predict, subject to substantial risks and delays, and often vary depending on the particular indication and development strategy. Moreover, the costs associated with commercializing drugs are high and market acceptance is uncertain.

We expect to continue significant spending in connection with the development and commercialization of GOCOVRI and our product candidates, particularly for the commercialization of GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease, as well as the development of ADS-5102 for other indications, the development of ADS-4101 for indications in epilepsy, for which Phase 3 clinical trials are expected to be initiated in 2019, and development of additional product candidates. To continue these activities, we may decide to raise additional funds through a combination of public or private equity offerings, debt financings, royalty financings, collaborations, strategic alliances, licensing arrangements, asset sales, and other marketing and distribution arrangements. Sufficient additional funding may not be available on acceptable terms, or at all. If adequate funds are not available in the future, we may need to delay, reduce the scope of, or put on hold our clinical studies, research and development programs, or commercialization efforts.

The following table summarizes our cash flows for the periods indicated (in thousands):

| | Year Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net cash (used in) provided by: | | | |
| Operating activities | $ (66,827) | $ (48,068) | $ (47,210) |
| Investing activities | 25,565 | (26,709) | 8,058 |
| Financing activities | 108,843 | 65,408 | 10,810 |
| Net increase (decrease) in cash and cash equivalents | $ 67,581 | $ (9,369) | $ (28,342) |

*Net Cash Used In Operating Activities*

Net cash used in operating activities was $66.8 million for the year ended December 31, 2017. Net loss of $89.5 million for the year ended December 31, 2017, included net non-cash adjustments of $19.4 million, which consisted primarily of stock-based compensation of $13.4 million and non-cash interest expense of $4.6 million. The primary use of cash for the year ended December 31, 2017, was to fund activities in support of the NDA and pre-commercial activities in preparation for the commercialization of GOCOVRI. Additionally, we used cash to fund development of ADS-4101 for indications in epilepsy.

Net cash used in operating activities was $48.1 million for the year ended December 31, 2016. Net loss of $60.1 million for the year ended December 31, 2016, included net non-cash adjustments of $11.1 million, primarily related to $10.6 million of stock-based compensation. The primary use of cash for the year ended December 31, 2016, was to fund the ongoing clinical studies and product development activities related to GOCOVRI.

Net cash used in operating activities was $47.2 million for the year ended December 31, 2015. Net loss of $51.8 million for the year ended December 31, 2015, included net non-cash adjustments of $11.3 million, which consisted primarily of stock-based compensation of $10.0 million. The primary use of cash was to fund the ongoing clinical studies and product development activities related to GOCOVRI.

*Net Cash Provided By (Used In) Investing Activities*

Net cash provided by investing activities was $25.6 million for the year ended December 31, 2017. In the year ended December 31, 2017, we received $26.8 million as a result of net maturities of available-for-sale securities, offset in part by $1.3 million in purchases of property and equipment.

Net cash used in investing activities was $26.7 million for the year ended December 31, 2016. Net cash used in investing activities for the year ended December 31, 2016 was a result of $25.1 million in net purchases of available-for-sale securities as a result of investing the cash from our follow-on public offering that occurred in January 2016, and $1.6 million in purchases of property and equipment.

Net cash provided by investing activities was $8.1 million for the year ended December 31, 2015. Net cash provided by investing activities for the year ended 2015 was a result of $9.5 million in net maturities of available-for-sale securities and $1.4 million in purchases of property and equipment.

*Net Cash Provided By Financing Activities*

Net cash provided by financing activities was $108.8 million for the year ended December 31, 2017. In the year ended December 31, 2017, we received net proceeds of $99.6 million from the issuance of long-term debt and received cash proceeds of $9.9 million related to the exercise of stock options and purchases of common stock under the Employee Stock Purchase Plan (ESPP).

Net cash provided by financing activities was $65.4 million for the year ended December 31, 2016. In the year ended December 31, 2016, we received net cash proceeds of $61.8 million related to the sale of common stock under a follow-on public offering, coupled with $3.6 million related to the exercise of stock options and purchases of common stock under the ESPP.

Net cash provided by financing activities was $10.8 million for the year ended December 31, 2015. In the year ended December 31, 2015 we received net cash proceeds of $9.7 million related to the sale of common stock under a controlled equity offering coupled with $1.2 million related to the exercise of stock options and from purchases of common stock under the ESPP.

**Off-balance sheet arrangements**

Since our inception, we have not engaged in any off-balance sheet arrangements, including the use of structured finance, special purpose entities, or variable interest entities.

**Contractual obligations**

Our future non-cancelable contractual obligations at December 31, 2017, were as follows (in thousands):

| | Total | | Less than 1 Year | | 2 - 3 Years | | 4 - 5 Years | | More than 5 Years |
|---|---|---|---|---|---|---|---|---|---|
| **Contractual obligations:** | | | | | | | | | |
| Operating lease obligations | $ | 1,510 | $ | 633 | $ | 877 | $ | — | $ | — |
| Purchase commitments | | 4,882 | | 3,149 | | 1,733 | | — | | — |
| Total contractual obligations | $ | 6,392 | $ | 3,782 | $ | 2,610 | $ | — | $ | — |

*Operating Lease Obligations*

Operating lease obligations in the table above relates to our office facilities. We lease approximately 18,500 square feet of office space in Emeryville, California under a lease that expires April 30, 2020. On January 16, 2018, we amended our lease agreement to relocate within the current building and increase our leased space to approximately 37,626 square feet. The amended lease agreement expires April 30, 2025. We expect to relocate the company no later than the second quarter of 2018.

*Purchase Commitments*

We enter into certain other long-term commitments for the supply of API, the manufacture of commercial supply of GOCOVRI, and other agreements for the provision of services, including services related to data access and packaging. To the extent these long-term commitments are non-cancelable, they are reflected in the above table. We also

72

enter into contracts in the normal course of business that generally provide for termination upon notice, and therefore are not reflected in the table above.

**Recent Accounting Pronouncements**

For a discussion of new accounting pronouncements, see "Note 2 - Summary of Significant Accounting Policies" in the accompanying "Notes to Consolidated Financial Statements" in this annual report.

**JOBS Act Accounting Election**

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. We have irrevocably elected not to avail ourselves of this exemption from new or revised accounting standards, and, therefore, are subject to the same new or revised accounting standards as other public companies that are not emerging growth companies.

**ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The primary objective of our investment activities is to preserve our capital to fund our operations. We also seek to maximize income from our investments without assuming significant risk. To achieve our objectives, we maintain a portfolio of cash equivalents and investments in a variety of securities of high credit quality. As of December 31, 2017, we had cash, cash equivalents, and investments of $176.4 million, consisting of cash and cash equivalents, as well as short and long-term investment grade available-for-sale securities. In January 2018, we raised an additional $134.1 million from the sale of 3,450,000 shares of common stock. A portion of our investments may be subject to interest rate risk and could fall in value if market interest rates increase. However, because our investments are primarily short-term in duration and our holdings in US government bonds and corporate debt securities mature prior to our expected need for liquidity, we believe that our exposure to interest rate risk is not significant and, as a consequence, a 1% movement in market interest rates would not have a significant impact on the total value of our portfolio. We actively monitor changes in interest rates.

73

**ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**ADAMAS PHARMACEUTICALS, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 75 |
| Consolidated Financial Statements | |
| Consolidated Balance Sheets at December 31, 2017 and 2016 | 76 |
| Consolidated Statements of Operations for the Years Ended December 31, 2017, 2016, and 2015 | 77 |
| Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2017, 2016, and 2015 | 78 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2017, 2016, and 2015 | 79 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2017, 2016, and 2015 | 80 |
| Notes to Consolidated Financial Statements | 81 |

74

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders
of Adamas Pharmaceuticals, Inc.

*Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of Adamas Pharmaceuticals, Inc. and its subsidiaries as of December 31, 2017 and December 31, 2016, and the related consolidated statements of operations, comprehensive loss, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2017, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and December 31, 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP


San Jose, California
February 22, 2018

We have served as the Company's auditor since 2007.

75

## ADAMAS PHARMACEUTICALS, INC.

### CONSOLIDATED BALANCE SHEETS

#### (in thousands, except share and per share data)

| | | December 31, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 91,316 | $ | 23,735 |
| Available-for-sale securities | | 82,126 | | 89,917 |
| Accounts receivable, net | | 367 | | 794 |
| Inventory | | 1,704 | | — |
| Prepaid expenses and other current assets | | 3,662 | | 2,541 |
| Total current assets | | 179,175 | | 116,987 |
| Property and equipment, net | | 3,132 | | 3,156 |
| Available-for-sale securities, non-current | | 2,991 | | 22,292 |
| Other assets | | 878 | | 38 |
| Total assets | $ | 186,176 | $ | 142,473 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 3,878 | $ | 3,589 |
| Accrued liabilities | | 12,385 | | 5,867 |
| Other current liabilities | | 344 | | 287 |
| Total current liabilities | | 16,607 | | 9,743 |
| Long-term debt | | 102,647 | | — |
| Other non-current liabilities | | 796 | | 547 |
| Total liabilities | | 120,050 | | 10,290 |
| Commitments and Contingencies (Note 8) | | | | |
| Stockholders' equity | | | | |
| Preferred stock, $0.001 par value — 5,000,000 shares authorized, and zero shares issued and outstanding at December 31, 2017 and December 31, 2016 | | — | | — |
| Common stock, $0.001 par value — 100,000,000 shares authorized, 23,320,551 and 22,013,644 shares issued and outstanding at December 31, 2017 and December 31, 2016, respectively | | 28 | | 27 |
| Additional paid-in capital | | 277,964 | | 254,558 |
| Accumulated other comprehensive loss | | (167) | | (193) |
| Accumulated deficit | | (211,699) | | (122,209) |
| Total stockholders' equity | | 66,126 | | 132,183 |
| Total liabilities and stockholders' equity | $ | 186,176 | $ | 142,473 |

The accompanying notes are an integral part of these consolidated financial statements.

76

**ADAMAS PHARMACEUTICALS, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(in thousands, except per share data)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| **Revenues:** | | | |
| Product sales, net | $ 568 | $ — | $ — |
| License and grant revenue | 3 | 572 | 1,916 |
| Total net revenues | 571 | 572 | 1,916 |
| **Costs and operating expenses:** | | | |
| Cost of product sales | 17 | — | — |
| Research and development | 27,168 | 31,230 | 35,895 |
| Selling, general and administrative, net | 61,312 | 30,326 | 23,458 |
| Total costs and operating expenses | 88,497 | 61,556 | 59,353 |
| Loss from operations | (87,926) | (60,984) | (57,437) |
| Interest and other income, net | 1,351 | 811 | 363 |
| Interest expense | (4,645) | — | — |
| Loss before income taxes | (91,220) | (60,173) | (57,074) |
| Benefit for income taxes | (1,730) | (115) | (5,272) |
| Net loss | $ (89,490) | $ (60,058) | $ (51,802) |
| Net loss per share, basic and diluted | $ (3.97) | $ (2.77) | $ (2.86) |
| Weighted average shares used in computing net loss per share, basic and diluted | 22,558 | 21,711 | 18,111 |

The accompanying notes are an integral part of these consolidated financial statements.

77

**ADAMAS PHARMACEUTICALS, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**

**(in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Net loss | $ (89,490) | $ (60,058) | $ (51,802) |
| Unrealized gain (loss) on available-for-sale securities | 26 | (35) | 22 |
| Comprehensive loss | $ (89,464) | $ (60,093) | $ (51,780) |

The accompanying notes are an integral part of these consolidated financial statements.

78

**ADAMAS PHARMACEUTICALS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

**(in thousands, except share data)**

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balances at December 31, 2014** | 17,551,375 | $ 22 | $ 157,581 | $ (180) | $ (10,349) | $ 147,074 |
| Exercise of stock options | 409,683 | — | 761 | — | — | 761 |
| Vesting of common stock | — | — | 112 | — | — | 112 |
| Issuance of common stock in conjunction with Controlled Equity Offering, net of commissions and issuance costs | 509,741 | 1 | 9,656 | — | — | 9,657 |
| Issuance of common stock in conjunction with warrant exercises | 3,484 | — | — | — | — | — |
| Net unrealized gain on available-for-sale securities | — | — | — | 22 | — | 22 |
| Stock issued under employee stock purchase plan | 31,179 | — | 407 | — | — | 407 |
| Stock-based compensation | — | — | 9,956 | — | — | 9,956 |
| Net loss | — | — | — | — | (51,802) | (51,802) |
| **Balances at December 31, 2015** | 18,505,462 | $ 23 | $ 178,473 | $ (158) | $ (62,151) | $ 116,187 |
| Exercise of stock options | 586,956 | 1 | 3,041 | — | — | 3,042 |
| Vesting of common stock | — | — | 34 | — | — | 34 |
| Issuance of common stock in conjunction with Secondary Offering, net of commissions and issuance costs | 2,875,000 | 3 | 61,819 | — | — | 61,822 |
| Net unrealized loss on available-for-sale securities | — | — | — | (35) | — | (35) |
| Stock issued under employee stock purchase plan | 46,226 | — | 620 | — | — | 620 |
| Stock-based compensation | — | — | 10,571 | — | — | 10,571 |
| Net loss | — | — | — | — | (60,058) | (60,058) |
| **Balances at December 31, 2016** | 22,013,644 | $ 27 | $ 254,558 | $ (193) | $ (122,209) | $ 132,183 |
| Exercise of stock options | 1,183,353 | 1 | 9,033 | — | — | 9,034 |
| Restricted stock units vested | 64,471 | — | 201 | — | — | 201 |
| Stock issued under employee stock purchase plan | 59,083 | — | 766 | — | — | 766 |
| Net unrealized gain on available-for-sale securities | — | — | — | 26 | — | 26 |
| Stock-based compensation | — | — | 13,406 | — | — | 13,406 |
| Net loss | — | — | — | — | (89,490) | (89,490) |
| **Balances at December 31, 2017** | 23,320,551 | $ 28 | $ 277,964 | $ (167) | $ (211,699) | $ 66,126 |

The accompanying notes are an integral part of these consolidated financial statements.

79

# ADAMAS PHARMACEUTICALS, INC.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

**(in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| **Cash flows from operating activities** | | | |
| Net loss | $ (89,490) | $ (60,058) | $ (51,802) |
| Adjustments to reconcile net loss to net cash used in operating activities | | | |
| Depreciation | 1,194 | 808 | 435 |
| Stock-based compensation | 13,367 | 10,571 | 9,956 |
| Non-cash interest expense | 4,645 | — | — |
| Change in fair value of embedded derivative liability | (294) | — | — |
| Net accretion of discounts and amortization of premiums of available-for-sale securities | 456 | (301) | 875 |
| Changes in assets and liabilities | | | |
| Accrued interest of available-for-sale securities | (161) | (2) | 110 |
| Inventory | (1,646) | — | — |
| Prepaid expenses and other assets | (2,036) | 2,643 | (4,416) |
| Accounts receivable, net | 427 | 490 | (760) |
| Accounts payable | 333 | 502 | (788) |
| Accrued liabilities and other liabilities | 6,378 | (2,721) | (820) |
| Net cash used in operating activities | (66,827) | (48,068) | (47,210) |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (1,258) | (1,624) | (1,399) |
| Purchases of available-for-sale securities | (62,510) | (103,528) | (59,828) |
| Maturities of available-for-sale securities | 89,333 | 78,443 | 69,285 |
| Net cash provided by (used in) investing activities | 25,565 | (26,709) | 8,058 |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of long-term debt | 99,600 | — | — |
| Proceeds from public offerings, net of offering costs | — | 61,822 | 9,657 |
| Payment of debt issuance costs | (633) | — | — |
| Proceeds from issuance of common stock upon exercise of stock options | 9,110 | 2,966 | 746 |
| Proceeds from employee stock purchase plan | 766 | 620 | 407 |
| Net cash provided by financing activities | 108,843 | 65,408 | 10,810 |
| Net increase (decrease) in cash and cash equivalents | 67,581 | (9,369) | (28,342) |
| Cash and cash equivalents at beginning of period | 23,735 | 33,104 | 61,446 |
| Cash and cash equivalents at end of period | $ 91,316 | $ 23,735 | $ 33,104 |
| **Supplemental disclosure** | | | |
| Cash paid for income taxes | $ — | $ — | $ 4,691 |
| **Supplemental disclosure of noncash investing and financing activities** | | | |
| Purchases of property and equipment in accounts payable and accrued expense | $ 61 | $ 148 | $ 161 |
| Stock-based compensation capitalized in inventory | $ 39 | $ — | $ — |
| Stock option exercise settled after period end | $ — | $ 76 | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. DESCRIPTION OF BUSINESS

Adamas Pharmaceuticals, Inc. (the "Company") focuses on time-dependent biology to redefine the treatment experience for patients suffering from chronic neurological diseases. In August 2017, the U.S. Food and Drug Administration (FDA) approved GOCOVRI™ (amantadine) extended release capsules (previously ADS-5102), the first and only FDA-approved medicine for the treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications. The Company is also advancing its pipeline of differentiated investigational programs, which includes ADS-5102 in development for the treatment of multiple sclerosis walking impairment; and ADS-4101, a high-dose, modified-release lacosamide in development for the treatment of partial onset seizures in patients with epilepsy. The Company's goal is to create and commercialize a new generation of medicines intended to lessen the burden of disease on patients, caregivers and society.

The Company was incorporated in the State of Delaware on November 15, 2000, and operates as one segment. The Company's headquarters and operations are located in Emeryville, California.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

### Use of Estimates

The preparation of the accompanying consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities and the reported amounts of revenues and expenses in the consolidated financial statements and the accompanying notes. On an ongoing basis, management evaluates its estimates, including those related to revenue recognition, clinical trial accruals, fair value of assets and liabilities including short-term and long-term classification, embedded derivatives, income taxes, and stock-based compensation. Management bases its estimates on historical experience and on various other market-specific and relevant assumptions that management believes to be reasonable under the circumstances. Actual results may differ from those estimates.

### Liquidity and Financial Condition

To date, a significant portion of the Company's resources have been dedicated to the research and development of its products. The Company made GOCOVRI available for physician and patient use in the fourth quarter of 2017, with a full commercial launch via the deployment of the Company's sales team in January 2018. Prior to the generation of revenue from GOCOVRI, the Company had not generated any commercial revenue from the sale of its products.

Based upon the current status of, and plans for, its product development and commercialization, the Company believes that the existing cash, cash equivalents, and investments of $176.4 million as of December 31, 2017, will be adequate to satisfy the Company's capital needs through at least the next twelve months from the issuance of this annual report on Form 10-K. However, the process of developing and commercializing products requires significant research and development, preclinical testing and clinical trials, manufacturing arrangements, as well as regulatory approvals. These activities, together with the Company's selling, general and administrative expenses, are expected to result in significant operating losses until the commercialization of the Company's products or license agreements generate sufficient revenue to offset expenses. Under its license agreement with Allergan, the Company received the final milestone payment in 2014, and is not entitled to receive any royalties for net sales of Namzaric® until mid-2020. Although the Company is eligible to receive royalties on net sales of Namenda XR® in mid-2018, it does not expect to receive such royalties because of the potential entry of generic versions of Namenda XR.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In January 2018, the Company completed a follow-on public offering of 3,450,000 shares of its common stock, which includes the exercise in full by the underwriters of their option to purchase 450,000 shares of common stock, at an offering price of $41.50 per share. Proceeds from the follow-on public offering were approximately $134.1 million, net of underwriting discounts, commissions, and offering-related transaction costs.

**Inventory**

Inventory is stated at the lower of cost or estimated net realizable value with cost determined under the first-in first-out method. Inventory consists of raw materials, work-in-process, and GOCOVRI finished goods. Raw materials and work-in-process that may be utilized for both commercial and clinical programs are identical and, as a result, the inventory has an "alternative future use" as defined in authoritative guidance and are included in inventory. Amounts in inventory associated with clinical development programs are charged to research and development expense when the product enters the research and development process and can no longer be used for commercial purposes and, therefore, does not have "alternative future use". Costs include active pharmaceutical ingredient (API), third-party contract manufacturing, third-party packaging services, freight, labor costs for personnel involved in the manufacturing process, and indirect overhead costs. If the Company identifies excess, obsolete or unsalable product, the Company will write down its inventory to its net realizable value in the period it is identified. To date, the Company has determined that a reserve for potentially excess, obsolete or unsalable inventory is not required.

