UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI ZAIDI,<br><br>        Plaintiff,<br><br>    v.<br><br>ADAMAS PHARMACEUTICALS, INC., et al.,<br><br>        Defendants. | Case No.  19-cv-08051-JSW<br><br>**ORDER GRANTING MOTION TO DISMISS, WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 70 |

Now before the Court for consideration is the motion to dismiss filed by Defendants Adamas Pharmaceuticals, Inc. ("Adamas"), Gregory T. Went ("Went"), Alfred G. Merriweather ("Merriweather"), Richard A. King ("King"), Rajiv Patni, M.D. ("Patni"), and Vijay Shreedhar ("Shreedhar") (collectively "Defendants").[1]  The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it HEREBY GRANTS Defendants' motion, with leave to amend as noted in this Order.

**BACKGROUND**

Lead Plaintiff Ralph Martinez ("Martinez"), on behalf of himself and other investors who acquired Adamas securities between August 8, 2017 and September 30, 2019 (the "Class Period"), alleges Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and violated Rule 10b-5 promulgated thereunder.

Adamas is a pharmaceutical company that specializes in developing treatments for chronic neurological disorders, including Parkinson's disease.  Went was Adamas' Chief Executive

---

[1]    The Court refers to Went, Merriweather, King, Patni, and Shreedhar as the "Individual Defendants."

United States District Court<br>Northern District of California

Officer ("CEO") and Chairman of the Board of Directors from its founding in 2000 to September 16, 2019, when he transitioned to a strategic advisory role at Adamas. Merriweather was Adamas' Chief Financial Officer ("CFO") from June 2017 until December 31, 2019, when he retired. King was Adamas' Chief Operating Officer ("COO") from April 27, 2017 to September 15, 2018, when he resigned for personal reasons. Patni was Adamas' Chief Medical Officer from June 2015 through the Class Period. Shreedhar became Adamas' Chief Commercial Officer in May 2019. (Amended Class Action Complaint ("AC") ¶¶ 30, 32, 34, 36, 38, 348, 350-351.)

One treatment for Parkinson's is levodopa therapy, which "replaces lost dopamine in patients." Martinez alleges that a primary side effect of levodopa therapy is dyskinesia, the "involuntary and uncontrolled movements that occur when there is too much dopamine." (*Id.* ¶¶ 2-3, 42-43.) On August 24, 2017, the Food and Drug Administration ("FDA") approved Adamas' drug, GOCOVRI, for treatment of levodopa-induced-dyskinesia ("LID"). (*Id.* ¶ 50.)

GOCOVRI is an extended release formulation of amantadine, a drug Martinez alleges had been used to treat LID even though it had not been approved by the FDA for that purpose. Adamas designed GOCOVRI to be administered at night in a single dose, which would permit maximum concentration of the drug during the day, when dyskinesia would be most bothersome, and would permit a lower concentration at night, when amantadine might impact sleep. These facts purportedly differentiated GOCOVRI from generic immediate-release versions of amantadine ("amantadine IR"). Amantadine IR was less expensive than GOCOVRI but was designed to be taken in multiple doses throughout the day. (*Id.* ¶¶ 5, 48; *see also id.* ¶¶ 45-47 (describing other treatments for dyskinesia).)

GOCOVRI was Adamas' primary source of revenue during the Class Period, and it was the "first drug treatment Adamas … developed and … market[ed] entirely on its own." (*Id.* ¶¶ 4, 50-51.) Adamas publicly stated that its success as a company depended upon the commercial success of GOCOVRI and purported to identify risks that could impact that success.[2] For

---

[2] The Plymouth County Contributory Retirement System also filed a lawsuit against Adamas and some of the Individual Defendants for alleged violations of Sections 11, 12(a) and 15 of the Securities Act of 1933 in Alameda County Superior Court. The claims in that case are based on alleged misstatements contained in Adamas Secondary Public Officering ("SPO") documents,

United States District Court
Northern District of California

United States District Court
Northern District of California

example, in several of its filings with the Securities and Exchange Commission ("SEC"), Adamas stated:

> ***GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business.***
>
> GOCOVRI may fail to gain sufficient market acceptance by physicians, hospital administrators, patients, healthcare payers, and others in the healthcare community.  The degree of market acceptance of GOCOVRI will depend on a number of factors, including:
>
> - Its efficacy, duration of response, and potential advantages compared to alternative treatments;
>
> - The prevalence and severity of any side effects;
>
> - The acceptability of the price of GOCOVRI relative to other treatments;
>
> - The willingness of physicians to change their current treatment practices;
>
> - Its convenience and ease of administration compared to alternative treatments;
>
> - The willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;
>
> - The effectiveness of our marketing, promotion, selling, and distribution support and
>
> - The availability of third-party insurance coverage or reimbursement.
>
> The failure of GOCOVRI to achieve market acceptance would negatively impact our business.
>
> ******
>
> ***If we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed.***

---

documents that also are at issue here.  The Superior Court sustained, in part, and overruled, in part, the defendants' demurrer, with leave to amend.  *See Plymouth Cty. Contributory Ret. Syst. v. Adamas Pharms., Inc.*, No. RG19018715, 2019 WL 7900426 (Ala. Cty. Super. Ct. Dec. 17, 2019). The Court will address that order and Martinez's reliance on it in its analysis.

… Specifically, for distribution of GOCOVRI, we are heavily dependent on third-party logistics, pharmacy and distribution partners. If they are unable to perform effectively or if they do not provide efficient distribution of the medicine to patients, our business will suffer.

******

***Failure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue.***

… Coverage decisions may depend on clinical and economic standards that disfavor new drug products when more established or cheaper therapeutic alternatives are already available or subsequently become available. For example, ***although no payer has done so to date***, a payer may determine to require patients to use other formulations of amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI.

Coverage and reimbursement may not be available for GOCOVRI. Even if we obtain coverage for GOCOVRI, the resulting reimbursement rates might not be adequate or may require co-payments or co-insurance payments that patients find unacceptably high. Coverage and reimbursement determinations by third-party payers will impact the demand for GOCOVRI and therefore our revenues. Patients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost. If coverage and reimbursement are not available or are available only to limited levels, we may not be able to successfully commercialize GOCOVRI.

As with any newly approved medicine for a particular indication, ***there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI***. Third-party payers are increasingly challenging the price and reviewing the cost-effectiveness of medical drug products, in addition to questioning their safety and efficacy. Coverage and reimbursement decisions for GOCOVRI by third party payers are generally subject to change and may not be permanent.

(AC ¶ 252 (quoting Adamas' Form 10-Q, dated May 3, 2018)[3]; *see also* Declaration of Tijana M. Brien ("Brien Decl."), ¶ 12; Brien Decl., Ex. 11 at 30-32).)[4]

---

[3]   The first two statements emphasized are emphasized in the Form 10-Q and the AC. Martinez added the emphasis in the latter two statements.

[4]   Martinez challenges identical or substantially similar statements included in Adamas': Form 8-K, dated January 22, 2018; Form 10-K, dated February 22, 2018; Form 10-Q, dated

4

Martinez alleges that despite touting the novelty and efficacy of and the positive responses to GOCOVRI, Defendants knew GOCOVRI would, and did, face significant obstacles to its commercial success. Those obstacles included, *inter alia*: amantadine IR was significantly cheaper and had been used for decades to treat LID; Adamas had not directly compared the efficacy and tolerability of GOCOVRI to amantadine IR; the patient population for GOCOVRI was limited; insurers would, and did, place coverage and reimbursement requirements on GOCOVRI; and Adamas decided to distribute GOCOVRI through a specialty pharmacy and did not provide free samples to physicians. (*See, e.g., id.* ¶¶ 79-84, 92, 97-116, 123, 127, 143-157.) In addition, on February 20, 2018, the FDA approved OSMOLEX ER, another extended release version of amantadine that was approved for the same indication as amantadine IR. (*Id.* ¶ 158.) Thus, according to Martinez, OSMOLEX ER posed competition to GOCOVRI.

During the Class Period, Adamas also sought approval from the FDA to use GOCOVRI as a treatment for multiple sclerosis walking impairment ("MSWI"), which, at the time, had one other treatment available: AMPYRA. (*Id.* ¶ 52.) Martinez alleges that it became "apparent that GOCOVRI as a treatment for MSWI faced similar market dynamics as Adamas had experienced in the Parkinson's market: the drug failed to offer substantial improvements over a cheaper generic competitor that was familiar to patients, physicians, and payers, which would limit demand and many payers would require a step-through of AMPYRA." (*Id.* ¶ 218.)

