**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (#270796)
LEANNE H. SOLISH (#280297)
CHRISTOPHER R. FALLON (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated,<br><br>                                        Plaintiff,<br><br>vs.<br><br>ADAMAS PHARMACEUTICALS, INC., GREGORY T. WENT, ALFRED G. MERRIWEATHER, AND RICHARD A. KING,<br><br>                                        Defendants. | Case No. 4:19-cv-08051-JSW<br><br>**LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date: March 11, 2022<br>Time: 9:00 a.m.<br>Judge: The Hon. Jeffrey S. White<br>Dept.: Courtroom 5, 2nd Floor |

# TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 1

MEMORANDUM OF LAW IN OPPOSITION................................................................. 1

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 2

III.  THE APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION................................................................................................................ 2

IV.   PLAINTIFF ADEQUATELY ALLEGES FALSITY ......................................... 2

    A.   Standard For Pleading A Materially False Or Misleading Statement..................... 2

    B.   King's 2017 Statements Were Materially Misleading............................................. 3

    C.   Defendants' False And Misleading Statements Regarding Payer Coverage And Reimbursement Following GOCOVRI's Commercial Launch ...................... 4

    D.   King's False And Misleading Statements Regarding Physician Feedback ............ 7

    E.   Defendants' Materially Misleading Statements Regarding GOCOVRI Market Access And Distribution .............................................................................. 9

V.    PLAINTIFF ADEQUATELY ALLEGES SCIENTER....................................... 10

    A.   Plaintiff Has Sufficiently Alleged That Defendants Knew, Or Should Have Known, Information Rendering Their Statements Misleading............................ 10

        1.   Adamas' Pre-launch Market Research, Including The 2017 Payer And Physician Surveys Support An Inference Of Scienter ...................... 10

        2.   Plaintiff Sufficiently Alleges Defendants' Scienter For Their Statements Following GOCOVRI's Launch ............................................ 11

        3.   The Six Former Employees Strengthen The Inference Of Scienter.......... 13

    B.   The Core Operations Inference Strengthens The Inference of Scienter ............... 14

    C.   Holistic Analysis.................................................................................................... 14

VI.   PLAINTIFF STATES A CLAIM FOR SECTION 20(A) CONTROL PERSON LIABILITY............................................................................................ 15

VII.  CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................................14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................................2

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ............................................................................5

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ....................................................................................................2

*Bruce v. Suntech Power Holdings Co. Ltd.*,
   64 F. Supp. 3d 1365 (N.D. Cal. 2014) ......................................................................................2

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ....................................................................................................9

*Costabile v. Natus Med. Inc.*,
   293 F. Supp. 3d 994 (N.D. Cal. 2018) ......................................................................................4

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................................15

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ....................................................................................................2

*In re Acadia Pharm. Inc. Securities Litig.*,
   2020 WL 2838686 (S.D. Cal. June 1, 2020)........................................................................3, 12

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................10

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ....................................................................................................2

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................................15

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................................3, 11

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..........................................................................15

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ...............................................................................6

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..............................................................................7, 8, 14

*In re Scot. Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 ...........................................................................................................13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ............................................................................................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .........................................................................8

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..............................................................................................5

*L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*,
   939 F. Supp. 294 (S.D.N.Y. 1996).....................................................................................4

*Macovski v. Groupon, Inc.*,
   2021 WL 3550287 (N.D. Ill. Aug. 11, 2021) ...................................................................6

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ..............................................................................................5

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ..........................................................................................12

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................................8

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .................................................................................10, 12, 14

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..............................................................................................3

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ..........................................................................................2, 4

*SEC v. Mozilo*,
   2009 WL 3807124 (C.D. Cal. Nov. 3, 2009)......................................................................2

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................15

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ...................................................................................................10

*South Ferry LP No. 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................................11, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................2, 10, 14

**SUMMARY OF ARGUMENT**

The Second Amended Complaint ("SAC") cures the pleading deficiencies identified by the Court in its Order, and its allegations satisfy the pleading requirements of the PSLRA.[1]

Contrary to the Defendants' motion to dismiss (Dkt. No. 85, the "Motion"), Lead Plaintiff Ralph Martinez ("Plaintiff") adequately alleges that Defendants made numerous false and misleading statements centering around Defendants' representations to the market about actual physician and payer feedback, on payers' coverage determinations and reimbursements, on physicians' willingness to prescribe GOCOVRI, and on the overall effectiveness of Adamas' specialty pharmacy and Onboard process. The SAC adds numerous particularized facts showing that Defendants' statements were false and/or misleading when made. Because these statements are current and historical facts, they are not protected under the PSLRA safe harbor and do not constitute inactionable opinions. Moreover, because Defendants' statements discussed core concerns for Adamas and the market, they are not immaterial puffery.

