**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (#270796)
Jospeh D. Cohen (#155601)
Leanne H. Solish (#280297)
Christopher R. Fallon (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*and the Settlement Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ADAMAS PHARMACEUTICALS, INC., *et al.*,<br><br>Defendants. | Case No. 4:19-cv-08051-JSW<br><br>**DECLARATION OF LEANNE H. SOLISH IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**<br><br>Hearing Date: September 27, 2024<br>Time: 9:00 a.m.<br>Location: Courtroom 5, 2nd Floor<br>Judge: Hon. Jeffrey S. White |

DECLARATION OF LEANNE H. SOLISH

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................................ 1

II.    PROSECUTION OF THE ACTION .................................................................................. 3

     A.    Background ............................................................................................................. 3

     B.    Commencement of the Instant Action.................................................................... 3

     C.    Lead Counsel's Investigation, the Amended Complaint And SAC, And Defendants' Motions To Dismiss ............................................................................................... 4

     D.    Discovery Efforts .................................................................................................. 6

     E.    The Mediation Process, Which Included Substantial Briefing, Results In A Settlement............................................................................................................... 7

     F.    Preliminary Approval of the Settlement................................................................ 8

III.   THE RISKS OF CONTINUED LITIGATION .................................................................. 9

     A.    Risks to Proving Liability ................................................................................... 10

     B.    Risk of Proving Loss Causation and Damages ................................................... 11

     C.    Other Risks, Including Trial And Appeals.......................................................... 12

     D.    The Settlement is Reasonable in Light of Potential Recovery in the Action .......... 13

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REGARDING THE NOTICE PROGRAM .................................. 15

V.    OBJECTIONS AND EXCLUSIONS ............................................................................. 18

VI.   ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ........................... 18

VII.  LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ........................................................................................ 21

     A.    The Fee Application ............................................................................................ 21

          1.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action ........................................................ 21

          2.    Standing and Caliber of Opposing Counsel .............................................. 22

          3.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ................................... 23

4.    The Reaction of the Settlement Class to the Fee and Expense Application 24

5.    Lead Plaintiff Ralph Martinez Supports the Fee Memorandum ................. 24

B.    Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable ..... 25

VIII.    CONCLUSION .................................................................................................................. 27

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Ralph Martinez in Support of: (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses |
| 2 | Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 3 | Declaration of Leanne H. Solish, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 4 | Declaration of Danielle S. Myers Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses |
| 5 | Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) |
| 6 | Table of Select Ninth Circuit Cases with 33% and Above Fee Awards |
| 7 | Table of Law Firm Billing Rates |
| 8 | *Eagle Bancorp, Inc. et al.*, No. 1:19-cv-06873-LGS, ECF No. 117 (S.D.N.Y. July 19, 2023) |
| 9 | *Yaron v. Intersect ENT, Inc., et al.*, No. 4:19-cv-02647-JSW, ECF No. 86 (N.D. Cal. April 10, 2023) |
| 10 | *Davis v. Yelp, Inc.* No. 3:18-cv-00400-EMC, ECF No. 216 (N.D. Cal. Aug. 29, 2023) |
| 11 | Doug Greene, *et al.*, *Analysis of Biotech Securities Class Action Motion to Dismiss Results, 2005-2022*, Guest Post In Kevin M. LaCroix's The D&O Diary (July 19, 2022) |
| 12 | *Berry v. Urban Outfitters Wholesale, Inc.*, No. 13-cv-02628, ECF No. 114 (N.D. Cal. Apr. 7, 2016) |
| 13 | *In re Interlink Elec., Inc. Sec. Litig.*, No. 05-cv-08133 AG (SH), ECF No. 165 (C.D. Cal. June 1, 2009) |
| 14 | *Hodges v. Akeena Solar, Inc.*, No. 5:09-cv-02147-JW, ECF No. 167 (N.D. Cal. Dec. 15, 2011) |
| 15 | *In re XL Fleet Corp. Sec. Litig.*, No. 1:21-cv-0200-JLR, ECF No. 198 (S.D.N.Y. April 30, 2024) |

I, Leanne H. Solish, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

**I.    INTRODUCTION**

1.    I am an attorney admitted to practice before this Court.  I am a partner with the law firm of Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel"), Court-appointed lead counsel for lead plaintiff Ralph Martinez ("Lead Plaintiff") in the above-captioned action (the "Action").[1]  I oversaw or conducted the day-to-day activities in the Action.  I am familiar with the proceedings in this litigation, and I have personal knowledge of the matters set forth herein based upon my supervision and participation in all aspects of the Action.

2.    I respectfully submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $4,650,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated April 2, 2024 (the "Preliminary Approval Order") (ECF No. 128), as well as of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (the "Final Approval Motion").

3.    I also respectfully submit this declaration in support of Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for: (a) an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (*i.e.*, $1,550,000, plus interest earned at the same rate as the Settlement Fund); and (b) reimbursement of Litigation Expenses in the total amount of $89,750.65, which includes Plaintiff's Counsel's out-of-pocket litigation costs of $79,750.65, and an award of $10,000 to Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for his costs, including for time spent, incurred in connection with his representation of the Settlement Class (the "Fee and Expense Application").

4.    This is a securities class action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  The

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated February 29, 2024 (the "Stipulation").  ECF No. 124-1.

[2] Plaintiff's Counsel are Lead Counsel, and Robbins Geller Rudman & Dowd LLP ("RGRD").

Settlement follows more than four years of litigation, during which the Court dismissed all defendants and claims, except for a claim against defendant Richard A. King ("Defendant" or "King") based on a single alleged material misstatement regarding payer reimbursement related to Adamas Pharmaceuticals, Inc.'s ("Adamas" or the "Company") drug, GOCOVRI.

