**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (#270796)
JOSEPH D. COHEN (#155601)
LEANNE H. SOLISH (#280297)
CHRISTOPHER R. FALLON (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*and the Proposed Settlement Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

ALI ZAIDI, Individually and on Behalf of All Others Similarly Situated,

                            Plaintiff,

vs.

ADAMAS PHARMACEUTICALS, INC., *et al.*,

                            Defendants.

Case No. 4:19-cv-08051-JSW

## DECLARATION OF PAUL MULHOLLAND RESPONDING TO COURT'S CLAIMS ADMINISTRATION QUESTIONS

I, Paul Mulholland, declare as follows:

1.      I am over 21 years of age and am not a party to the above-captioned action (the "Action").[1]  I have personal knowledge of the facts set forth herein and, if called on to do so, I could and would testify competently thereto.

2.      I am a Certified Public Accountant (inactive) and president of Strategic Claims Services ("SCS").  I have over thirty years of experience specializing in litigation support services principally in the area of administration of securities class action settlements.  I have administered over six hundred class action settlements.  I have also testified as an expert witness in securities and other class action matters.

3.      Pursuant to the Court's Order Preliminarily Approving Settlement, Providing for Notice, and Setting Final Fairness Hearing, dated April 2, 2024 ("Preliminary Approval Order"; ECF No. 128), SCS was retained as the Claims Administrator in the Action.  I submit this declaration to address the claims administration questions posed in the Notice of Questions for Hearing issued by the Court on September 24, 2024 (ECF No. 143).

**Question (i):  Why the increase in undeliverable Postcard Notices between the July 15, 2024 declaration of Margery Craig and the September 18, 2024 supplemental declaration of Margery Craig?**

4.      The number of undeliverable Postcard Notices went up between the July 15, 2024 Initial Declaration (515) and the September 18, 2024 Supplemental Declaration (1,758) because undeliverable mail is returned to SCS on a rolling basis.

**Question (i)a.  Is the Court's understanding correct that the claims administrator searched but was unable to obtain new addresses for the 726 returned postcards which were not re-mailed to updated addresses?**

5.      The 726 number is accurate.  There were 691 Postcard Notices with no updated address from skip-tracing, and 35 notices mailed to a new address after skip-tracing were again returned.  The math is as follows:

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated February 29, 2024 (ECF No. 124-1) (the "Stipulation").

1,758 Postcard Notices Undeliverable
46 Forwarding Addresses Received from US Postal Service
1,712 Skip Traced (1,712 + 46 = 1,758)
1,021 Remailed After Skip-Tracing
691 No New Address (1,021+ 691 = 1,712)
35 Returned After Remailing and Skip-Tracing
726 Total Undeliverable (691 + 35 = 726)

**Question (i)b: When were the notices re-mailed to the updated addresses? Did those recipients have the benefit of the opt-out period and time to object?**

6.      The Postcard Notices were re-mailed to updated addresses obtained through SCS's skip-tracing efforts on July 15, 2024, July 18, 2024, August 7, 2024, and August 20, 2024. The recipients had sufficient time to either file an objection or request exclusion. As noted in the Supplemental Mailing Declaration of Margery Craig, because the objection and exclusion deadlines in the Preliminary Approval Order were based on the date of the final Fairness Hearing, when the Court adjourned the Settlement Hearing from August 30, 2024 to September 27, 2024 (ECF No. 132), the deadlines to request exclusion or object were extended from August 9, 2024 to September 6, 2024. *See* ECF No. 139-1, ¶¶8-9. Notice of this change was provided to the Settlement Class Members via the Settlement Website. *See id.*

**Question (ii): Potential class members have submitted a total of 12,139 claims. Of these, 4,143 are considered valid, 7,956 are considered invalid, and 40 are awaiting determination. (Craig Supp. Decl., ¶ 10.) This seems like an unusually high percentage of invalid claims. Was this expected? Can the parties account for this?**

7.      Securities cases vary widely when it comes to valid versus invalid claims. Each security is different in terms of, among other things, trading volume, the timing of trades and percentage of ownership by retail investors or institutions, and cases differ in terms of the length of the class period and the number and timing of the corrective disclosure(s). All of these factors can be relevant to the percentage of valid claims, but because SCS is not privy to the confidential trading information of Settlement Class Members, we have no way knowing the maximum number of potentially valid claims.