The Company begins capitalizing costs as inventory when the product candidate receives regulatory approval. Prior to regulatory approval, inventory costs related to product candidates are recorded as research and development expense. The Company received FDA approval for GOCOVRI on August 24, 2017, and began capitalizing inventory manufactured at the FDA approved location, after FDA approval.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of highly liquid investments with original maturities, when purchased, of less than three months.

**Investments**

The Company classifies its investments as "available-for-sale." In general, these investments are free of trading restrictions. The Company carries these investments at fair value, based on quoted market prices or other readily available market information. Quoted market prices for U.S. government and corporate bonds include both principal and accrued interest components. Unrealized gains and losses are included in accumulated other comprehensive income, which is reflected as a separate component of stockholders' equity in its Consolidated Balance Sheets. Gains and losses are recognized when realized in its Consolidated Statements of Income. When the Company determines that an other-than-temporary decline in fair value has occurred, the amount of the decline that is related to a credit loss is recognized in income. Gains and losses are determined using the specific identification method. The Company considers all marketable debt securities with a maturity of less than one year to be short-term investments, with all others considered to be long-term investments.

All of the Company's available-for-sale securities are subject to a periodic impairment review. The Company recognizes an impairment charge when a decline in the fair value of its investments below the cost basis is judged to be other-than-temporary. Factors considered in determining whether a loss is temporary include the length of time and extent to which the investments' fair value has been less than the cost basis, the financial condition and near-term prospects of the investee, extent of the loss related to credit of the issuer, the expected cash flows from the security, its intent to sell or hold the security, and whether or not the Company will be required to sell the security before the recovery of its amortized cost.

**Consolidation**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. Intercompany balances and transactions have been eliminated in consolidation.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### Segments

In accordance with ASC 280-10-50, Segment Reporting, operating segments are identified as components of an enterprise about which separate discrete financial information is available for evaluation by the chief operating decision-maker in making decisions regarding resource allocation and assessing performance. The Company operates in one reportable segment: the development and commercialization of therapeutics targeting chronic disorders of the central nervous system. All revenues for the years ended December 31, 2017, 2016, and 2015 were generated in the United States.

### Revenue Recognition

The Company recognizes revenue when all four of the following criteria have been met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the fee is fixed or determinable, and (iv) collectability is reasonably assured. Revenue under license arrangements is recognized based on the performance requirements of the contract. Determinations of whether persuasive evidence of an arrangement exists and whether delivery has occurred or services have been rendered are based on management's judgments regarding the fixed nature of the fees charged for deliverables and the collectability of those fees. Should changes in conditions cause management to determine that these criteria are not met for any new or modified transactions, revenue recognized could be adversely affected.

#### *Product sales, net*

The Company's product sales, net, consist of U.S. sales of GOCOVRI and is recognized once all four revenue recognition criteria described above have been met. GOCOVRI was approved by the FDA on August 24, 2017 and the Company commenced shipments of GOCOVRI to a specialty pharmacy (SP) during October 2017. The SP dispenses product to a patient based on the fulfillment of a prescription. The Company's agreement with its SP provides for transfer of title to the product at the time the product is delivered to the SP. In addition, except for limited circumstances, the SP has no right of product return to the Company.

The Company has determined it can reasonably estimate its allowances for rebates and returns at the time title and risk of loss transfers to the SP. Therefore, the Company records revenue when the product is delivered to the SP, which is an approach frequently referred to as the "sell-in" revenue recognition model.

The Company recognizes revenue from product sales net of the following allowances at the time of revenue recognition:

*Distribution fees*: Distribution fees include fees paid to the SP for data and prompt payment discounts. Distribution fees are recorded as an offset to revenue based on contractual terms.

*Rebates*: Rebates include mandated discounts under the Medicaid Drug Rebate Program, Medicare Part D Prescription Drug Benefit Program, and TRICARE Retail Pharmacy Refunds Program (TRICARE). Rebates are amounts owed after the final dispensing of the product to a benefit plan participant and are based upon contractual agreements or statutory requirements with benefit providers. The allowance for rebates is estimated based on statutory discount rates and expected utilization at the time of sale. The Company estimates for expected utilization of rebates based on data received from the SP. The allowance for rebates is adjusted quarterly to reflect actual experience.

*Product Returns*: Consistent with industry practice, the Company offers limited product return rights. The Company generally allows for the return of product that is damaged or defective, and within a few months prior to and up to a few months after the product expiration date. The Company does not allow product returns for product that has been dispensed to a patient. The Company considers several factors in the estimation of potential product returns, including, expiration dates of the product shipped, the limited product return rights, third-party data in monitoring channel inventory levels, shelf life of the product, prescription trends, and other relevant factors.

*Medicare Part D coverage gap*: Medicare Part D coverage gap is a federal program to subsidize the costs of prescription drugs for Medicare beneficiaries in the United States, which mandates manufacturers to fund a portion of the Medicare Part D insurance coverage gap for prescription drugs sold to eligible patients. Funding of the coverage gap is generally invoiced and paid in arrears. Medicare Part D coverage gap is accrued at the time of sale based on an estimate

83

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

of the amount expected to be incurred for the current quarter's activity, plus an accrual balance for known prior quarters and is adjusted quarterly based on actual experience.

*Co-payment assistance*: The Company provides co-payment assistance to patients who have commercial insurance and meet certain eligibility requirements. Co-payment assistance is accrued based on actual program participation and estimates of program redemption using data provided by third-party administrators.

Each of the above adjustments are recorded at the time of revenue recognition, resulting in a reduction in product sales, net, and an increase in accrued expenses or a reduction in accounts receivable, net. The above adjustments require significant estimates, judgment and information obtained from external sources. If management's estimates differ from actuals, the Company will record adjustments that would affect product sales, net in the period of adjustment.

### License agreement revenue

The Company generates revenue from collaboration and license agreements for the development and commercialization of products. Collaboration and license agreements may include non-refundable upfront license fees, partial or complete reimbursement of research and development costs, contingent consideration payments based on the achievement of defined objectives, and royalties on sales of commercialized products. The Company's performance obligations under the collaboration and license agreements may include the license or transfer of intellectual property rights, obligations to provide research and development services and related materials, and obligations to participate on certain development and/or commercialization committees with the partners.

For revenue agreements with multiple-element arrangements, the Company allocates revenue to each non-contingent element based on the relative-selling-price of each element in an arrangement. When applying the relative-selling-price method, the Company determines the selling price for each deliverable using the following estimation hierarchy: (i) vendor-specific objective evidence of fair value of the deliverable, if it exists, (ii) third-party evidence of selling price, if vendor-specific objective evidence is not available, or (iii) the vendor's best estimate of selling price, if neither vendor-specific nor third-party evidence is available. Revenue allocated is then recognized when the four basic revenue recognition criteria, mentioned above, are met for each element.

The Company recognizes payments that are contingent upon achievement of a substantive milestone in their entirety in the period in which the milestone is achieved. Milestones are defined as events that can only be achieved based on the Company's performance and there is substantive uncertainty about whether the event will be achieved at the inception of the arrangement. Events that are contingent only on the passage of time or only on counterparty performance are not considered milestones subject to this guidance. Further, the amounts received must relate solely to prior performance, be reasonable relative to all of the deliverables and payment terms within the agreement and commensurate with the Company's performance to achieve the milestone after commencement of the agreement.

Amounts related to research and development funding and full-time equivalent employees assigned to the license agreement are recognized as the related services or activities are performed, in accordance with the contract terms.

### Cost of Product Sales

Cost of product sales consists primarily of direct and indirect costs related to the manufacturing of GOCOVRI products sold, including third-party manufacturing costs, packaging services, freight, and allocation of overhead costs. Cost of product sales may also include period costs related to certain inventory manufacturing services, inventory adjustment charges, as well as manufacturing variances. In connection with the FDA approval of GOCOVRI on August 24, 2017, the Company began capitalizing inventory manufactured at the FDA approved location starting in August 2017. Prior to receiving regulatory approval for GOCOVRI from the FDA, the Company expensed all costs incurred in the manufacture of GOCOVRI as research and development.

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to credit risk consist principally of cash and cash equivalents and short and long-term investments. Cash, cash equivalents, and investments are deposited with financial institutions or invested in security issuers that management believes are credit worthy. Deposits may, at times, exceed the

84

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

amount of insurance provided on such deposits. To date, the Company has not experienced any losses on invested cash and cash equivalents.

**Risk and Uncertainties**

The Company's future results of operations involve a number of risks and uncertainties. Factors that could affect the Company's future operating results and cause actual results to vary materially from expectations include, but are not limited to, rapid technological change, uncertainty of results of clinical trials and reaching milestones, uncertainty of market acceptance of the Company's products, competition from substitute products and larger companies, protection of proprietary technology, strategic relationships, and dependence on key individuals.

Products developed by the Company require approvals from the U.S. Food and Drug Administration ("FDA") or other international regulatory agencies prior to commercial sales. There can be no assurance that the products will receive the necessary approvals. If the Company is denied approval, approval is delayed, or the Company is unable to maintain approval, it could have a materially adverse impact on the Company.

The Company has expended and will continue to expend substantial funds to conduct research, development, and clinical testing of its product candidates. The Company also will be required to expend additional funds to establish commercial-scale manufacturing arrangements and to provide for the marketing and distribution of products that receive regulatory approval. The Company may require additional funds to conduct research and development activities and commercialize its products. Additional funds may not be available on acceptable terms, if at all. If adequate funds are unavailable on a timely basis from operations or additional sources of financing, the Company may have to delay, reduce the scope of or eliminate one or more of its research or development programs or alter its product commercialization plans, which may materially and adversely affect its business, financial condition, and operations.

**Accounts Receivable, net**

The Company's accounts receivable balance consists of amounts due from sales of GOCOVRI and amounts due from Allergan, in accordance with the contract terms of the license agreement. Receivables from sales of GOCOVRI are recorded net of allowances which generally include chargebacks, distribution fees, doubtful accounts, and discounts. Allergan receivables are for research and development funding and full-time equivalent employees assigned to the Allergan license agreement, as well as for reimbursement of external costs, recorded as contra-expense, associated with supporting prosecution and litigation of intellectual property rights.

The Company's estimate of the allowance for doubtful accounts is based on an evaluation of the aging of its receivables. Accounts receivable balances are written off against the allowance when it is probable that the receivable will not be collected. To date, the Company has determined that an allowance for doubtful accounts is not required.

**Property and Equipment**

Property and equipment are stated at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Leasehold improvements are amortized on a straight-line basis over the lesser of their useful life or the term of the lease. Maintenance and repairs are charged to expense as incurred, and improvements and betterments are capitalized. When assets are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the consolidated balance sheet and any resulting gain or loss is reflected in operations in the period realized.

Estimated useful lives by major asset category are as follows:

| | Useful Lives |
|---|---|
| Computer equipment and software | 3 years |
| Equipment | 5 years |
| Furniture and fixtures | 10 years |

85

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Leases**

At the inception of a lease, the Company evaluates the lease agreement to determine whether the lease is an operating, capital or build-to-suit lease using the criteria in ASC 840, "Leases." Certain lease agreements also require the Company to make additional payments for taxes, insurance, and other operating expenses incurred during the lease period, which are expensed as incurred. For operating leases, the Company recognizes rent expense on a straight-line basis over the lease term and records the difference between cash rent payments and the recognition of rent expense as a deferred liability. Where lease agreements contain rent escalation clauses, rent abatements and/or concessions, such as rent holidays and tenant improvement allowances, the Company applies them in the determination of straight-line expense over the lease term.

**Accounting for Long-Lived Assets**

The Company reviews property and equipment for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability is measured by the comparison of the carrying amount to the future net cash flows that the assets are expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the projected discounted future net cash flows arising from the asset. There have been no such impairments of long-lived assets as of December 31, 2017.

**Clinical Trial Accruals**

The Company's clinical trial accruals are based on estimates of patient enrollment and related costs at clinical investigator sites, as well as estimates for the services received and efforts expended pursuant to contracts with multiple research institutions and contract research organizations ("CROs") that conduct and manage clinical trials on the Company's behalf.

The Company estimates clinical trial expenses based on the services performed pursuant to contracts with research institutions and CROs that conduct and manage clinical trials on its behalf. In accruing service fees, the Company obtains the reported level of patient enrollment at each site and estimates the time period over which services are to be performed and activity expended in each period. If the actual timing of the performance of services or the level of effort varies from the estimate, the Company will adjust the accrual accordingly. Payments made to third parties under these arrangements in advance of the receipt of the related services are recorded as prepaid expenses until the services are rendered.

**Research and Development**

Research and development ("R&D") expenses include salaries and related compensation, contractor and consultant fees, external clinical trial expenses performed by CROs, licensing fees, acquired intellectual property with no alternative future use, and facility and administrative expense allocations. In addition, the Company funds R&D at research institutions under agreements that are generally cancelable at its option. Research costs typically consist of applied research and preclinical and toxicology work. Pharmaceutical manufacturing development costs consist of pre-approval inventory purchases, product formulation, chemical analysis, and the transfer and scale-up of manufacturing at facilities operated by the Company's contract manufacturers. Clinical development costs include the costs of Phase 1, Phase 2, and Phase 3 clinical trials. These costs are a significant component of the Company's research and development expenses.

The Company accrues costs for clinical trial activities performed by CROs and other third parties based upon the estimated amount of work completed on each study as provided by the CRO. These estimates are reviewed for reasonableness by the Company's internal clinical personnel, and the Company aims to match the accrual to actual services performed by the organizations as determined by patient enrollment levels and related activities. The Company monitors patient enrollment levels and related activities using available information; however, if the Company underestimates activity levels associated with various studies at a given point in time, the Company could be required to record significant additional R&D expenses in future periods when the actual activity level becomes known. The Company charges all such costs to R&D expenses. Non-refundable advance payments are capitalized and expensed as the related goods are delivered or services are performed.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Long-Term Debt**

Long-term debt consists of the Company's loan agreement with HealthCare Royalty Partners ("HCRP"). The Company accounted for the loan agreement as a debt financing arrangement. Interest expense is accrued using the effective interest rate method over the estimated period the debt will be repaid. Debt issuance costs have been recorded as a debt discount in the Company's consolidated balance sheets and are being amortized and recorded as interest expense throughout the life of the loan using the effective interest rate method. The Company must make certain assumptions and estimates, including future royalties and net product sales, in determining the expected repayment term and amortization period of the debt discount, as well as the classification between current and long-term portions. The Company periodically assesses these assumptions and estimates, and adjusts the liabilities accordingly. See Note 9 for further details of the Company's long-term debt.

**Embedded Derivatives Related to Debt Instruments**

Embedded derivatives that are required to be bifurcated from their host contract are evaluated and valued separately from the debt instrument. Under the Company's loan agreement with HCRP, upon the occurrence of a default or a change in control, the Company may be required to make mandatory prepayments of the borrowings. The prepayment premium is considered an embedded derivative, as the holder of the loans may exercise the option to require prepayment by the Company. Further, in the event of a regulatory change that results in a material adverse effect on HCRP's rate of return, the Company shall pay directly to HCRP an amount that compensates HCRP for such reduction. The embedded derivative is presented as a component of other non-current liabilities. The Company will remeasure the embedded derivatives each reporting period and report changes in the estimated fair value as gains or losses in interest and other income, net, in the condensed consolidated statement of operations.

**Fair Value of Financial Instruments**

The carrying value of the Company's cash and cash equivalents, short-term investments, accounts receivable, long-term investments and other current assets, other assets, accounts payable, accrued liabilities approximate fair value due to the short-term nature or determinable value of these items. See also Note 4 for further details of the Company's fair value instruments.

**Income Taxes**

The Company accounts for income taxes under the asset and liability approach. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized.

The Company follows the provisions of ASC 740, Income Taxes, under which it assesses all material positions taken in any income tax return, including all significant uncertain positions, in all tax years that are still subject to assessment or challenge by relevant taxing authorities. Assessing an uncertain tax position begins with the initial determination of the position's sustainability and is measured at the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. As of each balance sheet date, unresolved uncertain tax positions must be reassessed, and the Company will determine whether (i) the factors underlying the sustainability assertion have changed and (ii) the amount of the recognized tax benefit is still appropriate. The recognition and measurement of tax benefits requires significant judgment. Judgments concerning the recognition and measurement of a tax benefit might change as new information becomes available.

**Basic and Diluted Net Loss Per Share**

Basic net loss per share is based upon the weighted average number of common shares outstanding during the period. Diluted net loss per share is based upon the weighted average number of common shares outstanding and dilutive common stock equivalents outstanding during the period. Common stock equivalents are options granted under the Company's stock awards plans and are calculated under the treasury stock method. Common equivalent shares from unexercised stock options and unvested restricted stock units are excluded from the computation when there is a loss as their effect is anti-dilutive, or if the exercise price of such options is greater than the average market price of the stock for the period.

87

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Stock-Based Compensation**

The Company accounts for stock-based compensation of stock options granted to employees and directors and for employee stock purchase plan shares by estimating the fair value of stock-based awards using the Black-Scholes option-pricing model. The Company accounts for stock-based compensation of restricted stock units granted to employees based on the closing price of the Company's common stock on the date of grant. The fair value of stock-based awards, net of estimated forfeitures, is recognized and amortized over the applicable vesting period. All stock options awarded to non-employees are accounted for at the fair value of the consideration received or the fair value of the equity instrument issued, as calculated using the Black-Scholes model. Stock options granted to non-employees are subject to periodic revaluation at each reporting date as the underlying equity instruments vest.

In order to estimate the value of share-based awards, the Company uses the Black-Scholes model, which requires the use of certain subjective assumptions. The most significant subjective assumptions are management's estimates of the expected volatility and the expected term of the award. In addition, judgment is also required in estimating the amount of share-based awards that are expected to be forfeited. If actual results differ significantly from any of these estimates, stock-based compensation expense and the Company's results of operations could be materially impacted.

**Recent Accounting Pronouncements**

In May 2014, the FASB issued Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers*. The amendment in this ASU provides guidance on the revenue recognition to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The core principle of this update provides guidance to identify the performance obligations under the contract(s) with a customer and how to allocate the transaction price to the performance obligations in the contract. It further provides guidance to recognize revenue when (or as) the entity satisfies a performance obligation. This standard will replace most existing revenue recognition guidance. On July 9, 2015, the FASB approved a one-year deferral of the effective date of this standard to 2018 for public companies, with an option that would permit companies to adopt the standard as early as the original effective date of 2017. Early adoption prior to the original effective date is not permitted. Since the issuance of ASU 2014-09, the FASB has issued several amendments which clarify certain points, including ASU 2016-08, *Principal versus Agent Considerations (Reporting Revenue Gross versus Net)*; ASU 2016-10, *Identifying Performance Obligations and Licensing*; ASU 2016-11, *Rescission of SEC Guidance Because of Accounting Standards Updates 2014-09 and 2014-16 Pursuant to Staff Announcements at the March 3, 2016 EITF Meeting*; ASU 2016-12, *Narrow-Scope Improvements and Practical Expedients*; ASU 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers*; and ASU 2017-14, *Income Statement-Reporting Comprehensive Income (Topic 220), Revenue Recognition (Topic 605), and Revenue from contracts with Customers (Topic 606)*. The Company will adopt the new standard in the first quarter of fiscal year 2018 using the full retrospective method. The Company has evaluated the effect the new guidance will have on its consolidated financial statements and expects the adoption of this guidance to have no material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases*. The authoritative guidance significantly amends the current accounting for leases. Under the new provisions, all lessees will report a right-of-use asset and a liability for the obligation to make payments for all leases with the exception of those leases with a term of 12 months or less. All other leases will fall into one of two categories: (i) a financing lease or (ii) an operating lease. Lessor accounting remains substantially unchanged with the exception that no leases entered into after the effective date will be classified as leveraged leases. For sale leaseback transactions, a sale will only be recognized if the criteria in the new revenue recognition standard are met. For public business entities, this guidance is effective for fiscal periods beginning after December 15, 2018 and interim periods thereafter. Early adoption is permitted. The Company is currently evaluating the effect the new guidance will have on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses of Financial Instruments*. The new guidance changes the methodology for measuring credit losses on financial instruments and the timing of when such losses are recorded. This guidance is effective for fiscal years beginning after December 15, 2019. Early adoption is permitted. The Company is currently evaluating the effect the new guidance will have on its consolidated financial statements.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In May 2017, the FASB issued ASU No. 2017-09, *Compensation-Stock Compensation (Topic 718) – Scope of Modification Accounting.* The new guidance clarifies when to account for a change to the terms or conditions of a share-based payment award as a modification. This guidance is effective for fiscal years beginning after December 15, 2017. Early adoption is permitted. The Company does not expect the adoption of the new guidance to have a material impact on its consolidated financial statements.