Martinez alleges that the truth regarding the alleged misrepresentations and omissions was partially revealed on October 5, 2018, November 1, 2018, March 4, 2019, and September 30, 2019. At the end of the Class Period, Adamas' shares traded at $4.38 per share. (*Id.* ¶¶ 219, 332; *see also id.* ¶¶ 334, 337, 341, 347.)

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

Section 10(b) provides, in part, that it is unlawful "to use or employ in connection with the

---

August 2, 2018; Form 10-Q, dated November 1, 2018; Form 10-K, dated December 31, 2018; and Form 10-Q, dated May 9, 2019. (AC ¶¶ 235, 241, 276, 287, 302, 312.)

United States District Court
Northern District of California

purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that show: (1) a defendant made a material misrepresentation or omission of fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) loss causation; and (6) economic loss. *See Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 267 (2014).

Martinez also alleges the Individual Defendants violated Section 20(a), which creates joint and several liability for a "control person" who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled personal is liable[.]" 15 U.S.C. § 78t(a); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (stating that "without 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability").

## A.    **Appliable Legal Standards.**

Under Federal Rule of Civil Procedure 12(b)(6) the Court generally is "is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). However, the Court may consider "documents incorporated into the complaint by reference, and matters of which [the Court] may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) ("*Tellabs*").

United States District Court
Northern District of California

6

Even under the liberal pleadings standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a claim for relief will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must allege conduct that is not just conceivable; they must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the Plaintiff pleads factual content that allows take court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Claims sounding in fraud or mistake are subject to heightened pleading requirements, which require a plaintiff to "state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Where, as here, a plaintiff brings a claim for violations of Rule 10(b)(5) they "must meet both the heightened pleading requirements" of Rule 9(b) and "'the exacting pleading requirements' … of the Private Securities Litigation Reform Act ('PSLRA')." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) ("*Quality Systems*") (quoting *Tellabs,* 551 U.S. at 313).[5]

**B.      Requests for Judicial Notice.**

Defendants submit 41 documents as exhibits, which they argue the Court should consider either because they are incorporated by reference in the AC or because they are subject to judicial notice. (Brien Decl., Exs. 1-41; Request for Judicial Notice ("RJN"), 5:12-7:12.) These documents include Adamas' SEC filings, transcripts of investor calls, and reports issued by third parties. Martinez does not object, except to argue the Court should not accept the truth of any disputed facts contained in those documents. Martinez also requests that the Court take judicial

---

[5]      The pleading requirements for Martinez's Section 10(b) and 20(a) claims are the same. *See, e.g., City of Dearborn*, 856 F.3d at 623; *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).

7

notice of Adamas' entire Form 10-K for 2017.  (Declaration of Leanne H. Solish, Ex. A.)  The Court concludes the documents are the types of documents that would be subject to judicial notice and that Martinez has incorporated some of those documents by reference into the AC.  The Court will identify portions of the documents on which it has relied in its analysis.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999-1001 (9th Cir. 2018).

**C.     The Former Employees.**

Martinez relies, in part, on information provided by former employees to establish falsity and scienter, which requires him to "pass two additional hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. … Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citation omitted).

Martinez provides the job title for each of the former employees, information about their responsibilities at Adamas, and the dates of their employment.[6]  By way of example, Martinez alleges that FE-1 was Adamas' Mid-Atlantic Regional Business Director from September 2017 until approximately July 2019 and was hired to help launch GOCOVRI.[7]  FE-1 was responsible, with others, for recruiting sales representatives and ten representatives reported to FE-1.  (AC ¶ 58; *see also id.* ¶¶ 60, 62 (describing FE-3 and FE-5, who also were responsible for sales in specific regions).)

FE-2 worked for Adamas as a Senior Medical Science Liaison ("MSL") from April 2018 to December 2018.  MSLs "typically hold advance degrees … and were supposed to have more knowledge of GOCOVRI data and be able to discuss it in more depth" because they were "field

---

[6]     Defendants argue that the former employees were not working at Adamas at the time most of the statements at issue were made.  However, the statements that the Court concludes are alleged to be false were made when most of the former employees still worked at by Adamas.

[7]     That region covered North Carolina, Virginia, Washington, D.C., Maryland, Pennsylvania (excluding Philadelphia), Ohio, and parts of Kentucky, West Virginia, and Delaware.  (AC ¶ 58.)

United States District Court
Northern District of California

based and answered doctors' questions and collected doctors' feedback about GOGOVRI." FE-2 was responsible for a territory that included Texas, Arkansas, and Louisiana.  (AC ¶ 59.)

FE-4 was the Vice President of Marketing from June 2017 through February 2019 and reported to King and then reported to Went.  FE-4 was responsible for the commercial aspect of GOCOVRI's launch and served as Project Leader for the GOCOVRI brand.  According to FE-4, this was a "cross-functional team consisting of other department heads including Market Access Sales, and Clinical who all reported to King." (*Id.* ¶ 61.)  All manufacturing and purchase orders for GOCOVRI came through FE-4 and this team.  (*Id.*)  During their first year of employment, FE-5 served on a Sales Advisory Board, which consisted of sales representatives from each region.  Martinez alleges the Sales Advisory Board's purpose was to provide feedback about the sales process and any issues encountered with GOCOVRI sales.  (*Id.* ¶ 62.)  FE-6 was a Senior Director of Business Analytics from October or November 2016 until November 2018.  (*Id.* ¶ 63.)  Martinez alleges that FE-6 "initially worked on market research and data analytics for GOCOVRI" but then moved to other projects.  (*Id.*)

The details Martinez includes about FE-1 through FE-5, in connection with their job titles and responsibilities, are sufficiently specific to satisfy the PSLRA's pleading standards. *See, e.g., Zucco*, 552 F.3d at 996 (finding plaintiff's descriptions of confidential witnesses job titles, responsibilities, and dates of employment were "undoubtedly sufficient").  The allegations about FE-6 are less specific, especially as to when they conducted research about GOCOVRI.  Martinez does include some allegations about the type of market research Adamas conducted prior to GOCOVRI's launch in paragraph 96, so the Court will not entirely disregard Martinez's reliance on FE-6.  If, however, Martinez amends his complaint and continues to rely on FE-6, he shall be prepared to provide additional details regarding this former employee.

The Court also concludes that Martinez has demonstrated that the former employees would be in a position to know the information reported in the AC.  For example, FE-1 and FE-5 were sales representatives and would be in a position to gather information about GOCOVRI's sales and responses of physicians, at least in their territories.  Based on their role on the Sales Advisory Board, the Court also concludes Martinez has shown that FE-5 would have had access to

information from all sales representatives while serving on that Board.

However, many of the former employees couch their statements in terms of "belief" without specifying the basis for those beliefs. (*See, e.g.,* AC ¶¶ 59, 95, 103, 142, 151.) Martinez alleges that only FE-4 and FE-6 had a direct link to any of the Individual Defendants, although FE-1 and FE-5 had some contact with Adamas' SVP of Sales, who reported to King and then to Went. (AC ¶¶ 58-63.) In addition, the allegations based on information received from the former employees do not always include the types of "hard numbers" or specific information about research or other reports that would show the Individual Defendants' contemporaneous knowledge of the facts Martinez claims they failed to disclose. *See, e.g., Browning v. Amyris*, No. 13-cv-02209-WHO, 2014 WL 1285175, at *16 (N.D. Cal. Mar. 24, 2014) (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) ("*Oracle*")). Each of these facts impacts Martinez's ability to rely on the former employees to establish scienter and will be factored into the analysis below.

**D.      Improper Puzzle and Group Pleading.**

The PSLRA requires plaintiffs to plead the facts supporting falsity and scienter with particularity. *Zucco*, 552 F.3d at 990. Defendants argue that Martinez fails to meet that standard because he has engaged in improper "puzzle" and "group" pleading.[8]

**1.      Puzzle Pleading.**

Martinez must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which

---

[8]      Defendants were able to create a chart of the statements that they believe constitute the challenged statements, which contains bullet point argument about why the Court should not find the statements actionable. When a paragraph contains multiple statements, Defendants, however, do not clearly articulate whether each bullet point applies to each statement. (Brien Decl., ¶ 43, Appendix A.) The Appendix violates the spirt, if not the letter, of the page limitations imposed by the Court, and the Court could decline to consider it. *See, e.g., Jiangchen v. Rentech, Inc.*, No. 17-cv-1490-GW(FFMx), 2017 WL 10363990, at *4 (C.D. Cal. Nov. 20, 2017). However, Martinez has not objected to the Appendix and refers to it in his opposition. Accordingly, the Court has referred to it to resolve Defendants' motion. If either party seeks to include a similar appendix in the future, they shall demonstrate good cause and seek leave of Court to do so.

that belief is formed." 15 U.S.C. § 78u-4(b)(1). A puzzle pleading is one that leaves "it up to defendants and the court to try and figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false and misleading." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000).