The SAC's new allegations show that Defendants knew payers would require prior authorization and step therapy no matter what price Adamas charged and that many physicians were unwilling to prescribe GOCOVRI. Corroborating statements from six former employees show that Defendants tracked payer coverage determinations and had real-time access to fulfillment data, including reimbursement requirements, and regularly discussed it internally. In response, Adamas changed its sales messaging, sales compensation, physician targeting, and free sample policies. Viewed holistically, and combined with the core operations inference, these allegations give rise to a strong inference of scienter.

Because the SAC alleges predicate §10(b) violations, Plaintiff's §20(a) claim should be sustained.

---

[1] Defendants are Adamas Pharmaceuticals, Inc. ("Adamas" or the "Company"), founder, former CEO and Chairman Gregory T. Went ("Went"), former CFO Alfred G. Merriweather ("Merriweather"), and former COO Richard A. King ("King").

Unless otherwise indicated, all internal alterations, citations and quotations are omitted, "Order" refers to the Court's Order Granting Motion to Dismiss (Dkt. No. 79), citations to the Motion are "Mot. __," and citations to the SAC are "¶__." Terms not otherwise defined have the same meanings as in the SAC.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Has Plaintiff adequately pled that Defendants made false and/or misleading statements or omissions within the meaning of § 10(b) of the Securities Exchange Act and Securities Exchange Commission ("SEC") Rule 10b-5?

2.    Has Plaintiff adequately pled facts sufficient to support a strong inference of Defendants' scienter within the meaning of § 10(b) of the Exchange Act and Rule 10b-5?

3.    Has Plaintiff adequately pled a claim under § 20(a) of the Exchange Act?

## MEMORANDUM OF LAW IN OPPOSITION

## I.    INTRODUCTION

Plaintiff alleges that he and a class of investors were regularly misled about the commercial prospects for GOCOVRI, Adamas' only FDA-approved drug. Throughout the Class Period (August 8, 2017 to March 4, 2019), Defendants repeatedly touted payer and physician support for GOCOVRI, payers' coverage decisions and their speed of reimbursing GOCOVRI prescriptions, and that market access and distribution were seamless and straightforward.

The new allegations of the SAC directly address the deficiencies identified by the Court in its Order. For example, Plaintiff adds new details about Adamas' pre-launch market research, including that in 2017, Adamas had taken a survey of physicians to gauge demand, as well as a survey of payers to understand whether and how GOCOVRI would be covered and at what price point. The physician survey showed that doctors were confused about the differences between GOCOVRI and a widely-used generic alternative, amantadine, and that a segment of doctors were unwilling to switch to GOCOVRI. In July 2017, King and Went received and were presented the payer survey results, which showed that even if GOCOVRI's pricing was in the lowest tier, payers would impose access restrictions, including a requirement that patients had used amantadine.

The SAC also adds new allegations to show that Adamas tracked payer coverage determinations and had real-time access to fulfillment data, including reimbursement requirements, and that the Individual Defendants not only had access to that data, but regularly discussed it internally. The SAC also includes numerous former employee reports that physicians were frustrated with fulfillment delays, including reimbursement hurdles, that patients were experiencing the same

negative side effects caused by amantadine, and, as a result, were deciding to stop prescribing GOCOVRI altogether. These facts render Defendants' Class Period statements materially false and misleading, and, when viewed holistically, give rise to a strong inference of scienter.

## II.    STATEMENT OF FACTS

The Court's familiarity with the facts of the case is presumed. *See* Order at 1-5 (discussing background of case). These facts, including the SAC's new allegations, will be addressed *infra* as appropriate.