5.     The proposed Settlement provides for the resolution of all claims in the Action in exchange for a non-reversionary, all cash payment of $4,650,000.  As detailed below, Lead Counsel believes that the Settlement represents an extremely favorable result for the Settlement Class, especially when juxtaposed against the significant risks of continued litigation.  Indeed, the Defendant had advanced, and would continue to advance, serious arguments with respect to liability, loss causation and damages.  If any of these arguments were accepted, Lead Plaintiff's potential recovery would have been substantially reduced, if not completely eliminated.

6.     Moreover, the Settlement is the product of a mediator's proposal, by a well-respected mediator of securities class actions, following, *inter alia*: (a) a comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class; (b) extensive briefing of, and two decisions on, defendants' motions to dismiss; and (c) a full-day mediation session during which experienced counsel forcefully advocated on behalf of their respective clients.  Because the Settlement is substantively fair, and was achieved through a procedural fair process, Lead Counsel believes that it is in the best interest of the Settlement Class and should be approved.

7.     In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's consulting damages expert.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Courts—including this one—have routinely approved similar allocation plans, and Lead Counsel believes that the proposed plan should likewise

be approved.

8.    Lead Counsel, on behalf of all Plaintiff's Counsel, also seeks approval of the Fee and Expense Application.  As detailed in the concurrently filed memorandum of law in support thereof, as well as Exhibit 6 hereto, the requested 33⅓% fee is well within the range of percentage awards granted by courts in this Circuit in comparable complex litigation, and is a fair and reasonable amount in light of the work performed and the result obtained.  Moreover, the out-of-pocket expenses incurred were all reasonable and necessary for the prosecution of the Action and are considerably less than the maximum figure proposed in the Postcard Notice sent to the Settlement Class.

9.    For these reasons and those discussed below, Lead Counsel respectfully submits that the $4.65 million Settlement is an excellent result for the Settlement Class and should be approved as fair, reasonable, adequate, that the proposed Plan of Allocation is equitable and just, and that the requested attorneys' fees of 33⅓% of the $4.65 million Settlement Fund and reimbursement of Litigation Expenses should be awarded in full.

## II.    PROSECUTION OF THE ACTION

### A.    Background

10.    Adamas[3] was a pharmaceutical company that developed the drug GOCOVRI as a treatment for levodopa-induced-dyskinesia ("LID").[4]  GOCOVRI, Adamas's only FDA-approved drug, was the Company's primary source of revenue during the Settlement Class Period and Adamas's success hinged on this drug's commercial success.  Lead Plaintiff alleged that during the Settlement Class Period, he and the other Settlement Class Members were misled about the commercial prospects for GOCOVRI, and were damaged as a result thereof.

### B.    Commencement of the Instant Action

11.    On December 10, 2019, a class action complaint was filed in the United States

---

[3] Adamas was acquired by Supernus Pharmaceuticals, Inc. on November 24, 2021.

[4] Levodopa therapy is a treatment for Parkinson's which replaces lost dopamine in patients that has a side effect of dyskinesia – involuntary and uncontrolled movements that occur when there is too much dopamine. *Id*.

3
DECLARATION OF LEANNE H. SOLISH

District Court for the Northern District of California (the "Court"), styled *Ali Zaidi v. Adamas Pharmaceuticals Inc., et al.*, 4:19-cv-08051-JSW. ECF No. 1. The complaint alleged violations of the Exchange Act against defendants Adamas, Gregory T. Went ("Went"), and Alfred G. Merriweather ("Merriweather").

12.    On February 10, 2020, Ralph Martinez and five other movants filed motions pursuant to the PSLRA to be appointed lead plaintiff in the Action. ECF Nos. 14, 19, 24, 28, 32, 42.

13.    On March 3, 2020, the Court appointed Ralph Martinez to serve as lead plaintiff, and approved his selection of GPM to serve as lead counsel. ECF No. 56.

**C.    Lead Counsel's Investigation, the Amended Complaint And SAC, And Defendants' Motions To Dismiss**

14.    Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into the defendants' allegedly wrongful acts, which included, among other things: (a) reviewing and analyzing (i) Adamas's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports, research reports prepared by doctors and securities and financial analysts, and news articles concerning Adamas, GOCOVRI, OSMOLEX, Parkinson's, LID, and amantadine, (iii) Adamas's investor call transcripts, press releases, and other public statements made by the defendants prior to, during, and after the Settlement Class Period, and (iv) other publicly available material related to Adamas, including certain payer formularies and other documents concerning payer coverage decisions with respect to GOCOVRI, OSMOLEX, and amantadine; and (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information. Lead Counsel also consulted with a damages and loss causation expert.

15.    On May 15, 2020, Lead Plaintiff filed and served his 106-page (396-paragraph) Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"). ECF No. 60. The Amended Complaint asserted claims against King, and subsequently dismissed defendants Adamas, Went, Merriweather, Rajiv Patni ("Patni"), and Vijay Shreedhar ("Shreedhar"). Among other things, the Amended Complaint alleged that defendants

made materially false and misleading statements and omissions, in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, about: (a) whether payers, physicians, and patients understood the value proposition of GOCOVRI, and differentiated it from the generic amantadine IR; (b) payer reimbursement for GOCOVRI, including step-therapy requirements; (c) the ease of distributing GOCOVRI through Onboard, a specialty pharmacy; (d) the impact that the high cost, lack of free samples, and low levels of reimbursement for GOCOVRI were having on demand; (e) the impact payer reimbursement requirements and Onboard were having on fulfillment; and (f) the market opportunity for GOCOVRI as treatment for multiple sclerosis walking impairment.  Lead Plaintiff further alleged that the prices of Adamas's publicly traded securities were artificially inflated as a result of the defendants' allegedly false and misleading statements and that the price of Adamas's common stock declined when the truth was revealed.  Lead Plaintiff asserted these allegations on behalf of himself and a putative class of Adamas shareholders who, between August 8, 2017 through August 8, 2019, inclusive, purchased or otherwise acquired the publicly traded common stock of Adamas.  *Id.*

16.     On July 14, 2020, defendants moved to dismiss the Amended Complaint.  ECF No. 70.  Lead Plaintiff filed his opposition to the motion to dismiss on August 28, 2020.  ECF No. 72.  On September 28, 2020, defendants filed a brief in reply in support of their motion to dismiss the Amended Complaint.  ECF No. 76.