8.      Typically, where there is a long or multi-year class period, a high volume of trading relative to shares outstanding, and the first corrective disclosure is later in the class period—all of

3

which was true in this case—there are a lot of invalid claims because there are a large number of purchases and sales prior to a corrective disclosure. These "in and out traders" were not damaged as a proximate result of the alleged fraud because they did not hold the stock over a corrective disclosure, and they are not eligible for compensation under the proposed Plan of Allocation. Any claim filed with respect to such trades would be invalid.

9. In this case: (a) the Settlement Class Period is between August 8, 2017 and March 4, 2019, inclusive; (b) there were approximately 27 million shares of Adamas common stock outstanding during the Settlement Class Period; and (c) the first corrective disclosure took place on October 5, 2018—approximately 14 months after the beginning of the Settlement Class Period. Between August 8, 2017 (the start of the Settlement Class Period) and October 4, 2018 (the day before the first correct disclosure), approximately 258,992,232 shares of Adamas common stock were traded. This is nearly ten (10) times the number of shares outstanding. To the extent the shares were purchased and sold within this timeframe, they would not be eligible to participate in the Settlement, even if they incurred a trading loss. People who suffer trading losses often file claims even though they did not hold the security over a corrective disclosure, and this can drive up the invalid claims rate.

10. Another factor that can increase the invalid claims rate is the fact that nominees send notice to, or provide addresses to SCS for, all persons and entities on whose behalf they purchased shares during the Settlement Class Period. Nominees do not try to discern whether or not a shareholder is eligible to receive a payment in the case. Thus, notice is generally overinclusive, and many in and out traders file claims based solely on receipt of the notice. The effect is magnified in cases—like this one—with long class periods and alleged corrective disclosures that are later or at the end of the class period.

11. While 34% is at the lower range of the typical valid claims rate, I do not think it is unusual in this case given the length of the Settlement Class Period, the trading volume for Adamas common stock, and the date of the first alleged corrective disclosure. Indeed, SCS has administered many securities cases with valid claims rate less than 34%, and, to date, the vast

SUPPLEMENTAL DECLARATION OF PAUL MULHOLLAND
Case No. 4:19-cv-08051-JSW

majority of the invalid claims in this Action stem from in and out traders who did not hold the stock through a corrective disclosure.

**Question (iii):  What percentage of valid claims have estimated Distribution Amounts under $10?**

12.    The current percentage of valid claims with estimated distribution amounts under $10 is 63.6%.  If the minimum is lowered to $5, then approximately 51% of valid claims would be less than $5.  These percentages are estimates as we have not completed our cure, rejection, and quality assurance process.

13.    In SCS's experience, a minimum payment is not unusual in claims administration processes and has been used frequently in similar cases that SCS has administered.  SCS recommends the use of a $10.00 minimum payment in this case given the disproportionate administrative expense to the Settlement Fund associated with issuing small checks to Settlement Class Members.  Indeed, payments of less than $10.00 are economically impractical as compared to the cost to print and mail the check, and recipients are less likely to cash their checks than are those claimants who receive larger amounts.  SCS would, therefore, incur additional costs in contacting Settlement Class Members who have not cashed their checks and urging them to do so.  In addition, if the checks remain uncashed, the money must be reallocated to the other Settlement Class Members through second or third distributions, which create additional costs for the settlement fund.

14.    I am informed by Lead Counsel that additional information regarding the propriety of the $10 *de minimis* distribution provision, including supporting case law, may be found in the previously filed Joint Statement Addressing Order Requiring Additional Materials Regarding Motion For Preliminary Approval, ECF No. 127 at pp.1-2.

**Question (v):  Is it still true that no class members have objected to the terms of the settlement agreement and no class members have opted out?**[2]

---

[2] Question (iv) is directed to Robbins Geller Rudman & Dowd LLP.

SUPPLEMENTAL DECLARATION OF PAUL MULHOLLAND
Case No. 4:19-cv-08051-JSW

15. To date, SCS has not received any requests for exclusion. Moreover, SCS has not been notified of any objections or received any misdirected objections.

**Additional Information Regarding Claims Administration Costs**

16. To date, total administration costs have been $83,986.47. SCS is on track to complete the administration within the $140,000 estimate[3] that I provided to the Court in my declaration dated February 28, 2024. *See* ECF No. 124-3, at ¶17.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 25th day of September 2024, in Media, Pennsylvania.

Paul Mulholland

---

[3] Excludes broker charges.

SUPPLEMENTAL DECLARATION OF PAUL MULHOLLAND
Case No. 4:19-cv-08051-JSW