## 3. BALANCE SHEET COMPONENTS

**Prepaid expenses and other current assets (in thousands)**

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2017 | | 2016 | |
| Prepaid expenses | $ | 2,638 | $ | 1,316 |
| Income tax receivable | | 1,007 | | 168 |
| Other current assets | | 17 | | 1,057 |
| Prepaid expenses and other current assets | $ | 3,662 | $ | 2,541 |

**Property and equipment, net (in thousands)**

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2017 | | 2016 | |
| Computer equipment and software | $ | 3,289 | $ | 2,128 |
| Equipment | | 252 | | 252 |
| Furniture and fixtures | | 466 | | 466 |
| Leasehold improvements | | 1,645 | | 1,645 |
| | | 5,652 | | 4,491 |
| Less: Accumulated depreciation and amortization | | (2,520) | | (1,335) |
| Property and equipment, net | $ | 3,132 | $ | 3,156 |

Depreciation expense was $1,194,000, $808,000, and $435,000 for the years ended December 31, 2017, 2016, and 2015, respectively.

**Accrued liabilities (in thousands)**

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2017 | | 2016 | |
| Accrued employee related costs | $ | 5,499 | $ | 3,696 |
| Clinical trial accruals | | 1,720 | | 1,041 |
| Accrued consulting and other professional fees | | 4,897 | | 864 |
| Other | | 269 | | 266 |
| Accrued liabilities | $ | 12,385 | $ | 5,867 |

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## 4. FAIR VALUE MEASUREMENTS

In accordance with ASC 820-10, Fair Value Measurements and Disclosures, the Company determines the fair value of financial and non-financial assets and liabilities using the fair value hierarchy, which establishes three levels of inputs that may be used to measure fair value, as follows:

- Level 1 inputs, which include quoted prices in active markets for identical assets or liabilities;

- Level 2 inputs, which include observable inputs other than Level 1 inputs, such as quoted prices for similar assets or liabilities, quoted prices for identical or similar assets or liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the asset or liability. For available-for-sale securities, the Company reviews trading activity and pricing as of the measurement date. When sufficient quoted pricing for identical securities is not available, the Company uses market pricing and other observable market inputs for similar securities obtained from various third-party data providers. These inputs either represent quoted prices for similar assets in active markets or have been derived from observable market data; and

- Level 3 inputs, which include unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the underlying asset or liability. Level 3 assets and liabilities include those whose fair value measurements are determined using pricing models, discounted cash flow methodologies, or similar valuation techniques, as well as significant management judgment or estimation.

The following table represents the fair value hierarchy for the Company's financial assets and liabilities which require fair value measurement on a recurring basis (in thousands):

| | December 31, 2017 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | | Level 1 | | Level 2 | | Level 3 |
| **Assets:** | | | | | | | | |
| Money market | $ | 68,501 | $ | 68,501 | $ | — | $ | — |
| Corporate debt | | 23,471 | | — | | 23,471 | | — |
| U.S. Treasury notes | | 61,646 | | — | | 61,646 | | — |
| Total assets measured at fair value | $ | 153,618 | $ | 68,501 | $ | 85,117 | $ | — |
| **Liabilities:** | | | | | | | | |
| Embedded derivative liability | $ | 470 | $ | — | $ | — | $ | 470 |
| Total liabilities measured at fair value | $ | 470 | $ | — | $ | — | $ | 470 |

| | December 31, 2016 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | | Level 1 | | Level 2 | | Level 3 |
| **Assets:** | | | | | | | | |
| Money market | $ | 192 | $ | 192 | $ | — | $ | — |
| Corporate debt | | 51,233 | | — | | 51,233 | | — |
| U.S. Treasury notes | | 60,976 | | — | | 60,976 | | — |
| Total assets measured at fair value | $ | 112,401 | $ | 192 | $ | 112,209 | $ | — |

Money market funds are highly liquid investments and are actively traded. The pricing information on these investment instruments are readily available and can be independently validated as of the measurement date. This approach results in the classification of these securities as Level 1 of the fair value hierarchy.

Corporate debt and U.S. Treasury notes are measured at fair value using Level 2 inputs. The Company reviews trading activity and pricing for these investments as of each measurement date. When sufficient quoted pricing for identical securities is not available, the Company uses market pricing and other observable market inputs for similar securities obtained from various third-party data providers. These inputs represent quoted prices for similar assets in active markets or these inputs have been derived from observable market data. This approach results in the classification

90

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

of these securities as Level 2 of the fair value hierarchy. In certain cases where there is limited activity or less transparency around inputs to valuation, the related assets or liabilities are classified as Level 3. The Company classified an embedded derivative related to the Royalty-Backed Loan as a Level 3 liability.

The fair value of the embedded derivative as a result of a change in control was calculated using a probability-weighted discounted cash flow model. The model used in valuing this embedded derivative requires the use of significant estimates and assumptions including but not limited to: 1) expected cash flows the Company expects to receive on U.S. net sales of GOCOVRI and on royalties from Allergan on U.S. net sales of Namzaric; 2) the Company's risk adjusted discount rates; 3) the probability of receipt of orphan drug exclusivity for GOCOVRI for the treatment of dyskinesia in patients with Parkinson's disease; and 4) the probability of a change in control occurring during the term of the note based on the percentage of similar companies that were acquired over the previous five year period. Changes in the estimated fair value of the bifurcated embedded derivative are reported as gains or losses in interest and other income, net, in the condensed consolidated statement of operations. In the periods presented, the Company evaluated the embedded derivative value as a result of an event of default and the value as a result of increased costs due to a regulatory change and considered both to have no material value based on current assessment of probability, but could become material in future periods if a specified event of default or regulatory change became more probable than is currently estimated. See Note 9 "Long-Term Debt" for further description.

The following table sets forth a summary of the changes in the estimated fair value of the Company's embedded derivative, which is measured at fair value as a Level 3 liability on a recurring basis (in thousands):

| | | |
|---|---|---:|
| **Balance as of December 31, 2016** | $ | — |
| Issuance of long-term debt with embedded derivative | | 764 |
| Change in fair value included in interest and other income, net | | (294) |
| **Balance as of December 31, 2017** | $ | 470 |

There were no transfers between any of the levels of the fair value hierarchy during the years ended December 31, 2017 and 2016.

## 5. INVESTMENTS

The Company's investments consist of corporate debt and U.S. Treasury notes classified as available-for-sale securities.

The Company limits the amount of investment exposure as to institution, maturity, and investment type. To mitigate credit risk, the Company invests in investment grade corporate debt and United States Treasury notes. Such securities are reported at fair value, with unrealized gains and losses excluded from earnings and shown separately as a component of accumulated other comprehensive loss within stockholders' equity. Realized gains and losses are reclassified from other comprehensive loss to other income on the condensed consolidated statements of operations when incurred. The Company may pay a premium or receive a discount upon the purchase of available-for-sale securities. Interest earned and gains realized on available-for-sale securities and amortization of discounts received and accretion of premiums paid on the purchase of available-for-sale securities are included in investment income.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table is a summary of amortized cost, unrealized gain and loss, and the fair value of available-for-sale securities as of December 31, 2017 and 2016 (in thousands):

| | December 31, 2017 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **Investments:** | | | | |
| Corporate debt | $ 23,507 | $ — | $ (36) | $ 23,471 |
| U.S. Treasury notes | 61,777 | — | (131) | 61,646 |
| Total | $ 85,284 | $ — | $ (167) | $ 85,117 |
| **Reported as:** | | | | |
| Short-term investments | $ 82,280 | | $ (154) | $ 82,126 |
| Long-term investments | 3,004 | | (13) | 2,991 |
| Total | $ 85,284 | $ — | $ (167) | $ 85,117 |

| | December 31, 2016 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **Investments:** | | | | |
| Corporate debt | $ 51,354 | $ — | $ (121) | $ 51,233 |
| U.S. Treasury notes | 61,048 | 5 | (77) | 60,976 |
| Total | $ 112,402 | $ 5 | $ (198) | $ 112,209 |
| **Reported as:** | | | | |
| Short-term investments | $ 90,050 | $ 1 | $ (134) | $ 89,917 |
| Long-term investments | 22,352 | 4 | (64) | 22,292 |
| Total | $ 112,402 | $ 5 | $ (198) | $ 112,209 |

Short-term and long-term investments include accrued interest of $0.6 million and $14,000, respectively, as of December 31, 2017. Short-term and long-term investments includes accrued interest of $0.3 million and $0.1 million, respectively, as of December 31, 2016. The Company has not incurred any realized gains or losses on investments for the years ended December 31, 2017 and 2016. Investments are classified as short-term or long-term depending on the underlying investment's maturity date. Long-term investments held by the Company have a maturity date range of greater than 12 months and a maximum of 13 months as of December 31, 2017. All investments with unrealized losses at December 31, 2017 have been in a loss position for less than twelve months or the loss is not material and were temporary in nature. The Company does not intend to sell the investments that are in an unrealized loss position before recovery of their amortized cost basis.

## 6. INVENTORY

The Company began capitalizing inventory in August 2017 once the FDA approved GOCOVRI. Inventory consists of the following (in thousands):

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Raw materials | $ 859 | $ — |
| Work-in-process | 817 | — |
| Finished goods | 28 | — |
| Total inventory | $ 1,704 | $ — |

92

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**7. LICENSE AGREEMENTS**

In November 2012, the Company granted Allergan an exclusive license, with right to sublicense, certain of the Company's intellectual property rights relating to human therapeutics containing memantine in the United States. In connection with these rights, Allergan markets and sells Namzaric® and Namenda XR® for the treatment of moderate to severe dementia related to Alzheimer's disease. Pursuant to the agreement, Allergan made an upfront payment of $65.0 million. The Company earned and received additional cash payments totaling $95.0 million upon achievement by Allergan of certain development and regulatory milestones. Under the agreement, external costs incurred related to the prosecution and litigation of intellectual property rights are reimbursable. For the twelve months ended December 31, 2017 and 2016, reimbursed expenses amounting to $33,000 and $2.4 million, respectively, are reflected as a reduction to selling, general and administrative, net. In addition, the Company may earn tiered royalty payments based on future net sales of Namzaric and Namenda XR.

The Company identified the following two non-contingent performance deliverables under the license agreement: (i) transfer of intellectual property rights, inclusive of the related technology know-how conveyance ("license and know-how" or "license") and (ii) the obligation to participate on the Joint Development Committee ("JDC"). The Company concluded that the license and the know-how together represent a single deliverable, and therefore the two together have been accounted for as a single unit of accounting. There was no separate consideration identified in the agreement for the deliverables and there was no right of return under the agreement. The Company considered the provisions of the multiple-element arrangement guidance in determining whether the deliverables outlined above have standalone value. The transfer of license and know-how has standalone value separate from the obligation to participate on the JDC, as the agreement allows Allergan to sublicense its rights to the acquired license to a third party. Further, the Company believes that Allergan has research and development expertise with compounds similar to those licensed under the agreement and has the ability to engage other third parties to develop these compounds, allowing Allergan to realize the value of the license and know-how without receiving the JDC participation.

The Company developed its best estimates of selling prices ("BESP") for each deliverable in order to allocate the non-contingent arrangement consideration to the two units of accounting. Based on BESP analysis, value assigned to the obligation to participate on the JDC was a negligible amount. Accordingly, the entire upfront license fee of $65.0 million was allocated to the transfer of license and technical know-how. Revenue recognition commenced upon delivery of the license and was recognized on a straight-line basis through the period of the transfer of the know-how. Allergan was able to derive value from the license as the know-how was transferred. A straight-line pattern of revenue recognition is only acceptable when a more precise pattern cannot be discerned. The way in which the transfer of know-how occurred did not give rise to a more precise pattern of recognition, and the Company therefore recognized revenue on a straight-line basis over the period of the transfer of the know-how (from November 2012 to February 2013).

In November and December 2013, the Company received a total of $40.0 million in milestone payments under its license agreement with Allergan. The milestone payments were for the successful completion of studies that supported the New Drug Application ("NDA") filing with the FDA for Namzaric by Allergan. In May 2014, the Company received an additional $25.0 million milestone payment under the license agreement. This milestone payment was a result of the FDA's acceptance of the NDA for Namzaric. In December 2014, the Company received a final $30.0 million milestone payment in connection with the FDA approval of Namzaric. These amounts have been recorded as revenue when received in the consolidated statements of operations and comprehensive income during 2013 and 2014, respectively.

The Company is entitled to receive royalties on net sales in the United States by Allergan, its affiliates, or any of its sublicensees of controlled-release versions of memantine products covered by the terms of the license agreement. Beginning in May 2020, the Company will be entitled to receive royalties in the low to mid-teens from Allergan for sales of Namzaric in the United States. Beginning in June 2018, the Company will be entitled to receive royalties in the low to mid-single digits for sales of Namenda XR in the United States. Allergan's obligation to pay royalties with respect to fixed-dose memantine-donepezil products, including Namzaric, continues until the later of (i) 15 years after the commercial launch of the first fixed-dose memantine-donepezil product by Allergan in the United States or (ii) the expiration of the Orange Book listed patents for which Allergan obtained rights from the Company covering such product. Allergan's obligation to pay royalties with respect to Namenda XR continues until the expiration of the

93

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Orange Book listed patents covering such products. However, Allergan's obligation to pay royalties for any product covered by the license is eliminated in any quarter where there is significant competition from generics.

## 8. COMMITMENTS AND CONTINGENCIES

### Lease Commitments

The Company leases approximately 18,500 square feet of office space in Emeryville, California under an operating lease that expires April 30, 2020. The lease provides for periods of escalating rent. The total cash payments over the life of the lease are divided by the total number of months in the lease period and the average rent is charged to expense each month during the lease period. The Company's total rent expense was approximately $667,000, $625,000, and $628,000 for the years ended December 31, 2017, 2016, and 2015, respectively.

### Purchase Commitments

The Company has entered into agreements for the supply of API and the manufacture of commercial supply of GOCOVRI, with Moehs Ibérica, S.L. and Catalent Pharma Solutions, LLC, respectively. Under the terms of the agreements, the Company will supply the vendors with non-cancelable firm commitment purchase orders. The Company has also entered into other agreements with certain vendors for the provision of services, including services related to data access and packaging, under which the Company is contractually obligated to make certain payments to the vendors.

The Company enters into contracts in the normal course of business that include, among others, arrangements with CROs for clinical trials, vendors for pre-clinical research, and vendors for manufacturing. These contracts generally provide for termination upon notice, and therefore the Company believes that its obligations under these agreements are not material.

As of December 31, 2017, future minimum lease payments under the non-cancelable facility operating lease and non-cancelable purchase commitments were as follows (in thousands):

|  | December 31, 2017 |
| --- | --- |
| 2018 | $ 3,782 |
| 2019 | 2,019 |
| 2020 | 591 |
| 2021 | — |
| 2022 | — |
| Thereafter | — |
| Total | $ 6,392 |

### Contingencies

In the normal course of business, the Company enters into contracts and agreements that contain a variety of representations and warranties and provide for general indemnifications. The Company's exposure under these agreements is unknown, because it involves claims that may be made against the Company in the future, but have not yet been made. The Company accrues a liability for such matters when it is probable that future expenditures will be made and such expenditures can be reasonably estimated.

### Indemnification

In accordance with the Company's amended and restated certificate of incorporation and amended and restated bylaws, the Company has indemnification obligations to its officers and directors for certain events or occurrences, subject to certain limits, while they are serving in such capacity. There have been no claims to date, and the Company has a directors and officers liability insurance policy that may enable it to recover a portion of any amounts paid for future claims.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Litigation and Other Legal Proceedings**

In November 2012, the Company granted Forest an exclusive license to certain of the Company's intellectual property rights relating to human therapeutics containing memantine in the United States. Under the terms of that license agreement, Forest has the right to enforce such intellectual property rights which are related to its right to market and sell Namzaric and Namenda XR for the treatment of moderate to severe dementia related to Alzheimer's disease. The Company has a right to participate in, but not control, such enforcement actions by Forest.

As of the date of this filing, several companies have submitted Abbreviated New Drug Applications, or ANDAs, including one or more certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(iv) to the FDA requesting approval to manufacture and market generic versions of Namenda XR, on which the Company is entitled to receive royalties from Forest beginning in June 2018. In the notices, these companies allege that the patents associated with Namenda XR, some of which are owned by Forest or licensed by Forest from Merz Pharma GmbH & Co. KGaA, and others of which are owned by the Company and licensed by the Company exclusively to Forest in the United States, are invalid, unenforceable, and/or will not be infringed by the companies' manufacture, use, or sale of generic versions of Namenda XR. The Company, Forest, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH (together Merz) filed lawsuits in the U.S. District Court for the District of Delaware for infringement of the relevant patents against all of these companies. The Company and Forest will continue to enforce the patents associated with Namenda XR.

The Company and Forest have entered into a series of settlement agreements with all Namenda XR ANDA filers, except for one ANDA filer. Entry dates for generic Namenda XR are governed by the settlement agreements in that action. Subject to those agreements, the earliest date on which any of these agreements grants a license to market generic version of Namenda XR is January 31, 2020 or in the alternative, an option to launch an authorized generic version of Namenda XR beginning on January 31, 2021.

In January 2016, the Delaware District Court issued a claim construction (Markman) ruling in the Namenda XR litigation that includes findings of indefiniteness as to certain claim terms in the asserted patents licensed by the Company to Forest. On July 26, 2016, the District Court issued a final judgment of invalidity on those patents based upon the Markman ruling. The Company and Forest filed the notice of appeal of that final judgment to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). On December 11, 2017, the Federal Circuit issued a non-precedential opinion affirming the final judgment of the district court. On January 10, 2018, the Company and Forest filed a petition for rehearing/rehearing *en banc* with the Federal Circuit. On February 12, 2018, the appellate court denied that petition and on February 20, 2018, the mandate of the court was issued. Based upon the terms of certain settlement agreements with generic filers related to Namenda XR, certain generic filers can now commercialize generic versions of Namenda XR, if approved by the FDA.

On June 2, 2017, the Company and Forest filed a lawsuit against the remaining ANDA filer in the U.S. District Court for the District of Delaware for infringement of certain patents based on that filer's filing of an ANDA seeking FDA approval to manufacture and market generic versions of Namenda XR that included one or more certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(iv). This action is ongoing and in a very early stage.

On July 24, 2017, an ANDA filer that previously entered into a settlement agreement with Forrest and the Company filed a complaint against the Company and Forest in the Court of Chancery of the State of Delaware alleging that Forest and the Company breached the license agreement and settlement agreement entered into with that filer to settle the litigation related to its ANDA referencing Namenda XR as the reference listed drug. As of the date of this filing, this action has been settled by the parties.

Additionally, as of the date of this filing, a number of companies have submitted ANDAs including one or more certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(iv) to the FDA requesting approval to manufacture and market generic versions of Namzaric, on which the Company is entitled to receive royalties from Forest beginning in May 2020. The Company and Forest have filed lawsuits alleging infringement of the relevant patents against Namzaric ANDA filers, who are seeking to launch generic versions of Namzaric, in the same court as heard the Namenda XR litigation. As of the date of this filing, the Company and Forest have settled with all but one of the ANDA filers, including all first filers on all the available dosage forms of Namzaric. Entry dates for generic Namzaric are governed by the settlement agreements in those actions. Subject to those agreements, the earliest date on which any of these agreements grants a license to market generic version of Namzaric is January 1, 2025 or in the alternative, an option to launch an authorized

95

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

generic version of Namzaric beginning on January 1, 2026 or earlier in certain circumstances. The Company and Forest intend to continue to enforce the patents associated with Namzaric.

On June 2, 2017, the Company and Forest filed a lawsuit against the remaining ANDA filer in the U.S. District Court for the District of Delaware for infringement of certain patents based on its filing of an ANDA seeking FDA approval to manufacture and market generic versions of Namzaric that included one or more certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(iv). This action is ongoing and in a very early stage.