Here, the challenged statements cover a two-year period, span nearly 31 pages of the 101 page AC, and are set forth in 109 paragraphs. (AC ¶¶ 220-329.) Throughout this section of the AC, Martinez includes large block quotes. (*See, e.g., id.* ¶¶ 243, 274.) Martinez emphasizes particular statements within a block quote, but that is not always the case. *Cf. In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1101 (N.D. Cal. 2006) (noting complaint contained "extensive block quotes with multiple statements" some of which "on their face, appear to contain true facts or statements which Plaintiff does not seem to contest"). In addition, some of the statements that have been emphasized were not made by and do not repeat a statement made by one of the Individual Defendants. (*See, e.g.,* AC ¶¶ 260, 280, 292, 328 (questions by David A. Amsellem); *see also id.* ¶¶ 315, 342-343, 345-346.) Finally, Martinez does not emphasize text consistently and does not clearly distinguish where he added emphasis and where he has used emphasis contained in source documents. (*Compare, e.g., id.* ¶ 252 *with* ¶¶ 276, 287, 302.)[9]

Martinez does purport to identify the reason, or reasons, "this" or "the above" statement is false or misleading. However, the cited paragraphs often contain multiple statements. In his explanatory paragraphs, Martinez also incorporates by reference earlier paragraphs, which required the Court to refer back to those paragraphs to determine why the statements were allegedly false or misleading. (*See, e.g., id.* ¶¶ 243-244, referencing ¶¶ 227 and 240.)

The volume of alleged misstatements, the inconsistent use of emphasized text, and the decision to incorporate by reference earlier allegations makes it difficult to ascertain the particular statements at issue. *Cf. 3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 15-cv-2678-MMA (WVG), 2017 WL 971846, at *14 (S.D. Cal. Jan. 27, 2017) (finding allegations did not satisfy particularity

---

[9]     Martinez also emphasizes portions of the factual background that do not coincide with statements he argues are false or misleading. (*See, e.g.,* AC ¶ 217 ("ADMS will have a **new CEO, CFO and CCO**, to take over the launch in LID and oversee the pipeline[.]") (emphasis in AC).)

United States District Court
Northern District of California

requirements where plaintiff placed "emphasis … on portions of paragraphs of statements without explanation regarding the emphasis [and lumped] several paragraphs of statements together … stating in conclusory terms why all of the statements are false or misleading"). The AC is close to a puzzle, but the Court will not dismiss on that basis alone.

It does conclude Martinez fails to allege with particularity which of the statements he claims are false and/or misleading in the following paragraphs: 225, 239, 243, 245, 256, 258-260, 280, 304, 306, 314, 321, 327. These paragraphs contain multiple statements. Some paragraphs do not contain bold text to indicate which statement Martinez asserts is false and misleading. In others, although Martinez emphasizes certain statements, it is not clear that he challenges each of those statements. (*See, e.g.,* AC ¶ 243 (Parkinson's is "burdensome and costly"). Accordingly, the Court dismisses claims based on those statements, with leave to amend.

When the Court evaluates statements in the remaining paragraphs, it will focus only on statements Martinez has placed in bold text, including statements that are in bold in source documents.

### 2. Group Pleading.

Defendants also argue Martinez engages in improper group pleading with respect to falsity and scienter and seeks to hold the Individual Defendants liable for statements they did not make or could not have made. Under Rule 10b-5(b), the "maker of a statement", *i.e.*, "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" is liable. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). "[T]he 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 363 (5th Cir. 2004).

Martinez attributes at least one allegedly false or misleading statement to each Individual Defendant. (*See, e.g.,* AC ¶¶ 220 (King), 229 (Patni), 235 (Adamas), 250 (Went), 290 (Merriweather), and 328 (Shreedhar).) However, Martinez also attributes oral statements to "Defendants" and fails to allege how or why non-speakers would have had authority or control

United States District Court
Northern District of California

over the speaker.[10]  (*See, e.g.,* AC ¶¶ 224-226 (referring to statements by King) and ¶ 227.d (alleging that "Defendants' public statements" in paragraphs 224 through 226 "were materially false and misleading"); *id.* ¶¶ 39, 220-223 (attributing statements by King on August 8, 2017 to all Defendants although Shreedhar was not hired until May 2019).)  "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker." *Janus*, 564 U.S. at 142; *cf. In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1092-93 (C.D. Cal. 2008) (noting that "even under the 'group published doctrine,' oral statements cannot be attributed to a group").

The Court concludes that Martinez fails to allege facts demonstrating Individual Defendants can be held liable for oral statements they did not actually make.  The Court GRANTS, IN PART, Defendants' motion on that basis, and it shall limit its analysis of oral statements to the actual speaker.

Martinez also attributes written statements in SEC filings and Adamas' press releases to all Defendants, although only Merriweather and Went signed them.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (holding that a corporate officer who signs SEC filings can be a "maker" of statement).  Martinez argues that statements in Adamas' press releases and SEC filings can be attributed to each Individual Defendant based on "the common sense allegation" that they were Adamas' highest ranking officers and would have controlled "statements issued in publicly issued corporate documents[.]"  (Opp. at 18-19 n.17, citing *Glazer Cap. Mgmt., LP v. Magistri* 549 F.3d 736, 744 (9th Cir. 2008).)

In *Glazer Capital*, the court stated that, "in certain circumstances, some form of collective scienter pleading might be appropriate."  549 F.3d at 743 (citing, *e.g., Makor Issues & Rights, Ltd. v Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008)).  Taken in context, that analysis demonstrates a

---

[10]   A person who does not "make" a statement, as that term was defined in *Janus*, may still be held liable under Section 10(b) and Rules 10b-5(a) or (c) for disseminating false or misleading statements with the intent to defraud.  *Lorenzo v. S.E.C.*, -- U.S. --, 139 S.Ct. 1094, 1100-03 (2019); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).  Although Martinez cites to all three subsections of Rule 10b-5 in paragraph 383, his argument strongly suggests he seeks to hold the Individual Defendants liable for "making" materially misleading statements under Rule 10b-5(b), rather than as "disseminators" of statements as in *Janus*.

"collective scienter" theory applies when the facts alleged give rise to the type of "extremely rare" case "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (quoting *Berson v. Applied Signal Tech.*, 527 F.3d 982, 988 (9th Cir. 2008)). For reasons set forth in the Court's analysis of scienter, this is not one of those rare cases. In addition, Martinez's claims are based on some statements contained in Adamas' supplement to a prospectus, dated January 22, 2018. (Ex. 1.) That prospectus is not signed by any Individual Defendant. Although Martinez shows some of the statements in that document are allegedly false, he fails to establish scienter in connection with those statements.

The Court will limit its analysis of statements in SEC Filings to Adamas, Went, and Merriweather. The Court GRANTS, IN PART, the motion to dismiss claims against King, Patni, and Shreedhar based on those statements, with leave to amend. If Martinez chooses to amend, he must plead additional facts to establish why the other Individual Defendants should be held liable for those statements. *See In re Wells Fargo & Co. Shareholder Derivative Litig.*, 282 F. Supp. 3d 1074, 1094-95 (N.D. Cal. 2017) (plaintiffs did "more than simply allege liability based on a signature" and alleged "each of the Director Defendants was part of a specific committee whose general responsibilities would have afforded members knowledge regarding the illicit account creation scheme, and knowledge that the statements in the public filings were false or misleading").

## E.     Material Misrepresentations or Omissions.

Defendants argue that the allegations are not sufficient to establish that any of the statements or purported omissions in the AC are actionable.[11] A statement is not misleading simply because it is incomplete, but a "statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A statement is misleading "if it would give a reasonable investor the impression

---

[11]     When the Court has found a particular statement is not actionable, it has focused on Defendants' strongest argument for dismissal. The parties should not assume the Court has rejected other grounds for dismissal by its silence.

of a state of affairs that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) ("*Cutera*") (quoting *Berson*, 527 F.3d at 985).

The false or misleading statement also must be "material," *i.e.,* "there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 922 (N.D Cal. 2017) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The securities laws do not require disclosure of all material information, but if a defendant touts "positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quoting *Berson*, 527 F.3d at 987). Ordinarily, the question of whether a statement is material should be left to the trier of fact but "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014), *overruled on other grounds by City of Dearborn*, 856 F.3d at 616.