## III.   THE APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must … accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007), and "construe them in the light most favorable to the non-moving party," *Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1369-70 (N.D. Cal. 2014). While plaintiffs must meet a heightened pleading standard under Rule 9(b) and the PSLRA, a court should deny a motion to dismiss when the complaint plausibly articulates the circumstances constituting fraud. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.    PLAINTIFF ADEQUATELY ALLEGES FALSITY

### A.     Standard For Pleading A Materially False Or Misleading Statement

A plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was false or misleading. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017). "[A] statement that is literally true can be misleading and thus actionable under the securities laws" if it "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Once defendants choose to tout "positive information to the market," they are "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). "Both the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact." *SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

**B.     King's 2017 Statements Were Materially Misleading**

On August 8, 2017, King stated that "[physicians and payers] don't really see this profile [for GOCOVRI] as really having much to do with the amantadine IR profile." ¶160. The SAC alleges new details to show why this statement was false and misleading. First, by this time, Adamas had taken a quantitative study of physicians and received resulting commentary including that GOCOVRI sounded just like amantadine and physicians were unlikely to switch to GOCOVRI because they were already adjusting the dose of amantadine to get the same results. ¶72. This survey confirmed what Defendants already knew—there would be confusion about GOCOVRI's benefits because it was a reformulated version of amantadine (*id.*; ¶¶46, 73, 81 (head of GOCOVRI clinical trials was "often asked" about the difference between GOCOVRI and amantadine); ¶116 (market research indicated doctors were confused about the differences between these drugs))—and bolsters Dr. Shukla's published opinion in JAMA that the clinical data did not demonstrate GOCOVRI's benefits over amantadine (¶70). Second, Adamas, and specifically King and Went, received results from a payer survey in July 2017 that showed payer support was driven down by GOCOVRI being a reformulation of amantadine IR, and that no matter the price, access restrictions, including prior authorization and step-through of amantadine, would be required. ¶74.

Defendants inexplicably claim this statement was an expression of King's opinion. Mot. at 5-6. But because King was reporting results from Adamas' surveys of physicians and payers (¶160), it is thus a factual statement. *In re Acadia Pharm. Inc. Securities Litig.*, 2020 WL 2838686, at *5 (S.D. Cal. June 1, 2020) (reporting results of clinical trial "is simply not an opinion"). Even if the Court analyzes this statement as an opinion – which it is not – it is actionable because King knew physicians and payers viewed GOCOVRI as similar to amantadine (¶¶69-75). Order at 17 (statement of fact contained within an opinion if materially misleading if the supporting fact supplied by the speaker is untrue).[2]

---

[2] Defendants demand a showing that physicians continued to hold this belief just months after the survey's completion, before any physician could actually prescribe GOCOVRI. Mot. at 6. No such exacting pleading is required. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). Even so, the SAC alleges that

Also on August 8, 2017 King stated "there is no anticipation of requiring step-through of amantadine IR to get to [GOCOVRI]." ¶160. The Court previously found this statement to be forward-looking but granted leave to amend if Plaintiff could allege facts to bring this statement outside the scope of the safe harbor provision. Order at 24-25. The SAC does so. King's statement was made in the context of reporting the results of the payer survey presented to King in July 2017— it was not King's "prediction." *See Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) (although statements "contain[ed] a forward looking component, … [Defendants'] 'expectation' related directly to … existing, present facts."). The July 2017 survey showed that regardless of price, payers would impose access restrictions, including a step through of amantadine. ¶74. These survey results, along with allegations that Adamas had always anticipated a step-through requirement (¶¶74, 75), render King's statement materially false and misleading.

On September 18, 2017 King reported that, based on talks with payers, "payers were willing to support us at … the list price at $28,500 per year[.]" ¶163. It was materially misleading to state payers supported a $28,500 list price when the July 2017 payer survey[3] showed that payer support was driven down due to GOCOVRI being a reformulation of generic amantadine and, regardless of the price, payers would impose access restrictions (¶74). *Arena Pharm.*, 840 F.3d at 706.[4]

### C.     Defendants' False And Misleading Statements Regarding Payer Coverage And Reimbursement Following GOCOVRI's Commercial Launch

In three SEC filings, including Adamas' 2017 10-K and 1Q 2018 10-Q both signed by Went and Merriweather, Adamas stated that "although **no payer has done so to date**, a payer may determine to require patients to use other formulations of amantadine for dyskinesia ... prior to receiving reimbursement for GOCOVRI." ¶¶165, 167, 169. King made similar statements on

_____

physicians continued to hold these same beliefs throughout the Class Period. ¶¶111, 113-16, 124, 129, 131-33, 140-42.

[3] Defendants again imply, without any support, that payers may have changed their mind just two months after the survey results. Mot. at 5. Such an implication should be rejected.

[4] This statement is unlike the challenged statement in *L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*, 939 F. Supp. 294, 296-97 (S.D.N.Y. 1996). While there the challenged statement was defendants' subjective evaluation of a future event that was not alleged to be communicated to the defendants (*id.* at 297), the statement here concerns King reporting to the market the price payers were willing to "support" based off survey results that King received. ¶¶74, 163.