17.     The Court granted defendants' motion to dismiss the Amended Complaint with leave to amend certain allegations on October 8, 2021.  ECF No. 79.

18.     Following the Court's dismissal of the Amended Complaint, Lead Counsel continued its investigation into Adamas and the allegedly false and misleading statements and omissions.  This continued investigation included many additional interviews with former employees, as well as analysis into ways of addressing the pleading deficiencies identified by the Court.

19.     On November 5, 2021, Lead Plaintiff filed his 96-page (274-paragraph) Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC"), which asserted claims under the Exchange Act against Defendant, Adamas, Went and Merriweather.  ECF No. 82.  The SAC narrowed the categories of alleged misleading statements and omissions,

narrowed the class period from August 8, 2017 through March 4, 2019, and did not name Patni or Shreedhar as defendants. *Id.*

20.   On December 10, 2021, defendants moved to dismiss the SAC. ECF No. 85. On January 12, 2022, Lead Plaintiff filed his opposition to Defendants' motion to dismiss. ECF No. 88. On February 2, 2022, defendants filed a reply in support of the motion to dismiss the SAC. ECF No. 90.

21.   On January 13, 2023, the Court granted in part, and denied in part, defendants' motion to dismiss the SAC. The Court sustained Lead Plaintiff's claim against Defendant for a statement he made on August 8, 2017, asserting that Adamas did not anticipate a step-through of amantadine IR before payers would approve GOCOVRI, but dismissed Lead Plaintiff's claims against defendants Adamas, Went, and Merriweather. The Court also granted Lead Plaintiff leave to amend the SAC based on the deficiencies in pleading scienter as explained in the Court's Order. ECF No. 94; *Zaidi v. Adamas Pharmaceuticals, Inc., et al.*, 650 F. Supp. 3d 848 (N.D. Cal. 2023).

22.   Following the January 13, 2023 order, Lead Counsel continued to investigate Lead Plaintiff's allegations and worked with their investigator to locate and interview additional former Adamas employees. On February 27, 2023, Lead Plaintiff filed a notice informing the Court and defendants that he did not intend to amend his complaint at this time, and that the SAC would remain the operative pleading. ECF No. 97.

23.   On March 29, 2023, the Court entered an order dismissing Lead Plaintiff's Section 20(a) of the Exchange Act claim against Defendant based on the Court's January 13, 2023 Order on the motion to dismiss the SAC. ECF No. 103.

24.   On April 28, 2023, Defendant filed and served an answer to the SAC. ECF No. 108. In addition to denying the allegations in the SAC, the Defendant asserted eighteen affirmative defenses.

**D.   Discovery Efforts**

25.   With the PSLRA's automatic discovery stay having been lifted following the Court's partial denial of the motion to dismiss the SAC, discovery began. On March 8, 2023, Lead Counsel and Defendant's Counsel met and conferred pursuant to Rule 26(f), pursuant to which the Parties

thereafter filed a joint case management statement on March 24, 2023.  ECF No. 98.  On March 29, 2023, the Court vacated the initial case management conference and entered the Trial Scheduling Order.  ECF No. 102.

26.     On April 7, 2023, as required under the local rules, the Parties filed a stipulation and ADR certification in which they agreed to privately mediate with Robert A. Meyer, Esq. of JAMS, or a similar private mediation provider on or before October 4, 2023.  ECF No. 104.  The Court approved the proposed schedule for mediation the same day.  ECF No. 105.

27.     The Parties exchanged initial disclosures on May 12, 2023.  Lead Plaintiff served his first set of document requests on Defendant on May 19, 2023, to which Defendant responded on June 20, 2023.  Lead Plaintiff also served a third-party subpoena *duces tecum* on former defendant Adamas, to which Adamas responded on July 24, 2023.  The Parties filed a stipulated protocol for electronically stored information and a proposed protective order on June 27, 2023 (ECF Nos. 109 & 110), both of which the Court approved on June 28, 2023.  ECF Nos. 111 & 112.

**E.     The Mediation Process, Which Included Substantial Briefing, Results In A Settlement**

28.     During this time, the Parties, under the auspices of Mr. Meyer, began discussions to resolve the Action.  In an effort to preserve the Parties' resources, and in the interest of judicial economy, on July 28, 2023, the Parties entered a stipulation and proposed order to stay the Action until October 4, 2023, and to move all remaining dates in the Trial Scheduling Order.  ECF No. 113.  The Court entered the order the same day.  ECF No. 114.

29.     On July 31, 2023, Lead Counsel notified former defendant Adamas that discovery had been stayed pending an October 2023 mediation, and that if the Parties were unable to reach a settlement Lead Counsel would notify Adamas and arrange to discuss Adamas's responses to the subpoena *duces tecum* at that time.

30.     On September 21, 2023, Lead Counsel and Defendant's Counsel met with Mr. Meyer, a highly experienced mediator of complex cases, who presided over a full-day, virtual mediation between the Parties.  In advance of the mediation session, the Parties exchanged and provided to the mediator detailed mediation statements and exhibits that addressed the issues of

liability, loss causation and damages.