On April 20, 2017, an opposition was filed against the Company's European Patent EP 2 506 709 B1, which relates to extended release compositions comprising amantadine or a pharmaceutically acceptable salt thereof. On May 26, 2017, the Company received a Communication of Notices of Opposition (R. 79(1) EPC) from the European Patent Office that requested the Company file its observations in response to the opposition within a period of four months from May 26, 2017. The Company filed its response to the opposition on October 5, 2017.

On February 16, 2018, Osmotica Pharmaceuticals LLC and Vertical Pharmaceuticals LCC ("Osmotica") filed an action against the Company in U.S. District Court for the state of Delaware, requesting a declaratory judgment that Osmotica's newly-approved product Osmolex ER™ (amantadine) extended release tablets does not infringe certain of Adamas' patents. As of the date of this filing, Adamas has not received service of a summons and complaint.

From time to time, the Company may be party to legal proceedings, investigations, and claims in the ordinary course of its business. Other than the matters described above, the Company is not currently party to any material legal proceedings.

## 9. LONG-TERM DEBT

### Royalty-Backed Loan Agreement

In May 2017, the Company, through a new wholly-owned subsidiary, Adamas Pharma, LLC, entered into a Royalty-Backed Loan with HCRP, whereby the Company initially borrowed $35.0 million, followed by an additional $65.0 million received in the fourth quarter upon FDA approval and FDA's recognition in the Orange Book of the seven-year orphan drug exclusivity, which GOCOVRI earned upon approval on August 24, 2017. Principal and interest will be payable quarterly from the proceeds of a 12.5% royalty on U.S. net sales of GOCOVRI and up to $15.0 million of the Company's annual royalties from Allergan on U.S. net sales of Namzaric starting in May 2020, pursuant to the Company's license agreement with Allergan. The royalty rate on net sales of GOCOVRI will drop to 6.25% after the principal amount of the loan has been repaid in full, until the Company has made total payments of 200% of the funded amounts. The Company may elect to voluntarily prepay the loan at any time; or may be required to prepay, subject to specified prepayment trigger events as described below, in which case the amount due will be 200% of the funded amounts, less total payments made to date. Royalty rates are subject to increase to 17.5% and 22.5% if total principal and interest payments have not reached minimum specified levels at measurement dates on December 2021 and December 2022, respectively. Under the terms of the loan, HCRP has recourse to Adamas Pharma, LLC, not the Company. The loan agreement matures in December 2026 but as the repayment of the loan amount is contingent upon the sales volumes of GOCOVRI and royalties from Allergan, the repayment term may be shortened depending on the actual sales of GOCOVRI and actual royalties received from Allergan.

The loans bear interest at an annual rate of 11% on the outstanding principal amount and includes an interest-only period until the interest payment date following the ninth full calendar quarter after the $65.0 million additional loan. To the extent that royalties are insufficient to pay interest in full during the first nine quarters of the loan, any unpaid portion of the quarterly interest payment will be added to the principal amount of the loans. For the twelve months ended December 31, 2017, accrued interest in the amount of $4.4 million was added to the principal balance of the loan.

In connection with the Royalty-Backed Loan, the Company paid HCRP a lender expense amount of $0.4 million and incurred additional debt issuance costs totaling $0.8 million. The lender expense and additional debt issuance costs have been recorded as a debt discount and are being amortized and recorded as interest expense over the estimated term of the loan using the effective interest method. The Company recorded interest expense, including amortization of

96

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

the debt discount, related to the Royalty-Backed Loan, of $4.6 million for the twelve months ended December 31, 2017. Interest expense over the life of the Royalty-Backed Loan includes an annual interest rate of 11% on the outstanding principal, a royalty rate of 6.25% on net sales of GOCOVRI after the principal amount is paid, and amortization of the debt discount. The effective interest rate as of December 31, 2017 on the amounts borrowed under the Royalty-Backed Loan, including the amortization of the debt discount, was 19.1%.

The assumptions used in determining the expected repayment term of the loan and amortization period of the debt discount require that the Company make estimates that could impact the short and long-term classification of these costs, as well as the period over which these costs will be amortized and the effective interest rate.

The Company may be required to make mandatory prepayments of the borrowings under the Royalty-Backed Loan, subject to specified prepayment trigger events, including: (1) the occurrence of any event of default or (2) the occurrence of a change in control. Upon the prepayment of all or any of the outstanding principal balance, the Company shall pay in addition to such prepayment, a prepayment premium. As the holder of the loans may exercise the option to require prepayment by the Company, the prepayment premium is considered to be an embedded derivative which is required to be bifurcated from its host contract and accounted for as a separate financial instrument. The valuation of the embedded derivative is described further in Note 4.

Long-term debt and unamortized debt discount balances are as follows (in thousands):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Loans payable, gross | $ 100,000 | $ — |
| Less: Unamortized debt discount and issuance costs | (1,747) | — |
| Plus: Unpaid portion of quarterly interest payment | 4,394 | — |
| Carrying value of loans payable | $ 102,647 | $ — |
| Less: Current portion of long-term debt | — | — |
| Non-current portion of long-term debt | $ 102,647 | $ — |

The estimated fair value of the long-term debt, as measured using Level 3 inputs, approximates $109.5 million as of December 31, 2017. The estimated fair value was calculated in the same methodology as the valuation of the embedded derivative as described further in Note 4.

There are no contractual minimum principal payments due until the loan matures in December 2026 as the repayment of the loan amount is contingent upon the sales volumes of GOCOVRI and royalties from Allergan.

**10. CONVERTIBLE PREFERRED STOCK**

The Company's amended and restated certificate of incorporation filed on April 15, 2014, authorizes 5,000,000 shares of preferred stock, of which there were no shares outstanding as of December 31, 2017 and 2016.

**11. STOCKHOLDERS' EQUITY**

**Common Stock**

The amended and restated certificate of incorporation authorizes the Company to issue 100,000,000 shares of common stock. Common stockholders are entitled to dividends as and when declared by the board of directors, subject to the rights of holders of all classes of stock outstanding having priority rights as to dividends. There have been no dividends declared to date. Each share of common stock is entitled to one vote.

**Public Offering**

In January 2016, the Company completed a follow-on public offering of 2,875,000 shares of common stock, which includes the exercise in full by the underwriters of their option to purchase 375,000 shares of common stock, at an

97

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

offering price of $23.00 per share. Proceeds from the follow-on public offering were approximately $61.8 million, net of underwriting discounts and offering-related transaction costs.

### Sales Agreements

In June 2015, the Company entered into a sales agreement ("2015 Sales Agreement") with a sales agent, pursuant to which the Company was able to, at its discretion, issue and sell common stock from time to time with a value of up to a maximum of $25.0 million in an at-the-market offering. The sales agent earned a 3% commission on gross proceeds for any sales of common stock made under the 2015 Sales Agreement. The 2015 Sales Agreement was terminated in November 2016. During the year ended December 31, 2016, there were no shares sold under the 2015 Sales Agreement. The Company sold a total of 509,741 shares under the 2015 Sales Agreement in 2015 at prevailing market prices with an average price of $20.04 for net proceeds of $9.7 million.

In May 2017, the Company entered into a sales agreement ("2017 Sales Agreement") with Cowen and Company, LLC ("Cowen"), as sales agent, pursuant to which the Company may, from time to time, issue and sell at its option, shares of the Company's common stock for an aggregate offering price of up to $50.0 million under an at-the-market offering ("ATM Offering"). Sales of the common stock, if any, will be made pursuant to a shelf registration statement that was declared effective by the Securities and Exchange Commission ("SEC") on November 21, 2016. Cowen is acting as sole sales agent for any sales made under the Sales Agreement and the Company will pay Cowen a commission of up to 3% of the gross proceeds. The Company's common stock will be sold at prevailing market prices at the time of the sale, and, as a result, prices may vary. The Company is not obligated to make any sales of shares of common stock under the Sales Agreement. Unless otherwise terminated earlier, the Sales Agreement continues until all shares available under the Sales Agreement have been sold. As of December 31, 2017, no shares have been sold under the Sales Agreement.

### Shares reserved for Future Issuance

Shares of Company's common stock reserved for future issuance are as follows:

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Common stock awards issued and outstanding | 5,564,635 | 5,483,557 |
| Authorized for future issuance under 2014 Equity Incentive Plan | 1,723,733 | 1,576,926 |
| Authorized for future issuance under 2016 Inducement Plan | 188,715 | 334,062 |
| Employee stock purchase plan | 693,856 | 532,849 |
| **Total** | 8,170,939 | 7,927,394 |

## 12. STOCK-BASED COMPENSATION

### Stock Compensation Plans

In October 2002, the Company established its 2002 Employee, Director, and Consultant Stock Plan and in December 2007, the Company established its 2007 Stock Plan. No further grants were then made under the 2002 Plan.

In February 2014, the Company's board of directors adopted, and in March 2014 the Company's stockholders approved, the 2014 Equity Incentive Plan (the "2014 Plan"), which became effective on the completion of the IPO. No further grants were then made under the 2007 Plan. Under the 2014 Plan, 1,993,394 shares of the Company's common stock were made available for issuance which included all shares that, as of the effective time, were reserved for issuance pursuant to the 2007 Plan, and is subject to further increase for shares that were subject to outstanding options under the 2007 Plan and the 2002 Plan as of the effective time that thereafter expire, terminate, or otherwise are forfeited or reacquired. The number of shares of the Company's common stock reserved for issuance pursuant to the 2014 Plan will automatically increase on the first day of each fiscal year for a period of up to 10 years, commencing on the first day of the fiscal year following 2014, in an amount equal to 4% of the total number of shares of the Company's capital stock outstanding on the last day of the preceding fiscal year, or a lesser number of shares as determined by the Company's board of directors. For 2017, 2016, and 2015, the common stock available for issuance under the 2014 Plan increased by

**ADAMAS PHARMACEUTICALS, INC.**

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

880,362, 739,708, and 701,763 shares of common stock, respectively. As of December 31, 2017, the number of shares available for issuance under the 2014 Plan was 1,723,733.

Options granted under the 2014 Stock Plan may have terms of up to ten years. All options issued to date have had a ten year life. The exercise price of an ISO shall not be less than 100% of the estimated fair value of the shares on the date of grant, as determined by the board of directors. The exercise price of an ISO and NSO granted to a 10% stockholder shall not be less than 110% of the estimated fair value of the shares on the date of grant, respectively, as determined by the board of directors. The exercise price of a NSO shall not be less than the par value per share of common stock. The options granted generally vest over four years and vest at a rate of 25% upon the first anniversary of the issuance date and 1/48th per month thereafter. Restricted stock units granted vest at a rate of 25% per year over four years.

In March 2016, the Company's board of directors approved the 2016 Inducement Plan (the "Inducement Plan") under which 450,000 shares of the Company's common stock were made available for issuance. In January 2017, an amendment to the Inducement Plan was approved to increase the number of shares available for issuance an additional 450,000 shares for a total of 900,000 shares. Options granted under the Inducement Plan may have terms of up to ten years. All options issued to date have had a ten year life. Consistent with the 2014 Plan, options granted generally vest over four years and vest at a rate of 25% upon the first anniversary of the issuance date and 1/48th per month thereafter. Restricted stock units granted vest at a rate of 25% per year over four years. The Inducement Plan was adopted by the board of directors without stockholder approval pursuant to Rule 5635(c)(4) of the Nasdaq Listing Rules.

#### Stock Option Activity

The stock option and related activity under all of the Company's stock compensation plans is summarized as follows:

| | Outstanding Options | | Weighted Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (thousands) |
|---|---|---|---|---|
| **Stock Options** | Number of Shares | Weighted Average Exercise Price | | |
| **Balances, December 31, 2016** | 5,270,196 | $ 9.60 | | |
| Options granted | 1,444,675 | 18.87 | | |
| Options exercised | (1,183,353) | 7.63 | | |
| Options forfeited | (383,243) | 16.42 | | |
| Options expired | (10,691) | 20.29 | | |
| **Balances, December 31, 2017** | 5,137,584 | $ 12.12 | 6.48 | $ 111,981 |
| **Vested and expected to vest, December 31, 2017** | 4,991,486 | $ 11.99 | 6.43 | $ 109,438 |
| **Exercisable, December 31, 2017** | 3,363,191 | $ 9.01 | 5.31 | $ 83,688 |

The aggregate intrinsic value of options outstanding, vested and expected to vest, and exercisable were calculated as the difference between the exercise price of the options and the fair value of the Company's common stock as of December 31, 2017 of $33.89. The intrinsic value of options exercised, calculated as the difference between the exercise price and the fair value of the Company's common stock on the date of exercise, was approximately $18.1 million, $6.6 million, and $6.6 million for the years ended December 31, 2017, 2016, and 2015, respectively.

During the years ended December 31, 2017, 2016, and 2015, the Company granted stock options to employees to purchase 1,439,675, 1,030,375, and 917,150 shares of common stock, respectively, with a weighted-average grant date fair value of $11.93, $9.15, and $11.47, respectively. As of December 31, 2017, there was total unrecognized compensation cost related to unvested options of approximately $21.4 million. This cost is expected to be recognized over a period of 2.6 years. The total fair value of employee stock options vested for the years ended December 31, 2017, 2016, and 2015 was $10.6 million, $8.4 million and $10.0 million, respectively.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Restricted Stock Unit Activity**

The restricted stock unit and related activity under all of the Company's stock compensation plans is summarized as follows:

| Restricted Stock Units | Outstanding Units | |
| --- | --- | --- |
| | Number of Shares | Weighted-Average Grant Date Fair Value |
| **Unvested, December 31, 2016** | 213,361 | $ 14.66 |
| Granted | 349,896 | 19.97 |
| Vested | (64,471) | 14.96 |
| Forfeited | (71,735) | 16.13 |
| **Unvested, December 31, 2017** | 427,051 | $ 18.72 |

The aggregate intrinsic value of RSUs outstanding on December 31, 2017 was $14.5 million based on the fair value of the Company's common stock on that date. The aggregate intrinsic value of RSUs vested was approximately $1.2 million for the year ended December 31, 2017 and zero for both years ended December 31, 2016 and 2015. As of December 31, 2017, there was total unrecognized compensation cost related to unvested RSUs of approximately $7.0 million. This cost is expected to be recognized over a period of 3.4 years.

**Employee Stock Purchase Plan**

In February 2014, the Company's board of directors adopted and, in March 2014, the Company's stockholders approved, the 2014 Employee Stock Purchase Plan (the "ESPP"), which became effective on the completion of the Company's IPO. The ESPP authorized the issuance of 262,762 shares. Under the ESPP, employees, subject to certain restrictions, may purchase shares of common stock at 85% of the fair market value at either the beginning of the offering period or the date of purchase, whichever is less. Purchases are limited to the lesser of 15% of each employee's eligible annual compensation or $25,000. Through the end of 2017, the Company has issued a total of 149,363 shares under the ESPP. The number of shares available for future issuance under the plan were 693,856 at December 31, 2017. Beginning January 1, 2015 and continuing through and including January 1, 2024, the amount of common stock reserved for issuance under the ESPP will increase annually on that date by the lesser of (i) one percent (1%) of the total number of shares of common stock outstanding on such December 31, (ii) 520,000 shares of common stock, or (iii) a number of shares as determined by the board of directors prior to the beginning of each year, which shall be the lesser of (i) or (ii) above. For 2017, 2016, and 2015, the common stock available for issuance under the ESPP increased by 220,090, 184,927, and 175,440 shares of common stock, respectively.

**Stock-Based Compensation Expense**

The following table reflects stock-based compensation expense recognized for the years ended December 31, 2017, 2016, and 2015 (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Research and development | $ 3,597 | $ 2,855 | $ 3,156 |
| Selling, general and administrative | 9,770 | 7,716 | 6,800 |
| Total stock-based compensation expense | $ 13,367 | $ 10,571 | $ 9,956 |

Stock-based compensation of $39,000 was capitalized into inventory for the twelve months ended December 31, 2017. Stock-based compensation capitalized into inventory is recognized as cost of sales when the related product is sold.

100

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's method of valuation for share-based awards is based on the Black-Scholes model. The Company's determination of fair value of share-based payment awards on the date of grant using an option-pricing model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. A description of the assumptions follows:

- The expected stock price volatility assumption was determined by examining the historical volatilities of a group of industry peers, as well as taking into consideration the Company's own historical volatility since its IPO in 2014.

- The risk-free interest rate is based on the U.S. Treasury zero-coupon issues with remaining terms similar to the expected term on the options.

- The expected term of the options granted represents the average period the stock options are expected to remain outstanding. The Company has elected to use the "simplified method" for estimating the expected term, which is calculated as the mid-point between the vesting period and the contractual term of the options.

- The expected dividend yield assumption was based on the Company's historical and expectation of dividend payouts.

- Determination of the fair value of the shares of common stock underlying the stock options historically has been the responsibility of the Company's board of directors. Subsequent to the IPO in April 2014, the fair value of common stock is determined based on the closing price of the Nasdaq Global Market.

As stock-based compensation expense recognized in the Consolidated Statement of Operations for fiscal years 2017, 2016, and 2015 is based on awards ultimately expected to vest, each has been reduced for estimated forfeitures, based on historical experience. ASC 718-10 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.

The Company estimated the fair value of employee stock options and ESPP shares on the date of grant using the Black-Scholes model with the following weighted-average assumptions:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Stock Options** | | | |
| Expected price volatility | 68% - 70% | 69% - 71% | 68% - 80% |
| Risk-free interest rate | 1.83% - 2.17% | 1.23% - 1.81% | 1.37% - 1.95% |
| Expected term (in years) | 5.50 - 6.25 | 5.50 - 6.25 | 5.50 - 6.25 |
| Dividend yield | — | — | — |

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Employee Stock Purchase Plan** | | | |
| Expected price volatility | 51% - 71% | 68% - 73% | 56% - 62% |
| Risk-free interest rate | 0.60% - 1.45% | 0.49% - 0.60% | 0.07% - 0.41% |
| Expected term (in years) | 0.50 | 0.50 | 0.50 |
| Dividend yield | — | — | — |

Stock-based compensation expense related to employee stock options for the years ended December 31, 2017, 2016, and 2015 was $11.2 million, $9.3 million, and $8.7 million, respectively. Stock-based compensation expense related to the ESPP plan for the years ended December 31, 2017, 2016, and 2015 was $0.3 million, $0.3 million, and

101

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

$0.2 million, respectively. Stock-based compensation expense related to restricted stock units was $1.3 million, $0.5 million, and zero for the years ended December 31, 2017, 2016 and 2015, respectively.

**Non-Employee Stock-Based Compensation**

The Company granted 5,000 options to purchase common stock and 12,437 restricted stock units to consultants during the year ended December 31, 2017, 12,600 options to purchase common stock during the year ended 2016, and zero shares during the year ended 2015. These restricted stock units and options are granted in exchange for consulting services to be rendered and are measured and recognized as they are earned. Options issued during the year ended 2016 were granted to a member of the Company's board of directors. The Company believes that the estimated fair value of the restricted stock units and stock options is more readily measurable than the fair value of the services rendered.

The Company estimated the fair value of non-employee stock options using the Black-Scholes model with the following weighted-average assumptions:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Expected price volatility | 68% - 80% | 71% - 77% | 76% - 82% |
| Risk-free interest rate | 1.94% - 2.36% | 1.47% - 2.46% | 1.84% - 2.26% |
| Expected term (in years) | 6.00 - 9.75 | 7.00 - 9.75 | 8.00 - 9.00 |
| Dividend yield | — | — | — |

Compensation expense related to non-employee restricted stock units and options for years ended December 31, 2017, 2016, and 2015 was approximately $0.6 million, $0.5 million, and $1.1 million, respectively.