In addition to arguing that *none* of the challenged statements were actually false when made, Defendants argue that certain statements are not actionable because they are: (1) puffery; (2) opinions; or (3) protected by the PSLRA's safe harbor provision, 15 U.S.C. section 78u-5(c)(1).

### 1.    Puffery.

Defendants argue statements in the following paragraphs are non-actionable puffery: 222, 228, 231, 237, 246, 248, 250, 255, 257, 262, 265, 267-268, 270-274, 278-279, 281-284, 289, 291-293, 296, 307-308, 310, 315, 319, 322-323, 325, and 328.[12] In general, "[s]tatements of mere corporate puffery, vague statements of optimism like good, well-regarded, or other feel good monikers, are not actionable because professional investors, and most amateur investors as well,

_____

[12]    *See* Appendix A, Statements: 3, 7, 10, 13, 18-20, 22, 24, 29-37, 39-40, 42-45, 48, 50-52, 54, 60-62, 65, 67, 69-71, 73.

15

know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("*Intuitive Surgical*") (internal quotations and citations omitted). However, optimistic statements "when taken in context, may form a basis for a securities fraud claim when [they] address specific aspects of a company's operation that the speaker knows to be performing poorly" or "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually existed." *Quality Systems*, 865 F.3d at 1143-44 (internal quotations and citations omitted).

For example, in *Warshaw v. Xoma Corporation*, the Ninth Circuit held that a statement that everything was "going fine" with FDA approval was actionable because the company knew at the time that FDA approval would not occur. 74 F.3d 955, 959 (9th Cir. 1996)). Here, many of the challenged statements include the type of "feel good monikers" that constitute puffery or are not based on facts that suggest a state of affairs that "differs in a material way from the one that actually existed." *Quality Systems*, 865 F.3d at 1144. The Court concludes that the two quoted statements in paragraph 246 and bold statements in the following paragraphs fall into that category: the second bold statement in 222[13]; 248; the first two bold statements in paragraph 250; the first bold statement in paragraphs 265, 270[14], 279[15], 281, 289, 291, 293, 298, and 310; and the last bold statement in paragraphs 273[16], 278, and 292. The Court dismisses claims based on these statements without leave to amend.

### 2. Opinions.

Defendants argue that statements in the following paragraphs are non-actionable opinions:

---

[13]   The Court concludes Martinez has not alleged facts to show the first bold statement, which referenced how Adamas would price GOCOVRI was actually false when made, but the Court grants leave to amend with respect to that statement.

[14]   The Court concludes Martinez has not alleged facts to show the second bold statement in paragraph 270 was false or misleading when made, but it grants leave to amend.

[15]   The Court concludes Martinez has not alleged facts to show the second statement in bold text in paragraph 279 was false or misleading when made, but it grants leave to amend.

[16]   The Court concludes Martinez has not alleged facts to the first or second bold statements in paragraph 273 were false or misleading when made, but it grants leave to amend.

221, 230-231, 233, 250, 268, 280, 285, 289, 307, 315, 322-323, and 327.[17]  There are "three different standards for pleading falsity of opinion statements."  *City of Dearborn*, 856 F.3d at 615.  If a plaintiff relies on a material misrepresentation theory, they "must allege both that 'the speaker did not hold the belief … professed' and that the belief is objectively untrue."  *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).[18]  If a plaintiff alleges "that a statement of fact contained within an opinion is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue."  *Id.* (alterations, internal quotations and citation omitted).  Finally, if a plaintiff relies on material omissions, they must allege "facts going to the basis for the [speaker's] opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* (quoting *Omnicare*, 575 U.S. at 194).

Martinez challenges King's statement in paragraph 230 that he felt "comfortable and confident" that certain information could substantiate a difference between GOCOVRI and amantadine IR in the minds of physicians.  Martinez argues this opinion is objectively untrue because there was no clinical comparison of the two drugs.  However, King preceded his "comfortable and confident" statement with the statement that, in contrast to amantadine IR, GOCOVRI was dosed at night minimizing "the sleep-related side-effects" and that GOCOVRI had "durability based on long-term data."  (*Id.*)  Martinez does not allege facts to show that those facts, which form the basis of the opinion, are untrue.  He also does not allege facts to show that King did not, in fact, "feel comfortable or confident" that Adamas could substantiate a difference between the two drugs.  Accordingly, the Court concludes Martinez has not shown that this opinion is actionable.[19]

---

[17]    *See* Appendix A, Statements: 2, 9-11, 20, 32, 41, 46, 48, 60, 65, 69-70, 72.

[18]    In *Omnicare*, the Supreme Court addressed the standards for pleading falsity of opinions in a claim under Section 11 of the Securities Act.  The Ninth Circuit adopted those standards in *City of Dearborn*, 856 F.3d at 616.

[19]    Martinez also fails to allege facts to show that the statement in paragraph 230, "there's plenty of data with our product in our label to support the fact that it's very effective, that it's manageable," was false when made, but the Court will grant leave to amend.

17

The Court concludes the same is true for the statement "[t]his dyskinesia population is a challenging population to manage," in paragraph 231. Similarly, Martinez does not sufficiently allege particular facts to show that at the time King expressed the opinion contained in paragraph 233 the facts underlying his opinion were objectively untrue or that he did not believe the statement. Finally, the Court concludes that the facts alleged are not sufficient to establish the opinion statements in the following paragraphs are actionable: 250 (third bold statement), 268 (second bold statement), 285, 307, 322, and 323.

Accordingly, the Court GRANTS, IN PART, Defendants' motion and dismisses claims based on these statements, with leave to amend.

### 3. The Safe Harbor Provision.

Defendants argue the following paragraphs contain statements that fall within the PLSRA's safe harbor provision, including statements in SEC filings that outline risk factors: 220-221, 224, 228, 235, 237, 241, 252, 265, 268, 270 (third and fourth statements), 274, 276, 287, 289-290, 291 (first bold statement), 293-294, 296, 300, 302, 310, 312, 319, and 328.[20] The safe harbor provisions protects "forward-looking" statements, *i.e.*, statements " regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u(i).)

A forward-looking statement is exempt from liability when it is accompanied by meaningful cautionary language *or* was "made without actual knowledge that it is false or misleading." *Quality Systems*, 865 F.3d at 1141. In order to be "meaningful", cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement[.]" 15 U.S.C. § 78u–5(c)(1)(A)(i). "[T]erse, generic" or

---

[20]   *See* Appendix A, Statements: 1-2, 4, 7, 12-13, 15, 21, 30, 32-33, 37-38, 47-50, 52-54, 56-57, 62-63, 67, and 73. Martinez alleges that each challenged statement falls outside the PLSRA's safe harbor provision for the reasons set forth in paragraphs 378 and 379. Those allegations, standing alone, are too conclusory to overcome Defendants' challenges to the AC. *See, e.g., Cutera*, 610 F.3d at 1112 (finding nearly verbatim allegations "conclusory").

boilerplate statements are not sufficient. *See, e.g., Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998). The safe harbor also will not protect a "false or misleading non-forward-looking statement embedded in a mixed statement." *Quality Systems*, 865 F.3d at 1142.

> [T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.

*Id*. For example, in *Quality Systems*, the court concluded that the statement "sales were still going strong" would not be protected by the safe harbor provision if the implication was that "current sales were strong and that they would continue to be so, at least for a time," because the defendant "knew that its sales were about to collapse." *Id.* (quoting *Makor Issues & Rights*, 513 F.3d at 705).

The Court concludes that statements in the following paragraphs are not forward-looking and are not subject to the safe harbor provision: 265 (second bold statement), 270 (third and fourth bold statements), 274, 291 (first bold statement), and 310. The Court will address whether Martinez sufficiently alleges they are materially misleading in Section E.4, below.

### a. The Risk Factor Statements.

Martinez alleges statements identified as risk factors in Adamas' SEC filings, which are set forth in the following paragraphs are materially misleading: 235, 241, 252, 276, 287, 302, and 312.[21] Defendants argue these statements are forward-looking and are protected by the PSLRA's safe harbor provision because they provide meaningful cautionary language to investors. *See, e.g., Plevy,* 38 F. Supp. 2d at 832 (stating that rule in Ninth Circuit "appears to be" that "where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies").

---

[21]    Some of these SEC filings include general language that the filing contains forward-looking statements. (*See* Ex. 4 at 1, Ex. 14 at 1.)