Adamas' May 3, 2018 earnings call. ¶¶185, 187. By the time these statements were made, multiple payers covering millions of Americans had already required some sort of use of amantadine before reimbursing GOCOVRI prescriptions. ¶¶86-87, 98-99; *cf.* ¶92. These allegations are enough to establish falsity. Order at 22-23, 27.

Defendants challenge falsity by claiming the statements warned that a payer may require a physician to first prescribe amantadine IR for dyskinesia. Mot. at 7. This *not* what these statements actually say; rather, they affirmatively stated that no payer had to date required *patients to use* amantadine prior to reimbursement. Defendants' emphasis on dyskinesia is confusing: GOCOVRI was indicated for dyskinesia (¶49) and the SAC alleges that amantadine had been used to treat dyskinesia for decades (¶50) as reflected by payers' actual coverage determinations. Even so, dyskinesia is affirmatively mentioned by more than one payer listed in the chart in ¶86. At bottom, this argument is an improper factual dispute that is inappropriate at this stage. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff."). King's acknowledgement of instances of prior authorization or medical history with amantadine does not dispel the falsity of Defendants' repeated and concurrent assertions that no payers had required use of amantadine prior to reimbursing GOCOVRI.[5]

King also frequently touted the speed of payers' reimbursement (¶¶182-83, 187, 193-94, 196, 206(a)-(c)), as did Went (¶209). King similarly touted that GOCOVRI's differentiated profile and payers' reimbursement decisions demonstrated payers' support of GOCOVRI. ¶¶181, 196, 200, 206(b). These statements created the impression that payers' reimbursement decisions were not an impediment to fulfillment, continued prescriptions, and GOCOVRI's ultimate success, when the opposite was true. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). The Court has already found these types of statements to be materially misleading based on FE statements that reimbursements were slow

---

[5] This attempt to invoke the truth-on-the-market defense "is not available at the motion to dismiss stage." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020).

due to the requirements of prior authorization or step-through of amantadine. Order at 27. Similarly, Adamas' warning that "there may be significant delays in obtaining final coverage and reimbursement decisions for GOCOVRI" in its 2Q and 3Q 2018 10-Qs (¶¶173, 177) are materially misleading as the risks associated with these warnings had already occurred. Order at 23-24.

The SAC again details long reimbursement times due to payer reimbursement requirements and that these long reimbursement times led to lost prescriptions and physicians determining to discontinue prescribing GOCOVRI altogether. *See* ¶¶106-12, 120-25. In response, Adamas actually changed how it compensated sales representatives from the number of enrollments to also include a fulfillment requirement around the time King was making these statements. ¶119. Adamas extended QuickStart to 28 days from 14 days in March 2019 (¶¶141, 150) and, post-Class Period, admitted that improving these operational fulfillment issues was necessary (¶¶151-57). *See, e.g.*, *Macovski v. Groupon, Inc.*, 2021 WL 3550287, at *6 (N.D. Ill. Aug. 11, 2021) (admission of existence of problem at a later date supports an inference that problem was present earlier).

Defendants challenge falsity by pointing to King's occasional acknowledgment of some reimbursement requirements. Mot. at 7. Acknowledging some reimbursement requirements hardly informed investors of the long reimbursement delays, and how these delays negatively affected actual fulfillment and physicians' willingness to continue prescribing GOCOVRI. Nor does one analyst describing step-edits as a favorable landscape counter the materially misleading nature of these statements (*see* Mot. at 7, n.8), particularly when this analyst was unaware of these issues as demonstrated by its later questioning of management's understanding of the physician audience and the payer landscape (¶¶147, 225).

Defendants also repeat that the FE allegations cannot demonstrate falsity (Mot. at 8), despite the Court finding otherwise (Order at 27). Each of the FE accounts – from wide-ranging positions and regions (¶¶41-47) – corroborate each other and tend to show that these incidents were not so "isolated." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 992 (S.D. Ohio 2008) (crediting corroborating witness statements).[6] So do Adamas changing its sales representative compensation

---

[6] The Court concluded that Plaintiff has demonstrated that the FEs would be in a position to know the information reported. Order at 9. The SAC also adds additional details regarding FE6, including

(¶119), narrowing its focus to movement disorder centers, promoting OFF benefits, revising its treatment form (¶¶131-33), and evolving QuickStart into a free trial program (¶233), along with the admission that Adamas needed to "improve our operational effectiveness in the fulfillment process" after speaking to the sales and commercial teams (¶¶152-56). *Contra* Mot. at 8.