31.    The full-day mediation session began with each of the Parties having full and frank discussions concerning the merits of this Action with Mr. Meyer.  Thereafter, during the negotiation process, the Parties fully vetted the strengths and weaknesses of their respective claims and defenses. The session culminated in a recommendation by Mr. Meyer that the Parties settle the Action for a $4.65 million cash payment to the proposed Settlement Class, in return for a release of the Settlement Class's claims against Defendant (the "Mediator's Proposal").  The Parties accepted the Mediator's Proposal that same day.

32.    Over the course of the next several weeks, the Parties memorialized the Mediator's Proposal in a term sheet (the "Term Sheet"), which was executed on October 27, 2023.  The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendant in the Action in return for a cash payment by or on behalf of Defendant of $4,650,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

33.    On October 31, 2023, the Parties reported to the Court that they reached a tentative class-wide settlement.  *See* ECF No. 115.  That same day, pursuant to the Parties' stipulation, the Court set a briefing schedule for the motion for preliminary approval of the settlement (ECF No. 116), which was extended at the request of the Parties.  ECF No.  119.

**F.    Preliminary Approval of the Settlement**

34.    The Parties thereafter worked diligently to finalize the Settlement, which involved numerous complex terms and other issues that required substantial negotiation among the Parties. The terms of the Settlement are memorialized in the Stipulation dated February 29, 2024.  ECF No. 124-1.

35.    On March 1, 2024, Lead Plaintiff submitted his motion seeking preliminary approval of the Settlement.  ECF Nos. 123-124.

36.    On March 26, 2024, the Court entered an Order requiring the Parties to file a joint statement providing certain additional information about the proposed settlement.  ECF No. 126. On March 29, 2024, the Parties filed a joint statement containing the requested information.  ECF

No. 127.  That same day, Lead Counsel emailed the Supplemental Agreement for the Court's *in camera* review.  *See* ECF 128 at 1 (acknowledging receipt and consideration of the Supplemental Agreement).

37.    On April 2, 2024, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice.  ECF No. 128.  The order preliminarily approved the Settlement, conditionally certified the Settlement Class for settlement purposes only, appointed Lead Plaintiff as Class Representative, appointed Lead Counsel as Class Counsel, approved the proposed procedure to provide notice of the Settlement to potential Settlement Class Members, and set August 30, 2024, as the date for the final-approval hearing.  *Id.*  The Settlement Class is defined as:

> all persons and entities that purchased or otherwise acquired the publicly traded common stock of Adamas, between August 8, 2017 and March 4, 2019, both dates inclusive (the "Settlement Class Period"), and were damaged thereby. Excluded from the Settlement Class are: (a) persons and entities that suffered no compensable losses; (b) all shares of Adamas common stock purchased or acquired directly in Adamas' January 24, 2018 secondary public offering (which stock was issued pursuant to Adamas' November 21, 2016 Registration Statement and January 24, 2018 Prospectus Supplement and all materials incorporated therein) ("Covered Purchases"); and (c)(i) Defendant and Adamas; (ii) any person who served as a partner, control person, officer, and/or director of Adamas during the Settlement Class Period, and members of their Immediate Families (as defined in the Settlement); (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of Adamas; (iv) any entity in which the Defendant or Adamas has or had a controlling interest; (v) any trust of which Defendant is the settler or which is for the benefit of the Defendant and/or member(s) of his Immediate Family; (vi) Defendant's liability insurance carriers; and (vii) the legal representatives, heirs, successors, and assigns of any person or entity excluded under provisions (i) through (vi) hereof. For the avoidance of doubt: (i) "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with Adamas or the Defendant; and (ii) Covered Purchases are excluded from this Settlement. Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court.

38.    On June 25, 2024, the Court entered an Order continuing the date for the final-approval hearing to September 27, 2024.  ECF No. 132.

## III.    THE RISKS OF CONTINUED LITIGATION

39.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary, all cash payment of $4,650,000.  As explained more fully below,

there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation to a potentially litigated verdict, followed by the inevitable appeals. Indeed, this Court had already dismissed the Amended Complaint in its entirety and dismissed all but one of the SAC's alleged false and/or misleading statements or omissions during the Settlement Class Period. Defendant also asserted, or could have asserted, many non-frivolous arguments with respect to liability, loss causation, and damages in this case. These arguments, among many risks, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best interests. At bottom, there was simply no guarantee that Lead Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $4.65 million.

**A.    Risks to Proving Liability**

40.    Lead Plaintiff and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.

41.    Defendant forcefully argued in both motions to dismiss, and undoubtedly would continue to argue at summary judgment and trial, that: (a) Lead Plaintiff would not be able to prove that the sole remaining alleged misstatement was false and/or misleading; (b) the statement was not actionable because it was forward looking and protected by the PSLRA's safe harbor provision; (c) the statement was a materialization of a repeatedly warned of risk; (d) the statement was King's opinion based on his interpretation of data available to him at the time; and (e) the statement was not material because it concerned Defendant's expectations of payers' reimbursement requirements and, at the time, investors knew that GOCOVRI had not been approved by the FDA, and thus, payers had not completed their evaluation.

42.    Even if Lead Plaintiff could demonstrate falsity, Defendant would have continued to contest scienter. Specifically, Defendant would continue to argue that he was simply sharing his honestly held belief about what payer coverage might look like for GOCOVRI should it be approved by the FDA. Additionally, Defendant would continue to argue that there was no evidence of a motive for Defendant to commit securities fraud (*e.g.*, stock trading or incentive-based compensation tied to stock price). As the Court recognized in its second motion to dismiss decision,

defendants' argument against scienter "is reinforced by the lack of any suspicious stock sales, which is not dispositive but does undermine an inference of scienter." *Adamas Pharms.*, 650 F. Supp. 3d at 864.