## 13. INCOME TAXES

Loss before provision for income tax is summarized as follows (in thousands):

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 |
| United States | $ | (91,220) | $ | (60,147) | $ | (57,074) |
| International | | — | | (26) | | — |
| Total | $ | (91,220) | $ | (60,173) | $ | (57,074) |

The provision for income taxes is summarized as follows (in thousands):

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 |
| Current: | | | | | | |
| Federal | $ | (1,730) | $ | (116) | $ | (5,273) |
| State | | — | | 1 | | 1 |
| Foreign | | — | | — | | — |
| | | (1,730) | | (115) | | (5,272) |
| Deferred: | | | | | | |
| Federal | | — | | — | | — |
| State | | — | | — | | — |
| Foreign | | — | | — | | — |
| | | — | | — | | — |
| Benefit for income taxes | $ | (1,730) | $ | (115) | $ | (5,272) |

102

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The provision for income taxes differs from the amount computed by applying the federal income tax rate of 35% to pretax loss from operations as a result of the following:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | **2016** | | **2015** | |
| Statutory federal income tax rate | $ | (31,927) | $ | (21,079) | $ | (19,976) |
| State income taxes, net of federal tax benefits | | (5,041) | | (9) | | 1 |
| Foreign rate differential | | — | | 10 | | — |
| Tax credits | | (2,306) | | (3,905) | | (8,303) |
| Impact of federal rate change | | 24,907 | | — | | — |
| Net operating loss carryback | | — | | — | | 4,099 |
| Change in statutory rates | | (1,440) | | 624 | | — |
| Stock compensation | | (2,558) | | (1,109) | | 821 |
| State net operating losses | | 633 | | 1,779 | | — |
| Other | | — | | 109 | | 1,330 |
| Change in valuation allowance | | 16,002 | | 23,465 | | 16,756 |
| Income tax provision | $ | (1,730) | $ | (115) | $ | (5,272) |

Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | December 31, | | | |
|---|---|---|---|---|
| | **2017** | | **2016** | |
| Net operating loss carryforwards | $ | 44,177 | $ | 29,102 |
| Research and development tax credits | | 16,189 | | 14,453 |
| Accruals and reserves | | 371 | | 395 |
| Stock compensation | | 6,244 | | 6,902 |
| Depreciation and amortization | | 1,638 | | 1,765 |
| Total deferred tax assets | | 68,619 | | 52,617 |
| Less: Valuation allowance | | (68,619) | | (52,617) |
| Net deferred tax assets | $ | — | $ | — |

The deferred income tax assets have been fully offset by a valuation allowance, as realization is dependent on future earnings, if any, the timing and amount of which are uncertain. The net valuation allowance increased by $16.0 million and $23.5 million for the years ended December 31, 2017 and 2016, respectively.

The Company's accounting for deferred taxes involves the evaluation of a number of factors concerning the realizability of its net deferred tax assets. The Company primarily considered such factors as its history of operating losses, the nature of the Company's deferred tax assets, and the timing, likelihood, and amount, if any, of future taxable income during the periods in which those temporary differences and carryforwards become deductible. The Tax Act repealed corporate alternative minimum tax ("AMT") for tax years beginning after December 31, 2017, and provides that existing AMT credit carryovers are refundable beginning in 2018 through 2022. The Company has approximately $1.7 million of AMT credit carryovers that are fully refunded by 2022 and therefore the deferred tax asset has been reclassed to an income tax receivable. As for the remaining deferred tax assets, the Company does not believe that it is more likely than not that the deferred tax assets will be realized; accordingly, a full valuation allowance has been established and no deferred tax asset is shown in the accompanying balance sheets.

As of December 31, 2017, and December 31, 2016, the Company had federal net operating loss carryforwards of approximately $163.3 million and $73.0 million, respectively, available to reduce future taxable income. The Company also had state net operating loss carryforwards of approximately $131.3 million and $61.8 million as of December 31, 2017 and December 31, 2016, respectively. The federal net operating loss carryforward begins expiring in 2025, and the non-utilized state net operating loss carryforward began expiring in 2016. In the year ended December 31, 2017, $11.0 million of California net operating loss carryforwards expired.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company has federal research and development tax credit carryforwards of approximately $3.5 million. If not utilized, the carryforwards will begin expiring in 2024. The Company has state research and development credit carryforwards of approximately $3.2 million which do not expire. The Company also has orphan drug credit carryforwards of $13.5 million.

Under federal and similar state tax statutes, changes in the Company's ownership may limit its ability to use its available net operating loss and tax credit carryforwards. The annual limitation, as a result of a change of control, may result in the expiration of net operating losses and credits before utilization.

The Company's ability to use its remaining net operating loss and tax credit carryforwards may be further limited if the Company experiences a Section 382 ownership change in connection with future changes in its stock ownership.

*Uncertain Tax Positions*

The total amounts of unrecognized tax benefits for the years ended December 31, 2017, 2016, and 2015 were $4.0 million, $3.2 million, and $1.8 million, respectively. If recognized, none of the unrecognized tax benefits would affect the effective tax rate.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Balance at the beginning of the year** | $ 3,188 | $ 1,820 | $ 2,608 |
| Additions based on prior period tax positions | 43 | 93 | 980 |
| Additions based on current period tax positions | 803 | 1,275 | — |
| Reductions based on prior period tax positions | — | — | (1,768) |
| **Balance at the end of the year** | $ 4,034 | $ 3,188 | $ 1,820 |

The Company's policy is to account for interest and penalties as income tax expense. The Company accrued no interest related to unrecognized tax benefits during the years ended December 31, 2017, 2016, and 2015.

The Company files income tax returns in the U.S. federal jurisdiction, California, other state jurisdictions, and India. The Company is subject to U.S. federal income tax examination for the calendar years ending 2002 through 2017 due to net operating losses that have been carried forward for tax purposes. Additionally, the Company is subject to state income tax examinations for the 2006 through 2017 calendar years due to net operating losses that are being carried forward for tax purposes. The Company is subject to audit by the Indian tax authorities from 2014 onward. The Company is not currently under audit in any major tax jurisdiction.

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code, including, but not limited to, reducing the U.S. federal corporate tax rate from 35 percent to 21 percent for tax years beginning after December 31, 2017.

Pursuant to the SEC Staff Accounting Bulletin No. 118, "Income Tax Accounting Implications of the Tax Cuts and Jobs Act" ("SAB 118"), a company may select between one of three scenarios to determine a reasonable estimate arising from the Tax Act. Those scenarios are (i) a final estimate which effectively closes the measurement window; (ii) a reasonable estimate leaving the measurement window open for future revisions; and (iii) no estimate as the law is still being analyzed. The Company was able to provide a reasonable estimate for the revaluation of deferred taxes by recording a net tax provision of $24.9 million in the period ending December 31, 2017, which is offset by a full valuation allowance. This reasonable estimate will leave the measurement window open for up to one year. This tax expense is primarily due to the corporate rate reduction. The Company has also recorded a tax benefit of $1.7 million for the AMT credits which are refundable in tax year 2018 through 2022.

**ADAMAS PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## 14. NET LOSS PER SHARE

A reconciliation of the numerator and denominator used in the calculation of the basic and diluted net loss per share is as follows (in thousands, except per share data):

| | December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| **Historical net loss per share** | | | |
| Numerator: | | | |
| Net loss, basic and diluted | $ (89,490) | $ (60,058) | $ (51,802) |
| Denominator: | | | |
| Weighted average common shares outstanding, basic and diluted | 22,558 | 21,711 | 18,116 |
| Less: weighted average unvested common shares subject to repurchase | — | — | (5) |
| Weighted average common shares used in calculating net loss per share, basic and diluted | 22,558 | 21,711 | 18,111 |
| Net loss per share, basic and diluted | $ (3.97) | $ (2.77) | $ (2.86) |

The following shares of potentially dilutive securities were excluded from the computation of diluted net loss per share for the periods presented, because including them would have been anti-dilutive (in thousands):

| | December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Options to purchase common stock | 5,940 | 5,523 | 5,249 |
| Total | 5,940 | 5,523 | 5,249 |

## 15. QUARTERLY FINANCIAL INFORMATION (UNAUDITED)

The following table represents certain unaudited quarterly information for the eight quarters ended December 31, 2017. This data has been derived from unaudited consolidated financial statements that, in the opinion of the Company's management, include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of such information when read in conjunction with the Company's annual audited consolidated financial statements and notes thereto appearing elsewhere in this report. These operating results are not necessarily indicative of results for any future period (in thousands, except per share data):

| | Year Ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total net revenues | $ — | $ 2 | $ 1 | $ 568 (1) |
| Gross profit(2) | — | — | — | 551 |
| Net loss | (16,028) | (20,745) | (23,360) | (29,357) |
| Net loss per share, basic and diluted | (0.72) | (0.93) | (1.04) | (1.27) |

| | Year Ended December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Total net revenues | $ 175 | $ 222 | $ 138 | $ 37 |
| Gross profit | — | — | — | — |
| Net loss | (13,828) | (16,876) | (14,394) | (14,960) |
| Net loss per share, basic and diluted | (0.65) | (0.78) | (0.66) | (0.68) |

(1)   In the fourth quarter of 2017 the Company commenced commercial sales of GOCOVRI.
(2)   Gross profit is computed by subtracting cost of product sales from product sales, net.

**16. SUBSEQUENT EVENTS**

On January 16, 2018, the Company amended its lease agreement with KBSIII Towers at Emeryville, LLC to extend its lease until April 30, 2025, and relocate the Company within its current building from the seventh to the tenth and eleventh floors, containing approximately 37,626 rentable square feet. The relocation of the Company is expected to occur no later than the second quarter of 2018. Upon relocation, the Company shall pay a base rent of $159,911 per month for the first twelve months, with the monthly rent increasing approximately $5,000 per month in each subsequent year until the expiration of the lease.

On January 26, 2018, the Company completed a follow-on public offering of 3,450,000 shares of its common stock, which includes the exercise in full by the underwriters of their option to purchase 450,000 shares of common stock, at an offering price of $41.50 per share. Proceeds from the follow-on public offering were approximately $134.1 million, net of underwriting discounts, commissions, and offering-related transaction costs.

**ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.


**ITEM 9A.  CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and the rules and regulations thereunder, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) under the Exchange Act, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2017. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of December 31, 2017, our disclosure controls and procedures were effective.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, our principal executive officer and principal financial officer and effected by our board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in conformity with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013). Based on this assessment, management has concluded that, as of December 31, 2017, our internal control over financial reporting is effective based on those criteria**.**

*Attestation Report on Internal Control over Financial Reporting*

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm on internal control over financial reporting due to the deferral allowed under the JOBS Act for emerging growth companies.

**Changes in Internal Control Over Financial Reporting**

During the year ended December 31, 2017, we implemented processes and internal controls to record product sales, cost of product sales, and inventory as a result of the FDA approval of GOCOVRI. The implementation of these processes resulted in changes to internal controls over financial reporting, which we believe were material. There were no other changes in our internal controls over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the year ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.  OTHER INFORMATION**

None.

**PART III**

Certain information required by Part III is omitted from this annual report on Form 10-K and is incorporated herein by reference to our definitive Proxy Statement for our 2018 Annual Meeting of Stockholders, or the Proxy Statement, which we intend to file pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, within 120 days after December 31, 2017.

## ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item concerning our directors is incorporated by reference to the information set forth in the section titled "Election of Directors" and "Corporate Governance" in our Proxy Statement. Information required by this item concerning our executive officers is incorporated by reference to the information set forth in the section entitled "Executive Officers and Key Employees" in our Proxy Statement. Information regarding Section 16 reporting compliance is incorporated by reference to the information set forth in the section entitled "Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement.

Our written Code of Conduct and Ethics applies to all of our directors and employees, including our executive officers, including without limitation our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The Code of Conduct and Ethics is available on our website at http://www.adamaspharma.com in the Investors section under "Corporate Governance". Changes to or waivers of the Code of Conduct and Ethics will be disclosed on the same website. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding any amendment to, or waiver of, any provision of the Code of Conduct and Ethics in the future by disclosing such information on our website.

## ITEM 11.  EXECUTIVE COMPENSATION

The information required by this item regarding executive compensation is incorporated by reference to the information set forth in the sections titled "Executive Compensation" and "Compensation Committee Interlocks and Insider Participation" in our Proxy Statement.

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item regarding security ownership of certain beneficial owners and management is incorporated by reference to the information set forth in the section titled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in our Proxy Statement.

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item regarding certain relationships and related transactions and director independence is incorporated by reference to the information set forth in the sections titled "Certain Relationships and Related Persons Transactions" and "Corporate Governance", respectively, in our Proxy Statement.

## ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this item regarding principal accountant fees and services is incorporated by reference to the information set forth in the section titled "Principal Accountant Fees and Services" in our Proxy Statement.

## ITEM 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES

**(a)(1)  Financial Statements**

Consolidated Financial Statements are listed in the "Index to Consolidated Financial Statements" under Part II, Item 8 of this Annual Report on Form 10-K.

**(a)(2)  Financial Statement Schedules**

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the consolidated financial statements or related notes thereto.

**(a)(3)  Exhibits**

### EXHIBIT INDEX

| Exhibit Number | Exhibit Description | Incorporation By Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 3.1 | Amended and Restated Certificate of Incorporation of Adamas Pharmaceuticals, Inc. | 8-K | 001-36399 | 3.1 | 4/15/2014 | |
| 3.2 | Amended and Restated Bylaws of Adamas Pharmaceuticals, Inc. | S-1 | 333-194342 | 3.4 | 3/5/2014 | |
| 4.1 | Reference is made to Exhibits 3.1 through 3.2. | | | | | |
| 4.2 | Form of Common Stock Certificate of Adamas Pharmaceuticals, Inc. | S-1 | 333-194342 | 4.1 | 3/26/2014 | |
| 4.3 | Fourth Amended and Restated Investor Rights Agreement, dated as of September 30, 2011, by and among the registrant and certain of its stockholders. | S-1 | 333-194342 | 10.5 | 3/5/2014 | |
| 10.1* | Adamas Pharmaceuticals, Inc. 2002 Employee, Director and Consultant Stock Plan, as amended, and Form of Stock Option Grant Notice, Option Agreement and Form of Notice of Exercise. | S-1 | 333-194342 | 10.1 | 3/5/2014 | |
| 10.2* | Adamas Pharmaceuticals, Inc. 2007 Stock Plan, as amended, and Form of Stock Option Grant Notice, Option Agreement and Form of Notice of Exercise. | S-1 | 333-194342 | 10.2 | 3/5/2014 | |
| 10.3* | Adamas Pharmaceuticals, Inc. 2014 Equity Incentive Plan and Form of Stock Option Grant Notice and Option Agreement. | S-1 | 333-194342 | 10.3 | 4/7/2014 | |
| 10.4* | Adamas Pharmaceuticals, Inc. Form of Stock Option Grant Notice and Option Agreement. | 10-Q | 001-36399 | 10.24 | 8/11/2015 | |
| 10.5* | Adamas Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan. | S-1 | 333-194342 | 10.4 | 3/26/2014 | |

110

| Exhibit Number | Exhibit Description | Incorporation By Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 10.6* | Adamas Pharmaceuticals, Inc. Form of Restricted Stock Unit Grant Notice and Award Agreement. | 10-K | 001-36399 | 10.24 | 2/23/2016 | |
| 10.7* | Adamas Pharmaceuticals, Inc. Amended and Restated 2016 Inducement Plan. | S-8 | 333-216313 | 99.5 | 2/28/2017 | |
| 10.8* | Form of Restricted Stock Unit Grant Notice and Award Agreement under the Adamas Pharmaceuticals, Inc. 2016 Inducement Plan. | S-8 | 333-194342 | 99.6 | 3/17/2016 | |
| 10.9* | Form of Stock Option Grant Notice and Option Agreement under the Adamas Pharmaceuticals, Inc. 2016 Inducement Plan. | S-8 | 333-194342 | 99.7 | 3/17/2016 | |
| 10.10 | Office Lease Agreement by and between the registrant and CA-Emeryville Properties Limited Partnership, dated as of October 25, 2006. | S-1 | 333-194342 | 10.7 | 3/5/2014 | |
| 10.11 | First Amendment to Lease by and between the registrant and NOP Watergate LLC (as successor in interest to CA-Emeryville Properties Limited Partnership), dated as of April 29, 2009. | S-1 | 333-194342 | 10.8 | 3/5/2014 | |
| 10.12 | Second Amendment to Office lease Agreement by and between the registrant and Emeryville Office, L.L.C. (as successor to NOP Watergate, LLC), dated as of January 18, 2011. | S-1 | 333-194342 | 10.9 | 3/5/2014 | |
| 10.13 | Third Amendment to Lease by and between the registrant and Emeryville Office, L.L.C., dated as of June 17, 2011. | S-1 | 333-194342 | 10.10 | 3/5/2014 | |
| 10.14 | Fourth Amendment to Lease by and between the registrant and Emeryville Office, L.L.C., dated as of January 31, 2013. | S-1 | 333-194342 | 10.11 | 3/5/2014 | |
| 10.15 | Fifth Amendment to Lease by and between the registrant and Emeryville Office, L.L.C., dated as of May 23, 2014. | 10-Q | 001-36399 | 10.3 | 8/7/2014 | |
| 10.16 | Sixth Amendment to Lease by and between the registrant and KBSIII Towers At Emeryville, LLC, dated as of October 27, 2015. | 10-K | 001-36399 | 10.23 | 2/23/2016 | |
| 10.17** | License Agreement by and between the registrant and Forest Laboratories Holdings Limited, dated as of November 13, 2012. | S-1/A | 333-194342 | 10.6 | 4/7/2014 | |
| 10.18* | Adamas Pharmaceuticals, Inc. Amended and Restated Executive Severance Plan. | 10-Q | 001-36399 | 10.2 | 5/9/2017 | |
| 10.19* | Offer Letter by and between Adamas Pharmaceuticals, Inc. and Gregory Went, dated as of March 8, 2006. | S-1 | 333-194342 | 10.12 | 3/5/2014 | |

| Exhibit Number | Exhibit Description | Incorporation By Reference | | | | | Filed Herewith |
|---|---|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date | | |
| 10.20* | Offer Letter by and between registrant and William J. Dawson, dated as of August 12, 2014. | 8-K | 001-36399 | 10.8 | 8/13/2014 | | |
| 10.21* | Offer letter by and between the registrant and Rajiv Patni, MD, dated April 17, 2015. | 10-Q | 001-36399 | 10.23 | 8/11/2015 | | |
| 10.22* | Offer letter by and between the registrant and Jennifer Rhodes, dated March 25, 2016. | 10-Q | 001-36399 | 10.1 | 5/10/2016 | | |
| 10.23* | Form of Indemnity Agreement between the registrant and its directors and officers. | S-1 | 333-194342 | 10.17 | 3/5/2014 | | |
| 10.24* | 2016 Executive Cash Bonus Award Program. | 10-Q | 001-36399 | 10.2 | 5/10/2016 | | |
| 10.25* | 2017 Executive Cash Bonus Award Program. | 8-K | 001-36399 | 10.1 | 4/5/2017 | | |
| 10.26* | Consulting Services Agreement by and between the registrant and John MacPhee, M.P.H., dated February 1, 2016, and as amended dated August 5, 2016. | 10-Q | 001-36399 | 10.1 | 11/3/2016 | | |
| 10.27* | Compensatory Arrangements with Non-Employee Directors. | 10-K | 001-36399 | 10.27 | 2/28/2017 | | |
| 10.28* | Offer letter by and between the registrant and Richard A. King, dated April 17, 2017. | 10-Q | 001-36399 | 10.1 | 8/8/2017 | | |
| 10.29* | Offer letter by and between the registrant and Alfred G. Merriweather, dated June 26, 2017. | 10-Q | 001-36399 | 10.2 | 8/8/2017 | | |
| 10.30* | Separation agreement by and between the registrant and William Dawson, dated June 27, 2017. | 10-Q | 001-36399 | 10.3 | 8/8/2017 | | |
| 10.31** | Loan Agreement dated May 11, 2017 between Adamas Pharma, LLC and Healthcare Royalty Partners III, L.P. | 10-Q | 001-36399 | 10.4 | 8/8/2017 | | |
| 10.32 | Secured Promissory Note dated May 11, 2017 between Adamas Pharma, LLC and Healthcare Royalty Partners III, L.P. | 10-Q | 001-36399 | 10.5 | 8/8/2017 | | |
| 10.33** | Amended and Restated Commercial Supply Agreement by and between Adamas Pharmaceuticals, Inc. and Catalent Pharma Solutions, LLC. | 10-Q | 001-36399 | 10.1 | 11/2/17 | | |
| 10.34** | Amended and Restated API Supply Agreement by and between Adamas Pharma, LLC and Moehs Ibérica, S.L. | 10-Q | 001-36399 | 10.2 | 11/2/17 | | |
| 10.35* | 2017 compensation actions with respect to the CEO and CFO. | 8-K | 001-36399 | Item 5.02 | 2/27/2017 | | |
| 10.36* | Change in Compensation for Christopher B. Prentiss, Chief Accounting Officer. | 8-K | 001-36399 | Item 5.02 | 9/21/2017 | | |
| 10.37 | Secured Promissory Note dated November 27, 2017 between Adamas Pharma, LLC and Healthcare Royalty Partners III, L.P. | | | | | | X |

112

| Exhibit Number | Exhibit Description | Incorporation By Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 10.38 | Seventh Amendment to Lease by and between the registrant and KBSIII Towers At Emeryville, LLC, dated as of January 16, 2018. | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm. | | | | | X |
| 24.1 | Power of Attorney (included on the signature page hereto). | | | | | X |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as amended. | | | | | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as amended. | | | | | X |
| 32.1 | Certification of Principal Executive Officer and Principal Financial Officer pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.(1). | | | | | X |
| 101.INS | XBRL Instance Document | | | | | X |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |

---

(1)   This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Registrant under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

\* Management compensatory contract or arrangement.