19

In *Cutera,* the plaintiffs alleged the defendants were not able to meet revenue forecasts because of an inability to hire and to retain a high caliber sales force and allegedly misled investors by not disclosing information about the weakness of that sales force. 610 F.3d at 1106-07, 1109. During a conference call at which some of the misleading statements were made, defendants prefaced their prepared remarks by stating they would: "contain forward-looking statements concerning future financial performance and guidance[;]" that "management may make additional forward-looking statements in response to[] questions[;]" and that factors like "Cutera's 'ability to continue increasing sales performance worldwide' could cause variance in the results." *Id.* at 1112. The defendants also affirmatively warned of risks in areas the plaintiffs alleged the defendants misled investors, *i.e.,*: the company's "ability to compete and perform in the industry depended on the ability of its sales force to sell products to new customers and upgraded products to current customers, and that failure to attract and retain sales and marketing personnel would materially harm its ability to compete effectively and grow its business." *Id.*

The Ninth Circuit concluded that the defendants' cautionary language was adequate and brought the statements within the safe harbor provision. *Id.* at 1112-13; *see also Quality Systems*, 865 F.3d at 1148 (concluding that "these forward-looking statements are subject to a number of risks and uncertainties" and [a]s a result, actual results may vary substantially from those anticipated by the forward-looking statements," were adequate when risks and uncertainties were listed); *Park v. GoPro, Inc.*, No. 18-cv-00193-EMC, 2019 WL 1231175, at *16-17 (N.D. Cal. Mar. 15, 2019) (discussing adequate cautionary language).

In contrast are cautionary statements like "[w]hen we introduce or announce new or enhanced products, we face numerous risks relating product transitions, including the inability to accurately forecast demand (including with respect to our existing products)." *In re Illumina, Inc. Sec. Litig.*, No. 16-cv-03044-L-KSC, 2018 WL 500990, at *4 (S.D. Cal. Jan. 22, 2018) ("*Illumina*"). In that case, the court noted that "the introduction or announcement of 'new or enhanced products' [presumably] is a constant occurrence in" the defendants' business. *Id.* The court also distinguished *Cutera* on the basis that, there, the "defendant identified a variable (sales force development and retention) whose occurrence or non-occurrence was uncertain and could

20

United States District Court
Northern District of California

affect results," whereas the defendants in *Illumina* "had already introduced the products in question." *Id.* Thus, the court determined that defendants' cautionary language was "uninformative boilerplate" because it "did not even identify a specific factor whose occurrence or non-occurrence was unknown. Rather, it simply rehashed a constant reality of most product driven businesses: demand can change in the context of evolving product lines." *Id.*[22]

The statements at issue summarize the various risks Adamas might face in its effort to commercialize GOCOVRI. For example: "GOCOVRI may fail to achieve the degree of market acceptance by physicians, patients, healthcare payers, and others in the medical community necessary for commercial success, negatively impacting our business;" "[i]f we are unable to effectively market, promote, sell, and distribute GOCOVRI and to retain experienced commercial personnel, our business will be substantially harmed"; "[f]ailure to successfully obtain coverage and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue." (AC ¶¶ 235, 241, 252, 276, 287, 302 and 312.)

Martinez argues the risk factor statements are framed "in the abstract" and fail to disclose that the risks had "already … come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (quoting *Berson*, 527 F.3d at 986). Although *Berson* did not address the issue of whether statements were protected by the safe harbor provision, the Court finds guidance in its reasoning about why the statements were misleading. There, the defendants stated that "[w]e may experience significant contract cancellations that were previously booked and included in backlog," *i.e.,* "the dollar value of the work it has contracted to do but hasn't yet performed," which could negatively impact the company's revenue. 527 F.3d at 984, 986; *see also id.* (noting possibility of future cancellations). At the time, the company had received stop-orders on certain contracts that made it unlikely the company would be able to complete the work and, thus, would not earn revenue on those contracts. *Id.* at 984. The Ninth Circuit held that the

---

[22] The court also concluded that the plaintiffs sufficiently alleged the defendants knew the statements were false at the time they were made and, therefore, were not protected under the second prong of the safe harbor analysis. *Illumina*, 2018 WL 900550, at *5.

21

statements were misleading because they spoke "entirely of as-yet-unrealized risks and contingencies" without alerting "the reader that some of these risks may already have come to fruition[.]" *Id.* at 986.

Most of the risk factor statements that Martinez challenges are followed by paragraphs that explain why the risks described could negatively impact Adamas' revenues. (*See, e.g.,* Ex. 11 at 30-32). Those paragraphs contain more than "terse, generic statements." *Plevy*, 38 F. Supp. 2d at 832. Moreover, unlike the statements in *Illumina*, the statements do not "rehash[] a constant reality" attendant to the nature of Adamas' business. 2018 WL 900550, at *4. Instead, Adamas identified specific variables, such as acceptance by physicians and patients, GOCOVRI's efficacy and potential side effects, and support by its distribution network, which could negatively impact Adamas' revenues depending on the outcome.

Except as noted below, the Court concludes that Martinez has not sufficiently alleged that each of the prefatory statements contained in the risk factors fall outside the PLSRA's safe harbor provision.[23] Martinez challenges the statement that "[f]ailure to successfully obtain and reimbursement for GOCOVRI in the United States, or the availability of coverage and reimbursement only at limited levels, would diminish our ability to generate product revenue." Martinez alleges that by December 2017, at least four payers required some form of step therapy before approving coverage or reimbursement for GOCOVRI and that between January 2018 and April 2018, additional payers followed suit. (AC ¶ 127; *see also* AC Exhibits A-H.)

Martinez also challenges the statement that "*although no payer has done so to date,* a payer may determine to require patients to use other formulations of amantadine for dyskinesia (even though it is not approved for that indication) prior to receiving reimbursement for GOCOVRI[.]" (*See,* AC ¶¶ 235, 241, 252.) The second-half of that statement does refer to future events, but the emphasized portion amounts to a statement of existing fact. The Court concludes this is a mixed-statement. Thus, when analyzing the cautionary language, the Court considers it

---

[23]   This conclusion also is based on the fact that Martinez has not clearly identified statements in the accompanying paragraphs that render the prefatory statements misleading.

"in the light of the non-forward-looking statement."[24]  *Quality Systems*, 865 F.3d at 1146. Martinez alleges sufficient facts to show that at least some payers had required step-throughs for GOCOVRI and that the cautionary language failed adequately apprise investors that risk already had come to fruition.  However, for the reasons set forth in its discussion of scienter, the Court concludes Martinez fails to show Went or Merriweather had actual knowledge of that fact.

Martinez also bases his claims on statements in the risk factor sections of SEC filings that "[p]atients may choose not to use GOCOVRI if coverage is not provided or reimbursement is inadequate to cover a significant portion of its cost" and "[a]s with any approved medicine for a particular indication, *there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVIRI.*"  (AC ¶¶ 252, 276, 287; *cf.* AC ¶¶ 302, 312 (adding "or changes in coverage and reimbursement decisions over time" following "for GOCOVRI"). According to Martinez, in order to make GOCOVRI affordable, patients would require insurance coverage or reimbursement.  He also alleges that payers use various methods to contain costs, including requiring step-through therapy before approving drugs that are more expensive than other alternatives.  (*See, e.g.,* AC ¶¶ 112, 114.)  Again, Martinez alleges that at the time Adamas included these risk factor statements in their SEC filings, payers were requiring step-through therapy before providing coverage or reimbursement.

Martinez alleges facts to show that the risks associated with these statements had occurred and that those facts were not disclosed.  *See, e.g., Berson*, 527 F.3d at 986.  The same is true for the statements that "[p]atients may choose not to use GOCOVRI if coverage is not provided or

---

[24]   The Court's conclusion on why the statement would be false is supported by the opinion in *Plymouth*, which noted that the plaintiffs alleged that by the time of Adamas' SPO, "large insurers had already imposed requirements significantly restricting the use of GOCOVRI due to its high price and limited demonstration of additional efficacy over its competitor product, Amantadine IR, including listing GOCOVRI as a non-preferred drug, requiring prior authorization and requiring that patients to try the cheaper Amantadine IR first."  2019 WL 7900426, at *2.  Although the court did not engage in extensive analysis, it did determine the statement was neither forward looking nor puffery and that the plaintiffs adequately alleged it was false or misleading.  *Id.*, 2019 WL 7900426, at *3.  However, the court's determination that the statements were false is not dispositive in this case, because the plaintiffs in *Plymouth* did not need to establish scienter to state a claim.  *See, e.g., Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995) (Section 12); *In re Daou Syst., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (Section 11).

23

reimbursement is inadequate to cover a significant portion of its cost" and "there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI." (*See also* AC ¶¶ 302, 312 (adding "or changes in coverage and reimbursement decisions over time" to latter statement).) However, for the reasons set forth in its discussion of scienter, the Court concludes Martinez fails to show Went or Merriweather had actual knowledge of these facts.