Defendants' puffery challenge should likewise again be rejected. *Compare* Dkt. No. 70-45 (challenging speed of fulfillment statements as puffery) *with* Order at 15-16 (rejecting Defendants' puffery arguments as to these statements). Indeed, these statements are not puffery because they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017).

Payers' reimbursement determinations and fulfillment issues were also known or knowable to Defendants. Mot. at 7, 9. King admitted as much during earnings calls (*see* ¶¶97, 100, 104), and the SAC adds allegations regarding Adamas' tracking of payers' coverage determinations through Onboard's fulfillment data (including the rate of fulfillment, time to fulfill, and the reasons why a prescription had not yet been filled) which was provided to all executives, including the Individual Defendants, through monthly reports and instantaneously through Tableau dashboards, as well as through an Excel spreadsheet keeping track of each payer. ¶¶88-90. Both FE4 and FE6, who reported to King or Went during their employment (¶¶44, 47), regularly discussed fulfillment data with King and Went and said there were daily discussions on how to reduce fulfillment time. ¶¶89, 112. The Sales Advisory Board also reported market access issues, including reimbursement issues to executives, including Went, who attended a summer 2018 meeting where solutions to these problems were offered—Went responded that he would considered these suggestions. ¶¶91, 124; *see generally* ¶¶106-12, 119-25.

### D. King's False And Misleading Statements Regarding Physician Feedback

King also touted positive physician and patient feedback, which was key to GOCOVRI's

---

that 80% of FE6's time was spent on GOCOVRI market research from October/November 2016 until November 2017, which decreased to half of FE6's time after that. ¶¶46-47. Defendants challenge FE5's reliability (*see* Mot. at 8-9), however, this inconsistency was due to a transcription error in counsel's drafting of the first amended complaint, which was corrected in the SAC. Counsel apologizes for any confusion caused by this inadvertent error.

growth and success. ¶¶179, 189, 198, 202, 204. Contrary to King's statements, patients were experiencing the same negative side effects as amantadine, causing drop-offs and negatively impacting demand because physicians increasingly viewed GOCOVRI as lacking any benefit over amantadine to justify the high price differential. Moreover, fulfillment delays, including reimbursement hurdles and other operational difficulties through the specialty pharmacy, frustrated physicians to the point of discontinuing to prescribe GOCOVRI altogether. ¶¶97, 106-09, 111-16, 120-24.

Defendants claim that these statements were too immaterial to be actionable. Mot. at 10. But King made these statements in his opening remarks and in response to analyst questions during earnings calls, demonstrating that physicians' opinions were a core concern. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) ("environmentally friendly" statements were not puffery because environmental friendliness was a core aspect of Volkswagen's business and goals). For example, King stated that physicians' "positive reinforcement" was "key to seeing continued and expanded usage by physicians over time" (¶198),[7] and that physicians "become regular and continuous prescribers of GOCOVRI" when asked about the pace of growth of prescriptions per prescriber (¶202). Materiality is also supported by Adamas' precipitous stock drops and accompanying analyst commentary following the revelations that physician support was not so positive (¶¶128-150). *E.g.*, *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock").

King also knew that these statements were untrue. *Quality Sys.*, 865 F.3d at 1143 ("even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."). Well before commercial launch, King knew physicians were skeptical of GOCOVRI's benefits when juxtaposed with its high cost. ¶¶69-73, 273. After launch

---

[7] Plaintiff did not previously challenge this statement. The Court dismissed as puffery, and Plaintiff does not re-challenge, King's preceding sentence – that he was "thrilled with the comments we continue to hear …." *See* Order at 16. Plaintiff concedes that ¶191 is puffery.

the field team reported that: (i) many physicians remained unconvinced by GOCOVRI's clinical data and were unwilling to prescribe it; (ii) physicians whose patients tried GOCOVRI were experiencing tolerability issues and sleep related side effects (the lack of which was GOCOVRI's supposed benefit); and (iii) physicians were frustrated by the additional requirements that came with prescribing GOCOVRI, which had to be completed before a physician could even try GOCOVRI— all of which factored into physicians' decisions to discontinue prescribing GOCOVRI. ¶¶111-16, 119-24, 129, 131-32, 140-42. King repeatedly communicated with physicians (¶¶68, 94, 101, 118, 241) and regularly discussed fulfillment data and issues. ¶¶89, 112. It is inconceivable that King did not know physicians' negative views on GOCOVRI, particularly when he rooted these statements to daily commentary from the field team and doctors. ¶¶189, 198.