43.     There was also no assurance that Lead Plaintiff would be able to ascertain evidence and testimony sufficient to prove his allegations, or that such evidence would be accepted by the Court at summary judgment or trial.  The events at issue took place between five and seven years ago.  Memories fade, documents are lost, and Lead Plaintiff would have had to rely on testimony from people who may well have a personal or profession relationship with Defendant to prove his case.  These issues could have seriously affected Lead Plaintiff's ability to successfully prosecute this Action.

44.     Despite believing this Action is meritorious, Lead Plaintiff and Lead Counsel were well aware of the high hurdles they would have to surmount in order to successfully prove Defendant acted with the requisite mental state of mind—*i.e.*, an intent to deceive or extreme recklessness—to ultimately prove Defendant's liability under the federal securities laws.

**B.     Risk of Proving Loss Causation and Damages**

45.     Even assuming that Lead Plaintiff overcame the risks to establishing Defendant's liability, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and class-wide damages.

46.     Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is Lead Plaintiff's burden to prove loss causation and damages.  This would require Lead Plaintiff to proffer expert testimony as to: (a) what the "true value" of Adamas common stock would have been had there been no alleged material misstatement; (b) the amount by which Adamas common stock was artificially inflated by the alleged material misstatement; and (c) the amount of artificial inflation removed by the purported corrective disclosures made on October 5, 2018, November 1, 2018, and March 4, 2019.  Defendant almost certainly would have retained his own damages expert(s) to present conflicting conclusions and theories as to the reasons for the declines in Adamas common stock on the alleged disclosure dates.  For example, Defendant would have argued, *inter alia*, that the remaining statement was fully disclosed in the first alleged disclosure (*i.e.*, the October 5, 2018,

Bank of America report revealing the impact of step therapy requirements on physician interest and demand for GOCOVRI).  Moreover, Defendant would likely argue that the existence of step-therapy requirements was revealed to the market prior to October 5, 2018.  Were either of these arguments to succeed, damages would have been significantly reduced, if not eliminated.

47.     The burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.  Additionally, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  As this Court is no doubt aware, a jury's reaction to complicated expert testimony is highly unpredictable, and there is always the possibility that a jury could be swayed by Defendant's expert(s) and award only a fraction of the damages Lead Plaintiff contended were suffered by the Settlement Class.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.

**C.     Other Risks, Including Trial And Appeals**

48.     In addition, any future recovery would require Lead Plaintiff to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this.  For example, Lead Plaintiff would have to move to certify the class, which, if granted, would likely result in Defendant filing a Rule 23(f) petition for appellate review.  The arguments raised with respect to loss causation and damages could have also posed a substantial risk to class certification as Defendant would argue a lack of price impact.  And, as there was only one plaintiff, if Defendant was able to demonstrate that he was atypical in any way, it could put the entire case at risk.

49.     Lead Plaintiff would also have to complete substantial fact and expert discovery, which would entail, among other things, document production, review and analysis of documents produced by Defendant and third parties, taking and/or defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending Lead Plaintiff's deposition.  The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain.  Furthermore, Lead Plaintiff would have to successfully navigate and prevail against Defendants' anticipated motion(s) for summary judgment, as well as at

DECLARATION OF LEANNE H. SOLISH

trial. And finally, even if Lead Plaintiff prevailed on all of those stages, he would have to succeed on the appeals that would surely follow. This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all. Indeed, even prevailing at trial would not guarantee a recovery larger than the $4,650,000 Settlement.[5]

50.    Lead Counsel know from painful experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured. For instance, Lead Counsel lost a six-week antitrust jury trial in this District after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

51.    Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

**D.    The Settlement is Reasonable in Light of Potential Recovery in the Action**

52.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. *If* Lead Plaintiff had fully prevailed in his claims at both summary judgment and after a jury trial, *if* the Court certified the same class period as the Settlement Class Period, and *if* the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss causation as to each of the three stock price drop dates alleged in this case—*i.e., Lead Plaintiff's best-case scenario*—estimated total *maximum* damages are approximately $164.2 million. Thus, the $4.65 million Settlement Amount represents approximately 2.83% of the total *maximum* damages potentially available in this Action.

53.    However, had this litigation continued, Defendant would have raised serious arguments

---

[5] *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

relating to Plaintiff's loss causation allegations. *See* Sec. III.B, *supra*. If, for example, the Court or jury found that the truth of the remaining alleged statement was fully disclosed on October 5, 2018, recoverable damages would have been an estimated $21.1 million—in which case the Settlement Amount equates to a 22.03% recovery. A recovery in the range of 2.83-22.03% is consistent with, or substantially higher, than those obtained in securities cases with similarly sized damages. *See* Ex. 5 (excerpt from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), at p. 25 (Fig. 21) (median recovery for securities class actions that settled between January 2014 and December 2023 was 2.9% for cases with estimated damages between $100-$199 million and 5.1% for those with estimated damages of $20-$49 million). It is also well-within the range of reasonableness considering this securities litigation has been fully dismissed once, and all but one of the alleged misstatements in the SAC were dismissed a second time.