\*\* Confidential treatment has been granted for certain portions of this exhibit.

**ITEM 16.  FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Adamas Pharmaceuticals, Inc.**
(Registrant)

Date:    February 22, 2018                                               /s/ Gregory T. Went, Ph.D.

Gregory T. Went, Ph.D.
*Chief Executive Officer*
*(Principal Executive Officer)*

Date:    February 22, 2018                                               /s/ Alfred G. Merriweather

Alfred G. Merriweather
*Chief Financial Officer*
*(Principal Financial Officer)*

114

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Gregory T. Went, Ph.D. and Alfred G. Merriweather, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Gregory T. Went<br>Gregory T. Went, Ph.D. | Chief Executive Officer and Chairman<br>(Principal Executive Officer) | February 22, 2018 |
| /s/ Alfred G. Merriweather<br>Alfred G. Merriweather | Chief Financial Officer<br>(Principal Financial Officer) | February 22, 2018 |
| /s/ Christopher B. Prentiss<br>Christopher B. Prentiss | Chief Accounting Officer<br>(Principal Accounting Officer) | February 22, 2018 |
| /s/ Michael Bigham<br>Michael Bigham | Director | February 22, 2018 |
| /s/ Martha J. Demski<br>Martha J. Demski | Director | February 22, 2018 |
| /s/ Mardi C. Dier<br>Mardi C. Dier | Director | February 22, 2018 |
| /s/ William Ericson<br>William Ericson | Director | February 22, 2018 |
| /s/ Ivan Lieberburg<br>Ivan Lieberburg, M.D., Ph.D. | Director | February 22, 2018 |
| /s/ John MacPhee<br>John MacPhee | Director | February 22, 2018 |
| /s/ David L. Mahoney<br>David L. Mahoney | Director | February 22, 2018 |

115

# SECURED PROMISSORY NOTE
## (Subsequent Tranche Loan)

**THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE LOAN AGREEMENT REFERRED TO BELOW. TRANSFERS OF THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE BORROWER PURSUANT TO THE TERMS OF THE LOAN AGREEMENT. IN ADDITION, THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED, HEDGED OR OTHERWISE TRANSFERRED WITHOUT THE PRIOR WRITTEN CONSENT OF THE BORROWER, WHICH CONSENT SHALL, FOR PURPOSES OF THIS SENTENCE, BE DEEMED TO HAVE BEEN GIVEN UPON THE REQUEST OF THE HOLDER HEREOF.**

New York, New York

$65,000,000.00                                                                              Dated: November 27, 2017

FOR VALUE RECEIVED, the undersigned, Adamas Pharma, LLC, a Delaware limited liability company, with offices located at 1900 Powell Street, Emeryville, California 94608 ("**Borrower**") HEREBY PROMISES TO PAY to the order of HEALTHCARE ROYALTY PARTNERS III, L.P. ("**Lender**") the principal amount of SIXTY FIVE MILLION DOLLARS ($65,000,000) or such lesser amount as shall equal the outstanding principal balance of the Subsequent Tranche Loan made to Borrower by Lender, plus interest on the aggregate unpaid principal amount of such Subsequent Tranche Loan, at the rates and in accordance with the terms of the Loan Agreement, dated as of May 10, 2017 by and between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"). If not sooner paid, the entire principal amount and all accrued and unpaid interest hereunder shall be due and payable on the Maturity Date as set forth in the Loan Agreement. Any capitalized term not otherwise defined herein shall have the meaning attributed to such term in the Loan Agreement.

Principal, interest, and all other amounts (including but not limited to additional amounts, if any, payable under Section 3.02 of the Loan Agreement) due with respect to the Subsequent Tranche Loan under the Loan Agreement or the other Loan Documents, are payable in lawful money of the United States of America to Lender as set forth in the Loan Agreement and this Secured Promissory Note (this "**Note**"). The principal amount of this Note and the interest rate applicable thereto, and all payments made with respect thereto, shall be recorded by Lender and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Note.

This Note is a Loan Document, is entitled to the benefits of the Loan Documents, is subject to the Loan Agreement and evidences the Indebtedness incurred thereunder.

The Loan Agreement, among other things, (a) provides for the making of a Subsequent Tranche Loan by Lender to Borrower, and (b) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of the principal hereof, together with interest and other amounts, upon the terms and conditions specified therein.

This Note may not be prepaid except as set forth in Section 3.02 of the Loan Agreement.

This Note and the obligation of Borrower to repay the unpaid principal amount of the Subsequent Tranche Loan, interest on the Subsequent Tranche Loan and all other amounts due Lender under the Loan Agreement and other Loan Documents, is secured under the Security Agreement and by the pledge under the Stock Pledge Agreement.

Presentment for payment, demand, notice of protest and all other demands and notices of any kind in connection with the execution, delivery, performance and enforcement of this Note are hereby waived.

This Note is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein in accordance with Section 5.05 of the Loan Agreement.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING GENERAL OBLIGATIONS LAW SECTIONS 5-1401 AND 5-1402**

**BUT OTHERWISE WITHOUT GIVING EFFECT TO LAWS CONCERNING CONFLICTS OF LAWS OR CHOICE OF FORUM THAT WOULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

Sections 1.02 (Rules of Construction), 4.03 (Interest on Late Payments), 4.05 (Administration and Enforcement Expenses), 8.11 (Waiver of Stay, Extension or Usury Laws), 12.11 (Jurisdiction), 12.12 (Waiver of Jury Trial) and 12.13 (Waiver of Immunity) of the Loan Agreement shall be deemed incorporated herein *mutatis mutandis*.

The ownership of an interest in this Note shall be registered on a record of ownership maintained by Borrower or its agent. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the transfer is registered on such record of ownership and the transferee is identified as the owner of an interest in the obligation. Borrower shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to or interest in this Note on the part of any other person or entity.

*[Balance of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

**BORROWER:**

ADAMAS PHARMA, LLC

By:    ADAMAS PHARMACEUTICALS, INC., its manager

By:    /s/ Gregory T. Went

       Name:    Gregory T. Went
       Title:    Chief Executive Officer

**LOAN INTEREST AND PAYMENTS OF PRINCIPAL
SUSEQUENT TRANCHE LOAN**

| Date | Principal Amount | Interest | Payment Amount | Notation By |
|------|------------------|----------|----------------|-------------|
|      |                  |          |                |             |

**SUBSEQUENT FUNDING DATE CERTIFICATE OF THE BORROWER**

The undersigned, being the duly elected and qualified Senior Officer of Adamas Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and sole Manager of Adamas Pharma, LLC, a Delaware limited liability company ("Borrower"), does hereby certify pursuant to Section 6.02(e) of that certain Loan Agreement, dated as of May 11, 2017 (the "Loan Agreement"), between Borrower and Healthcare Royalty Partners III, L.P., a Delaware limited partnership ("Lender"), as of November 27, 2017 (the "Subsequent Funding Date"), that:

(A)     Borrower has executed and delivered to the Lender the Subsequent Tranche Note evidencing the Subsequent Tranche Loan, dated the Subsequent Funding Date;

(B)     no event has occurred and is continuing that (i) constitutes a Default or an Event of Default or a Prepayment Trigger and (ii) no such event shall occur or shall have occurred by reason of the making of the Subsequent Tranche Loan;

(C)     the representations and warranties made by Borrower in Article VII of the Loan Agreement and in the other Transaction Documents are true and correct in all material respects as of the Subsequent Funding Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date, before and after giving effect to the Subsequent Tranche Loan (except that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects); and

(D)     FDA Approval has occurred.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the Subsequent Funding Date.

"Borrower"

ADAMAS PHARMA, LLC

By:     Adamas Pharmaceuticals, Inc.,
        its manager

By:     /s/ Gregory T. Went
        Name:     Gregory T. Went
        Title:    Chief Executive Officer

**SEVENTH AMENDMENT TO LEASE**

THIS SEVENTH AMENDMENT TO LEASE ("**Amendment**"), dated for reference purposes only as of the 16th day of January, 2018 is entered into by and between KBSIII Towers at Emeryville, LLC, a Delaware limited liability company ("**Landlord**"), and ADAMAS PHARMACEUTICALS, INC., a Delaware corporation (formerly known as Neuromolecular Pharmaceuticals, Inc.) ("**Tenant**").

**RECITALS:**

A.      Landlord (as successor to Emeryville Office, L.L.C. and NOP Watergate, LLC) and Tenant are parties to that certain Office Lease Agreement dated October 25, 2006 (the "**Original Lease**"), which Original Lease has previously been amended by that certain: (i) First Amendment to Lease dated April 29, 2009 (the "**First Amendment**"), (ii) Second Amendment to Office Lease Agreement dated January 18, 2011 (the "**Second Amendment**"), (iii) Third Amendment to Lease dated June 17, 2011 (the "**Third Amendment**"), (iii) Fourth Amendment to Lease dated January 31, 2013 (the "**Fourth Amendment**"), (iv) Fifth Amendment to Lease dated May 23, 2014 (the "**Fifth Amendment**"), and (v) Sixth Amendment to Lease dated October 27, 2015 (the "**Sixth Amendment**" ) (the Original Lease, as so amended, is referred to herein collectively as the "**Lease**"). Pursuant to the Lease, Tenant currently leases from Landlord those certain premises on the seventh floor of the building at 1900 Powell Street, Emeryville, California (the "**Building**"), described as Suite 750 containing approximately 18,539 rentable square feet (the "**Current Premises**").

B.      Capitalized terms not defined herein have the meanings given to such terms in the Lease.

C.      The Term of the Lease is currently scheduled to expire on April 30, 2020. Landlord and Tenant desire to enter into this Amendment to extend the Term of the Lease.

D.      In addition, the parties desire to amend the Lease in order to, among other things, relocate Tenant from the Current Premises to those certain spaces commonly known as (i) Suite 1000 located on the Tenth (10th) floor of the Building, consisting of approximately 18,813 rentable square feet, and (ii) Suite 1100 located on the Eleventh (11th) floor of the Building, consisting of approximately 18,813 rentable square feet, containing approximately 37,626 rentable square feet in the aggregate (together, the "**New Premises**"), as depicted on Exhibit A attached hereto, and to further amend the terms of the Lease upon the terms and conditions set forth below.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Amendment and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.   Re-measurement of the Building and Property. Landlord and Tenant hereby acknowledge and agree that the Building and Project have been re-measured and for all purposes of the Lease as amended hereby (the **"Amended Lease"**), (a) the Building shall be deemed to consist of approximately

1

222,207 rentable square feet; and (b) the Property shall be deemed to consist of approximately 815,018 rentable square feet.

2.    <u>New Premises</u>. Tenant hereby agrees to lease from Landlord, and Landlord hereby agrees to lease to Tenant, the New Premises on the terms and conditions hereinafter set forth. As of the New Premises Commencement Date (as defined in <u>Section 4</u> below): (a) <u>Exhibit A</u> attached hereto showing the New Premises is hereby incorporated into and made a part of the Lease; (b) all references in the Lease to the defined term (i) "Premises" shall mean and refer to the New Premises, (ii) "Rentable Square Footage of the Building" shall be deemed to be 222,207 rentable square feet, and (iii) rentable square footage of the "Premises" (New Premises) shall be deemed to be 37,626 rentable square feet. Tenant's use and occupancy of the New Premises shall be in accordance with all of the terms and conditions of the Amended Lease.

3.    <u>Current Premises</u>. Tenant shall have the right to continue to occupy the Current Premises in accordance with the terms and conditions of the Lease until no later than 12:00 midnight on the date which is five (5) business days after the New Premises Commencement Date (the **"Surrender Date**"); provided, however, if Tenant surrenders the Current Premises by the Surrender Date, Tenant's obligation to pay Rent for the Current Premises accruing after the New Premises Commencement Date shall cease, otherwise, if Tenant fails to surrender the Current Premises by the Surrender Date, Tenant shall be obligated to pay holdover rent for the Current Premises pursuant to <u>Section 22</u> of the Original Lease as amended, for each day that Tenant continues to occupy the Current Premises (with any such rent prorated on the basis of a 30-day month), until Tenant actually surrenders the Current Premises in accordance with the terms of the Amended Lease. Tenant agrees to surrender possession of the Current Premises to Landlord on or before the Surrender Date, broom clean and in good order, condition and repair, ordinary wear and tear excepted, and otherwise in compliance with the terms of <u>Section 25</u> the Original Lease regarding surrender as if the Term had expired as to the Current. Upon such surrender, all rights of Tenant to possession and occupancy of the Current Premises and Tenant's obligations with respect to the Current Premises will terminate except as to Tenant's surviving obligations under the Lease, and all of Tenant's rights and obligations under the Amended Lease shall relate solely to the New Premises. Tenant shall be responsible for all costs and expenses related to its relocation from the Current Premises to the New Premises, including, without limitation, all moving costs and costs to install telephone and data cabling in the New Premises. Notwithstanding the foregoing, Tenant shall have no obligation to remove from the Current Premises the furniture, fixtures, and equipment described on <u>Exhibit C</u> attached hereto (the **"Current Premises Remaining "FF&E"**), and Tenant hereby conveys and transfers to Landlord as if by quitclaim or bill of sale, all of Tenant's right, title and interest in and to the Current Premises Remaining FF&E, and Landlord hereby accepts and takes possession of the Current Premises Remaining FF&E in its "As-Is" condition, without representation or warranty by Tenant.

4.    <u>New Premises Commencement Date and New Premises Term</u>. The Term as to the New Premises (**"New Premises Term"**) shall commence on the earlier to occur of: (a) the date Tenant moves into the New Premises to commence operation of its business in all or any portion of the New Premises; or (b) the date Landlord delivers the New Premises to Tenant with the "Tenant Improvements" (as defined in the Work Letter attached hereto <u>Exhibit B</u>) "substantially completed" (as defined in the Work Letter) (the **"New Premises Commencement Date"**). The New Premises Term shall expire on April 30, 2025 (the **"New Premises Expiration Date"**). In no event shall the New Premises Term operate to release

2

Tenant from liability for any amounts owed or defaults that exist under the Lease for the Current Premises prior to the New Premises Commencement Date; provided, however, notwithstanding the foregoing, if Tenant surrenders the Current Premises on or before the Surrender Date, Tenant shall have no obligation to pay Rent for the Current Premises accruing from and after the New Premises Commencement Date.

5.    Base Rent. Prior to the New Premises Commencement Date, Tenant shall pay monthly installments of monthly Base Rent for the Current Premises pursuant to the terms of the Lease. Effective as of the New Premises Commencement Date and continuing for the duration of the New Premises Term, Tenant shall pay monthly installments of monthly Base Rent for the New Premises to Landlord in accordance with the following schedule:

| Months* | Monthly Installment of Base Rent |
|---------|----------------------------------|
| 1 - 12 | $159,910.50** |
| 13 - 24 | $164,707.80 |
| 25 - 36 | $169,649.05 |
| 37 - 48 | $174,738.52 |
| 49 - 60 | $179,980.68 |
| 61 - 72 | $185,380.10 |
| 73 - 84 | $190,941.50 |
| 85 - 4/30/2025 | $196,669.75 |

*Months are measured from the New Premises Commencement Date.

**Notwithstanding the foregoing, provided Tenant is not in default under the Amended Lease, Landlord hereby agrees to abate Tenant's obligation to pay the monthly Base Rent due during the first three (3) full months of the New Premises Term (the **"Abatement Period"**) (such amount of abated monthly Base Rent, being hereinafter collectively referred to as the **"Abated Amount"**); provided, however, such abatement shall immediately cease upon the occurrence of any Tenant default which continues beyond applicable notice and cure periods. During such Abatement Period, Tenant will still be responsible for the payment of any and all other monetary obligations due under the Amended Lease. Tenant acknowledges that any default by Tenant under the Amended Lease will cause Landlord to incur costs not contemplated hereunder, the exact amount of such costs being extremely difficult and impracticable to ascertain, therefore, should Tenant at any time during the New Premises Term be in default after having been given notice and opportunity to cure and such default results in a termination of the Amended Lease, then the total unamortized sum of such Abated Amount (amortized on a straight line basis over the New Premises Term of this Lease) so conditionally excused shall be recoverable by Landlord; provided, however, Tenant acknowledges and agrees that nothing in this subparagraph is intended to limit any other remedies available to Landlord at law or in equity under applicable law (including, without limitation, the remedies under Civil Code Section 1951.2 and/or 1951.4 and any successor statutes or similar laws), in the event Tenant defaults under the Amended Lease beyond any applicable notice and cure period.

3

6.    Condition of New Premises. Tenant acknowledges that, except as provided in Section 8 and the Work Letter attached hereto, Landlord shall not be obligated to refurbish or improve the New Premises in any manner whatsoever or to otherwise provide funds for the improvement of the New Premises, and Tenant hereby accepts the New Premises "AS-IS"; provided, however, on the New Premises Commencement Date the New Premises shall be clean, with systems and equipment servicing the New Premises in good working condition and order. Tenant further acknowledges that except as expressly provided in this Amendment, neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of any of the New Premises, the improvements, refurbishments, or alterations therein, or the Building or with respect to the functionality thereof or the suitability of any of the foregoing for the conduct of Tenant's business, and that all representations and warranties of Landlord, if any, are as set forth in this Amendment.

7.    Condition of the Current Premises. Tenant acknowledges that it is presently in possession of the Current Premises and is fully aware of the condition of the Current Premises. Tenant acknowledges that Landlord shall not be obligated to refurbish or improve the Current Premises in any manner whatsoever or to otherwise provide funds for the improvement of the Current Premises in conjunction with this Amendment, and Tenant hereby accepts the Current Premises "AS-IS". Tenant further acknowledges that except as expressly provided in the Lease and this Amendment, neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Current Premises, the improvements, refurbishments, or alterations therein, or the Building or with respect to the functionality thereof or the suitability of any of the foregoing for the conduct of Tenant's business and that all representations and warranties of Landlord, if any, are as set forth in the Lease and this Amendment.

8.    Tenant Improvements. Landlord hereby grants Tenant a tenant improvement allowance in the amount of $30.00 per rentable square foot of the New Premises (i.e., $1,128,780.00, based on the New Premises consisting of approximately 37,626 rentable square feet) (the **"Allowance"**), to be applied in accordance with the terms and conditions of the Work Letter attached hereto as Exhibit B.

9.    Early Access. So long as Landlord has received from Tenant certificates satisfactory to Landlord evidencing the insurance required to be carried by Tenant under the Amended Lease, and so long as Tenant and its contractors and employees do not interfere with the completion of the Tenant Improvements, Landlord shall give Tenant and its designated contractors access to the New Premises at least two (2) weeks prior to the estimated New Premises Commencement Date (the "Early Access Period") for purposes of installing Tenant's cabling, furniture, fixtures, and equipment ("Tenant's Work"). Tenant's Work shall be performed by Tenant at Tenant's sole cost and expense. Tenant's access to the New Premises during the Early Access Period shall be subject to all terms and conditions of the Amended Lease, except that Tenant shall not be obligated to pay Rent during the Early Access Period until the New Premises Commencement Date. Tenant agrees to provide Landlord with prior notice of any such intended early access and to cooperate with Landlord during the period of any such early access so as not to interfere with Landlord in the completion of any the Tenant Improvements in the New Premises pursuant to the Work Letter. Should Landlord determine such early access interferes with the Tenant Improvements, Landlord may deny Tenant access to the New Premises until the Tenant Improvements are substantially completed. Tenant shall promptly comply surrender any keys or other means of access to the New Premises and otherwise comply with such denial.