Because the Court cannot say it would be futile, the Court will grant Martinez leave to amend to show why statements in the risk factor sections of Adamas' SEC filings would fall outside the PSLRA's safe harbor provision.

### b.   Conference Calls.

The Court concludes the following statements qualify as forward-looking: "there is no anticipation of requiring a step-through of amantadine IR to get to [GOCOVRI]" and "[Medicare] will likely add [GOCOVRI], given there's no other product for this indication, sometime in 2018 and make it available through Medicare," and "We anticipate broad payer coverage for GOCOVRI that will grow over the course of 2018." (AC ¶¶ 220-221, 228.) Unlike the statements regarding payer coverage described above, these statements were made in August 2017 and November 2, 2017, before Martinez alleged payers began to make the coverage decisions requiring step-throughs.

The Court concludes the statements regarding growth rates and the percentage of patients that would utilize GOCOVRI, contained in paragraphs 224 ("25% to 30% range"), 289 ("we are on our way to reaching our goal of 25% to 30% penetration), and 290 ("Looking to 2019, we similarly believe that approximately 2% penetration on average for the year is an appropriate framework."), are forward-looking. *See, e.g. Intuitive Surgical*, 759 F.3d at 1058 (describing as "classic growth and revenue projections" statements that "[i]nstrument and accessor[ies] revenues … are expected to grow approximately 55% over 2007" and "we continue to expect *dVP* procedures to grow approximately 40%..."). The same is true for the statements in paragraphs 294, 296 (second bold statement), 300, and 328.

Defendants prefaced most conference calls or presentations with warnings that they would be making forward-looking statements. (*See, e.g.,* Ex. 2 at 4.) For example, they advised

24

participants that the "[i]nformation concerning factors that could cause actual results to differ materially from those contained in or implied by such forward-looking statements" were discussed in Adamas' SEC filings.  (*See, e.g., id.*; *cf.* Ex. 10 at 2 (referring participants to Adamas records "on file … to make sure you fully understand all risks associated with investments in Adamas), Exs. 36 at 4, 38 at 4, and 39 at 4.)

The Ninth Circuit has held that similar language satisfies the PSLRA's requirement that forward-looking statements be accompanied by meaningful cautionary language.  *See Intuitive Surgical*, 759 F.3d at 1059 ("Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements.  Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties.  These risks and uncertainties are described in detail in the company's [SEC] filings.  Prospective investors are cautioned not to place undue reliance on such forward-looking statements."); *see also Cutera*, 610 F.3d at 1112 ("[T]hese prepared remarks contain forward-looking statements concerning future financial performance and guidance ... management may make additional forward-looking statements in response to questions, and ... factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results.").

Because the statements described above do not relate solely to payer coverage, the Court concludes that Martinez has failed to allege statements in the following paragraphs are actionable: 220 (second bold statement), 221, 224, 228, 289 (second bold statement), 290, 294, 296 (second bold statement), 300, and 328 (second bold statement).  The Court dismisses claims based on these statements, with leave to amend if Martinez can in good faith allege facts to bring them outside the scope of the safe harbor provision.

### 4.    Not False When Made.

Finally, the Court addresses Defendants' argument that Martinez fails to allege statements in the following paragraphs were false when made: 220 (first bold statement), 226, 229, 255, 257, 261-262, 265 (second bold statement), 267, 270-272, 281 (second and third bold statements), 282-284, 291 (first bold statement), 292 (first bold statement), 293 (second and third bold statements),

United States District Court
Northern District of California

25

296 (first bold statement), 308, 310 (second bold statement), 315, 317, and 325.[25]

The Court concludes Martinez does not allege facts that demonstrate at the time the statement in paragraph 226 was made, payers were not willing to support the particular prices alleged. Similarly, although Martinez may be able to show that Defendants overestimated the type of patients who would use GOCOVRI, the facts alleged do not suggest GOCOVRI was not "appropriate for all patients, irrespective of dyskinesia or dyskinesia duration" or that "adoption" was not "occurring in a combination of amantadine experienced and [naïve] patients." (AC ¶¶ 229, 291 (first bold statement).) The second bold statement in paragraph 293 refers to OSMOLEX, and the Court concludes Martinez does not adequately allege that statement was false or misleading when made.

The Court also concludes Martinez fails to allege sufficient facts to show why statements in the following paragraphs are allegedly false or misleading: 228 (first bold statement), 255, 257, 265 (second bold statement), 267 (emphasized text), 274 (second, third, and fifth bold statements), 281 (third bold statement), 282, 296 (first bold statement), 308, 310 (second bold statement), 315, 317, 319, 325. For example, the facts in paragraphs 227 and 254, which set forth the reasons these statements were purportedly false, do not show that "patient experiences on the medicine [GOCOVRI]" were negative rather than positive. Similarly, there are no facts to show that physicians did not move to more than one patient, as alleged in paragraph 270. There also are no facts to show patients on Adamas' Quick Start program were not a "small minority" of its patient population. (AC ¶ 272.) Taken in that context, Martinez does not allege facts to show the statement regarding the speed of reimbursement is false. Similarly, Martinez does not allege facts to show Adamas did not "streamline" ways it could provide responses needed by payers, as alleged in paragraph 271. Although Martinez alleges that at the end of the phase II trials regarding GOCOVRI's use for MSWI, there was only a 17% improvement, which was similar to AMPYRA, there are no facts to suggest those figures had not improved by the time Patni made the statement

---

[25] *See* Appendix A, Statements 1, 6, 8, 22, 24, 28-31, 33-35, 42-45, 50-52, 54, 61-62, 65-66, and 71.

in paragraph 310 regarding a "large treatment effect in a broad population."

Martinez also challenges the statement that, on or about August 8, 2017, payers "don't see this [GOCOVRI's] profile as really having much to do with the amantadine IR profile[.]"  (AC ¶ 220.)  Although Martinez does allege that amantadine IR had been used to treat LID and was covered as a preferred drug, he does not include facts to show that at the time the statement was made payers did not have that perspective on GOCOVRI's profile.

However, the Court concludes that the allegations showing that a number of payers had required patients to step-through amantadine IR in order to obtain coverage for GOCOVRI are sufficient to show that the bold statement in paragraph 261 is materially misleading.  For those same reasons, the Court concludes Martinez sufficiently alleges the first, third, and fifth bold statements regarding GOCOVRI's profile set forth in paragraph 274 are materially misleading.  Martinez also alleges that the first bold statement in paragraph 296 was false because of "operational issues" with Onboard.  (*See* AC ¶ 297, cross-referencing AC ¶ 254.)  Although not entirely clear, the operational issues appear to be addressed in paragraphs 148 through 152.  Those paragraphs include allegations that prescriptions were lost because physicians and patients either sent them to or tried to fill them at regular pharmacies, rather than through the Onboard program, and also include allegations about the forms used to fulfill prescriptions.  The Court concludes these facts are sufficient to show the statement is materially misleading.

The Court also concludes the facts alleged in the AC are sufficient to show that reimbursements were not happening quickly, contrary to King's statement alleged in paragraph 262.  For example, FE-3 and FE-5 state that reimbursements were slow due to the requirements of prior authorization or the step-through from amantadine IR.  (AC ¶¶ 138-139.)  For these reasons, the Court concludes Martinez sufficiently alleges the statements in paragraphs 271 (first bold statement), 281 (second bold statement), 283-284, and 292 regarding support from payers and the speed of reimbursements are materially misleading.

As discussed, the Court concludes Martinez has not alleged sufficient facts to show anyone other than Adamas, Went, or Merriweather could be liable for the statements in Adamas' SEC filings.  Therefore, the GRANTS, IN PART, and dismisses claims based on those statements

27

Case 4:19-cv-08051-JSW   Document 79   Filed 10/08/21   Page 28 of 37

against King, Patni, and Shreedhar, with leave to amend.  Because Martinez fails to allege Patni and Shreedhar made any of the oral statements Martinez alleges are false, the Court also GRANTS, IN PART, the motion to dismiss claims against Patni and Shreedhar based on those statements, with leave to amend.

**F.      Scienter.**

Adamas, Went, Merriweather, and King argue that Martinez's theory of scienter is inherently implausible: if they knew from the start GOCOVRI would not be successful, it would make no sense for them to make positive statements over a nearly two-year period about that success.  According to them, a more compelling inference is that notwithstanding certain struggles, they remained optimistic that GOCVORI would be commercially successful.