For these same reasons Kings' statements are not inactionable opinions. Order at 17 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017)). At least three statements were reports from the field team, physician feedback, and physician prescription frequency, and do not express King's opinions. ¶¶189, 198, 202. And even if they are analyzed as an opinion, the challenged portions are materially misleading statements of fact contained within such supposed opinions. Order at 17.

### E.    Defendants' Materially Misleading Statements Regarding GOCOVRI Market Access And Distribution

On a handful of occasions, King and Went commented that market access and distribution through Adamas' specialty pharmacy and Onboard, which provided reimbursement support for patients and physicians (¶¶61-62), were seamless and straightforward. ¶¶182, 208, 211. Patients and physicians actually found the specialty pharmacy and Onboard to be confusing, cumbersome, and time consuming, leading to fulfillment issues and lost prescriptions, and aggravating physicians' willingness to prescribe GOCOVRI. ¶¶112-13, 122-24, 152-54. This Court has already found these allegations sufficient to show these statements to be misleading. Order at 27. Defendants claim that these statements were immaterial, despite their Class Period emphasis on the success of these programs to Adamas' business. ¶¶61-63, 171, 175. Went and King knew of the operational issues in the fulfillment process through instantaneous access to fulfillment data, monthly reports, field

team reports, and their daily discussions concerning fulfillment issues. ¶¶112, 115, 124, 189, 238-41.[8] Although these statements were not opinions, these allegations show not only that these statements were objectively untrue but also that Went and King did not subjectively believe any opinion that may have been expressed. *Contra* Mot. at 9.

## V.    PLAINTIFF ADEQUATELY ALLEGES SCIENTER

Scienter requires that "the defendant[] made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn*, 856 F.3d 605. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Id.* at 570. A strong inference of scienter arises if a "reasonable person would deem the inference … cogent and at least as compelling as any opposing inference[.]" *Tellabs*, 551 U.S. at 324. Under this test, "the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). In making a scienter determination, "[t]he inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id*. at 324.

### A.    Plaintiff Has Sufficiently Alleged That Defendants Knew, Or Should Have Known, Information Rendering Their Statements Misleading

#### 1.    Adamas' Pre-launch Market Research, Including The 2017 Payer And Physician Surveys Support An Inference Of Scienter

The 2017 payer and physician surveys, and the results reported from those surveys raise a strong inference of scienter. The July 2017 payer survey, which was both circulated and presented to King and Went, showed that payer support for GOCOVRI's price was driven down because GOCOVRI was a reformulation of amantadine, and that regardless of the price point, payers would

---

[8] Adamas' warnings that its business would suffer if distribution of GOCOVRI to patients was inefficient (¶¶171, 175) were misleading as they had already come to fruition. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).

impose the same reimbursement restrictions, including prior reimbursement and step therapy. ¶74; *see also* ¶75 (Went stated that payer requirement of amantadine trial was the "market reality [since] before we launched"). The 2017 physician survey reported physicians' confusion between GOCOVRI and amantadine, and, along with Adamas' market research and the JAMA editorial, showed that many doctors were unwilling to switch to GOCOVRI. ¶¶69-73.

Defendants do not directly challenge Went and King's knowledge of this early market feedback, and indeed, King based his contradictory 2017 statements on these results. ¶¶160, 162. Instead, Defendants demand certain unnecessary details[9] and question how the payer survey could have possibly informed scienter after GOCOVRI's launch. Mot. at 12. These pre-launch warnings, *i.e.*, that regardless of price, payers intended to impose prior authorization and step therapy, and physicians were unwilling to switch to GOCOVRI, put Defendants on notice—Adamas, Went, Merriweather, and King were thus, at minimum, deliberately reckless in making their post-launch payer and physician statements, particularly when Adamas tracked payer reimbursement, fulfillment, and regularly received physician feedback. *South Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.").[10]

### 2. Plaintiff Sufficiently Alleges Defendants' Scienter For Their Statements Following GOCOVRI's Launch

Not only did Adamas' pre-launch research warn of significant risks as to the false and misleading nature of their post-launch statements, Adamas tracked coverage determinations,

---

[9] Certain of these details were actually offered by King. *See* ¶¶76, 85 (listing the number of payers included in Adamas' research).