54. Moreover, the estimated damages for each of these scenarios assumes that Lead Plaintiff is given full credit for each of the respective drops and does not take into account any disaggregation arguments that Defendant may have raised. *See Destefano v. Zynga, Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) ("[L]oss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market …."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by changed economic circumstances, 'changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements.") (quoting *Dura*, 544 U.S. at 343). Even if Lead Plaintiff was able to establish that at least some portion of the stock price drop on each of the alleged corrective disclosure dates were attributable to the fraud, Defendant likely would have raised arguments concerning the release of other, non-fraud related information on those dates, which could have decreased the amount of recoverable damages even further. When viewed in that context, the Settlement amount is even more reasonable.

55. In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendant's arguments, and considered the very real risks presented by the significant hurdles of

class certification, summary judgment, trial and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

56. Lead Counsel's conclusion that the Settlement is fair, reasonable, and adequate is also supported by Lead Plaintiff. *See* Ex. 1, ¶8.

**IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REGARDING THE NOTICE PROGRAM**

57. The Court's Preliminary Approval Order directed that the Postcard Notice be disseminated to the Settlement Class. *See* ECF No. 128. The Preliminary Approval Order also set deadlines for the receipt of objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final fairness hearing date (the "Settlement Hearing"). *Id*. On June 25, 2024, the Court continued the Settlement Hearing from August 30, 2024, to September 27, 2024. ECF No. 132. Because the exclusion and objection deadlines were based on the date of the Settlement Hearing, the adjournment extended the deadlines to opt-out or to object from August 9, 2024, to September 6, 2024. These changes were posted to the case specific settlement website (www.AdamasSecuritiesSettlement.com (the "Settlement Website")). *See* Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections (Ex. 2, "Craig Decl."), at ¶¶12-13.

58. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, to begin mailing and emailing notice of the Settlement and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice and emailing of the Notice and Claim Form, Lead Counsel instructed SCS to post downloadable copies of the Notice and Claim Form on the Settlement Website. Upon request, SCS mailed and/or emailed copies of the Notice and/or Claim Form to Settlement Class Members and their nominees and will continue to do so until the deadline to submit a Claim Form has passed.

59. The Postcard Notice provides a limited description of the Settlement and directs

potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $120,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to his representation of the Settlement Class in an amount not to exceed $10,000. *See* Craig Decl., Ex. C (Notice) at ¶¶5, 72.

60. As in most class actions of this nature, the large majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name" —*i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers. The names and addresses of these beneficial purchasers are known only to the nominees. Thus, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees. *See id.*, ¶4. At the time of the initial mailing, SCS's proprietary master mailing list consisted of 1,107 banks and brokerage companies, as well as 1,328 mutual funds, insurance companies, pension funds, and money managers. *Id.*

61. On April 23, 2024, SCS caused a letter to be sent by First-Class Mail or e-mailed to the 2,435 nominees contained in the SCS master mailing list. *Id.* The letter notified the nominees of the Settlement and requested that, within 7 calendar days from the date of the letter, they either: (a) request from SCS sufficient copies of the Postcard Notice to forward to all such beneficial purchasers/owners and within seven (7) calendar days of receipt of those Postcard Notices forward them to all such beneficial purchasers/owners; (b) request from SCS a link to the Notice and Claim Form and, within seven (7) calendar days of receipt of the link from SCS, email the link to all such beneficial owners for whom valid email addresses are available; or (c) send a list of the names,

mailing addresses and email addresses (to the extent available) of all such beneficial owners to SCS at *Adamas Securities Litigation*, c/o Strategic Claims Services, P.O. Box 230, Suite 205, Media, PA 19063, in which event SCS would promptly mail the Postcard Notice, or email a link to the Notice and Claim Form, to such beneficial owners. *Id.*, ¶4 & Ex. B (nominee letter).

62. As of July 15, 2024, a total of 30,085 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed the link to the Notice and Claim Form. *Id.*, ¶¶5-7 & n.2. This number does not include 147 Postcard Notices that were returned as undeliverable and for which SCS was unable to obtain an updated address.[6]

63. On May 13, 2024, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.*, ¶9 & Ex. D.

64. Lead Counsel also caused SCS to establish the case-specific Settlement Website, which became operational on April 23, 2024, to provide potential Settlement Class Members with information concerning the Settlement. On the Settlement Website, Settlement Class Members can submit a claim online, and download copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and SAC. *Id.*, ¶11.

65. The deadline to submit a valid Claim Form with all required information is August 28, 2024. *See* Ex. 2-C (Notice) at p. 3, 6, 9, 10; Stipulation at ¶25. As of July 15, 2024, SCS has received thirteen (13) Claim Forms. *See* Craig Decl., ¶14. In my experience, as well as SCS's, the vast majority of claimants—including institutional investors—submit their claims on or shortly before the deadline. *Id*.

66. Once SCS has processed all of the Claims it receives, Lead Counsel will move the Court to enter a Class Distribution Order. In conjunction with that motion, Lead Counsel will provide the Court with information concerning all of the Claims received by SCS, and SCS's recommendations regarding the acceptance and rejection of Claims. *See* Stipulation, ¶27.

---

[6] A total of 515 Postcard Notices were returned to SCS as undeliverable. SCS was able to obtain updated addresses and re-mail 368 of these Postcard Notices, leaving a total of 147 Postcard Notices as undeliverable as of July 15, 2024. *Id.*, ¶7 & n.2.

## V.    OBJECTIONS AND EXCLUSIONS

67.    The deadline for Settlement Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, and/or to the Fee and Expense Application is September 6, 2024.  To date, no requests for exclusion have been received.  Craig Decl., ¶12. SCS will file a supplemental affidavit after the deadline addressing whether any requests for exclusion have been received.  To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been entered on this Court's docket, or has otherwise been received by Lead Counsel or SCS.  *See id.*, ¶13.  Lead Counsel will file reply papers by September 20, 2024, that will address any objections that may be received.