4

10.    Tenant's Pro Rata Share. Prior to the New Premises Commencement Date, Tenant shall continue to pay for Tenant's Pro Rata Share of Expense Excess and Tax Excess in accordance with the terms of the Lease. As of the New Premises Commencement Date and continuing for the duration of the New Premises Term, Tenant's Pro Rata Share allocable to the New Premises shall be 16.93%, based upon the New Premises containing 37,626 rentable square feet and the Building containing 222,207 rentable square feet. During the New Premises Term, the Base Year shall be adjusted to be the calendar year 2018 (the "Adjusted Base Year"), and during the New Premises Term, Tenant shall continue to pay Tenant's Pro Rata Share of Expense Excess and Tax Excess calculated using the Adjusted Base Year, in accordance with the Amended Lease.

11.    Accessibility. Pursuant to Section 1938 of the California Civil Code, Landlord hereby advises Tenant that as of the date of this Amendment none of the Current Premises, the New Premises, the Building nor the Project has undergone inspection by a Certified Access Specialist. Further, pursuant to Section 1938 of the California Civil Code, Landlord notifies Tenant of the following: "A Certified Access Specialist (CASp) can inspect the Premises and determine whether the Premises comply with all of the applicable construction-related accessibility standards under state law. Although California state law does not require a CASp inspection of the Premises, the commercial Project owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the Premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of any such CASp inspection, the payment of the costs and fees for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the Premises." Therefore and notwithstanding anything to the contrary contained in the Amended Lease, Landlord and Tenant agree that (a) Tenant may, at its option and at its sole cost, cause a CASp to inspect the Premises and determine whether the Premises complies with all of the applicable construction related accessibility standards under California law, (b) the parties shall mutually coordinate and reasonably approve of the timing of any such CASp inspection so that Landlord may, at its option, have a representative present during such inspection, and (c) Tenant shall be solely responsible for the cost of any repairs necessary to correct violations of construction-related accessibility standards within the Premises, in the Building or at the Project identified by any such CASp inspection, any and all such alterations and repairs within the Premises to be performed by Tenant in accordance with Section 9 of the Original Lease and if any alterations and repairs to other portions of the Building or the Project are required as a result of Tenant's CASp inspection then Tenant shall reimburse Landlord upon demand, as Additional Rent, for the cost to Landlord of performing such alterations and repairs; provided, however, unless such repair or alterations relate solely to other alterations to the Premises which Tenant is obligated to, or elects to, remove upon the expiration or earlier termination of the Lease Term (in which case Tenant shall simultaneously also remove any CASp identified alterations and repairs), Tenant shall have no obligation to remove any repairs or alterations made pursuant to a CASp inspection under this Section 11.

12.    Parking. Prior to the New Premises Commencement Date, Tenant shall continue to have the right to use thirty-seven (37) unreserved vehicle parking stalls in the parking lot or lots of the Property designated by Landlord for the use of tenants of the Building, subject to the terms of the Lease. As of the New Premises Commencement Date, Tenant shall have the right to use up to one hundred thirteen (113) unreserved parking spaces for the New Premises designated by Landlord for the use of tenants of the Building at the monthly rate of $105.00 per stall for unreserved, and $150.00 per month for a reserved stall, or at the prevailing market rate for the Property as determined by Landlord in its commercially reasonable discretion from time to time, all subject to the terms of the Amended Lease.

5

13.    <u>Extension Option</u>. Tenant shall have one (1) option to extend the New Premises Term of the Amended Lease for one (1) additional period of five (5) years, subject to and in accordance with the terms and conditions of <u>Rider No. 1</u> and <u>Rider No. 2</u> attached hereto and incorporated by this reference.

14.    <u>Signage</u>. Tenant shall have the right to have placed by Landlord, at Landlord's expense, Tenant's name on a Building standard suite/unit door sign, and on the Building's directory board. The sign rights granted herein are personal to the original Tenant executing this Lease or any Transfer to an Affiliate (as defined in the Original Lease) and may not be assigned, voluntarily or involuntarily, by any person or entity other than the original Tenant or such Affiliate. The sign rights granted to the Tenant hereunder are not assignable separate and apart from the Amended Lease, nor may any sign right granted herein be separated from the Amended Lease in any manner, either by reservation or otherwise without Landlord's consent or as otherwise expressly permitted in the Amended Lease. In the event Tenant's name change or the Amended Lease is assigned to an Affiliate, Tenant may change the name on the a Building standard suite/unit door sign and on the Building's directory board to reflect such changed name at Tenant's sole cost, provided that Tenant's name change or the name of such Affiliate is not an Objectionable Name. **"Objectionable Name"** shall mean any name which relates to an entity which is of a character or reputation, or is associated with a political orientation or faction, which is inconsistent with the quality of the Building, or which would otherwise reasonably offend landlords of comparable buildings in the vicinity of the Building.

15.    <u>Notice Address of Landlord</u>.

Landlord's addresses for notices under the Amended Lease are hereby replaced in their entirety with the following:

| | |
|---|---|
| Landlord's Notice Address: | KBSIII Towers At Emeryville, LLC<br>c/o KBS Capital Advisors, LLC<br>800 Newport Center Drive, Suite 700 Newport Beach, CA 92660 |
| With a copy to: | Attn: General Counsel<br>KBSIII Towers At Emeryville, LLC<br>c/o KBS Capital Advisors, LLC<br>800 Newport Center Drive, Suite 700 Newport Beach, CA 92660<br>Attn: Brent Carroll, Asset Manager |
| Landlord's Address for Payment of Rent: | KBSIII Towers At Emeryville, LLC<br>c/o P.O. Box 740499<br>Los Angeles, CA 90074-0499 |
| For payment of Parking Charges: | LAZ Parking<br>2000 Powell Street, Suite 100<br>Emeryville, CA 94608 |

16.    <u>New Premises Furniture, Fixtures and Equipment</u>. Effective as of the New Premises Commencement Date, Landlord shall be deemed to have conveyed to Tenant via quitclaim bill of sale

6

and for consideration of one dollar ($1.00), the furniture, fixtures and equipment existing in the New Premises and scheduled on Exhibit D attached hereto (the **"New Premises Remaining FF&E"**). Notwithstanding anything herein to the contrary, Tenant's use of, and Landlord's conveyance of, the New Premises Remaining FF&E shall be "as-Is" and without any representations or warranties by Landlord.

17. SNDA. Landlord will use reasonable efforts to obtain a non-disturbance, subordination and attornment agreement from Landlord's current lender with respect to the Project on such lender's current standard form of agreement all within ninety (90) days of the mutual execution of this Amendment. "Reasonable efforts" of Landlord shall not require Landlord to incur any cost, expense or liability to obtain such agreement, except for fees or review costs charged by the lender. Upon request of Landlord, Tenant will execute the current lender's form of non-disturbance, subordination and attornment agreement and return the same to Landlord for execution by the lender. Landlord's failure to obtain a non-disturbance, subordination and attornment agreement for Tenant shall have no effect on the rights, obligations and liabilities of Landlord and Tenant or be considered to be a default by Landlord under the Amendment Lease.

18. Other Lease Amendments.

A. Section 1l.02(c) of the Original Lease is changed to read: (c) in the event of an assignment of the Lease requiring Landlord's consent or subletting of more than 20% of the Rentable Square Footage of the Premises for substantially the remaining term of the Lease (excluding unexercised options), recapture the portion of the Premises Tenant is proposing to Transfer.

B. Exhibit B of the Original Lease Section 2.01(b) is changed to add "not to exceed 3% of Rent".

C. Exhibit B of the Original Lease Section 2.0l(g) is changed to add after the word "deductibles" the following: "(provided, however, that Tenant's Pro Rata Share of any earthquake deductible shall be amortized over the useful life of the improvements constructed with such earthquake insurance proceeds").

19. Broker. Landlord and Tenant each represent and warrant to the other that it is not aware of any brokers or finders, other than Cushman and Wakefield, representing Landlord, and Newmark Cornish & Carey, representing Tenant, who may claim a fee or commission in connection with the consummation of the transactions contemplated by this Amendment. If any other claims for brokers' or finders' fees in connection with the transactions contemplated by this Amendment arise, then Tenant agrees to indemnify, protect, hold harmless and defend Landlord (with counsel reasonably satisfactory to Landlord) from and against any such claims if they shall be based upon any statement, representation or agreement made by Tenant, and Landlord agrees to indemnify, protect, hold harmless and defend Tenant (with counsel reasonably satisfactory to Tenant) if such claims are based upon any statement, representation or agreement made by Landlord.

20.        <u>Representations and Warranties</u>. Tenant hereby represents, warrants, and agrees that: (a) there exists no breach, default, or event of default by Landlord under the Lease, or any event or condition which, with notice or passage of time or both, would constitute a breach, default, or event of default by Landlord under the Lease; (b) the Lease continues to be a legal, valid, and binding agreement and obligation of Tenant; and (c) Tenant has no current offset or defense to its performance or obligations under the Lease. Tenant hereby waives and releases all demands, charges, claims, accounts, or causes of action of any nature whatsoever against Landlord or Landlord's managers, members, officers, directors, employees or agents, including without limitation, both known and unknown demands, charges, claims, accounts, and causes of action that have previously arisen out of or in connection with the Lease, except for continuing obligations of Landlord under the Lease.

21.        <u>Authority</u>. Each signatory of this Amendment on behalf of Landlord and Tenant represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

22.        <u>Successors and Assigns</u>. This Amendment shall extend to, be binding upon, and inure to the benefit of, the respective successors and permitted assigns and beneficiaries of the parties hereto.

23.        <u>No Other Modification</u>. Landlord and Tenant agree that except as otherwise specifically modified in this Amendment, the Lease has not been modified, supplemented, amended, or otherwise changed in any way and the Lease remains in full force and effect between the parties hereto as modified by this Amendment. To the extent of any inconsistency between the terms and conditions of the Lease and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall apply and govern the parties. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. For purposes of this Amendment, signatures by facsimile or electronic PDF shall be binding to the same extent as original signatures.

[NO FURTHER TEXT ON THIS PAGE; SIGNATURES ON FOLLOWING PAGE]

8

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be executed the date first above written.

**Tenant:**

ADAMAS PHARMACEUTICALS, INC.,
a Delaware corporation

By:      /s/ Alfred G. Merriweather

Name:    Alfred G. Merriweather

Its:       CFO


[SIGNATURES CONTINUED ON FOLLOWING PAGE]


9

**Landlord:**

KBSIII TOWERS AT EMERYVILLE, LLC,
a Delaware limited liability company

By:      KBS Capital Advisors, LLC
           a Delaware limited liability company
           Its: Authorized Agent

| | |
|---|---|
| By: | /s/ Brent Carroll |
| Name: | Brent Carroll |
| Title: | Senior Vice President |
| Date signed: | 1/16/18 |

10

**Landlord:**

KBSIII TOWERS AT EMERYVILLE, LLC,
a Delaware limited liability company

By:      KBS Capital Advisors, LLC
           a Delaware limited liability company
           Its: Authorized Agent

**EXHIBIT A**

**DEPICTION OF NEW PREMISES**



Exhibit A-1



Exhibit A-2

**EXHIBIT B**

**WORK LETTER**

1.      **TENANT IMPROVEMENTS.** As used in the Lease and this Work Letter, the term **"Tenant Improvements"** or **"Tenant Improvement Work"** means those items of general tenant improvement construction shown on the Final Plans (described in Section 4 below), more particularly described in Section 5 below. To the extent triggered by the initial Tenant Improvements set forth in this Work Letter and Tenant's initial occupancy of the New Premises and required by the city of Emeryville, California, Landlord shall be responsible, at its cost, for correcting any violations of Title III of the Americans with Disabilities Act (**"ADA"**) with respect to the restroom(s) or path of travel from the entrance of the Building to and from the entrance to the New Premises; provided however, Landlord shall not be responsible for (a) any obligations or violations in connection with Alterations or improvements to the New Premises other than the initial Tenant Improvements set forth in this Work Letter; or (b) violations of the New Premises due to Tenant's specific use and occupancy of the New Premises, all of which shall be Tenant's sole responsibility. Notwithstanding the foregoing, Landlord shall have the right to contest any alleged violation in good faith, including, without limitation, the right to apply for and obtain a waiver or deferment of compliance, the right to assert any and all defenses allowed by applicable Law and the right to appeal any decisions, judgments or rulings to the fullest extent permitted by applicable Law. Landlord, after the exhaustion of any and all rights to appeal or contest, will make all repairs, additions, alterations or improvements necessary to comply with the terms of any final order or judgment.

2.      **WORK SCHEDULE.** Within ten (10) days after the execution of this Lease, Landlord will deliver to Tenant, for Tenant's review and approval, a schedule (**"Work Schedule"**) which will set forth the timetable for the planning and completion of the installation of the Tenant Improvements and the New Premises Commencement Date. The Work Schedule will set forth each of the various items of work to be done or approval to be given by Landlord and Tenant in connection with the completion of the Tenant Improvements. The Work Schedule will be submitted to Tenant for its approval, which approval Tenant agrees not to unreasonably withhold, and, once approved by both Landlord and Tenant, the Work Schedule will become the basis for completing the Tenant Improvements. All plans and drawings required by this Work Letter and all work performed pursuant thereto are to be prepared and performed in accordance with the Work Schedule. Landlord may, from time to time during construction of the Tenant Improvements, modify the Work Schedule as Landlord reasonably deems appropriate. If Tenant fails to approve the Work Schedule, as it may be modified after discussions between Landlord and Tenant within fifteen (15) business days after the date the Work Schedule is first received by Tenant, the Work Schedule shall be deemed to be approved by Tenant as submitted.

3.      **CONSTRUCTION REPRESENTATIVES.** Landlord hereby appoints the following person(s) as Landlord's representative (**"Landlord's Representative"**) to act for Landlord in all matters covered by this Work Letter: Dennis Latta.

Tenant hereby appoints the following person(s) as Tenant's representative (**"Tenant's Representative"**) to act for Tenant in all matters covered by this Work Letter: Alf Merriweather.

All communications with respect to the matters covered by this Work Letter are to be made to Landlord's Representative or Tenant's Representative, as the case may be, in writing in compliance with the notice

Exhibit B-1

provisions of the Lease. Either party may change its representative under this Work Letter at any time by written notice to the other party in compliance with the notice provisions of the Lease.

4. **TENANT IMPROVEMENT PLANS.**

(a)        **Preparation of Space Plans.** In accordance with the Work Schedule, Tenant agrees to meet with Landlord's architect and/or space planner for the purpose of promptly preparing preliminary space plans for the layout of the New Premises (**"Space Plans"**). The Space Plans are to be sufficient to convey the architectural design of the New Premises and layout of the Tenant Improvements therein and are to be submitted to Landlord in accordance with the Work Schedule for Landlord's approval. If Landlord reasonably disapproves any aspect of the Space Plans, Landlord will advise Tenant in writing of such disapproval and the reasons therefor in accordance with the Work Schedule. Tenant will then submit to Landlord for Landlord's approval, in accordance with the Work Schedule, a redesign of the Space Plans incorporating the revisions reasonably required by Landlord.

(b)        **Preparation of Final Plans.** Based on the approved Space Plans, and in accordance with the Work Schedule, at Landlord's election, Landlord's architect will prepare complete architectural plans, drawings and specifications and complete engineered mechanical, structural and electrical working drawings for all of the Tenant Improvements for the New Premises (collectively, the **"Final Plans"**). The Final Plans will be submitted to Tenant for signature to confirm that they are consistent with the Space Plans. If Tenant reasonably disapproves any aspect of the Final Plans based on any inconsistency with the Space Plans, Tenant agrees to advise Landlord in writing of such disapproval and the reasons therefor within the time frame set forth in the Work Schedule. In accordance with the Work Schedule, Landlord will, subject to Section 4(c) below, then cause Landlord's architect to redesign the Final Plans incorporating the revisions reasonably requested by Tenant so as to make the Final Plans consistent with the Space Plans.

(c)        **Requirements of Tenant's Final Plans.** Landlord will not unreasonably withhold its consent to changes in the Final Plans proposed by Tenant provided the Final Plans, as revised, will: (i) be compatible with the Building shell and with the design, construction and equipment of the Building; (ii) be comprised of the Building standards set forth in the written description thereof (the **"Standards"**) or of at least equal quality as the Standards and approved by Landlord; (iii) comply with all applicable laws, ordinances, rules and regulations of all governmental authorities having jurisdiction, and all applicable insurance regulations; (iv) not require Building service beyond the level normally provided to other tenants in the Building and will not overload the Building floors; and (v) be of a nature and quality consistent with the overall objectives of Landlord for the Building, as determined by Landlord in its reasonable but subjective discretion.

(d)        **Submittal of Final Plans.** Once approved by Landlord and Tenant, at Landlord's election, Landlord's architect will submit the Final Plans to the appropriate governmental agencies for plan checking and the issuance of a building permit. Landlord's architect, with Tenant's cooperation, will make any changes to the Final Plans which are requested by the applicable governmental authorities to obtain the building permit. After approval of the Final Plans no further changes may be made without the prior written approval of both Landlord and Tenant, and then only after agreement by Tenant to pay any costs resulting from the design and/or construction of such changes in excess of the Allowance. Tenant hereby acknowledges that any such changes will be subject to the terms of Sections 7 and 8

Exhibit B-2

below. Landlord's approval of the Final Plans shall create no liability or responsibility on the part of Landlord for the completeness of such plans or their design sufficiency or compliance with Laws.

(e)     **Changes to Shell of Building.** If the Final Plans or any amendment thereof or supplement thereto shall require changes in the Building shell, the increased cost of the Building shell work caused by such changes will be paid for by Tenant or charged against the Allowance described in Section 5 below.

(f)     **Work Cost Estimate and Statement.** Prior to the commencement of construction of any of the Tenant Improvements shown on the Final Plans, Landlord will submit to Tenant a written estimate of the cost (the **"Work Cost"**) to complete the Tenant Improvement Work, which written estimate will be based on the Final Plans taking into account any modifications which may be required to reflect changes in the Final Plans required by the City or County in which the New Premises are located (the **"Work Cost Estimate"**), and competitively bid by at least 3 subs for each trade (to the extent reasonably practicable). Tenant will either approve the Work Cost Estimate or disapprove specific items and submit to Landlord revisions to the Final Plans to reflect deletions of and/or substitutions for such disapproved items. Submission and approval of the Work Cost Estimate will proceed in accordance with the Work Schedule. Upon Tenant's approval of the Work Cost Estimate (such approved Work Cost Estimate to be hereinafter known as the **"Work Cost Statement"**), Landlord will have the right to purchase materials and to commence the construction of the items included in the Work Cost Statement pursuant to Section 6 hereof. If the total costs reflected in the Work Cost Statement exceed the Allowance described in Section 5 below, Tenant agrees to pay such excess, as Additional Rent as invoiced after the allowance has been expended in full. Throughout the course of construction, any differences between the estimated Work Cost in the Work Cost Statement and the actual Work Cost will be determined by Landlord and appropriate adjustments and payments by Landlord or Tenant, as the case may be.

## 5.   PAYMENT FOR THE TENANT IMPROVEMENTS.

(a)     **Allowance.** Landlord hereby grants to Tenant an Allowance as referenced in Section 7 of this Amendment (the **"Allowance"**). The Allowance is to be used only for:

(i)     Payment of the cost of preparing the Space Plans and the Final Plans, including mechanical, electrical, plumbing and structural drawings and of all other aspects necessary to complete the Final Plans. The Allowance will not be used for the payment of extraordinary design work not consistent with the scope of the Standards (i.e., above-standard design work) or for payments to any other consultants, designers or architects other than Landlord's architect, engineers and consultants.

(ii)     The payment of plan check, permit and license fees relating to construction of the Tenant Improvements.