Martinez must allege particular and specific facts to show Adamas and the Individual Defendants intended to "deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Zucco*, 552 F.3d at 991; 15 U.S.C. § 78u-4(b)(2)).  To act with scienter, a defendant must have "made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).  Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct."  *S. Ferry*, 542 F.3d at 782.  "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard*, 228 F.3d at 1064.)

The scienter inquiry is "inherently comparative."  *Tellabs*, 551 U.S. at 323.  Thus, in evaluating scienter, a court must "consider plausible nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 324; *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) ("*NVIDIA*")  ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inference[s].") (quoting *Tellabs*, 551 U.S. at 322-23).  The inference of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences."  *Tellabs*, 551 U.S. at 324 (internal citations and quotations omitted).  A

28

court must adopt a holistic view and "a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784. "A complaint will survive, … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one would draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

Martinez's arguments on scienter are founded on (1) executive departures and (2) the core operations inference, the latter of which encompasses his arguments about the information provided by former employees and the Individual Defendants' purported access to disputed information. The Court engages in a dual inquiry, in which it first inquires whether any of Martinez's "allegations, standing alone, is sufficient to create a strong inference of scienter." *NVIDIA,* 768 F.3d at 1056. If none of the allegations alone are sufficient, the Court then "consider[s] the allegations holistically to determine whether they create a strong inference of scienter taking together." *Id.*

### 1. Executive Departures.

Martinez argues that scienter can be inferred from the fact that King, Merriweather, and Went stepped down from their respective roles at Adamas during the Class Period. (AC ¶¶ 348-351.) "[R]esignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter," for example when they are "uncharacteristic" or are "accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. To support this argument, Martinez relies, in part, on *In re WageWorks, Inc., Securities Litigation*, No. 18-cv-1523-JSW, 2020 WL 2886547 (N.D. Cal. June 1, 2020) ("*WageWorks*").

In *WageWorks*, this Court found that allegations about the fact that the defendant company's CEO and CFO had resigned were sufficient on their own to establish scienter. *Id.*, 2020 WL 2896547, at *6-*8. There, the plaintiffs relied on a press release in which the company announced it would need to restate its financials, citing problems with "an open flow information" and issues with "appropriate tone at the top for an effective control environment." In the same press release, the company announced the CEO and CFO would resign. *Id.*, 2020 WL 2896547, at *6. This Court determined the reference to the problem with an open flow of information and the appropriate tone at the top supported "an inference that improperly stated revenue arose from

withheld information." *Id.* Shortly thereafter, in an SEC filing, the company expressly admitted that the problems were attributed to "senior management." *Id.* Finally, the company's auditor called for the CEO's resignation. *Id.*, 2020 WL 2896547, at *7. This Court concluded "the close temporal proximity to the initial revelations weigh[ed] against an innocent inference that the defendants resigned for 'unrelated personal or business reasons.'" *Id.*, 2020 WL 2896547, at *6 (quoting *Zucco*, 552 F.3d at 1002).

Martinez argues that *WageWorks* is analogous because of the "temporal proximity" to Adamas' corrective disclosures and its announcements that Merriweather, King, and Went would be stepping down from their roles. Although Martinez alleges FE-1 "believed" King was fired because of issues relating to prescriptions that were not reimbursed, he fails to include any facts about why FE-1 held that belief. Those allegations are too vague to be considered reliable. *Cf. Zucco,* 552 F.3d at 1002 (finding "vague hearsay allegations … not specific enough to extract a strong inference of scienter" from turnover in defendant company's financial department).

Martinez also argues that Went founded Adamas and came up with the idea for GOCOVRI. He also argues that Went, Merriweather, and King were Adamas' three top executives which makes their departure within a year of each other uncharacteristic. Adamas stated "Mr. Merriweather's separation was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices." (*See* Ex. 40 at 2.) In addition, Went remained as a strategic advisor. (*Id.*; AC ¶ 30.) The Ninth Circuit has found similar facts "detrimental" to an inference of scienter. *NVIDIA*, 768 F.3d at 1030; *see also City of Dearborn*, 856 F.3d at 622 (concluding the fact that a defendant "remained an employee of Align for an additional six months after the first goodwill impairment announcement was made … diminishes any inference of scienter based on his resignation). In contrast to the facts alleged in *WageWorks*, the Court concludes Martinez has not alleged facts to undermine "innocent inferences." 2020 WL 2896547, at *7 n.5 (noting that defendant company continued to struggle with transparency after initial resignations).

The Court concludes the allegations relating to the Individual Defendants' resignations, on their own, are not sufficient to show scienter.

30

### 2. The Core Operations Inference. [26]

Martinez also relies on the core operations inference to establish scienter, which allows a plaintiff to attribute knowledge of facts that are "critical to a business's 'core operations[,]'" to a "company and its key officers." *Browning*, 2014 WL 1285175, at \*15 (quoting *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003)). The Ninth Circuit has outlined three circumstances in which the core operations may be used to establish scienter. *See S. Ferry*, 542 F.3d at 986. Those three circumstances are: (1) where it would be absurd to conclude that defendants did not have knowledge of the disputed information; (2) where defendants have actual knowledge of the disputed information; (3) and where "core operations" allegations taken together with other allegations raise a cogent and compelling inference of scienter. The Court addresses the first two circumstances in this section and the third in its holistic analysis of scienter.

First, allegations about a company's core operations "may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* (quoting *Berson*, 527 F.3d at 988); *see also Glazer Capital,* 549 F.3d at 743 (addressing as a hypothetical example a situation where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero," reasoning that "so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false") (quoting *Makor Issues & Rights*, 513 F.3d at 710).

*Berson* is an example of one of the "exceedingly rare" cases where bare allegations relating to core operations may establish scienter. In that case, the individual defendants "were directly responsible for the [company's] day-to-day operations[.]" 527 F.3d at 988. Based on that fact and

---

[26] Martinez argues that the Court also can infer scienter based on the nature of the false statements. *See, e.g., Zucco*, 552 F.3d at 1000 (discussing when falsity may be indicative of scienter). The *Zucco* court's analysis of that issue referenced *South Ferry*, in which the Ninth Circuit specifically analyzed the core operations inference and what a plaintiff must allege to rely on that theory. Accordingly, the Court has considered Martinez's argument about the nature of the statements in its analysis of the core operations inference.

31

the magnitude of the revenue loss, "tens of millions of dollars[,]" the court reasoned that it would be "absurd to suggest" that the defendants were not aware of those facts. *Id.* at 989 (internal quotation and citation omitted); *cf. Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 935 (N.D. Cal. 2012) (finding that "massive" nature of slowdown and change in company's "book-to-bill ratio" was so "qualitatively significant" that it was plausible to infer "upper management was likely aware of that fact at or about the time of the downturn").

In contrast to *Berson* is *Browning*. There, the plaintiffs alleged the defendant company's "success or failure" hinged on its ability to commercialize its signature product in a short period of time. *Id.*, 2014 WL 1285175, at *15. Relying on the core operations inference, the plaintiffs argued that the company's CEO, who made the allegedly false statements, must have been aware of the efforts necessary to and the ability to achieve that success. *Id.* The court held that the plaintiffs' allegations were insufficient to show it was one of the "exceedingly rare" cases where the core operations inference alone could demonstrate scienter. Although the company's signature product was involved, the court reasoned that to adopt plaintiff's argument "would eviscerate the core-operations test and turn it into an automatic presumption of comprehensive knowledge on the part of management." *Id.*

Martinez alleges that GOCOVRI accounted for 99% of Adamas' revenue during the Class Period. Adamas acknowledged in its SEC filings that its "success depend[ed] heavily on [GOCOVRI's] successful commercialization." (*Id.* ¶ 51.) Adamas also outlined the many factors that would impact its ability to do so. (*See, e.g., id.* ¶ 276.) Unlike the hypothetical posed in *Makor*, Martinez does not suggest Adamas was not able to market GOCOVRI at all. He does include graphs in the AC that show a significant drop in prescriptions between Q2 2018 and Q1 2019, but Martinez fails to provide any information about the source of those graphs or how those figures impacted Adamas' overall revenues.

Without further detail, the Court cannot reasonably infer it would be absurd for Went or Merriweather to not know those facts. Rather, the Court finds the allegations here are more analogous to the facts in *Browning*, where the court noted that "a significant number of factors" would need to go well and found it "unreasonable to expect [the CEO] to be so aware of all these

32

factors … that his projections for two years would certainly be accurate." 2014 WL 1285175, at *16. As that court aptly stated, "knowing the status of a few dispositive factors is very different from knowing whether a still-burgeoning company as a whole will achieve its goals." *Id.* The Court concludes that this case is not one of the "exceedingly rare" cases where the core operations inference alone would suffice to establish scienter.