[10] Adamas' 2017 market research, which was supposed to bring objective facts in defining the market and projected demand for GOCOVRI, also displays Went's scienter. Rather than accept the low projections, Went fired a consultant, only to have a second consultant come up with the same projections. ¶73. This firing exemplifies Went ignoring red flags as to GOCOVRI's market acceptance, and FE6 provided this instance as an example of Went regularly not accepting information FE6 provided to him. Defendants claim there is no basis for FE6's "speculation." Not so. The SAC alleges that: (a) FE6 was working with the fired consultant on these projections; (b) 80% of FE6's time was spent on GOCOVRI market research at that time; and (c) FE6 reported directly to Went around this time, and thereafter to King (¶¶46, 47, 73). FE6 was certainly in a position to possess the information alleged. *In re Daou Sys.*, 411 F.3d at 1015.

prescription fulfillment, and received regular feedback from physicians, displaying that Defendants were, at minimum, deliberately reckless in making their post-launch statements. *Reese*, 747 F.3d at 569 ("An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.").

***Adamas Tracked Payer Coverage Determinations And Fulfillment Issues:*** The Company used an Excel spreadsheet to keep track of each payer, their number of patients, and their fulfillment. ¶90. Shortly after commercial launch in January 2018, all commercial analysts and executives, including the Individual Defendants, received data from Onboard via both monthly fulfillment reports and real-time Tableau dashboards. ¶88. Tableau provided the Individual Defendants with access to data regarding the rate of fulfillment, the time to fulfill, the status of fulfillment, and the reasons why a prescription was not or had not yet been fulfilled, which necessarily would include payers' coverage determinations and reimbursement requirements. *Id.*; ¶112. FE4 and FE6, both who reported directly to King and Went at different times, stated that they regularly discussed this fulfillment data with King and Went, that King and Went discussed this data with each other, and that fulfillment problems were noticed immediately and there were daily discussions on how address the long fulfillment times. ¶¶89, 112.[11] King admitted to knowing that payers were requiring use of amantadine prior to reimbursing GOCOVRI and his attempt to parse-out a "hard" step further supports King's scienter. ¶¶97-99.

***The Field Team Regularly Reported Physicians' Frustrations With GOCOVRI:*** Adamas' field team almost immediately reported physicians' frustrations with GOCOVRI and its side effects, which, combined with long fulfillment times and onerous reimbursement requirements dissuaded physicians from continuing to prescribe GOCOVRI. ¶¶106-16, 120-24. These reports further alerted

---

[11] "[R]el[iance] on the existence of internal reports [that] contain[s] at least some specifics from those reports as well as such facts as may indicate their reliability" supports both falsity and scienter. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (finding that individual defendants' instantaneous access to reports and former employee allegations about company's overall financial health adds to strong inference of scienter); *see also Acadia Pharm.*, 2020 WL 2838686, at *7 (allegations that defendants had access to information and were likely aware of practices alleged to be misleading supports scienter).

King and Went of the issues with reimbursement and fulfillment, in addition to physicians' actual feedback. King admitted to receiving daily feedback from the field team (¶¶189, 191),[12] and the Sales Advisory Board was created for the express purpose of providing feedback on sales and market access issues to executives. ¶91. Went attended at least one Sales Advisory Board meeting in the summer of 2018 where these issues were discussed and received proposed solutions. ¶124; *see also* ¶115.

*Adamas' Internal Changes Support Scienter*: Just months after commercial launch, Went changed the sales message due to physicians' continued confusion about GOCOVRI. ¶116. By summer 2018, payers' coverage denials and lengthy fulfillment times were so pervasive that the sales commission structure was changed to include a fulfillment component because commissions on enrollments alone frequently failed to produce revenue. ¶119. On September 15, 2018, King departed from Adamas for "personal reasons" with just a day's notice. ¶¶119, 127.[13] Went instructed sales representatives to focus on commercial payers who had higher rates of reimbursement, rather than on patients who could most benefit from GOCOVRI. ¶125.

### 3. The Six Former Employees Strengthen The Inference Of Scienter

Each of the FEs, from different positions and in various roles, paint a consistent picture about payers' and physicians' views and responses to GOCOVRI, fulfillment issues due to coverage decisions, the slow rate of reimbursement due to payers' reimbursement requirements, confusion by physicians and patients as to the process, and operational issues with Onboard. ¶¶106-16, 119-25, 238-40; Order at 27. Together, the FE statements establish that the Individual Defendants had access to reports and real-time fulfillment data documenting fulfillment issues, including coverage and reimbursement decisions and times. Each of the FEs had personal knowledge of the pervasive coverage, fulfillment, and physician issues, and FE4 confirmed that Went and King knew of the fulfillment data because FE4 discussed it with them. ¶89; *see also* ¶112 (daily discussions on

---

[12] *See, e.g.*, *South Ferry*, 687 F. Supp. 2d at 1258 (scienter pled where CEO's "statements *themselves* suggest that he had actual knowledge of" WaMu's hedging operations) (emphasis in original).