## VI.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

68.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $4.65 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiff for his costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information online or postmarked no later than August 28, 2024.  *See* Ex. 2-C (Notice) at p. 3, 6, 9, 10; Stipulation at ¶25.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

69.    The Plan of Allocation is detailed in the long-form Notice.  *See* Ex. 2-C (Notice, pp. 11-15).  The full Notice is posted online at the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violation of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violation of law.  Under the Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on his, her, or its total Recognized Loss Amount

as compared to the total Recognized Loss Amounts of all Authorized Claimants. *See id.*, ¶¶53-59. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.*, ¶53.

70. The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the price of Adamas common stock was artificially inflated during the period between August 8, 2017 and March 4, 2019, due to Defendant's alleged materially false and misleading statement. The Plan of Allocation is based on the premise that the decrease in the price of Adamas common stock following the alleged corrective disclosures that occurred on October 5, 2018, November 2, 2018, and March 5, 2019, may be used to measure the alleged artificial inflation in the price of Adamas common stock prior to these disclosures.

71. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.*, ¶68.

72. An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of Adamas common stock the Claimant purchased, acquired, or sold during the Settlement Class Period, and when that Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Adamas common stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but

did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

73.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶68. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. *Id.* In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.

74.    The Net Settlement Fund in its entirety will be distributed to Authorized Claimants and if any funds remain after the initial distribution (for example, due to uncashed or returned checks), further distributions to Authorized Claimants who would receive at least $10.00 from such a re-distribution will be conducted as long as they are cost effective. *Id*. at ¶69. If Lead Counsel, in consultation with the Claims Administrator, deems a further distribution not cost effective, Lead Counsel proposes the Public Justice Foundation ("Public Justice") as the *cy pres* recipient of any residual funds that may remain. Public Justice is a non-sectarian, not-for-profit organization dedicated to, among other things, investor education and advocacy. This Court and others have previously approved Public Justice as the *cy pres* recipient in securities class actions. *See Stein v. Eagle Bancorp, Inc. et al.*, No. 1:19-cv-06873-LGS, ECF No. 117 (S.D.N.Y. July 19, 2023) (Ex. 8); *Yaron v. Intersect ENT, Inc.*, Case No. 4:19-CV-02647-JSW, ECF No. 86, at ¶8 (N.D. Cal. Apr. 10, 2023) (White, J.) (Ex. 9); *Davis v. Yelp, Inc.* No. 3:18-cv-00400-EMC, ECF No. 216, at ¶8 (N.D. Cal. Aug. 29, 2023) (Chen, J.) (Ex. 10).

75.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Adamas common stock that were attributable to the conduct alleged in the SAC. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

76.     To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VII.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

77.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33⅓% of the Settlement Fund (*i.e.*, $1,550,000 plus interest accrued thereon) on behalf of all Plaintiff's Counsel.  Lead Counsel also request reimbursement in the amount of $79,750.65 for out-of-pocket expenses incurred by Plaintiff's Counsel in connection with the prosecution and resolution of the Action, and reimbursement to Lead Plaintiff in the amount of $10,000 for costs, including lost wages, incurred directly related to his representation of the Settlement Class pursuant to as authorized by the PSLRA (15 U.S.C. § 78u-4(a)(4)).

78.     The legal authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee and Expense Application.  The primary factual bases for the requested fees and expenses are set forth below.

### A.    The Fee Application

#### 1.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

79.     Attached hereto as Exhibits 3 & 4 are declarations from GPM and RGRD in support of an award of attorneys' fees and reimbursement of litigation expenses.  In accordance this District's Procedural Guidance for Class Action Settlements, included within each supporting declaration is a schedule categorizing the hours worked by each attorney or paraprofessional, and the lodestar of each firm from the inception of the case through and including June 18, 2024, a summary of expenses by category, and a firm résumé.  Time expended in preparing the Fee and Expense Application has not been included.  The following is a summary chart of the hours expended and lodestar amounts for the two firms:

| LAW FIRM | LODESTAR |
|---|---|
| GLANCY PRONGAY & MURRAY LLP | $1,601,831.50 |
| ROBBINS GELLER RUDMAN & DOWD LLP | $89,750.50 |
| **TOTAL LODESTAR** | **$1,691,582.00** |

80. As set forth above and in detail in Exhibits 3 & 4, Plaintiff's Counsel have collectively expended a total of 2,090.30 hours in the investigation and prosecution of the Action through and including June 18, 2024. The resulting total lodestar is $1,691,582.00. The requested fee of 33⅓% of the Settlement Fund equals $1,550,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a fractional or negative multiplier of 0.92 to Plaintiff's Counsel's lodestar. Such a multiplier is not only reasonable, but modest, when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

81. As detailed above, throughout this case, Plaintiff's Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by lawyers and other personnel on this case. I personally devoted substantial time to this case, and was personally involved in drafting or reviewing and editing all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiff, communicating with Lead Plaintiff on a regular basis, engaging with counsel for Defendant on a variety of matters, and was intimately involved in Settlement negotiations. Other experienced attorneys at our firms also drafted, reviewed and/or edited pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiff and were involved in Settlement negotiations and other matters. Other attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiff's Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

82. As demonstrated by the firm résumés, attached hereto as Exhibits 3-C and 4-C, Plaintiff's Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation. Indeed, GPM and RGRD have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved in courts throughout the country. I believe Plaintiff's Counsel's experience added valuable leverage in the settlement negotiations.