(iii)     Construction of the Tenant Improvements, including, without limitation, the following:

(aa)   Installation within the New Premises of all partitioning, doors, floor coverings, ceilings, wall coverings and painting, millwork and similar items;

(bb)   All electrical wiring, lighting fixtures, outlets and switches, and other electrical work necessary for the New Premises;

Exhibit B-3

(cc)     The furnishing and installation of all duct work, terminal boxes, diffusers and accessories necessary for the heating, ventilation and air conditioning systems within the New Premises, including the cost of meter and key control for after-hour air conditioning;

(dd)     Any additional improvements to the New Premises required for Tenant's use of the New Premises including, but not limited to, odor control, special heating, ventilation and air conditioning, noise or vibration control or other special systems or improvements;

(ee)     All fire and life safety control systems such as fire walls, sprinklers, halon, fire alarms, including piping, wiring and accessories, necessary for the New Premises;

(ff)    All plumbing, fixtures, pipes and accessories necessary for the New Premises;

(gg)    Testing and inspection costs;

(hh)     Fees for the general contractor including, but not limited to, fees and costs attributable to general conditions associated with the construction of the Tenant Improvements;

(ii)    Landlord's construction management fee of actual costs not to exceed two and one-half percent (2.5%) of the total costs of the Tenant Improvements.

(jj)    Tenant's reasonable, actual, out-of-pocket, documented costs and expenses incurred with respect to its relocation to the New Premises and Tenant's project manager overseeing the initial Tenant Improvements. Upon request, Tenant shall provide to Landlord paid invoices for all such costs and expenses.

(b)        **Excess Costs**. The cost of each item referenced in Section 5(a) above shall be charged against the Allowance. If the Work Cost exceeds the Allowance, Tenant agrees to pay to Landlord such excess including the fee for Landlord's contractor and Landlord's two and one half percent (2.5%) fee for the construction manager associated with the supervision of such excess work prior to the commencement of construction within ten (10) business days after invoice therefor (less any sums previously paid by Tenant for such excess pursuant to the Work Cost Estimate). Except as expressly provided above, in no event will the Allowance be used to pay for Tenant's furniture, artifacts, equipment, telephone systems or any other item of personal property which is not affixed to the New Premises.

(c)        **Changes.** If, after the Final Plans have been prepared and the Work Cost Statement has been established, Tenant requires any changes or substitutions to the Final Plans, any additional costs related thereto including the fee for Landlord's contractor and Landlord's two and one-half percent (2.5%) fee for the construction manager associated with the supervision of such changes or substitutions are to be paid by Tenant to Landlord within ten (10) business days after invoice therefor. Any changes to the Final Plans will be approved by Landlord and Tenant in the manner set forth in Section 4 above and will, if necessary, require the Work Cost Statement to be revised and agreed upon between Landlord and Tenant in the manner set forth in Section 4(f) above. Landlord will have the right to decline Tenant's request for a change to the Final Plans if such changes are inconsistent with the provisions of Section 4 above, or if the change would unreasonably delay construction of the Tenant Improvements and the New Premises Commencement Date.

Exhibit B-4

(d)        **Governmental Cost Increases.** If increases in the cost of the Tenant Improvements as set forth in the Work Cost Statement are due to requirements of any governmental agency, Tenant agrees to pay Landlord the amount of such increase including the fee for Landlord's contractor and Landlord's two and one-half percent (2.5%) fee for the construction manager associated with the supervision of such additional work within ten (10) business days of Landlord's written notice; provided, however, that Landlord will first apply toward any such increase any remaining balance of the Allowance and Additional Allowance.

(e)        **Unused Allowance Amounts.** Any unused portion of the Allowance upon completion of the Tenant Improvements in the New Premises will not be refunded to Tenant or be available to Tenant as a credit against any obligations of Tenant under the Lease unless Tenant has paid for excess costs as described in Sections 5(b), 5(c) or 5(d), in which case the unused Allowance may be applied toward such excess cost amounts and paid to Tenant. Notwithstanding the foregoing, Tenant shall have the right to apply a portion of the unused Allowance in the amount of up to $17.50 per rentable square foot of the New Premises (i.e., up to $658,455.00, based on the New Premises consisting of approximately 37,626 rentable square feet) as a credit against monthly Base Rent next coming due under the Lease during the years 2018 and 2019, provided that Tenant submits to Landlord notice of such election to apply such portion of the unused Allowance as a credit against monthly Base Rent, if at all, within sixty (60) days following the New Premises Commencement Date.

6.    **CONSTRUCTION OF TENANT IMPROVEMENTS.** Until Tenant approves the Final Plans and Work Cost Statement, Landlord will be under no obligation to cause the construction of any of the Tenant Improvements. Following Tenant's approval of the Work Cost Statement described in Section 4(f) above, Landlord's contractor will commence and diligently proceed with the construction of the Tenant Improvements, subject to Tenant Delays (as described in Section 8 below) and Force Majeure Delays (as described in Section 9 below).

7.        **SUBSTANTIAL COMPLETION.**

(a)        **Substantial Completion; Punch-List.** The Tenant Improvements will be deemed to be "substantially completed" when Landlord: (i) is able to provide Tenant with reasonable access to the New Premises and (ii) has substantially performed all of the Tenant Improvement Work required to be performed by Landlord under this Work Letter, other than minor "punch-list" type items and adjustments which do not materially interfere with Tenant's access to or use of the New Premises. Within ten (10) business days after delivery of the New Premises to Tenant, Tenant and Landlord will conduct a walk-through inspection of the New Premises and prepare a written punch-list specifying those punch-list items which require completion, which items Landlord will thereafter diligently complete.

(b)        **Delivery of Possession.** Landlord agrees to deliver possession of the New Premises to Tenant when the Tenant Improvements have been substantially completed in accordance with Section (a) above. The parties estimate that Landlord will deliver possession of the New Premises to Tenant and the Term will commence on or before March 1, 2018 (the **"Estimated New Premises Commencement Date"**). Tenant agrees that if Landlord is unable to deliver possession of the New Premises to Tenant on or prior

Exhibit B-5

to the Estimated New Premises Commencement Date, the Amended Lease will not be void or voidable, nor will Landlord be liable to Tenant for any loss or damage resulting therefrom.

8.    **TENANT DELAYS.** For purposes of this Work Letter, "Tenant Delays" means any delay in the completion of the Tenant Improvements resulting from any or all of the following: (a) Tenant's failure to timely perform any of its obligations pursuant to this Work Letter, including any failure to complete, on or before the due date therefor, any action item which is Tenant's responsibility pursuant to the Work Schedule delivered by Landlord to Tenant pursuant to this Work Letter; (b) Tenant's changes to Space Plans or Final Plans after Landlord's approval thereof; (c) Tenant's request for materials, finishes, or installations which are not readily available or which are incompatible with the Standards; (d) any delay of Tenant in making payment to Landlord for Tenant's share of the Work Cost; or (e) any other act or failure to act by Tenant, Tenant's employees, agents, architects, independent contractors, consultants and/or any other person performing or required to perform services on behalf of Tenant.

9.    **FORCE MAJEURE DELAYS.** For purposes of this Work Letter, "Force Majeure Delays" means any actual delay in the construction of the Tenant Improvements, which is beyond the reasonable control of Landlord or Tenant, as the case may be, as "Force Majeure" is described in Section 26.03 of the Lease.

Exhibit B-6

**EXHIBIT C**

**CURRENT PREMISES REMAINING FF&E**

Exhibit C-1

EXHIBIT C



Tenant will leave the Workstations and built in desks referenced in this plan. All other office/conference furniture and FF&E will be removed by Tenant.

EXHIBIT C -CURRENT PREMISES REMAINING "FF&E"

ADAMAS PHARMACEUTICALS

AS BUILT 1/9/18

interior motions

1485 Park Avenue, Emeryville, CA 94608   Tel:510.653.6100

## EXHIBIT D - NEW PREMISES REMAINING FF&E

### 10th floor Inventory

| Furniture Type | Color | Quantity |
|---|---|---|
| Cubicle Desks with Storage Locker | Teal accent | 74 |
| Rolling desk drawers | Teal accent | 67 |
| Avaya Phones | | 60 |
| Small Conference Room Tables | Dark Chestnut Brown | 1 |
| Medium Conference Room Tables | Dark Chestnut Brown | 2 |
| Large Conference Room Tables | Dark Chestnut Brown | 0 |
| Private Office Desks with Hutch | Dark Chestnut Brown | 4 |
| Huddle Room Small Tables | White | 4 |
| Smartboard | | 2 |
| Brita Hydration Station | | 3 |
| Rectangular table approx 4" with wheels | White | 3 |
| 5 Shelf Bookcase | Dark Chestnut Brown | 4 |
| 4 Drawer Metal Cabinet | White | 8 |
| Conference Room Credenza | Dark Chestnut Brown | 3 |
| Kitchen Bartools | White | 7 |
| Circular Wood Table - Medium | Dark Chestnut Brown | 2 |
| Circular Wood Table - Small | Dark Chestnut Brown | 1 |
| Think Lounge Chairs Large | Teal accent | 2 |
| Fire Extinguishers | | 4 |
| Circular Wood Table - Small | White | 1 |

### 11th floor Furniture Inventory

| Furniture Type | Color | Quantity |
|---|---|---|
| Cubicle Desks | Goldenrod yellow accent | 101 |
| Small Conference Room Tables | Dark Chestnut Brown | 1 |
| Medium Conference Room Tables | Dark Chestnut Brown | 3 |
| Large Conference Room Tables | | 0 |
| Private Office Desks with Hutch | Goldenrod yellow accent | 6 |
| Smartboard | | 1 |
| Brita Hydration Station | | 2 |
| Think Lounge Chairs - Large | Goldenrod yellow accent | 12 |
| Avaya Desk Phones | | 86 |
| 5 shelf wood bookcase | Dark Chestnut Brown | 6 |
| Rolling desk cabinets | Goldenrod yellow accent | 91 |
| 5 shelf metal file cabinets | White | 15 |
| 3 shelf metal file cabinets | White | 1 |
| Conference room credenza | Dark Chestnut Brown | 3 |
| Fire Extinguisher | | 4 |
| Small huddle phone desk table approx 2' | White | 1 |
| Small circular glass table | White obscure | 3 |
| Small wooden circular table | Dark Chestnut Brown | 4 |
| Wooden circular table | White | 2 |
| Lowback stools | Beige | 2 |

## RIDER NO. 1 TO AMENDED LEASE

## EXTENSION OPTION RIDER

This Rider No. 1 is made and entered into by and between KBSIII TOWERS AT EMERYVILLE, LLC, a Delaware limited liability company (**"Landlord"**), and ADAMAS PHARMACEUTICALS, INC., a Delaware corporation (**"Tenant"**), as of the day and year of this Amendment between Landlord and Tenant to which this Rider is attached. Landlord and Tenant hereby agree that, notwithstanding anything contained in the Amended Lease to the contrary, the provisions set forth below shall be deemed to be part of the Amended Lease and shall supersede any inconsistent provisions of the Amended Lease. All references in the Amended Lease and in this Rider to the "Lease" shall be construed to mean the Amended Lease (and all exhibits and Riders attached thereto), as amended and supplemented by this Rider. All capitalized terms not defined in this Rider shall have the same meaning as set forth in the Amended Lease.

1.      Landlord hereby grants to Tenant one (1) option (the **"Extension Option"**) to extend the Lease Term for one (1) additional period of five (5) years (the **"Option Term"**), on the same terms, covenants and conditions as provided for in the Amended Lease during the initial Term, except for the Base Rent, which shall initially be equal to the "fair market rental rate" for the New Premises for the Option Term as defined and determined in accordance with the provisions of the Fair Market Rental Rate Rider attached to the Lease as Rider No. 2, subject to fair market annual rent adjustments during the Option Term.

2.      The Extension Option must be exercised, if at all, by written notice (**"Extension Notice"**) delivered by Tenant to Landlord no sooner than that date which is two hundred seventy (270) days and no later than that date which is one hundred eighty (180) days prior to the expiration of the then current Lease Term. The Extension Option shall, at Landlord's sole option, not be deemed to be properly exercised if, at the time the Extension Option is exercised or on the scheduled commencement date for the Option Term, Tenant has (a) committed an uncured event of default whose cure period has expired pursuant to Section 18 of the Original Lease (or if Tenant would be in default but for the passage of time, the giving of notice or both), (b) assigned all or any portion of the Lease or its interest therein except in a Business Transfer, or (c) sublet all or any portion of the New Premises. Provided Tenant has properly and timely exercised the Extension Option, the then current Lease Term shall be extended by the Option Term, and all terms, covenants and conditions of the Amended Lease shall remain unmodified and in full force and effect, except that the Base Rent shall be as set forth above.

Rider No. 1-1

**RIDER NO. 2 TO AMENDED LEASE**

**FAIR MARKET RENTAL RA TE RIDER**

This Rider No. 2 is made and entered into by and between KBSIII TOWERS AT EMERYVILLE, LLC, a Delaware limited liability company (**"Landlord"**), and ADAMAS PHARMACEUTICALS, INC., a Delaware corporation (**"Tenant"**), as of the day and year of this Amendment between Landlord and Tenant to which this Rider is attached. Landlord and Tenant hereby agree that, notwithstanding anything contained in the Amended Lease to the contrary, the provisions set forth below shall be deemed to be part of the Amended Lease and shall supersede any inconsistent provisions of the Amended Lease. All references in the Amended Lease and in this Rider to the "Lease" shall be construed to mean the Amended Lease (and all exhibits and Riders attached thereto), as amended and supplemented by this Rider. All capitalized terms not defined in this Rider shall have the same meaning as set forth in the Amended Lease.

1.    The term **fair market rental rate"** as used in the Amended Lease and any Rider attached to the Amended Lease shall mean the annual amount per square foot, projected during the Option Term (including annual adjustments), that a willing, non-equity renewal tenant (excluding sublease and assignment transactions) would pay, and a willing, institutional landlord of a comparable quality office building located in the Emeryville, California area would accept, in an arm's length transaction (what Landlord is accepting in the current transactions for the Building may be used for purposes of projecting rent for the Option Term), for space of comparable size, quality and floor height as the New Premises, taking into account the age, quality and layout of the existing improvements in the New Premises, and taking into account items that professional real estate brokers or professional real estate appraisers customarily consider, including, but not limited to, rental rates, space availability, tenant size, tenant improvement allowances, parking charges and any other lease considerations, if any, then being charged or granted by Landlord or the lessors of such similar office buildings. All economic terms other than Base Rent, such as tenant improvement allowance amounts, if any, operating expense allowances, parking charges, etc., will be established by Landlord and will be factored into the determination of the fair market rental rate for the Option Term. Accordingly, the fair market rental rate will be an effective rate, not specifically including, but accounting for, the appropriate economic considerations described above.

2.    Landlord shall provide written notice of Landlord's determination of the fair market rental rate not later than ninety (90) days after the last day upon which Tenant may timely exercise the right giving rise to the necessity for such fair market rental rate determination. Tenant shall have ten (10) days (**"Tenant's Review Period"**) after receipt of Landlord's notice of the fair market rental rate within which to accept such fair market rental rate or to reasonably object thereto in writing. Failure of Tenant to so object to the fair market rental rate submitted by Landlord in writing within Tenant's Review Period shall conclusively be deemed Tenant's rejection thereof. If within Tenant's Review Period Tenant reasonably objects to or is deemed to have disapproved the fair market rental rate submitted by Landlord, Landlord and Tenant will meet together with their respective broker to present and discuss their individual determinations of the fair market rental rate for the New Premises under the parameters set forth in Paragraph 1 above and shall diligently and in good faith attempt to negotiate a rental rate on the basis

Rider No. 2-1

of such individual determinations. Such meeting shall occur no later than ten (10) days after the expiration of Tenant's Review Period. The parties shall each provide the other with such supporting information and documentation as they deem appropriate. At such meeting if Landlord and Tenant are unable to agree upon the fair market rental rate, they shall each submit to the other their respective best and final offer as to the fair market rental rate. If Landlord and Tenant fail to reach agreement on such fair market rental rate within five (5) business days following such a meeting (the **"Outside Agreement Date"**), the fair market rental rate determination shall be made in accordance with the provisions of Section 3 below.

3.    (a)    Landlord and Tenant shall each appoint one (1) independent appraiser who shall by profession be an M.A.I. certified real estate appraiser who shall have been active over the five (5) year period ending on the date of such appointment in the leasing of commercial (including office) properties in the Emeryville, California area. The determination of the appraisers shall be limited solely to the issue of whether Landlord's or Tenant's last proposed (as of the Outside Agreement Date) best and final fair market rental rate for the New Premises is the closest to the actual fair market rental rate for the New Premises as determined by the appraisers, taking into account the requirements specified in Section 1 above. Each such appraiser shall be appointed within fifteen (15) days after the Outside Agreement Date.

(b)    The two (2) appraisers so appointed shall within fifteen (15) days of the date of the appointment of the last appointed appraiser agree upon and appoint a third appraiser who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two (2) appraisers.

(c)    The three (3) appraisers shall within thirty (30) days of the appointment of the third appraiser reach a decision as to whether the parties shall use Landlord's or Tenant's submitted best and final fair market rental rate, and shall notify Landlord and Tenant thereof. During such thirty (30) day period, Landlord and Tenant may submit to the appraisers such information and documentation to support their respective positions as they shall deem reasonably relevant and Landlord and Tenant may each appear before the appraisers jointly to question and respond to questions from the appraisers.

(d)    The decision of the majority of the three (3) appraisers shall be binding upon Landlord and Tenant and neither party shall have the right to reject the decision or to undo the exercise of the applicable Option. If either Landlord or Tenant fails to appoint an appraiser within the time period specified in Section 3(a) hereinabove, the appraiser appointed by one of them shall within thirty (30) days following the date on which the party failing to appoint an appraiser could have last appointed such appraiser reach a decision based upon the same procedures as set forth above *(i.e.,* by selecting either Landlord's or Tenant's submitted best and final fair market rental rate), and shall notify Landlord and Tenant thereof, and such appraiser's decision shall be binding upon Landlord and Tenant and neither party shall have the right to reject the decision or to undo the exercise of the applicable Option.

(e)    If the two (2) appraisers fail to agree upon and appoint a third appraiser, either party, upon ten (10) days written notice to the other party, can apply to the Presiding Judge of the Superior Court of Alameda County to appoint a third appraiser meeting the qualifications set forth herein. The third appraiser, however, selected shall be a person who has not previously acted in any capacity for ether party.

Rider No. 2-2

(f)    The cost of each party's appraiser shall be the responsibility of the party selecting such appraiser, and the cost of the third appraiser (or arbitration, if necessary) shall be shared equally by Landlord and Tenant.

(g)    If the process described hereinabove has not resulted in a selection of either Landlord's or Tenant's submitted best and final fair market rental rate by the commencement of the applicable lease term, then the fair market rental rate estimated by Landlord will be used until the appraiser(s) reach a decision, with an appropriate rental credit and other adjustments for any overpayments of Base Rent or other amounts if the appraisers select Tenant's submitted best and final estimate of the fair market rental rate. The parties shall enter into an amendment to this Amended Lease confirming the terms of the decision.

Rider No. 2-3

**Exhibit 23.1**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (No. 333-214409) and Form S-8 (Nos. 333-216313, 333-210255, 333-202467 and 333-195384) of Adamas Pharmaceuticals, Inc. of our report dated February 22, 2018 relating to the financial statements, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
San Jose, California
February 22, 2018

**Exhibit 31.1**

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
### Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, Gregory T. Went, Ph.D., hereby certify that:

1. I have reviewed this annual report on Form 10-K of Adamas Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:    February 22, 2018

/s/ Gregory T. Went, Ph.D.

Gregory T. Went, Ph.D.
*Chief Executive Officer*
*(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Alfred G. Merriweather, hereby certify that:

1. I have reviewed this annual report on Form 10-K of Adamas Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:    February 22, 2018

/s/ Alfred G. Merriweather
Alfred G. Merriweather
*Chief Financial Officer*
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Gregory T. Went, Ph.D., Chief Executive Officer of Adamas Pharmaceuticals, Inc. (the "Company"), and Alfred G. Merriweather, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2017, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

2. The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**IN WITNESS WHEREOF**, the undersigned have set their hands hereto as of the 22nd day of February, 2018.

| | |
|---|---|
| /s/ Gregory T. Went, Ph.D. | /s/ Alfred G. Merriweather |
| Gregory T. Went, Ph.D. | Alfred G. Merriweather |
| *Chief Executive Officer* | *Chief Financial Officer* |
| *(Principal Executive Officer)* | *(Principal Financial Officer)* |

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Registrant under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.