In the second circumstance outlined in *South Ferry*, a plaintiff can establish scienter under a core operations theory when they include "detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry*, 542 F.3d at 785; *see also In re Daou*, 411 F.3d at 1022 ("specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database, are factors in favor of inferring scienter in light of improper accounting reports") (citing *Oracle*, 380 F.3d at 1234). In contrast, "[g]eneral allegations of defendants hands-on management style, their interaction with other officers and employees, their attendance at monthly meetings, and their receipt of unspecified weekly or monthly reports," are not sufficient to establish scienter. *In re Daou*, 411 F.3d at 1022 (internal quotations and citations omitted).

For example, in *Quality Systems*, the plaintiffs relied on confidential witnesses, one of whom was on a conference call with an individual defendant who made statements showing his knowledge of the disputed facts. 865 F.3d at 1145. The confidential witnesses also provided information about the specific types of reports provided to the individual defendants, which the court characterized as "particularized allegations that defendants had actual access to the disputed information[.]" *Id.* (internal quotations and citations omitted). The individual defendants also stated they "had real-time access to, and knowledge of, sales information," referring to specific databases that contained the information. The court found that statement comparable to statements in *Oracle* that "top executives admitted to having monitored a database of sales data." *Id.* (quoting *Oracle*, 380 F.3d at 1231 (alterations omitted)).

In contrast, allegations that a company was "data driven," its "management software is used to track and manage every project," and that individual defendants used "key operating metrics" were insufficient to show scienter under a core operations inference. *See In re SolarCity*

33

*Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1012 (N.D. Cal. 2017) ("*SolarCity*").  The court determined those allegations were not sufficient to show the individual defendants' "detailed involvement in the minutia of" the company's operations.  274 F. Supp. 3d at 1012; *see also Lopes v. Fitbit, Inc.*, No. 18-cv-665-JST, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020) (finding "generalities about management's access to data" was insufficient and did not provide the "who, what, where, when, and how" each defendant gained access to the relevant information) (internal quotations and citations omitted).

Martinez alleges that King and Went stated they got "daily feedback" from Adamas' field team and that they had been in contact with payers and had "research" about payers.  (*See, e.g.,* AC ¶¶ 64-65, 68, 117-118.)  Martinez alleges that payer decisions often are available on their websites, and King did make statements during various earnings calls that acknowledged he was aware of that fact.  (*Id.* ¶¶ 72, 124, 127 & n.4, 128, Exs. A-H, 129.)[27]  However, Martinez does not provide specific details about the nature of those conversations.  Nor does he include details about the research to which the Individual Defendants purportedly had access, which would demonstrate they knew the rosy picture they were touting was contrary to the actual state of affairs.  Martinez's reliance on the information provided by the former employees fares no better because they either fail to provide specific information about what the research and reports showed or fail to show how, when, or where the Individual Defendants would have learned those facts.  (*See, e.g.,* AC ¶ 138 (FE-5 reporting that 1/5 to 1/3 of prescriptions in Q1 18 were denied but failing to include allegations whether the Individual Defendants had those hard numbers and when, where, and how they would have learned them).)

The Court concludes the Individual Defendants' statements about contacts with payers are not the type of "specific admissions" that show they had "detailed involvement" in the minutia of Adamas' operations, especially in connection with the speed of reimbursements.  Rather, the Court finds the allegations are analogous to the type of generalized statements the *SolarCity* court

---

[27]    FE-4 states that Adamas always anticipated some payers would require a step-through of amantadine but does not explain the basis for that belief.  For example, the research cited in paragraph 110 related to pricing, not reimbursement criteria.

United States District Court
Northern District of California

found insufficient to show scienter on this theory.  Similarly, although Martinez alleges that Adamas and the Individual Defendants made statements that purport to corroborate information provided by the former employees, that Court concludes those allegations also are not sufficient to establish scienter.  Temporal proximity of an alleged false statement and later disclosures can support an inference of scienter. *See, e.g., Yourish v. Cal. Amplifier,* 191 F.3d 983, 997 (9th Cir. 1999).  But, "[a]n after-the-fact statement does not constitute an admission unless it contradicts the substance of an earlier statement and essentially states I knew it all along." *Lopes*, 2020 WL 1465932, at *11 (internal quotations and citations omitted).

Martinez does allege that FE-4, VP of Marketing, reported directly to Went and to King, but Martinez fails to include any allegations that include details about the specific information they would have received or details about meetings. *Compare Cutler v. Kirchner*, 696 Fed. Appx. 809, 815 (9th Cir. 2017) (noting that confidential witness was "one of twelve people to participate in quarterly meetings of" company's executive board and described how "senior management team kept abreast" of disputed information) *with Intuitive Surgical*, 759 F.3d at 1062 (noting that complaint was missing "allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives"); *Bodri*, 252 F. Supp. 3d at 925 ("Plaintiff has filed to provide any content of the original or revised forecasts that quantifies or clarifies what Defendants knew and when[.]").

The Court concludes Martinez fails to allege sufficient facts to premise scienter solely on the core operations inference.

### 3.    Holistic Analysis.

Finally, the Court examines the allegations holistically.  As discussed at the start of the Court's analysis of scienter, Defendants argue Martinez's theory does not make sense, relying on *Nguyen v. Endologix, Inc.,* 962 F.3d 405 (9th Cir. 2020).  In *Nguyen*, the plaintiff alleged the defendants misrepresented the likelihood that the FDA would approve a new medical device.  The plaintiff's central theory of liability was that the "defendants knew that the FDA would not approve [the device], or at least that it would not do so on the timeline defendants were telling the market" because they were aware that trials in Europe had resulted in migration problems in the

35

device that would likely manifest during trials in the United States. *Id.* at 415; *see also id.* at 407, 409.

The court found an immediate roadblock to the plaintiff's theory: it made no sense for the defendants "to keep the stock price high for a time and then face" an inevitable fallout when the FDA eventually discovered the device's unsolvable and intractable problem. *Id.* at 415. The court also found the plaintiff's reliance on confidential witness testimony did not overcome the "plausibility problem" because the confidential witnesses left the company before the allegedly false statements were made. More importantly, the court found information attributable to the confidential witness "lack[ed] any detail" about the problems in the European trials. In sum, the court concluded "the notion that a company would promise FDA approval it knew would not materialize does not, without more, create a strong inference of intent to deceive or deliberate recklessness" and determined a "more plausible inference … is that defendants made promising statements … but then modulated their optimism when the results began to raise more questions." *Id.* at 418-19; *cf. Cozzarelli v. Inspire Pharms.*, 549 F.3d 618, 627 (4th Cir. 2008) ("It is improbable that Inspire would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.").

In addition to the problems with his reliance on the former employees' testimony, Martinez does not allege any of the Individual Defendants sold stock during the Class Period. That fact is not dispositive, but it does undermine an inference of scienter. *See, e.g., Nguyen,* 962 F.3d at 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs."); *SolarCity*, 274 F. Supp. 3d at 1011 (concluding in the holistic analysis that lack of stock sales supported "inference of no scienter").

A court may allow a complaint "to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. When the Court views Martinez's allegations of scienter individually and collectively, it concludes he has not met his burden, and it GRANTS Defendants' motion for failure to adequately allege scienter.

//

36

**G.     The Court Dismisses the 20(a) Claim, With Leave to Amend.**

In order to state a claim under Section 20(a), a plaintiff must plead "(1) a primary violation of federal securities laws" and "(2) that the defendant exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065.  Because Martinez has not alleged a primary violation of Section 10(b), the control person claims under Section 20(a) fail, but the Court grants leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss with leave to amend in accordance with the rulings in this Order.  If Martinez chooses to amend, the Court encourages him to be circumspect in the statements he seeks to challenge.  In addition, Martinez shall not incorporate earlier paragraphs by reference to explain why a given statement is false or misleading.  Even if that makes an amended complaint lengthier, it will ensure the reader is not required to "figure out exactly what the misleading statements are, and to match the statements up with the reasons why they are false or misleading." *In re Autodesk*, 132 F. Supp. 2d at 841.  Martinez also shall not use emphasized text except in the section of an amended complaint that addresses the allegedly false and misleading statement or statements.  Those statements, and those statements, alone shall be emphasized in bold text and shall be consistent throughout any amended complaint.

If Martinez chooses to amend, he shall file an amended complaint by no later than October 29, 2021.  Defendants shall answer or otherwise respond 21 days after service of the amended complaint.  The Court will set a case management conference once Martinez files an amended complaint.

**IT IS SO ORDERED**.

Dated: October 7, 2021

JEFFREY S. WHITE
United States District Judge