[13] Although King's resignation on its own is insufficient show scienter (*see* Order at 30), it does add to circumstantial evidence of scienter. *E.g.*, *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007).

addressing fulfillment issues). With the totality of the SAC's other allegations, the CW allegations support a strong inference of scienter. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145 (crediting multiple statements from CWs, including CWs who had personal knowledge of declining sales during the class period based on information provided through Salesforce software, and finding these allegations contributed to a holistic inference of scienter).

### B.    The Core Operations Inference Strengthens The Inference of Scienter

It is well recognized that "the theory that facts critical to a business's core operations ... are known to a company's key officers … can be one relevant part of a complaint that raises a strong inference of scienter." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*20 (N.D. Cal. Nov. 27, 2018); *see also Reese*, 747 F.3d at 569 ("It may ... be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies"). Defendants admitted that Adamas' "success depend[ed] heavily on successful commercialization of GOCOVRI" and GOCOVRI accounted for 99% of Adamas' revenue throughout the Class Period. ¶231; *see also* ¶¶229-35.

Although the Court found this is not a case where the core operations alone would suffice to establish scienter (Order at 27), scienter can be established using the core operations theory under the second and third circumstances outlined by the Ninth Circuit. Order 31. As detailed *supra*, the SAC has added detailed and specific allegations about King and Went's exposure and actual access to the disputed information, including the pre-launch payer and physician surveys and the Individual Defendants' access to monthly fulfillment reports, an Excel spreadsheet keeping track of payers and fulfillment, and real-time Tableau dashboards with fulfillment information (¶¶72-75, 88-91, 115-116, 119, 124-25, 238). And, as explained below, when examined together with all the other allegations, the SAC raises a cogent and compelling inference of scienter.

### C.    Holistic Analysis

*Tellabs* instructs courts to determine if all "facts alleged, taken collectively, give rise to a strong inference of scienter." 551 U.S. at 310. The Ninth Circuit further explained that courts must not "unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012).

When viewed holistically, the SAC raises a cogent and compelling inference that Defendants knew or should have known that their favorable statements to the market concerning payers, physicians, and fulfillment were false and misleading.[14] It may be true that Defendants were genuinely optimistic about GOCOVRI's prospects (Mot. at 15), but this inference is not more compelling than the inference that Defendants' knew or were deliberately reckless in not knowing that material information contrary to their optimistic statements rendered their statements false and misleading—nor does their optimism excuse it. *E.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*25 (S.D.N.Y. Dec. 2, 2013) (crediting inference that defendant "consciously chose to withhold information ... from the public in the hopes that the dispute would be quickly resolved and that investors would be none the wiser").[15]

## VI.    PLAINTIFF STATES A CLAIM FOR SECTION 20(A) CONTROL PERSON LIABILITY

Defendants' sole argument against Section 20(a) control person liability is that Plaintiff failed to plead an underlying primary violation. Mot. at 15 n.18. Because Plaintiff adequately pleads a violation of Section 10(b), his Section 20(a) claim should be sustained.

## VII.    CONCLUSION

Defendants' motion should be denied in its entirety. If the Court grants any portion of the motion, Plaintiff requests leave to amend as amendment would not be futile. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend should be granted with particular liberality in PSLRA cases).

---

[14] *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) (plaintiffs may "bridge the gap" between "a defendant's mere access to information and an inference of knowledge" using a variety of different means, including "a defendant's own public statements," confidential witness reports, or the core operations doctrine).

[15] Motive or stock sales allegations are not necessary to plead scienter and should not weigh against the strong inference of scienter plead here. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (declining to draw negative inference from the absence of stock sales because complaint did not rely on allegations of improper financial motive); *see also id.* at 1122-23 (denying judicial notice of Form 4 showing stock purchases because stock sales were not discussed in complaint and competing negative inferences "must arise from the facts alleged in the complaint.").

Dated: January 12, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/Leanne H. Solish*
Robert V. Prongay
Leanne H. Solish
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com