**2.    Standing and Caliber of Opposing Counsel**

83. The quality of work performed by Plaintiff's Counsel in attaining the Settlement

should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Cooley LLP, a firm with a national reputation for the tenacious defense of class actions and other complex civil matters. In the face of this experienced and formidable opposition, Plaintiff's Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 3.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

84.    This prosecution was undertaken by Plaintiff's Counsel on a fully contingent basis. From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiff's Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

85.    With an average lag time of many years for complex cases like this case to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiff's Counsel received no compensation during more than four years of litigation and incurred $79,750.65 in litigation-related expenses in prosecuting the Action.

86.    Plaintiff's Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiff's Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. And, even when that effort is put forth, sometimes you lose.

87.    Moreover, courts have repeatedly recognized that it is in the public interest to have

experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### 4. The Reaction of the Settlement Class to the Fee and Expense Application

88.    As noted above, as of July 15, 2024, notice has been provided to 30,085 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Craig Decl., ¶7; Exs. 2-A (Postcard Notice), 2-C (Notice). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. Craig Decl., ¶9; Ex. 2-D (confirmations of Summary Notice publication). To date, no objections to the maximum potential attorneys' fees request have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by September 20, 2024.

89.    In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 33⅓%, which equates to a fractional multiplier of 0.92, is fair and reasonable, and is supported by the fee awards courts in this Circuit and others have granted in other comparable cases.

### 5. Lead Plaintiff Ralph Martinez Supports the Fee Memorandum

90.    As set forth in the declaration submitted by Lead Plaintiff, Mr. Martinez concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery

obtained for the Settlement Class, and the risks of the Action. *See* Ex. 1, ¶¶9-10. Mr. Martinez has been intimately involved in this case since his appointment as Lead Plaintiff, and his endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

**B.     Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable**

91.     Plaintiff's Counsel seek a total of $89,750.65 in Litigation Expenses to be paid from the Settlement Fund. This amount includes $79,750.65 in out-of-pocket expenses reasonably and necessarily incurred by Plaintiff's Counsel in connection with commencing, litigating, and settling the claims asserted in the Action, as well as $10,000 for Lead Plaintiff directly related to his representation of the Settlement Class. I respectfully submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

92.     Plaintiff's Counsel are seeking reimbursement of a total of $79,750.65 in out-of-pocket costs and expenses. The following is a combined breakdown by category of all expenses incurred by Plaintiff's Counsel, as taken from Exs. 3-B & 4-B hereto:

| CATEGORY OF EXPENSE: | AMOUNT |
|---|---|
| ATTORNEY SERVICE FEE | $134.30 |
| COURIER AND SPECIAL POSTAGE | $144.85 |
| EXPERTS - ECONOMETRICS (Loss Causation, Damages, Plan of Allocation) | $16,054.00 |
| PRIVATE INVESTIGATOR FEES | $40,161.25 |
| MEDIATOR FEES | $10,475.00 |
| ONLINE LEGAL AND FACTUAL RESEARCH | $11,237.83 |
| PHOTOIMAGING | $20.00 |
| TRAVEL AIRFARE | $798.92 |
| TRAVEL HOTEL | $724.50 |
| GRAND TOTAL | $79,750.65 |

93.     The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $120,000. The total amount requested by Plaintiff's Counsel and Lead Plaintiff, $89,750.65, falls well below the $120,000 cap Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard

Notice and long-form Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in the reply papers.

94. From the beginning of the case, Plaintiff's Counsel were aware that they might never recover any of their expenses. Plaintiff's Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced to prosecute this Action. Accordingly, Plaintiff's Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

95. The largest component of expenses, $40,161.25, or approximately 50.36% of the total expenses, was expended on the retention of a private investigation firm to assist Lead Counsel in their factual investigation into Lead Plaintiff's claims.

96. Another large component of expenses, $16,054.00, or approximately 20.13% of the total expenses, was expended on the retention of experts in the fields of financial analysis, loss causation and damages. The experts were consulted at different points throughout the litigation, including on matters related to the preparation of the amended complaints, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

97. Another large component of expenses, $10,475.00, or approximately 13.13% of the total expenses, of the total expenses, was expended on Lead Counsel's share of mediation fees paid to JAMS for the services of Mr. Meyer.

98. The other Litigation Expenses for which Plaintiff's Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These Litigation Expenses include, among others, costs of on-line legal and factual research, copying costs, and postage and delivery expenses.

99. Finally, Mr. Martinez worked closely with Lead Counsel throughout the pendency of this Action in connection with his service as Lead Plaintiff. For example, Mr. Martinez: (a) collected and produced documents related to his transaction in Adamas common stock to Lead Counsel; (b) moved to be appointed as lead plaintiff in the Action; (c) reviewed all significant pleadings and briefs filed in the Action; (d) regularly communicated with his attorneys via email

and telephone about case developments and litigation strategy; (e) reviewed Court orders and discussed them with his attorneys; (f) communicated with Lead Counsel regarding mediation related topics and made himself available during the mediation and settlement negotiations; (g) evaluated and approved the Settlement Amount; and (h) communicated with counsel regarding the process for finalizing the Settlement. *See* Ex. 1, ¶¶5, 12-13.

100.    In my opinion, the Litigation Expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

## VIII.    CONCLUSION

101.    For all the reasons set forth above, I respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.  I further submit that the requested attorneys' fee in the amount of 33⅓% of the Settlement Amount should be approved as fair and reasonable, and the request for reimbursement of $89,750.65 in Litigation Expenses (which includes $10,000 for Lead Plaintiff's Ralph Martinez costs) should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this, the 30th day of July 2024, at Los Angeles, California.

 *s/ Leanne H. Solish*
Leanne H. Solish

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old.  On July 30, 2024, I served true and correct copies of the foregoing document, by posted the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 30, 2024, at Los Angeles, California.

*s/ Leanne H. Solish*
Leanne H. Solish

DECLARATION OF LEANNE H. SOLISH